UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

08 CV 5516

————————————————————— x

AMIDA CAPITAL MANAGEMENT II, LLC, :    Civil Action No.

           Plaintiff,    :    COMPLAINT FOR VIOLATIONS OF
                  :    §10(B) OF THE SECURITIES EXCHANGE
                  :    ACT OF 1934 AND COMMON LAW
     vs.    :    CLAIMS

                  :

CERBERUS CAPITAL MANAGEMENT,    :
L.P.,    :
                  :

           Defendant.    :

————————————————————— x    DEMAND FOR JURY TRIAL

JUN 18 2008

U.S.D.C. S.D. N.Y.
CASHIERS

## INTRODUCTION

1.      This action concerns millions of dollars in losses suffered by plaintiff Amida Capital Management II, LLC ("Amida" or the "Plaintiff") when it relied on false representations made by defendant Cerberus Capital Management, L.P. ("Cerberus" or the "Defendant") regarding its intent to complete a $6.6 billion merger with United Rentals, Inc. ("URI").

2.      Cerberus is one of the world's largest private investment firms, with total assets of hundreds of billions of dollars. Cerberus was founded in 1992 by Stephen Feinberg and William Richter. Cerberus's portfolio companies, including an 80 percent ownership in Chrysler Corporation and 51 percent ownership in GMAC Financial Services, generate revenues of more than $60 billion a year and employ about a quarter-million people, including 80,000 at Chrysler alone.

3.      On July 23, 2007, URI announced that it had signed a definitive merger agreement (the "Merger Agreement") pursuant to which affiliates of Cerberus would acquire all of the outstanding shares of URI common stock for $34.50 per share (the "Merger"). The Merger was anticipated to close in November 2007.

4.      Following the announcement of the Merger, Amida began purchasing on a hedged basis URI common stock.

5.      Then, in early November 2007, Amida was invited by investment bank Credit Suisse, on behalf of Cerberus, to attend a roadshow in New York City scheduled for November 5, 2007 (the "Roadshow"). The Roadshow was held for the ostensible purpose of soliciting investment in a $2.25 billion debt offering in connection with the Merger.

6.      During this Roadshow, Cerberus delivered a presentation to the attendees, including Amida, in which Cerberus gave further comfort that the Merger would close as planned. Cerberus never gave any indication that it had no intention of closing at the already agreed-upon price. Furthermore, Cerberus emphasized that it was already actively involved in the management and

- 1 -

operations of URI, including implementation of cost control measures and evaluation of the URI workforce.  More specifically, Cerberus' representative stated:

- With an industry growing at 11% compound annual growth rate, or "CAGR," Cerberus found its investment in URI to be attractive, notwithstanding the current credit environment;

- New management at URI, *under the direction of new owner Cerberus*, had already taken steps to enhance cost savings at URI, transforming Cerberus-controlled URI from a "growth story" to a "cost story," and that Cerberus-controlled URI was now focused on improving its core business, with the benefit of approximately $200 million in immediate cost savings;

- New management at Cerberus-controlled URI had already sold URI's three corporate jets;

- New management at Cerberus-controlled URI would strive to outsource more functions; and

- New management at Cerberus-controlled URI planned on terminating 1,100 employees, resulting in a $55 million cost savings for URI.

7.      At the time of the Roadshow, Cerberus had no present intention of consummating the Merger with URI at the price marketed at the Roadshow.

8.      In fact, Cerberus had expressly and covertly told URI in *August 2007* that it would not complete the Merger with URI unless URI agreed to renegotiate the previously executed Merger Agreement.

9.      Thus, despite the fact that Cerberus knew that it was going to walk away from the Merger, it assured Amida and other Roadshow attendees that the Merger with URI would be consummated in order to ultimately gain maximum leverage over URI.  Just nine days after the initial Roadshow, on November 14, 2007, and just 48 hours prior to the scheduled closing of the Merger, Cerberus backed out of the Merger.  Cerberus did so *in the absence* of any risks associated with the deal such as a material adverse change ("MAC") or any other legal covenants or conditions which URI failed to satisfy.

10.    Relying on Cerberus' false and misleading statements at the Roadshow, Amida maintained its URI position and purchased an additional $14.4 million in URI common stock.

11.    As a direct result of Amida's reliance on Cerberus' Roadshow misrepresentations, Amida suffered economic losses of millions of dollars upon Cerberus' public disclosure of its pre-Roadshow discussions with URI: that it would not complete the Merger at the price agreed to and marketed at the Roadshow. This last minute revelation, which Cerberus leaked to the press ahead of any public disclosure, was intended to – and did – cause a precipitous drop in URI's stock price, because Cerberus wanted to force URI to renegotiate the deal at the expense of those investors, such as Amida, who relied on Cerberus' representations at the Roadshow that it would consummate the deal. In fact, Cerberus had actually threatened URI, inquiring whether URI was "ready for a $20 stock price." On the news that Cerberus was backing out of the Merger, URI posted its biggest stock price drop since it went public in 1997.

### JURISDICTION AND VENUE

12.    The claims asserted herein arise under and pursuant to §10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5. In connection with the acts, conduct and other wrongs complained of herein, Cerberus, directly or indirectly, used the means and instrumentalities of interstate commerce and the United States mail.

13.    Jurisdiction exists pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331. Supplemental jurisdiction exists pursuant to 28 U.S.C. §1367.

14.    Venue is proper pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1391(b). The violations of law complained of herein occurred in substantial part in this District, including the dissemination of materially false and misleading statements. Cerberus is also headquartered in this District, and Plaintiff has its principal offices in this District.

- 3 -

## THE PARTIES

**Plaintiff**

15.    (a)    Plaintiff, Amida Capital Management II, LLC, is an investor with its principal offices in New York, New York.

(b)    Prior to the Roadshow, Plaintiff owned millions of dollars of URI common stock. Based on misrepresentations made by Defendant at the Roadshow, Plaintiff purchased millions of dollars of additional URI common stock. As a direct and proximate result of Cerberus' false statements and omissions of material fact, Amida suffered millions of dollars of economic losses, when – just days after the Roadshow – Cerberus announced that it was terminating the Merger.

**Defendant**

16.    Defendant Cerberus Capital Management, L.P. is a large private equity firm headquartered in New York, New York. Cerberus has hundreds of billions of dollars in total assets, and manages approximately $26 billion in funds and accounts. Cerberus, along with its affiliates, holds controlling or significant minority interests in over 50 companies around the world which collectively generate annual revenues that exceed $120 billion and employ more than 250,000 people.

## SUBSTANTIVE ALLEGATIONS

17.    Cerberus is one of the world's largest private investment firms, with approximately $26 billion under management, including sizeable investments in apparel, paper products, aerospace and defense, financial services, real estate, energy, retail, manufacturing, transportation, and building products.

18.    Since it was established in 1992, Cerberus has completed numerous large and complex acquisitions, including its recent acquisitions in 2007 of 80 percent of Chrysler Corporation

in a $7.4 billion transaction and of Torex Retail in a $398 million transaction.  An investor group led by Cerberus also purchased a 51% stake in GMAC in a $14 billion deal in 2006.

19.     *Business Week* published an article on October 3, 2005 entitled "What's Bigger than Cisco, Coke or McDonald's?," which describes Cerberus as a "Wall Street powerhouse." Despite its size and power, Cerberus enjoys a reputation for being one of the most secretive operations on Wall Street.

20.     On July 22, 2007, affiliates of Cerberus entered into a Merger Agreement with URI, pursuant to which, *inter alia*, Cerberus agreed to purchase all of the common shares of URI for $34.50 per share in cash, for a total transaction value of approximately $6.6 billion.  URI is the largest equipment rental company in the world based on revenues, with an integrated network of approximately 700 rental locations in the U.S., Canada and Mexico.

21.     In a press release dated July 23, 2007, URI announced the Merger and made positive statements about its future prospects under Cerberus management.

22.     In connection with the acquisition, URI filed its Preliminary Proxy Statement with the U.S. Securities and Exchange Commission ("SEC") on August 30, 2007, and filed its Definitive Proxy Statement (the "Proxy") on September 19, 2007, scheduling the special meeting of the URI stockholders to vote on the proposed Merger for October 19, 2007.

23.     In the Proxy, URI extolled the many benefits of the Merger, including, but not limited to: the price per share to be paid in the Merger represented a premium of more than 25 percent to the average closing price of URI stock in the preceding one-year period; the Merger was more favorable for URI shareholders than any other reasonably available strategic alternative; and the execution risks related to achieving URI's long-term financial plan, compared to the risks and benefits of the Merger.

- 5 -

24.    On October 19, 2007, URI issued a press release announcing that the Merger was overwhelmingly approved by its stockholders at a special meeting held earlier that day. Approximately 99.8 percent of the votes cast by URI stockholders were in favor of the Merger. URI also indicated in the press release that the Merger was expected to close in November 2007.

25.    Following the announcement of the Merger, during September and October 2007, Amida purchased a net total of $2.95 million in URI common stock.

26.    Then, in early November 2007, Amida was invited by investment bank Credit Suisse, on behalf of Cerberus, to attend the Roadshow at the W Hotel in New York City scheduled for November 5, 2007. The ostensible purpose of the Roadshow was to induce and solicit individuals and entities to purchase securities (*i.e.*, $2.25 billion of Second Priority Senior Secured Notes due 2014 of United Rentals (North America), Inc.) in connection with the Merger.

27.    Upon information and belief, few (if any) mergers have failed to close following a roadshow for reasons other than a MAC.

28.    At the Roadshow, Cerberus provided to Amida and other attendees an Offering Circular dated November 1, 2007 (the "Offering Circular"). The Offering Circular emphasized the benefits of the Merger and the associated debt offering, including, *inter alia*, the funding of $443 million of a $1.5 billion senior secured revolving credit facility and an equity contribution to URI by Cerberus of over $1.4 billion at the close of the Merger.

29.    During this Roadshow, Carlton D. Donaway ("Donaway"), Senior Advisor – Operations for Cerberus, delivered a presentation to the attendees, including Amida, in which Donaway said that the Merger would close as planned and he further exalted the value of the deal.

30.    More specifically, Cerberus emphasized that the poor condition of the credit and financial markets did not affect Cerberus' optimistic view of the Merger. Cerberus stressed at the

Roadshow that with an industry growing at an 11% compound annual growth rate, or CAGR, Cerberus found its investment in URI to be attractive, notwithstanding the current credit environment.

31.     Indeed, according to Donaway, Cerberus had already asserted significant control over the management and operations of URI. Donaway told attendees at the Roadshow that Cerberus was already actively involved in the day-to-day management of URI. Donaway further stated that new management at URI, under the direction of Cerberus, had already taken steps to enhance cost savings at URI, transforming URI from a "growth story" to a "cost story," and that URI (under Cerberus) was now focused on improving its core business, with the benefit of approximately $200 million in immediate cost savings. In addition, Donaway stated that new management at URI, under the direction of Cerberus, had already sold URI's three corporate jets.

32.     Donaway then emphasized that new management at URI, under the direction of Cerberus, would strive to outsource more functions.

33.     Furthermore, Donaway indicated that Cerberus had already completed an evaluation of the workforce of URI. More specifically, Donaway told Roadshow attendees that new management at URI, under the direction of Cerberus, planned on terminating 1,100 employees, over 700 of them by November 16, 2007, and the remainder of them by March 2008, resulting in a $55 million cost savings for URI.

34.     Cerberus is well aware that roadshows are extremely significant in the world of mergers and acquisitions. As a sophisticated private equity investment firm, Cerberus is aware that investors reasonably rely on information presented at roadshows in making investment decisions. Roadshows, Cerberus knows, send a very clear and strong message to the marketplace and potential investor organizations and, as a result, the mere occurrence has a positive impact on the company's

stock price, especially in situations involving merger arbitrageurs who are investors who bet on whether a merger will be completed. Indeed, Cerberus embarked on a similar roadshow in July 2007 for the purpose of raising $62 billion to finance its purchase of Chrysler.

35.     Amida relied on Cerberus' representations made at the Roadshow. Following the Roadshow presentation, believing URI – under the control of Cerberus – to be an attractive investment and consistent with a merger arbitrage strategy, Amida held onto the millions of dollars in URI common stock that it had acquired prior to the Roadshow, and on various dates from November 5, 2007 through November 14, 2007, Amida purchased an additional $14.4 million of URI common stock.

36.     Unbeknownst to Amida, the statements made by Donaway at the Roadshow on behalf of Cerberus were *categorically and knowingly false* and were intended to superficially drive up the price of URI's stock so that when Cerberus later publicly disclosed its true intention to renegotiate the deal, such action would inflict the greatest damage on URI's stock price.

37.     When Cerberus induced Amida to retain and purchase additional URI securities, Amida was unaware that Cerberus made false representations at the Roadshow and was likewise unaware that Cerberus had no intention of completing the Merger. There is no question that Cerberus knew at the time of the Roadshow that it was not going to consummate the Merger at the marketed, stated and agree-upon price and terms. The evidence from the trial in URI's petition for specific performance against Cerberus affiliates in *United Rentals, Inc. v. RAM Holdings, Inc.*, et al., C.A. No. 3360-CC (Del. Ch.) (the "Specific Performance Action") clearly shows that Cerberus knew *as early as August 2007* that it had no intention to consummate the Merger with URI.

38.     More particularly, on August 29, 2007, Cerberus demanded that URI renegotiate the price of the Merger. Internal URI e-mails dated August 29, 2007 confirm that Cerberus was "going to go back and try to renegotiate [the] purchase price on [the Merger]."

39.     Then, on August 31, 2007, Cerberus sent a letter to URI indicating that it was troubled by URI's refusal to discuss a renegotiation of the Merger Agreement. *See* Cerberus letter to URI dated August 31, 2007, a copy of which is attached hereto and incorporated herein by reference as **Exhibit A**.

40.     In addition, evidence from the trial in the Specific Performance Action revealed that Cerberus quietly advised URI that disclosures in the Proxy were misleading because they failed to disclose the material fact that Cerberus had been threatening to walk away from the Merger unless URI renegotiated the terms of the Merger Agreement.   As a result, and at the very least, Cerberus should either have disclosed this fact to Roadshow attendees or should not have marketed the Roadshow presentation that the Merger was going to close at the initial agreed-upon price. Indeed, Cerberus had an affirmative obligation to make such a material fact public.

41.     In a letter dated September 6, 2007, URI responded to Cerberus that it categorically refused to negotiate any changes to the terms of the Merger Agreement. *See* Letter from URI to Cerberus dated September 6, 2007, a copy of which is attached hereto and incorporated herein by reference as **Exhibit B.**

42.     URI's response and refusal to renegotiate with Cerberus created a stalemate situation that signaled the end of any possibility of a merger between URI and Cerberus.

43.    On November 14, 2007, *only nine days* after assuring investors of the completion and benefits of the Merger and URI debt ownership to attendees at the Roadshow,[1] including Amida, Cerberus refused to close the deal at the agreed-upon price, but instead offered to renegotiate the price or pay URI a termination fee in the amount of $100 million. Cerberus admitted that there were no material adverse changes in URI's business that led to this decision. Indeed, in a letter to its investors dated January 22, 2008, Cerberus stated that it was "allowed . . . to walk away from the deal for any reason and incur a maximum exposure of $100 million, a loss of about ½ of 1 percent for our funds."

44.    Following Cerberus' termination of the Merger Agreement on November 14, 2007, URI issued a press release and filed a Form 8-K with the SEC stating that URI had been informed "that Cerberus is not prepared to proceed with the purchase of United Rentals on the terms set forth in its merger agreement" and that URI was "considering all of its legal remedies in this matter."

45.    URI filed its complaint in the Specific Performance Action on November 19, 2007.

46.    Not surprisingly, as a result of Cerberus' deceptive scheme to artificially affect URI's stock price to further its own ends, upon the announcement of Cerberus' intent to walk away from the Merger, URI's stock price plummeted from a high of $34.30 per share on November 13, 2007, to a low of $21.91 per share on November 14, 2007 – a *36% decrease*.

47.    URI stock has still not recovered, closing at $19.50 on June 9, 2008. The following chart shows the immediate and long-term impact on URI's stock price:

---

[1]    One of the Trial Exhibits in the Specific Performance Action (Exhibit No. 76) was Cerberus' November 5, 2007 Roadshow presentation, which is currently sealed by the Delaware Chancery Court and is, thus, not available to Plaintiff. However, Plaintiff believes that this document – which Plaintiff will obtain from Cerberus in discovery in this action – will confirm the false and misleading statements Cerberus made to Amida at the Roadshow.



48.    As a direct and proximate result of Cerberus' false statements of material fact regarding the Merger, Amida suffered economic losses and damages of millions of dollars when Cerberus ultimately revealed that it had no intention of completing the URI Merger, causing a precipitous drop in URI's stock price.

49.    Indeed, the only reason URI's common stock has even moderately increased recently is because of URI's June 10, 2008 decision to tender to repurchase up to 27.16 million shares of common stock through a "modified Dutch auction" at a price not less than $22.00 and not greater than $25.00, which represents approximately 31.4% of the total number of shares of URI common stock currently outstanding.

## FIRST CLAIM FOR RELIEF

### For Violation of §10(b) of the 1934 Exchange Act and Rule 10b-5

50.    Plaintiff incorporates ¶¶1 – 49 by reference.

51.    Defendant is liable for violations of the anti-fraud provisions of the federal securities laws.

52.    In connection with the purchase and sale of securities, Defendant prepared and disseminated as part of its Prospectus the false statements specified above, which Defendant willfully and wantonly knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. Defendant, in fact, touted itself as the new owners of URI, but omitted to state material facts, including the fact that it indicated as early as August 2007 that it would pull out of the Merger if URI would not renegotiate the terms of the Merger Agreement, and that URI unequivocally replied in writing to Cerberus on September 6, 2007 that it was not willing to renegotiate the terms.

53.    Defendant violated §10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. 240.10b-5, in that Defendant:

(a)    Employed devices, schemes, and artifices to defraud;

(b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; or

(c)    Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff in connection with its purchases and retention of URI common stock.

54.    Although Defendant knew that it did not intend to consummate the Merger as early as August 2007, it made false statements and promises regarding the Merger to potential investors, including Plaintiff, at the Roadshow. Defendant intentionally made deceptive and material misstatements regarding the positive effects of the Merger on the value of URI common stock.

55.    As detailed above, Defendant knew at the time of the Roadshow that the statements it publicly made during the Roadshow to potential investors including Plaintiff were materially false and misleading.

56.    Defendant's material misrepresentations and/or omissions were made knowingly and/or with reckless disregard of the truth and for the purpose and effect of inducing Plaintiff and others to purchase URI stock, as well as to hold onto prior investments in URI stock.

57.    As a large and sophisticated private equity investment firm, Cerberus understands the purpose of roadshows and their significance in mergers and acquisitions. Defendant is aware that attendees reasonably rely on information presented at such roadshows and that the occurrence of the Roadshow alone is a *prima facie* indication and milestone culminating in the deal closing process. Therefore, Cerberus continued the charade of holding and marketing the Roadshow for the solitary purpose of inducing the public to believe that the Merger would close, thus driving up the URI stock price. However, Cerberus' scheme was intended to merely increase its leverage once it made public that it refused to close the Merger at the agreed-upon price.

58.    Plaintiff justifiably and reasonably relied on Defendant's representations at the Roadshow. A rational investor would have no reason to question the veracity of statements made at a roadshow presentation; and Plaintiff in fact had no reason to doubt the truthfulness of Defendant's representations.

59.    Plaintiff would not have held onto the URI stock it had purchased prior to the Roadshow and would not have purchased additional URI stock following the Roadshow at the prices it paid, or at all, if Plaintiff had been aware that Defendant made knowingly false statements of material fact regarding its intent to complete the Merger with URI and with regard to URI's positive future outlook as a result of the Merger or that Cerberus approached URI to renegotiate the deal.

- 13 -

60.    The Merger Agreement had been executed and approved by URI shareholders at the time Defendant made the materially false statements relating to the Merger. The misrepresentations of Defendant, the acquiring company in the Merger, were made in connection with the purchase of the URI stock as the misrepresentations were disseminated publicly in a medium upon which a reasonable investor would rely, and that they were material when disseminated.

61.    In reliance on these misrepresentations by Defendant, Plaintiff held on to its prior investment of millions of dollars and purchased additional millions of dollars of URI common stock.

62.    As a direct and proximate result of Defendant's deceitful and wrongful conduct, Plaintiff suffered damages in connection with its retention and additional purchase of URI common stock. Specifically, Plaintiff suffered economic loss and damages of millions of dollars when eventually Cerberus publicly disclosed that it had no intention of completing the URI Merger, causing a precipitous drop in URI's stock price.

### SECOND CLAIM FOR RELIEF

### For Common Law Fraud

63.    Plaintiff incorporates ¶¶1 – 49 by reference.

64.    Defendant is liable for fraud under New York law. Defendant made material misrepresentations or omissions of fact which were known to be false by Defendant for the purpose of inducing Plaintiff to rely upon them and with an intent to defraud. Plaintiff's reliance was justifiable and reasonable, and Plaintiff suffered injury and damages as a result of Defendant's material misrepresentations or omissions.

65.    During Defendant's solicitation of Plaintiff to invest in the URI debt offering, Defendant misrepresented and omitted a number of material facts regarding the Merger including, *inter alia*, that Defendant intended to terminate the Merger Agreement if URI did not renegotiate the terms of the Merger (as evidenced by the letter dated August 31, 2007 to URI and testimony in the

Specific Performance Action) and that, in writing on September 6, 2007, URI had refused to renegotiate the terms of the Merger Agreement with Defendant. Furthermore, Defendant discussed at the Roadshow the positive effects that would occur when the Merger closed, even though Defendant knew that these statements were false and misleading because it fully intended to pull out of the Merger Agreement at the agreed-upon terms. Defendant aggressively misled Plaintiff and other Roadshow attendees and the public to believe it was going to complete the Merger on the terms specified in the Merger Agreement for Defendant's sole objective to inflate the URI stock price into risk arbitrageurs' hands which would increase Defendant's leverage in forcing URI to accept a lower stock price, as risk arbitrage traders are not long term holders of stock.

66.     As demonstrated by evidence presented in the Specific Performance Action, at the time such statements of material fact were made to Plaintiff regarding the Merger, Defendant knew said statements were false and knew that Plaintiff would rely on these statements and act on them by investing in URI and by holding onto its previous investments in URI common stock.

67.     Defendant made these false statements of material fact regarding URI's future following the Merger with the intent to cause Plaintiff to hold its previously acquired shares and purchase additional shares of URI common stock.

68.     Defendant knew that the aforesaid representations were untrue at the time those representations were made, made such promises with the intent to deceive or with reckless disregard for whether they would deceive, and further made those representations without any intention to perform the promises arising therefrom or made the promises arising therefrom with the positive intention not to perform them, or with reckless disregard for whether they would be performed.

- 15 -

69.     Defendant made false statements at the Roadshow that were intended to solicit investment in URI. The false statements were made for the purpose of inducing Plaintiff and other investors to act in reliance on them.

70.     As a large and sophisticated private equity investment firm, Cerberus understands the purpose of roadshows and their significance in mergers and acquisitions, and is aware that attendees reasonably rely on information presented at such roadshows.

71.     Plaintiff justifiably and reasonably relied on Defendant's representations. Furthermore, Plaintiff had no reason to question the veracity of Defendant's statements.

72.     As a direct and proximate result of Defendant's material misrepresentations omissions of fact, Plaintiff has suffered injury and damages in connection with its additional purchase and retention of URI common stock. Specifically, Plaintiff suffered economic loss and damages of millions of dollars when Cerberus ultimately revealed that it had no intention of completing the URI Merger at the agreed-upon price, resulting in a precipitous drop in URI's stock price.

## THIRD CLAIM FOR RELIEF

### For Fraudulent Inducement

73.     Plaintiff incorporates ¶¶1 – 49 by reference.

74.     Defendant is liable for fraudulent inducement under New York law. Defendant made material representations, which Defendant knew to be false, with the intention of inducing reliance. Plaintiff actually and reasonably relied on Defendant's misrepresentations and these misrepresentations caused Plaintiff to suffer a detriment.

75.     Defendant made false representations of material fact to Plaintiff. Specifically, Defendant made false statements regarding the Merger to Plaintiff and other attendees at the Roadshow. Defendant intentionally made deceptive and material misstatements regarding the

positive effects of the Merger on the value of URI common stock. However, at the time Defendant made its Roadshow presentation to Plaintiff, Defendant knew that it intended to terminate the Merger Agreement.

76.    Defendant knew that the aforesaid representations were untrue at the time those representations were made, made such promises with the intent to deceive and further made those representations without any intention to perform the promises arising therefrom or made the promises arising therefrom with the positive intention not to perform them.

77.    Defendant also knew that if it disclosed its intention not to perform the aforesaid representations, Plaintiff and other investors would not purchase URI stock and would not hold onto previously acquired URI stock.

78.    By means of the aforesaid representations, Defendant intended to induce Plaintiff to hold onto the shares of URI common stock it purchased prior to the Roadshow and to purchase additional shares of URI common stock in reliance on the representations.

79.    Plaintiff justifiably, reasonably and to its detriment relied on Defendant's representations at the Roadshow. As a direct result of those representations, Plaintiff did hold onto its previously acquired shares of URI stock and purchased additional millions of dollars of URI common stock. As a large, sophisticated private investment firm, Defendant understands the purpose and aim of roadshows, and is aware that investors reasonably rely on information presented at such roadshows. It was reasonable for Plaintiff to rely on the statements made by Defendant, as such statements are highly regulated by appropriate governmental authorities and as a reasonable investor would rely on such statements, Plaintiff had no reason to doubt the truthfulness of the statements.

80.    As a direct and proximate result of Defendant's fraudulent inducement, Plaintiff has suffered damages. Specifically, Plaintiff suffered economic loss and damages of millions of dollars when Defendant ultimately revealed that it had no intention of completing the URI Merger, resulting in a precipitous drop in URI's stock price.

### FOURTH CLAIM FOR RELIEF

### For Promissory Estoppel

81.    Plaintiff incorporates ¶¶1 – 49 by reference.

82.    Defendant made a clear and unambiguous promise to Plaintiff and other investors that it intended to consummate the Merger with URI at the agreed upon terms and that the future prospects of URI following the Merger were very favorable. By virtue of the statements made by Defendant's representative, Donaway, coupled with the offer to purchase notes in URI, Defendant made it clear and unambiguous that the Merger would be consummated.

83.    Plaintiff justifiably, reasonably and foreseeably relied on the promise made by Defendant.

84.    As a direct and proximate result of the reasonable, foreseeable and detrimental reliance by Plaintiff on the promise made by Defendant, Plaintiff was injured due to the precipitous decline in the price of the URI common stock following Defendant's revelation that it would not proceed with the Merger. Specifically, Plaintiff suffered economic loss and damages of millions of dollars.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.    Declaring the conduct of Defendant to be in violation of law as set forth herein;

B.     Awarding compensatory money damages in favor of Plaintiff against Defendant for all losses and damages suffered as a result of the acts complained of herein, in an amount to be proven at trial, including pre- and post-judgment interest thereon;

C.     Awarding Plaintiff punitive damages on claims on which such damages are permitted by law;

D.     Awarding Plaintiff its reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

E.     Such other and further relief as the Court may deem just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

DATED: June 18, 2008

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
DAVID A. ROSENFELD


DAVID A. ROSENFELD

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
PAUL GELLER
STUART A. DAVIDSON
DOUGLAS WILENS
CULLIN A. O'BRIEN
ALINA DAVIS
120 East Palmetto Park Road, Ste. 500
Boca Raton, FL 33432
Telephone:  561/750-3000
561/750-3364 (fax)

Attorneys for Plaintiff

- 19 -

# EXHIBIT A

RAM HOLDINGS, INC.

August 31, 2007

CONFIDENTIAL

United Rentals, Inc.
Five Greenwich Office Park
Greenwich, Connecticut 06831
Attention: Roger E. Schwed, General Counsel

Dear Mr. Schwed:

As you know, on August 29, 2007, we communicated to UBS Investment Bank our desire to have a conversation with United Rentals, Inc. ("URI") about the terms of the Agreement and Plan of Merger, dated as of July 22, 2007, among URI, Ram Holdings, Inc. and Ram Acquisition Corp. (the "Merger Agreement"). We are troubled by URI's refusal to discuss the Merger Agreement with us.

Our request for a discussion was prompted by our concerns about recent unanticipated developments in the credit and financial markets. We fully understand the terms and conditions of the Merger Agreement, Guarantee and Stockholders Agreements (each as defined in the Merger Agreement) and related agreements. We believe it is in all of the parties' best interests to discuss the impact of these unanticipated market developments sooner rather than later. We would have expected that URI's Board of Directors would prefer to address these concerns now through a constructive dialogue.

We are also troubled by URI's actions surrounding the filing of the Proxy Statement (as defined in the Merger Agreement). We raised a number of comments on the last draft we received, but URI chose to file the Proxy Statement without addressing our substantive comments or even discussing them with our counsel.

In light of the foregoing concerns, we are renewing our request to discuss the terms of the Merger Agreement. We will look forward to your response.

Very truly yours,

RAM HOLDINGS, INC.

By: _____
        Steven F. Mayer
        President

cc:    Gary Horowitz (Simpson Thacher & Bartlett, LLP)
       Cary Kochman (UBS Investment Bank)
       Peter H. Ehrenberg and Robert G. Minion (Lowenstein Sandler PC)

# EXHIBIT B

Exhibit 99.3

**UNITED RENTALS, INC.**
Five Greenwich Office Park
Greenwich, CT 06831

September 6, 2007

**CONFIDENTIAL**

Mr. Stephen A, Feinberg
Cerberus Capital Management, L.P.
299 Park Avenue
New York, NY 10171

Dear Steve:

We have not met, but with Brad Jacobs stepping down from United Rentals, Inc.'s board I wanted to introduce myself. The board has asked me to oversee the completion of our transaction with Cerberus. In that connection, I wanted to address with you the recent calls and letter that we received from Cerberus's acquisition vehicle, RAM Holdings, Inc., asking for a discussion with URI about the terms of the merger agreement.

As our advisors previously communicated to your colleagues, Steven Mayer and Mike Green, there is no basis for any discussion regarding changes to the merger agreement. The sole basis cited in the letter is your organization's "concerns about recent unanticipated developments in the credit and financial markets." We fail to see how these developments have any relevance to our negotiated transaction, as their impact is expressly carved out of the merger agreement. Section 3.1 of the merger agreement, for example, is clear that "facts, circumstances, events, changes, effects or occurrences ... generally affecting the economy or the financial, debt, credit or securities markets in the United States..." do not excuse RAM's performance under our agreed-upon transaction. Moreover, RAM has committed debt financing which by its terms is not conditioned on the developments referenced in your team's letter.

We also question the letter's characterization of the change in market conditions as "unanticipated." The merger agreement and related debt commitment letters were signed early in the morning on July 23, 2007. A review of the business press at that time (and in the weeks beforehand) shows that changes and further tightening in the credit markets were widely known and, in any event, were discussed at length during the negotiation of our transaction.

Simply put, we are sorely disappointed that your organization is now looking to renegotiate our deal without cause or contractual support. Steve and Mike repeatedly represented at the time of our negotiations that Cerberus prided itself on not renegotiating its deals and should be viewed as being in the same league as other top-tier private equity firms. RAM's seeking any modifications to the merger agreement is wholly inconsistent not only with these representations but also with the good faith discharge of its contractual obligation to use its reasonable best efforts to consummate the merger.

Finally, RAM's complaints about our filing the preliminary proxy statement without calling its counsel to discuss the final few comments sent for our review are not warranted. We provided RAM with a number of drafts of the proxy statement, and we waited to file the proxy statement until we had a chance to carefully consider and discuss with our advisors all of the suggestions RAM submitted.

I hope we can dispense with further communications of this type. We have received enthusiastic feedback about URI from your colleagues on site in Greenwich who are transition

Mr. Stephen A. Feinberg
September 6, 2007
Page 2

planning, which is not surprising given the performance of the business. We should continue to focus the energy of the group on transition cooperation, working together to finalize the materials RAM will need to complete its financing on the best possible terms, and bringing this transaction to a successful closing under the existing contractual terms.

Very truly yours,

L. Keith Wimbush

cc:   Steven Mayer
     *RAM Holdings, Inc.*
    Peter Ehrenberg and Robert Minion
     *Lowenstein Sandler PC*
    Roger Schwed, Esq.
     *United Rentals, Inc.*
    Cary Kochman and Emily McNeal
     *UBS Investment Bank*
    Gary Horowitz and Eric Swedenburg
     *Simpson Thacher & Bartlett LLP*
    Board of Directors
     *United Rentals, Inc.*