UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

AMIDA CAPITAL MANAGEMENT II, LLC,

               Plaintiff,

        -against-

CERBERUS CAPITAL MANAGEMENT, L.P.,

              Defendant.

Case No. 1:08-CV-05516-MGC

---

## <u>DECLARATION OF ROBERT C. HORA</u>

      ROBERT C. HORA, under penalty of perjury, hereby declares pursuant to 28 U.S.C. § 1746 as follows:

      1.      I am an associate with the law firm Milbank, Tweed, Hadley & McCloy LLP, counsel for Defendant Cerberus Capital Management, L.P. ("CCM"). I am a member in good standing of the Bar of the State of New York and am duly admitted to practice before this Court. I make this Declaration in support of CCM's Motion to Dismiss the Complaint.

      2.      Attached hereto as Exhibit A is a true and correct copy of the Form 13-F filed by Plaintiff Amida Capital Management II, LLC ("Amida") with the U.S. Securities and Exchange Commission on or about May 9, 2008.

      3.      Attached hereto as Exhibit B is a true and correct copy of the Preliminary Confidential Offering Circular dated November 1, 2007, referenced in paragraph 28 of the Complaint.

      4.      Attached hereto as Exhibit C is a true and correct copy of an article from the Economist dated September 27, 2007, entitled *A Boom in Bust Ups.*

5.      Attached hereto as Exhibit D are true and correct copies of various news articles issued prior to November 5, 2007 regarding mergers and acquisitions that had failed or were being questioned as a result of turmoil in the credit and financial markets.

6.      Attached hereto as Exhibit E are true and correct copies of news various articles concerning the acquisition of Home Depot's wholesale supply unit by a group of private equity buyers.

7.      Attached hereto as Exhibit F is a true and correct copy of a letter dated August 31, 2007 from Steven F. Mayer of RAM Holdings, Inc. to Roger Schwed of United Rentals, Inc.

8.      Attached hereto as Exhibit G are true and correct copies of portions of the transcript of the trial testimony of Emily McNeal of UBS Securities LLC in the proceedings entitled *United Rentals, Inc. v. RAM Holdings, Inc. and RAM Acquisition Corp.*, Civ. A. No. 3360-C (Del. Ch. 2007) (the "Delaware Action")

9.      Attached hereto as Exhibit H are true and correct copies of portions of the transcript of the trial testimony in the Delaware Action of Stephen M. Feinberg, Chief Executive Officer of CCM.

10.      Attached hereto as Exhibit I is a true and correct copy of a letter dated November 14, 2007 from Steven F. Mayer of RAM Holdings, Inc. to Roger Schwed of United Rentals, Inc.

11.      Attached hereto as Exhibit J are true and correct copies of portions of the transcript of the trial testimony in the Delaware Action of Cary Kochman of UBS Securities LLC.

12.     I declare that the foregoing is true under penalty of perjury.

Executed this 7th day of August 2008.

                    ____/s/ Robert C. Hora____
                    Robert C. Hora

## <u>CERTIFICATE OF SERVICE</u>

I, Robert C. Hora, an attorney duly admitted to practice before the United States District Court for the Southern District of New York, certify that on August 7, 2008, a copy of the foregoing Declaration of Robert C. Hora was filed electronically.  Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's CM/ECF system.

<u>      /s/ Robert C. Hora      </u>
Robert C. Hora
MILBANK, TWEED, HADLEY & MCCLOY LLP
1 Chase Manhattan Plaza
New York, NY  10005-1413
Phone:  (212) 530-5000
Fax:  (212) 530-5219
E-mail:  rhora@milbank.com

Exhibit A

```
<DOCUMENT>
<TYPE>13F-HR
<SEQUENCE>1
<FILENAME>acm13f_hr050908.txt
<DESCRIPTION>FORM 13F-HR - AMIDA CAPITAL MANAGEMENT II, LLC
<TEXT>
```

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

FORM 13F

Report for the Calendar Year or Quarter Ended: March 31, 2008

Check here if Amendment [ ]                  Amendment Number: _____

Institutional Investment Manager Filing this Report:

Name:      Amida Capital Management II, LLC, attn: David Rich

Address:   415 Madison Avenue
           Second Floor
           New York, NY 10017

Form 13F File Number: 028-12997

The institutional  investment  manager filing this report and the person by whom
it is signed hereby  represent  that the person signing the report is authorized
to submit it, that all the  information  contained  herein is true,  correct and
complete,  and  that it is  understood  that  all  required  items,  statements,
schedules, lists, and tables, are considered integral parts of this form.

Person Signing this Report on Behalf of Reporting Manager:

Name:     David Rich

Title:    Managing Member

Phone:    (212) 981-3300

Signature, Place, and Date of Signing:

   /s/ David Rich            New York, New York            May 9, 2008
   ----------------          ------------------            ----------------
     [Signature]              [City, State]                    [Date]


Report Type:

[X]   13F HOLDINGS REPORT

[ ]   13F NOTICE

[ ]   13F COMBINATION REPORT

```
<PAGE>
```

Form 13F SUMMARY PAGE

Report Summary:

Number of Other Included Managers:     None

Form 13F Information Table Entry Total:   345

Form 13F Information Table Value Total:  $468,626 (in thousands)


<PAGE>

<TABLE>
<CAPTION>

|  | Title Of | | Market Value | Shares/ | Sh/ |
| Name of Issuer | Class | CUSIP | (x 1000) | Prn amount | Prn |
| ----------------------- | ----- | ----- | -------- | ---------- | --- |
| <S> | <C> | <C> | <C> | <C> | <C> |
| 3M CO | COM | 88579Y101 | 792 | 10,000 | SH |
| ADVANCED MICRO DEVICES | NOTE 6.000% | 007903AL1 | 5,659 | 9,000,000 | PRN |
| AES CORP | COM | 00130H105 | 834 | 50,000 | SH |
| ALCOA INC | COM | 13817101 | 361 | 10,000 | SH |
| ALCOA INC | COM | 13817101 | 361 | 10,000 | SH |
| ALLEGHENY TECHNOLOGIES | COM | 01741R102 | 143 | 2,000 | SH |
| ALLEGHENY TECHNOLOGIES | COM | 01741R102 | 714 | 10,000 | SH |
| ALLEGHENY TECHNOLOGIES | COM | 01741R102 | 714 | 10,000 | SH |
| ALLEGHENY TECHNOLOGIES | COM | 01741R102 | 714 | 10,000 | SH |
| AMERICAN EXPRESS CO | COM | 25816109 | 1,530 | 35,000 | SH |
| AMERICAN TOWER CORP | CL A | 29912201 | 510 | 13,000 | SH |
| AMERICAN TOWER CORP | CL A | 29912201 | 784 | 20,000 | SH |
| AMERICAN TOWER CORP | CL A | 29912201 | 980 | 25,000 | SH |
| AMERICREDIT CORP | COM | 03060R101 | 205 | 20,400 | SH |
| AMERICREDIT CORP | COM | 03060R101 | 302 | 30,000 | SH |
| AMERICREDIT CORP | NOTE 1.750% | 03060RAM3 | 925 | 1,000,000 | PRN |
| AMERICREDIT CORP | NOTE 2.125% | 03060RAR2 | 2,170 | 4,000,000 | PRN |
| AMGEN INC | NOTE 0.125% | 031162AN0 | 4,531 | 5,000,000 | PRN |
| AMGEN INC | NOTE 0.375% | 031162AQ3 | 2,603 | 3,000,000 | PRN |
| AMR CORP | COM | 1765106 | 271 | 30,000 | SH |
| AMR CORP | COM | 1765106 | 541 | 60,000 | SH |
| AMR CORP | COM | 1765106 | 740 | 82,000 | SH |
| ANHEUSER BUSCH COS INC | COM | 35229103 | 712 | 15,000 | SH |
| ANHEUSER BUSCH COS INC | COM | 35229103 | 759 | 16,000 | SH |
| APOGENT TECHNOLOGIES I | DBCV | 03760AAK7 | 11,705 | 6,000,000 | PRN |
| APOLLO GROUP INC | CL A | 37604105 | 216 | 5,000 | SH |
| APOLLO GROUP INC | CL A | 37604105 | 216 | 5,000 | SH |
| APPLE INC | COM | 37833100 | 1,435 | 10,000 | SH |
| APPLE INC | COM | 37833100 | 1,435 | 10,000 | SH |
| APPLE INC | COM | 37833100 | 1,650 | 11,500 | SH |
| ARVINMERITOR INC | NOTE 4.625% | 043353AF8 | 2,663 | 3,000,000 | PRN |
| AT&T INC | COM | 00206R102 | 287 | 7,500 | SH |
| AT&T INC | COM | 00206R102 | 766 | 20,000 | SH |
| AUTOZONE INC | COM | 53332102 | 774 | 6,800 | SH |
| AUTOZONE INC | COM | 53332102 | 1,138 | 10,000 | SH |

</TABLE>

<PAGE>

```
<TABLE>
<CAPTION>
                             Title Of                  Market Value    Shares/     Sh/
        Name of Issuer        Class        CUSIP        (x 1000)     Prn amount   Prn
------------------------      -----        -----       --------      ----------   ---

<S>                          <C>          <C>          <C>           <C>          <C>

BANK OF AMERICA CORPOR         COM         60505104      1,516          40,000     SH
BEA SYSTEMS INC                COM         73325102      1,532          80,000     SH
BEAR STEARNS COS INC           COM         73902108        105          10,000     SH
BEAR STEARNS COS INC           COM         73902108        210          20,000     SH
BEAR STEARNS COS INC           COM         73902108        262          25,000     SH
BEAZER HOMES USA INC           COM         07556Q105     2,835         300,000     SH
BEAZER HOMES USA INC           COM         07556Q105       756          80,011     SH
BEST BUY INC                   COM         86516101        829          20,000     SH
BEST BUY INC                   COM         86516101      1,037          25,000     SH
BEST BUY INC                   COM         86516101      1,244          30,000     SH
BHP BILLITON LTD           SPONSORED ADR   88606108        790          12,000     SH
BHP BILLITON LTD           SPONSORED ADR   88606108        988          15,000     SH
BLACKSTONE GROUP L P       COM UNIT LTD    09253U108       548          34,500     SH
BLOCKBUSTER INC                CL A        93679108        326         100,000     SH
BOEING CO                      COM         97023105        372           5,000     SH
BOEING CO                      COM         97023105      1,948          26,200     SH
BOEING CO                      COM         97023105      2,231          30,000     SH
BP PLC                     SPONSORED ADR   55622104      1,092          18,000     SH
BP PLC                     SPONSORED ADR   55622104      1,213          20,000     SH
BP PLC                     SPONSORED ADR   55622104      1,213          20,000     SH
BURLINGTON NORTHN
 INC-W/RTS                     COM         12189T104       369           4,000     SH
CAMECO CORP                    COM         13321L108       132           4,000     SH
CAMECO CORP                    COM         13321L108       412          12,500     SH
CAMECO CORP                    COM         13321L108       494          15,000     SH
CATERPILLAR INC DEL            COM         149123101     1,566          20,000     SH
CELESTICA INC              SUB VTG SHS     15101Q108        34           5,000     SH
CENTEX CORP                    COM         152312104       484          20,000     SH
CEPHALON INC                   NOTE        156708AK5     2,337       2,059,000     PRN
CHECK POINT SOFTWARE T         ORD         M22465104       560          25,000     SH
CHECK POINT SOFTWARE T         ORD         M22465104       560          25,000     SH
CHECK POINT SOFTWARE T         ORD         M22465104       560          25,000     SH
CHECK POINT SOFTWARE T         ORD         M22465104       560          25,000     SH
CHESAPEAKE ENERGY CORP         COM         165167107       300           6,500     SH
CHESAPEAKE ENERGY CORP         COM         165167107     1,154          25,000     SH
CHESAPEAKE ENERGY CORP         COM         165167107     1,385          30,000     SH
CHESAPEAKE ENERGY CORP     NOTE 2.750%     165167BW6     3,302       2,500,000     PRN

</TABLE>

<PAGE>

<TABLE>
<CAPTION>
                             Title Of                  Market Value    Shares/     Sh/
        Name of Issuer        Class        CUSIP        (x 1000)     Prn amount   Prn
------------------------      -----        -----       --------      ----------   ---

<S>                          <C>          <C>          <C>           <C>          <C>
```

| Name of Issuer | Title Of Class | CUSIP | Market Value (x 1000) | Shares/ Prn amount | Sh/ Prn |
|---|---|---|---|---|---|
| CHINA PETE & CHEM CORP | SPON ADR H SHS | 16941R108 | 129 | 1,500 | SH |
| CISCO SYS INC | COM | 17275R102 | 366 | 15,200 | SH |
| CISCO SYS INC | COM | 17275R102 | 1,205 | 50,000 | SH |
| CISCO SYSTEMS INC. | COM | 17275R102 | 477 | 19,800 | SH |
| CITIGROUP INC | COM | 172967101 | 214 | 10,000 | SH |
| CITIGROUP INC | COM | 172967101 | 321 | 15,000 | SH |
| CLEAR CHANNEL COMMUNIC | COM | 184502102 | 292 | 10,000 | SH |
| CLEAR CHANNEL COMMUNIC | COM | 184502102 | 292 | 10,000 | SH |
| CLEAR CHANNEL COMMUNIC | COM | 184502102 | 877 | 30,000 | SH |
| CLEAR CHANNEL COMMUNIC | COM | 184502102 | 2,338 | 80,000 | SH |
| CLEAR CHANNEL COMMUNIC | COM | 184502102 | 3,010 | 103,000 | SH |
| CLEARWIRE CORP | CL A | 185385309 | 512 | 34,600 | SH |
| CLEARWIRE CORP | CL A | 185385309 | 3,976 | 268,500 | SH |
| CLEARWIRE CORP | CL A | 185385309 | 178 | 12,000 | SH |
| CLEARWIRE CORP | CL A | 185385309 | 444 | 30,000 | SH |
| CLOROX CO DEL | COM | 189054109 | 1,133 | 20,000 | SH |
| CME GROUP INC | COM | 12572Q105 | 844 | 1,800 | SH |
| CME GROUP INC | COM | 12572Q105 | 938 | 2,000 | SH |
| COEUR D ALENE MINES CO | NOTE 1.250% | 192108AQ1 | 2,181 | 2,500,000 | PRN |
| COEUR D ALENE MINES CO | NOTE 3.250% | 192108AR9 | 1,913 | 2,000,000 | PRN |
| COMCAST CORP NEW | CL A | 20030N101 | 580 | 30,000 | SH |
| COMCAST HOLDINGS CORP | ZONES CV2% PCS | 200300507 | 856 | 25,000 | SH |
| CONOCOPHILLIPS | COM | 20825C104 | 495 | 6,500 | SH |
| CONOCOPHILLIPS | COM | 20825C104 | 1,379 | 18,100 | SH |
| CONOCOPHILLIPS | COM | 20825C104 | 1,524 | 20,000 | SH |
| CONOCOPHILLIPS | COM | 20825C104 | 4,573 | 60,000 | SH |
| CONOCOPHILLIPS | COM | 20825C104 | 7,621 | 100,000 | SH |
| CONSOLIDATED EDISON IN | COM | 209115104 | 397 | 10,000 | SH |
| CONSOLIDATED EDISON IN | COM | 209115104 | 596 | 15,000 | SH |
| CONTINENTAL AIRLS INC | CL B | 210795308 | 64 | 3,350 | SH |
| CONTINENTAL AIRLS INC | CL B | 210795308 | 385 | 20,000 | SH |
| CONTINENTAL AIRLS INC | CL B | 210795308 | 577 | 30,000 | SH |
| CONTINENTAL AIRLS INC | NOTE 5.000% | 210795PJ3 | 9,913 | 8,500,000 | PRN |
| COSTCO WHSL CORP NEW | COM | 22160K105 | 812 | 12,500 | SH |
| COSTCO WHSL CORP NEW | COM | 22160K105 | 1,624 | 25,000 | SH |
| COUNTRYWIDE FINANCIAL | COM | 222372104 | 330 | 60,000 | SH |

```
</TABLE>

<PAGE>

<TABLE>
<CAPTION>
```

| Name of Issuer | Title Of Class | CUSIP | Market Value (x 1000) | Shares/ Prn amount | Sh/ Prn |
|---|---|---|---|---|---|
| ---------------------- | ----- | ----- | -------- | ---------- | --- |
| <S> | <C> | <C> | <C> | <C> | <C> |
| CROCS INC | COM | 227046109 | 87 | 5,000 | SH |
| CROCS INC | COM | 227046109 | 524 | 30,000 | SH |
| CYPRESS SEMICONDUCTOR | NOTE 1.000% | 232806AK5 | 5,931 | 5,000,000 | PRN |
| DELTA AIR LINES INC DE | COM NEW | 247361702 | 421 | 49,000 | SH |
| DELTA AIR LINES INC DE | COM NEW | 247361702 | 516 | 60,000 | SH |
| DENTSPLY INTL INC NEW | COM | 249030107 | 965 | 25,000 | SH |
| DENTSPLY INTL INC NEW | COM | 249030107 | 980 | 25,400 | SH |
| DENTSPLY INTL INC NEW | COM | 249030107 | 1,158 | 30,000 | SH |

```
DENTSPLY INTL INC NEW          COM            249030107    1,788      46,312   SH
DEVRY INC DEL                  COM            251893103      418      10,000   SH
DISNEY WALT CO                 COM DISNEY     254687106      803      25,600   SH
DOVER CORP                     COM            260003108      251       6,000   SH
E M C CORP MASS                COM            268648102      717      50,000   SH
E M C CORP MASS                COM            268648102    3,297     229,900   SH
EAST WEST BANCORP INC          COM            27579R104       50       2,800   SH
ECOLAB INC                     COM            278865100      434      10,000   SH
ECOLAB INC                     COM            278865100    1,520      35,000   SH
ECOLAB INC                     COM            278865100    1,954      45,000   SH
EMBARQ CORP                    COM            29078E105      602      15,000   SH
EXXON MOBIL CORP               COM            30231G102    1,692      20,000   SH
EXXON MOBIL CORP               COM            30231G102    1,269      15,000   SH
FEDERAL NATL MTG ASSN          COM            313586109      263      10,000   SH
FEDEX CORP                     COM            31428X106    1,112      12,000   SH
FEDEX CORP                     COM            31428X106    1,853      20,000   SH
FLUOR CORP NEW                 NOTE 1.500%    343412AA0    9,538   3,770,000   PRN
FORD MOTOR CO DEL              COM PAR $0.01  345370860      515      90,000   SH
FORD MTR CO DEL                COM PAR $0.01  345370860      572     100,000   SH
FORD MTR CO DEL                COM PAR $0.01  345370860      629     110,000   SH
FORD MTR CO DEL                NOTE 4.250%    345370CF5    5,574   6,500,000   PRN
FORTRESS INVT GROUP LLC        CL A           34958B106      123      10,000   SH
FREEPORT-MCMORAN COPPE         COM            35671D857      144       1,500   SH
FREEPORT-MCMORAN COPPE         COM            35671D857      962      10,000   SH
FREEPORT-MCMORAN COPPE         COM            35671D857      962      10,000   SH
FREEPORT-MCMORAN COPPE         COM            35671D857      962      10,000   SH
FREEPORT-MCMORAN COPPE         COM            35671D857      962      10,000   SH
GANNETT INC                    COM            364730101      116       4,000   SH

</TABLE>

<PAGE>

<TABLE>
<CAPTION>
```

| Name of Issuer | Title Of Class | CUSIP | Market Value (x 1000) | Shares/ Prn amount | Sh/ Prn |
|---|---|---|---|---|---|
| ----------------------- | ----- | ----- | -------- | ---------- | --- |
| <S> | <C> | <C> | <C> | <C> | <C> |
| GANNETT INC | COM | 364730101 | 291 | 10,000 | SH |
| GANNETT INC | COM | 364730101 | 581 | 20,000 | SH |
| GARMIN LTD | ORD | G37260109 | 972 | 18,000 | SH |
| GENERAL CABLE CORP DEL | COM | 369300108 | 1,418 | 24,000 | SH |
| GENERAL CABLE CORP DEL | NOTE 0.875% | 369300AD0 | 10,850 | 8,000,000 | PRN |
| GENERAL ELECTRIC CO | COM | 369604103 | 740 | 20,000 | SH |
| GENERAL ELECTRIC CO | COM | 369604103 | 1,851 | 50,000 | SH |
| GENERAL MLS INC | COM | 370334104 | 449 | 7,500 | SH |
| GENERAL MLS INC | COM | 370334104 | 2,395 | 40,000 | SH |
| GENERAL MTRS CORP | COM | 370442105 | 381 | 20,000 | SH |
| GENERAL MTRS CORP | DEB SR CV C 33 | 370442717 | 7,425 | 450,000 | SH |
| GILEAD SCIENCES INC | COM | 375558103 | 247 | 4,800 | SH |
| GILEAD SCIENCES INC | COM | 375558103 | 773 | 15,000 | SH |
| GOLD FIELDS LTD NEW | SPONSORED ADR | 38059T106 | 76 | 5,500 | SH |
| GOLD FIELDS LTD NEW | SPONSORED ADR | 38059T106 | 346 | 25,000 | SH |
| GOLDMAN SACHS GROUP IN | COM | 38141G104 | 2,315 | 14,000 | SH |
| GOLDMAN SACHS GROUP IN | COM | 38141G104 | 2,481 | 15,000 | SH |

```
GOLDMAN SACHS GROUP IN      COM          38141G104   3,308      20,000    SH
GOOGLE INC                  CL A         38259P508   1,233       2,800    SH
GOOGLE INC                  CL A         38259P508   2,202       5,000    SH
GOOGLE INC                  CL A         38259P508   2,202       5,000    SH
GOOGLE INC                  CL A         38259P508   2,202       5,000    SH
GOOGLE INC                  CL A         38259P508   2,202       5,000    SH
GOOGLE INC                  CL A         38259P508   7,554      17,150    SH
HAYES LEMMERZ INTL INC      COM NEW      420781304     140      50,000    SH
HEALTHWAYS INC              COM          422245100   1,414      40,000    SH
HERSHEY CO                  COM          427866108     377      10,000    SH
HERSHEY CO                  COM          427866108     490      13,000    SH
HERSHEY CO                  COM          427866108     753      20,000    SH
HERTZ GLOBAL HOLDINGS       COM          42805T105      60       5,000    SH
HERTZ GLOBAL HOLDINGS       COM          42805T105     241      20,000    SH
HEWITT ASSOCS INC           COM          42822Q100     398      10,000    SH
HEWITT ASSOCS INC           COM          42822Q100     497      12,500    SH
HOVNANIAN ENTERPRISES       CL A         442487203     318      30,000    SH
HOVNANIAN ENTERPRISES       CL A         442487203     398      37,500    SH
HOVNANIAN ENTERPRISES       CL A         442487203   1,060     100,000    SH

</TABLE>

<PAGE>

<TABLE>
<CAPTION>

                            Title Of                Market Value    Shares/     Sh/
       Name of Issuer        Class        CUSIP      (x 1000)    Prn amount    Prn
-----------------------      -----        -----      --------    ----------    ---

<S>                         <C>          <C>         <C>          <C>          <C>

HOVNANIAN ENTERPRISES
  INC-CL A                   CL A         442487203   1,683     158,800    SH
ILLUMINA INC                NOTE 0.625%   452327AB5   9,025   5,000,000    PRN
INFINEON TECHNOLGIES AG
  ADR                       SPONSORED ADR 45662N103      91      13,000    SH
INFINEON TECHNOLOGIES       SPONSORED ADR 45662N103     211      30,000    SH
INFINEON TECHNOLOGIES       SPONSORED ADR 45662N103     211      30,000    SH
INFINEON TECHNOLOGIES       SPONSORED ADR 45662N103     211      30,000    SH
INTERNATIONAL BUSINESS      COM          459200101   1,151      10,000    SH
INVITROGEN CORP             COM          46185R100     342       4,000    SH
INVITROGEN CORP             COM          46185R100     855      10,000    SH
INVITROGEN CORP             COM          46185R100     855      10,000    SH
ISHARES INC                 MSCI BRAZIL  464286400     270       3,500    SH
ITT EDUCATIONAL SERVIC      COM          45068B109     230       5,000    SH
J P MORGAN CHASE & CO       COM          46625H100     301       7,000    SH
JABIL CIRCUIT INC           COM          466313103     473      50,000    SH
JOHNSON & JOHNSON           COM          478160104     973      15,000    SH
JP MORGAN CHASE & CO        COM          46625H100     430      10,000    SH
JP MORGAN CHASE & CO        COM          46625H100     859      20,000    SH
JP MORGAN CHASE & CO        COM          46625H100     859      20,000    SH
JP MORGAN CHASE & CO        COM          46625H100     859      20,000    SH
JP MORGAN CHASE & CO        COM          46625H100   1,074      25,000    SH
JP MORGAN CHASE & CO        COM          46625H100   1,503      35,000    SH
KB HOME                     COM          48666K109   4,080     165,000    SH
KB HOME                     COM          48666K109     124       5,000    SH
KOHLS CORP                  COM          500255104     772      18,000    SH
KOHLS CORP                  COM          500255104     858      20,000    SH
```

```
KONINKLIJKE PHILIPS EL      NY REG SH
                            NEW         500472303    1,534       40,000    SH
L-3 COMMUNICATIONS HLD      COM         502424104    1,093       10,000    SH
LEHMAN BROS HLDGS INC       COM         524908100      188        5,000    SH
LEHMAN BROS HLDGS INC       COM         524908100      188        5,000    SH
LEHMAN BROS HLDGS INC       COM         524908100      376       10,000    SH
LEHMAN BROS HLDGS INC       COM         524908100      527       14,000    SH
LEHMAN BROTHERS HOLDINGS
 INC                        COM         524908100      565       15,000    SH
LEHMAN BROTHERS HOLDINGS
 INC                        COM         524908100      753       20,000    SH
LENNAR CORP                 CL A        526057104    1,230       65,400    SH
LENNAR CORP                 CL A        526057104       94        5,000    SH
LENNAR CORP                 CL A        526057104      376       20,000    SH
```

</TABLE>

<PAGE>

<TABLE>
<CAPTION>

```
                            Title Of              Market Value     Shares/    Sh/
     Name of Issuer          Class      CUSIP      (x 1000)      Prn amount  Prn
----------------------       -----      -----      --------      ----------  ---

<S>                         <C>         <C>        <C>           <C>         <C>

LEVEL 3 COMMUNICATIONS       COM         52729N100       27       12,500    SH
LEVEL 3 COMMUNICATIONS       COM         52729N100      106       50,000    SH
LOCKHEED MARTIN CORP         DBCV        539830AP4    3,424    2,500,000    PRN
MACYS INC                    COM         55616P104      184        8,000    SH
MACYS INC                    COM         55616P104      346       15,000    SH
MARKET VECTORS ETF TR        AGRIBUS ETF 57060U605      590       11,000    SH
MARVELL TECHNOLOGY GRO       ORD         G5876H105      272       25,000    SH
MASSEY ENERGY CORP           COM         576206106       80        2,200    SH
MASSEY ENERGY CORP           COM         576206106      365       10,000    SH
MASTERCARD INC               CL A        57636Q104      223        1,000    SH
MASTERCARD INC               CL A        57636Q104    1,115        5,000    SH
MBIA INC                     COM         55262C100       61        5,000    SH
MEDTRONIC INC                NOTE 1.500% 585055AL0    2,634    2,500,000    PRN
MERCK & CO INC               COM         589331107      759       20,000    SH
MERRILL LYNCH & CO INC       COM         590188108      204        5,000    SH
MERRILL LYNCH & CO INC       COM         590188108      407       10,000    SH
MERRILL LYNCH & CO INC       COM         590188108      477       11,700    SH
MERRILL LYNCH & CO INC       COM         590188108      815       20,000    SH
MERRILL LYNCH & CO INC       NOTE        590188W46    3,190    3,000,000    PRN
MICRON TECHNOLOGY INC        COM         595112103    1,175      196,800    SH
MICRON TECHNOLOGY INC        NOTE 1.875% 595112AH6    2,179    3,000,000    PRN
MICROSOFT CORP               COM         594918104       34        1,200    SH
MONSANTO CO NEW              COM         61166W101      725        6,500    SH
MONSANTO CO NEW              COM         61166W101    1,115       10,000    SH
MORGAN STANLEY               COM NEW     617446448       91        2,000    SH
M-SYSTEMS FIN INC            NOTE 1.000% 55375VAB8    4,838    5,000,000    PRN
NIKE INC                     CL B        654106103      272        4,000    SH
NIKE INC                     CL B        654106103      680       10,000    SH
NORFOLK SOUTHERN CORP        COM         655844108      217        4,000    SH
NORFOLK SOUTHERN CORP        COM         655844108    1,086       20,000    SH
NORTEL NETWORKS CORP N       COM NEW     656568508      184       27,500    SH
NORTEL NETWORKS CORP N       COM NEW     656568508      403       60,300    SH
```

```
NORTEL NETWORKS CORP N          COM NEW      656568508      669      100,000      SH
NORTHROP GRUMMAN CORP           COM          666807102      467        6,000      SH
NORTHROP GRUMMAN CORP           COM          666807102      778       10,000      SH
NORTHWEST AIRLS CORP            COM          667280408      360       40,000      SH

</TABLE>
<PAGE>

<TABLE>
<CAPTION>
```

| Name of Issuer | Title Of Class | CUSIP | Market Value (x 1000) | Shares/ Prn amount | Sh/ Prn |
|---|---|---|---|---|---|
| ----------------------- | ----- | ----- | -------- | ---------- | --- |
| <S> | <C> | <C> | <C> | <C> | <C> |
| NYSE EURONEXT | COM | 629491101 | 309 | 5,000 | SH |
| NYSE EURONEXT | COM | 629491101 | 685 | 11,100 | SH |
| NYSE EURONEXT | COM | 629491101 | 1,080 | 17,500 | SH |
| ORACLE CORP | COM | 68389X105 | 763 | 39,000 | SH |
| ORACLE CORP | COM | 68389X105 | 1,174 | 60,000 | SH |
| PACIFIC SUNWEAR CALIF | COM | 694873100 | 378 | 30,000 | SH |
| PATTERSON COMPANIES IN | COM | 703395103 | 1,089 | 30,000 | SH |
| POWERSHARES QQQ TRUST | UNIT SER 1 | 73935A104 | 2,186 | 50,000 | SH |
| POWERSHARES QQQ TRUST | UNIT SER 1 | 73935A104 | 1,093 | 25,000 | SH |
| POWERSHARES QQQ TRUST | UNIT SER 1 | 73935A104 | 656 | 15,000 | SH |
| PROCTER & GAMBLE CO | COM | 742718109 | 3,504 | 50,000 | SH |
| QUALCOMM INC | COM | 747525103 | 308 | 7,500 | SH |
| QUALCOMM INC | COM | 747525103 | 820 | 20,000 | SH |
| RAMBUS INC DEL | COM | 750917106 | 268 | 11,500 | SH |
| RAMBUS INC DEL | COM | 750917106 | 1,748 | 75,000 | SH |
| RAMBUS INC DEL | NOTE | 750917AB2 | 13,067 | 11,500,000 | PRN |
| RAYTHEON CO | COM NEW | 755111507 | 1,292 | 20,000 | SH |
| RED HAT INC | DBCV 0.500% | 756577AB8 | 2,959 | 3,000,000 | PRN |
| REGIONS FINANCIAL CORP | COM | 7591EP100 | 20 | 1,000 | SH |
| RELIANT ENERGY INC | COM | 75952B105 | 237 | 10,000 | SH |
| RESEARCH IN MOTION LTD | COM | 760975102 | 337 | 3,000 | SH |
| RESEARCH IN MOTION LTD | COM | 760975102 | 1,122 | 10,000 | SH |
| RSC HOLDINGS INC | COM | 74972L102 | 55 | 5,000 | SH |
| SAKS INC | COM | 79377W108 | 125 | 10,000 | SH |
| SALESFORCE COM INC | COM | 79466L302 | 1,157 | 20,000 | SH |
| SCHERING PLOUGH CORP | COM | 806605101 | 216 | 15,000 | SH |
| SCHERING PLOUGH CORP | COM | 806605101 | 360 | 25,000 | SH |
| SELECT SECTOR SPDR TR | SBI INT-FINL | 81369Y605 | 2,164 | 86,995 | SH |
| SIGMA ALDRICH CORP | COM | 826552101 | 1,193 | 20,000 | SH |
| SILVER STD RES INC | COM | 82823L106 | 455 | 15,000 | SH |
| SILVER STD RES INC | COM | 82823L106 | 455 | 15,000 | SH |
| SLM CORP | COM | 78442P106 | 77 | 5,000 | SH |
| SLM CORP | COM | 78442P106 | 77 | 5,000 | SH |
| SOUTH FINL GROUP INC | COM | 837841105 | 59 | 4,000 | SH |
| SPECTRUM BRANDS INC | COM | 84762L105 | 137 | 30,000 | SH |
| SPECTRUM BRANDS INC | COM | 84762L105 | 1,074 | 235,000 | SH |

```
</TABLE>

<PAGE>

<TABLE>
<CAPTION>
```

| Name of Issuer | Title Of Class | CUSIP | Market Value (x 1000) | Shares/ Prn amount | Sh/ Prn |
|---|---|---|---|---|---|
| ----------------------- | ----- | ----- | -------- | ---------- | --- |
| <S> | <C> | <C> | <C> | <C> | <C> |
| STARWOOD HOTELS&RESORT | COM | 85590A401 | 1,035 | 20,000 | SH |
| STRAYER ED INC | COM | 863236105 | 534 | 3,500 | SH |
| STRAYER ED INC | COM | 863236105 | 763 | 5,000 | SH |
| STRAYER ED INC | COM | 863236105 | 1,525 | 10,000 | SH |
| STRYKER CORP | COM | 863667101 | 651 | 10,000 | SH |
| STRYKER CORP | COM | 863667101 | 1,301 | 20,000 | SH |
| STRYKER CORP | COM | 863667101 | 1,561 | 24,000 | SH |
| SUNPOWER CORP | COM CL A | 867652109 | 1,490 | 20,000 | SH |
| SUNPOWER CORP | DBCV 1.250% | 867652AA7 | 6,953 | 4,750,000 | PRN |
| SYBASE INC | COM | 871130100 | 3,285 | 124,900 | SH |
| SYMANTEC CORP | NOTE 0.750% | 871503AD0 | 1,065 | 1,000,000 | PRN |
| TEVA PHARMACEUTICAL FI | DBCV 0.250% | 88164RAB3 | 10,191 | 7,500,000 | PRN |
| TEVA PHARMACEUTICAL IN | ADR | 881624209 | 924 | 20,000 | SH |
| TEVA PHARMACEUTICAL IN | ADR | 881624209 | 1,155 | 25,000 | SH |
| TEVA PHARMACEUTICAL IN | ADR | 881624209 | 1,524 | 33,000 | SH |
| TIFFANY & CO NEW | COM | 886547108 | 418 | 10,000 | SH |
| TIME WARNER INC | COM | 887317105 | 351 | 25,000 | SH |
| TITANIUM METALS CORP | COM NEW | 888339207 | 226 | 15,000 | SH |
| TITANIUM METALS CORP | COM NEW | 888339207 | 753 | 50,000 | SH |
| TORCHMARK CORP | COM | 891027104 | 307 | 5,100 | SH |
| TRANSOCEAN SEDCO FOREX | NOTE 1.625% | 893830AU3 | 5,469 | 5,000,000 | PRN |
| UBS AG | SHS NEW | H89231338 | 86 | 3,000 | SH |
| UNITED PARCEL SERVICE | CL B | 911312106 | 584 | 8,000 | SH |
| UNITED PARCEL SERVICE | CL B | 911312106 | 730 | 10,000 | SH |
| UNITED PARCEL SERVICE | CL B | 911312106 | 3,651 | 50,000 | SH |
| UNITED RENTALS INC | COM | 911363109 | 565 | 30,000 | SH |
| UNITED RENTALS INC. | COM | 911363109 | 460 | 24,400 | SH |
| UNITED STATES OIL FUND | UNITS | 91232N108 | 814 | 10,000 | SH |
| UNITED STATES STL CORP | COM | 912909108 | 634 | 5,000 | SH |
| UNITED STATES STL CORP | COM | 912909108 | 634 | 5,000 | SH |
| UNITEDHEALTH GROUP INC | COM | 91324P102 | 687 | 20,000 | SH |
| VALERO ENERGY CORP NEW | COM | 91913Y100 | 246 | 5,000 | SH |
| VALERO ENERGY CORP NEW | COM | 91913Y100 | 491 | 10,000 | SH |
| VALERO ENERGY CORP NEW | COM | 91913Y100 | 737 | 15,000 | SH |
| VALERO ENERGY CORP NEW | COM | 91913Y100 | 1,363 | 27,750 | SH |
| VCA ANTECH INC | COM | 918194101 | 766 | 28,000 | SH |

</TABLE>

<PAGE>

<TABLE>
<CAPTION>

| Name of Issuer | Title Of Class | CUSIP | Market Value (x 1000) | Shares/ Prn amount | Sh/ Prn |
|---|---|---|---|---|---|
| ----------------------- | ----- | ----- | -------- | ---------- | --- |
| <S> | <C> | <C> | <C> | <C> | <C> |
| VCA ANTECH INC | COM | 918194101 | 821 | 30,000 | SH |
| VERIZON COMMUNICATIONS | COM | 92343V104 | 911 | 25,000 | SH |
| VISHAY INTERTECHNOLOGY | COM | 928298108 | 453 | 50,000 | SH |

```
VODAFONE GROUP PLC NEW       SPONS ADR
                             NEW          92857W209    1,033     35,000    SH
WACHOVIA CORP NEW             COM          929903102      270     10,000    SH
WACHOVIA CORP NEW             COM          929903102      675     25,000    SH
WAL MART STORES INC           COM          931142103    1,580     30,000    SH
WALT DISNEY CO HOLDING CO    COM DISNEY    254687106      785     25,000    SH
WASHINGTON MUT INC            COM          939322103      309     30,000    SH
WASHINGTON MUT INC           CONV7.75%
                             SER R         939322814    2,130      3,000    SH
WASHINGTON MUTUAL INC        CONV7.75%
                             SER R         939322814    2,485      3,500    SH
WASTE MANAGEMENT INC          COM          94106L109      420     12,500    SH
WASTE MGMT INC DEL            COM          94106L109      302      9,000    SH
WASTE MGMT INC DEL            COM          94106L109      336     10,000    SH
WENDYS INTL INC               COM          950590109      346     15,000    SH
WILLBROS GROUP INC            COM          969199108      459     15,000    SH
WRIGLEY WM JR CO              COM          982526105      628     10,000    SH
WRIGLEY WM JR CO              COM          982526105    1,257     20,000    SH
XM SATELLITE RADIO HLD        CL A         983759101      581     50,000    SH
YAHOO INC                     FRNT         984332AB2   41,025  30,000,000   PRN
YAMANA GOLD INC               COM          98462Y100       58      4,000    SH
YAMANA GOLD INC               COM          98462Y100      292     20,000    SH


                             Total:   468,626
```

```
</TABLE>
</TEXT>
</DOCUMENT>
```

Exhibit B-1

# PRELIMINARY CONFIDENTIAL OFFERING CIRCULAR

(Dated November 1, 2007)

## $2,550,000,000



## RAM Transition Corp.

### to be merged with and into

# United Rentals (North America), Inc.

## % Second Priority Senior Secured Notes due 2014

The information in this preliminary offering circular is not complete and may be changed.

We are offering $2,550,000,000 aggregate principal amount of our                    % Second Priority Senior Secured Notes due 2014. We will pay interest on the notes on each                    and                    , commencing on                    , 2008. The notes will mature on                    , 2014.

We may redeem some or all of the notes at any time prior to                    , 2011 at a price equal to 100% of the principal amount of the notes redeemed plus accrued and unpaid interest, if any, plus a ''make-whole'' premium set forth in this offering circular. We may also redeem some or all the notes at any time on or after                    , 2011, at the redemption prices set forth in this offering circular. In addition, we may redeem up to 35% of the aggregate principal amount of the notes at any time prior to                    , 2010 using the net proceeds from certain equity offerings at the redemption prices set forth in this offering circular. There is no sinking fund for the notes.

This offering is part of the financing for, and is conditioned upon the concurrent consummation of, the proposed merger of RAM Acquisition Corp., a Delaware corporation and our parent company, with and into United Rentals, Inc., a Delaware corporation, with United Rentals, Inc. as the surviving corporation. Immediately after the effective time of such merger, United Rentals, Inc. will cause us to merge with and into United Rentals (North America), Inc., a Delaware corporation and a wholly owned subsidiary of United Rentals, Inc., with United Rentals (North America), Inc. as the surviving corporation, and upon such merger, United Rentals (North America), Inc. will assume our rights and obligations as issuer under the notes, the indenture and the registration rights agreement by operation of law.

The notes will be our senior obligations and will rank equally in right of payment with all of our existing and future senior indebtedness and will be senior in right of payment to all of our existing and future subordinated indebtedness. The notes will be issued by RAM Transition Corp. and, immediately after the consummation of the related transactions described in this offering circular, will be guaranteed by United Rentals, Inc. and all of United Rentals (North America), Inc.'s direct and indirect domestic subsidiaries that will guarantee our new senior secured credit facilities. The notes and the related guarantees will be secured by a second priority lien on substantially all of our assets and the assets of the guarantors that will secure obligations under our new senior secured credit facilities, which are secured by a first priority lien.

We will agree to file an exchange offer registration statement or, under certain circumstances, a shelf registration statement, pursuant to a registration rights agreement. In the event we fail to comply with certain of our obligations under the registration rights agreement, we will pay additional interest on the notes.

We expect that the notes will be eligible for trading in The PORTAL<sup>SM</sup> Market, a subsidiary of The Nasdaq Stock Market, Inc.

**Investing in the notes involves risks. See ''Risk Factors'' on page 19.**

**Price:**        %

plus accrued interest, if any, from                    , 2007.

Delivery of the notes in book-entry form will be made on or about                    , 2007.

The notes have not been registered under the Securities Act of 1933, as amended (the ''Securities Act''), or the securities laws of any state. The notes may not be offered or sold within the United States or to U.S. persons, except to qualified institutional buyers in reliance on the exemption from registration provided by Rule 144A of the Securities Act and to certain persons in offshore transactions in reliance on Regulation S of the Securities Act. You are hereby notified that sellers of the notes may be relying on the exemption from the provisions of Section 5 of the Securities Act provided by Rule 144A.

*Joint Book-Running Managers*

## Credit Suisse

### Morgan Stanley

#### Banc of America Securities LLC

##### Lehman Brothers

The date of this confidential offering circular is                    , 2007.

# TABLE OF CONTENTS

| | Page |
|---|---|
| Notice to Investors . . . . . . . . . . . . . | i |
| Notice to New Hampshire Residents . | iii |
| SEC Review . . . . . . . . . . . . . . . . . . . . | iii |
| Use of Non-GAAP Measures . . . . . . . | iii |
| Industry and Market Data . . . . . . . . | v |
| Trademarks . . . . . . . . . . . . . . . . . . . | v |
| Forward-Looking Statements . . . . . . | vi |
| Offering Circular Summary . . . . . . . | 1 |
| Risk Factors . . . . . . . . . . . . . . . . . . . | 19 |
| Use of Proceeds . . . . . . . . . . . . . . . . | 35 |
| Capitalization . . . . . . . . . . . . . . . . . . | 37 |
| Unaudited Pro Forma Financial Information . . . . . . . . . . . . . . . . . . . | 39 |
| Selected Historical Consolidated Financial Information . . . . . . . . . . | 51 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations . . . . . . . | 54 |

| | Page |
|---|---|
| Business . . . . . . . . . . . . . . . . . . . . . . . | 73 |
| Management . . . . . . . . . . . . . . . . . . . . | 93 |
| Principal Stockholders . . . . . . . . . . . | 95 |
| Certain Relationships and Related Party Transactions . . . . . . . . . . . . | 96 |
| Description of Other Indebtedness . | 97 |
| Description of the Notes . . . . . . . . . . | 105 |
| Certain United States Federal Income Tax Considerations . . . . . . | 177 |
| Plan of Distribution . . . . . . . . . . . . . | 182 |
| Notice to Canadian Residents . . . . . . | 187 |
| Transfer Restrictions . . . . . . . . . . . . | 189 |
| Legal Matters . . . . . . . . . . . . . . . . . . | 191 |
| Independent Registered Public Accounting Firm . . . . . . . . . . . . . . . | 191 |
| Where You Can Find More Information . . . . . . . . . . . . . . . . . . | 191 |
| Index to Financial Statements . . . . . | F-1 |

———————

**You should rely only on the information contained in this offering circular or to which we have referred you. We have not authorized anyone to provide you with information that is different. This offering circular may only be used where it is legal to sell these securities. The information in this offering circular may only be accurate on the date of this document.**

———————

It is expected that delivery of the notes will be made against payment therefor on or about the date specified on the cover of this offering circular, which is the          business day following the date hereof (such settlement cycle being referred to as "T+    "). You should note that trading of the notes on the date hereof or the next     succeeding business days may be affected by the T+    settlement. See "Plan of Distribution."

**NOTICE TO INVESTORS**

We are furnishing this offering circular on a confidential basis in connection with an offering exempt from registration under, or not subject to, the Securities Act, and applicable state securities laws solely to allow a prospective investor to consider purchasing the notes. Delivery of this offering circular to any other person or any reproduction of this offering circular, in whole or in part, without our or the initial purchasers' prior consent, is prohibited. The information contained in this offering circular has been provided by us and other sources identified in this offering circular we believe to be reliable. No representation or warranty, express or implied, is made by the initial purchasers as to the accuracy or completeness of the information contained or incorporated in this offering circular, and nothing contained or incorporated in this offering circular is, or shall be relied upon as, a promise or representation by the initial purchasers, whether as to the past or the future.

This offering circular contains summaries, believed to be accurate in all material respects, of terms of certain documents, but reference is made to the actual documents, copies of which will be made available upon request as indicated under "Where You Can Find More Information." All summaries are qualified in their entirety by this reference.

In making an investment decision regarding the notes offered by this offering circular, you must rely on your own examination of United Rentals, Inc. and United Rentals (North America), Inc. and its subsidiaries and the terms of the offering, including the merits and risks involved. The offering is being made on the basis of this offering circular. Any decision to purchase notes in the offering must be based on the information contained in this offering circular. No person is authorized in connection with any offering made by this offering circular to give any information or to make any representation not contained in this offering circular, and, if given or made, any other information or representation must not be relied upon as having been authorized by us or the initial purchasers.

This offering circular is being provided on a confidential basis (1) to "qualified institutional buyers" (as defined in Rule 144A under the Securities Act) for informational use solely in connection with their consideration of the purchase of the notes and (2) in offshore transactions complying with Rule 903 or Rule 904 of Regulation S under the Securities Act. Its use for any other purpose is not authorized. This offering circular may not be copied or reproduced in whole or in part, nor may it be distributed or any of its contents be disclosed to anyone other than the prospective investors to whom it is being provided.

In making your purchase, you will be deemed to have made certain acknowledgments, representations and agreements as indicated in this offering circular under the caption "Transfer Restrictions." The notes are subject to restrictions on transferability and resale and may not be transferred or resold except as permitted under the Securities Act and applicable state securities laws pursuant to an effective registration statement or a valid exemption from the registration requirements of the Securities Act. You should be aware that you may be required to bear the financial risks of this investment for an indefinite period of time. See "Transfer Restrictions."

You must comply with all applicable laws and regulations in force in any jurisdiction in connection with the distribution of this offering circular and the offer or sale of the notes. See "Transfer Restrictions." In making an investment decision, you must rely on your own examination of us and the terms of this offering, including the merits and risks involved. You should not construe the contents of this offering circular as legal, business or tax advice. You should consult your own attorney, business advisor or tax advisor.

The information contained in this offering circular is as of the date of this offering circular or such other dates as are specified herein and is subject to change, completion or amendment without notice. Neither the delivery of this offering circular at any time nor any subsequent commitment to enter into any financing shall, under any circumstances, create any implication that there has been no change in

the information set forth in this offering circular or in our affairs since the date of this offering circular.

We are entitled to withdraw this offering at any time before closing. We are making this offering subject to the terms described in this offering circular and the indenture relating to the notes.

The notes described in this offering circular have not been registered with, recommended by or approved by the U.S. Securities and Exchange Commission, which we refer to as the SEC, or any other federal or state securities commission or regulatory authority, nor has the SEC or any such state securities commission or authority passed upon the accuracy or adequacy of this offering circular. Any representation to the contrary is a criminal offense.

The notes may not be offered or sold in or into the United Kingdom except in circumstances that do not constitute an offer to the public within the meaning of section 103(6) of the Financial Services and Markets Act 2000, or the FSMA, or the Public Offers of Securities Regulations 1995, or the POS Regulations. All applicable provisions of the FSMA and the POS Regulations must be complied with in respect of anything done in relation to the notes in, from or otherwise involving or having an effect in the United Kingdom.

This communication is directed solely at persons who (i) are outside the United Kingdom or (ii) are investment professionals within the meaning of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2001, or the Financial Promotion Order, who have professional experience in matters relating to investments or (iii) are persons falling within Article 49(2)(a) to (e) of the Financial Promotion Order (all such persons together being referred to as "relevant persons"). This communication must not be acted on or relied on by persons who are not relevant persons. Any investment or investment activity to which this communication relates is available only to relevant persons and will be engaged in only with relevant persons.

The notes have not been and will not be qualified for sale under the securities laws of any province or territory of Canada. The notes are not being offered and may not be offered or sold, directly or indirectly, in Canada or to or for the account of any resident of Canada in contravention of the securities laws of any province or territory thereof.

This offering circular is a confidential document that we are providing only to prospective purchasers of the notes solely for the purpose of making a decision whether to invest in the notes. By receiving this offering circular, you will be deemed to have agreed not to do any of the following:

- use this offering circular for any purpose other than evaluating whether to invest in the notes;

- reproduce this offering circular or deliver this offering circular or any reproduction of it to any other institution or person, in whole or in part, without our and the initial purchasers' prior consent; or

- disclose any information in the offering circular to any other institution or person.

This offering circular does not constitute an offer to sell or a solicitation of an offer to buy the notes to any person in any jurisdiction where it is unlawful to make such an offer or solicitation. For a further description of certain restrictions on the offer and sale of the notes, see "Plan of Distribution," "Notice to Canadian Residents" and "Transfer Restrictions."

## NOTICE TO NEW HAMPSHIRE RESIDENTS

**NEITHER THE FACT THAT A REGISTRATION STATEMENT OR AN APPLICATION FOR A LICENSE HAS BEEN FILED UNDER CHAPTER 421-B OF THE NEW HAMPSHIRE REVISED STATUTES WITH THE STATE OF NEW HAMPSHIRE NOR THE FACT THAT A SECURITY IS EFFECTIVELY REGISTERED OR A PERSON IS LICENSED IN THE STATE OF NEW HAMPSHIRE CONSTITUTES A FINDING BY THE SECRETARY OF STATE THAT ANY DOCUMENT FILED UNDER RSA 421-B IS TRUE, COMPLETE AND NOT MISLEADING. NEITHER ANY SUCH FACT NOR THE FACT THAT AN EXEMPTION OR EXCEPTION IS AVAILABLE FOR A SECURITY OR A TRANSACTION MEANS THAT THE SECRETARY OF STATE HAS PASSED IN ANY WAY UPON THE MERITS OR QUALIFICATIONS OF, OR RECOMMENDED OR GIVEN APPROVAL TO, ANY PERSON, SECURITY OR TRANSACTION. IT IS UNLAWFUL TO MAKE, OR CAUSE TO BE MADE, TO ANY PROSPECTIVE PURCHASER, CUSTOMER OR CLIENT ANY REPRESENTATION INCONSISTENT WITH THE PROVISIONS OF THIS PARAGRAPH.**

## SEC REVIEW

We will agree to (i) file a registration statement with the SEC with respect to a registered exchange offer to exchange the notes for new exchange notes having terms substantially identical in all material respects to the notes (except that the new exchange notes will not contain terms with respect to registration rights or transfer restrictions) or (ii) use our commercially reasonable efforts to file a shelf registration statement with respect to resales of the notes. See "Description of the Notes—Exchange Offer; Registration Rights." We expect to include substantially all of the information that we present in this offering circular in any such registration statement. As a result of the SEC's review of the registration statement, we may be required to make changes to the description of the business, the historical financial statements, the pro forma financial information and other information of United Rentals, Inc. and its subsidiaries we present in this offering circular that is included in the registration statement. We believe that the financial statements of United Rentals, Inc. and its subsidiaries and the other financial data included in this offering circular have been prepared in a manner that complies, in all material respects, with generally accepted accounting principles in the United States, or GAAP, and the regulations published by the SEC, and are consistent with current SEC practice with the exception of (i) the presentation of our financial data for the twelve months ended September 30, 2007 and (ii) the presentation of EBITDA (as defined below), Adjusted EBITDA (as defined below) and free cash flow (as defined below).

The SEC has adopted certain regulations regarding the use of financial measures that differ from measures calculated in accordance with GAAP. The SEC may take the view that the non-GAAP financial measures and ratios included in this offering circular do not comply with these regulations and may require us to remove them from, or change the way we report such non-GAAP financial measures in, the registration statement in order to comply with such regulations. Any modification or reformulation of historical or pro forma financial information of United Rentals, Inc. and its subsidiaries or any other information in the registration statement that we make as a result of comments by the SEC or otherwise could be significant.

## USE OF NON-GAAP MEASURES

We have included certain non-GAAP financial measures in this offering circular, such as EBITDA, Adjusted EBITDA and free cash flow. We define EBITDA as earnings before interest, income taxes, depreciation and amortization, restructuring benefit and loss from discontinued operation. We have described certain adjustments to EBITDA, principally to exclude items that we believe are not indicative of future performance, to arrive at Adjusted EBITDA. By excluding certain items that we believe are not representative of our core business, we believe that EBITDA is a useful financial metric

to assess operating performance from period to period. We believe that EBITDA and Adjusted EBITDA provide investors with additional information to assess our ability to generate cash from operations sufficient to pay taxes, service debt and undertake capital expenditures. In addition, we use EBITDA for business planning purposes and in measuring the performance of significant investments that we have made in the past in property, plant and equipment. Depreciation and amortization expense comprises a meaningful portion of our cost structure. Our measurement of EBITDA may not be, and our measurement of Adjusted EBITDA is not, comparable to those of other companies, and our adjustments to EBITDA are not in accordance with the SEC's rules regarding the use of non-GAAP financial measures. We may not be able to include Adjusted EBITDA in the registration statement we have agreed to file. EBITDA and Adjusted EBITDA should not be considered as alternatives to net income (loss), operating income, cash provided by operations or any other performance measures calculated or derived in accordance with GAAP as measures of operating performance or as alternatives to cash provided by operations or as a measure of liquidity.

EBITDA and Adjusted EBITDA have important limitations as analytical tools and you should not consider them in isolation or as substitutes for analysis of our results as reported under GAAP. For example, EBITDA and Adjusted EBITDA:

- exclude certain tax payments that may represent a reduction in cash available to us;

- do not reflect any cash capital expenditure requirements for the assets being depreciated and amortized that may have to be replaced in the future;

- do not reflect changes in, or cash requirements for, our working capital needs;

- do not reflect the significant interest expense, or the cash requirements necessary to service interest or principal payments, on our debt; and

- include a reversal of an excess restructuring charge.

In addition, Adjusted EBITDA:

- excludes non-cash stock compensation;

- excludes costs incurred in connection with the Transactions;

- excludes increases in the cost of equipment sold resulting from the application of purchase accounting adjustments with respect to the Transactions; and

- assumes certain cost savings that we may not be able to achieve.

We also refer to free cash flow information in this offering circular. Free cash flow is defined as (i) net cash provided by operating activities—continuing operations less (ii) purchases of rental and non-rental equipment plus (iii) proceeds from sales of rental and non-rental equipment and from sale-leaseback transactions. We believe free cash flow provides useful information concerning cash flow available to meet future debt service obligations and working capital requirements. However, free cash flow is not a measure of performance or liquidity under GAAP. Accordingly, free cash flow should not be considered as an alternative to net income or cash flow from operating activities as indicators of liquidity.

The financial data for the twelve-month period ended September 30, 2007, or the LTM Period, is presented for informational purposes only. The LTM Period is not a financial reporting period in accordance with GAAP and should not be considered in isolation from or as a substitute for our consolidated historical financial statements. Article 11 of Regulation S-X generally does not allow presentation of statements of operations data for periods that do not conform to the historical periods of the relevant reporting entity; however, we have presented statements of operations data for the LTM Period because we believe it provides meaningful additional information about us. The statements of

operations information for the LTM Period is derived by subtracting our statements of operations information for the nine months ended September 30, 2006 from our statements of operations information for the year ended December 31, 2006 and adding our statements of operations information for the nine months ended September 30, 2007.

See "Offering Circular Summary—Summary Historical and Pro Forma Financial Information" for a reconciliation of EBITDA and Adjusted EBITDA and free cash flow to the most directly comparable GAAP financial measure.

## INDUSTRY AND MARKET DATA

This offering circular includes estimates of market share and industry data and forecasts that we obtained from industry publications and surveys, including those of Rental Equipment Register, Daniel Kaplan Associates, Manfredi & Associates, the U.S. Census Bureau, Associated Equipment Distributors, International Rental News and internal company estimates of United Rentals, Inc. and its subsidiaries. Between 2004 and 2007, we granted to Daniel Kaplan Associates options covering a total of 154,425 shares of United Rentals, Inc.'s common stock for its services as a consultant. Industry publications, surveys, and forecasts generally state that the information contained therein has been obtained from sources believed to be reliable, but there can be no assurance as to the accuracy or completeness of the included information. We and the initial purchasers have not independently verified any of the data from third-party sources nor have we or the initial purchasers ascertained the underlying economic assumptions relied upon therein. Unless otherwise noted, all information regarding the market share of United Rentals, Inc. and its subsidiaries is based on the latest market data currently available to us, and all market share data is based on net sales in the applicable market. Market share and industry data and forecasts based on internal company estimates of United Rentals, Inc. and its subsidiaries may vary materially from others in their industry. We cannot assure you that internal company estimates of United Rentals, Inc. and its subsidiaries are accurate or that estimated growth rates will be achieved. Our estimates involve risks and uncertainties, and are subject to change based on various factors, including those discussed under the heading "Risk Factors" in this offering circular.

## TRADEMARKS

We have proprietary rights to a number of trademarks important to our business, including United Rentals®, RENTALMAN®, INFOMANAGER® and UR*data*®. All other trademarks or service marks referred to in this offering circular are the property of their respective owners and are not our property.

## FORWARD-LOOKING STATEMENTS

Some of the information in this offering circular contains disclosures which are "forward-looking statements" within the meaning of the safe harbor provisions of Section 21E of the Securities Exchange Act of 1934, as amended ("Exchange Act"). Forward-looking statements include all statements that do not relate solely to historical or current facts, and can be identified by the use of forward-looking terminology such as "may," "believe," "will," "expect," "should," "seek," "on-track," "intend," "project," "estimate," "anticipate," "plan" or "continue," or the negative thereof or comparable terminology, or by discussions of strategy. You should be aware that forward-looking statements are based on estimates and assumptions and involve known and unknown risks and uncertainties. Although we believe that the expectations reflected in these forward-looking statements are reasonable, we cannot assure you that the actual results or developments we anticipate will be realized, or even if realized, that they will have the expected effects on our business or operations. These forward-looking statements speak only as of the date on which the statements were made and we undertake no obligation to publicly update or revise any forward-looking statements made in this offering circular or elsewhere as a result of new information, future events or otherwise. In addition to other factors and matters contained in this document, we believe the following factors could cause actual results to differ materially from those discussed in the forward-looking statements:

- the outcome of any legal proceedings that have been or may be instituted against us and our obligation to provide indemnification to current and former directors, officers and employees in connection with such proceedings;

- a significant decline in non-residential construction and industry spending;

- competitive factors in the industries in which we operate;

- a significant increase in the costs associated with our equipment fleet, including the cost of new equipment and the cost of maintenance of existing equipment, as well as the timing of capital expenditures;

- exposure to liability claims which may exceed the level of our insurance or not be covered at all;

- the loss of key members of our management team;

- the impact of the substantial indebtedness incurred to finance the Transactions described in this offering circular;

- the inability to execute our business strategy, development plans or cost savings plans;

- the termination of one or more relationships with material suppliers;

- the inability to make timely deliveries to our customers; and

- potential conflicts between the interests of our financial sponsor, which has the power to control our affairs and policies, and the interests of our creditors.

Important factors that could cause actual results to differ materially from our expectations are disclosed under "Risk Factors" and elsewhere in this offering circular. Many of the factors that will determine our future results are beyond our ability to control or predict. In light of the significant uncertainties inherent in the forward-looking statements contained herein, readers should not place undue reliance on forward-looking statements, which reflect our management's views only as of the date hereof. We cannot guarantee any future results, levels of activity, performance or achievements.

## OFFERING CIRCULAR SUMMARY

*This summary highlights information included elsewhere in this offering circular. This summary is not complete and does not contain all of the information that you should consider before investing in the notes. You should carefully read this entire offering circular, including our consolidated financial statements and related notes thereto and the information contained in the section entitled "Risk Factors."*

*On July 22, 2007, RAM Holdings, Inc. ("RAM Holdings"), a Delaware corporation, and RAM Acquisition Corp. ("Merger Sub"), a Delaware corporation, entities formed by affiliates of Cerberus Capital Management, L.P. (together with its affiliates, "Cerberus" or the "Sponsor"), entered into an agreement and plan of merger (the "Merger Agreement") with United Rentals, Inc. ("URI"), pursuant to which Merger Sub will merge with and into URI, with URI as the surviving corporation (the "URI Merger"). Immediately after the effective time of the URI Merger, URI will execute and deliver a guarantee of, and will cause certain of its domestic subsidiaries to execute and deliver guarantees of, the notes, and will cause RAM Transition Corp., a Delaware corporation and a wholly owned direct subsidiary of Merger Sub, to merge with and into URNA, with URNA as the surviving corporation (the "URNA Merger" and, together with the URI Merger, the "Mergers"). Upon the URNA Merger, URNA will assume the rights and obligations as issuer under the notes, as well as under the indenture and the registration rights agreement described in this offering circular, by operation of law. In this offering circular, (i) the term "URNA" refers to United Rentals (North America), Inc., which will be the successor to RAM Transition Corp. as a result of the URNA Merger, (ii) the term "URI" refers to United Rentals, Inc., the parent of URNA, and (iii) unless otherwise indicated herein or as the context otherwise requires, the terms "United Rentals," "we," "us," "our," "our company" or "the company" refer to URI and its subsidiaries. In this offering circular, "pro forma" information gives effect to the Transactions as described under "Unaudited Pro Forma Financial Information," and Adjusted EBITDA is presented solely on a pro forma basis and gives effect to certain cost savings described under "—Summary Historical and Pro Forma Financial Information."*

### The Company

Founded in 1997, we are the largest equipment rental company in the world based on revenues. With a network of approximately 700 rental locations in the U.S., Canada and Mexico, we operate across an extensive and diverse geographic footprint through two business segments: our general rentals segment (which includes our general industrial and aerial businesses) and our trench safety, pump and power segment. Our fleet of rental equipment is the most extensive in the industry, with more than 20,000 classes of equipment comprised of general construction and industrial equipment, aerial work platforms and trench safety equipment as well as general tools and light equipment. As of September 30, 2007, our rental fleet consisted of more than 270,000 units and had an original equipment cost of approximately $4.3 billion. We believe our size and scale confer several competitive advantages, including the ability to service high-value national accounts, support large job sites, transfer assets across regions to maximize utilization and drive purchasing economies.

Our highly diversified rental fleet is used in a wide array of construction project types, including commercial, infrastructure, industrial, other non-residential and some residential. Our equipment consists of:

- *General construction and industrial equipment*, such as backhoes, skid-steer loaders, forklifts, earthmoving equipment, material handling equipment, compressors, pumps and generators;

- *Aerial lift equipment*, such as scissor lifts and boom lifts;

- *General tools and light equipment*, such as pressure washers, water pumps, heaters and hand tools; and

- *Trench safety equipment* for underground work, such as trench shields, aluminum hydraulic shoring systems, slide rails, crossing plates, construction lasers and line testing equipment.

1

We rent our fleet to a highly diversified customer base that includes major construction companies, large and medium-sized industrial companies, governmental agencies, small businesses and some individuals. We enjoy strong customer loyalty and believe that United Rentals is one of the most recognized equipment rental companies in the industry. During 2006, we retained approximately 93% of our active customer base, measured by revenues. At September 30, 2007, we employed 11,789 employees. For the LTM Period, we generated revenues of $3,740 million, EBITDA of $1,141 million and Adjusted EBITDA of $1,233 million. Between 2004 and 2006, our revenues and EBITDA grew at a compound annual growth rate, or CAGR, of 13.3% and 13.1%, respectively.

Our primary source of revenues is equipment rental, which accounted for approximately 70% of total revenues in 2006. We generate the remainder of our revenues through the sale of new and used rental equipment as well as related contractor supplies, parts and services. The following charts show our revenues for the fiscal year ended December 31, 2006 broken down by business line, segment and end market:



### Industry Overview

The equipment rental industry encompasses the rental of a wide range of equipment, from small tools to heavy earthmoving equipment. According to Manfredi & Associates, industry-wide U.S. equipment rental revenues grew from an estimated $7 billion in 1990 to an estimated $35 billion in 2006, representing a CAGR of 11% during such period. Industry equipment rental revenues are projected by Manfredi & Associates to increase 8% in 2007 to $38 billion. We believe the key drivers of equipment rental demand are (i) the ongoing shift of end-users from ownership to rental and (ii) non-residential construction spending.

***Shift from Ownership to Rental.*** According to Daniel Kaplan Associates, rental equipment companies purchased an estimated 40% of all construction equipment sold in North America in 2006, up from an estimated 5% in 1993. The North American equipment rental industry is under-developed relative to those of other mature economies such as the United Kingdom and Japan, where, in 2006, rental equipment companies purchased roughly 80% and 60%, respectively, of total construction equipment sold. The shift from owning to renting equipment in the U.S. is expected to continue as construction and industrial firms increasingly recognize the many advantages of equipment rental versus ownership. According to International Rental News, North American rental penetration is projected to increase to 50% by 2010. Renting allows end-users to:

- avoid the large capital investment required for equipment purchases;

- access a broad selection of equipment and current technology best suited for each particular project;

- obtain the best-fit type of equipment on an as-needed basis;

- reduce storage and maintenance costs;

- supplement owned equipment;

- minimize costs related to idle equipment; and

- reduce depreciation charges.

We believe that rental equipment typically accounts for a small component of the total budget for a given construction project. End users tend to be more focused on quality and availability of equipment, as a lack of such equipment can result in costly delays. According to a 2006 survey by Associated Equipment Distributors, equipment rental customers surveyed ranked price as the fourth most important factor with respect to selecting an equipment rental provider. Product availability, equipment quality and past experience each ranked higher than price.

***Non-Residential Construction Spending.***   Non-residential construction spending is a key driver of equipment rental demand and is funded by a diverse group of both public and private constituents. According to the U.S. Census Bureau, during the twelve month period ended August 2007, $596 billion was spent on non-residential construction projects in the U.S., of which approximately $329 billion was privately funded and $267 billion was publicly funded. During the same period, non-residential construction grew at a seasonally adjusted annual rate of 14.7% year-over-year, with private sector spending up 15.2% year-over-year and public sector spending up 14.2% year-over-year. The current expansion period for non-residential construction spending was in its 42nd month in August 2007 and the previous expansion period lasted approximately 90 months, according to the U.S. Census Bureau. Additionally, Global Insights projects that U.S. non-residential construction spending will grow by 11.2% in 2007 and at a CAGR of 5.7% from 2007 through 2010. We believe this continued growth in non-residential construction spending will result in increased demand for rental equipment.

## Investment Considerations

***Market Leadership.***   We are the largest equipment rental company in the world based on revenues and believe that we have one of the most recognized equipment rental brands in the industry. According to the Rental Equipment Register, we have a leading share of the U.S. market, having generated rental revenues in 2006 that were approximately $1 billion greater than those of our nearest competitor. We maintain an extensive branch network with approximately 700 locations throughout North America. We believe our size and national footprint enable us to better serve larger customers that increasingly demand national coverage across a wide range of equipment rental needs. We also believe our size and footprint offer significant advantages compared to smaller competitors, including purchasing leverage, the ability to transfer fleet within our network to take advantage of demand and rate differences, and cost savings from the consolidation of common functions to a regional or national level.

***Geographic and Customer Diversity.***   Our approximately 700 locations are located throughout 48 states in the U.S., ten Canadian provinces and one state in Mexico and serve customers that range from Fortune 500 companies to small businesses and individuals. Our customer base is highly diversified as measured by customer concentration, industry/sector, end-users of equipment and geography. In 2006, our largest customer accounted for less than 1% of our revenues, our top 10 customers accounted for approximately 2% of our revenues and our top 100 customers accounted for less than 10% of our revenues. In addition, our customers represent a wide range of end markets, including commercial, infrastructure, industrial, other non-residential and some residential construction. We believe this level of geographic and customer diversity provides us with flexibility in operating our business and softens the impact of market cycles on our operations.

***Ability to Generate Substantial Free Cash Flow Through Economic Cycles.***   Our business model allows us the flexibility to buy and sell fleet in accordance with market dynamics in order to manage cash flow. In times of strong demand, we have generated significant cash flows from operations and have reinvested a portion of this cash in building our fleet. In times of slowing demand, we have the ability to curtail capital expenditures and increase sales of rental equipment to preserve and generate free cash flow to repay debt.

***Strong National Account Program.***   We maintain a national accounts sales force that is dedicated to establishing and expanding relationships with large companies, particularly those with a national or multi-regional presence. We offer our national account customers the benefits of a consistent level of service across North America, a wide selection of equipment and a single point of contact for all of their equipment needs. As of June 30, 2007, we serviced approximately 1,500 national account customers as well as approximately 650 governmental agencies in the U.S. Revenues from national account customers in 2006 generated more than $700 million and represented over 19% of total revenues.

***Leading Information Technology Systems.***   We have advanced information technology systems that facilitate rapid and informed decision-making and enable us to respond quickly to changing market conditions. Each branch is equipped with one or more workstations that run our proprietary RENTALMAN® software package and our UR*data*® application. These branch systems are linked together electronically throughout the network and allow for real-time entry and processing of data as well as the creation of detailed reports that can be used to effectively monitor and manage our business operations. Our information technology systems are supported by our in-house group of highly trained information technology specialists. Versions of our RENTALMAN® software package are also licensed to several of the largest equipment rental companies in the U.S.

## Strategy

We intend to use our extensive fleet, broad footprint, advanced information technology systems and industry experience to generate significant cash flow and strengthen our leadership position in the equipment rental industry. We plan to achieve these objectives by:

***Reorganizing Our Field Operations.***   We intend to continue reorganizing our field operations. Specifically, we are in the process of (i) lifting performance responsibilities from the branch level to the district level or higher, (ii) centralizing fleet management at the district level or higher to optimize fleet allocation, service and delivery, and (iii) centralizing sales management at the district level or higher to enable the sales force to rent equipment from any branch within its district. The reorganization is expected to create opportunities for branch closures as fleet assets are moved from low-return branches to high-return locations. Further, centralizing responsibility at the district level is expected to create additional cost-saving opportunities by permitting administrative and back-office functions to be consolidated within each district. We believe the realignment of our field operations should increase equipment utilization and reduce operating costs.

***Reducing Operating Spend.***   In an effort to bring our cost structure in line with those of other leading equipment rental companies, we engaged a major consulting firm in the spring of 2007 to review our back-office functions related to the general and administrative aspects of our business and identify opportunities for increased efficiencies. Such firm identified a number of opportunities to consolidate duplicative functions, outsource back-office operations and automate processes. As a result, we have implemented a headcount reduction program and undertaken specific initiatives to reduce our selling, general and administrative expenses.

***Accelerating Sourcing Initiatives.***   Our rental equipment purchases have been centralized, which we believe has enabled us to negotiate more favorable pricing and other terms from our equipment

4

providers. We launched a strategic sourcing initiative in 2006 that was designed to centralize our non-equipment purchases. We believe that centralizing the procurement of these items will enable us to leverage our significant spend to obtain better pricing and/or terms from our suppliers. We spent over $1.2 billion in 2006 on materials, services, contractor supplies, parts and other non-equipment spend.

These cost savings programs that we target could result in annual savings of approximately $200 million over time, including targets of approximately $55 million for headcount reductions, approximately $55 million for strategic sourcing initiative savings and approximately $90 million for other selling, general and administrative ("SG&A") expense savings. A portion of these cost savings is included in our calculation of Adjusted EBITDA. See "Risk Factors—Risks Related to Our Business—Our cost reduction programs may not achieve the cost savings and operations improvements and efficiencies we expect, and we may have to implement further cost reduction programs and incur additional related charges."

*Optimizing Time Utilization.*   We continue to reassess existing fleet investments and realign certain incentive programs to increase the time utilization of our fleet assets. We intend to better allocate resources to where they are needed rather than where they are located, resulting in fleet rationalization opportunities. We also expect to implement stricter fleet investment policies to improve our return on capital. By coupling such initiatives with an increased focus on preventative maintenance and improved turn-around time for returned equipment, we believe that we can increase the time utilization of our fleet and serve our customer base with a smaller fleet.

*Deemphasizing Contractor Supplies Business.*   We currently sell a variety of contractor supplies, such as construction consumables, tools, small equipment and safety supplies, through several channels, including our sales representatives, rental branches and U.S. and Canadian product catalogues. Although revenues from the contractor supplies business have grown from $125 million in 2002 to $398 million for the LTM Period, this business requires that we maintain significant volumes of inventory in order to meet customer demand and carries a higher cost structure relative to our core equipment rental business. In 2006, the gross margin for our contractor supplies business was 21.6% versus 38.9% for our equipment rental operations (including depreciation). In addition, we believe that during 2006 the contractor supplies business generated a net operating loss on a fully-allocated basis, as we estimate that our sales force spent approximately 40% of its time selling contractor supplies products.

Going forward, we intend to deemphasize our contractor supplies business and position it as a complementary offering to our core equipment rental business. We expect this deemphasis to result in productivity improvements within our sales force, thus helping to improve equipment utilization and rental rates, as well as result in some headcount reduction. As part of the deemphasis, we expect to reduce the number of stock keeping units associated with these operations. Additionally, we have recently closed one of our nine distribution centers and we intend to evaluate the closure of additional distribution centers.

*Implementing Like-Kind-Exchange Tax Savings Program.*   We use accelerated depreciation for tax purposes versus straight-line depreciation for accounting purposes. Sales of assets that have been fully depreciated for tax purposes can therefore give rise to significant tax liabilities. We intend to explore whether we can take advantage of tax deferral opportunities that may be available under Section 1031 of the Internal Revenue Code, which permits tax gains to be temporarily deferred as long as the proceeds from asset sales are reinvested in similar assets. We did not previously implement a similar program because of net operating loss carryforwards we had been utilizing in recent years.

**The Transactions**

**The Acquisition**

On July 22, 2007, RAM Holdings and Merger Sub entered into the Merger Agreement with URI, pursuant to which Merger Sub will merge with and into URI, with URI as the surviving corporation. Immediately thereafter, RAM Transition Corp. will merge with and into URNA, with URNA as the surviving corporation. Upon the URNA Merger, URNA will assume the rights and obligations of RAM Transition Corp. under the notes, the indenture and the registration rights agreement by operation of law. In this offering circular, we refer to these transactions as the "Acquisition."

Upon completion of the URI Merger, each outstanding share of common stock of URI will be converted into the right to receive $34.50 in cash. In addition, and also upon completion of the URI Merger, each outstanding share of Series C Preferred Stock and Series D Preferred Stock of URI will be converted into the right to receive an amount in cash equal to the sum of (i) $1,000 (the "Liquidation Preference") plus (ii) an amount equal to 6.25% per annum of the Liquidation Preference compounded annually from January 7, 1999 in the case of the Series C Preferred Stock or September 30, 1999 in the case of the Series D Preferred Stock to and including the closing date of the URI Merger plus (iii) any accrued and unpaid dividends thereon as of the closing date of the URI Merger.

**The Financings**

The Acquisition, the repayment of our existing debt and the payment of related fees and expenses will be financed with (1) proceeds from the notes offered hereby, (2) borrowings of approximately $1,543 million (without giving effect to approximately $138 million of outstanding letters of credit) under our new senior secured credit facilities, (3) borrowings of $1,350 million under our new senior unsecured bridge credit facility, (4) an indirect equity contribution of approximately $1,426 million by the Sponsor and others and (5) cash on hand, expected to be $125 million.

We expect to use a portion of such financings to repurchase all or substantially all of the (i) $1,000 million in aggregate outstanding principal amount of URNA's 6½% Senior Notes due 2012, (ii) $375 million in aggregate outstanding principal amount of URNA's 7% Senior Subordinated Notes due 2014 and (iii) $525 million in aggregate outstanding principal amount of URNA's 7¾% Senior Subordinated Notes due 2013 (collectively, the "existing notes") pursuant to previously launched tender offers and consent solicitations (collectively, the "tender offers"). This offering circular is not an offer to purchase, a solicitation of an offer to purchase or a solicitation of consents with respect to the existing notes. The tender offers have been made solely pursuant to an Offer to Purchase and Consent Solicitation Statement and related Consent and Letter of Transmittal, each dated October 16, 2007. Throughout this offering circular, we assume that all of the existing notes will be repurchased pursuant to the tender offers at substantially the same time as the consummation of the Acquisition and this offering. The tender offers are subject to customary conditions, including consummation of the Acquisition.

We intend to consummate the Acquisition concurrently with the issuance of the notes offered hereby and the closing of our new senior secured credit facilities and our new senior unsecured bridge credit facility. The closing of this notes offering is contingent upon the consummation of the Acquisition and the closing of our new senior secured credit facilities and our new senior unsecured bridge credit facility.

As used in this offering circular, the term "Transactions" means, collectively, the Acquisition, our entering into our new senior secured credit facilities and our new senior unsecured bridge credit facility, the consummation of the tender offers, the equity investment by the Sponsor and others, this offering of the notes and application of the proceeds therefrom. For a more complete description of the Transactions, see "Management's Discussion and Analysis of Financial Condition and Results of Operations—The Transactions," "Description of Other Indebtedness" and "Description of the Notes."

**Corporate and Debt Structure**

The chart below illustrates in summary form our corporate and debt structure after giving effect to this offering, the application of the net proceeds from this offering and the other Transactions, including the URI Merger and the URNA Merger. See "Management's Discussion and Analysis of Financial Condition and Results of Operations—The Transactions" and "Principal Stockholders."



_____

(1)  In addition to the $1,350 million U.S. senior secured revolving credit facility that URNA will assume upon consummation of the URNA Merger, one of our Canadian subsidiaries will enter into a new $150 million senior secured revolving credit facility (the "Canadian Sub-Facility") that will be guaranteed by URI, URNA, our U.S. subsidiaries that will guarantee and secure our new senior secured credit facilities and the notes offered hereby and foreign subsidiaries of URNA.

(2)  Guarantees will not be given by special purpose financing entities and certain other subsidiaries.

7

## Sources and Uses

The following table summarizes the estimated sources and uses of proceeds in connection with the Transactions expected at closing. The actual amounts set forth in the table and in the accompanying footnotes are subject to adjustment and may differ at the time of the consummation of the Transactions. You should read the following together with the information set forth under "Unaudited Pro Forma Financial Information" and "Management's Discussion and Analysis of Financial Condition and Results of Operations—The Transactions."

| Sources | | Uses | |
|---|---|---|---|
| (Dollars in millions) | | | |
| New senior secured revolving credit facility(1) . | $   443 | Purchase price(4) . . . . . . . . . . . . . . . . . . . . | $3,294 |
| New senior secured term loan facility(1) . . . . | 1,100 | Refinance existing net debt(5) . . . . . . . . . . . | 2,256 |
| Notes offered hereby . . . . . . . . . . . . . . . . . | 2,550 | Repay preferred stock . . . . . . . . . . . . . . . . . | 759 |
| New senior unsecured bridge credit facility(2) . | 1,350 | Merger value of converted subordinated | |
| Equity contribution(3) . . . . . . . . . . . . . . . . . | 1,426 | convertible debentures(6) . . . . . . . . . . . . . | 147 |
| | | Transaction fees and expenses(7) . . . . . . . . . | 413 |
| Total Sources . . . . . . . . . . . . . . . . . . . . . . . | **$6,869** | Total Uses . . . . . . . . . . . . . . . . . . . . . . . . . | **$  6,869** |

(1) Our new senior secured credit facilities will consist of a $1,100 million senior secured term loan facility and $1,500 million senior secured revolving credit facilities (including the $150 million Canadian Sub-Facility). We expect to borrow at closing the full amount under the senior secured term loan for the Transactions and approximately $443 million under the senior secured revolving credit facilities (without giving effect to approximately $138 million of outstanding letters of credit). These levels of borrowing at closing assume that (i) URI's subordinated convertible debentures and URNA's 1⅞% convertible senior subordinated notes are converted as a result of the Acquisition and that holders receive the per share merger consideration and (ii) $125 million of cash will be available at closing and used to refinance a portion of existing debt. See Notes (4) and (6) below. Our new senior secured credit facilities will have a term of six years.

(2) Our new senior unsecured bridge credit facility will consist of $1,350 million in aggregate principal amount of unsecured senior loans and will provide, in the event that such facility is not refinanced within one year of the closing date of such facility, that such facility will become a term loan facility, which will mature on the eighth anniversary of the closing.

(3) Consists of estimated equity indirectly contributed by the Sponsor and others.

(4) We estimate that the aggregate merger consideration payable to our common stock equityholders from the URI Merger will be approximately $3,294 million, which will include merger consideration of $34.50 per share payable with respect to shares of URI common stock issuable upon the conversion of all of URNA's outstanding 1⅞% convertible senior subordinated notes, which are convertible at the rate of approximately $22.25 per share, subject to adjustment. As of September 30, 2007, there was approximately $144 million in aggregate principal amount of such convertible notes outstanding, which would require the payment of an aggregate merger consideration of approximately $223 million if all such convertible notes were converted. See "Description of Other Indebtedness—1⅞% Convertible Senior Subordinated Notes." To the extent that holders of such convertible notes elect not to exercise their conversion rights, then the convertible notes of such holders would remain outstanding and the amount of borrowings expected to be drawn under our new senior secured revolving credit facilities at closing would be reduced by an amount equal to approximately $1.55 for each $1 of principal amount of such convertible notes left outstanding.

(5) Represents our outstanding debt, including approximately $328 million we expect to be outstanding at closing under our existing senior secured term loan facility, approximately $153 million we expect to be outstanding at closing under our existing Canadian credit facility and approximately $1,900 million of our existing notes, less approximately $125 million of cash assumed to be on hand at closing.

(6) Immediately following the closing of the URI Merger, we expect that holders of the 6½% convertible quarterly income preferred securities ("QUIPs") of United Rentals Trust I (the "Trust") will exercise their

right to cause the Trust to convert URI's outstanding 6½% subordinated convertible debentures into shares of common stock of URI to be issuable to such holders. Immediately after the URI Merger, the subordinated convertible debentures will be convertible at the rate of approximately $34.28 per share, subject to adjustment. As of September 30, 2007, there was approximately $146 million in aggregate principal amount of subordinated convertible debentures outstanding, which would require the payment of an aggregate merger consideration of approximately $147 million if all such convertible debentures were converted. See "Description of Other Indebtedness—Subordinated Convertible Debentures." To the extent that holders of the QUIPs do not exercise their conversion rights, then the subordinated convertible debentures applicable to such holders would remain outstanding and the amount of borrowings expected to be drawn under our new senior secured revolving credit facility at closing would be reduced by an amount equal to approximately $1.01 for each $1 of principal amount of subordinated convertible debentures left outstanding.

(7)  Reflects discounts, fees and expenses payable by us, including the initial purchasers' discounts, fees and expenses associated with our tender offers for our existing notes, expenses we incurred in connection with the URI Merger, costs associated with the cancellation of financial derivatives, accrued interest on debt repaid and other payments made in connection with the Transactions.

**The Sponsor**

Founded in 1992, Cerberus Capital Management, L.P. and its affiliates are one of the world's leading private investment firms. Cerberus currently manages approximately $26 billion in funds and accounts and is active in private equity, lending and real estate. Cerberus specializes in providing both financial resources and operational expertise to help transform undervalued companies into industry leaders for long-term success and value creation. Cerberus employs an operations management team of over 120 business executives and, along with its affiliates, holds controlling or significant minority interests in over 50 companies around the world. These companies collectively employ more than 250,000 people and generate annual revenues that exceed $120 billion. Companies owned or controlled by Cerberus or in which its affiliates have a significant equity investment include GMAC Financial Services, Chrysler LLC, Boxclever, Aozora Bank, BAWAG psk, EntreCap Financial Corporation and AerCap Aviation Solutions. Cerberus is headquartered in New York City, with affiliate or advisory offices in Atlanta, Chicago, Los Angeles, London, Baarn, Frankfurt, Hong Kong, Tokyo, Osaka and Taipei.

**The Offering**

Issuer . . . . . . . . . . . . . . . . . . . . . . RAM Transition Corp., prior to the URNA Merger, and United Rentals (North America), Inc., as the surviving entity in the URNA Merger.

Notes Offered . . . . . . . . . . . . . . . $2,550,000,000 aggregate principal amount of     % second priority senior secured notes due 2014.

Maturity . . . . . . . . . . . . . . . . . . . The notes will mature on            , 2014.

Interest Payment Date . . . . . . . . .          and          of each year, commencing            , 2008.

Guarantees . . . . . . . . . . . . . . . . . The notes will be jointly and severally guaranteed on a senior basis by URI and URNA's direct and indirect U.S. subsidiaries that guarantee URNA's new senior secured credit facilities.

On a pro forma basis, the non-guarantor subsidiaries of URNA would have accounted for approximately $178 million, or 14%, of our total Adjusted EBITDA for the LTM Period, and approximately $953 million, or 11% of our total assets, and approximately $192 million (excluding debt under our Canadian Sub-Facility), or 3% of our total liabilities, in each case as of September 30, 2007. To the extent that the purchase price allocation changes the valuation of guarantor and non-guarantor assets and liabilities, the ratio of non-guarantor assets and liabilities to total assets and liabilities could change.

Collateral . . . . . . . . . . . . . . . . . . The notes will be secured by second priority security interests in:

- 100% of the capital stock of certain of URNA's existing and future subsidiaries that are owned directly or indirectly by URNA or any guarantors (subject to certain exceptions); and

- substantially all of the other property and assets, in each case, that are held by URNA or any of the guarantors, to the extent that such assets secure the first priority lien obligations and to the extent that a second priority security interest is able to be granted or perfected therein.

The collateral is subject to a number of important limitations and exceptions as described under "Description of the Notes—Security" and "Risk Factors—Risks Relating to the Notes."

Our new senior secured credit facilities will be secured by first priority liens on the same assets securing the notes and the guarantees thereof. The notes will not be secured by a lien on any asset that does not also secure our obligation under our new senior secured credit facilities.

The value of the collateral at any time will depend on market and other economic conditions, including the availability of suitable buyers for the collateral. In addition, the indenture governing the notes and the security documents will allow us to incur other permitted liens on our assets, as well as additional

indebtedness that may be secured by first or second priority liens on the same collateral securing the notes.

Under certain circumstances, to the extent that the collateral is released under our new senior secured credit facilities, the security interest of the holders of the notes in the same collateral will be released. See "Description of the Notes—Security for the Notes."

The rights of the holders of the notes with respect to the collateral will be substantially limited pursuant to an intercreditor agreement to be entered into between the collateral agent for the notes and the collateral agent for the holders of the indebtedness under our new senior secured credit facilities. See "Description of the Notes—Intercreditor Agreement."

**Ranking** . . . . . . . . . . . . . . . . . . . . The notes and the guarantees will be our and the guarantors' senior secured obligations and will rank:

- senior in right of payment to any of our and the guarantors' existing and future subordinated indebtedness;

- equal in right of payment with all of our and the guarantors' existing and future senior indebtedness; and

- junior in priority as to all collateral with respect to our and the guarantors' obligations under our new senior secured credit facilities and any other future obligations secured by a first priority lien on the collateral.

The notes also will be effectively junior in right of payment to the existing and future liabilities of our non-guarantor subsidiaries. See "Description of the Notes—Ranking."

As of September 30, 2007, after giving pro forma effect to the Transactions:

- we and the guarantors would have had approximately $5,564 million of senior indebtedness outstanding, including approximately $1,543 million of first priority senior secured indebtedness under our new senior secured credit facilities (excluding approximately $138 million of outstanding letters of credit) and $2,550 million of second priority senior secured indebtedness consisting of the notes offered hereby; and

- our non-guarantor subsidiaries would have had approximately $192 million (excluding debt under our Canadian Sub-Facility) of total liabilities, including trade payables.

**Optional Redemption** . . . . . . . . . . At any time prior to                , 2011, URNA may redeem some or all of the notes at a price equal to 100% of the principal amount of the notes redeemed plus accrued and unpaid interest and additional interest, if any, to the applicable redemption date plus a "make-whole" premium set forth in this offering circular. URNA may redeem some or all of the notes at any time on or after                , 2011, at the redemption prices set forth in

this offering circular. In addition, at any time prior to       , 2010, URNA may redeem up to 35% of the aggregate principal amount of the notes using the net proceeds from certain equity offerings at the redemption prices set forth in this offering circular.

**Change of Control** . . . . . . . . . . . .     If a change of control occurs, URNA must give holders of the notes an opportunity to sell us their notes at a purchase price of 101% of the principal amount of such notes, plus accrued and unpaid interest and additional interest, if any, to the date of purchase. The term "Change of Control" is defined under "Description of the Notes—Certain Definitions."

**Certain Covenants** . . . . . . . . . . . .     The indenture governing the notes will contain covenants that, among other things, limit our ability and the ability of URI and certain subsidiaries to:

- incur or guarantee additional indebtedness;
- pay dividends and make other restricted payments;
- incur restrictions on the payment of dividends or other distributions from our restricted subsidiaries;
- create or incur certain liens;
- make certain investments;
- transfer or sell assets;
- engage in transactions with affiliates; and
- merge or consolidate with other companies or transfer all or substantially all of our assets.

These covenants are subject to a number of important limitations and exceptions as described under "Description of the Notes—Certain Covenants."

**Registration Rights** . . . . . . . . . . . .     Under a registration rights agreement to be entered into as part of this offering, URNA will agree to use its commercially reasonable efforts to:

- file a registration statement within 180 days after the issue date of the notes relating to an offer to exchange the notes offered hereby for publicly tradeable notes with substantially identical terms;
- cause the registration statement to become effective within 270 days after the issue date of the notes;
- consummate the exchange offer; and
- file a shelf registration statement for the resale of the notes if it cannot effect an exchange offer within the required time periods and in other limited circumstances.

**Transfer Restrictions** . . . . . . . . . .     We have not registered the notes offered hereby under the Securities Act. Purchasers may only offer or sell notes in transactions exempt from or not subject to the registration requirements of the Securities Act. See "Transfer Restrictions."

13

| | |
|---|---|
| **Use of Proceeds** . . . . . . . . . . . . . . | We will use the net proceeds from the issuance of the notes, borrowings under our new senior secured credit facilities and our new senior unsecured bridge credit facility, the proceeds of the Sponsor's and others' equity investments and cash on hand to consummate the Transactions and to pay related fees and expenses. See "Use of Proceeds." |
| **Conditions to the Offering** . . . . . . | Consummation of this offering will occur concurrently with, and is conditioned upon, the consummation of the other Transactions. See "The Transactions." |

### Risk Factors

You should carefully consider the risk factors set forth under the caption "Risk Factors" and the other information included in this offering circular prior to making an investment in the notes. See "Risk Factors" beginning on page 19.

### Securities and Exchange Commission Investigation

We have been engaged in an ongoing SEC investigation regarding our company. We have received subpoenas from, and have furnished documents to, the SEC and the U.S. Attorney's Office. We have been advised that the SEC may seek injunctions and civil penalties. See "Business—Securities and Exchange Commission Inquiry and Special Committee Review."

### Information About United Rentals

United Rentals is a Delaware corporation founded in 1997. Our principal executive offices are located at Five Greenwich Office Park, Greenwich, Connecticut 06831, and our telephone number is (203) 622-3131. Our corporate web address is *http://www.ur.com*. **Our website and the information on, or accessible through, the website are not a part of, or incorporated by reference in, this offering circular and should not be relied upon by prospective investors in connection with any decision to purchase the notes.**

## Summary Historical and Pro Forma Financial Information

The following table sets forth a summary of our selected historical and pro forma consolidated financial information as of and for the periods presented. The summary historical consolidated financial information for each of the fiscal years ended December 31, 2004, 2005 and 2006, have been derived from our audited consolidated financial statements included elsewhere in this offering circular. The summary historical consolidated financial information as of September 30, 2007 and for the nine-month periods ended September 30, 2006 and September 30, 2007 have been derived from our unaudited interim condensed consolidated financial statements included elsewhere in this offering circular, which have been prepared on a basis consistent with the accounting policies used for our annual audited financial statements. In the opinion of management, such unaudited financial information reflects all adjustments, consisting of only normal recurring adjustments, necessary for a fair presentation of the results for those periods. The results of operations for any interim period are not necessarily indicative of the results that may be expected for a full fiscal year.

The statements of operations information for the LTM Period is derived by subtracting our statements of operations information for the nine months ended September 30, 2006 from our statements of operations information for the year ended December 31, 2006 and adding our statements of operations information for the nine months ended September 30, 2007.

The summary unaudited pro forma financial information gives effect to the Transactions as if they had occurred on January 1, 2006 for purposes of the unaudited pro forma condensed consolidated statements of operations information and as of September 30, 2007 with respect to the unaudited pro forma condensed consolidated balance sheet information. The pro forma adjustments related to the Transactions are preliminary and based upon available information and certain assumptions that we believe are reasonable. The actual adjustments will be made as of the closing date of the Transactions and may differ from those reflected in the summary unaudited pro forma financial information presented below. Such differences may be material.

The summary unaudited pro forma financial information is for illustrative and informational purposes only and does not purport to represent or be indicative of what our financial condition or results of operations information would have been had the Transactions occurred on such dates. See "Management's Discussion and Analysis of Financial Condition and Results of Operations—The Transactions." The unaudited pro forma financial information should not be considered representative of our future financial condition or results of operations.

You should read this information together with the information included under the headings "Use of Non-GAAP Measures," "Risk Factors," "Unaudited Pro Forma Financial Information," "Selected Historical Consolidated Financial Information," "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our historical financial statements and related notes included elsewhere in this offering circular.

| | Years Ended December 31, | | | Nine Months Ended September 30, | | LTM Period | |
|---|---|---|---|---|---|---|---|
| | 2004 | 2005 | 2006 | 2006 | 2007 | Historical | Pro Forma |
| | | | | (Dollars in millions) | | | |
| **Income statement data:** | | | | | | | |
| Revenues: | | | | | | | |
| Equipment rentals | $2,058 | $2,338 | $2,530 | $1,874 | $1,947 | $2,603 | $2,603 |
| Sales of rental equipment | 272 | 304 | 335 | 248 | 243 | 330 | 330 |
| New equipment sales | 177 | 205 | 232 | 172 | 177 | 237 | 237 |
| Contractor supplies sales | 202 | 301 | 385 | 288 | 301 | 398 | 398 |
| Service and other revenues | 126 | 140 | 158 | 119 | 133 | 172 | 172 |
| Total revenues | 2,835 | 3,288 | 3,640 | 2,701 | 2,801 | 3,740 | 3,740 |
| Gross profit: | | | | | | | |
| Gross profit from equipment rentals | 711 | 858 | 985 | 720 | 741 | 1,006 | 877 |
| Gross profit from sales of rental equipment | 76 | 81 | 98 | 76 | 69 | 91 | 19 |
| Gross profit from new equipment sales | 31 | 37 | 41 | 31 | 30 | 40 | 40 |
| Gross profit from contractor supplies | 54 | 70 | 83 | 54 | 56 | 85 | 85 |
| Gross profit from service and other revenues | 61 | 69 | 82 | 61 | 73 | 94 | 94 |
| Total gross profit | 933 | 1,115 | 1,289 | 942 | 969 | 1,316 | 1,115 |
| Selling, general and administrative expenses | 449 | 553 | 613 | 453 | 447 | 607 | 607 |
| Restructuring benefit | (4) | — | — | — | — | — | — |
| Non-rental depreciation and amortization | 41 | 38 | 50 | 37 | 38 | 51 | 165 |
| Operating income | 447 | 524 | 626 | 452 | 484 | 658 | 343 |
| Interest expense, net | 327 | 181 | 208 | 157 | 146 | 197 | 600 |
| Interest expense—subordinated convertible debentures | 14 | 14 | 13 | 11 | 7 | 9 | — |
| Other expense (income), net | 6 | (2) | — | — | (7) | (7) | (7) |
| Income (loss) from continuing operations before provision for income taxes | 100 | 331 | 405 | 284 | 338 | 459 | (250) |
| Provision (benefit) for income taxes | 28 | 129 | 156 | 112 | 128 | 172 | (102) |
| Income (loss) from continuing operations | 72 | 202 | 249 | 172 | 210 | 287 | (148) |
| Loss from discontinued operations, net of taxes | (156) | (15) | (25) | (1) | (1) | (25) | |
| Net income (loss) | $ (84) | $ 187 | $ 224 | $ 171 | $ 209 | $ 262 | |
| **Cash flow data-continuing operations:** | | | | | | | |
| Purchases of rental equipment | $ (586) | $ (746) | $ (873) | $ (787) | $ (785) | $ (871) | |
| Purchases of non-rental equipment | (39) | (56) | (78) | (50) | (81) | (109) | |
| Proceeds from rental equipment sales | 272 | 304 | 335 | 248 | 243 | 330 | |
| Proceeds from non-rental equipment sales | 8 | 11 | 17 | 13 | 20 | 24 | |
| Cash flow provided by (used for): | | | | | | | |
| Operating activities | 703 | 638 | 833 | 589 | 484 | 728 | |
| Investing activities | (424) | (526) | (638) | (615) | (626) | (649) | |
| Financing activities | (64) | (80) | (404) | (156) | 47 | (201) | |
| **Other financial data:** | | | | | | | |
| EBITDA(1) | $ 848 | $ 950 | $1,084 | $ 793 | $ 850 | $1,141 | $1,069 |
| Free cash flow(2) | 381 | 151 | 234 | 13 | (119) | 102 | |
| Adjusted EBITDA(3) | | | | | | | 1,233 |
| Cash paid for interest | | | | | | | 561 |
| Ratio of Adjusted EBITDA to cash paid for interest | | | | | | | 2.2x |
| Ratio of total debt to Adjusted EBITDA | | | | | | | 4.5x |

|  | At September 30, 2007 | |
|---|---|---|
|  | Historical | Pro Forma |
|  | (Dollars in millions) | |
| **Balance sheet data:** | | |
| Cash and cash equivalents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 112 | $ — |
| Rental equipment, net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,918 | 3,600 |
| Total assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 5,717 | 8,971 |
| Total debt, including subordinated convertible debentures . . . . . . . . . . . . . . . . . . . . . . . . . | 2,759 | 5,564 |
| Total stockholders' equity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,865 | 1,426 |

(1) EBITDA is defined as earnings before interest, income taxes, depreciation and amortization, restructuring benefit and discontinued operation. See "Use of Non-GAAP Measures." The table below provides a reconciliation of net income (loss) to EBITDA for the periods indicated:

|  | Years Ended December 31, | | | Nine months Ended September 30, | | LTM Period | |
|---|---|---|---|---|---|---|---|
|  | 2004 | 2005 | 2006 | 2006 | 2007 | Historical | Pro forma |
|  | (Dollars in millions) | | | | | | |
| Net income (loss) . . . . . . . . . . . . | $ (84) | $ 187 | $ 224 | $171 | $209 | $ 262 | |
| Plus: | | | | | | | |
| Loss from discontinued operation, net . . . . . . . . . . | 156 | 15 | 25 | 1 | 1 | 25 | |
| Income taxes . . . . . . . . . . . . | 28 | 129 | 156 | 112 | 128 | 172 | |
| Income (loss) from continuing operations before provision for income taxes . . . . . . . . | 100 | 331 | 405 | 284 | 338 | 459 | $ (250) |
| Interest expense, net . . . . . . . | 327 | 181 | 208 | 157 | 146 | 197 | 600 |
| Interest expense—subordinated convertible debentures . . . . | 14 | 14 | 13 | 11 | 7 | 9 | — |
| Depreciation—rental equipment . . . . . . . . . . . . | 370 | 386 | 408 | 304 | 321 | 425 | 554 |
| Non-rental equipment depreciation . . . . . . . . . . . | 41 | 38 | 50 | 37 | 38 | 51 | 165 |
| Restructuring benefit . . . . . . . | (4) | — | — | — | — | — | — |
| EBITDA . . . . . . . . . . . . . . . | $ 848 | $ 950 | $1,084 | $793 | $850 | $1,141 | $1,069 |

(2) Free cash flow is defined as (i) net cash provided by operating activities—continuing operations less (ii) purchases of rental and non-rental equipment plus (iii) proceeds from sales of rental and non-rental equipment and from sale-leaseback transactions. See "Use of Non-GAAP Measures." The table below provides a reconciliation between net cash provided by operating activities—continuing operations and free cash flow for the periods presented.

|  | Years Ended December 31, | | | Nine Months Ended September 30, | | LTM Period |
|---|---|---|---|---|---|---|
|  | 2004 | 2005 | 2006 | 2006 | 2007 | Historical |
|  | (Dollars in millions) | | | | | |
| Net cash provided by operating activities—continuing operations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 703 | $ 638 | $ 833 | $ 589 | $ 484 | $ 728 |
| Less: | | | | | | |
| Purchases of rental equipment . . . . . . . . . . . . . . . . . | (586) | (746) | (873) | (787) | (785) | (871) |
| Purchases of non-rental equipment . . . . . . . . . . . . . | (39) | (56) | (78) | (50) | (81) | (109) |
| Plus: | | | | | | |
| Proceeds from sales of rental equipment . . . . . . . . | 272 | 304 | 335 | 248 | 243 | 330 |
| Proceeds from sales of non-rental equipment . . . . . | 8 | 11 | 17 | 13 | 20 | 24 |
| Proceeds from sale-leaseback transactions . . . . . . . | 23 | — | — | — | — | — |
| Free cash flow . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 381 | $ 151 | $ 234 | $ 13 | $(119) | $ 102 |

(3)  Adjusted EBITDA is defined as EBITDA adjusted to exclude the items described below:

|  | Pro Forma LTM Period |
| --- | --- |
|  | (Dollars in millions) |
| EBITDA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $  1,069 |
| Plus: |  |
| Increase in cost of equipment sold(a) . . . . . . . . . . . . . . . . . . . . . . | 72 |
| Non-cash stock compensation(b) . . . . . . . . . . . . . . . . . . . . . . . . . | 18 |
| Transaction-related expense(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . | 6 |
| Headcount reductions(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 59 |
| Amendment of former chairman's service agreement . . . . . . . . . . . | 5 |
| Other SG&A related corporate savings(e) . . . . . . . . . . . . . . . . . . . | 4 |
| Adjusted EBITDA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $  1,233 |

(a)  In connection with the application of purchase accounting reflected in the pro forma financial information, the fair market value of equipment sold during the period is recorded at the preliminary estimated fair market value of the equipment. This adjustment reflects the difference between the historical net book value and the new adjusted book value based on the application of our preliminary purchase accounting.

(b)  Reflects non-cash stock-based compensation expense.

(c)  Relates to professional fees and retention-related charges incurred in connection with the Acquisition and the Transactions. All costs reflected were incurred in the nine month period ended September 30, 2007.

(d)  Represents annualized cost savings associated with either actual or identified headcount reductions, net of related severance.

(e)  Includes (i) the full year effect of the recent termination of the corporate jet program primarily used by our former chairman and our former chief executive officer, estimated at $2 million, (ii) the full year effect of the elimination of our National Hockey League sponsorship agreement, estimated at $1 million, and (iii) reduced third party professional fees associated with the insourcing of our internal audit function, estimated at $1 million.

Exhibit B-2

# RISK FACTORS

*Any investment in the notes involves a high degree of risk. You should consider carefully the following information about these risks, together with the other information contained in this offering circular, before buying any of the notes. If any of the following risks actually occur, our business, financial condition, operating results or cash flow could be materially and adversely affected. Additional risks or uncertainties not presently known to us, or that we currently deem immaterial, may also impair our business operations. We cannot assure you that any of the events discussed in the risk factors below will not occur and if such events do occur, you may lose all or part of your original investment in the notes.*

## Risks Related to Our Indebtedness

***Our substantial indebtedness will require us to devote a substantial portion of our cash flow to debt service and could, among other things, constrain our ability to obtain additional financing and make it more difficult for us to cope with a downturn in our business.***

After completing the Transactions, we will be highly leveraged. As of September 30, 2007, after giving pro forma effect to the Transactions, we would have had approximately $5,564 million of total debt outstanding. Based on anticipated borrowings under our new senior secured credit facilities of approximately $1,543 million on the closing date of the Transactions, we would have had an additional $919 million available under such facilities, which amount will increase based upon increases in our borrowing base. In addition, we would have had approximately $138 million of outstanding letters of credit issued for our account.

Our high degree of leverage could have important consequences for you, including:

- increasing our vulnerability to adverse economic, industry or competitive developments;
- limiting our flexibility in planning for, or reacting to, changes in our business or market conditions and placing us at a competitive disadvantage compared to competitors who are not as highly leveraged;
- requiring us to devote a substantial portion of our cash flow to debt service, reducing the funds available for other purposes, including operations, capital expenditures and future business opportunities;
- affecting our ability to obtain additional financing, particularly since substantially all of our assets will be subject to security interests relating to our indebtedness; or
- decreasing our profitability and/or cash flow.

Further, if we are unable to service our indebtedness and fund our operations, we will be forced to adopt an alternative strategy that may include:

- reducing or delaying capital expenditures;
- limiting our growth;
- seeking additional capital;
- selling assets; or
- restructuring or refinancing our indebtedness.

Even if we adopt an alternative strategy, the strategy may not be successful and we may continue to be unable to service our indebtedness and fund our operations.

***Despite our high indebtedness level, we may still be able to incur substantially more debt. This could further exacerbate the risks associated with our substantial leverage.***

We may be able to incur substantial additional indebtedness in the future. Although the indenture governing the notes and the terms of our new senior secured credit facilities will contain restrictions on the incurrence of additional indebtedness, these restrictions are subject to a number of qualifications and exceptions, and the indebtedness incurred in compliance with these restrictions could be substantial. Specifically, the indenture governing the notes will permit us to incur all the indebtedness provided for under our new senior secured credit facilities. Based on anticipated borrowings under our new senior secured credit facilities of approximately $1,543 million on the closing date of the Transactions, we would have had an additional $919 million of availability under such facilities (net of approximately $138 million of outstanding letters of credit), which amount will increase to the extent of increases in our borrowing base. Furthermore, the restrictions in the indenture governing the notes and our new senior secured credit facilities do not prevent us from incurring obligations that do not constitute indebtedness. To the extent new indebtedness is added to our and our subsidiaries' current debt levels, the substantial leverage risks described above would increase.

***To service our indebtedness and other obligations, we will require a significant amount of cash. Our ability to generate cash depends on many factors beyond our control.***

For the year ended December 31, 2006 and the nine months ended September 30, 2007, on a pro forma basis after giving effect to the Transactions, our earnings would have been insufficient to cover fixed charges. We would have had to have generated additional earnings of $272 million and $201 million, respectively, to have achieved a ratio of earnings to fixed charges of 1:1. Our ability to make payments on and to refinance our indebtedness, including the notes, and to fund working capital needs and planned capital expenditures will depend on our ability to generate cash in the future. This, to a certain extent, is subject to general economic, financial, competitive and other factors that are beyond our control.

We cannot assure you that our business will generate sufficient cash flows from operations or that future borrowings will be available to us under our new senior secured credit facilities or otherwise in an amount sufficient to enable us to pay our indebtedness, including the notes, or to fund our other liquidity needs. If we do not generate sufficient cash flows from operations to satisfy our debt obligations, including payments on the notes, we may have to undertake alternative financing plans, such as refinancing or restructuring our debt, selling assets, reducing or delaying capital investments or seeking to raise additional capital. We cannot assure you that any refinancing would be possible, that any assets could be sold, or, if sold, of the timing of the sales and the amount of proceeds realized from those sales, or that additional financing could be obtained on acceptable terms, if at all. Our ability to restructure or refinance our debt will depend on the condition of the capital markets and our financial condition at that time. Any refinancing of our debt could result in higher interest rates and may require us to comply with more onerous covenants, which could further restrict our business operations.

***Our new senior secured credit facilities, our new senior unsecured bridge credit facility and the indenture governing the notes offered hereby will impose significant operating and financial restrictions, which may prevent us from capitalizing on business opportunities and taking some actions.***

Our new senior secured credit facilities, our new senior unsecured bridge credit facility and the indenture governing the notes offered hereby will contain a number of restrictive covenants that will impose significant operating and financial restrictions on us, including covenants that restrict us and our subsidiaries from, in certain circumstances:

- incurring additional indebtedness and issuing certain preferred stock;

- paying dividends on our equity interests or redeeming, repurchasing or retiring our equity interests or subordinated indebtedness;

- transferring or selling our assets;

- making investments;

- creating liens and entering into sale/leaseback transactions;

- creating restrictions on the ability of our subsidiaries to pay dividends or make other payments to us;

- engaging in transactions with our affiliates; and

- merging or consolidating with other companies or transferring all or substantially all our assets.

In addition, under our new senior secured revolving credit facility, in the event that the sum of our availability under such facility is less than $250 million (such an event being a "covenant trigger"), until such covenant trigger is cured, we will be required to maintain a fixed charge coverage ratio for the four fiscal quarter period then ending and a total leverage ratio for such period. Should we not be able to maintain either of such ratios, and if we fail to be in compliance with either of these tests, we will not be able to borrow additional funds under our new senior secured revolving credit facilities, which may make it difficult for us to operate our business.

The terms of our senior unsecured bridge credit facility and the unsecured high yield debt securities that we intend to issue following the closing date of the Transactions to refinance such facility (the "take-out securities") are expected to contain negative covenants and events of default similar to, and in certain instances more restrictive and less favorable to us than, the negative covenants and events of default under the indenture governing the notes offered hereby. To the extent any covenants or events of default thresholds materially differ from those of the notes offered hereby, an event that otherwise would not adversely affect us or the notes could result in a default or event of default under our senior unsecured bridge credit facility or indenture governing the take-out securities, which could result in a cross-default under our new senior secured credit facilities or the indenture governing the notes offered hereby.

In addition, the applicable margin on the interest rate under our senior secured bridge credit facility will increase by 50 basis points if such facility has not been refinanced within six months after the initial funding of such facility, and by an additional 50 basis points every three months thereafter that any debt under such facility remains outstanding up to a maximum interest rate of 12.25% per annum. Additionally, the take-out securities may be issued at a substantial discount, in addition to customary fees, commissions and expenses, which would result in the incurrence of additional indebtedness in order to refinance our senior unsecured bridge credit facility and to be able to pay such fees, commissions and expenses. Moreover, the interest rate and the amount of the debt service obligations applicable to the take-out securities may be significantly higher than the corresponding amounts under our senior unsecured bridge credit facility. The increased amount of such debt service obligations and, to the extent applicable, the increased amount of the debt we incur in order to refinance our senior unsecured bridge credit facility, may have a material adverse effect on our ability to service our debt obligations, including the notes offered hereby, our ability to satisfy our financial covenants under our new senior secured credit facilities and our ability to grow our business and implement our strategy.

The restrictions in the indenture governing the notes and the documentation governing our new senior secured credit facilities and our new senior unsecured bridge credit facility (or the indenture governing any take-out securities) may prevent us from taking actions that we believe would be in the best interests of our business and may make it difficult for us to successfully execute our business strategy or effectively compete with companies that are not similarly restricted. We also may incur

21

future debt obligations that might subject us to additional restrictive covenants that could affect our financial and operational flexibility. We cannot assure you that we will be granted waivers or amendments to these agreements if for any reason we are unable to comply with these agreements. The breach of any of these covenants and restrictions could result in a default, which could result in an acceleration of our indebtedness.

***If we default on our obligations to pay our other indebtedness, we may not be able to make payments on the notes.***

Any default under the agreements governing our indebtedness, including a default under our new senior secured credit facilities, and the remedies sought by the holders of such indebtedness, could adversely affect our ability to pay the principal, premium, if any, and interest on the notes and substantially decrease the market value of the notes. If we are unable to generate sufficient cash flows and are otherwise unable to obtain funds necessary to meet required payments of principal, premium, if any, and interest on our indebtedness, or if we otherwise fail to comply with the various covenants, including financial and operating covenants, in the instruments governing our indebtedness (including our new senior secured credit facilities), we would be in default under the terms of the agreements governing such indebtedness. In the event of such default, the holders of such indebtedness could elect to declare all the funds borrowed thereunder to be due and payable, the lenders under our new senior secured credit facilities could elect to terminate their commitments or cease making further loans and institute foreclosure proceedings against our assets, or we could be forced to apply all available cash flows to repay such indebtedness, and, in any such case, we could ultimately be forced into bankruptcy or liquidation. Because the indenture governing the notes and the agreements governing our new senior secured credit facilities will have customary cross-default or cross-acceleration provisions, if the indebtedness under the notes or under our new senior secured credit facilities is accelerated, we may be unable to repay or refinance the amounts due. See "Description of Other Indebtedness" and "Description of the Notes."

***An increase in market interest rates would increase our interest expense and our debt service obligations because some of our debt bears interest at variable rates.***

A portion of our indebtedness bears interest at variable rates that are linked to changing market interest rates. As a result, an increase in market interest rates would increase our interest expense and our debt service obligations. Our pro forma cash paid for interest, for the twelve months ended September 30, 2007, would have been $561 million. At September 30, 2007, on a pro forma basis, we would have had approximately $2,938 million aggregate principal amount of indebtedness that bears interest at variable rates. This amount represents approximately 53% of our total indebtedness. A 1% increase in such rates would increase our annual interest expense by approximately $29 million.

**Risks Related to the Notes**

***The notes offered hereby will be structurally subordinated to all of the debt and liabilities of our non-guarantor subsidiaries.***

Some of our subsidiaries, including our foreign subsidiaries, will not guarantee the notes offered hereby. In addition, under certain circumstances the guarantees with respect to the notes can be released. See "Description of the Notes—Guarantees." Generally, claims of creditors (both secured and unsecured) of a non-guarantor subsidiary, including trade creditors and claims of preference shareholders (if any) of the subsidiary (or the equivalent of any of the foregoing under local law), will have priority with respect to the assets and cash flow of the non-guarantor subsidiary over the claims of creditors of its parent entity. In the event of a bankruptcy, liquidation or reorganization or other bankruptcy or insolvency proceeding of any of these non-guarantor subsidiaries (or the equivalent of any of the foregoing under local law), holders of the notes offered hereby will participate with all other

holders of our indebtedness in the assets remaining and dividended or otherwise distributed or paid to the issuer after the subsidiaries involved in such proceedings have paid all of their debts and liabilities. In any of these cases, the relevant subsidiaries may not have sufficient funds to make payments to us.

On a pro forma basis, our non-guarantor subsidiaries would have accounted for approximately $178 million, or 14%, of our total Adjusted EBITDA, for the twelve months ended September 30, 2007, and approximately $953 million, or 11%, of our total assets, and approximately $192 million (excluding debt under our Canadian Sub-Facility), or 3%, of our total liabilities, as of September 30, 2007. To the extent that the final purchase price allocation adjustments change the valuation of guarantor and non-guarantor assets and liabilities, the ratio of non-guarantor assets and liabilities to total assets and liabilities could change.

***There may not be sufficient collateral to satisfy our obligations under all or any of the notes.***

Indebtedness under our new senior secured credit facilities will be secured by (i) a first-priority lien on substantially all of our assets and the assets of the guarantors and (ii) a pledge of the capital stock and other equity interests held by us or any guarantor (except that we will not pledge more than 65% of the voting stock and other equity interests of any foreign subsidiary). The notes are secured by a second priority lien on the assets that secure the new senior secured credit facilities. In the event of a bankruptcy, liquidation, dissolution, reorganization or similar proceeding against us, the proceeds of the assets securing the new senior secured credit facilities and the notes offered hereby must first be used to pay in full both the new senior secured credit facilities and any other obligation secured by a priority lien on the collateral before making any payments on the notes.

As of September 30, 2007, after giving pro forma effect to the Transactions, we would have had approximately $5,564 million of outstanding indebtedness and $138 million of outstanding letters of credit with a prior claim on the collateral. Based on anticipated borrowings under our new senior secured credit facilities of approximately $1,543 million on the closing date of the Transactions, we would have had an additional $919 million of availability under such facilities, which amount would increase based upon increases in our borrowing base. In addition, the indenture governing the notes allows a significant amount of indebtedness and other obligations to be secured by a lien on the collateral securing the notes on a first priority basis, and a significant additional amount of indebtedness secured by a lien on such collateral on an equal and ratable basis, provided that, in each case, such indebtedness or other obligations could be incurred under the debt incurrence covenant contained in the indenture. Any additional obligation secured by a lien on the collateral securing the notes (whether senior to or equal with the second priority lien of such notes) will adversely affect the relative position of the holders of such notes with respect to the collateral securing such notes.

The assets owned by our foreign subsidiaries are not part of the collateral securing the notes. Our foreign subsidiaries will be permitted to incur substantial indebtedness in compliance with covenants under our new senior secured credit facilities and the indenture governing the notes. With respect to those assets that are not part of the collateral securing the notes but which secure other obligations, the notes will be effectively junior to these obligations to the extent of the value of such assets.

The value of the collateral at any time will depend on market and other economic conditions, including the availability of suitable buyers for the collateral. By their nature, some or all of the pledged assets may be illiquid and may have no readily ascertainable market value. The value of the assets pledged as collateral for the notes could be impaired in the future as a result of changing economic conditions, our failure to implement our business strategy, competition and other future trends. In the event of a foreclosure, liquidation, bankruptcy or similar proceeding, no assurance can be given that the proceeds from any sale or liquidation of the collateral will be sufficient to pay our obligations under the notes, in full or at all, after first satisfying our obligations under the new senior secured credit facilities and any other obligations secured by a priority lien on the collateral.

23

Accordingly, there may not be sufficient collateral to pay all or any of the amounts due on the notes. After the proceeds of the collateral have been used to satisfy the notes and any other indebtedness with a *pari passu* lien on the collateral, any notes remaining outstanding will be general unsecured claims that are equal in right of payment with our and the guarantors' unsecured unsubordinated indebtedness and other obligations, including trade payables.

### Holders of the notes will not control decisions regarding collateral.

Under the terms of the Intercreditor Agreement, at any time obligations that have the benefit of the first priority liens on the collateral are outstanding, any actions that may be taken in respect of the collateral, including the ability to cause the commencement of enforcement proceedings against the collateral and to control the conduct of such proceedings, and the approval of amendments to, releases of collateral from the lien of, and waivers of past defaults under, the security documents, will be taken at the direction of the holders of the obligations secured by the priority liens and neither the trustee nor the collateral agent, on behalf of the holders of the notes, will have the ability to control or direct such actions, even if the rights of the holders of such notes are adversely affected, subject to certain exceptions. As a result, the lenders under the new senior secured credit facilities will control substantially all matters related to the collateral securing the new senior secured credit facilities and the notes. The lenders under the new senior secured credit facilities may cause the collateral agent for such facilities to dispose of, release or foreclose on, or take other actions with respect to, the shared collateral with which holders of the notes may disagree or that may be contrary to the interests of holders of such notes. To the extent shared collateral is released from liens securing the new senior secured credit facilities, the liens on such assets (but not the proceeds therefrom) securing the notes will also automatically be released.

In addition, the security documents generally provide that, so long as the senior secured credit facilities are in effect, the lenders under the senior secured credit facilities may change, waive, modify or vary the security documents without the consent of the holders of the notes, provided that any such change, waiver or modification does not materially adversely affect the rights of the holders of such notes and not the other secured creditors in a like or similar manner. See "Description of the Notes— Security."

Furthermore, the security documents generally allow us and our subsidiaries to remain in possession of, retain exclusive control over, freely operate and collect, invest and dispose of any income from the collateral securing the notes. In addition, to the extent we sell any assets that constitute collateral, the proceeds from such sale will be subject to the second priority lien securing the notes only to the extent such proceeds would otherwise constitute "collateral" securing such notes under the security documents. To the extent the proceeds from any such sale of collateral do not constitute "collateral" under the security documents, the pool of assets securing the notes would be reduced and such notes would not be secured by such proceeds.

### The value of the collateral securing the notes may be insufficient to secure post-petition interest or to permit the entire claim for principal to be treated as secured.

In the event of a bankruptcy, liquidation, dissolution, reorganization or similar proceeding against the guarantors located in the U.S., holders of the notes will only be entitled to post-petition interest under the U.S. federal bankruptcy code to the extent that the value of their security interest in the collateral is greater than their pre-bankruptcy claim. In such event, holders of the notes may be deemed to have an unsecured claim to the extent that our obligations in respect of the notes exceed the fair market value of the collateral securing the notes. As a result, holders of the notes that have a security interest in collateral with a value equal or less than their pre-bankruptcy claim will not be entitled to post-petition interest under the bankruptcy code.

24

In addition, it is possible that the bankruptcy trustee, the debtor-in-possession or competing creditors will assert that the fair market value of the collateral with respect to the notes on the date of the bankruptcy filing was less than the then-current principal amount of the notes. Upon a finding by a bankruptcy court that the notes are under-collateralized, the claims in the bankruptcy proceeding with respect to the notes would be bifurcated between a secured claim and an unsecured claim, and the unsecured claim would not be entitled to the benefits of security in the collateral. Other consequences of a finding of under-collateralization would be, among other things, a lack of entitlement on the part of the notes to receive post-petition interest and a lack of entitlement on the part of the unsecured portion of such notes to receive other "adequate protection" under U.S. federal bankruptcy laws. In addition, if any payments of post-petition interest had been made at the time of such a finding of under-collateralization, those payments could be recharacterized by the bankruptcy court as a reduction of the principal amount of the secured claim with respect to the notes.

***The collateral securing the notes may be released, and if all the collateral is released, the notes will no longer be secured obligations.***

The indenture governing the notes permits us to release assets from the collateral for sale or other disposition, subject to certain conditions. In addition, upon the release of a guarantor from its guarantee of the notes, such guarantor's assets will also be released from the collateral. Finally, if at any time the new senior secured credit facilities (and all other first priority lien obligations, as defined) release collateral, then such collateral will also be released from the liens securing the notes. To the extent collateral is released from the liens securing the notes, the value of the remaining collateral will be less; and, if all collateral is so released, the notes will no longer constitute secured obligations.

***Rights of holders of the notes in the collateral may be adversely affected by bankruptcy proceedings.***

The right of the security agent to repossess and dispose of the collateral securing the notes offered hereby upon acceleration is likely to be significantly impaired by U.S. federal bankruptcy law if bankruptcy proceedings are commenced by or against us prior to or possibly even after the security agent has repossessed and disposed of the collateral. Under the U.S. Bankruptcy Code, a secured creditor, such as the security agent, is prohibited from repossessing its security from a debtor in a bankruptcy case, or from disposing of security repossessed from a debtor, without bankruptcy court approval. Moreover, U.S. bankruptcy law permits the debtor to continue to retain and to use collateral, and the proceeds, products, rents or profits of the collateral, even though the debtor is in default under the applicable debt instruments, provided that the secured creditor is given "adequate protection." The meaning of the term "adequate protection" may vary according to circumstances, but it is intended in general to protect the value of the secured creditor's interest in the collateral and may include cash payments or the granting of additional security, if and at such time as the court in its discretion determines, for any diminution in the value of the collateral as a result of the stay of repossession or disposition or any use of the collateral by the debtor during the pendency of the bankruptcy case. In view of the broad discretionary powers of a bankruptcy court, it is impossible to predict how long payments under the notes offered hereby could be delayed following commencement of a bankruptcy case, whether or when the security agent would repossess or dispose of the collateral, or whether or to what extent holders of the notes offered hereby would be compensated for any delay in payment of loss of value of the collateral through the requirements of "adequate protection." Furthermore, in the event the bankruptcy court determines that the value of the collateral is not sufficient to repay all amounts due on the notes offered hereby, the holders of such notes would have "undersecured claims" as to the difference. U.S. federal bankruptcy laws do not permit the payment or accrual of interest, costs and attorneys' fees for "undersecured claims" during the debtor's bankruptcy case.

*Any future pledge of collateral might be avoidable by a trustee in bankruptcy.*

Any future pledge of collateral in favor of the collateral agent, including pursuant to security documents delivered after the date of the indenture governing the notes, might be avoidable by the pledgor (as debtor in possession) or by its trustee in bankruptcy if certain events or circumstances exist or occur, including, among others, if the pledgor is insolvent at the time of the pledge, the pledge permits the holders of the notes to receive a greater recovery than if the pledge had not been given and a bankruptcy proceeding in respect of the pledgor is commenced within 90 days following the pledge, or, in certain circumstances, a longer period.

*Rights of holders of the notes may be adversely affected by the failure to perfect security interests in certain collateral acquired in the future.*

The security interest in the collateral securing the notes includes domestic assets, both tangible and intangible, whether now owned or acquired or arising in the future. Applicable law requires that certain property and rights acquired after the grant of a general security interest can only be perfected at the time such property and rights are acquired and identified. There can be no assurance that the trustee or the collateral agent will monitor, or that we will inform the trustee or the collateral agent of, the future acquisition of property and rights that constitute collateral, and that the necessary action will be taken to properly perfect the security interest in such after-acquired collateral. Such failure may result in the loss of the security interest therein or the priority of the security interest in favor of the notes against third parties.

*The guarantee of the notes by URI does not give noteholders a claim to significant assets other than those to which they already have a claim as direct creditors of URNA. Furthermore, substantially all of URI's assets are subject to an existing security interest, which gives certain of our lenders a priority claim to such assets.*

The notes are guaranteed by URI. However, substantially all of URI's net worth is attributable to the stock of URNA owned by URI. Consequently, the URI guarantee does not give noteholders a claim to any significant assets other than those to which they already have a claim as direct creditors of URNA. Furthermore, substantially all of URI's assets are subject to a first priority security interest in favor of the lenders under our new senior secured credit facilities, which give these lenders a claim to such assets.

*We may not be able to repurchase the notes upon a change of control.*

Upon the occurrence of specific kinds of change of control events, we will be required to offer to repurchase all outstanding notes at 101% of their principal amount plus accrued and unpaid interest. The source of funds for any such purchase of the notes will be our available cash or cash generated from our subsidiaries' operations or other sources, including borrowings, sales of assets or sales of equity. We may not be able to repurchase the notes upon a change of control because we may not have sufficient financial resources to purchase all of the notes that are tendered upon a change of control. Further, we will be contractually restricted under the terms of our new senior secured credit facilities from repurchasing the notes tendered by holders upon a change of control. Accordingly, we may not be able to satisfy our obligations to purchase the notes unless we are able to refinance or obtain waivers under our new senior secured credit facilities. Our failure to repurchase the notes upon a change of control would cause a default under the indenture governing the notes and a cross default under the new senior secured credit facilities. The new senior secured credit facilities also provide that a change of control will be a default that permits the lenders to accelerate the maturity of borrowings thereunder. Any of our future debt agreements may contain similar provisions.

26

***Federal and state fraudulent transfer laws may permit a court to void the notes and the guarantees, subordinate claims in respect of the notes and the guarantees and require noteholders to return payments received and, if that occurs, you may not receive any payments on the notes.***

Federal and state fraudulent transfer and conveyance statutes may apply to the issuance of the notes and the incurrence of any guarantees of the notes, including the guarantee by the guarantors entered into upon issuance of the notes and subsidiary guarantees (if any) that may be entered into thereafter under the terms of the indenture governing the notes. Under federal bankruptcy law and comparable provisions of state fraudulent transfer of conveyance laws, which may vary from state to state, the notes or guarantees could be voided as a fraudulent transfer of conveyance if (1) we or any of the guarantors, as applicable, issued the notes or incurred the guarantees with the intent of hindering, delaying or defrauding creditors or (2) we or any of the guarantors, as applicable, received less than reasonably equivalent value or fair consideration in return for either issuing the notes or incurring the guarantees and, in the case of (2) only, one of the following is also true at the time thereof:

- we or such guarantor, as applicable, were insolvent or rendered insolvent by reason of the issuance of the notes or the incurrence of the guarantee;

- the issuance of the notes or the incurrence of such guarantee left us or such guarantor, as applicable, with an unreasonably small amount of capital to carry on the business; or

- we or such guarantor intended to, or believed that we or such guarantor would, incur debts beyond our or such guarantor's ability to pay such debts as they mature.

We cannot be certain as to the standards a court would use to determine whether or not we or the guarantors were solvent at the relevant time. Generally, however, an entity would be considered insolvent if, at the time it incurred indebtedness:

- the sum of its debts, including contingent liabilities, was greater than the fair saleable value of all its assets; or

- the present fair saleable value of its assets was less than the amount that would be required to pay its probable liability on its existing debts, including contingent liabilities, as they became absolute and mature; or

- it could not pay its debts as they became due.

If a court were to find that the issuance of the notes or the incurrence of the guarantee was a fraudulent transfer or conveyance, the court could void the payment obligations under the notes or such guarantee or subordinate the notes or such guarantee to presently existing and future indebtedness of ours or of the related guarantor, or require the holders of the notes to repay any amounts received with respect to the notes or such guarantee. In the event of a finding that a fraudulent transfer or conveyance occurred, you may not receive any repayment on the notes.

***There are restrictions on your ability to transfer or resell the notes without registration under applicable securities laws.***

The notes are being offered and sold pursuant to an exception from registration under U.S. and applicable state securities laws. Therefore, you may transfer or resell the notes in the U.S. only in a transaction registered under or exempt from the registration requirements of the U.S. and applicable state securities laws, and you may be required to bear the risk of your investment for an indefinite period of time. By purchasing the notes, you will be deemed to have made certain acknowledgements, representations and agreements as set forth under "Transfer Restrictions."

*Your ability to transfer the notes may be limited by the absence of an active trading market, and there is no assurance that any active trading market will develop for the notes.*

The notes are new issues of securities for which there is not an established public market. We do not intend to have the notes listed on a national securities exchange or included in any automated quotation system, although we expect the notes to be eligible for trading by "qualified institutional buyers," as defined under Rule 144A of the Securities Act, in The PORTAL℠ Market ("PORTAL"), a subsidiary of The Nasdaq Stock Market, Inc.

The initial purchasers have advised us that they intend to make a market in the notes, and the exchange notes, if issued, as permitted by applicable laws and regulations; however, the initial purchasers are not obligated to make a market in any of the notes or the exchange notes, and they may discontinue their market making activities at any time without notice. Therefore, an active market for any of the notes or exchange notes may not develop or, if developed, it may not continue. The liquidity of any market for the notes will depend upon the number of holders of the notes, our performance, the market for similar securities, the interest of securities dealers in making a market in the notes and other factors. Additionally, a liquid trading market may not develop for the notes or any series of notes. If a market develops, the notes could trade at prices that may be lower than the initial offering price of the notes. If an active market does not develop or is not maintained, the price and liquidity of the notes may be adversely affected. Historically, the market for non-investment grade debt has been subject to disruptions that have caused substantial volatility in the prices of securities similar to the notes. The market, if any, for any of the notes or exchange notes may not be free from similar disruptions and any such disruptions may adversely affect the prices at which you may sell your notes. In addition, subsequent to their initial issuance, the notes or exchange notes may trade at a discount from their initial offering price, depending upon prevailing interest rates, the market for similar notes, our performance and other factors.

*The trading price of the notes may be volatile.*

The trading price of the notes could be subject to significant fluctuation in response to, among other factors, changes in our operating results, interest rates, the market for noninvestment grade securities, general economic conditions and securities analysts' recommendations regarding our securities.

*Following the consummation of the URI Merger, the Sponsor will control United Rentals, Inc. and its subsidiaries, including URNA, and may have conflicts of interest with us or you in the future.*

Upon the consummation of the URI Merger, the Sponsor will control RAM Holdings, and through its control of RAM Holdings, the Sponsor will control URI and all its subsidiaries, including URNA. As a result of this ownership, the Sponsor will be entitled to elect all or substantially all of our directors, to appoint new management and to approve actions requiring the approval of our stockholders, including approving or rejecting proposed mergers or sales of all or substantially of all our assets, regardless of whether holders of the notes believe that any such transactions are in their own best interests.

The interests of the Sponsor may differ from the holders of the notes in material respects. For example, if we encounter financial difficulties or are unable to pay our debts as they mature, the interests of the Sponsor might conflict with your interests as a holder of the notes. The Sponsor also may have an interest in pursuing acquisitions, divestitures, financings (including financings that are secured) or other transactions that might involve risks to you as a holder of the notes.

The Sponsor is in the business of making or advising on investments in companies, and may, from time to time in the future, acquire interests in businesses or provide advice to make such investments that directly or indirectly compete with certain portions of our business or the businesses of our

suppliers or customers. The Sponsor or its affiliates or advisors may also pursue acquisition opportunities that may be complementary to our business and, as a result, may differ from the interests of the holders of the notes in material respects. See "Principal Stockholders," "Certain Relationships and Related Party Transactions," "Description of Other Indebtedness" and "Description of the Notes."

**Risks Related to Our Business**

***Decreases in construction and industrial activities could adversely affect our revenues and operating results by decreasing the demand for our equipment or the prices that we can charge.***

Our rental equipment is used primarily in the non-residential construction industry, which is cyclical in nature. Trench safety, pump and power equipment is principally used in connection with construction and industrial activities. Weakness in our end markets, such as a decline in construction or industrial activity, may lead to a decrease in the demand for our equipment or the prices that we can charge. Any such decrease could adversely affect our operating results by causing our revenues and gross profit margins to be reduced.

The following factors, among others, may cause weakness in our end markets, either temporarily or long-term:

- weakness in the economy or the onset of a recession;
- an increase in the cost of construction materials;
- an increase in interest rates;
- adverse weather conditions which may temporarily affect a particular region; or
- terrorism or hostilities involving the United States or Canada.

***We are subject to an ongoing inquiry by the SEC.***

We are the subject of a non-public, fact-finding inquiry by the SEC that appears to relate to a broad range of our accounting practices and was not confined to a specific period. In August 2004, we issued a press release and filed a Form 8-K disclosing the existence of the SEC inquiry. In March 2005, our board of directors formed a special committee of independent directors (the "Special Committee") to review matters related to the SEC inquiry. Our board of directors received and acted upon findings of the Special Committee in January 2006. In July 2007 the staff of the SEC advised us that it expects to seek injunctive and monetary relief against us. See "Business—Securities and Exchange Commission Inquiry and Special Committee Review" for additional information regarding this inquiry.

We are cooperating with the SEC in its ongoing inquiry. The U.S. Attorney's Office has also requested information from us informally and by subpoena about matters related to the SEC inquiry. We are also cooperating fully with this office. We cannot predict the outcome of these inquiries or when these matters might be resolved. These matters have the potential to adversely affect us in a number of ways, including the following:

- we are likely to continue to incur additional expenses in connection with responding to the inquiries, regardless of the outcome, including expenses related to our indemnification obligations to our directors, officers and certain current and former employees;
- responding to the inquiries has in the past diverted and may continue to divert the time and attention of our management from normal business operations;
- if proceedings are brought, depending on the outcome, we may be required to pay fines and/or take corrective actions that would adversely affect our operations; and

- until these matters are resolved with respect to the SEC inquiry, the SEC may not permit registration statements filed by us, including the exchange offer registration statement that we intend to file with respect to the notes offered hereby, to be declared effective, which could result in our having to pay additional interest with respect to the notes, limit the liquidity of the notes as described above in "—Risks Related to the Notes—There are restrictions on your ability to transfer or resell the notes without registration under applicable securities laws" or impair our ability to issue and sell registered securities in connection with future financings.

If we are ultimately required to pay significant amounts or take significant corrective actions, our results and liquidity could be materially adversely affected. In addition, regardless of the outcome, the publicity surrounding the inquiries and the potential risks associated with the inquiries could negatively impact the perception of our company by investors and others, which could adversely affect the price of our securities, our access to the capital markets or our borrowing costs.

***We are subject to certain ongoing class action lawsuits.***

Three class action lawsuits have been filed against us, as described under "Business—Legal Proceedings." All three of the complaints allege, among other things, that (i) certain of our SEC filings and other public statements contained false and misleading statements which resulted in damages to the plaintiffs and the members of the purported class when they purchased our securities and (ii) the conduct in connection therewith violated Section 10(b) of the Exchange Act, SEC Rule 10b-5 and, in the case of the individual defendants, Section 20(a) of the Exchange Act. The complaints seek unspecified compensatory damages, costs and expenses.

We intend to defend against these actions vigorously. However, we do not know what the outcome of these proceedings will be and, if we do not prevail, we may be required to pay substantial damages or settlement amounts. Further, regardless of the outcome, we may incur significant defense costs, and the time and attention of our management may be diverted from normal business operations. If we are ultimately required to pay significant defense costs, damages or settlement amounts, such payments could materially and adversely affect our liquidity and results of operations.

***Our operating results may fluctuate, which could affect the trading value of the notes.***

We expect that our revenues and operating results may fluctuate from quarter to quarter or over the longer term due to a number of factors, which could adversely affect the trading value of the notes offered hereby. These factors, in addition to general economic conditions, include:

- seasonal rental patterns of our customers, with rental activity tending to be lower in the winter;

- completion of acquisitions;

- changes in government spending for infrastructure projects and other non-residential construction such as hospitals and schools;

- changes in demand for our equipment or the prices we charge due to changes in economic conditions, competition or other factors;

- changes in the interest rates applicable to our floating rate debt (including the mark-to-market impact on any interest rate swaps that we have and that may not be designated as fair value hedges);

- cost fluctuations, such as the recent increases in the cost of oil, steel and employee-related compensation and healthcare benefits;

- the need to charge against earnings any previously capitalized expenditures relating to a potential acquisition that we determine will not be consummated (such as financing commitment fees, merger and acquisition advisory fees and professional fees); or

- the possible need, from time to time, to record goodwill impairment charges or other write-offs or charges due to a variety of occurrences, such as the adoption of new accounting standards, store divestitures, consolidations or closings, restructurings, the refinancing of indebtedness, the impairment of assets or the buy-out of equipment leases.

*Turnover of members of our management and our ability to attract and retain key personnel may affect our ability to efficiently manage our business and execute our growth strategy.*

Our success will be dependent, in part, on the experience and skills of our management team. Upon consummation of the Transactions, we expect that our senior management team will consist of a combination of existing management (including our acting chief executive officer, who we anticipate will either retain that position on a going forward basis or be invited to assume another senior executive position), managers promoted from within our ranks and new talent recruited by the Sponsor. We also expect that there may be some turnover within our senior management staff as a result of the Transactions, including the scheduled departure of our current chief financial officer. We are focused on attracting and retaining top management talent. There can be no assurance, however, that our efforts to attract and retain senior management staff will be successful. We recognize that the demand for well-qualified management personnel is significant, and that it may be difficult to identify, attract and retain the services of qualified personnel in the future. If we are unable to fill all of our senior management positions, or if we lose the services of any key member of our senior management team and are unable to find a suitable replacement, we may be challenged to effectively manage our business and execute our strategy.

*We are exposed to various claims relating to our business, and our insurance may not fully cover them.*

We are in the ordinary course exposed to a variety of claims relating to our business. These claims include those relating to (1) personal injury or death caused by equipment rented or sold by us, (2) motor vehicle accidents involving our vehicles and employees and (3) employment-related claims. Further, as described under "Business—Legal Proceedings," several shareholder derivative and class action lawsuits have been filed against us. Currently, we carry a broad range of insurance for the protection of our assets and operations. However, such insurance may not fully protect us for a number of reasons, including:

- our insurance policies are often subject to significant deductibles or self-insured retentions: $2 million per occurrence for each general liability or automobile claim and $1 million per occurrence for each workers' compensation claim;

- our director and officer liability insurance policy has no deductible for individual non-indemnifiable loss coverage, but is subject to a $2.5 million deductible for company reimbursement coverage and all director and officer coverage is subject to certain exclusions;

- we do not maintain stand-alone coverage for environmental liability (other than legally required fuel storage tank coverage), because we believe that the cost for such coverage is high relative to the benefit that it provides; and

- certain types of claims, such as claims for punitive damages or for damages arising from intentional misconduct, which are often alleged in third-party lawsuits, might not be covered by our insurance.

We establish and regularly evaluate our loss reserves to address business operations claims, or portions thereof, not covered by our insurance policies. To the extent that we are found liable for any

significant claims that exceed our established levels of reserves, that cause us to significantly increase such reserves or that are not otherwise covered by insurance, our liquidity and operating results could be materially adversely affected. In addition, the class action and derivative lawsuits against us, and our indemnification costs associated with the SEC and U.S. Attorney's Office inquiries, may not be fully reimbursable or covered by insurance. It is also possible that some or all of the insurance that is currently available to us will not be available in the future on economically reasonable terms, or not available at all.

***We may be unsuccessful in implementing our strategies.***

We intend to leverage our extensive fleet, our broad footprint, our advanced information technology systems and our experience in the equipment rental industry to generate significant cash flows and to strengthen our leadership position in the equipment rental industry. However, we may be unsuccessful in accomplishing our objectives, due in part to factors outside of our control, such as general economic conditions, industry-specific concerns and competitive factors. We may also find that approaches we had intended to develop, such as our like-kind-exchange tax savings program, cannot be pursued due to regulatory or other impediments.

***If we are unable to obtain additional capital as required, we may be unable to fund the capital outlays required for the success of our business.***

If the cash that we generate from our business, together with cash that we may borrow under our new senior secured credit facilities is not sufficient to fund our capital requirements, we will require additional financing. However, we may not succeed in obtaining the requisite additional financing on terms that are satisfactory to us or at all. If we are unable to obtain sufficient additional capital in the future, we may be unable to fund the capital outlays required for the success of our business, including those relating to purchasing equipment, making acquisitions, opening new rental locations and refinancing existing indebtedness.

***We have in the past been required to restate our financial statements and have had material weaknesses in our internal controls.***

As described under "Business—Restatement of Financial Statements and Related Matters," we determined that our originally issued financial statements for the years ended December 31, 2002 and 2003 required restatement in order to correct accounting errors related to the recognition of equipment rental revenue, self-insurance reserves, customer relationships and the provision for income taxes. We also determined that the accounting for certain short-term sale-leaseback transactions and trade package transactions had involved irregularities. Additionally, we identified other matters for which we believed restatement was not required.

As described under "Business—Remediation of Material Weakness in Financial Statement Close Process," we have in the past had material weaknesses in our internal control over financial reporting and as of December 31, 2005 and as of the end of each of the first three quarters of 2006 had a material weakness in our financial close process. We have taken actions to remediate all material weaknesses that we previously identified. However, there can be no assurance that we will not identify additional weaknesses in the future. Additionally, even if we believe we have effective control over financial reporting, the process for assessing the effectiveness of internal control over financial reporting requires subjective judgments and the application of standards that are relatively new and subject to questions of interpretation. Accordingly, we cannot be certain that our independent auditors will agree with our assessment. If either we or our auditors ultimately conclude that our internal control over financial reporting is not effective, the perception of our company may be adversely affected, which could in turn adversely affect the price of our securities, our access to the capital markets and our borrowing costs.

32

***Goodwill related to acquisitions represents a substantial portion of our total assets. If the fair value of our goodwill should drop below the recorded value, we would be required to write off the excess goodwill. Any write-off would reduce our total assets and stockholders' equity and be a charge against income.***

On September 30, 2007, we had goodwill of $1,359 million on our balance sheet, which represented approximately 24% of our total assets as of such date. This goodwill is an intangible asset and represents the excess of the purchase price that we paid for acquired businesses over the estimated fair value of the net assets of those businesses. Of the goodwill recorded on our balance sheet at September 30, 2007, 94% is associated with our general rentals segment and 6% is associated with our trench safety, pump and power segment. We are required to test our goodwill for impairment at least annually. In general, this means that we must determine whether the fair value of the goodwill, calculated in accordance with applicable accounting standards, is at least equal to the recorded value shown on our balance sheet. If the fair value of the goodwill is less than the recorded value, we are required to write-off the excess goodwill as an operating expense. Our results in 2004 were adversely affected by the write-off of approximately $139 million of goodwill related to our now discontinued traffic control operations, and our results in the preceding two years were also adversely affected by significant goodwill write-offs. In addition, in connection with the Transactions, on a pro forma basis as of September 30, 2007, we would have had goodwill of $2,228 million on our balance sheet. Based on the current performance of our general rentals and trench safety, pump and power segments, as well as current market conditions, we do not currently anticipate significant goodwill write-offs. However, in previous years we recorded significant goodwill write-offs, and we cannot be certain that a future downturn in the business or changes in market conditions will not necessitate additional write-offs in future periods.

***Our industry is highly competitive, and competitive pressures could lead to a decrease in our market share or in the prices that we can charge.***

The equipment rental industry is highly fragmented and competitive. Our competitors include small, independent businesses with one or two rental locations, regional competitors which operate in one or more states, public companies or divisions of public companies, and equipment vendors and dealers who both sell and rent equipment directly to customers. We may in the future encounter increased competition from our existing competitors or from new companies. Competitive pressures could adversely affect our revenues and operating results by, among other things, decreasing our rental volumes, depressing the prices that we can charge or increasing our costs to retain employees.

***Disruptions in our information technology systems could adversely affect our operating results by limiting our capacity to effectively monitor and control our operations.***

Our information technology systems facilitate our ability to monitor and control our operations and adjust to changing market conditions. Any disruptions in these systems or the failure of these systems to operate as expected could, depending on the magnitude of the problem, adversely affect our operating results by limiting our capacity to effectively monitor and control our operations and adjust to changing market conditions.

***We are subject to numerous environmental and safety regulations. If we are required to incur compliance or remediation costs that are not currently anticipated, our operating results could be adversely affected.***

Our operations are subject to numerous laws and regulations governing environmental protection and occupational health and safety matters. These laws regulate such issues as wastewater, stormwater, solid and hazardous wastes and materials, and air quality. Under these laws, we may be liable for, among other things, (i) the costs of investigating and remediating any contamination at our sites as well as sites to which we sent hazardous wastes for disposal or treatment, regardless of fault and (ii) fines and penalties for non-compliance. Our operations generally do not raise significant environmental risks,

but we use hazardous materials to clean and maintain equipment, dispose of solid and hazardous waste discharge wastewater from equipment washing, and store and dispense petroleum products contained in underground and above-ground storage tanks located at certain of our locations.

Based on conditions currently known to us, we do not believe that any pending or likely remediation or compliance effort will have a material adverse effect on our business. We cannot be certain, however, as to the potential financial impact on our business if new adverse environmental conditions are discovered or environmental and safety requirements become more stringent. If we are required to incur environmental compliance or remediation costs that are not currently anticipated, our liquidity and operating results could be adversely affected depending on the magnitude of such costs.

***Labor disputes could disrupt our ability to serve our customers or lead to higher labor costs.***

As of September 30, 2007, we had approximately 800 employees who are represented by unions and covered by collective bargaining agreements and approximately 11,000 employees who are not represented by unions. Various unions periodically seek to organize certain of our nonunion employees. Union organizing efforts or collective bargaining negotiations could potentially lead to work stoppages and/or slowdowns or strikes by certain of our employees, which could adversely affect our ability to serve our customers. In addition, these efforts could negatively affect our relationship with certain customers. Further, our labor costs could increase as a result of the settlement of actual or threatened labor disputes or an increase in the number of our employees covered by collective bargaining agreements.

***We have operations outside the United States. As a result, we may incur losses from currency conversions and have higher costs than we otherwise would have due to the need to comply with foreign laws.***

Our operations in Canada and Mexico are subject to the risks normally associated with international operations. These include (1) the need to convert currencies, which could result in a gain or loss depending on fluctuations in exchange rates, (2) the adverse effect that currency fluctuations could have on borrowing limits under the Canadian Sub-Facility, (3) the need to comply with foreign laws, (4) the possibility of political or economic instability in foreign countries and (5) the need to comply with United States laws, such as the Foreign Corrupt Practices Act, that govern our operations in foreign jurisdictions.

***Our cost reduction programs may not achieve the cost savings and operations improvements and efficiencies we expect, and we may have to implement further cost reduction programs and incur additional related charges.***

In 2007, we implemented a workforce reduction program, a strategic sourcing initiative and other SG&A initiatives designed to reduce operating expenses and increase organizational efficiencies. Though we have begun to realize cost savings and operational improvements from these efforts, the extent to which we achieve our goals will depend on a number of factors, some of which are beyond our control. Even if we take all of the steps that we expect to take, we may not achieve the cost reductions and operational efficiencies we anticipate, the reductions and efficiencies we do achieve may not be realized on the timetable we anticipate, the costs we incur to effect such programs and initiatives may be greater than we expect and there may be consequences resulting from such programs and initiatives that will adversely effect us. Therefore, the anticipated cost savings reflected in our Adjusted EBITDA for the LTM Period may not be realized.

## USE OF PROCEEDS

We intend to use the net proceeds from this offering, in addition to our cash on hand and borrowings under our New Credit Facility described under "Description of Certain Indebtedness," to complete the Transactions described elsewhere in this offering circular. The actual amounts set forth in the table and in the accompanying footnotes are subject to adjustment and may differ at the time of the consummation of the Transactions. You should read the following together with the information set forth under "Unaudited Pro Forma Financial Information", "Selected Historical Financial Information" and "The Transactions." The estimated sources and uses of funds in connection with such transactions are as follows:

| Sources<br>(Dollars in millions) | Amount | Uses<br>(Dollars in millions) | Amount |
|---|---|---|---|
| New senior secured revolving credit facility(1) | $ 443 | Purchase price(4) | $ 3,294 |
| New senior secured term loan facility(1) | 1,100 | Refinance existing net debt(5) | 2,256 |
| Notes offered hereby | 2,550 | Repay preferred stock | 759 |
| New senior unsecured bridge credit facility(2) | 1,350 | Merger value of converted subordinated | |
| Equity contribution(3) | 1,426 | convertible debentures(6) | 147 |
| | | Transaction fees and expenses(7) | 413 |
| **Total Sources** | **$ 6,869** | **Total Uses** | **$ 6,869** |

(1) Our new senior secured credit facilities will consist of a $1,100 million senior secured term loan facility and $1,500 million senior secured revolving credit facilities (including the $150 million Canadian Sub-Facility). We expect to borrow at closing the full amount under the senior secured term loan for the Transactions and approximately $443 million under the senior secured revolving credit facilities (without giving effect to approximately $138 million of outstanding letters of credit). These levels of borrowing at closing assume that (i) URI's subordinated convertible debentures and URNA's 1⅞% convertible senior subordinated notes are converted as a result of the Acquisition and that holders receive the per share merger consideration and (ii) $125 million of cash will be available at closing and used to refinance a portion of existing debt. See Notes (4) and (6) below. Our new senior secured credit facilities will have a term of six years.

(2) Our new senior unsecured bridge credit facility will consist of $1,350 million in aggregate principal amount of unsecured senior loans and will provide, in the event that such facility is not refinanced within one year of the closing date of such facility, that such facility will become a term loan facility, which will mature on the eighth anniversary of the closing.

(3) Consists of estimated equity indirectly contributed by the Sponsor and others.

(4) We estimate that the aggregate merger consideration payable from the URI Merger to our common stock equityholders will be approximately, $3,294 million, which will include merger consideration of $34.50 per share payable with respect to shares of URI common stock issuable upon the conversion of all of URNA's outstanding 1⅞% convertible senior subordinated notes, which are convertible at the rate of approximately $22.25 per share, subject to adjustment. As of September 30, 2007, there was approximately $144 million in aggregate principal amount of such convertible notes outstanding, which would require the payment of an aggregate merger consideration of approximately $223 million if all such convertible notes were converted. See "Description of Other Indebtedness—1⅞% Convertible Senior Subordinated Notes." To the extent that holders of such convertible notes elect not to exercise their conversion rights, then the convertible notes of such holders would remain outstanding and the amount of borrowings expected to be drawn under our new senior secured revolving credit facilities at closing would be reduced by an amount equal to approximately $1.55 for each $1 of principal amount of such convertible notes left outstanding.

(5) Represents our outstanding debt, including approximately $328 million we expect to be outstanding at closing under our existing senior secured term loan facility, approximately $153 million we expect to be outstanding at closing under our existing Canadian credit facility and approximately $1,900 million of our existing notes, less approximately $125 million of cash assumed to be on hand at closing.

(6) Immediately following the closing of the URI Merger, we expect that holders of the 6½% convertible quarterly income preferred securities ("QUIPs") of United Rentals Trust I (the "Trust"), will exercise their right to cause the Trust to convert URI's outstanding 6½% subordinated convertible debentures into shares of common stock of URI to be issuable to such holders. Immediately after the URI Merger, the subordinated convertible debentures will be convertible at the rate of approximately $34.28 per share, subject to adjustment. As of September 30, 2007, there was approximately $146 million in aggregate principal amount of subordinated convertible debentures outstanding, which would require the payment of an aggregate merger consideration of approximately $147 million if all such convertible debentures were converted. See "Description of Other Indebtedness—Subordinated Convertible Debentures." To the extent that holders of the QUIPs do not exercise their conversion rights, then the subordinated convertible debentures applicable to such holders would remain outstanding and the amount of borrowings expected to be drawn under our new senior secured revolving credit facility at closing would be reduced by an amount equal to approximately $1.01 for each $1 of principal amount of subordinated convertible debentures left outstanding.

(7) Reflects discounts, fees and expenses payable by us, including the initial purchasers' discounts, fees and expenses associated with our tender offers for our existing notes, expenses we incurred in connection with the URI Merger, costs associated with the cancellation of financial derivatives, accrued interest on debt repaid and other payments made in connection with the Transactions.

## CAPITALIZATION

The following table sets forth our unaudited consolidated cash and cash equivalents and our capitalization as of September 30, 2007 on an actual basis and on a pro forma basis to give effect to the Transactions as if they had occurred on that date. You should read the data set forth in the table below in conjunction with "Use of Proceeds," "Unaudited Pro Forma Financial Information," "Selected Historical Financial Data," "Management's Discussion and Analysis of Financial Condition and Results of Operations—The Transactions," and our financial statements and the accompanying notes included elsewhere in this offering circular.

| | As of September 30, 2007 | |
| --- | --- | --- |
| | Actual | Pro Forma |
| | (Dollars in millions) | |
| Cash and cash equivalents | $ 112 | $ — |
| **Debt (including current maturities):** | | |
| Existing credit facilities | $ 489 | $ — |
| New senior secured credit facilities(1) | | |
| Revolving credit facility | — | 443 |
| Term loan facility | — | 1,100 |
| Notes offered hereby | — | 2,550 |
| New senior unsecured bridge credit facility | — | 1,350 |
| 6½% Senior Notes due 2012(2) | 1,000 | — |
| 7¾% Senior Subordinated Notes due 2013(2) | 525 | — |
| 7% Senior Subordinated Notes due 2014(2) | 375 | — |
| 1⅞% Convertible Senior Subordinated Notes due October 15, 2023(3) | 144 | — |
| Subordinated convertible debentures(4) | 146 | — |
| Other debt, including capital leases | 80 | 121 |
| Total debt | 2,759 | 5,564 |
| **Stockholders' Equity:** | | |
| Preferred stock | — | — |
| Common stock | 1 | — |
| Additional paid-in capital | 1,479 | 1,426 |
| Retained earnings | 278 | — |
| Accumulated other comprehensive income | 107 | — |
| Total stockholders' equity | 1,865 | 1,426 |
| Total capitalization | $ 4,624 | $ 6,990 |

(1) In addition, following the refinancing described under "Management's Discussion and Analysis of Financial Results of Operations—The Transactions," we expect $138 million of letters of credit will be outstanding. Upon consummation of the Transactions, we anticipate that, based on our borrowing base and assuming approximately $138 million of letters of credit will be outstanding, we would have up to approximately $919 million of availability under our new revolving credit facility.

(2) We anticipate that all or substantially all of the $1,900 million principal amount of 6½% Senior Notes, 7% Senior Subordinated Notes and 7¾% Senior Subordinated Notes will be repurchased in the tender offers described under "Management's Discussion and Analysis of Financial Results of Operations—The Transactions."

(3)  We anticipate that all or substantially all of the $144 million of 1⅞% Convertible Senior Subordinated Notes will be converted on or prior to the completion of the URI Merger. Following the URI Merger, any outstanding 1⅞% Convertible Senior Subordinated Notes will be convertible to the merger consideration that would be paid on the common stock issuable under the 1⅞% Convertible Senior Subordinated Notes had the holders converted on the closing date of the URI Merger. The URI Merger will trigger an obligation to make an offer to purchase the outstanding 1⅞% Convertible Senior Subordinated Notes at par between 30 and 60 days after the occurrence of a fundamental change (such as the URI Merger); therefore, to the extent that there are any 1⅞% Convertible Senior Subordinated Notes outstanding after the URI Merger, we would have to make such an offer.

(4)  We anticipate that all or substantially all of the $146 million of the subordinated convertible debentures will be converted after the completion of the URI Merger, whereupon the aggregate merger consideration payable in respect of the shares of URI common stock issuable upon conversion of such debentures is expected to total approximately $147 million. See "Description of Other Indebtedness—Subordinated Convertible Debentures."

## UNAUDITED PRO FORMA FINANCIAL INFORMATION

The following unaudited pro forma condensed consolidated financial statements are based on the historical consolidated financial statements of United Rentals, Inc. included elsewhere in this offering circular, as adjusted to give pro forma effect to the Transactions, including the Acquisition and the related financings.

The unaudited pro forma condensed consolidated balance sheet as of September 30, 2007 gives effect to the Transactions as if they had occurred on September 30, 2007. The unaudited pro forma condensed consolidated statements of operations for the year ended December 31, 2006, the nine months ended September 30, 2006 and the nine months ended September 30, 2007, give effect to the Transactions as if they had occurred on January 1, 2006. The consolidated statements of operations information for the LTM Period is derived by subtracting our pro forma statements of operations information for the nine months ended September 30, 2006 from our pro forma statements of operations information for the year ended December 31, 2006 and adding our pro forma statements of operations information for the nine months ended September 30, 2007. The related acquiring entities, RAM Acquisition Corp. and RAM Transition Corp., have been formed, but have not engaged in any operating activities and are not shown separately.

In the unaudited pro forma condensed consolidated financial statements, the Acquisition is accounted for using the purchase method of accounting in accordance with the Statement of Financial Accounting Standards (SFAS) No. 141, *Business Combinations*. Under the purchase method of accounting, the total purchase price for the Acquisition and related transactions, including related fees and expenses, are allocated to the assets acquired and liabilities assumed based upon estimates of fair value. The unaudited pro forma adjustments reflected herein are based upon preliminary available information and assumptions that we believe are reasonable under the circumstances and which are described in the accompanying notes. These preliminary estimates are expected to change upon finalization of appraisals and valuation studies that will be obtained after the consummation of the Acquisition. The final allocation will be based upon the actual assets and liabilities that exist as of the date of completion of the Acquisition and the appraisals and valuation studies relating to those assets and liabilities. Therefore, the final allocations may differ materially from the estimates used to prepare these pro forma condensed consolidated financial statements.

The unaudited pro forma condensed consolidated financial statements are presented for illustrative purposes only and are not necessarily indicative of, and do not purport to represent or be indicative of what our financial condition or results of operations information would have been had the Transactions occurred on the dates described above, nor are they necessarily indicative of our operating results for any future period or our financial position as of any future date.

The unaudited pro forma condensed consolidated financial statements should be read in conjunction with the accompanying notes and with the information contained in "Selected Historical Consolidated Financial Data," "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our historical consolidated financial statements and related notes included elsewhere in this offering circular.

**Unaudited Pro Forma Condensed Consolidated Balance Sheet**

**As of September 30, 2007**

**(Dollars in millions)**

| | Historical | Adjustments for the Transactions | Pro Forma |
|---|---|---|---|
| **ASSETS** | | | |
| Cash and cash equivalents | $ 112 | $ (112) (a) | $ — |
| Accounts receivable, net of allowance for doubtful accounts | 582 | — | 582 |
| Inventory | 123 | — | 123 |
| Prepaid expenses and other assets | 51 | — | 51 |
| Deferred taxes | 51 | — | 51 |
| Total current assets | 919 | (112) | 807 |
| Rental equipment, net | 2,918 | 682 (b) | 3,600 |
| Property and equipment net | 415 | — | 415 |
| Goodwill and other intangible assets, net | 1,407 | 2,621 (b) | 4,028 |
| Other long-term assets | 58 | 63 (c) | 121 |
| **Total assets** | $5,717 | $3,254 | $8,971 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | |
| Current maturities of long-term debt | $ 78 | $ (48)(a)(d) | $ 30 |
| Accounts payable | 248 | — | 248 |
| Accrued expenses and other liabilities | 273 | (36)(e) | 237 |
| Total current liabilities | 599 | (84) | 515 |
| Long-term debt | 2,535 | 2,999 (a)(d) | 5,534 |
| Subordinated convertible debentures | 146 | (146)(a)(f) | — |
| Deferred taxes | 472 | 966 (g) | 1,438 |
| Other long-term liabilities | 100 | (42)(h) | 58 |
| **Total liabilities** | 3,852 | 3,693 | 7,545 |
| Preferred stock | — | — | — |
| Common stock | 1 | (1)(i) | — |
| Additional paid-in capital | 1,479 | (53)(i) | 1,426 |
| Retained earnings (accumulated deficit) | 278 | (278)(i) | — |
| Accumulated other comprehensive income | 107 | (107)(i) | — |
| **Total stockholders' equity** | 1,865 | (439) | 1,426 |
| **Total liabilities and stockholders' equity** | $5,717 | $3,254 | $8,971 |

*See accompanying notes to unaudited pro forma condensed consolidated balance sheet*

**Notes to Unaudited Pro Forma Condensed Consolidated Balance Sheet**

(a)  The following table illustrates the sources and uses of cash in the Transactions, assuming they had occurred on September 30, 2007:

|  | (Dollars in millions) |
|---|---|
| Sources: | |
| New senior secured revolving credit facility (1) . . . . . . . . . . . . . . | $ 443 |
| New senior secured term loan facility (2) . . . . . . . . . . . . . . . . . | 1,100 |
| Notes offered hereby . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,550 |
| New senior unsecured bridge credit facility . . . . . . . . . . . . . . . . | 1,350 |
| Equity contribution (3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,426 |
| Total sources . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $6,869 |
| Uses: | |
| Purchase price (4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $3,294 |
| Repayment of preferred stock (5) . . . . . . . . . . . . . . . . . . . . . . . | 759 |
| Merger value of converted subordinated convertible debentures (6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 147 |
| Debt issuance costs (7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 120 |
| Other transaction costs and expenses (8) . . . . . . . . . . . . . . . . . . | 293 |
| Retirement of debt (9) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,256 |
| Total uses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $6,869 |

(1)  Reflects our new $1,500 million senior secured revolving credit facilities, which will be partially drawn at closing.

(2)  Reflects our new senior secured term loan facility in an aggregate principal amount of $1,100 million, with a maturity of six years, which we will borrow in full on the closing date. Our new senior secured term loan will require scheduled quarterly payments of 0.25% of the original principal amount for the first five years and three quarters, with the balance paid in the final quarterly installment. On a pro forma basis at September 30, 2007, the current portion of the new senior secured term loan is $10 million.

(3)  Reflects cash equity investment to be made by the Sponsor and others.

(4)  The Merger Agreement provides that, upon the closing of the Transactions, each holder of outstanding shares of URI common stock will be entitled to receive $34.50 in cash for each share of common stock owned. The amount set forth above includes merger consideration of $34.50 per share payable with respect to shares of URI common stock issuable upon the conversion of all of URNA's 1⅞% convertible senior subordinated notes, which are convertible at the rate of approximately $22.25 per share, subject to adjustment. As of September 30, 2007, there was approximately $144 million in aggregate principal amount of such convertible notes outstanding, which would require the payment of an aggregate merger consideration of approximately $223 million if all such convertible notes were converted.

**Notes to Unaudited Pro Forma Condensed Consolidated Balance Sheet (Continued)**

(5)   Represents the merger consideration that would have been payable to the holders of URI's preferred stock if the URI Merger occurred on September 30, 2007.

(6)   Immediately after the URI Merger, the subordinated convertible debentures will be convertible at the rate of approximately $34.28 per share, subject to adjustment. As of September 30, 2007, there was approximately $146 million in aggregate principal amount of subordinated convertible debentures outstanding, which would require the payment of an aggregate merger consideration of approximately $147 million if all such convertible debentures were converted.

(7)   Reflects our estimates of fees and costs associated with the financing of the Transactions.

(8)   Reflects our estimate of other fees and expenses associated with the Transactions, including interest and premiums associated with the repayment or repurchase of our existing debt, advisory fees, professional fees and other transaction costs. The total estimate includes approximately $154 million, which we will expense on or prior to the closing relating to the repurchase of existing notes, advisory fees of approximately $39 million and approximately $27 million relating to interest which will have been accrued as of the expected closing date with respect to existing indebtedness.

(9)   Reflects the retirement of our existing 7¾% senior subordinated notes, 7% senior subordinated notes, 6½% senior notes, outstanding indebtedness under our existing term loan and revolving credit facilities and assumes the conversion of all URNA's 1⅞% convertible senior subordinated notes. This amount also reflects payments expected to be made in respect of URNA's 1⅞% senior subordinated convertible notes at an assumed conversion ratio of $22.25 per share. Additionally, this amount reflects the expected usage of available cash to finance a portion of the Acquisition.

(b)  The pro forma financial statement reflects our preliminary estimates of the purchase price allocation, which will be completed upon finalization of appraisals and other valuation studies that are currently in process. For purposes of the pro forma financial statements, the estimates used for certain property, plant and equipment and identifiable intangible assets are based on preliminary appraisals that management has used in estimating the fair value of acquired assets. We have assumed that historical values of all other assets and liabilities approximate fair value. The final purchase price allocation may result in a materially different allocation than that assumed in the pro forma financial statements. Any increase to the purchase price allocated to property, plant and equipment and identifiable intangible assets will result in additional depreciation and amortization expense after the consummation of the Acquisition.

**Notes to Unaudited Pro Forma Condensed Consolidated Balance Sheet (Continued)**

The preliminary estimated allocations of the purchase price to the fair values of assets acquired and liabilities assumed are as follows:

|  | (Dollars in millions) |
|---|---|
| Accounts receivable, net of allowance for doubtful accounts . . . . . | $   582 |
| Inventory . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 123 |
| Rental equipment, net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3,600 |
| Property and equipment, net . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 415 |
| Other intangible assets, net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1,800 |
| Other assets, excluding deferred tax assets . . . . . . . . . . . . . . . . . . | 172 |
| Accounts payable, accrued expenses and other . . . . . . . . . . . . . . . | (664) |
| Deferred taxes, net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (1,387) |
| Goodwill . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 2,228 |
| Total preliminary purchase price . . . . . . . . . . . . . . . . . . . . . . . . . | $ 6,869 |

Reflects adjustments to reflect preliminary estimated fair market value of our rental equipment assets:

|  | (Dollars in millions) |
|---|---|
| Estimated fair market value of equipment . . . . . . . . . . . . . . . . . . | $ 3,600 |
| Elimination of historical rental equipment, net . . . . . . . . . . . . . . | (2,918) |
| Total adjustment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $   682 |

Reflects the preliminary estimated fair values of goodwill and other intangible assets as follows:

|  | (Dollars in millions) |
|---|---|
| Goodwill . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 2,228 |
| Trade names and trademarks (indefinite useful life) . . . . . . . . . . . | 600 |
| Customer relationships (10 year estimated useful life) . . . . . . . . . | 1,200 |
| Elimination of historical goodwill and other intangible assets, net . | (1,407) |
| Total adjustment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 2,621 |

(c)  Adjustments to reflect the issuance costs associated with new indebtedness:

|  | (Dollars in millions) |
|---|---|
| Total estimated transaction fees . . . . . . . . . . . . . . . . . . . . . . . . . | $ 413 |
| Transaction-related costs to be expensed . . . . . . . . . . . . . . . . . . . | (293) |
| Capitalization of deferred issuance costs associated with new indebtedness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 120 |
| Elimination of historical debt issuance costs . . . . . . . . . . . . . . . . | (57) |
| Total adjustment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $   63 |

**Notes to Unaudited Pro Forma Condensed Consolidated Balance Sheet (Continued)**

(d) Reflects the retirement of debt outstanding as of September 30, 2007 and the recognition of the debt expected to be issued in connection with the Transactions:

|  | (Dollars in millions) |
|---|---|
| Long-term portion of new debt . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 5,413 |
| Elimination of existing long-term debt . . . . . . . . . . . . . . . . . . . . . | (2,414) |
| Total long-term debt adjustment . . . . . . . . . . . . . . . . . . . . . . . . . | 2,999 |
| Current portion of new debt . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 30 |
| Elimination existing current debt . . . . . . . . . . . . . . . . . . . . . . . | (78) |
| Total current debt adjustment . . . . . . . . . . . . . . . . . . . . . . . . . . | $   (48) |

(e) Reflects the elimination of accrued interest associated with indebtedness to be repaid.

(f) Reflects the elimination of our subordinated convertible debentures.

(g) Represents the estimated impact on deferred income tax liabilities resulting from the pro forma purchase accounting adjustments at an estimated blended statutory tax rate of 38.9%. We expect changes to our deferred tax positions, including valuation allowance requirements based on merger expenses and other costs associated with the Transactions, and with the finalization of the purchase price allocation.

The pro forma adjustments to deferred tax liabilities reflect increases to deferred tax liabilities for:

|  | (Dollars in millions) |
|---|---|
| Book value to tax value of fixed asset basis differences . . . . . . . . . | $266 |
| Book value to tax value of trade name basis differences . . . . . . . . | 233 |
| Book value to tax value of customer intangible basis differences . . | 467 |
| Total adjustment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $966 |

(h) Reflects the elimination of financial derivative instruments.

(i) Reflects the impact of the Transactions on our historical stockholders' equity:

|  | Elimination of historical stockholders' equity | Equity contribution | Total adjustment |
|---|---|---|---|
|  |  | (Dollars in millions) |  |
| Preferred stock . . . . . . . . . . . . . . . . | $   — | $   — | $   — |
| Common stock . . . . . . . . . . . . . . . . | (1) |  | (1) |
| Additional paid-in capital . . . . . . . . | (1,479) | 1,426 | (53) |
| Retained earnings (accumulated deficit) . . . . . . . . . . . . . . . . . . . . | (278) | — | (278) |
| Accumulated other comprehensive income . . . . . . . . . . . . . . . . . . . . | (107) | — | (107) |
| Total adjustment . . . . . . . . . . . . . . . | $(1,865) | $1,426 | $(439) |

**Unaudited Pro Forma Condensed Consolidated Statement of Operations**

**For the Year Ended December 31, 2006**

**(Dollars in millions)**

| | Historical | Adjustments for the Transactions | Pro Forma |
|---|---|---|---|
| Revenues: | | | |
| Equipment rentals | $2,530 | $  — | $2,530 |
| Sales of rental equipment | 335 | — | 335 |
| New equipment sales | 232 | — | 232 |
| Contractor supplies sales | 385 | — | 385 |
| Service and other revenues | 158 | — | 158 |
| **Total revenues** | 3,640 | — | 3,640 |
| Cost of revenues: | | | |
| Cost of equipment rentals, excluding depreciation | 1,137 | — | 1,137 |
| Depreciation of rental equipment | 408 | 120 (a) | 528 |
| Cost of rental equipment sales | 237 | 69 (b) | 306 |
| Cost of new equipment sales | 191 | — | 191 |
| Cost of contractor supplies sales | 302 | — | 302 |
| Cost of service and other revenues | 76 | — | 76 |
| **Total cost of revenues** | 2,351 | 189 | 2,540 |
| **Gross profit** | 1,289 | (189) | 1,100 |
| Selling, general and administrative expenses | 613 | — | 613 |
| Non-rental depreciation and amortization | 50 | 116 (c) | 166 |
| Operating income | 626 | (305) | 321 |
| Interest expense, net | 208 | 385 (d) | 593 |
| Interest expense—subordinated convertible debentures | 13 | (13)(e) | — |
| Other (income) expense, net | — | — | — |
| Income (loss) from continuing operations before provision for income taxes | 405 | (677) | (272) |
| Provision (benefit) for income taxes | 156 | (254)(f) | (98) |
| Income (loss) from continuing operations | $  249 | $(423) | $ (174) |

*See accompanying notes to the unaudited pro forma condensed consolidated statement of operations.*

**Unaudited Pro Forma Condensed Consolidated Statement of Operations**

**For the Nine Months Ended September 30, 2006**

**(Dollars in millions)**

| | Historical | Adjustments for the Transactions | Pro Forma |
|---|---|---|---|
| Revenues: | | | |
| Equipment rentals | $1,874 | $ — | $1,874 |
| Sales of rental equipment | 248 | — | 248 |
| New equipment sales | 172 | — | 172 |
| Contractor supplies sales | 288 | — | 288 |
| Service and other revenues | 119 | — | 119 |
| **Total revenues** | 2,701 | — | 2,701 |
| Cost of revenues: | | | |
| Cost of equipment rentals, excluding depreciation | 850 | — | 850 |
| Depreciation of rental equipment | 304 | 93(a) | 397 |
| Cost of rental equipment sales | 172 | 52(b) | 224 |
| Cost of new equipment sales | 141 | — | 141 |
| Cost of contractor supplies sales | 234 | — | 234 |
| Cost of service and other revenues | 58 | — | 58 |
| **Total cost of revenues** | 1,759 | 145 | 1,904 |
| **Gross profit** | 942 | (145) | 797 |
| Selling, general and administrative expenses | 453 | — | 453 |
| Non-rental depreciation and amortization | 37 | 87 (c) | 124 |
| Operating income | 452 | (232) | 220 |
| Interest expense, net | 157 | 286 (d) | 443 |
| Interest expense—subordinated convertible debentures | 11 | (11)(e) | — |
| Other (income), net | — | — | — |
| Income (loss) from continuing operations before provision for income taxes | 284 | (507) | (223) |
| Provision (benefit) for income taxes | 112 | (190)(f) | (78) |
| Income (loss) from continuing operations | $ 172 | $ (317) | $ (145) |

*See accompanying notes to the unaudited pro forma condensed consolidated statement of operations.*

Exhibit B-3

**Unaudited Pro Forma Condensed Consolidated Statement of Operations**

**For the Nine Months Ended September 30, 2007**

**(Dollars in millions)**

| | Historical | Adjustments for the Transactions | Pro Forma |
|---|---|---|---|
| **Revenues:** | | | |
| Equipment rentals | $1,947 | $ — | $1,947 |
| Sales of rental equipment | 243 | — | 243 |
| New equipment sales | 177 | — | 177 |
| Contractor supplies sales | 301 | — | 301 |
| Service and other revenues | 133 | — | 133 |
| **Total revenues** | 2,801 | — | 2,801 |
| **Cost of revenues:** | | | |
| Cost of equipment rentals, excluding depreciation | 885 | — | 885 |
| Depreciation of rental equipment | 321 | 102 (a) | 423 |
| Cost of rental equipment sales | 174 | 55 (b) | 229 |
| Cost of new equipment sales | 147 | — | 147 |
| Cost of contractor supplies sales | 245 | — | 245 |
| Cost of service and other revenues | 60 | — | 60 |
| **Total cost of revenues** | 1,832 | 157 | 1,989 |
| **Gross profit** | 969 | (157) | 812 |
| Selling, general and administrative expenses | 447 | — | 447 |
| Non-rental depreciation and amortization | 38 | 85 (c) | 123 |
| Operating income | 484 | (242) | 242 |
| Interest expense, net | 146 | 304 (d) | 450 |
| Interest expense—subordinated convertible debentures | 7 | (7)(e) | — |
| Other (income), net | (7) | — | (7) |
| Income (loss) from continuing operations, before provision for income taxes | 338 | (539) | (201) |
| Provision (benefit) for income taxes | 128 | (210)(f) | (82) |
| Income (loss) from continuing operations | $ 210 | $ (329) | $ (119) |

*See accompanying notes to the unaudited pro forma condensed consolidated statement of operations.*

**Unaudited Pro Forma Condensed Consolidated Statement of Operations**

**For the Twelve Months Ended September 30, 2007**

**(Dollars in millions)**

| | Historical | Adjustments for the Transactions | Pro Forma |
|---|---|---|---|
| Revenues: | | | |
| Equipment rentals | $2,603 | $ — | $2,603 |
| Sales of rental equipment | 330 | — | 330 |
| New equipment sales | 237 | — | 237 |
| Contractor supplies sales | 398 | — | 398 |
| Service and other revenues | 172 | — | 172 |
| **Total revenues** | 3,740 | — | 3,740 |
| Cost of revenues: | | | |
| Cost of equipment rentals, excluding depreciation | 1,172 | — | 1,172 |
| Depreciation of rental equipment | 425 | 129 (a) | 554 |
| Cost of rental equipment sales | 239 | 72 (b) | 311 |
| Cost of new equipment sales | 197 | — | 197 |
| Cost of contractor supplies sales | 313 | — | 313 |
| Cost of service and other revenue | 78 | — | 78 |
| **Total cost of revenues** | 2,424 | 201 | 2,625 |
| **Gross profit** | 1,316 | (201) | 1,115 |
| Selling, general and administrative expenses | 607 | — | 607 |
| Non-rental depreciation and amortization | 51 | 114 (c) | 165 |
| Operating income | 658 | (315) | 343 |
| Interest expense, net | 197 | 403 (d) | 600 |
| Interest expense—subordinated convertible debentures | 9 | (9)(e) | — |
| Other (income) expense, net | (7) | — | (7) |
| Income (loss) from continuing operations before provision for income taxes | 459 | (709) | (250) |
| Provision (benefit) for income taxes | 172 | (274) (f) | (102) |
| Income (loss) from continuing operations | $ 287 | $ (435) | $ (148) |

*See accompanying notes to the unaudited pro forma condensed consolidated statement of operations.*

48

**Notes to Unaudited Pro Forma Condensed Consolidated Statements of Operations**

(a)  Reflects the difference between historical depreciation and what would have been recorded based on the adjusted fair market value of the rental fleet resulting from the preliminary purchase price allocation of rental equipment assets:

|  | Year Ended December 31, 2006 | Nine Months Ended September 30, | | LTM Period |
|---|---|---|---|---|
|  |  | 2006 | 2007 |  |
|  |  | (Dollars in millions) | | |
| Depreciation expense based on adjusted fair market value of rental fleet | $ 528 | $ 397 | $ 423 | $ 554 |
| Historical depreciation expense | (408) | (304) | (321) | (425) |
| Total adjustment | $ 120 | $ 93 | $ 102 | $ 129 |

(b)  Reflects the difference between historical cost of sales and what would have been recorded based on the adjusted fair market value of the rental fleet:

|  | Year Ended December 31, 2006 | Nine Months Ended September 30, | | LTM Period |
|---|---|---|---|---|
|  |  | 2006 | 2007 |  |
|  |  | (Dollars in millions) | | |
| Cost of rental equipment sales based on adjusted fair market value of rental fleet | $ 306 | $ 224 | $ 229 | $ 311 |
| Historical cost of rental equipment sales | (237) | (172) | (174) | (239) |
| Total adjustment | $ 69 | $ 52 | $ 55 | $ 72 |

(c)  Reflects the difference between historical amortization of other intangible assets and the amortization of the estimated fair value of our customer relationships using a straight-line method over an estimated useful life of 10 years:

|  | Year Ended December 31, 2006 | Nine Months Ended September 30, | | LTM Period |
|---|---|---|---|---|
|  |  | 2006 | 2007 |  |
|  |  | (Dollars in millions) | | |
| Amortization of customer relationships over an estimated useful life of 10 years | $ 120 | $ 90 | $ 90 | $ 120 |
| Historical amortization of other intangible assets | (4) | (3) | (5) | (6) |
| Total adjustment | $ 116 | $ 87 | $ 85 | $ 114 |

**Notes to Unaudited Pro Forma Condensed Consolidated Statements of Operations (Continued)**

(d)  Reflects the elimination of historical interest expense and fees, excluding interest income and capital lease interest expense, and the addition of interest expense and fees with respect to the following new indebtedness:

| | Year Ended December 31, 2006 | Nine Months Ended September 30, | | LTM Period |
|---|---|---|---|---|
| | | 2006 | 2007 | |
| | | (Dollars in millions) | | |
| Senior secured revolving credit facility . . . . . . . | $  39 | $  29 | $  30 | $  40 |
| Senior secured term loan facility . . . . . . . . . . . | 91 | 68 | 69 | 92 |
| Notes offered hereby . . . . . . . . . . . . . . . . . . . | 280 | 210 | 209 | 279 |
| Senior unsecured bridge credit facility . . . . . . . | 189 | 142 | 141 | 188 |
| Elimination of historical interest expense and fees, excluding interest income and capital lease interest . . . . . . . . . . . . . . . . . . . . . . . . . | (214) | (163) | (145) | (196) |
| Total adjustment . . . . . . . . . . . . . . . . . . . . . . | $ 385 | $ 286 | $ 304 | $ 403 |

The debt amounts, interest rates, and deferred financing costs and amortizable lives associated with our new credit facilities and the notes offered hereby are as follows:

| | Debt | Interest rate | Deferred financing costs | Deferred financing costs amortized straight-line over the following lives in years |
|---|---|---|---|---|
| | | (Dollars in millions) | | |
| Senior secured revolving credit facility . . . . . . . . . . . . . . . . . . . . . | $  443 | LIBOR + 2.75% | $ 19 | 6 |
| Senior secured term loan facility . . | 1,100 | LIBOR + 2.75% | 14 | 6 |
| Notes offered hereby  . . . . . . . . . . | 2,550 | 10.63% | 63 | 7 |
| Senior unsecured bridge credit facility . . . . . . . . . . . . . . . . . . . . . | 1,350 | 12.25% | 24 | 1 |
| Total . . . . . . . . . . . . . . . . . . . . . | $5,443 | | $120 | |

A 0.125% change in assumed interest rates would have an annual impact of $7 million on pro forma interest expense.

(e)  Reflects the elimination of interest expense on the subordinated convertible debentures expected to be converted subsequent to the Transactions.

(f)  Reflects the income tax effects of the pro forma adjustments, calculated using our operational tax rates of:

| | Year Ended December 31, 2006 | Nine Months Ended September 30, | | LTM Period |
|---|---|---|---|---|
| | | 2006 | 2007 | |
| Operational tax rate . . . . . . . . . . . . . . . . . . . | 37.5% | 37.5% | 38.9% | 38.6% |

### SELECTED HISTORICAL CONSOLIDATED FINANCIAL INFORMATION

The following table presents our selected historical consolidated financial information as of the dates and for the periods presented. The selected historical financial information for the years ended December 31, 2004, 2005 and 2006 and as of December 31, 2005 and 2006 has been derived from our audited financial statements included elsewhere in this offering circular. The selected historical financial information for the years ended December 31, 2002 and 2003 and as of December 31, 2002, 2003 and 2004 have been derived from our audited financial statements not presented herein.

The selected historical financial information for the nine months ended September 30, 2006 and September 30, 2007 and as of September 30, 2006 and 2007 has been derived from our unaudited financial statements included elsewhere in this offering circular. Our unaudited financial statements for the interim periods have been prepared on a basis consistent with the accounting policies in our annual audited financial statements. In the opinion of management, such unaudited financial information reflects all adjustments, consisting only of normal and recurring adjustments, necessary for a fair presentation of the results for those periods. The results for any interim period are not necessarily indicative of the results that may be expected for a full fiscal year.

You should read this information together with the information included under the headings "Risk Factors," "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our historical financial statements and related notes included elsewhere in this offering circular.

| | Year Ended December 31, | | | | | Nine Months Ended September 30, | |
|---|---|---|---|---|---|---|---|
| | 2002 | 2003 | 2004 | 2005 | 2006 | 2006 | 2007 |
| | (Dollars in millions, except ratio) | | | | | | |
| **Income statement data:** | | | | | | | |
| Total revenues | $2,460 | $2,549 | $2,835 | $3,288 | $3,640 | $2,701 | $2,801 |
| Total cost of revenues | 1,656 | 1,836 | 1,902 | 2,173 | 2,351 | 1,759 | 1,832 |
| Gross profit | 804 | 713 | 933 | 1,115 | 1,289 | 942 | 969 |
| Selling, general and administrative expenses | 412 | 414 | 449 | 553 | 613 | 453 | 447 |
| Goodwill impairment | 172 | 238 | — | — | — | — | — |
| Restructuring and asset impairment charge | 23 | — | (4) | — | — | — | — |
| Non-rental depreciation and amortization | 33 | 40 | 41 | 38 | 50 | 37 | 38 |
| Operating income | 164 | 21 | 447 | 524 | 626 | 452 | 484 |
| Interest expense, net | 199 | 244 | 327 | 181 | 208 | 157 | 146 |
| Interest expense-subordinated convertible debentures | — | — | 14 | 14 | 13 | 11 | 7 |
| Preferred dividends of a subsidiary trust | 18 | 15 | — | — | — | — | — |
| Other (income) expense, net | 2 | 16 | 6 | (2) | — | — | (7) |
| Income (loss) from continuing operations before provision (benefit) for income taxes, discontinued operations and cumulative effect of change in accounting principle | (55) | (254) | 100 | 331 | 405 | 284 | 338 |
| Provision (benefit) for income taxes | 9 | (48) | 28 | 129 | 156 | 112 | 128 |
| Income (loss) from continuing operations before discontinued operations and cumulative effect of change in accounting principle | (64) | (206) | 72 | 202 | 249 | 172 | 210 |
| Loss from discontinued operations, net of income taxes | (54) | (48) | (156) | (15) | (25) | (1) | (1) |
| Income (loss) before cumulative effect of change in accounting principle | (118) | (254) | (84) | 187 | 224 | 171 | 209 |
| Cumulative effect of change in accounting principle, net(1) | (288) | — | — | — | — | — | — |
| Net income (loss) | $ (406) | $ (254) | $ (84) | $ 187 | $ 224 | $ 171 | $ 209 |
| **Other financial data** | | | | | | | |
| Ratio of earnings to fixed charges(2) | 0.8x | 0.2x | 1.3x | 2.3x | 2.4x | 2.3x | 2.7x |
| **Balance sheet data (at period end):** | | | | | | | |
| Total assets | $4,738 | $4,756 | $5,070 | $5,470 | $5,366 | $5,561 | $5,717 |
| Total debt(3) | 2,513 | 2,817 | 2,945 | 2,930 | 2,556 | 2,798 | 2,613 |
| Subordinated convertible debentures(4) | — | 222 | 222 | 222 | 146 | 159 | 146 |
| Company-obligated mandatorily redeemable convertible preferred securities of a subsidiary trust(4) | 227 | — | — | — | — | — | — |
| Stockholders' equity | 1,246 | 1,069 | 1,026 | 1,229 | 1,538 | 1,501 | 1,865 |

See Notes to Selected Historical Consolidated Financial Information

**Notes to Selected Historical Consolidated Financial Information**

(1) The cumulative effect of change in accounting principle in 2002 resulted from a goodwill impairment charge recognized upon the adoption of a new accounting standard. Of this amount, $88 million relates to our discontinued operations which are discussed further in Note 3 to our consolidated financial statements.

(2) The ratio of earnings to fixed charges is calculated by dividing the sum of income (loss) from continuing operations before provision (benefit) for income taxes, discontinued operations and fixed charges, by fixed charges. Fixed charges consist of interest expense, capitalized interest and imputed interest on our lease obligations. Interest component of rent was determined based on an estimate of a reasonable interest factor at the inception of the leases. Due to our losses in 2002 and 2003, the ratio coverage was less than 1:1. We would have had to generate additional earnings of $55 million and $254 million in 2002 and 2003, respectively, to achieve a coverage ratio of 1:1.

(3) Represents all current and long term debt other than subordinated convertible debentures.

(4) A subsidiary trust issued trust preferred securities in 1998 and we recorded such preferred securities as a separate category on our balance sheet. In 2003, the Financial Accounting Standards Board (FASB) issued FIN 46 and upon adoption of this standard as of December 31, 2003, we deconsolidated the trust. Upon deconsolidation, the trust preferred securities were removed from our consolidated balance sheets at December 31, 2003 and the subordinated convertible debentures that we issued to the subsidiary trust, which previously had been eliminated in our consolidated balance sheets, were no longer eliminated in our consolidated balance sheets at December 31, 2003. The carrying amount of the trust preferred securities removed from the consolidated balance sheets was the same as the carrying amount of the subordinated convertible debentures added to the consolidated balance sheets. However, the subordinated convertible debentures are reflected as a component of liabilities on the consolidated balance sheets at December 31, 2003, whereas the trust preferred securities were reflected as a separate category prior to December 31, 2003.

53

## MANAGEMENT'S DISCUSSION AND ANALYSIS OF
## FINANCIAL CONDITION AND RESULTS OF OPERATIONS

*The following discussion and analysis of our results of operations and financial condition covers periods prior to the consummation of the Acquisition. Accordingly, the following discussion and analysis of historical periods does not reflect the significant impact that the Acquisition will have on us, including significantly increased leverage. You should read the following discussion of our results of operations and financial condition with the "Unaudited Pro Forma Financial Information," "Selected Consolidated Financial Information," the audited financial statements and the unaudited financial statements included elsewhere in this offering circular. This discussion contains forward-looking statements and involves numerous risks and uncertainties, including, but not limited to, those described under "Risk Factors." Actual results may differ materially from those contained in any forward-looking statements.*

### Overview

Founded in 1997, we are the largest equipment rental company in the world based on revenues. With a network of approximately 700 rental locations in the U.S., Canada and Mexico, we operate across an extensive and diverse geographic footprint through two business segments: our general rentals segment (which includes our general industrial and aerial businesses) and our trench safety, pump and power segment. Our fleet of rental equipment is the most extensive in the industry, with more than 20,000 classes of equipment comprised of general construction and industrial equipment, aerial work platforms and trench safety equipment, as well as general tools and light equipment. As of September 30, 2007, our rental fleet consisted of more than 270,000 units and had an original equipment cost of approximately $4.3 billion. We believe such size and scale confer several competitive advantages, including the ability to service high-value national accounts, support large job sites, transfer assets across regions to maximize utilization and drive purchasing economies.

Our primary source of revenue is equipment rental, which accounted for approximately 70% of total revenues in 2006. We generate the remainder of our revenues through the sale of new and used rental equipment as well as related contractor supplies, parts and services.

In August 2004, we received notice from the SEC that it was conducting a non-public, fact-finding inquiry of our company, together with a subpoena requiring certain of our documents. The SEC inquiry appears to relate to a broad range of our accounting practices and was not confined to a specific period. In March 2005, our board of directors formed a Special Committee of independent directors to review matters related to the SEC inquiry. The Special Committee retained independent counsel. The board of directors received and acted upon findings of the Special Committee in January 2006. The actions that we took with respect to the Special Committee's findings, and actions that we took with respect to certain other accounting matters, including the restatement of previously issued consolidated financial statements for 2003 and 2002, are discussed in our Annual Report on Form 10-K for the year ended December 31, 2005 (the "2005 Form 10-K"). We have provided documents in response to SEC subpoenas and informal requests as well as to the Special Committee, which has, in turn, provided documents to the SEC.

In July 2007, we received a letter from the staff of the SEC stating that the staff intends to recommend that the SEC authorize the staff to file an injunctive action against us for alleged violations of provisions relating to the maintenance of books and records, internal accounting controls, periodic filing requirements, as well as antifraud provisions as set forth in Section 17(a) of the Securities Act, Sections 10(b), 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Securities Exchange Act and Rules 10b-5, 12b-20, 13a-1, 13a-11, 13a-13 and 13b2-1 thereunder. The letter states that the relief the staff may recommend includes permanent injunctions and civil penalties. Under SEC procedures, we have the opportunity to respond to the SEC staff before the staff makes a formal recommendation as to whether any action should be brought by the SEC. The staff's letter also states that the staff intends to request

authorization to engage in settlement discussions with us. We intend to continue cooperating fully with the SEC in this matter.

The U.S. Attorney's Office has also requested information from us informally and by subpoena about matters related to the SEC inquiry. We are also cooperating fully with this office.

In addition to the matters referenced above, we are also subject to certain ongoing class action and derivative suits. Although we have not accrued any amounts related to the ultimate disposition of these or the above matters to date, any liabilities resulting from an adverse judgment or settlement of such matters may be material to our results of operations and cash flows during the period incurred. Other costs associated with the SEC inquiry, the U.S. Attorney's Office inquiry and the class action and derivative suits, including reimbursement of attorneys' fees incurred by indemnified officers and directors, are expensed as incurred.

### The Transactions

On July 22, 2007, RAM Holdings and Merger Sub entered into the Merger Agreement with URI, pursuant to which Merger Sub will merge with and into URI, with URI as the surviving corporation. Immediately thereafter, RAM Transition Corp. will merge with and into URNA, with URNA as the surviving corporation. Upon the URNA Merger, URNA will assume the rights and obligations of RAM Transition Corp. under the notes, the indenture and the registration rights agreement by operation of law. In this offering circular, we refer to these transactions as the "Acquisition."

Upon completion of the URI Merger, each outstanding share of common stock of URI will be converted into the right to receive $34.50 in cash. In addition, and also upon completion of the URI Merger, each outstanding share of Series C Preferred Stock and Series D Preferred Stock of URI will be converted into the right to receive an amount in cash equal to the sum of (i) the Liquidation Preference plus (ii) an amount equal to 6.25% per annum of the Liquidation Preference compounded annually from January 7, 1999 in the case of the Series C Preferred Stock or September 30, 1999 in the case of the Series D Preferred Stock to and including the closing date of the URI Merger plus (iii) any accrued and unpaid dividends thereon as of the closing date of the URI Merger.

In connection with the Acquisition, we expect that we will enter into (i) a $1,500 million senior secured revolving credit facility, of which approximately $443 million is expected to be funded at the closing of the merger, and (ii) a $1,100 million senior secured term loan facility, with Banc of America Securities LLC ("BAS"), Credit Suisse Securities (USA) LLC ("CS Securities") and Morgan Stanley Senior Funding, Inc. ("Morgan Stanley") as Joint Lead Arrangers; Bank of America, N.A. as administrative agent and collateral agent; BAS, CS Securities, Morgan Stanley and Lehman Brothers Inc. as Joint Book Running Managers; and other lenders.

In addition, the Sponsor and others will make an equity contribution of approximately $1,426 million to RAM Holdings.

The Acquisition, the repayment of our existing debt and the payment of related fees and expenses will be financed with (1) proceeds from the notes offered hereby, (2) borrowings of approximately $1,543 million under our new senior secured credit facilities, (3) borrowings of $1,350 million under our new senior unsecured bridge credit facility, (4) an indirect equity contribution by the Sponsor and others in the amount of $1,426 million, and (5) and cash on hand.

We expect to use a portion of such proceeds to repurchase all or substantially all of the (i) $1,000 million in aggregate outstanding principal amount of our 6½ Senior Notes due 2012, (ii) $375 million in aggregate outstanding principal amount of our 7% Senior Subordinated Notes due 2014 and (iii) $525 million in aggregate outstanding principal amount of our 7¾% Senior Subordinated Notes due 2013 pursuant to previously launched tender offers.

We anticipate that we will incur certain expenses associated with the Acquisition which will reduce our earnings during the quarter in which the Acquisition is consummated. These charges will include charges of approximately $22 million related to the acceleration of unvested equity at the date of the Acquisition, charges of $154 million related to debt tender premiums and consent solicitation fees, $39 million related to investment banking, accounting and advisory fees and charges of $37 million related to the unwinding of swaps.

**Critical Accounting Policies**

We prepare our consolidated financial statements in accordance with GAAP. A summary of our significant accounting policies is contained in Note 2 to our audited consolidated financial statements included elsewhere in this offering circular. In applying many accounting principles, we make assumptions, estimates and/or judgments. These assumptions, estimates and judgments are often subjective and may change based on changing circumstances or changes in our analysis. Material changes in these assumptions, estimates and judgments have the potential to materially alter our results of operations. We have identified below our accounting policies that we believe could potentially produce materially different results were we to change underlying assumptions, estimates and judgments. Although actual results may differ from those estimates, we believe the estimates are reasonable and appropriate.

*Revenue Recognition.*   We recognize equipment rental revenue on a straight-line basis. Our rental contract periods are daily, weekly or monthly. By way of example, if a customer were to rent a piece of equipment and the daily, weekly and monthly rental rates for that particular piece were (in actual dollars) $100, $300 and $900, respectively, we would recognize revenues of $32.14 per day. The daily rate is calculated by dividing the monthly rate of $900 by 28 days, the monthly term. As part of this straight-line methodology, when the equipment is returned, we recognize as incremental revenue the excess, if any, between the amount the customer is contractually required to pay over the cumulative amount of revenue recognized to date. Revenues from the sale of rental equipment and new equipment are recognized at the time of delivery to, or pick-up by, the customer and when collectibility is reasonably assured. Sales of contractor supplies are also recognized at the time of delivery to, or pick-up by, the customer.

*Allowance for Doubtful Accounts.*   We maintain an allowance for doubtful accounts. The allowance reflects our estimate of the amount of our receivables that we will be unable to collect. We base our estimate on a combination of an analysis of our accounts receivable on a specific accounts basis and historical write-off experience. Our estimate could require change based on changing circumstances, including changes in the economy or in the particular circumstances of individual customers. Accordingly, we may be required to increase or decrease our allowance.

*Useful Lives of Rental Equipment and Property and Equipment.*   We depreciate rental equipment and property and equipment over their estimated useful lives, after giving effect to an estimated salvage value which ranges from 0% to 10% of cost. The useful life of an asset is determined based on our estimate of the period the asset will generate revenues, and the salvage value is determined based on our estimate of the minimum value we will realize from the asset after such period. We may be required to change these estimates based on changes in our industry or other changing circumstances. If these estimates change in the future, we may be required to recognize increased or decreased depreciation expense for these assets.

*Purchase Price Allocation.*   We have made a significant number of acquisitions in the past. We allocate the cost of the acquired enterprise to the assets acquired and liabilities assumed based on their respective fair values at the date of acquisition. With the exception of goodwill, long-lived fixed assets generally represent the largest component of our acquisitions. The long-lived fixed assets that we acquire are primarily rental equipment, transportation equipment and real estate. With limited

exceptions, virtually all of the rental equipment that we have acquired through purchase business combinations has been classified as "To be Used," rather than as "To be Sold." Equipment that we acquire and classify as "To be Used" is recorded at fair value, as determined by replacement cost to us of such equipment. We use third-party valuation experts to help calculate replacement cost.

In addition to long-lived fixed assets, we also acquire other assets and assume liabilities. These other assets and liabilities typically include, but are not limited to, parts inventory, accounts receivable, accounts payable and other working capital items. Because of their short-term nature, the fair values of these other assets and liabilities generally approximate the book values reflected on the acquired entities' balance sheets. However, when appropriate, we adjust these book values for factors such as collectibility and existence. The intangible assets that we have acquired are primarily goodwill, customer-related intangibles (specifically customer relationships) and covenants not-to-compete. Goodwill is calculated as the excess of the cost of the acquired entity over the net of the amounts assigned to the assets acquired and the liabilities assumed. Customer relationships and non-compete agreements are valued based on an excess earnings or income approach with consideration to projected cash flows.

*Impairment of Goodwill.*  We have made acquisitions in the past that included the recognition of a significant amount of goodwill. Commencing January 1, 2002, goodwill is no longer amortized, but instead is reviewed for impairment annually or more frequently as events occur that indicate a decline in fair value below its carrying value. In general, this means that we must determine whether the fair value of the goodwill, calculated in accordance with applicable accounting standards, is at least equal to the recorded value on our balance sheet. If the fair value of the goodwill is less than the recorded value, we are required to write-off the excess goodwill as an operating expense.

Prior to January 1, 2004, we tested for goodwill impairment on a branch-by-branch basis. Accordingly, a goodwill write-off was required even if only one or a limited number of our branches had an impairment as of the testing date and even if there were no impairment for all our branches on an aggregate basis. Commencing January 1, 2004, we began testing for goodwill impairment at a regional, rather than a branch, level. We began testing for impairment at this level because accounting standards require that goodwill impairment testing be performed at the reporting unit level. In 2004, following a reorganization of our reporting structure, our regions became our reporting units. This change in reporting units may impact future goodwill impairment analyses because there are substantially fewer regions than there are branches.

*Impairment of Long-Lived Assets.*  We review the valuation of our long-lived assets on an ongoing basis and assess the carrying value of such assets if facts and circumstances suggest they may be impaired. If this review indicates the carrying value of these assets may not be recoverable, the carrying value is reduced to its estimated fair value. The determination of recoverability is based upon an undiscounted cash flow analysis over the asset's remaining useful life. We make estimates and assumptions when applying the undiscounted cash flow analysis. These estimates and assumptions may prove to be inaccurate due to factors such as changes in economic conditions, changes in our business prospects or other changing circumstances. If these estimates change in the future, we may be required to recognize write-downs on our long-lived assets.

*Income Taxes.*  We recognize deferred tax assets and liabilities for certain future deductible or taxable temporary differences expected to be reported in our income tax returns. These deferred tax assets and liabilities are computed using the enacted tax rates that are expected to apply in the periods when the related future deductible or taxable temporary difference is expected to be settled or realized. In the case of deferred tax assets, the future realization of the deferred tax benefits and carryforwards are determined with consideration to historical profitability, projected future taxable income, the expected timing of the reversals of existing temporary differences and tax planning strategies. We generally evaluate projected taxable income for a five-year period to determine the recoverability of all

deferred tax assets and, in addition, examine the length of the carryforward to ensure the deferred tax assets are established at an amount that is more likely than not to be realized. We have not provided a valuation allowance related to the federal deferred tax asset associated with our federal net operating loss carryforwards because we believe that it is more likely than not that the full benefit of these amounts will be recovered during the carryforward period. We have provided a partial valuation allowance against a deferred tax asset for certain foreign tax credit and state operating loss carryforward amounts. These valuation allowances were required because it is more likely than not that some of the foreign tax credit and carryforward amounts will expire unused.

We are subject to ongoing tax examinations and assessments in various jurisdictions. Accordingly, accruals for tax contingencies are established based on the probable outcomes of such matters. Our ongoing assessments of the probable outcomes of the examinations and related tax accruals require judgment and could increase or decrease our effective tax rate as well as impact our operating results.

We adopted FIN 48 effective January 1, 2007. FIN 48 clarifies the accounting and recording for uncertainties in income tax law. FIN 48 prescribes a comprehensive model for the financial statement recognition, measurement, presentation and disclosure of uncertain tax provisions taken or expected to be taken in income tax return.

*Reserves for Claims.*   We are exposed to various claims relating to our business, including those for which we retain portions of the losses through the application of deductibles and self-insured retentions, which we sometimes refer to as "self-insurance." These claims include (i) workers compensation claims and (ii) claims by third parties for injury or property damage involving our equipment or personnel. These types of claims may take a substantial amount of time to resolve and, accordingly, the ultimate liability associated with a particular claim may not be known for an extended period of time. Our methodology for developing self-insurance reserves is based on management estimates which incorporate actuarial valuations that are periodically prepared by our third party actuaries. Our estimation process considers, among other matters, the cost of known claims over time, cost inflation and incurred but not reported claims. These estimates may change based on, among other things, changes in our claims history or receipt of additional information relevant to assessing the claims. Further, these estimates may prove to be inaccurate due to factors such as adverse judicial determinations or settlements at higher than estimated amounts. Accordingly, we may be required to increase or decrease our reserve levels.

*Legal Contingencies.*   We are involved in a variety of claims, lawsuits, investigations and proceedings, as described elsewhere in this offering circular. We determine whether an estimated loss from a contingency should be accrued by assessing whether a loss is deemed probable and can be reasonably estimated. We assess our potential liability by analyzing our litigation and regulatory matters using available information. We develop our views on estimated losses in consultation with outside counsel handling our defense in these matters, which involves an analysis of potential results, assuming a combination of litigation and settlement strategies. Should developments in any of these matters cause a change in our determination as to an unfavorable outcome and result in the need to recognize a material accrual, or should any of these matters result in a final adverse judgment or be settled for a significant amount, they could have a material adverse effect on our results of operations in the period or periods in which such change in determination, judgment or settlement occurs. To date, we have expensed as incurred the amounts we have paid in defense costs and for advances made with respect to indemnification claims. See Note 13 to our audited consolidated financial statements included elsewhere in this offering circular.

**Results of Operations**

Our reportable segments are general rentals and trench safety, pump and power. The general rentals segment (which includes our general industrial and aerial businesses) involves the rental of

construction, aerial, industrial and homeowner equipment and related services and activities. The general rentals segment's customers include construction and industrial companies, manufacturers, utilities, municipalities and homeowners. The general rentals segment operates throughout the United States and Canada and has one location in Mexico. The trench safety, pump and power segment includes the rental of specialty construction products and related services. The trench safety, pump and power segment's customers include construction companies involved in infrastructure projects, municipalities and industrial companies. This segment operates in the United States and has one location in Canada.

These segments align our external segment reporting with how management evaluates and allocates resources. We evaluate segment performance based on segment operating results.

Our revenues and operating results fluctuate from quarter to quarter, reflecting the seasonal rental patterns of our customers, with rental activity tending to be lower in the winter.

We completed acquisitions in each of 2004, 2005 and 2006 which are discussed further in Note 7 to our audited consolidated financial statements included elsewhere in this offering circular. In view of the fact that our operating results for these years were affected by acquisitions, we believe that our results for these periods are not fully directly comparable, although there is no material impact from these acquisitions.

In December 2006, we entered into a definitive agreement to sell our traffic control business to HTS Acquisition, Inc., an entity newly-formed by affiliates of private equity investors Wynnchurch Capital Partners and Oak Hill Special Opportunities Fund, L.P. The transaction closed in February 2007 and we received net proceeds of $68 million, subject to post-closing adjustment.

In accordance with SFAS No. 144, "Accounting for the Impairment or Disposal of Long-Lived Assets," the results of operations of our traffic control business have been reported as a discontinued operation in our consolidated financial statements presented elsewhere in this offering circular. The assets and liabilities associated with the traffic control business have also been classified separately in our condensed consolidated balance sheets presented herein. Additionally, our condensed consolidated statements of cash flows separately report the cash flows of the discontinued operation within the operating and investing sections. Revenues related to our discontinued operation were approximately $209 million and $20 million for the nine months ended September 30, 2006 and 2007, respectively, and $255 million, $270 million and $280 million, respectively, for the years ended December 31, 2004, 2005 and 2006. During both the nine months ended September 30, 2006 and 2007, we reported after-tax losses from our discontinued operation of $1 million. During the years ended December 31, 2004, 2005 and 2006, we reported after-tax losses losses from our discontinued operation of $156 million, $15 million and $25 million, respectively.

*Results of Operations for the nine months ended September 30, 2006 and September 30, 2007*

Revenues for the nine months ended September 30, 2006 and September 30, 2007 were as follows:

|  | Nine Months Ended September 30, | | Percent Change |
|---|---|---|---|
|  | 2006 | 2007 |  |
|  | (Dollars in millions) | | |
| Equipment rentals | $1,874 | $1,947 | 4% |
| Sales of rental equipment | 248 | 243 | (2) |
| New equipment sales | 172 | 177 | 3 |
| Contractor supplies sales | 288 | 301 | 5 |
| Service and other revenues | 119 | 133 | 12 |
| Total revenues | $2,701 | $2,801 | 4 |

Revenues by segment for the nine months ended September 30, 2006 and September 30, 2007 were as follows:

| | General rentals | Trench safety, pump and power | Total |
|---|---|---|---|
| | | (Dollars in millions) | |
| **Nine months ended September 30, 2006** | | | |
| Equipment rentals . . . . . . . . . . . . . . . . . . . . . . | $1,745 | $129 | $1,874 |
| Sales of rental equipment . . . . . . . . . . . . . . . . | 238 | 10 | 248 |
| New equipment sales . . . . . . . . . . . . . . . . . . . | 159 | 13 | 172 |
| Contractor supplies sales . . . . . . . . . . . . . . . . . | 276 | 12 | 288 |
| Service and other revenues . . . . . . . . . . . . . . . | 117 | 2 | 119 |
| Total revenues . . . . . . . . . . . . . . . . . . . . . . . . | $2,535 | $166 | $2,701 |
| **Nine months ended September 30, 2007** | | | |
| Equipment rentals . . . . . . . . . . . . . . . . . . . . . . | $1,815 | $132 | $1,947 |
| Sales of rental equipment . . . . . . . . . . . . . . . . | 231 | 12 | 243 |
| New equipment sales . . . . . . . . . . . . . . . . . . . | 167 | 10 | 177 |
| Contractor supplies sales . . . . . . . . . . . . . . . . . | 289 | 12 | 301 |
| Service and other revenues . . . . . . . . . . . . . . . | 130 | 3 | 133 |
| Total revenues . . . . . . . . . . . . . . . . . . . . . . . . | $2,632 | $169 | $2,801 |

Equipment rentals include our revenues from renting equipment, as well as related revenues, such as the fees we charge for equipment delivery, fuel, repair or maintenance of rental equipment and damage waivers. Sales of rental equipment include our revenues from the sale of used rental equipment. Contractor supplies sales include our sales of supplies utilized by contractors, which include construction consumables, tools, small equipment and safety supplies. Services and other includes our repair services (including parts sales) as well as the operations of our subsidiaries that develop and market software for use by equipment rental companies in managing and operating multiple branch locations.

*Equipment rentals.*   Equipment rentals for the nine months ended September 30, 2007 of $1,947 million increased $73 million, or 4%, reflecting a 2.5 percentage point increase in time utilization on a larger fleet, partially offset by a 0.6 percent decline in rental rates. Equipment rentals represented 70% of total revenues for the nine months ended September 30, 2007. On a segment basis, equipment rentals represented 69% and 78% of total revenues for general rentals and trench safety, pump and power, respectively. General rentals equipment rentals increased $70 million, or 4%, reflecting a 3.1% increase in same-store rental revenues. Trench safety, pump and power equipment rentals increased $3 million, reflecting increases from cold starts. This benefit was partially offset by a 0.3% decline in same-store revenues, reflecting the absence of the benefit we received from hurricane-related business in the prior year period.

*Sales of rental equipment.*   For the nine months ended September 30, 2007, sales of rental equipment represented approximately 9% of our total revenues and our general rentals segment accounted for approximately 95% of these sales. Sales of rental equipment for trench safety, pump and power were insignificant. For the nine months ended September 30, 2007, sales of rental equipment declined insignificantly as compared to the prior year period.

*New equipment sales.*   For the nine months ended September 30, 2007, new equipment sales represented 6% of our total revenues and our general rentals segment accounted for approximately 94% of these sales. New equipment sales for trench safety, pump and power were insignificant. For the

60

nine months ended September 30, 2007, new equipment sales increased insignificantly as compared to the prior year period.

*Sales of contractor supplies.*   Sales of contractor supplies represent our revenues associated with selling a variety of supplies, including construction consumables, tools, small equipment and safety supplies. Consistent with sales of rental and new equipment, general rentals accounts for substantially all of our contractor supplies sales. For the nine months ended September 30, 2007, sales of contractor supplies increased 5%, reflecting increased volume during the first half of the year.

*Service and other revenues.*   Service and other revenues primarily represents our revenues earned from providing services (including parts sales). Consistent with sales of rental and new equipment as well as sales of contractor supplies, general rentals accounts for substantially all of our service and other revenues. For the nine months ended September 30, 2007, service and other revenues increased 12%, as compared to the prior year period, reflecting increased volume.

## Segment Operating Profit

Segment operating profit and operating margin were as follows:

| | General rentals | Trench safety, pump and power | Total |
|---|---|---|---|
| | | (Dollars in millions) | |
| **Nine months ended September 30, 2006** | | | |
| Operating profit . . . . . . . . . . . . . . . . . . . . . . . | $409 | $43 | $452 |
| Operating margin . . . . . . . . . . . . . . . . . . . . . . . | 16.1% | 25.9% | 16.7% |
| **Nine months ended September 30, 2007** | | | |
| Operating profit . . . . . . . . . . . . . . . . . . . . . . . | $440 | $44 | $484 |
| Operating margin . . . . . . . . . . . . . . . . . . . . . . . | 16.7% | 26.0% | 17.3% |

*General rentals.*   For the nine months ended September 30, 2007, our operating margin improved 0.6 percentage points, reflecting improved selling, general and administrative expense leverage.

*Gross Margin.*   Gross margins by revenue classification were as follows:

| | Nine months Ended September 30, | |
|---|---|---|
| | 2006 | 2007 |
| Total gross margin . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 34.9% | 34.6% |
| Equipment rentals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 38.4 | 38.1 |
| Sales of rental equipment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 30.6 | 28.4 |
| New equipment sales . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 18.0 | 16.9 |
| Contractor supplies sales . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 18.8 | 18.6 |
| Service and other revenues . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 51.3 | 54.9 |

For the nine months ended September 30, 2007, total gross profit margin decreased 0.3 percentage points, primarily reflecting reduced gross margins from equipment rentals and sales of rental equipment, partially offset by improved gross margins on service and other. Equipment rentals gross margin decreased 0.3 percentage points, reflecting increased rental costs. Gross margins on sales of rental equipment decreased 2.2 percentage points, reflecting a change in mix of equipment sold. The gross margin improvement in service and other primarily reflects increased revenues from the licensing of software.

***Selling, general and administrative expenses (SG&A).***   SG&A expense information for the nine months ended September 30, 2006 and 2007 was as follows:

|  | Nine months Ended September 30, | |
|---|---|---|
|  | 2006 | 2007 |
|  | (Dollars in millions) | |
| Total SG&A expenses ............................ | $ 453 | $ 447 |
| SG&A as a percentage of revenues .................... | 16.8% | 16.0% |

SG&A expense primarily includes sales force compensation, bad debt expense, information technology costs, advertising and marketing expenses, third party professional fees, management salaries and clerical and administrative overhead. For the nine months ended September 30, 2007, SG&A expense of $447 million decreased $6 million as compared to 2006 and declined by 0.8 percentage points of revenues. This improvement reflects an $11 million reduction in the level of professional fees related to regulatory matters and reduced bad debt expense of $7 million. The benefit associated with these matters was partially offset by increased costs associated with our exploration of strategic alternatives, the amendment of our former Chairman's service agreement, and charges associated with the accelerated vesting, upon his June 4, 2007 retirement, of a restricted stock award (see "—Income taxes") held by our former Chief Executive Officer, as well as normal inflationary increases. For the nine month period ended September 30, 2007, the year-over-year reduction in bad debt expense reflects improved accounts receivable collection experience, write-off trends and credit management.

***Interest expense, net*** for the nine months ended September 30, 2006 and 2007 was as follows:

|  | Nine months Ended September 30, | |
|---|---|---|
|  | 2006 | 2007 |
|  | (Dollars in millions) | |
| Interest expense, net ............................... | $157 | $146 |

Interest expense for the nine months ended September 30, 2007 decreased by $11 million and includes $3 million of interest expense benefits associated with changes in the fair value of interest rate swaps which were de-designated as fair value hedges in February 2007. Interest expense for the nine months ended September 30, 2007 reflects the favorable mark-to-market impact of these swaps as well as lower average debt balances, partially offset by the increase in interest rates applicable to our floating rate debt.

***Income taxes.***   The following table summarizes our continuing operations provision for income taxes and the related effective tax rate for the nine months ended September 30, 2006 and 2007:

|  | Nine months Ended September 30, | |
|---|---|---|
|  | 2006 | 2007 |
|  | (Dollars in millions) | |
| Income from continuing operations ................... | $ 284 | $ 338 |
| Provision for income taxes ......................... | 112 | 128 |
| Effective tax rate ................................. | 39.4% | 37.9% |

The difference between the consolidated effective tax rates and the U.S. federal statutory income tax rate of 35% primarily relate to state taxes as well as certain non-deductible charges. During the third quarter of 2007, we recorded a benefit of $2 million within the income tax provision as a result of the reversal of a valuation allowance. The valuation allowance was related to certain state tax net operating loss carryforwards. Additionally, within the tax provision, a charge of $3 million was recorded

in the second quarter related to the restricted stock grant referred to in the following paragraph and a benefit of $1 million was recorded in the first quarter related to the release of a valuation allowance applicable to foreign tax credits.

Between June 2001 and March 31, 2007, we had been recognizing a tax benefit on compensation expense associated with a restricted stock award made to our former Chief Executive Officer, Wayland Hicks, in June 2001. Because this award vested for tax purposes in 2002 and because Section 162(m) of the Internal Revenue Code limits the deductibility of a portion of his compensation, no tax benefit should have been recognized. Accordingly, our results for the second quarter of 2007 include a charge of $3 million within the income tax provision, representing the reversal of the cumulative income tax benefit recognized in prior periods. The second quarter effective tax rate also reflects a non-deductible charge of $5 million within selling, general and administrative expenses for the remaining amortization of this award.

Our effective tax rate is based on recurring factors, including the geographic mix of income before taxes and the related tax rates in those jurisdictions. In addition, our effective tax rate will change based on discrete or other nonrecurring events (such as audit settlements) that may not be predictable.

*Results of Operations for the Years Ended December 31, 2004, 2005 and 2006*

Revenues for each of the three years in the period ended December 31, 2006 were as follows:

| | Year Ended December 31, | | | Percent Change | |
| --- | --- | --- | --- | --- | --- |
| | 2004 | 2005 | 2006 | 2005 | 2006 |
| | (Dollars in millions) | | | | |
| Equipment rentals .................... | $2,058 | $2,338 | $2,530 | 13.6% | 8.2% |
| Sales of rental equipment .............. | 272 | 304 | 335 | 11.8 | 10.2 |
| New equipment sales ................. | 177 | 205 | 232 | 15.8 | 13.2 |
| Contractor supplies sales .............. | 202 | 301 | 385 | 49.0 | 27.9 |
| Service and other revenues ............. | 126 | 140 | 158 | 11.1 | 12.9 |
| Total revenues ...................... | $2,835 | $3,288 | $3,640 | 16.0 | 10.7 |

Revenues by segment for each of the three years in the period ended December 31, 2006 were as follows:

| | General rentals | Trench safety, pump and power | Total |
|---|---|---|---|
| | | (Dollars in millions) | |
| **2004** | | | |
| Equipment rentals ....................... | $1,957 | $101 | $2,058 |
| Sales of rental equipment ................. | 259 | 13 | 272 |
| New equipment sales .................... | 170 | 7 | 177 |
| Contractor supplies sales ................. | 196 | 6 | 202 |
| Service and other revenues ............... | 123 | 3 | 126 |
| Total revenues ......................... | $2,705 | $130 | $2,835 |
| **2005** | | | |
| Equipment rentals ....................... | $2,198 | $140 | $2,338 |
| Sales of rental equipment ................. | 291 | 13 | 304 |
| New equipment sales .................... | 191 | 14 | 205 |
| Contractor supplies sales ................. | 291 | 10 | 301 |
| Service and other revenues ............... | 137 | 3 | 140 |
| Total revenues ......................... | $3,108 | $180 | $3,288 |
| **2006** | | | |
| Equipment rentals ....................... | $2,361 | $169 | $2,530 |
| Sales of rental equipment ................. | 322 | 13 | 335 |
| New equipment sales .................... | 216 | 16 | 232 |
| Contractor supplies sales ................. | 369 | 16 | 385 |
| Service and other revenues ............... | 155 | 3 | 158 |
| Total revenues ......................... | $3,423 | $217 | $3,640 |

2006 total revenues of $3,640 million increased 10.7% compared with total revenues of $3,288 million in 2005. The increase primarily reflects an 8.2% increase in equipment rentals and a 27.9% increase in contractor supplies sales. The increase in equipment rentals reflects a 5.1% increase in rental rates and a 1.9 percentage point increase in dollar equipment utilization. The increase in contractor supplies sales reflects increased volume as we expanded our product offering. Equipment rentals represented 71% and 70% of our revenues in 2005 and 2006, respectively.

2005 total revenues of $3,288 million increased 16.0% compared with total revenues of $2,835 million in 2004. The increase primarily reflects a 13.6% increase in equipment rentals and a 49.0% increase in contractor supplies sales. The increase in equipment rentals reflects a 5.5% increase in rental rates and a 5.0 percentage point increase in dollar equipment utilization. The increase in contractor supplies sales reflects increased volume, as we expanded our product offering. Equipment rentals represented 73% of our revenues in 2004.

*Equipment rentals.* 2006 equipment rentals of $2,530 million increased $192 million, or 8.2%, reflecting a 5.1% increase in rental rates and a 1.9 percentage point increase in our dollar equipment utilization. Equipment rentals represented 70% of total revenues in 2006. On a segment basis, equipment rentals represented 69% and 78% of total revenues for general rentals and trench safety, pump and power, respectively. General rentals equipment rentals increased $163 million, or 7.4%, reflecting increased rental rates and a 6.3% increase in same-store rental revenues. Trench safety, pump and power equipment rentals increased $29 million, or 20.7%, reflecting a 5.0% increase in same-store rental revenues, as well as increased revenues from acquisitions and cold starts.

2005 equipment rentals of $2,338 million increased $280 million, or 13.6%, reflecting a 5.5% increase in rental rates and a 5.0 percentage point increase in our dollar equipment utilization. Equipment rentals represented 71% of total revenues in 2005. On a segment basis, equipment rentals represented 71% and 78% of total revenues for general rentals and trench safety, pump and power, respectively. General rentals equipment rentals increased $241 million, or 12.3%, reflecting increased rental rates and a 10.6% increase in same-store rental revenues. Trench safety, pump and power equipment rentals increased $39 million, or 38.6%, reflecting a 22.8% increase in same-store rental revenues.

*Sales of rental equipment.*    For each of the three years in the period ended December 31, 2006, sales of rental equipment have represented approximately 9% of our total revenues and our general rentals segment accounted for approximately 96% of these sales. 2006 sales of rental equipment of $335 million increased $31 million, or 10.2%, as compared to 2005, reflecting price increases and a shift in the mix of equipment sold. 2005 sales of rental equipment of $304 million increased $32 million, or 11.8%, as compared to 2004, reflecting an increase in the number of units of equipment sold.

*New equipment sales.*    For each of the three years in the period ended December 31, 2006, new equipment sales represented approximately 6% of our total revenues. Our general rentals segment accounted for approximately 94% of these sales. 2006 new equipment sales of $232 million increased $27 million, or 13.2%, as compared to 2005, reflecting price increases and a shift in the mix of equipment sold. 2005 new equipment sales of $205 million increased $28 million, or 15.8%, as compared to 2004, reflecting an increase in the number of units sold.

*Contractor supplies sales.*    Consistent with sales of rental and used equipment, general rentals accounts for substantially all of our contractor supplies sales. Between 2004 and 2006, general rentals accounted for approximately 97% of total sales of contractor supplies. 2006 sales of contractor supplies of $385 million increased $84 million, or 27.9%, as compared to 2005, reflecting an increase in the volume of supplies sold. 2005 sales of contractor supplies of $301 million increased $99 million, or 49.0%, as compared to 2004, reflecting an increase in the volume of supplies sold.

*Service and other revenues.*    Consistent with sales of rental and new equipment as well as sales of contractor supplies, general rentals accounts for substantially all of our service and other revenues. Service and other revenues increased 12.9% and 11.1% in 2006 and 2005, respectively.

**Fourth Quarter 2006 Items.**    In December 2006, we entered into a definitive agreement to sell our traffic control business to HTS Acquisition, Inc., which was completed in February 2007. In connection with this transaction, we recorded an after-tax loss on sale in 2006 of $24 million, which has been reflected in discontinued operations in our consolidated statements of operations. Additionally, during the fourth quarter of 2006, we recorded a charge of $9 million, reflecting recent loss experience related to our estimated provision for self-insurance reserves. Of this amount, $7 million was recorded in cost of equipment rentals, excluding depreciation, and the balance was recorded in discontinued operations, as it relates to our traffic control operations. Also, during the fourth quarter of 2006, we reduced our reserve for inventory obsolescence and shrinkage by $10 million following our annual physical inventory inspections. Of this amount, $7 million was recorded in cost of contractor supplies sales and $3 million was recorded in cost of equipment rentals, excluding depreciation. In addition to these matters, we recorded a charge of $7 million in the fourth quarter related to our estimated exposure for sales-tax matters. This amount has been reflected in selling, general and administrative expenses in the accompanying consolidated statement of operations.

**Segment Operating Profit.**    As discussed in Note 3 to our audited consolidated financial statements, traffic control, which was previously presented as a reporting segment, is now presented within discontinued operations. In conjunction with this presentation, general corporate overhead costs previously allocated to traffic control have been reclassified to continuing operations and reflected

within the operating results of general rentals and trench safety, pump and power, our remaining reportable segments. Prior period segment results have been recast to reflect this presentation. Additionally, in 2006, we determined that the amount of self-insurance costs attributable to our traffic control operations exceeded the amount of such costs allocated to these operations and, as a result, have reflected more of these costs within discontinued operations than were previously allocated to traffic control when it was a reportable segment. Prior period segment results have been recast to reflect this presentation. The current methodology for allocating self-insurance costs, which includes our estimated exposures for general liability, workers' compensation and automobile liability, reflects the risk profiles of our segments and is based on actuarially performed analyses. As a result of these changes, approximately $15 million, $15 million and $16 million of corporate overhead costs for 2004, 2005 and 2006, respectively, that otherwise would have been allocated to traffic control have been reflected in our reportable segment operating income and approximately $4 million, $11 million and $9 million of self-insurance costs for 2004, 2005 and 2006, respectively, that would have been allocated to our reportable segments under our prior allocation methodology have been presented within discontinued operations. Taking into account these matters, segment operating profit and operating margin for each of the three years in the period ended December 31, 2006 were as follows:

|  | General rentals | Trench safety, pump and power | Total |
|---|---|---|---|
|  | (Dollars in millions) | | |
| **2004** | | | |
| Operating Profit . . . . . . . . . . . . . . . . . . . . . . . . | $ 417 | $30 | $ 447 |
| Operating Margin  . . . . . . . . . . . . . . . . . . . . . . . | 15.4% | 23.1% | 15.8% |
| **2005** | | | |
| Operating Profit . . . . . . . . . . . . . . . . . . . . . . . . | $ 477 | $47 | $ 524 |
| Operating Margin  . . . . . . . . . . . . . . . . . . . . . . . | 15.3% | 26.1% | 15.9% |
| **2006** | | | |
| Operating Profit . . . . . . . . . . . . . . . . . . . . . . . . | $ 568 | $58 | $ 626 |
| Operating Margin  . . . . . . . . . . . . . . . . . . . . . . . | 16.6% | 26.7% | 17.2% |

*General rentals.*   For each of the three years in the period ended December 31, 2006, general rentals accounted for at least 90% of our total operating profit. This contribution percentage is consistent with general rentals' revenue contribution over the same period, which has ranged from 94 to 95%. General rentals' operating margin in 2006 increased 1.3 percentage points from 2005, as the benefits of higher rental rates were partially offset by increased costs for labor and benefits as well as reduced gross margins on contractor supplies. General rentals' operating margin in 2005 decreased 0.1 percentage points from 2004 as increased selling, general and administrative expenses offset the benefits of higher rental rates.

*Trench safety, pump and power.*   Operating profit in 2006 increased $11 million, reflecting a $37 million increase in revenues. Trench safety, pump and power operating profit increased $17 million in 2005 reflecting a $50 million increase in revenues.

*Gross Margin.*    We have historically realized higher gross margins on sales of rental equipment than on sales of new equipment. This is consistent with the marketplace in general and not unique to us. Gross margins by revenue classification were as follows:

|  | Year Ended December 31, | | |
| --- | --- | --- | --- |
|  | 2004 | 2005 | 2006 |
| Total gross margin | 32.9% | 33.9% | 35.4% |
| Equipment rentals | 34.5 | 36.7 | 38.9 |
| Sales of rental equipment | 27.9 | 26.6 | 29.3 |
| New equipment sales | 17.5 | 18.0 | 17.7 |
| Contractor supplies sales | 26.7 | 23.3 | 21.6 |
| Service and other revenues | 48.4 | 49.3 | 51.9 |

2006 gross margin of 35.4% increased 1.5 percentage points from 2005, reflecting a 2.2 percentage point increase in equipment rentals gross margin and a 2.7 percentage point increase in the sales of rental equipment gross margin, partially offset by a 1.7 percentage point reduction in gross margin on contractor supplies. The improved equipment rental margin reflected a 5.1% increase in rental rates as well as a 1.9 percentage point improvement in dollar equipment utilization. The improved margin on sales of rental equipment reflects improved pricing and a shift in the mix of equipment sold. The reduction in contractor supplies sales gross margin reflects increased costs related to our distribution centers.

2005 gross margin of 33.9% increased 1.0 percentage point from 2004. The improved margin performance was primarily a result of a 2.2 percentage point increase in equipment rentals gross margin, partially offset by a 3.4 percentage point reduction in gross margins on contractor supplies sales. The improved equipment rental margin reflected a 5.5% increase in rental rates as well as a 5.0 percentage point improvement in dollar equipment utilization. The reduction in contractor supplies sales gross margin reflects costs incurred to open distribution centers in the United States and Canada. The reduction in gross margins on sales of rental equipment, as well as the increased margin realized on sales of new equipment, reflects a change in the mix of equipment sold.

*Selling, General and Administrative Expenses (SG&A).*    SG&A expense information for each of the three years in the period ended December 31, 2006 was as follows:

|  | Year Ended December 31, | | |
| --- | --- | --- | --- |
|  | 2004 | 2005 | 2006 |
|  | (Dollars in millions) | | |
| Total SG&A expenses | $449 | $553 | $613 |
| SG&A as a percentage of revenues | 15.8% | 16.8% | 16.8% |

2006 SG&A expense of $613 million increased 10.8% as compared to 2005 and was flat as a percentage of revenue. The increase in actual spend in SG&A reflects normal inflationary increases, higher selling and insurance costs related to growth in the business and increased professional fees for business improvement initiatives. These increases were partially offset by a year-over-year reduction of $5 million in the level of professional fees related to restatement matters as well as reduced bad debt expense.

2005 SG&A expense of $553 million increased 23.2% as compared to 2004 and represented 16.8% of revenue as compared to 15.8% in 2004. This increase reflected increased commissions associated with revenue growth as well as an increase in the number of sales people. In addition to these higher selling costs related to growth in the business, the year-over-year growth in SG&A expense reflected normal inflationary increases as well as increased professional fees related to restatement matters of $23 million.

*Non-rental Depreciation and Amortization.*    Non-rental depreciation and amortization for each of the three years in the period ended December 31, 2006 was as follows:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2004 | 2005 | 2006 |
| | (Dollars in millions) | | |
| Non-rental depreciation and amortization . . . . . . . . . . . . . . | $41 | $38 | $50 |

Non-rental depreciation and amortization includes (i) depreciation expense associated with equipment that is not offered for rent (such as computers and office equipment) and amortization expense associated with leasehold improvements, as well as (ii) the amortization of other intangible assets. Our other intangible assets consist of non-compete agreements and customer-related intangible assets. The increase in 2006 relates to a higher base of depreciable assets. Additionally, during the second quarter of 2006, we determined that we had been depreciating certain vehicles on capital lease over a period which exceeded the related contractual lease terms. As a result, our non-rental depreciation and amortization expense for 2006 includes a charge of $4 million to correct depreciation expense recorded since the fourth quarter of 2002.

*Interest Expense, Net.*    Interest expense, net for each of the three years in the period ended December 31, 2006 was as follows:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2004 | 2005 | 2006 |
| | (Dollars in millions) | | |
| Interest expense, net . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $327 | $181 | $208 |

Interest expense, net for the year ended December 31, 2006 increased $27 million or 14.9% as compared to 2005 reflecting the increase in interest rates applicable to our floating rate debt, partially offset by lower average debt balances. The increase also reflects a net charge of $6 million that we recorded during 2006 related to our $400 million term loan prepayment as well as the retirement of $76 million of subordinated convertible debentures. The net charge of $6 million includes non-cash write-offs of $9 million associated with deferred financing costs, partially offset by a gain of $3 million recognized in conjunction with the termination of certain interest rate caps. Interest expense, net for the year ended December 31, 2005 decreased $146 million, or 44.6%, as compared to 2004, reflecting the absence of $171 million of refinancing charges, partially offset by an increase in interest rates applicable to our floating rate debt. As of December 31, 2005 and 2006, approximately 45% and 53% of our total debt was floating rate debt, respectively. 2004 interest expense, net includes $171 million of charges incurred in 2004 related to the refinancing of approximately $2.1 billion of debt.

*Interest Expense, Subordinated Convertible Debentures.*    Interest expense, subordinated convertible debentures for each of the three years in the period ended December 31, 2006 was as follows:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2004 | 2005 | 2006 |
| | (Dollars in millions) | | |
| Interest expense, subordinated convertible debentures . . . | $14 | $14 | $13 |

In August 1998, the Trust issued $300 million of 6½% Convertible Quarterly Income Preferred Securities (the "Trust Preferred Securities"). In 2003, the Financial Accounting Standards Board issued FIN 46 and upon adoption of this standard as of December 31, 2003, we deconsolidated the Trust. Upon deconsolidation, the Trust Preferred Securities were removed from our consolidated balance sheets at December 31, 2003 and the subordinated convertible debentures that we issued to the Trust, which previously had been eliminated in our consolidated balance sheets, were no longer eliminated in our consolidated balance sheets at December 31, 2003. The carrying amount of the Trust Preferred

Securities removed from our consolidated balance sheets was the same as the carrying amount of the subordinated convertible debentures added to our consolidated balance sheets. However, the subordinated convertible debentures are reflected as a component of liabilities on the consolidated balance sheets at December 31, 2003, whereas the Trust Preferred Securities were reflected as a separate category prior to December 31, 2003. The subordinated convertible debentures included in our consolidated balance sheets reflect the obligation to the Trust with respect to the issued and outstanding Trust Preferred Securities. The Trust is not consolidated in our financial statements because we are not the primary beneficiary of the Trust. As of December 31, 2005 and 2006, the aggregate amount of subordinated convertible debentures outstanding was $222 million and $146 million, respectively. The decline in interest expense- subordinated convertible debentures from 2005 to 2006 reflects the retirement of $76 million of these subordinated convertible debentures in the second half of 2006.

*Income Taxes.*    The following table summarizes our continuing operations provision for income taxes and the related effective tax rate for each respective period:

|  | 2004 | 2005 | 2006 |
|---|---|---|---|
|  | (Dollars in millions) | | |
| Income from continuing operations | $ 100 | $ 331 | $ 405 |
| Provision for income taxes | 28 | 129 | 156 |
| Effective tax rate(1) | 28% | 39% | 38.5% |

(1)  A detailed reconciliation of this effective tax rate to the U.S. federal statutory income tax rate is included in Note 12 to our audited consolidated financial statements.

The differences between the effective tax rates of 28%, 39% and 38.5% and the U.S. federal statutory income tax rate of 35% for 2004, 2005 and 2006, respectively, relate primarily to state taxes and certain nondeductible charges and other items. Our effective income tax rate will change based on discrete events (such as audit settlements) as well as other factors, including the geographical mix of income before taxes and the related tax rates in those jurisdictions.

**Liquidity and Capital Resources**

*Liquidity.*    Historically, we have managed our liquidity using internal cash management practices, which have been subject to (i) the policies and cooperation of the financial institutions we utilize to maintain and provide cash management services, (ii) the legal requirements of the agreements to which we are a party and (iii) the statutes, regulations and practices of each of the local jurisdictions in which we operate.

Our principal existing sources of cash have been, and our sources of cash subsequent to the Acquisition are expected to continue to be, cash generated from operations, including from the sale of rental equipment, and borrowings. The Acquisition, the repayment of our existing debt and the payment of related fees and expenses will be financed with (1) proceeds from the notes offered hereby, (2) borrowings of approximately $1,543 million under our new senior secured credit facilities, (3) borrowings of $1,350 million under our new senior unsecured bridge credit facility, (4) an indirect equity contribution by the Sponsor and others in the amount of $1,426 million, and (5) cash on hand ($125 million expected on the closing date of the Transactions).

We expect that our principal needs for cash relating to our existing operations over the first twelve months after the Acquisition will be to fund (i) operating activities and working capital, (ii) the purchase of rental equipment and inventory items offered for sale, (iii) payments due under operating leases and (iv) debt service. We plan to fund such cash requirements from operations and borrowings under our new revolving credit facility. Upon consummation of the Transactions, after giving effect to the foregoing assumptions and an assumed applicable tax rate of 38.9%, we anticipate that, based on

our borrowing base and assuming approximately $138 million of letters of credit will be issued, we would have approximately $919 million of availability under our new revolving credit facility.

*Sources and Uses of Cash—Continuing Operations.*   During the nine months ended September 30, 2007, we (i) generated cash from operating activities of $484 million, (ii) generated cash from the sale of rental equipment of $243 million and (iii) received proceeds from the exercise of common stock options of $22 million. We used cash during this period principally to (i) purchase rental and non-rental equipment of $866 million and (ii) purchase other companies for $23 million.

During the nine months ended September 30, 2006, we (i) generated cash from operating activities of $589 million, (ii) generated cash from the sale of rental equipment of $248 million and (iii) received proceeds from the exercise of common stock options of $64 million. We used cash during this period principally to (i) purchase rental and non-rental equipment of $837 million, (ii) fund payments on debt, net of proceeds received, of $158 million, (iii) retire $64 million of subordinated convertible debentures and (iv) purchase other companies for $39 million.

During 2006, we (i) generated cash from operations of $833 million, (ii) generated cash from the sale of rental and non-rental equipment of $352 million and (iii) received proceeds from the exercise of stock options of $78 million. We used cash during this period principally to (i) purchase rental and non-rental equipment of $951 million, (ii) fund payments on debt, net of proceeds received, of $404 million and (iv) retire $76 million of subordinated convertible debentures. During 2005, we (i) generated cash from operations of $638 million and (ii) generated cash from the sale of rental and non-rental equipment of $315 million. We used cash during this period principally to (i) purchase rental and non-rental equipment of $802 million, (ii) fund debt repayments and financing costs of $74 million and (iii) purchase other companies, net of cash acquired, of $40 million. During 2004, we (i) generated cash from operations of $703 million and (ii) generated cash from the sale of rental and non-rental equipment of $280 million. We used cash during this period principally to (i) purchase rental and non-rental equipment of $625 million, (ii) purchase other companies, net of cash acquired, of $102 million and (iii) fund payments on debt, net of proceeds received, as well as financing costs, of $51 million.

*Certain Information Concerning Contractual Obligations.*   The table below provides certain information concerning the payments coming due, assuming the debt to be incurred in connection with the Transactions was issued on January 1, 2007, under certain categories of our existing contractual obligations as of December 31, 2006:

|  | 2007 | 2008 | 2009 | 2010 | 2011 | Thereafter | Total |
|---|---|---|---|---|---|---|---|
|  | | | (Dollars in millions) | | | | |
| Debt excluding capital leases(1) ......... | $  10 | $  10 | $  10 | $  10 | $  55 | $5,393 | $  5,488 |
| Interest due on debt(2) ............... | 561 | 560 | 559 | 558 | 557 | 1,140 | 3,935 |
| Capital leases(1) ................... | 20 | 19 | 14 | 10 | 5 | 8 | 76 |
| Operating leases(1): | | | | | | | |
| Real estate..................... | 79 | 69 | 58 | 47 | 39 | 140 | 432 |
| Rental equipment................. | 29 | 21 | 9 | — | — | — | 59 |
| Non-rental equipment.............. | 32 | 21 | 12 | 8 | 5 | 1 | 79 |
| Service agreements(3) ............... | 2 | — | — | — | — | — | 2 |
| Purchase obligations(4) .............. | 338 | — | — | — | — | — | 338 |
| Total ...................... | $1,071 | $700 | $662 | $633 | $661 | $6,682 | $10,409 |

(1) The payments due with respect to a period represent (i) in the case of debt to be incurred in connection with the Transactions and capital leases, the scheduled principal payments due in such

70

period, and (ii) in the case of operating leases, the minimum lease payments due in such period under non-cancelable operating leases plus the maximum potential guarantee amounts.

(2) Estimated interest payments have been calculated on an accrual basis based on the principal amount of debt to be incurred in connection with the Transactions effective January 1, 2007 and the interest rates payable thereon.

(3) These represent service agreements with third parties to operate the distribution centers associated with contractor supplies.

(4) As of December 31, 2006, we had outstanding purchase orders with our equipment and inventory suppliers. These purchase orders, which were negotiated in the ordinary course of business, aggregate approximately $338 million. These purchase commitments can be cancelled by us, generally with 30 days' notice and without cancellation penalties. The equipment and inventory receipts from the suppliers for these purchases and related payments to the suppliers are expected to be completed throughout 2007.

*Certain Information Concerning Off-Balance Sheet Arrangements.*   We lease real estate, rental equipment and non-rental equipment under operating leases as a regular business activity. As part of some of our equipment operating leases, we guarantee that the value of the equipment at the end of the term will not be less than a specified projected residual value. If the actual residual value for all equipment subject to such guarantees were to be zero, then our maximum potential liability under these guarantees was approximately $8 million at December 31, 2006. In accordance with FIN 45, "Guarantor's Accounting and Disclosure Requirements for Guarantees, Including Indirect Guarantees of Indebtedness of Others," this potential liability was not reflected on our balance sheet as of December 31, 2006 or any prior date because the leases associated with such guarantees were entered into prior to January 1, 2003.

*Relationship between URI and URNA.*   URI is principally a holding company and primarily conducts its operations through its wholly owned subsidiary, URNA, and subsidiaries of URNA. URI provides certain services to URNA in connection with its operations. These services principally include: (i) senior management services, (ii) finance and tax-related services and support, (iii) information technology systems and support, (iv) acquisition related services, (v) legal services and (vi) human resource support. In addition, URI leases certain equipment and real property that are made available for use by URNA and its subsidiaries.

**Quantitative and Qualitative Disclosures about Market Risk**

Our exposure to market risk primarily consists of (1) interest rate risk associated with our variable rate debt and (2) foreign currency exchange rate risk primarily associated with our Canadian operations.

*Interest Rate Risk.*   Assuming that upon consummation of the closing of the Transactions, we will have outstanding $443 million of indebtedness under our new senior secured revolving credit facility (not including up to $138 million in outstanding letters of credit), $1,100 million of indebtedness under our new senior secured term loan facility, $2,550 million of the notes offered hereby, and $1,350 million of indebtedness under our new senior unsecured bridge credit facility. We will have $2,893 million of our debt bearing interest at variable rates, including approximately (a) $443 million outstanding under our senior secured revolving credit facility, (b) $1,100 million outstanding under our senior secured term loan facility and (c) $1,350 million under our senior unsecured bridge credit facility. Assuming we do not have in effect any interest rate swaps or cap agreements applicable to our variable rate facilities, an increase in the variable component used in determining the interest rates on our variable rate facilities would result in the interest rates under any such facility being limited by the maximum interest rate applicable to such facility. Upon the consummation of the Transactions, after giving effect to the

foregoing assumptions and an assumed applicable tax rate of 38.9%, we expect that our annual earnings would decrease by approximately $18 million for each one percentage point increase in the interest rates applicable to our variable debt, and by $9 million for a ten percent increase in the variable component used in determining the interest rates applicable to our variable debt.

   ***Currency Exchange Risk.***   The functional currency for our Canadian operations is the Canadian dollar. As a result, our future earnings could be affected by fluctuations in the exchange rate between the U.S. and Canadian dollars. Based upon the level of our Canadian operations during 2006 relative to our company as a whole, a 10% change in this exchange rate would not have a material impact on our earnings. In addition, we periodically enter into foreign exchange contracts to hedge our transaction exposures. We had no outstanding foreign exchange contracts as of September 30, 2007. We do not engage in purchasing forward exchange contracts for speculative purposes.

## BUSINESS

**The Company**

Founded in 1997, we are the largest equipment rental company in the world based on revenues. With a network of approximately 700 rental locations in the U.S., Canada and Mexico, we operate across an extensive and diverse geographic footprint through two business segments: our general rentals segment (which includes our general industrial and aerial businesses) and our trench safety, pump and power segment. Our fleet of rental equipment is the most extensive in the industry, with more than 20,000 classes of equipment comprised of general construction and industrial equipment, aerial work platforms and trench safety equipment as well as general tools and light equipment. As of September 30, 2007, our rental fleet consisted of more than 270,000 units and had an original equipment cost of approximately $4.3 billion. We believe such size and scale confer several competitive advantages, including the ability to service high-value national accounts, support large job sites, transfer assets across regions to maximize utilization and drive purchasing economies.

Our highly diversified rental fleet is used in a wide array of construction project types, including commercial, infrastructure, industrial, other non-residential and some residential. Our equipment consists of:

- *General construction and industrial equipment*, such as backhoes, skid-steer loaders, forklifts, earthmoving equipment, material handling equipment, compressors, pumps and generators;
- *Aerial lift equipment*, such as scissor lifts and boom lifts;
- *General tools and light equipment*, such as pressure washers, water pumps, heaters and hand tools; and
- *Trench safety equipment* for underground work, such as trench shields, aluminum hydraulic shoring systems, slide rails, crossing plates, construction lasers and line testing equipment.

We rent our fleet to a highly diversified customer base that includes major construction companies, large and medium-sized industrial companies, governmental agencies, small businesses and some individuals. We enjoy strong customer loyalty and believe that United Rentals is one of the most recognized equipment rental companies in the industry. During 2006, we retained approximately 93% of our active customer base, measured by revenues. At September 30, 2007, we employed 11,789 employees. For the LTM Period, we generated revenues of $3,740 million, EBITDA of $1,141 million and Adjusted EBITDA of $1,233 million. Between 2004 and 2006, our revenues and EBITDA grew at a CAGR of 13.3% and 13.1%, respectively.

Our primary source of revenues is equipment rental, which accounted for approximately 70% of total revenues in 2006. We generate the remainder of our revenues through the sale of new and used rental equipment as well as related contractor supplies, parts and services. The following charts show our revenues for the fiscal year ended December 31, 2006 broken down by business line, segment and end market:



73

**Industry Overview**

The equipment rental industry encompasses the rental of a wide range of equipment, from small tools to heavy earthmoving equipment. According to Manfredi & Associates, industry-wide U.S. equipment rental revenues grew from an estimated $7 billion in 1990 to an estimated $35 billion in 2006, representing a CAGR of 11% during such period. Industry equipment rental revenues are projected by Manfredi & Associates to increase 8% in 2007 to $38 billion. We believe the key drivers of equipment rental demand are (i) the ongoing shift of end-users from ownership to rental and (ii) non-residential construction spending.

*Shift from Ownership to Rental.*   According to Daniel Kaplan Associates, rental equipment companies purchased an estimated 40% of all construction equipment sold in North America in 2006, up from an estimated 5% in 1993. The North American equipment rental industry is under-developed relative to those of other mature economies such as the United Kingdom and Japan, where, in 2006, rental equipment companies purchased roughly 80% and 60%, respectively, of total construction equipment sold. The shift from owning to renting equipment in the U.S. is expected to continue as construction and industrial firms increasingly recognize the many advantages of equipment rental versus ownership. According to International Rental News, North American rental penetration is projected to increase to 50% by 2010. Renting allows end-users to:

- avoid the large capital investment required for equipment purchases;
- access a broad selection of equipment and current technology best suited for each particular project;
- obtain the best-fit type of equipment on an as-needed basis;
- reduce storage and maintenance costs;
- supplement owned equipment;
- minimize costs related to idle equipment; and
- reduce depreciation charges.

We believe that rental equipment typically accounts for a small component of the total budget for a given construction project. End users tend to be more focused on quality and availability of equipment, as a lack of such equipment can result in costly delays. According to a 2006 survey by Associated Equipment Distributors, equipment rental customers surveyed ranked price as the fourth most important factor with respect to selecting an equipment rental provider. Product availability, equipment quality and past experience each ranked higher than price.

*Non-Residential Construction Spending.*   Non-residential construction spending is a key driver of equipment rental demand and is funded by a diverse group of both public and private constituents. According to the U.S. Census Bureau, during the twelve month period ended August 2007, $596 billion was spent on non-residential construction projects in the U.S., of which approximately $329 billion was privately funded and $267 billion was publicly funded. During the same period, non-residential construction grew at a seasonally adjusted annual rate of 14.7% year-over-year, with private sector spending up 15.2% year-over-year and public sector spending up 14.2% year-over-year. The current expansion period for non-residential construction spending was in its 42nd month in August 2007 and the previous expansion period lasted approximately 90 months, according to the U.S. Census Bureau. Additionally, Global Insights projects that U.S. non-residential construction spending will grow by 11.2% in 2007 and at a CAGR of 5.7% from 2007 through 2010. We believe that this continued growth in non-residential construction spending will result in increased demand for rental equipment.

**Investment Considerations**

*Market Leadership.*   We are the largest equipment rental company in the world based on revenues and believe that we have one of the most recognized equipment rental brands in the industry. According to the Rental Equipment Register, we have a leading share of the U.S. market, having

Exhibit B-4

generated rental revenues in 2006 that were approximately $1 billion greater than those of our nearest competitor. We maintain an extensive branch network with approximately 700 locations throughout North America. We believe our size and national footprint enable us to better serve larger customers that increasingly demand national coverage across a wide range of equipment rental needs. We also believe our size and footprint offer significant advantages compared to smaller competitors, including purchasing leverage, the ability to transfer fleet within our network to take advantage of demand and rate differences, and cost savings from the consolidation of common functions to a regional or national level.

*Geographic and Customer Diversity.*   Our approximately 700 locations are located throughout 48 states in the U.S., ten Canadian provinces and one state in Mexico and serve customers that range from Fortune 500 companies to small businesses and individuals. Our customer base is highly diversified as measured by customer concentration, industry/sector, end-users of equipment and geography. In 2006, our largest customer accounted for less than 1% of our revenues, our top 10 customers accounted for approximately 2% of our revenues and our top 100 customers accounted for less than 10% of our revenues. In addition, our customers represent a wide range of end markets, including commercial, infrastructure, industrial, other non-residential and some residential construction. We believe this level of geographic and customer diversity provides us with flexibility in operating our business and softens the impact of market cycles on our operations.

*Ability to Generate Substantial Free Cash Flow Through Economic Cycles.*   Our business model allows us the flexibility to buy and sell fleet in accordance with market dynamics in order to manage cash flow. In times of strong demand, we have generated significant cash flows from operations and have reinvested a portion of this cash in building our fleet. In times of slowing demand, we have the ability to curtail capital expenditures and increase sales of rental equipment to preserve and generate free cash flow to repay debt.

*Strong National Account Program.*   We maintain a national accounts sales force that is dedicated to establishing and expanding relationships with large companies, particularly those with a national or multi-regional presence. We offer our national account customers the benefits of a consistent level of service across North America, a wide selection of equipment and a single point of contact for all of their equipment needs. As of June 30, 2007, we serviced approximately 1,500 national account customers as well as approximately 650 governmental agencies in the U.S. Revenues from national account customers in 2006 generated more than $700 million and represented over 19% of total revenues.

*Leading Information Technology Systems.*   We have advanced information technology systems that facilitate rapid and informed decision-making and enable us to respond quickly to changing market conditions.

Each branch is equipped with one or more workstations that are electronically linked to our other locations and to our AS/400 system located in our data center. Rental transactions are entered at these workstations and processed on a real-time basis. Management and branch personnel can access our systems 24 hours a day. These systems run our proprietary RENTALMAN® software package, which is licensed to several of the largest equipment rental companies. Our RENTALMAN® software package which we license and our UR*data*® application allow us to:

- Obtain a wide range of operational and financial data;
- Access all equipment and arrange for equipment to be delivered from other local branches directly to the customer;
- Manage equipment availability, rates, quotes, reservations, purchasing, maintenance, account terms, invoicing and accounts receivable;
- Monitor business activity on a real-time basis; and
- Permit customers to access their accounts online.

Our information technology systems and website are supported by our in-house group of information technology specialists. This group trains branch personnel, upgrades and customizes systems, provides hardware and technology support, operates a support desk to assist branch and other personnel in the day-to-day use of the systems, extends the systems to newly acquired locations and manages our website. We also have a fully functional back-up facility designed to enable business continuity in the event that our main computer facility becomes inoperative. This backup facility also allows us to perform system upgrades and maintenance without interfering with the normal ongoing operation of our information technology systems.

**Competition**

The equipment rental industry is highly fragmented and competitive. Our competitors primarily include small, independent businesses with one or two rental locations; regional competitors which operate in one or more states; public companies or divisions of public companies that operate nationally or internationally; and equipment vendors and dealers who both sell and rent equipment directly to customers. We believe that, in general, large companies enjoy significant competitive advantages compared to smaller operators, including greater purchasing power, the ability to provide customers with a broader range of equipment and services and with newer and better maintained equipment, and greater flexibility to transfer equipment among locations in response to, and in anticipation of, customer demand.

**Products and Services**

Our principal products and services are described below.

*Equipment Rental (70% of 2006 Revenues).*   We offer approximately 20,000 classes of rental equipment, including general construction and industrial equipment, aerial work platforms, general tools and light equipment, and trench and safety equipment.

The primary equipment categories in our rental fleet, each of which represented at least 5% of equipment rental revenues in 2006, include: (i) aerial lift equipment (approximately 39% of 2006 equipment rental revenues), (ii) earth moving equipment (approximately 17%), (iii) forklifts (approximately 15%) and (iv) trench (approximately 5%). We believe that our fleet is one of the best maintained in the industry. The weighted average age of our fleet was 39.2 months at December 31, 2006.

*Contractor Supplies Sales (11% of 2006 Revenues).*   We sell a variety of contractor supplies including construction consumables, tools, small equipment and safety supplies. Our target market for contractor supplies products consists of existing rental customers, and the primary channels through which they are marketed include our sales representatives, rental branches, and U.S. and Canadian product catalogs. In 2002, we launched an initiative to increase contractor supplies sales across our network. In 2004 and 2005, we opened a total of nine (one of which has subsequently been closed) distribution centers located across the U.S. and Canada to support our contractor supplies operations. Revenues from this business have grown from $125 million in 2002 to $385 million in 2006.

*Sales of Used Equipment (9% of 2006 Revenues).*   We routinely sell used rental equipment and invest in new equipment in order to manage repairs and maintenance costs as well as the age, composition and size of our fleet. We also sell used equipment in response to customer demand for this equipment. The rate at which we replace used equipment with new equipment depends on a number of factors, including general economic conditions, growth opportunities, customer demand for specific equipment and the age of our fleet.

*New Equipment Sales (6% of 2006 Revenues).*   We sell new equipment for many leading equipment manufacturers. The manufacturers that we represent and the brands that we carry include: Genie, JLG and Skyjack (aerial lifts); Multiquip, Wacker and Honda USA (compaction equipment, generators and pumps); Sullair (compressors); Skytrak and Lull (rough terrain reach forklifts); John Deere and

Takeuchi (skid-steer loaders and mini-excavators); Terex (telehandlers); and DeWalt (generators). The type of new equipment that we sell varies by location.

*Service and Other Revenues (4% of 2006 Revenues).*   We offer repair and maintenance services and sell parts for equipment that is owned by our customers. Our target market for these services consists of our current rental customers as well as those who purchase both new and used equipment from our branches.

We have two subsidiaries that are involved in the development and marketing of software. One of the subsidiaries develops and markets our RENTALMAN® software package which is an enterprise resource planning application that we use and also license to several other large equipment rental companies. The other subsidiary develops and markets our INFOMANAGER® software which provides a complete solution for creating an advanced business intelligence system. INFOMANAGER® helps with extracting raw data from transactional applications and transforming it into meaningful information and saving it into a database that is specifically optimized for analytical use.

## Business Segments

We report our financial results in two reportable segments, general rentals and trench safety, pump and power.

*General Rentals (94% of 2006 Revenues).*   The general rentals segment consists of two businesses, our general industrial business, which includes the rental of earthmoving equipment, booms and lifts and other industrial equipment, and our aerial business, which consists of the rental of scissor and boom lifts, which continue to replace the use of scaffolding for purposes of safety and productivity.

*General Industrial Business (70% of 2006 Revenues).*   Our general industrial business accounted for approximately 74% of the 2006 revenues of our general rentals segment. Our general industrial business customers include construction and industrial companies, municipalities, manufacturers, utilities, institutions, property managers and homeowners. Recently, this business has benefited from significant increases in government infrastructure spending and lodging construction as well as increased investment in energy and power generation in the Gulf Coast region of the United States and Western Canada. Our general industrial business operates throughout the United States and Canada with one location in Mexico.

*Aerial Business (24% of 2006 Revenues).*   Our aerial business accounted for approximately 26% of the 2006 revenues of our general rentals segment. Our aerial business customers include construction and industrial companies, utilities and municipalities. Aerial equipment is generally used in large-scale, long-term projects, and we have a number of long-term project commitments that continue into 2008. Additionally, our aerial business typically has higher time utilization rates as compared to our general industrial business and our trench safety, pump and power segment. Our aerial business operates throughout the United States and Canada.

*Trench Safety, Pump and Power (6% of 2006 Revenues).*   The trench safety, pump and power segment includes the rental of trench safety equipment for underground construction projects as well as the rental of pumps and temporary power equipment and related services. Our trench safety, pump and power customers include construction companies involved in infrastructure projects, municipalities, industrial companies and homeowners. Recent increases in public works and infrastructure projects, disaster recovery initiatives and reclamation projects are expected to drive future demand. The trench safety, pump and power segment operates in the United States and has one location in Canada.

These segments align our external segment reporting with how management evaluates and allocates resources. We evaluate segment performance based on segment operating results.

The accounting policies of our segments are the same as those described in the summary of significant accounting policies set forth in Note 2 to our audited consolidated financial statements included elsewhere in this offering circular. Certain corporate costs, including those related to selling,

finance, legal, risk management, human resources, corporate management and information technology systems, are deemed to be of an operating nature and are allocated to our segments based on the actual amount of costs incurred in the prior year for SG&A and equipment rental revenue generating activities. As discussed in Note 3 to our audited consolidated audited financial statements included elsewhere in this offering circular, traffic control, which was previously presented as a reporting segment, is now presented within discontinued operations. In conjunction with this presentation, general corporate overhead costs previously allocated to traffic control based on our management reporting have been reclassified to continuing operations and reflected within the operating results of general rentals and trench safety, pump and power, our remaining reportable segments. Prior period segment results have been recast to reflect this presentation. Additionally, in 2006, we determined the amount of self-insurance costs attributable to our traffic control operations exceeded the amount of such costs allocated to these operations and, as a result, have reflected more of these costs within discontinued operations than were previously allocated to traffic control when it was a reportable segment. Prior period segment results have been recast to reflect this presentation. The current methodology for allocating self-insurance costs, which includes our estimated exposures for general liability, workers' compensation and automobile liability, reflects the risk profiles of our segments and is based on actuarially performed analyses. As a result of these changes, approximately $15 million, $15 million and $16 million of corporate overhead costs for 2004, 2005 and 2006, respectively, that otherwise would have been allocated to traffic control have been reflected in our reportable segment operating income and approximately $4 million, $11 million and $9 million of self-insurance costs for 2004, 2005 and 2006, respectively, that would have been allocated to our reportable segments under our prior allocation methodology have been presented within discontinued operations.

The following table sets forth financial information by segment. Information related to our consolidated balance sheets is presented as of December 31, 2005 and 2006.

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2004 | 2005 | 2006 |
| | (Dollars in millions) | | |
| Total reportable segment revenues | | | |
| General rentals | $2,705 | $3,108 | $3,423 |
| Trench safety, pump and power | 130 | 180 | 217 |
| Total revenues | $2,835 | $3,288 | $3,640 |
| Total reportable segment depreciation and amortization expense | | | |
| General rentals | $ 395 | $ 404 | $ 435 |
| Trench safety, pump and power | 16 | 20 | 23 |
| Total depreciation and amortization expense | $ 411 | $ 424 | $ 458 |
| Reportable segment operating income | | | |
| General rentals | $ 417 | $ 477 | $ 568 |
| Trench safety, pump and power | 30 | 47 | 58 |
| Segment operating income | $ 447 | $ 524 | $ 626 |
| Total capital expenditures | | | |
| General rentals | $ 590 | $ 763 | $ 900 |
| Trench safety, pump and power | 35 | 38 | 51 |
| Assets of discontinued operation | 24 | 22 | 14 |
| Total capital expenditures | $ 649 | $ 823 | $ 965 |
| Total assets | | | |
| General rentals | | $5,200 | $5,112 |
| Trench safety, pump and power | | 116 | 147 |
| Assets of discontinued operation | | 154 | 107 |
| Total assets | | $5,470 | $5,366 |

We operate in the United States, Canada and Mexico. Geographic area information for the years ended December 31, 2004, 2005 and 2006 is as follows, except for balance sheet information which is presented as of December 31, 2005 and 2006 only:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2004 | 2005 | 2006 |
| | (Dollars in millions) | | |
| Reportable segment revenues from external customers | | | |
| Domestic | $2,585 | $2,960 | $3,260 |
| Foreign (primarily Canada) | 250 | 328 | 380 |
| Total revenues from external customers | $2,835 | $3,288 | $3,640 |
| Rental equipment, net | | | |
| Domestic | | $2,099 | $2,318 |
| Foreign | | 220 | 243 |
| Total consolidated rental equipment, net | | $2,319 | $2,561 |
| Property and equipment, net | | | |
| Domestic | | $ 285 | $ 329 |
| Foreign | | 21 | 30 |
| Total consolidated property and equipment, net | | $ 306 | $ 359 |
| Goodwill and other intangible assets, net | | | |
| Domestic | | $1,214 | $1,242 |
| Foreign | | 147 | 134 |
| Total consolidated goodwill and other intangible assets, net | | $1,361 | $1,376 |

Operating segment revenues and profitability for the nine months ended September 30, 2006 and 2007 were as follows:

| | Nine Months Ended September 30, | |
| --- | --- | --- |
| | 2006 | 2007 |
| | (Dollars in millions) | |
| Total reportable segment revenues | | |
| General rentals | $2,535 | $2,632 |
| Trench safety, pump and power | 166 | 169 |
| Total revenues | $2,701 | $2,801 |
| Total reportable segment depreciation and amortization expense | | |
| General rentals | $ 324 | $ 342 |
| Trench safety, pump and power | 17 | 17 |
| Total depreciation and amortization expense | $ 341 | $ 359 |
| Reportable segment operating income | | |
| General rentals | $ 409 | $ 440 |
| Trench safety, pump and power | 43 | 44 |
| Segment operating income | $ 452 | $ 484 |
| Total reportable segment capital expenditures | | |
| General rentals | $ 797 | $ 836 |
| Trench safety, pump and power | 40 | 30 |
| Total capital expenditures | $ 837 | $ 866 |

## Strategy

We intend to use our extensive fleet, broad footprint, advanced information technology systems and industry experience to generate significant cash flow and strengthen our leadership position in the equipment rental industry. We plan to achieve these objectives by:

*Reorganizing Our Field Operations.*   We intend to continue reorganizing our field operations. Specifically, we are in the process of (i) lifting performance responsibilities from the branch level to the district level or higher, (ii) centralizing fleet management at the district level or higher to optimize fleet allocation, service and delivery, and (iii) centralizing sales management at the district level or higher to enable the sales force to rent equipment from any branch within its district. The reorganization is expected to create opportunities for branch closures as fleet assets are moved from low-return branches to high-return locations. Further, centralizing responsibility at the district level is expected to create additional cost-saving opportunities by permitting administrative and back-office functions to be consolidated within each district. We believe the realignment of our field operations should increase equipment utilization and reduce operating costs.

*Reducing Operating Spend.*   In an effort to bring our cost structure in line with those of other leading equipment rental companies, we engaged a major consulting firm in the spring of 2007 to review our back-office functions related to the general and administrative aspects of our business and identify opportunities for increased efficiencies. Such firm identified a number of opportunities to consolidate duplicative functions, outsource back-office operations and automate processes. As a result, we have implemented a headcount reduction program and undertaken specific initiatives to reduce our selling, general and administrative expenses.

*Accelerating Sourcing Initiatives.*   Our rental equipment purchases have been centralized, which we believe has enabled us to negotiate more favorable pricing and other terms from our equipment providers. We launched a strategic sourcing initiative in 2006 that was designed to centralize our non-equipment purchases. We believe that centralizing the procurement of these items will enable us to leverage our significant spend to obtain better pricing and/or terms from our suppliers. We spent over $1.2 billion in 2006 on materials, services, contractor supplies, parts, and other non-equipment spend.

These cost savings programs that we target could result in annual savings of approximately $200 million over time, including targets of approximately $55 million for headcount reductions, approximately $55 million for strategic sourcing initiative savings and approximately $90 million for other SG&A savings. A portion of these cost savings is included in our calculation of Adjusted EBITDA. See "Risk Factors—Risks Related to Our Business—Our cost reduction programs may not achieve the cost savings and operations improvements and efficiencies we expect, and we may have to implement further cost reduction programs and incur additional related charges."

*Optimizing Time Utilization.*   We continue to reassess existing fleet investments and realign certain incentive programs to increase the time utilization of our fleet assets. We intend to better allocate resources to where they are needed rather than where they are located, resulting in fleet rationalization opportunities. We also expect to implement stricter fleet investment policies to improve our return on capital. By coupling such initiatives with an increased focus on preventative maintenance and improved turn-around time for returned equipment, we believe that we can increase the time utilization of our fleet and serve our customer base with a smaller fleet.

*Deemphasizing Contractor Supplies Business.*   We currently sell a variety of contractor supplies, such as construction consumables, tools, small equipment and safety supplies, through several channels, including our sales representatives, rental branches and U.S. and Canadian product catalogues. Although revenues from the contractor supplies business have grown from $125 million in 2002 to $398 million for the LTM Period, this business requires that we maintain significant volumes of inventory in order to meet customer demand and carries a higher cost structure relative to our core equipment rental business. In 2006, the gross margin for our contractor supplies business was 21.6% versus 38.9%

for our equipment rental operations (including depreciation). In addition, we believe that during 2006 the contractor supplies business generated a net operating loss on a fully-allocated basis, as we estimate that our sales force spent approximately 40% of its time selling contractor supplies products.

Going forward, we intend to deemphasize our contractor supplies business and position it as a complementary offering to our core equipment rental business. We expect this deemphasis to result in productivity improvements within our sales force, thus helping to improve equipment utilization and rental rates, as well as result in some headcount reduction. As part of the deemphasis, we expect to reduce the number of stock keeping units associated with these operations. Additionally, we have recently closed one of our nine distribution centers and we intend to evaluate the closure of additional distribution centers.

***Implementing Like-Kind-Exchange Tax Savings Program.***   We use accelerated depreciation for tax purposes versus straight-line depreciation for accounting purposes. Sales of assets that have been fully depreciated for tax purposes can therefore give rise to significant tax liabilities. We intend to explore whether we can take advantage of tax deferral opportunities that may be available under Section 1031 of the Internal Revenue Code, which permits tax gains to be temporarily deferred as long as the proceeds from asset sales are reinvested in similar assets. We did not previously implement a similar program because of net operating loss carryforwards we had been utilizing in recent years.

## Customers

Our customer base is highly diversified, as measured by customer concentration, industry/sector, end-uses of equipment and geography. In 2006, our largest customer accounted for less than 1% of our revenues. During the same period, our top 10 customers accounted for approximately 2% of our revenues and our top 100 customers accounted for less than 10% of our revenues. Further, in 2006 we retained over 93% of our active customer base, measured by revenues.

Our customer base varies by branch and is determined by several factors, including the equipment mix and marketing focus of the particular branch as well as the business composition of the local economy. We serve four distinct customer segments:

***Non-Residential Construction.***   Customers in this segment are generally involved in construction with a variety of end-uses such as office, retail, lodging, healthcare, distribution, manufacturing, schools and libraries.

***Infrastructure.***   Customers in this segment are generally involved in the construction of bridges, highways, power plants, dams, airports, railway stations and bus stations.

***Industrial.***   Customers in this segment use our products and services for general facility maintenance and improvements.

***Residential Construction.***   Customers in this segment are generally engaged in home building or use our products and services as they undertake specific homeowner projects.

Our business is seasonal, with demand for our rental equipment tending to be lower in the winter months.

## Sales and Marketing

We market our products and services through multiple channels as described below.

***Sales Force.***   As of January 1, 2007, we had over 2,700 sales people including approximately 1,300 outside sales representatives and approximately 1,400 inside sales people who are responsible for calling on existing and potential customers as well as assisting our customers in planning for their equipment needs. We have ongoing programs for training our employees in sales and service skills and on strategies for maximizing the value of each transaction.

*National Account Program.*   Our National Account sales force is dedicated to establishing and expanding relationships with large customers, particularly those with a national or multi-regional presence. Our National Account team, which consisted of 50 sales professionals as of January 1, 2007, includes those who service governmental agencies. Additionally, they closely coordinate their efforts with the local sales force in each area.

*E-Rentals.*   Our customers can rent or buy equipment online 24 hours a day, seven days a week, at our E-Rentals portal, which can be found at *http://www.ur.com*. Our customers can also use our UR*data*® application to access real-time reports on their business activity with us.

*Advertising.*   We promote our business through local and national advertising in various media, including trade publications, yellow pages, the Internet, radio and direct mail. We also regularly participate in industry trade shows and conferences and sponsor a variety of local promotional events. As part of our SG&A reduction initiatives, we have implemented reductions in our advertising expenditures.

## Properties

The information set forth below excludes properties associated with our discontinued traffic control operations.

As of January 1, 2007, we operated 696 rental locations. Of these locations, 597 are in the United States, 98 are in Canada and 1 is in Mexico. The number of locations in each state or province is shown in the table below, as well as the number of locations that are general rentals (GR) and trench safety, pump and power (TPP).

### (As of January 1, 2007)

### United States

- Alabama (GR 11)
- Alaska (GR 6)
- Arizona (GR 12, TPP 4)
- Arkansas (GR 4, TPP 1)
- California (GR 85, TPP 14)
- Colorado (GR 16, TPP 2)
- Connecticut (GR 11, TPP 1)
- Delaware (GR 5)
- Florida (GR 30, TPP 8)
- Georgia (GR 21, TPP 2)
- Idaho (GR 2)
- Illinois (GR 6, TPP 1)
- Indiana (GR 13, TPP 1)
- Iowa (GR 9, TPP 2)
- Kansas (GR 2)
- Kentucky (GR 5)
- Louisiana (GR 5, TPP 2)
- Maine (GR 2)
- Maryland (GR 14, TPP 2)
- Massachusetts (GR 10, TPP 2)
- Michigan (GR 8)
- Minnesota (GR 9, TPP 1)
- Mississippi (GR 3)
- Missouri (GR 7, TPP 3)
- Montana (GR 1)
- Nebraska (GR 6)
- Nevada (GR 8, TPP 3)
- New Hampshire (GR 3)
- New Jersey (GR 9, TPP 2)
- New Mexico (GR 4)
- New York (GR 21)
- North Carolina (GR 13)
- North Dakota (GR 3)
- Ohio (GR 11, TPP 4)
- Oklahoma (GR 2)
- Oregon (GR 17, TPP 2)
- Pennsylvania (GR 12, TPP 1)
- Rhode Island (GR 1)
- South Carolina (GR 8)
- South Dakota (GR 2)
- Tennessee (GR 9)
- Texas (GR 43, TPP 10)
- Utah (GR 5, TPP 1)
- Virginia (GR 14, TPP 1)
- Washington (GR 26, TPP 4)
- Wisconsin (GR 6)
- West Virginia (GR 2)
- Wyoming (GR 1)

|                  Canada                  |                Mexico                |
| :--------------------------------------- | :----------------------------------- |
| • Alberta (GR 8)                         | • Nuevo Leon (GR 1)                  |
| • British Columbia (GR 22, TPP 1)        |                                      |
| • Manitoba (GR 3)                        |                                      |
| • New Brunswick (GR 8)                   |                                      |
| • Nova Scotia (GR 5)                     |                                      |
| • Newfoundland (GR 7)                    |                                      |
| • Ontario (GR 33)                        |                                      |
| • Quebec (GR 9)                          |                                      |
| • Saskatchewan (GR 1)                    |                                      |
| • Prince Edward Island (GR 1)            |                                      |

Our branch locations generally include facilities for displaying equipment and, depending on the location, may include separate areas for equipment service, storage and displaying contractor supplies. As of January 1, 2007, we owned 132 of our rental locations and leased the other locations. We also lease premises for other purposes such as district and regional offices and service centers. Our leases provide for varying terms and, as of January 1, 2007, include 32 leases that are on a month-to-month basis and 34 leases that provide for a remaining term of less than one year and do not provide a renewal option.

As of January 1, 2007, we had a fleet of approximately 6,200 vehicles. These vehicles are used for delivery, maintenance and sales functions. As of January 1, 2007, approximately 60% of this fleet was leased and the balance was owned.

Our corporate headquarters are located in Greenwich, Connecticut, where we occupy approximately 51,000 square feet under a lease that expires in 2013. Additionally, we maintain a facility in Shelton, Connecticut, where we occupy 32,000 square feet under a lease that expires in 2016. Further, we maintain a shared-service facility in Tampa, Florida, where we occupy 43,000 square feet under a lease that expires in 2011.

## Suppliers

Our strategic approach with respect to our suppliers is to maintain a select number of vendors per category of equipment that can satisfy our anticipated volume and business requirements. This approach is designed to enable us to negotiate favorable pricing and terms and match product availability with anticipated customer demand. We utilize a comprehensive selection process to determine our equipment suppliers and consider product capabilities, industry position, product liability history, and financial strength.

We have made ongoing efforts to consolidate our supplier base in order to further increase our purchasing power. We estimate that our largest supplier accounted for approximately 28% of our 2006 purchases of equipment for rental or resale and that our 10 largest suppliers accounted for approximately 73% of such purchases. We believe we have sufficient alternative sources of supply available for each of our major equipment categories.

## Employees

As of September 30, 2007 we had 11,789 employees, of which 10,671 were in field sales and operations and 1,118 in general corporate and support. We benefit from an experienced operations

team, including 11 regional vice presidents with an average of 12 years of service with us, as well as 88 district managers and 562 branch managers each with an average of nine years of service. We monitor employee satisfaction through ongoing engagement surveys and we consider our relationship with our employees to be good.

**Environmental and Safety Regulations**

Our operations are subject to numerous laws governing environmental protection and occupational health and safety matters. These laws regulate such issues as wastewater, storm water, solid and hazardous wastes and materials, and air quality. Our operations generally do not raise significant environmental risks, but we use and store hazardous materials as part of maintaining our rental equipment fleet and the overall operations of our business, dispose of solid and hazardous waste and wastewater from equipment washing, and store and dispense petroleum products from underground and above-ground storage tanks located at certain of our locations. Under the environmental and safety laws, we may be liable for, among other things, (1) the costs of investigating and remediating contamination at our sites as well as sites to which we sent hazardous wastes for disposal or treatment regardless of fault and (2) fines and penalties for non-compliance. As of December 31, 2005 and December 31, 2006 we were not, and currently we are not, aware of any such matters that would be reasonably likely to have a material impact on our business, and we believe that we currently conduct our activities and operations in substantial compliance with applicable environmental and safety laws. We incur ongoing expenses associated with the performance of appropriate investigation and remediation activities at certain of our locations. We do not anticipate these expenditures will have a material adverse effect on our business or earnings.

**Securities and Exchange Commission Inquiry and Special Committee Review**

In August 2004, we received a letter from the SEC that it was conducting a non-public, fact-finding inquiry of our company. The letter transmitted a subpoena requesting certain of our documents. The letter and the subpoena referred to an SEC investigation entitled *In the Matter of United Rentals, Inc*. The notice from the SEC stated that the inquiry did not mean that the SEC had concluded that we or anyone else had broken the law or that the SEC had a negative opinion of any person, entity or security. The inquiry appeared to relate to a broad range of our accounting practices and was not confined to a specific period. We have since received additional document subpoenas from the SEC.

In March 2005, our board of directors formed a Special Committee of independent directors to review matters related to the SEC inquiry. The Special Committee retained independent counsel. Our board of directors received and acted upon findings of the Special Committee in January 2006. The actions that we took with respect to the Special Committee's findings relating to six short-term or minor sale-leaseback transactions and trade packages, as well as some other accounting matters, are discussed below. With respect to the accounting for purchase business combinations, the primary focus of the Special Committee's inquiry was our historical practices concerning the valuation of rental equipment acquired in purchase business combinations and the practice of recognizing profit on sales of this equipment within one year of its acquisition. These practices are discussed in our 2005 Form 10-K.

Based upon recommendations by the Special Committee, our board of directors directed us to take a number of specific actions to address the issues identified by the Special Committee, including, among other things, the removal of certain finance and accounting employees from their positions, as well as the dismissal and/or reprimanding of certain other employees.

We have provided documents in response to the SEC subpoenas and informal requests as well as to the Special Committee, which has, in turn, provided documents to the SEC.

In July 2007, we received a letter from the staff of the SEC stating that the staff intends to recommend that the SEC authorize the staff to file an injunctive action against us for alleged violations of provisions relating to the maintenance of books and records, internal accounting controls, periodic filing requirements, as well as antifraud provisions as set forth in Section 17(a) of the Securities Act, Sections 10(b), 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Securities Exchange Act and Rules 10b-5, 12b-20, 13a-1, 13a-11, 13a-13 and 13b2-1 thereunder. The letter states that the relief the staff may recommend includes permanent injunctions and civil penalties. Under SEC procedures, we have the opportunity to respond to the SEC staff before the staff makes a formal recommendation as to whether any action should be brought by the SEC. The staff's letter also states that the staff intends to request authorization to engage in settlement discussions with us. We intend to continue cooperating fully with the SEC in this matter.

The U.S. Attorney's Office has also requested information from us informally and by subpoena about matters related to the SEC inquiry. We are also cooperating fully with this office.

We cannot predict the outcome of these inquiries or when these matters might be resolved.

**Restatement of Financial Statements and Related Matters**

Contemporaneous with the filing of the 2005 Form 10-K, we filed our annual report on Form 10-K for the fiscal year ended December 31, 2004 (the "2004 Annual Report"). The 2004 Annual Report includes restated consolidated financial statements for the fiscal years ended December 31, 2002 and 2003, which corrected accounting errors related to the recognition of equipment rental revenue, self-insurance reserves, customer relationships and the provision for income taxes, and the accounting for certain short-term sale-leaseback transactions that constituted irregularities (the "Restatement"). In addition, the 2004 Annual Report provides supplemental information regarding matters which we did not restate, including certain trade package transactions, which involved irregularities, and certain of our historical purchase accounting practices.

The Restatement had the effect of increasing our net loss and net loss per diluted share for 2002 by $8 million and $.10, respectively, and decreasing our net loss and net loss per diluted share for 2003 by $5 million and $.06 per share, respectively. The impact of the Restatement on periods prior to January 1, 2002 is reflected as a decrease of $65 million to beginning retained earnings as of January 1, 2002.

**Legal Proceedings**

The description of the inquiry and investigations of the SEC and the U.S. Attorney's Office in "—Securities and Exchange Commission Inquiry and Special Committee Review" above is incorporated by reference herein. Following our public announcement of the SEC inquiry described in "—Securities and Exchange Commission Inquiry and Special Committee Review" above, three purported class action lawsuits were filed against us in the United States District Court for the District of Connecticut. The plaintiff in each of the lawsuits initially sought to sue on behalf of a purported class comprised of purchasers of our securities from October 23, 2003 to August 30, 2004. The lawsuits initially named as the defendants URI, our chairman, our vice chairman and then chief executive officer, our former president and chief financial officer, and our former corporate controller. These initial complaints alleged, among other things, that certain of our SEC filings and other public statements contained false and misleading statements which resulted in damages to the plaintiffs and the members of the purported class when they purchased our securities. On the basis of those allegations, plaintiffs in each action asserted claims (a) against all defendants under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and (b) against one or more of the individual defendants under Section 20(a) of the Exchange Act. The complaints sought unspecified compensatory damages, costs and expenses. On February 1, 2005, the Court entered an order consolidating the three actions. On

November 8, 2005, the Court appointed City of Pontiac Policeman's and Fireman's Retirement System as lead plaintiff for the purported class. The consolidated action is now entitled *In re United Rentals, Inc. Securities Litigation*.

On June 5, 2006, pursuant to a schedule agreed to by the parties and approved by the Court, lead plaintiff filed a consolidated amended complaint, which (a) added allegations relating to, among other things, the conclusions of the Special Committee and other matters disclosed in our 2005 Form 10-K, (b) amended the purported class period to include purchasers of our securities from February 28, 2001 to August 30, 2004 and (c) named as an additional defendant our first chief financial officer. In September 2006, we and certain of the individual defendants moved to dismiss the consolidated amended complaint in this action. Briefing with respect to these motions is now complete. We intend to continue to defend against this action vigorously. At this stage of the litigation, it is not possible to estimate the amount of loss or range of possible loss that might result from an adverse judgment or a settlement of this matter.

In January 2005 an alleged shareholder filed an action in Connecticut State Superior Court, Judicial District of Norwalk/Stamford at Norwalk, purportedly suing derivatively on our behalf. The action, entitled *Gregory Riegel v. John N. Milne*, *et al.,* named as defendants certain of our current and/or former directors and officers, and named us as a nominal defendant. The complaint asserted, among other things, that the defendants breached their fiduciary duties to us by causing or allowing us to disseminate misleading and inaccurate information to shareholders and the market and by failing to establish and maintain adequate accounting controls, thus exposing us to damages. The complaint seeks unspecified compensatory damages, costs and expenses against the defendants. The parties to the Riegel action have agreed that the proceedings in this action will be stayed pending the resolution of the motions to dismiss in the purported shareholder class actions.

In November 2004 we received a letter from counsel for an alleged shareholder, raising allegations similar to the ones set forth in the derivative complaint described above and demanding that we take action in response to those allegations against certain of our current and/or former directors and/or officers. Following receipt of the letter, our board of directors formed a special committee to consider the letter. In August 2005, this alleged shareholder commenced an action in Connecticut State Superior Court, Judicial District of Norwalk/Stamford at Stamford, purporting to sue derivatively on the company's behalf. The action, entitled *Nathan Brundridge v. Leon D. Black, et al*., initially named as defendants certain of our current and former directors or officers, and named us as a nominal defendant. The initial complaint in this action asserted, among other things, that all of the defendants breached fiduciary obligations to us by causing or allowing us to disseminate misleading and inaccurate information to shareholders and the market, and by failing to establish and maintain adequate accounting controls, thus exposing us to damages. The initial complaint in this action also asserted a claim for unjust enrichment against our chairman and our vice chairman and then chief executive officer. The initial complaint sought unspecified compensatory damages, equitable relief, costs and expenses against all of the defendants. The initial complaint also sought an order, in connection with plaintiff's unjust enrichment claim, directing the defendants against whom that claim was asserted to disgorge certain compensation they received from us with respect to fiscal years 2001, 2002 and 2003.

On June 5, 2006, pursuant to a schedule agreed to by the parties and approved by the Court, plaintiff in the Brundridge action filed an amended complaint, which (a) added allegations relating to, among other things, the conclusions of the Special Committee and other matters disclosed in the 2005 Form 10-K, and (b) named as an additional defendant our former president and chief financial officer and asserted the same claims against him as it previously asserted and continued to assert against our chairman and our vice chairman and then chief executive officer. In September 2006, we and certain of the individual defendants moved to dismiss the amended complaint in this action. In December 2006, plaintiff in this action filed its opposition to these motions to dismiss. Subsequently, the parties agreed that the proceedings in this action will be stayed pending resolution of the motions to dismiss in the

87

purported shareholder class actions. The parties' agreement provides that any party may terminate the stay at any time on 30 days' written notice to the Court and all other parties, and defendants will have an opportunity to submit reply papers in further support of their motions to dismiss this action after the termination of the stay.

In August 2005 another alleged shareholder filed an action in the United States District Court for the District of Connecticut, purporting to sue derivatively on our behalf. The action, entitled *Natalie Gordon v. Wayland R. Hicks, et al.*, named as defendants certain of our current and former directors and officers, and named us as a nominal defendant. The initial complaint in this action asserted claims against each of the defendants for breach of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment. Each of these claims is premised on, among other things, the theory that the individual defendants caused or permitted us to disseminate misleading and inaccurate information to shareholders and to the market, and failed to establish and maintain adequate accounting controls, thus exposing us to damages. The initial complaint also asserted (a) a claim that a former director breached fiduciary obligations by selling shares of our common stock while in possession of material, non-public information, and (b) a claim against our chairman, vice chairman and then chief executive officer, and our former president and chief financial officer for recovery of certain incentive-based compensation under section 304 of the Sarbanes-Oxley Act. The initial complaint sought unspecified compensatory damages, equitable relief, restitution, costs and expenses against all of the defendants. The initial complaint also sought an order declaring that the defendants against whom the section 304 claim was directed are liable under the Sarbanes-Oxley Act and directing them to reimburse us for all bonuses or other incentive-based or equity-based compensation they received for the fiscal years 1999 through 2004.

On June 5, 2006, pursuant to a schedule agreed to by the parties and approved by the Court, plaintiff in the Gordon action filed an amended complaint, which (a) added allegations relating to, among other things, the conclusions of the Special Committee and other matters disclosed in the 2005 Form 10-K, and (b) named as additional defendants certain other of our current and/or former directors and/or officers. The amended complaint also asserted an additional claim against certain of our current and/or former directors for violation of Section 14(a) of the Exchange Act. In September 2006, we and certain of the individual defendants moved to dismiss the amended complaint in this action. Briefing with respect to these motions is now complete.

Following our July 23, 2007 announcement of the merger agreement with affiliates of Cerberus, two lawsuits against the proposed acquisition were filed. First, a putative class action complaint, entitled *Donald Lefari v. United Rentals, Inc. et al.*, was filed in the Superior Court of the Judicial District of Stamford-Norwalk on July 23, 2007. This lawsuit purports to be brought on behalf of all common stockholders of URI and names us and all of our directors and Cerberus as defendants. The operative complaint alleges, among other things, that our board of directors violated its fiduciary duties to our stockholders by entering into the Merger Agreement and that our proxy statement failed to disclose material information. The plaintiff in the *Lefari* action sought to enjoin the proposed transaction on those bases. On September 19, 2007, the parties to the *Lefari* action entered into a memorandum of understanding to settle the action and we expect a settlement agreement to be negotiated by the parties. On September 28, 2007, the plaintiff in the *Brundridge* action described above filed a second lawsuit, *Nathan Brundridge vs. Wayland R. Hicks et al.*, in the Superior Court of the State of Connecticut, Judicial District of Stamford-Norwalk. This lawsuit names our current directors as defendants. The complaint alleges, among other things, that URI's board of directors failed to disclose all the material facts that URI's stockholders require in order to cast an informed vote for or against the proposal to adopt the Merger Agreement. If the court approves the anticipated settlement agreement in the *Lefari* action, we expect that lawsuit will be dismissed with prejudice, and thereby release claims asserted by the plaintiff in the second *Brundridge* action.

88

We are also subject to a number of claims and proceedings that generally arise in the ordinary conduct of our business. These matters include, but are not limited to, general liability claims (including personal injury, product liability, and property and auto claims), indemnification and guarantee obligations, employee injuries and employment-related claims, self-insurance obligations and contract and real estate matters. Based on advice of counsel and available information, including current status or stage of proceeding, and taking into account accruals for matters where we have established them, we currently believe that any liabilities ultimately resulting from these ordinary course claims and proceedings will not, individually or in the aggregate, have a material adverse effect on our consolidated financial position, results of operations or cash flows.

**Control Deficiency Issues Identified for 2004, 2005 and 2006.**

A control deficiency or the combination of multiple control deficiencies often result in a material weakness that leads to an increased likelihood that a material misstatement of an annual or interim financial statement will go undetected. Control deficiencies were identified as of December 31, 2004 and December 31, 2005 and were ultimately resolved by December 31, 2006.

*2004 Control Deficiency Issues.* As of December 31, 2004, in connection with management's assessment of the effectiveness of internal control over financial reporting, the following material weaknesses were identified: (i) ineffective maintenance of the control environment over financial reporting; (ii) ineffective internal control over the financial statement close process; (iii) ineffective internal controls surrounding the accounting for income taxes; (iv) ineffective internal controls pertaining to the self-insurance reserve estimation process and (v) ineffective internal controls regarding the manner in which certain types of bulk rental assets were recorded, tracked and relieved from the accounts upon disposal or sale.

Such control deficiencies and related material weaknesses resulted in adjustments, including numerous audit adjustments, to our consolidated financial statements for the year ended December 31, 2004, and to the restatement of our consolidated financial statements for the years ended December 31, 2003 and 2002, and restatement of the first, second and third quarter 2004 and 2003 financial statements. As a result of the material weaknesses identified above, our management concluded that we did not maintain effective internal control over financial reporting as of December 31, 2004.

*2005 Control Deficiency Issues.* During fiscal 2005, we engaged in substantial efforts to address the material weaknesses in our internal control over financial reporting that were identified as of December 31, 2004. Such efforts included: (i) maintenance of our control environment over financial reporting through (a) significantly strengthening management within key financial functions, (b) strengthening of our corporate governance practices, including forming a Compliance Committee to monitor and enhance our code of conduct and related matters including the subsequent release of mandatory ethics and compliance training for all employees, and (c) the improvement of procedures used when investigating and resolving allegations of wrong-doing; (ii) maintenance of our control environment over the financial statement close process through the development of specific procedures such as (a) the documentation and performance of (x) formal, written policies and procedures including implementing formal monthly closing meetings with corporate and region accounting staff, and (y) formal account reconciliation and analysis processes including, review and approval requirements, (b) additional review and documentation of the assumptions and processes used in determining the reserve balances for judgmental accounts and (c) implementation of more formal journal entry documentation; (iii) maintenance of our control environment over taxes and accounting through (a) the establishment of procedures to ensure that the income tax provision and related tax assets and liabilities are reconciled accurately and timely, (b) maintenance of tax basis balance sheets and effective reconciliation of the cumulative book-to-tax differences, (c) annual evaluation of the appropriate state tax rates, (d) enhanced communications between business unit, tax and accounting department

personnel, and (e) the completion of a thorough analysis of historical acquisitions and other activities supporting deferred tax liabilities and assets; (iv) the remediation in 2005 of the material weakness pertaining to our self-insurance estimation and evaluation process through the engagement of qualified, third-party actuaries to perform actuarial calculations of the liabilities for outstanding and incurred-but-not-reported claims; and (v) the correction of control deficiencies surrounding accounting for bulk rental assets, the completion of a thorough analysis of the bulk assets accounting practices within each of our three reportable business segments and the implementation of appropriate actions to ensure that the bulk asset accounting properly reflected the transactions within each segment. These actions included standardizing bulk rental asset policies and practices across all locations within each segment, modification of the inventory system and updating procedures to capture asset quantities and unit costs and to properly track bulk rental asset changes.

It is believed that the foregoing actions improved our internal control over financial reporting, as well as our disclosure controls and procedures. However, the material weakness in our financial close process was not remediated by December 31, 2005 and, accordingly, our internal control over financial reporting and our disclosure controls and procedures remained ineffective as of December 31, 2005.

***2006 Resolution of Outstanding Control Issues Relating to the Material Weakness in the Financial Statement Close Process.*** Management determined that internal controls over the financial statement close process were not effective as of December 31, 2005. This material weakness continued to exist as of the end of each of the first three quarters of 2006. Commencing with the first quarter of 2006, we began implementing enhancements to the financial close process. These enhancements, which were completed in the fourth quarter of 2006, included: (i) the formalization of the account reconciliation and analysis processes; (ii) the performance of consistent and timely reviews and documentation of the assumptions and processes used in determining the reserve balances for judgmental accounts; (iii) the adoption of measures to verify that the requisite preparation of journal entries was complied with and that management had approved such entries; (iv) the appropriate documentation of accounting policies and procedures and (v) the appointment of an experienced Corporate Controller and additional staff for the corporate finance and accounting functions.

As a result of these enhancements, management determined that the material weakness in our financial close process was remediated as of December 31, 2006.

**Management's Report on Internal Control over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act. Our internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with U.S. GAAP. Our internal control over financial reporting includes those policies and procedures that: (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of our assets; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with GAAP, and that our receipts and expenditures are being made only in accordance with authorizations of our management and directors; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of our assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Under the supervision of our chief executive officer and chief financial officer, our management assessed the effectiveness of our internal control over financial reporting as of December 31, 2006. In making this assessment, management used the criteria set forth in *Internal Control-Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). Based on this assessment, our management has concluded that our internal control over financial reporting was effective as of December 31, 2006.

Our independent registered public accounting firm, Ernst & Young LLP, has audited management's assessment of the effectiveness of internal control over financial reporting and the effectiveness of our internal control over financial reporting as of December 31, 2006. Ernst & Young LLP's report on management's assessment of the effectiveness of our internal control over financial reporting and on the effectiveness of our internal control over financial reporting as of December 31, 2006 is set forth on the following page.

**Report of Independent Registered Public
Accounting Firm on Internal Control Over Financial Reporting**

**The Board of Directors and Stockholders of United Rentals, Inc.**

We have audited management's assessment, included in the accompanying Management's Report on Internal Control Over Financial Reporting, that United Rentals, Inc. and subsidiaries maintained effective internal control over financial reporting as of December 31, 2006, based on criteria established in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (the COSO criteria). United Rentals, Inc.'s management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting. Our responsibility is to express an opinion on management's assessment and an opinion on the effectiveness of the company's internal control over financial reporting based on our audit.

We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, evaluating management's assessment, testing and evaluating the design and operating effectiveness of internal control, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

In our opinion, management's assessment that United Rentals, Inc. and subsidiaries maintained effective internal control over financial reporting as of December 31, 2006, is fairly stated, in all material respects, based on the COSO criteria. Also, in our opinion, United Rentals, Inc. and subsidiaries maintained, in all material respects, effective internal control over financial reporting as of December 31, 2006, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the consolidated balance sheets of United Rentals, Inc. and subsidiaries as of December 31, 2006 and 2005, and the related consolidated statements of operations, stockholders' equity, and cash flows for each of the three years in the period ended December 31, 2006 of United Rentals, Inc. and subsidiaries and our report dated February 26, 2007, expressed an unqualified opinion thereon.

/s/ ERNST & YOUNG LLP

New York, New York
February 26, 2007

92

## MANAGEMENT

The following table sets forth certain information regarding our directors and our executive officers upon consummation of the Transactions. We also intend to appoint two independent directors.

| Name | Position |
| --- | --- |
| Carlton Donaway . . . . . . . | Executive Chairman |
| Jeff Fenton . . . . . . . . . . . | Vice Chairman |
| Michael J. Kneeland . . . . . | Executive Vice President, Interim Chief Executive Officer and Chief Operating Officer |
| Ken Mettel . . . . . . . . . . | Vice President—Finance |
| Helge Jacobsen . . . . . . . . | Executive Vice President of Business Processes |
| Steven F. Mayer . . . . . . . . | Director |
| Mike Green . . . . . . . . . . . | Director |
| Mark Suwyn . . . . . . . . . . | Director |

**Carlton Donaway, Executive Chairman**

Mr. Donaway has over 27 years of experience in the air-express, logistics, ocean-freight and overland-transportation industries. Most recently, he was the Executive Chairman for DHL Holdings USA following the merger of DHL USA and Airborne, Inc. Prior to that position, he was Chairman, President and CEO of Airborne, Inc., a Fortune 500 company. Prior to Airborne Inc., Mr. Donaway was President and CEO of ABX Air. Mr. Donaway has also held executive positions in customer support, quality assurance, market development, sales and operations. Mr. Donaway began his career with the U.S. Navy. He has an M.B.A. from the University of Minnesota and a B.A. in Anthropology from California State University. Mr. Donaway is currently a director of Ace Aviation Holdings and ACTS Technical Services, Inc.

**Jeff Fenton, Vice Chairman**

Mr. Fenton's professional experience includes 20 years with General Electric Company in a variety of leadership roles, including GE Aircraft Engines, GE Medical Systems and GE Capital Equipment Leasing. Prior to leaving GE, Mr. Fenton was CEO of GE Capital Modular Space. After leaving GE in 1999, Mr. Fenton became CEO and President of Maxim Crane Works, a global leader in crane services and equipment leasing, where he remained until 2002. Mr. Fenton holds a degree in Mechanical Engineering from Northeastern University and a Masters in Management as a Sloan Fellow from the Massachusetts Institute of Technology. He is currently the Chairman of Bluelinx Holdings, a buildings product distributor.

**Michael J. Kneeland, Executive Vice President, Interim Chief Executive Officer and Chief Operating Officer**

Mr. Kneeland joined us in 1998 upon the acquisition of Equipment Supply Co. and held numerous operating positions of increasing responsibility, including VP-Aerial Division and VP-Southeast Region. He served as EVP of Operations from 2003 until being named Interim Chief Executive Officer of the company in 2007. Mr. Kneeland's more than 25 years of professional experience in the equipment rental industry include senior management positions with Freestate Industries, Inc. and Equipment Supply Co.

**Ken Mettel, Vice President—Finance**

Mr. Mettel was named to his current position in 2007 after serving for one year as VP-Market Strategy and Customer Insight and previously spending five years as our VP-Planning and Analysis. Prior to joining us in 2001, Mr. Mettel held senior management positions with International Paper as

VP-Strategic Planning and with Unilever as Director of Financial Analysis. Mr. Mettel received a B.A. in Economics from Tufts University and an M.B.A. from Columbia University.

**Helge Jacobsen, Executive Vice President of Business Processes**

Helge Jacobsen joined Cerberus in July 2004 where he has played a variety of roles, including leading diligence teams and as part of the executive team of portfolio companies. Prior to joining Cerberus, Mr. Jacobsen was employed by GE, where he was VP of Supply Chain/Six Sigma for GE Consumer and Industrial in Europe. After receiving his M.B.A. in 1998 from the University of Washington, he started in GE's audit staff where he led financial audits and drove operational excellence in supply chain, pricing and finance. Mr. Jacobsen holds a B.S. from the University of Aalborg in Denmark.

**Steven F. Mayer, Director**

Mr. Mayer is a Managing Director and senior member of the Investment Team at Cerberus Capital Management, L.P. Prior to joining Cerberus in 2002 and since 2001, Mr. Mayer was an Executive Managing Director of Gores Technology Group. Prior to joining Gores, from 1996 to 2001, Mr. Mayer was a Managing Director of Libra Capital Partners, L.P. From 1994 until 1996, Mr. Mayer was a Managing Director of Aries Capital Group, LLC, a private equity investment firm that he co-founded. From 1992 until 1994, he was a Principal with Apollo Advisors, L.P. and Lion Advisors, L.P., affiliated private investment firms. Prior to that time, Mr. Mayer was an attorney with Sullivan & Cromwell. He is a member of the boards of directors of LNR Property Holdings Corp., Decision One Corporation and Talecris Biotherapeutics Holdings Corp. Mr. Mayer received an A.B., cum laude, from Princeton University and his J.D., magna cum laude, from Harvard Law School.

**Mike Green, Director**

Mr. Green is a Managing Director and senior member of the Investment Team at Cerberus Capital Management, L.P. Mr. Green has a diverse background in private equity investment, distressed and turnaround investment and business operations leadership. His industry experience includes aerospace, transportation, telecommunications, manufacturing and software systems. From 2003 to 2005, Mr. Green was President, Cerberus Operations, which he established and grew into a multi-industry, multi-functional investment support entity of more than 100 professionals. From 1999 to 2003, he was the General Partner of TenX Capital Management, which was acquired by Cerberus in 2003. From 1993 to 1999, Mr. Green financed and actively participated in acquisitions of underperforming companies, two of which he served as the CEO (Trispan Solutions and Naviant Information Systems).

Prior to that, Mr. Green spent 12 years at General Electric Company, where he worked in several operating departments and held positions in engineering, manufacturing, sales, marketing and general management. Mr. Green received an M.S.E.E. from Villanova University and B.S.E.E. from the State University of New York at Buffalo and is a graduate of the GE Management Training Institute. Mr. Green currently serves on the boards of directors of ACE Aviation (Air Canada), Fila, AerCap and Tandem.

**Mark Suwyn, Director**

Mr. Suwyn served as a Director of URI from September 2004 until July 2007. Mr. Suwyn, who is associated with the Sponsor, is the Chief Executive Officer and Chairman of NewPage Corporation (a producer of coated papers). Mr. Suwyn  served as Chairman and Chief Executive Officer of Louisiana-Pacific Corp from 1996 until his retirement in 2004. Prior to joining Louisiana-Pacific, Mr. Suwyn was Director and Executive Vice President of Distribution, Specialty Products and Forestlands at International Paper from 1992 to 1995. Before joining International Paper, he served in a variety of positions with E.I. DuPont from 1967 through 1992. Mr. Suwyn earned a doctorate in inorganic chemistry from Washington State University.

## PRINCIPAL STOCKHOLDERS

Following the consummation of the Transactions, all of URNA's issued and outstanding shares will be held by URI and all of URI's issued and outstanding shares will be held by RAM Holdings, Inc., an entity formed by affiliates of the Sponsor.

The Sponsor, together with investment funds associated with, advised by or designated by the Sponsor, will beneficially own a controlling interest in RAM Holdings, Inc. The members of our board of directors affiliated with these entities or their advisors may be deemed to beneficially own shares owned by these entities or their associated investment funds or funds advised by them. Each such individual disclaims beneficial ownership of any such shares in which such individual does not have a pecuniary interest.

**CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS**

We have from time to time purchased equipment and parts from and sold equipment to Terex Corporation ("Terex") and expect to do so in 2007. One of our former directors (until June 2005) is chairman and chief executive officer of Terex. We purchased approximately $124 million, $157 million and $146 million of equipment and parts from Terex during 2004, 2005 and 2006, respectively. We also sold approximately $12 million, $7 million and $0 of equipment to Terex during 2004, 2005 and 2006, respectively. As of December 31, 2005 and 2006, amounts due to Terex were $10 million and $11 million and amounts due from Terex were $0 and $0, respectively.

## DESCRIPTION OF OTHER INDEBTEDNESS

The following summary of certain provisions of the instruments evidencing our material indebtedness does not purport to be complete and is subject to, and is qualified in its entirety by reference to, all of the provisions of the agreements, including certain terms therein that are not otherwise defined in this offering circular.

### New Senior Secured Credit Facilities

*We summarize below the principal terms of the agreements that will govern our new senior secured credit facilities. As the final terms of our new senior secured credit facilities have not been agreed upon, the final terms may differ from those set forth herein and any such differences may be significant. In addition, in connection with the syndication of our new senior secured credit facilities, the pricing and structure of our new senior secured credit facilities may be changed by the applicable administrative agent, in consultation with us, subject to certain limitations. This summary is not a complete description of all the terms of the agreements.*

Our new senior secured credit facilities that we expect to enter into as part of the financing are expected to include a (i) $1,350 million senior secured U.S. revolving credit facility, (ii) Canadian Dollar equivalent of $150 million senior secured Canadian revolving credit facility and (iii) $1,100 million senior secured U.S. term loan facility. Following the closing of the Mergers, URNA is expected to be the borrower under our new senior secured U.S. credit facilities and URI and the subsidiaries of URNA that guarantee the notes are expected to be guarantors of such facilities. United Rentals of Canada, Inc. is expected to be the borrower under the new senior secured Canadian revolving credit facility and URI and all of its subsidiaries, subject to certain exceptions, are expected to be guarantors of such facility. The obligors under our new senior secured credit facilities will grant a first priority lien on all of their assets to the respective lenders and the agents under each of the facilities. Affiliates of the initial purchasers of the notes offered hereby are expected to be lenders and agents under our new senior secured credit facilities, including Bank of America, N.A., as U.S. administrative agent and U.S. collateral agent for the U.S. facilities and, Bank of America, N.A. (acting through its Canadian branch), as Canadian administrative agent and Canadian collateral agent for the senior secured Canadian revolving credit facility, and a syndicate of banks, financial institutions and other entities reasonably acceptable to the Sponsor are expected to be lenders under such facilities. The maturity date for each of our new senior secured credit facilities is expected to be the six-year anniversary ("the Facilities Maturity Date") of the closing date (the "Facilities Closing Date") of our new senior secured credit facilities.

#### Revolving Credit Facilities

The senior secured U.S. revolving credit facility is expected to have aggregate commitments of up to $1,350 million, with subfacilities for letters of credit and swingline loans. The senior secured Canadian revolving credit facility is expected to have aggregate commitments of up to the Canadian Dollar equivalent of $150 million, with subfacilities for letters of credit and swingline loans. We expect borrowings of approximately $293 million under our U.S. revolving credit facility and our Canadian revolving credit facility to be fully drawn on the closing date of the senior secured credit facilities (the "Facilities Closing Date") concurrently with the closing of the Mergers. In addition to the initial borrowings made on the Facilities Closing Date, additional borrowings may be made at any time under each revolving credit facility on and after the Facilities Closing Date and until the sixth anniversary thereof (the "Facilities Maturity Date"), subject to availability under the applicable borrowing base, which shall be determined based upon the value of the respective assets securing our new senior secured credit facilities. Each borrowing base is expected to be equal to (A) the sum of (a) 85% of the net amount of eligible accounts receivable of the U.S. or Canadian credit parties, as the case may be; (b) the lesser of (i) 55% of the lower of cost and market value of eligible inventory of the U.S. or

97

Canadian credit parties, as the case may be, and (ii) a consolidated inventory maximum of $100 million; (c) the lesser of (i) 95% of the net book value and (ii) 85% of the appraised net orderly liquidation value of the eligible equipment of the U.S. or Canadian credit parties, as the case may be; and (d) the lesser of (i) 70% of the appraised fair market value of the eligible real estate of the U.S. or Canadian credit parties, as the case may be, for which the applicable agent under the applicable revolving credit facility has received mortgages and certain other reasonably acceptable documentation and (ii) a consolidated real estate maximum of $150 million *minus* (B) (i) any term loan outstanding under our new senior secured credit facilities and (ii) such reserves as the applicable agent shall establish in its reasonable credit judgment. Eligibility will be determined in accordance with mutually agreed criteria to be set forth in the documentation governing the senior secured revolving credit facilities. There will be no amortization of the senior secured revolving credit facilities.

### *U.S. Term Loan Facility*

The senior secured U.S. term loan facility is expected to be in an aggregate principal amount of $1,100 million, with all amounts borrowed thereunder borrowed on the Facilities Closing Date. The senior secured U.S. term loan facility will amortize in equal quarterly installments in amounts equal to 0.25% of the original principal amount of the senior secured term loan facility, with the balance payable on the Facilities Maturity Date.

### *Guarantees and Security*

All of URNA's obligations under the new senior secured U.S. revolving credit facility and new senior secured U.S. term loan facility and certain hedging and other arrangements will be unconditionally guaranteed by URI and, subject to certain exceptions, URNA's existing and future direct and indirect domestic subsidiaries.

In addition, all obligations of United Rentals of Canada, Inc. under the new senior secured Canadian revolving credit facility and under certain hedging and other arrangements will be unconditionally guaranteed by URI and, subject to certain exceptions, by URNA's existing and future direct and indirect domestic subsidiaries and certain foreign subsidiaries.

All of URNA's obligations under the new senior secured U.S. revolving credit facility and new senior secured U.S. term loan facility and certain hedging and other arrangements will be secured, subject to permitted liens and other agreed upon exceptions, by substantially all of its assets and the assets of the guarantors under the new senior secured U.S. revolving credit facility and new senior secured U.S. term loan facility referred to above, including:

- a first priority pledge of all of the equity interests of URNA and all of the equity interests held by URNA or by any such guarantor (which pledge, in the case of any foreign subsidiary, shall be limited to 65% of the voting stock of such foreign subsidiary); and

- a first priority security interest in, and mortgages on, substantially all other tangible and intangible assets of URNA and each guarantor.

All obligations of United Rentals of Canada, Inc. under the new senior secured Canadian revolving credit facility and under certain hedging and other arrangements will be secured, subject to permitted liens and other agreed upon exceptions, by substantially all of its assets and the assets of the guarantors under the new senior secured Canadian revolving credit facility referred to above, including:

- a first priority pledge of all of the equity interests of United Rentals of Canada, Inc. and all of the equity interests held by United Rentals of Canada, Inc. or by any such guarantor; and

- a first priority security interest in, and mortgages on, substantially all other tangible and intangible assets of United Rentals of Canada, Inc. and each such guarantor.

*Certain Covenants and Events of Default*

**Restrictive Covenants.**   The following negative covenants are expected to apply to URI, URNA, United Rentals of Canada, Inc. and their subsidiaries (subject to materiality qualifiers, exceptions and baskets):

- limitation on dispositions of assets;

- limitation on mergers and acquisitions (other than the Mergers);

- limitations on dividends, stock repurchases and redemptions and other restricted payments;

- limitation on indebtedness (including guarantees) and prepayment, amendment and redemption of indebtedness (excluding (i) loans under our new senior secured credit facilities, (ii) the prepayment of loans under our new senior unsecured bridge credit facility with the proceeds of any refinancing debt (subject to certain terms and conditions) incurred and/or equity issued after the Facilities Closing Date and (iii) certain other exceptions);

- limitation on loans and investments;

- limitation on liens and further negative pledges and sale-leaseback transactions;

- limitation on payment restrictions affecting subsidiaries;

- limitation on transactions with affiliates; and

- limitations on changes in business conducted by URNA and its subsidiaries.

**Financial Covenants.**   It is expected that the documentation governing our new senior secured credit facilities will require that, in the event that borrowing availability under the senior secured revolving credit facilities is less than $250 million (this event being a "covenant trigger"), until the covenant trigger is cured, we will be required to maintain a minimum fixed charge coverage ratio and a total maximum leverage ratio.

The credit agreement governing our new senior secured facilities will also contain certain customary affirmative covenants and events of default.

*Cash Management*

The borrowers under our new senior secured credit facilities will be required to implement cash management procedures with respect to the collection of accounts receivable of the borrowers and the guarantors which will provide that the borrowers will be required to cause or direct all cash resulting from the collection of collateral of the borrowers and the guarantors (subject to exceptions in an amount to be determined) to be deposited daily in a collateral account maintained by the applicable administrative agent for application to the outstanding loans under our new senior secured credit facilities, if either of the following events should occur: (i) borrowing availability under our new senior secured revolving credit facilities is less than $250 million for five consecutive days (a "liquidity event") and thereafter for so long as such liquidity event continues or is deemed to continue or (ii) after the occurrence and during the continuance of an event of default. A liquidity event will be deemed to continue until borrowing availability is greater than or equal to $250 million for 30 consecutive days.

*Prepayments*

**Mandatory Prepayments.**   We will be required to mandatorily prepay the revolving credit facilities as long as excess availability (as defined below) is less than zero. In addition, loans under our new senior secured credit facilities shall be prepaid (in the order set forth below) in an amount equal to (a) 100% of the net proceeds received from the sale or other disposition of the assets of the borrowers or any of its subsidiaries after the Facilities Closing Date, subject to thresholds and certain other

exceptions, and subject to 100% reinvestment rights if the proceeds are reinvested or committed to be reinvested within 270 days of receipt and, if committed, then actually reinvested within 365 days of receipt, (b) 100% of the net proceeds received by the borrowers or any of their subsidiaries from the issuance of debt after the Facilities Closing Date (other than permitted debt, including debt incurred to replace our new senior unsecured bridge credit facility and subject to certain other exceptions), and (c) 25% of excess cash flow (to be defined), with reduction to 0% based upon achievement and maintenance of a leverage ratio to be mutually agreed.

Upon the occurrence and during the continuance of a cash dominion triggering event, all amounts deposited in the collection account of the U.S. borrowers or Canadian borrowers, as the case may be, will be applied daily by the applicable administrative agents to repay outstanding loans and cash collateralize outstanding letters of credit under the applicable senior secured revolving credit facility. There will be no prepayment penalties (except LIBOR and, if applicable, Canadian Bankers' Acceptance Equivalent breakage costs) for mandatory prepayments.

"Excess availability" means the amount by which (a) the lesser of (i) the applicable borrowing base and (ii) the sum of the aggregate commitments under the applicable revolving credit facility exceeds (b) the sum of (i) the aggregate outstanding principal balance under the applicable revolving credit facility plus (ii) the undrawn face amount of applicable outstanding letters of credit issued under the applicable revolving credit facility and the unreimbursed amount of payments in respect of drafts under letters of credit issued under the applicable revolving credit facility.

**Optional Prepayments.**   Optional prepayments of our new senior secured credit facilities and reduction of the commitments under the revolving credit facility will be permitted in whole or in part without premium or penalty (except LIBOR and, if applicable, Canadian Bankers' Acceptance Equivalent breakage costs).

*Interest Rate and Fees*

Borrowings under the new senior secured credit facilities will bear interest at a rate per annum equal to an applicable margin plus, at our option, either (1) if the loans are made in U.S. dollars, (a) the adjusted London interbank offer rate or (b) a base rate determined by reference to a prime rate or (2) if the loans are made in Canadian dollars, (a) the adjusted London interbank offer rate, (b) a Canadian Bankers' Acceptances Equivalent rate, (c) a Canadian prime rate for Canadian Dollar advances, or (d) a Canadian base rate for U.S. Dollar advances. Swingline loans made under each senior secured revolving credit facility will bear interest equal to an applicable margin plus the applicable prime or base rate.

The initial applicable margin for borrowings under our new senior secured U.S. revolving credit facility and U.S. term loan facility will be 1.75% with respect to base rate borrowings and 2.75% with respect to LIBOR borrowings. The initial applicable margin for borrowings under our new senior secured Canadian revolving credit facility will be 1.75% with respect to Canadian prime rate and Canadian base rate borrowings and 2.75% with respect to LIBOR and Canadian Bankers' Acceptances Equivalent borrowings. The applicable margin under our new senior secured credit facilities may be adjusted based on our senior leverage ratio.

In addition to paying interest on outstanding principal under our new senior secured credit facilities, we will be required to pay commitment fees to the lenders under (1) the senior secured U.S. revolving credit facility and (2) the senior secured Canadian revolving credit facility in respect of the unutilized commitments thereunder at rates equal to amounts to be determined. The borrowers under our new senior secured U.S. revolving credit facility and Canadian revolving credit facility also will pay customary letter of credit and agency fees.

*Incremental Facility*

Subject to the satisfaction of certain conditions, URNA is expected to have the ability on one or more occasions to incur additional senior secured U.S. term loans under a new U.S. term loan facility to be included in our new senior secured credit facilities or to increase commitments for additional senior secured U.S. revolving loans under the senior secured U.S. revolving credit facility, in an aggregate principal amount of up to $250 million for these additional loan facilities; and to have the same guarantees as, and be secured on a pari passu basis by the same collateral securing, our new U.S. senior secured credit facilities.

**New Senior Unsecured Bridge Credit Facility**

*We summarize below the principal terms of the agreements that will govern our new unsecured bridge facility. As the final terms of our new unsecured bridge facility have not been agreed upon, the final terms may differ from those set forth herein and any such differences may be significant. In addition, in connection with the syndication of our new senior unsecured bridge credit facility, the pricing and structure of our new senior unsecured bridge facility may be changed by the agent, in consultation with us, subject to certain limitations. This summary is not a complete description of all the terms of the agreements.*

We expect to enter into a senior unsecured bridge credit facility on the closing date of the Transactions with Credit Suisse Securities (USA) LLC, Morgan Stanley Senior Funding, Inc. and Banc of America Securities LLC, as joint lead arrangers, Credit Suisse, Cayman Islands Branch, acting through one or more of its affiliates as administrative agent, and the other lenders party thereto. Our new senior unsecured bridge credit facility is expected to consist of a $1,350 million senior unsecured bridge loan, the proceeds of which will be used to provide a portion of the financing to consummate the Transactions. For the avoidance of doubt, references to our new senior unsecured bridge credit facility shall include the Bridge Exchange Notes (as defined below) issued in connection with such facility.

*Maturity and Bridge Exchange Notes*

The Bridge Maturity Date of the initial loans under our new senior unsecured bridge credit facility is expected to be the one year anniversary (the "Initial Bridge Maturity Date") of the closing date of the senior unsecured bridge credit facility (the "Bridge Closing Date"); provided, however, if the outstanding loans have not been repaid as of the Bridge Maturity Date, the maturity of each loan will automatically extend to the eighth anniversary of the Bridge Closing Date (the "Extended Maturity Date"). At any time on or after the Initial Bridge Maturity Date, the lenders will have the option to exchange loans under the senior unsecured bridge credit facility for senior unsecured notes of URNA (the "Bridge Exchange Notes"); provided, however, that we will be able to defer the first issuance of Bridge Exchange Notes until we have received requests to issue an aggregate of at least $100 million in principal amount of Bridge Exchange Notes for the holders thereof. In addition, indebtedness under our new senior unsecured bridge credit facility and the Bridge Exchange Notes will be guaranteed on a senior unsecured basis by the same entities that guarantee the notes offered hereby.

*Interest Rates*

We expect that the interest rates per annum applicable to loans under our new senior unsecured bridge credit facility initially will accrue at a rate per annum equal to LIBOR for a three-month interest period plus 525 basis points (the "Applicable Margin"). The Applicable Margin will increase by 50 basis points on the six-month anniversary of the Bridge Closing Date and by an additional 50 basis points every three months thereafter; provided that the interest rate shall not exceed 12.25% per annum.

*Optional and Mandatory Prepayments*

We will be required to prepay our new senior unsecured bridge credit facility at par plus accrued and unpaid interest, but without penalty or premium, with all net cash proceeds received by us from:

- public offerings of our equity securities;
- the incurrence of debt by us, other than under our new senior secured credit facilities and certain other exceptions to be agreed upon; and
- from certain asset dispositions;

in each case, subject to certain customary exceptions and any requirements under our new senior secured credit facilities and the notes offered hereby.

We may voluntarily prepay the loans under our new senior unsecured bridge credit facility, in whole or in part, at par plus accrued and unpaid interest and customary breakage costs, but without penalty or premium.

*Covenants and Events of Default*

Prior to the Initial Bridge Maturity Date, our new senior unsecured bridge credit facility is expected to contain affirmative covenants, negative covenants, and events of default similar to those contained in the documentation governing our new senior secured credit facilities. However, on and after the Initial Bridge Maturity Date, the covenants and events of default under our new senior unsecured bridge credit facility and the indenture governing the Bridge Exchange Notes are expected to be similar to those contained in the indenture governing the notes offered hereby with such modifications to reflect the relative effective subordination of the Bridge Exchange Notes compared to the notes offered hereby, as may be reasonably agreed upon by us and the lenders under our new senior unsecured bridge credit facilities.

*Take-Out Securities*

We will be obligated under certain circumstances to issue take-out securities in one or more private placements, such as offerings of high yield notes pursuant to Rule 144A under the Securities Act, and to refinance indebtedness under our new senior unsecured bridge credit facility, which offerings may be at a substantial discount and at higher rates of interest than the debt being refinanced with the proceeds therefrom.

**Certain Information Concerning Certain Other Indebtedness and Obligations**

*Interest Rate Swap Agreements*

We have periodically utilized interest rate swap agreements to manage and mitigate our exposure to changes in interest rates.

*$1\frac{7}{8}\%$ Convertible Senior Subordinated Notes*

In October and December 2003, URNA issued approximately $144 million aggregate principal amount of $1\frac{7}{8}\%$ Convertible Senior Subordinated Notes due October 15, 2023. The $1\frac{7}{8}\%$ Convertible Senior Subordinated Notes are unsecured. Holders of the $1\frac{7}{8}\%$ Convertible Senior Subordinated Notes may convert them into shares of URI common stock prior to their maturity at a conversion price of approximately $22.25 per share (subject to adjustment in certain circumstances), unless the notes have previously been redeemed or repurchased, if (i) the price of URI common stock reaches a specified threshold, (ii) the notes are called for redemption, (iii) specified corporate transactions (such as the URI Merger) occur or (iv) the trading price of the notes falls below certain thresholds. We anticipate

Exhibit B-5

all or substantially all of the 1⅞% Convertible Senior Subordinated Notes to be converted on or prior to the completion of the URI Merger which will entitle holders thereof to receive the merger consideration of $34.50 for each share of URI common stock into which their 1⅞% Convertible Senior Subordinated Notes are converted. Any of the 1⅞% Convertible Senior Subordinated Notes which are not converted on or prior to the completion of the merger will remain outstanding. Following the URI Merger, any outstanding 1⅞% Convertible Senior Subordinated Notes will be convertible to the merger consideration that would be paid on the common stock issuable under the 1⅞% Convertible Senior Subordinated Notes had the holders converted on the closing date of the URI Merger. The URI Merger will trigger our obligation to make an offer to purchase the outstanding 1⅞% Convertible Senior Subordinated Notes at par, plus accrued and unpaid interest to the date of such purchase, between 30 and 60 days after the occurrence of a fundamental change (such as the URI Merger); therefore, to the extent that there are any 1⅞% Convertible Senior Subordinated Notes outstanding after the URI Merger, we would have to make such an offer.

### Subordinated Convertible Debentures

In August 1998, the Trust, a subsidiary trust of URI, sold $300 million of Trust Preferred Securities. The net proceeds from the sale of the Trust Preferred Securities were approximately $290 million. The Trust used such proceeds to purchase Subordinated Convertible Debentures from URI which resulted in URI receiving all of the proceeds from the sale of the Trust Preferred Securities. URI in turn contributed the net proceeds from the sale of the Trust Preferred Securities to its wholly owned subsidiary, URNA. The Subordinated Convertible Debentures are reflected as a component of liabilities on our consolidated balance sheets and reflect the obligation to the Trust with respect to the issued and outstanding Trust Preferred Securities. The Trust is not consolidated in our financial statements because we are not the primary beneficiary of the Trust.

Holders of the Trust Preferred Securities may elect to have their Trust Preferred Securities converted into common stock of URI, at which time the liquidation preference of the Trust Preferred Securities so elected for conversion will be exchanged for an equal principal amount of Subordinated Convertible Debentures, whereupon the principal amount of such Subordinated Convertible Debentures will be converted into shares of common stock of URI at the conversion price then in effect. The Trust Preferred Securities are presently convertible into common stock of URI at a conversion price equivalent to $43.6325 per share, subject to certain adjustments in the conversion price upon the occurrence of certain events, including the URI Merger. Immediately following the completion of the URI Merger, the conversion price of the Trust Preferred Securities will be adjusted to approximately $34.28 per share, which is equivalent to the product of the per share merger consideration of $34.50 payable to holders of common stock of URI immediately prior to the effective time of the URI Merger multiplied by a fraction, the numerator of which will be $50 and the denominator of which will be the redemption price then in effect for the Trust Preferred Securities as though the redemption date of the Trust Preferred Securities was to be the date of the URI Merger.

As of September 30, 2007, the outstanding liquidation preference of such Trust Preferred Securities was approximately $146 million. We expect that immediately following the completion of the URI Merger that all or substantially all of the Trust Preferred Securities will be converted into the right to receive the merger consideration which, as of September 30, 2007, after giving pro forma effect to the conversion of all such securities, would require us to pay merger consideration therefor in cash of approximately $147 million.

We have the right to make an optional redemption of all or a portion of the Trust Preferred Securities at any time and from time to time up to the amount of the proceeds derived, directly or indirectly, by URI from the issuance and sale of its common stock within 12 months preceding the date fixed for redemption, upon not less than 30 nor more than 60 days' notice at a redemption price equal to the then outstanding liquidation preference of the Trust Preferred Securities, plus, in each case,

accrued and unpaid distributions thereon until the date of redemption, plus, through and including July 31, 2007, a redemption premium equal to 0.65% of the liquidation preference of the Trust Preferred Securities being redeemed.

### Other Debt

In November 2003, URNA issued $525 million aggregate principal amount of 7¾% senior subordinated notes due 2013 (the "7¾% Notes"), in January 2004, URNA issued $375 million aggregate principal amount of 7% senior subordinated notes due 2014 (the "7% Notes"), and in February 2004, URNA issued $1,000 million aggregate principal amount of 6½% senior subordinated notes due 2012 (the "6½% Notes", and together with the 7¾% Notes and the 7% Notes, the "existing notes"), all or substantially all of which we expect shall be purchased by URNA and retired on the issue date of the notes offered hereby in connection with tender offers and consent solicitations being made by URNA as part of the refinancing described under "Management's Discussion and Analysis of Financial Condition and Results of Operations—The Transactions." To the extent that any existing notes remain outstanding, the indentures governing the Existing Notes will be supplemented in connection with the closing of the tender offers and consent solicitations, which will result in the elimination of substantially all of the restrictive covenants under such indenture, including limitations on (i) indebtedness; (ii) restricted payments; (iii) liens; (iv) the disposition of proceeds of asset sales; (v) issuance of preferred stock of certain subsidiaries; (vi) transactions with affiliates; (vii) dividends and other payment restrictions affecting certain subsidiaries; (viii) designations of unrestricted subsidiaries; and (ix) additional subsidiary guarantees.

## DESCRIPTION OF THE NOTES

The second priority senior secured fixed rate notes (the "*Notes*") will be issued under an indenture (the "*Indenture*") initially among RAM Transition Corp., as issuer, RAM Acquisition Corp., as guarantor, and The Bank of New York, as trustee (the "*Trustee*"). Immediately after the effective time of the URI Merger, URNA and the Guarantors will execute and deliver a first supplemental indenture to the Indenture, whereupon they will become guarantors under the Indenture as so supplemented and the Notes, and, immediately after the effective time of the URNA Merger, URNA will, by operation of law and by the execution of a second supplemental indenture to the Indenture, URNA, as the survivor of the URNA Merger will assume the rights and obligations of, and replace and be substituted for, RAM Transition Corp., as issuer, under the Indenture and the Notes.

The Indenture will not be qualified under the Trust Indenture Act of 1939, as amended (the "*Trust Indenture Act*"), except upon effectiveness of a registration statement for the Exchange Offer. See "—Exchange Offer; Registration Rights." By its terms, however, the Indenture will incorporate certain provisions of the Trust Indenture Act, and, upon consummation of the Exchange Offer, the Indenture will be subject to and governed by the Trust Indenture Act. References to the Notes include the Exchange Notes (as defined herein) unless the context otherwise requires.

Certain terms used in this description are defined under the subheading "—Certain Definitions." In this description, the words "Company," "we" and "our" refer only to RAM Transition Corp., prior to the effective time of the URNA Merger and thereafter, to United Rentals (North America), Inc., and not to any of their respective Subsidiaries.

The following description is only a summary of the material provisions of the Indenture and the Registration Rights Agreement. We urge you to read the Indenture and the Registration Rights Agreement because they, not this description, define your rights as holders of these Notes. You may request copies of these agreements at our address set forth under the heading "Where You Can Find More Information."

### Maturity, Interest and Principal

The Company will issue the Notes initially in an aggregate principal amount of $2,550 million. The Notes will mature on           , 2014. Subject to our compliance with the covenant described under the subheading "—Certain Covenants—Limitation on Indebtedness," we are permitted to issue more Notes under the Indenture (the "*Additional Notes*"). The Notes offered hereby and the Additional Notes thereof, if any, will rank equally and be treated as a single class for all purposes of the Indenture, including waivers, amendments, redemptions and offers to purchase. Holders of Additional Notes will share equally and ratably in the Collateral.

The Notes will be issued only in registered form without coupons, in denominations of $2,000 and any greater multiple of $1,000 thereof. Principal of, premium, if any, and interest on the Notes will be payable, and the Notes will be transferable, at the office or agency of the Company maintained for such purpose (which initially shall be the principal corporate trust office or agency of the Trustee in the City of New York), or, at the option of the Company, cash payments of interest may be made by check mailed to the holders of the Notes at their respective addresses set forth in the register of holders; provided that (a) all cash payments of principal, premium, if any, and interest with respect to the Notes represented by one or more global notes will be made by wire transfer of immediately available funds to the accounts specified by the holder or holders thereof and (b) all cash payments of principal, premium, if any, and interest with respect to certificated Notes will be made by wire transfer to a U.S. dollar account maintained by the payee with a bank in the United States if such holder elects payment by wire transfer by giving written notice to the Trustee to such effect designating such account no later than 30 days immediately preceding the relevant due date for payment (or such other date as the

Trustee may accept in its discretion). No service charge will be made for any transfer, exchange or redemption of Notes, except in certain circumstances for any tax or other governmental charge that may be imposed in connection therewith; however the registrar and the Trustee may require a holder to furnish appropriate endorsements and transfer documents in connection with a transfer of Notes. The Company will not be required to transfer or exchange any Note selected for redemption or tendered (and not withdrawn) for repurchase in connection with a Change of Control Offer or an Asset Sale Offer. The registered holder of a Note will be treated as the owner of such Note for all purposes.

Initial settlement for the Notes will be made in same day funds. The Notes are expected to trade in the Same-Day Funds Settlement System of The Depository Trust Company (*"DTC"*) until maturity, and secondary market trading activity for the Notes will therefore settle in same day funds.

The Notes will be senior obligations of the Company, will have the benefit of the second priority security interest on the Collateral, will accrue interest at the rate of         % per annum and will be payable semiannually in arrears on each          and         , commencing on         , 2008, to the holders of record of Notes at the close of business on the          and         , respectively, immediately preceding such interest payment date. Interest on the Notes will accrue from the most recent date to which interest has been paid or, if no interest has been paid, from the Issue Date. Interest on the Notes will be computed on the basis of a 360-day year constituted of twelve 30-day months.

**Additional Interest**

Additional interest may accrue on the Notes in certain circumstances pursuant to the Registration Rights Agreement.

**Mandatory Redemption; Offers to Purchase; Open Market Purchases**

The Company will not be required to make any mandatory redemption or sinking fund payments with respect to the Notes. However, under certain circumstances, the Company may be required to offer to purchase the Notes as described under the caption "Change of Control" and "Disposition of Proceeds of Asset Sales". The Company may at any time and from time to time purchase Notes pursuant to an issuer tender offer, in the open market or otherwise.

**Optional Redemption**

The Notes will be redeemable at our option, in whole or in part, at any time on or after         , 2011 at the redemption prices (expressed as percentages of principal amount on the redemption date) set forth below, plus accrued and unpaid interest, if any, to the redemption date (subject to the right of holders of record on the relevant record date to receive interest due on the relevant interest payment date), if redeemed during the twelve-month period beginning         of the years indicated below:

| Year | Redemption Price |
|---|---|
| 2011 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | % |
| 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | % |
| 2013 and thereafter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 100.000% |

In addition, at any time, or from time to time, on or prior to         , 2010, we may, at our option, use the net cash proceeds of one or more Equity Offerings to redeem up to an aggregate of 35% of the principal amount of the Notes (which includes Additional Notes thereof, if any), at a redemption price equal to         % of the principal amount of the Notes, plus accrued and unpaid interest, if any, thereon to the redemption date; *provided, however*, that at least 50% of the aggregate principal amount of Notes (which includes Additional Notes thereof, if any) remains outstanding immediately after the

occurrence of such redemption. In order to effect the foregoing redemption with the proceeds of any Equity Offering, we shall send a redemption notice to the Trustee not later than 90 days after the consummation of any such Equity Offering. Notice of any redemption upon any Equity Offering may be given prior to the completion thereof, and any such redemption or notice may, at the Company's discretion, be subject to one or more conditions precedent, including completion of the related Equity Offering.

In addition, at any time or from time to time, on or prior to          , 2011, we will be entitled at our option to redeem all or a portion of the Notes at a redemption price equal to 100% of the principal amount of the Notes plus the Applicable Premium as of, and accrued and unpaid interest, if any, to, the redemption date (subject to the right of holders on the relevant record date to receive interest due on the relevant interest payment date). Notice of such redemption must be made in accordance with the procedures specified under the caption "Selection and Notice of Redemption".

**Selection and Notice of Redemption**

In the event that less than all of the Notes are to be redeemed at any time, selection of such Notes for redemption will be made by the Trustee in compliance with the requirements of the principal national securities exchange, if any, on which such Notes are listed or, if the Notes are not then listed on a national securities exchange, on a pro rata basis, to the extent practicable (subject to the rules of DTC and applicable legal requirements); *provided, however*, that Notes shall only be redeemable in principal amounts of $2,000 and any greater multiple of $1,000 thereof unless such Notes are being redeemed in whole. Notice of redemption shall be mailed by first-class mail to each holder of Notes to be redeemed at its registered address (or otherwise in accordance with the procedures of DTC), at least 30 but not more than 60 days before the redemption date, except that redemption notices may be mailed more than 60 days prior to a redemption date if the notice is issued in connection with a defeasance or a satisfaction and discharge of the Notes. If any Note is to be redeemed in part only, the notice of redemption that relates to such Note shall state the portion of the principal amount thereof to be redeemed. A new Note in a principal amount equal to the unredeemed portion thereof will be issued in the name of the holder thereof upon cancellation of the original Note. On and after the redemption date, interest will cease to accrue on Notes or portions thereof called for redemption, unless we default in the payment of the redemption price.

**Ranking**

*Senior Indebtedness versus Notes*

The Indebtedness evidenced by the Notes and the guarantees thereof will rank *pari passu* in right of payment with all existing and future Senior Indebtedness of the Company and the Guarantors, as the case may be, and will be senior in right of payment to all existing and future Subordinated Indebtedness of the Company and the Guarantors, and have the benefit of the second priority security interest in the Collateral as described under "—Security". Pursuant to the Security Documents and the Intercreditor Agreement, the security interests securing the Notes and the guarantees thereof are second in priority (subject to Permitted Liens, including exceptions described under the caption "—Security") to all security interests at any time granted to secure First Priority Lien Obligations and holders of obligations secured by Permitted Liens may have a prior secured claim to any collateral securing the debt owed to them. The lenders under the Credit Agreement and any other holders of First Priority Lien Obligations will have a first ranking security interest in substantially all of the assets of the Company and certain of its Subsidiaries.

As of September 30, 2007, on a *pro forma* basis after giving effect to the Transactions, the Senior Indebtedness of the Company and each Guarantor would have been approximately $5,564 million, including $1,543 million of first priority secured Indebtedness (consisting of Indebtedness under the

Credit Agreement) and $2,550 million of second priority secured Indebtedness (consisting of the Notes).

As adjusted to give effect to this offering and the use of proceeds thereof described under "Use of Proceeds" and the other transactions described under "Offering Circular Summary—The Transactions," virtually all of the Senior Indebtedness of the Guarantors will consist of their respective guarantees of Senior Indebtedness of the Company under the Credit Agreement, with respect to the Notes and with respect to the Unsecured Bridge Facility. Secured debt and other secured obligations of the Company (including obligations with respect to the Credit Agreement) will be effectively senior to the Notes to the extent such debt has (i) a higher priority lien on the Collateral securing the Notes or (ii) a lien on other property that does not constitute Collateral securing the Notes.

### Liabilities of Subsidiaries versus Notes

A substantial portion of our operations are conducted through our subsidiaries. Claims of creditors of such subsidiaries that are not Subsidiary Guarantors, including trade creditors and creditors holding Indebtedness or guarantees issued by such subsidiaries, and claims of preferred stockholders of such subsidiaries generally will have priority with respect to the assets and earnings of such subsidiaries over the claims of our creditors, including holders of the Notes. Accordingly, the Notes will be effectively subordinated to creditors (including trade creditors) and preferred stockholders, if any, of our subsidiaries that are not Subsidiary Guarantors.

As of September 30, 2007, on a *pro forma* basis after giving effect to the Transactions, the total Indebtedness and other liabilities of our subsidiaries that are not Subsidiary Guarantors would have been $192 million (excluding debt under the Canadian Sub-Facility), including trade payables, and on a pro forma basis Adjusted EBITDA for the LTM Period of our subsidiaries that are not Subsidiary Guarantors would have been $178 million. Although the Indenture will limit the Incurrence of Indebtedness, such limitation is subject to a number of significant qualifications. Moreover, the Indenture will not impose any limitation on the incurrence by such subsidiaries of liabilities that are not considered Indebtedness under the Indenture. See "—Certain Covenants—Limitation on Indebtedness."

## Security

The Notes and the guarantees thereof will be secured by second priority security interests (subject to Permitted Liens and the exceptions described below) in the Collateral. The Collateral will consist of substantially all of the property and assets, in each case, that are held by us or any of the Guarantors, to the extent that such assets secure the First Priority Lien Obligations from time to time and to the extent that a second priority security interest is able to be granted or perfected therein subject to the exceptions described below. The initial Collateral does not include (i) any property or assets owned by any Foreign Subsidiaries, (ii) any lease, license, contract, property right or agreement of ours or the guarantors, if and only for so long as the grant of a security interest under the security documents would result in a breach, termination or default under that lease, license, contract, property right or agreement, (iii) Capital Stock of any Foreign Subsidiaries, except for up to 65% of the Capital Stock of any "First Tier" Foreign Subsidiary, (iv) certain other property and assets described in the Security Documents and (v) proceeds and products from any and all of the foregoing excluded assets described in clauses (i) through (iv), unless such proceeds and products would otherwise constitute Collateral. As of September 30, 2007, we had rental equipment, property and equipment with a book value of $1,407 million and goodwill and other intangible assets with a book value of $3,333 million. In addition, we have current assets, consisting mainly of accounts receivable, some of which will secure the Notes. The book value of our assets may not be indicative of the fair market value of such assets, which could

be substantially lower. Accordingly, the value of the collateral securing the Notes could be less than the First Priority Lien Obligations, which will have a priority claim against such collateral.

The security interests securing the Notes will be second in priority to any and all security interests at any time granted to secure the First Priority Lien Obligations and may also be subject to other Permitted Liens. Non-U.S. assets of the Canadian borrower under the Credit Agreement will also constitute Collateral for the Secured Bank Indebtedness but will not be part of the Collateral for the Notes. The First Priority Lien Obligations include Secured Bank Indebtedness and related obligations, as well as certain Hedging Obligations and certain other obligations in respect of cash management services and could include additional Indebtedness incurred in the future. The person holding First Priority Lien Obligations will have rights and remedies with respect to the property subject to such Liens that, if exercised, could adversely affect the value of the Collateral or the ability of the Intercreditor Agent to realize or foreclose on the Collateral on behalf of holders of the Notes.

We and the Guarantors are and will be able to Incur additional Indebtedness in the future that could share in the Collateral, including additional First Priority Lien Obligations and Indebtedness secured by a Permitted Lien that may be prior to or *pari passu* with Liens securing the Notes. The amount of such First Priority Lien Obligations and additional Indebtedness secured by a Permitted Lien will be limited by the covenant disclosed under "—Certain Covenants—Limitation on Liens," and the amount of all such additional Indebtedness will be limited by the covenant described under "—Certain Covenants—Limitation on Indebtedness". Under certain circumstances, however, the amount of such First Priority Lien Obligations and additional Indebtedness could be significant.

*Limitations on Stock Collateral*

The Capital Stock and securities of a Subsidiary of the Company that are owned by the Company or any Guarantor constitute Collateral only to the extent that such Capital Stock and securities can secure the Notes or the guarantees thereof without Rule 3-10 or Rule 3-16 of Regulation S-X under the Securities Act (or any other law, rule or regulation) requiring separate financial statements of such Subsidiary to be filed with the SEC (or any other governmental agency). In the event that Rule 3-10 or Rule 3-16 of Regulation S-X under the Securities Act requires or is amended, modified or interpreted by the SEC to require (or is replaced with another rule or regulation, or any other law, rule or regulation is adopted, which would require) the filing with the SEC (or any other governmental agency) of separate financial statements of any Subsidiary due to the fact that such Subsidiary's Capital Stock and securities secure the Notes or the guarantees thereof, then the Capital Stock and securities of such Subsidiary shall automatically be deemed not to be part of the Collateral (but only to the extent necessary to not be subject to such requirement). In such event, the Security Documents may be amended or modified, without the consent of any holder of the Notes, to the extent necessary to release the second-priority security interests on the shares of Capital Stock and securities that are so deemed to no longer constitute part of the Collateral.

In the event that Rule 3-10 or Rule 3-16 of Regulation S-X under the Securities Act is amended, modified or interpreted by the SEC to permit (or is replaced with another rule or regulation, or any other law, rule or regulations adopted, which would permit) such Subsidiary's Capital Stock and securities to secure the Notes or the guarantees thereof in excess of the amount then pledged without the filing with the SEC (or any other governmental agency) of separate financial statements of such Subsidiary, then the Capital Stock and securities of such Subsidiary shall automatically be deemed to be a part of the Collateral (but only to the extent necessary to not be subject to any such financial statement requirement). In such event, the Security Documents may be amended or modified, without the consent of any holder of the Notes, to the extent necessary to subject such additional Capital Stock and securities to the Liens under the Security Documents.

In accordance with the limitations set forth in the two immediately preceding paragraphs, as of the Issue Date, the Collateral included shares of Capital Stock of the Subsidiaries only to the extent that the applicable value of such Capital Stock (on a Subsidiary-by-Subsidiary basis) was less than 20% of the aggregate principal amount of the Notes outstanding. Following the Issue Date, however, the portion of the Capital Stock of Subsidiaries constituting Collateral may decrease or increase as described above.

*After-Acquired Collateral*

From and after the Issue Date and subject to certain limitations and exceptions, if we or any Guarantor creates any additional security interest upon any property or asset to secure any First Priority Lien Obligation (which include Obligations in respect of the Credit Agreement), we or such Guarantor must use commercially reasonable efforts to concurrently grant a second priority security interest (subject to Permitted Liens, including the first priority Lien that secures obligations in respect of the First Priority Lien Obligation) upon such property as security for the Notes. Also, if granting a security interest in such property requires the consent of a third party, we will use commercially reasonable efforts to obtain such consent with respect to the second priority security interest for the benefit of the Trustee on behalf of the holders of the Notes. If such third party does not consent to the granting of the second priority security interest after the use of such commercially reasonable efforts, the applicable entity will not be required to provide such security interest. See "Risk Factors—Risks Relating to the Notes—Rights of holders of the notes in the collateral may be adversely affected by the failure to perfect security interests in certain collateral acquired in the future."

*Security Documents and Intercreditor Agreement*

We, the Guarantors and the Trustee, in its capacity as collateral agent (the *"Collateral Agent"*), will enter into one or more Security Documents defining the terms of the security interests that secure the Notes and the guarantees thereof. These security interests will secure the payment and performance when due of all of the Obligations of us and the Guarantors under the Notes, the guarantees thereof, the Indenture and the Security Documents, as provided in the Security Documents. We and the Guarantors will use commercially reasonable efforts to complete prior to or after the Issue Date all filings and other similar actions required in connection with the perfection of such security interests, subject to the terms and conditions of the Intercreditor Agreement.

On the Issue Date, the Collateral Agent and the Intercreditor Agent will enter into the Intercreditor Agreement, which may be amended from time to time without the consent of holders of the Notes to add other parties holding other second-lien Obligations and other First Priority Lien Obligations permitted to be Incurred by the Indenture. Pursuant to the terms of the Intercreditor Agreement, at any time at which First Priority Lien Obligations are outstanding (whether Incurred prior to, on or after the Issue Date), the Intercreditor Agent thereunder will determine the time and method by which the security interests in the Collateral will be enforced. The Trustee will not be permitted to enforce the security interest even if an Event of Default under the Indenture has occurred and the Notes have been accelerated except (a) in any insolvency or liquidation proceeding, as necessary to file a claim or statement of interest with respect to such Notes or (b) as necessary to take any action in order to create, prove, preserve, perfect or protect (but not enforce) its rights in the second priority Liens. See "Risk Factors—Risks Related to the Notes—Holders of the notes will not control decisions regarding collateral." After an Event of Default under the Indenture has occurred and the Notes have been accelerated and after all First Priority Lien Obligation shall have been discharged in full, the Trustee in accordance with the provisions of the Indenture and the Security Documents will distribute all cash proceeds (after payment of the costs of enforcement and collateral administration) of the Collateral received by it under the Security Documents for the ratable benefit of the holders of the Notes. The proceeds from the sale of the Collateral remaining after the satisfaction

of all First Priority Lien Obligations may not be sufficient to satisfy the obligations owed to the holders of the Notes. By its nature some or all of the Collateral will be illiquid and may have no readily ascertainable market value. Accordingly, the Collateral may not be able to be sold in a short period of time, if saleable. See "Risk Factors—Risk Factors Related to the Notes—There may not be sufficient collateral to satisfy our obligations under all or any of the notes."

In addition, the Security Documents and the Intercreditor Agreement will provide that, so long as there are First Priority Lien Obligations outstanding (whether Incurred prior to, on or after the Issue Date), (1) holders of First Priority Lien Obligations may direct the Intercreditor Agent to take actions with respect to the Collateral (including the release of Collateral and manner of realization) without the consent of the holders of the Notes, (2) we and the Guarantors may require the Trustee to agree to modify the Security Documents or the Intercreditor Agreement, without the consent of the Trustee and the holders of the Notes, to secure additional extensions of credit and add additional secured creditors so long as such modifications do not expressly violate the provisions of the Credit Agreement or the Indenture and (3) the holders of the First Priority Lien Obligations may change, waive, modify or vary the Security Documents without the consent of the holders of the Notes; *provided, however*, that any such change, waiver or modification does not materially adversely affect the rights of the holders of the Notes and not the other secured creditors in a like or similar manner. Any provider of additional extensions of credit shall be entitled to rely on the determination of an officer that such modifications do not expressly violate the provisions of the Credit Agreement or the Indenture if such determination is set forth in an officer's certificate delivered to such provider; *provided, however*, that such determination will not affect whether or not we have complied with our undertakings in the Indenture, the Security Documents or the Intercreditor Agreement. See "Risk Factors—Risks Related to the Notes—Holders of the notes will not control decisions regarding collateral."

In addition, if the Company or any Guarantor is subject to any insolvency or liquidation proceeding, the Trustee and the holders will agree that:

(1)  if the Intercreditor Agent shall desire to permit the use of cash collateral or to permit the Company or any Guarantor to obtain financing under Section 363 or Section 364 of Title 11 of the United States Code or any similar provision in any Bankruptcy Law (*"DIP Financing"*), then the Trustee and the holders agree not to object to such use of cash collateral or DIP Financing and will not request adequate protection or any other relief in connection therewith (except to the extent permitted by the Intercreditor Agreement) and, to the extent the Liens securing the First Priority Lien Obligations are subordinated or pari passu with such DIP Financing, will subordinate its Liens in the Collateral to such DIP Financing (and all Obligations relating thereto) on the same basis as they are subordinated to the First Priority Lien Obligations;

(2)  they will not object to (and will not otherwise contest) any motion for relief from the automatic stay or from any injunction against foreclosure or enforcement in respect of the First Priority Lien Obligations made by the Intercreditor Agent or any holder of the First Priority Lien Obligations;

(3)  they will not object to (and will not otherwise contest) any order relating to a sale of assets of the Company or any Guarantor for which the Intercreditor Agent has consented that provides, to the extent the sale is to be free and clear of Liens, that the Liens securing the First Priority Lien Obligations, the Notes will attach to the proceeds of the sale on the same basis of priority as the existing Liens in accordance with the Intercreditor Agreement;

(4)  until the First Priority Lien Obligations have been discharged, none of them will seek relief from the automatic stay or any other stay in any insolvency or liquidation proceeding in respect of the Collateral, without the prior written consent of the Intercreditor Agent unless holders of First Priority Lien Obligations have sought such relief;

(5)  none of them shall contest (or support any other Person contesting) (a) any request by the Intercreditor Agent or the holders of First Priority Lien Obligations for adequate protection or (b) any objection by the Intercreditor Agent or the holders of First Priority Lien Obligations to any motion, relief, action or proceeding based on the Intercreditor Agent's or the holders of First Priority Lien Obligations' claiming a lack of adequate protection. Notwithstanding the foregoing, in any insolvency or liquidation proceeding, (i) if holders of First Priority Lien Obligations (or any subset thereof) are granted adequate protection in the form of additional collateral in connection with any DIP Financing or use of cash collateral under Section 363 or Section 364 of Title 11 of the United States Bankruptcy Code or any similar law, then the Trustee may seek or request adequate protection in the form of a replacement Lien on such additional collateral, which Lien is subordinated to the Liens securing the First Priority Lien Obligations and such DIP Financing (and all Obligations relating thereto) on the same basis as the other Liens securing the Notes are so subordinated to the Liens securing First Priority Lien Obligations under the Intercreditor Agreement and (ii) in the event the Trustee seeks or requests adequate protection and such adequate protection is granted in the form of additional collateral, then the Trustee and the noteholders agree that the holders of the First Priority Lien Obligations shall also be granted a senior Lien on such additional collateral as security for the applicable First Priority Lien Obligations and any such DIP Financing and that any Lien on such additional collateral securing the Notes shall be subordinated to the Liens on such collateral securing the First Priority Lien Obligations and any such DIP Financing (and all Obligations relating thereto) and any other Liens granted to the holders of First Priority Lien Obligations as adequate protection on the same basis as the other Liens securing the Notes are so subordinated to such Liens securing First Priority Lien Obligations under the Intercreditor Agreement; and

(6)  until the discharge of First Priority Lien Obligations has occurred, the Trustee, on behalf of itself and each noteholder, will not assert or enforce a claim (if any) under Section 506(c) of the United States Bankruptcy Code senior to or on a parity with the Liens securing the First Priority Lien Obligations for costs or expenses of preserving or disposing of any collateral.

Subject to the terms of the Security Documents and the agreements governing or granting the First Priority Lien Obligations, we and the Guarantors will have the right to remain in possession and retain exclusive control of the Collateral securing the Notes (other than any cash, securities, obligations and Cash Equivalents constituting part of the Collateral and deposited with the Intercreditor Agent in accordance with the provisions of the Security Documents and other than as set forth in the Security Documents), to freely operate the Collateral and to collect, invest and dispose of any income therefrom. See "Risk Factors—Risks Related to the Notes—Rights of holders of notes in the collateral may be adversely affected by bankruptcy proceedings."

*Release of Collateral*

We and the Guarantors will be entitled to the release of property and other assets included in the Collateral from the Liens securing the Notes under any one or more of the following circumstances:

(1)  if all other Liens on such property or assets securing First Priority Lien Obligations (including all commitments and letters of credit thereunder) are released; *provided, however*, that if we or any Guarantor subsequently Incurs First Priority Lien Obligations that are secured by liens on such property or assets and the related Liens are Incurred in reliance on clause (b) of the definition of Permitted Liens, then we and our Restricted Subsidiaries will be required to reinstitute the security arrangements with respect to such property or assets in favor of the Notes, which, in the case of any such subsequent First Priority Lien Obligations, will be second priority Liens on such property or assets securing such First Priority Lien Obligations to the same extent provided by the Security Documents and on the terms and conditions of the security documents relating to such First Priority Lien Obligations, with the second priority lien held either by the administrative agent, collateral agent or

112

other representative for such First Priority Lien Obligations or by a collateral agent or other representative designated by us to hold the second priority Liens for the benefit of the holders of the Notes and subject to an intercreditor agreement that provides the administrative agent or collateral agent substantially the same rights and powers as afforded under the Intercreditor Agreement;

(2)  to enable us to consummate the disposition of such property or assets to the extent not prohibited under the covenant described under "—Certain Covenants—Disposition of Proceeds of Asset Sales";

(3)  in the case of a Guarantor that is released from its guarantee with respect to the Notes, the release of the property and assets of such Guarantor; or

(4)  as described under "—Amendments and Waivers" below.

If an Event of Default under the Indenture exists on the date on which the First Priority Lien Obligations are repaid in full and terminated (including all commitments and letters of credit thereunder), the second priority Liens on the Collateral securing the Notes will not be released, except to the extent the Collateral or any portion thereof was disposed of in order to repay the First Priority Lien Obligations secured by the Collateral, and thereafter the Trustee (or another designated representative acting at the direction of the holders of a majority of the outstanding principal amount of the second priority Indebtedness, including the Notes, under the Intercreditor Agreement) will have the right to direct the Intercreditor Agent to foreclose upon the Collateral (but in such event, the Liens on the Collateral securing the Notes will be released when such Event of Default and all other Events of Default under the Indenture cease to exist).

The security interests in all Collateral securing the Notes also will be released upon (i) payment in full of the principal of, together with accrued and unpaid interest on, the Notes, the guarantees thereof and all other Obligations under the Indenture and the Security Documents that are due and payable at or prior to the time such principal, together with accrued and unpaid interest, are paid (including pursuant to a satisfaction and discharge of the Indenture as described below under "—Satisfaction and Discharge") or (ii) a legal defeasance or covenant defeasance under the Indenture as described below under "—Defeasance."

## Guarantees

Holdings and the Subsidiary Guarantors will guarantee, on a senior basis, jointly and severally, to each holder and the Trustee, the full and prompt performance of the Company's obligations under the Indenture and the Notes, including the payment of principal of and interest on the Notes (all such obligations guaranteed by such Guarantors being herein called the *"Guaranteed Obligations"*). Subject to limited exceptions, the Subsidiary Guarantors are the current and future Subsidiaries of the Company that are not Foreign Subsidiaries, Special Purpose Vehicles or Unrestricted Subsidiaries. The Guaranteed Obligations of each Guarantor of the Notes will be secured by second priority security interests (subject to Permitted Liens) in the Collateral owned by such Guarantor. Such Guarantors will agree to pay, in addition to the amount stated above, any and all expenses (including reasonable counsel fees and expenses) Incurred by the Trustee or the holders in enforcing any rights under the guarantees of the Notes.

The obligations of each Subsidiary Guarantor are limited to the maximum amount which, after giving effect to all other contingent and fixed liabilities of such Subsidiary Guarantor and after giving effect to any collections from or payments made by or on behalf of any other Subsidiary Guarantor in respect of the obligations of such other Subsidiary Guarantor under its guarantee or pursuant to its contribution obligations under the Indenture, will result in the obligations of such Subsidiary Guarantor under the guarantee not constituting a fraudulent conveyance or fraudulent transfer under federal or

state law. See "Risk Factors—Federal and state fraudulent transfer laws may permit a court to void the notes and the guarantees, subordinate claims in respect of the notes and the guarantees and require noteholders to return payments received and, if that occurs, you may not receive any payments on the notes."

Each Subsidiary Guarantor that makes a payment under its guarantee will be entitled to a contribution from each other Subsidiary Guarantor in an amount equal to such other Subsidiary Guarantor's pro rata portion of such payment based on the respective net assets of all the Subsidiary Guarantors at the time of such payment determined in accordance with GAAP, *provided, however*, that during a Default, such right of contribution shall be suspended until such Default is cured or waived or, if earlier, payment in full of all guaranteed obligations under the Indenture.

Subject to the Intercreditor Agreement, the guarantee of a Subsidiary Guarantor with respect to the Notes will be automatically released:

(1)  upon the sale or other disposition (including by way of consolidation or merger) of such Subsidiary Guarantor other than to the Company or a Restricted Subsidiary and as permitted by the Indenture;

(2)  upon the sale or disposition of all or substantially all the assets of such Subsidiary Guarantor other than to the Company or a Restricted Subsidiary and as permitted by the Indenture;

(3)  upon defeasance or covenant defeasance;

(4)  in the case of any Restricted Subsidiary that is required to guarantee the Notes pursuant to the covenant described under "—Additional Subsidiary Guarantees," if such Restricted Subsidiary ceases to have outstanding any guarantee of Indebtedness of the Company or any Restricted Subsidiary that would have required such Restricted Subsidiary to be a Subsidiary Guarantor; or

(5)  if the Company properly designates any Restricted Subsidiary that is a Subsidiary Guarantor as an Unrestricted Subsidiary.

The guarantee of a Subsidiary Guarantor also will be automatically released upon the applicable Subsidiary ceasing to be a Subsidiary as a result of any foreclosure of any pledge or security interest securing First Priority Lien Obligations, subject to, in each case, the application of the proceeds of such foreclosure in the manner described under "—Security."

**Exchange Offer; Registration Rights**

We have agreed pursuant to the Registration Rights Agreement that we will, subject to certain exceptions, use our commercially reasonable efforts:

(1)  within 180 days after the issue date for the Notes, to file a registration statement (the *"Exchange Offer Registration Statement"*) with the SEC with respect to a registered offer (the *"Exchange Offer"*) to exchange the Notes for new notes of the Company (the *"Exchange Notes"*) having terms substantially identical in all material respects to the Notes (except that the Exchange Notes will not contain terms with respect to transfer restrictions);

(2)  to cause the Exchange Offer Registration Statement to be declared effective under the Securities Act within 270 days after the Issue Date;

114

(3)  unless the Exchange Offer would not be permitted by applicable law or SEC policy:

(a)  to commence the Exchange Offer; and

(b)  as soon as practicable after the effectiveness of the Exchange Offer Registration Statement (the *"Effectiveness Date"*), to offer the Exchange Notes and the related guarantees in exchange for surrender of the Notes and the related guarantees; and

(4)  to keep the Exchange Offer open for not less than 20 Business Days (or longer if required by applicable law) after the date notice of the Exchange Offer is mailed to the holders of the Notes.

For each Note validly and properly tendered to us and not withdrawn pursuant to the Exchange Offer, we will issue to the holder of such Note an Exchange Note having a principal amount equal to that of the surrendered Note. Interest on each Exchange Note will accrue from the last interest payment date on which interest was paid on the Note surrendered in exchange therefor or if no interest has been paid on such Note, from the date of its original issue.

Under existing SEC interpretations, the Exchange Notes and the related guarantees will be freely transferable by holders other than our affiliates after the Exchange Offer without further registration under the Securities Act if the holder of the Exchange Notes represents to us in the Exchange Offer that:

(1)  it is acquiring the Exchange Notes in the ordinary course of its business,

(2)  that it has no arrangement or understanding with any person to participate in the distribution (within the meaning of the Securities Act) of the Exchange Notes; and

(3)  it is not an affiliate of the Company, as such terms are interpreted by the SEC;

*provided, however*, that broker-dealers (*"Participating Broker-Dealers"*) receiving Exchange Notes in the Exchange Offer will have a prospectus delivery requirement with respect to resales of such Exchange Notes. The SEC has taken the position that Participating Broker-Dealers may fulfill their prospectus delivery requirements with respect to Exchange Notes (other than a resale of an unsold allotment from the original sale of the Notes) with the prospectus contained in the Exchange Offer Registration Statement.

Under the Registration Rights Agreement, the Company is required to allow Participating Broker-Dealers and other persons, if any, with similar prospectus delivery requirements to use the prospectus contained in the Exchange Offer Registration Statement in connection with the resale of such Exchange Notes for a period commencing on the day the Exchange Offer is consummated and continuing for 90 days (or such shorter period during which Participating Broker-Dealers are required by law to deliver such prospectus); *provided, however*, that if for any day during such period the Company restricts the use of such prospectus, such period shall be extended on a day-for-day basis (such period, the *"Participating Broker-Dealer Prospectus Period"*).

A holder of Notes (other than certain specified holders) who wishes to exchange such Notes for Exchange Notes in the Exchange Offer will be required to represent (i) that any Exchange Notes to be received by it will be acquired in the ordinary course of its business and that at the time of the commencement of the Exchange Offer it has no arrangement or understanding with any person to participate in the distribution (within the meaning of the Securities Act) of the Exchange Notes and that (x) it is not an "affiliate" of the Company, as defined in Rule 405 of the Securities Act, or (y) if it is an affiliate, that it will comply with the registration and prospectus delivery requirements of the Securities Act to the extent applicable, (ii) if such holder is not a broker-dealer, that it is not engaged in, and does not intend to engage in, the distribution of applicable Exchange Notes, and (iii) if such

holder is a broker-dealer (a "participating broker-dealer") which will receive Exchange Notes for its own account in exchange for notes that were acquired as a result of market-making or other trading activities, that it will deliver a prospectus in connection with any resale of such Exchange Notes.

In the event that:

(1)  applicable interpretations of the staff of the SEC or applicable law do not permit us to effect the Exchange Offer; or

(2)  for any other reason we do not consummate the Exchange Offer within 310 days of the Issue date; or

(3)  an Initial Purchaser shall notify us prior to the 20th Business Day following consummation of the Exchange Offer that the Notes held by it are not eligible to be exchanged in the Exchange Offer or it may not resell the Exchange Notes acquired by it in the Exchange Offer to the public without delivering a prospectus and the prospectus contained in the Exchange Offer Registration Statement is not appropriate or available for such resales; or it is a broker-dealer and owns notes acquired directly from the Company or an Affiliate of the Company;

then, we will, subject to certain exceptions use our commercially reasonable efforts,

(1)  to file a shelf registration statement (the *"Shelf Registration Statement"*) covering resales of the Notes or the Exchange Notes, as the case may be, on or prior to the 90th day after such filing obligation arises; *provided, however*, if the obligation to file the Shelf Registration Statement arises because the Exchange Offer has not been consummated within 310 days after the Issue Date, then we will use our reasonable best efforts to file the Shelf Registration Statement on or prior to the 60th day after such filing obligation arises;

(2)  to cause the Shelf Registration Statement to be declared effective under the Securities Act on or prior to the 180th calendar day after such filing obligation arises; and

(3)  to keep the Shelf Registration Statement effective until the earliest of:

(A)  the time when the Notes covered by the Shelf Registration Statement can be sold pursuant to Rule 144 without any limitations under clauses (c), (e), (f) and (h) of Rule 144;

(B)  two years from the effective date of the Shelf Registration Statement; and

(C)  the date on which all Notes registered thereunder are disposed of in accordance therewith.

We will, in the event that a Shelf Registration Statement is filed, among other things, provide to each holder for whom such Shelf Registration Statement was filed copies of the prospectus which is a part of the Shelf Registration Statement, notify each holder when the Shelf Registration Statement has become effective and take certain other actions as are required to permit unrestricted resales of the Notes, as the case may be. A holder selling such Notes or Exchange Notes pursuant to the Shelf Registration Statement generally would be required to be named as a selling security holder in the related prospectus and to deliver a prospectus to purchasers, will be subject to certain of the civil liability provisions under the Securities Act in connection with such sales and will be bound by the provisions of the Registration Rights Agreement that are applicable to such holder (including certain indemnification obligations).

If any of the following events occur (each such event a "Registration Default"), we will pay additional cash interest on the Notes or Exchange Notes, subject to certain exceptions, from and including the date on which any such Registration Default shall occur to but excluding the date on which all Registration Defaults have been cured:

(1)  the Company has not filed any of the registration statements required by the Registration Rights Agreement on or prior to the date specified for such filing;

(2)  any of such registration statements is not declared effective by the SEC on or prior to the date specified for such effectiveness;

(3)  the Company has not consummated the Exchange Offer within 30 Business Days of the Effectiveness Date with respect to the Exchange Offer Registration Statement;

(4)  the Shelf Registration Statement is declared effective but thereafter, during the period for which the Company is required to maintain the effectiveness of such registration statement, it ceases to be effective or usable in connection with the resale of the Notes or the Exchange Notes, as the case may be, covered by such registration statement for a period of 60 days, whether or not consecutive; or

(5)  the Exchange Offer Registration Statement is declared effective but thereafter, during the Participating Broker-Dealer Prospectus Period, it ceases to be effective (or the Company restricts the use of the prospectus included therein) for a period of 60 days, whether or not consecutive.

Notwithstanding the foregoing, any Registration Default specified in clause (1), (2) or (3) of the preceding sentence that relates to the Exchange Offer Registration Statement or the Exchange Offer shall be deemed cured at such time as the Shelf Registration Statement is declared effective by the SEC.

If a Registration Default exists, the interest rate on the Specified Notes (as defined below) will increase by 0.25% per annum, with respect to the first 90-day period (or portion thereof) while a Registration Default is continuing immediately following the occurrence of such Registration Default. Such interest rate will increase by an additional 0.25% per annum at the beginning of each subsequent 90-day period (or portion thereof) while a Registration Default is continuing until all Registration Defaults have been cured, up to a maximum rate of additional interest of 1.00% per annum. Following the cure of all Registration Defaults, the accrual of additional interest on the Specified Notes will terminate and the interest rate will revert to the original rate. The Indenture provides that additional interest as aforesaid will constitute liquidated damages and will be the exclusive monetary remedy available to holders of the Notes in respect of any Registration Default.

"*Specified Notes*" means the Notes (not including the Exchange Notes); *provided, however*, that, if the Registration Default relates solely to a Shelf Registration Statement, then (i) if such Shelf Registration Statement is required to cover both Notes and Exchange Notes, "Specified Notes" shall mean both the Notes and Exchange Notes and (ii) if such Shelf Registration Statement is required to cover only Exchange Notes, "Specified Notes" shall mean only the Exchange Notes; *provided further, however*, that, if the Registration Default relates to an Exchange Offer Registration Statement that is unavailable for use during the Participating Broker-Dealer Prospectus Period, "Specified Notes" shall mean the Exchange Notes.

All references in the Indenture, in any context, to any interest or other amount payable on or with respect to the Notes shall be deemed to include any additional interest pursuant to the Registration Rights Agreement.

If we effect the Exchange Offer, we will be entitled to close the Exchange Offer 20 Business Days after the commencement thereof; *provided, however*, that we have accepted all Notes theretofore validly tendered in accordance with the terms of the Exchange Offer.

Holders of notes will be required to make certain representations to the Company (as described in the Registration Rights Agreement) in order to participate in the Exchange Offer and will be required to deliver certain information to be used in connection with the Shelf Registration Statement and to provide comments on the Shelf Registration Statement within the time periods set forth in the registration rights agreement in order to have their notes included in the Shelf Registration Statement and benefit from the provisions regarding additional interest set forth above. By acquiring the Notes, a holder will be deemed to have agreed to indemnify the Company and any Guarantors against certain losses arising out of information furnished by such holder in writing for inclusion in any Shelf Registration Statement. Holders of Notes will also be required to suspend their use of the prospectus included in the Shelf Registration Statement under certain circumstances upon receipt of written notice to that effect from the Company.

**Change of Control**

Upon the occurrence of a Change of Control, we shall be obligated to make an offer to purchase (a *"Change of Control Offer"*), on a Business Day (the *"Change of Control Purchase Date"*) not more than 60 nor less than 30 days following the occurrence of the Change of Control, all of the then outstanding Notes tendered at a purchase price in cash (the *"Change of Control Purchase Price"*) equal to 101% of the principal amount thereof plus accrued and unpaid interest, if any, thereon to the Change of Control Purchase Date except to the extent the Company has exercised its right to redeem such Notes as described under "Optional Redemption." We shall be required to purchase all Notes validly and properly tendered pursuant to the Change of Control Offer and not withdrawn. The Change of Control Offer is required to remain open for at least 20 Business Days.

In order to effect such Change of Control Offer, we shall except to the extent the Company has exercised its right to redeem such Notes as described under "Optional Redemption," not later than the 30th day after the Change of Control, mail to each holder of Notes notice of the Change of Control Offer (or otherwise in accordance with the procedures of DTC), which notice shall govern the terms of the Change of Control Offer and shall state, among other things, the procedures that holders of Notes must follow to accept the Change of Control Offer.

If a Change of Control Offer is made, there can be no assurance that we will have available funds sufficient to pay the Change of Control Purchase Price for all of the Notes that might be delivered by holders of Notes seeking to accept the Change of Control Offer. In addition, there can be no assurance that our debt instruments will permit such offer to be made. The Credit Agreement prohibits us from purchasing, or imposes restrictions on our ability to purchase, Notes pursuant to a Change of Control Offer and, in order to make such offer, at a time when we are prohibited from purchasing Notes, we would be required to repay all principal (including letter of credit disbursements), interest and fees and provide for the expiration or termination of all letters of credit and commitments under, or Refinance, the Credit Agreement or seek a waiver from the lenders thereunder to allow us to make the Change of Control Offer. The occurrence of a Change of Control is also an event of default under the Credit Agreement and would entitle the lenders to accelerate all amounts owing thereunder. Failure to make a Change of Control Offer with respect to the Notes, even if prohibited by our debt instruments, also would constitute a default under the Indenture. We shall not be required to make a Change of Control Offer upon a Change of Control if (1) a third party makes the Change of Control Offer in the manner, at the times and otherwise in compliance with the requirements applicable to a Change of Control Offer made by the Company and purchases all Notes validly and properly tendered and not withdrawn under such Change of Control Offer, (2) notice of redemption has been given (or is concurrently given) pursuant to the Indenture as described above under the caption "—Optional Redemption," unless and until there is a default in payment of the applicable redemption price, or (3) in connection with or in contemplation of any Change of Control, we have or a third party has made an offer to purchase (an *"Alternate Offer"*) any and all Notes validly and properly tendered at a cash price equal to or higher

than the Change of Control Purchase Price and we have or such third party has purchased all Notes validly and properly tendered and not withdrawn in accordance with the terms of such Alternate Offer.

The Change of Control purchase feature of the Notes may in certain circumstances make more difficult or discourage a sale or takeover of our company and, thus, the removal of incumbent management. The Change of Control purchase feature is a result of negotiations between us and the Initial Purchasers. After the Issue Date, we have no present intention to engage in a transaction involving a Change of Control, although it is possible that we could decide to do so in the future. Subject to the limitations discussed below, we could, in the future, enter into certain transactions, including acquisitions, Refinancings or other recapitalizations, that would not constitute a Change of Control under the Indenture, but that could increase the amount of indebtedness outstanding at such time or otherwise affect our capital structure or credit ratings. The Indenture will contain restrictions on our ability to Incur additional Indebtedness, as described under "—Certain Covenants—Limitation on Indebtedness," "—Limitation on Sale/Leaseback Transactions" and "—Certain Covenants— Limitation on Liens." Such restrictions can only be waived with the consent of the holders of a majority in principal amount of the Notes. Except for the limitations contained in such covenants, however, the Indenture will not contain any covenants or provisions that may afford holders of the Notes protection in the event of a highly leveraged transaction. The definition of "Change of Control" excludes certain transactions by Permitted Holders, including a direct or indirect sale, lease, exchange or other transfer of all or substantially all of the assets of the Company to Permitted Holders.

The use of the term "all or substantially all" in provisions of the Indenture, such as clause (b) of the definition of "Change of Control" and under "—Consolidation, Merger, Sale of Assets, etc.", has no clearly established meaning under New York law (which governs the Indenture) and has been the subject of limited judicial interpretation in only a few jurisdictions. Accordingly, there may be a degree of uncertainty in ascertaining whether any particular transaction would involve a disposition of "all or substantially all" of the assets of a person, which uncertainty should be considered by prospective purchasers of Notes.

Notes repurchased by the Company pursuant to a Change of Control Offer will have the status of Notes issued but not outstanding or will be retired and canceled at the option of the Company. Notes purchased by a third party pursuant to the preceding paragraph will have the status of Notes issued and outstanding.

The Company will comply with Rule 14e-1 under the Exchange Act and any other securities laws and regulations thereunder, to the extent such laws or regulations are applicable, in the event that a Change of Control occurs and the Company is required to purchase Notes as described above. To the extent that the provisions of any securities laws or regulations conflict with the Change of Control provisions of the Indenture, the Company will comply with the applicable securities laws and regulations and will not be deemed to have breached its obligations under the Change of Control provisions of the Indenture by virtue of such compliance.

Notwithstanding anything to the contrary herein, a Change of Control Offer may be made in advance of a Change of Control, conditional upon such Change of Control, if a definitive agreement is in place for the Change of Control at the time of making of the Change of Control Offer.

Future indebtedness that we may Incur may contain prohibitions on the occurrence of certain events that would constitute a Change of Control or require the repurchase of such indebtedness upon a Change of Control. Moreover, the exercise by the holders of their right to require us to repurchase the Notes could cause a default under such indebtedness, even if the Change of Control itself does not, due to the financial effect of such repurchase on us. In addition, we may not have the financial resources to make a Change of Control Offer. See "Risk Factors—If we experience a change of control, we will be required to make an offer to repurchase the Notes."

The provisions under each Indenture relative to the Company's obligation to make a Change of Control Offer may be waived or modified with the consent of the holders of at least a majority in principal amount of the then outstanding Notes issued under such Indenture.

**Certain Covenants**

The Indenture will contain the following covenants, among others, relating to the Notes:

*Limitation on Indebtedness.*    (a) The Company will not, and will not permit any Restricted Subsidiary to, directly or indirectly, Incur any Indebtedness (including any Acquired Indebtedness) other than Permitted Indebtedness; *provided, however*, that (i) the Company and any Subsidiary Guarantors will be permitted to Incur Indebtedness (including Acquired Indebtedness) and (ii) a Restricted Subsidiary will be permitted to Incur Acquired Indebtedness if in each case the Consolidated Fixed Charge Coverage Ratio of the Company is at least 2:1, after giving *pro forma* effect to the Incurrence of such Indebtedness and (if applicable) the application of the net proceeds therefrom, including to Refinance other Indebtedness, as if such Indebtedness were Incurred at the beginning of the four full fiscal quarters immediately preceding such Incurrence, taken as one period (any Indebtedness Incurred pursuant to this proviso being herein called "Coverage Indebtedness").

(b)  For purposes of determining compliance with this covenant:

(1)  any Indebtedness outstanding on the Issue Date under the Credit Agreement will be treated as Incurred on the Issue Date under clause (b) of the definition of "Permitted Indebtedness";

(2)  in the event that an item of Indebtedness (or any portion thereof) meets the criteria of more than one of the types of Indebtedness permitted to be Incurred, the Company, in its sole discretion, will classify such item of Indebtedness (or any portion thereof) at the time of Incurrence, and later, from time to time, may reclassify all or a portion of such item of Indebtedness, in any manner that complies with this covenant and will only be required to include the amount and type of such Indebtedness in one of the permitted categories; *provided*, *however*, that (x) all Indebtedness outstanding under the Credit Agreement on the Issue Date will be treated as Incurred on the Issue Date under clause (b) of the definition of "Permitted Indebtedness" and (y) the Company shall not be permitted to reclassify any Indebtedness Incurred under clause (b) of the definition of "Permitted Indebtedness" as Coverage Indebtedness;

(3)  the Company will be entitled to divide and classify an item of Indebtedness in more than one of the types of Indebtedness permitted to be Incurred, and in connection therewith shall be entitled to treat a portion of such Indebtedness as Coverage Indebtedness and the remainder of such Indebtedness as any one of the categories of Permitted Indebtedness, and later, from time to time, to redivide and reclassify all or a portion of such item of Indebtedness, in any manner that complies with this covenant; *provided*, *however*, that (x) all Indebtedness outstanding under the Credit Agreement on the Issue Date will be treated as Incurred on the Issue Date under clause (b) of the definition of "Permitted Indebtedness" and (y) the Company shall not be permitted to reclassify any Indebtedness Incurred under clause (b) of the definition of "Permitted Indebtedness" as Coverage Indebtedness;

(4)  the Indenture will not treat (1) unsecured Indebtedness as subordinated or junior to secured Indebtedness merely because it is unsecured or (2) Indebtedness as subordinated or junior to any other Indebtedness merely because it has junior priority with respect to security in the same collateral;

(5)  accrual of interest, the accretion of accreted value, the payment of interest in the form of additional Indebtedness with the same terms, the payment of dividends on Redeemable Capital Stock in the form of additional shares of Redeemable Capital Stock of the same class, accretion of original issue discount or liquidation preference and increases in the amount of Indebtedness

outstanding solely as a result of fluctuations in the exchange rate of currencies will not be deemed to be an Incurrence of Indebtedness for purposes of this covenant;

(6)  guarantees of, or obligations in respect of letters of credit relating to, Indebtedness which is otherwise included in the determination of a particular amount of Indebtedness shall not be included in the determination of such amount of Indebtedness; provided that the Incurrence of the Indebtedness represented by such guarantee or letter of credit, as the case may be, was in compliance with this covenant;

(7)  the amount of any Indebtedness outstanding as of any date will be:

(A)  the accreted value of the Indebtedness, in the case of any Indebtedness issued with original issue discount;

(B)  the principal amount of the Indebtedness, in the case of any other Indebtedness;

(C)  in respect of Indebtedness of another Person secured by a Lien on the assets of the specified Person, the lesser of (i) the Fair Market Value of such assets at the date of determination; and (ii) the amount of the Indebtedness subject to such Lien of the other Person; and

(D)  in respect of any Hedging Obligations, the amount payable as a result of the termination of such Hedging Obligations at the time of determination.

(c)  Notwithstanding the foregoing paragraph (a) but as otherwise expressly provided herein, neither the Company nor any Subsidiary Guarantor will Incur any Indebtedness pursuant to the foregoing paragraph (a) if the proceeds thereof are used, directly or indirectly, to Refinance any Subordinated Obligations of the Company or any Subsidiary Guarantor unless such Indebtedness shall be subordinated to the Notes or the applicable Subsidiary guarantee to at least the same extent as such Subordinated Obligations.

(d)  For purposes of determining compliance with any U.S. dollar-denominated restriction on the Incurrence of Indebtedness, the U.S. dollar-equivalent principal amount of Indebtedness denominated in a foreign currency shall be calculated based on the relevant currency exchange rate in effect on the date such Indebtedness was Incurred, in the case of term debt, or first committed or first Incurred (whichever yields the lower U.S. dollar equivalent), in the case of revolving credit debt; provided that if such Indebtedness is Incurred to refinance other Indebtedness denominated in a foreign currency, and such refinancing would cause the applicable U.S. dollar-denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such refinancing, such U.S. dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such Refinancing Indebtedness does not exceed the principal amount of such Indebtedness being Refinanced plus all accrued interest on such Indebtedness and all fees and expenses, including any premium (including any tender premium) and defeasance costs and other amounts necessary to accomplish such Refinancing.

*Limitation on Restricted Payments.*    The Company will not, and will not permit any Restricted Subsidiary to, directly or indirectly:

(a)  declare or pay any dividend or make any other distribution or payment on Capital Stock of the Company or any Restricted Subsidiary or make any payment to the direct or indirect holders (in their capacities as such) of Capital Stock of the Company or any Restricted Subsidiary (other than (i) dividends or distributions payable solely in Capital Stock of the Company or any direct or indirect parent of the Company (other than Redeemable Capital Stock) or in options, warrants or other rights to purchase Capital Stock of the Company or any direct or indirect parent of the Company (other than Redeemable Capital Stock) or (ii) the declaration or payment of dividends or other distributions to the extent declared or paid to the Company or any Restricted Subsidiary);

121

(b)  purchase, redeem, defease or otherwise acquire or retire for value any Capital Stock of the Company or any direct or indirect parent of the Company or any options, warrants, or other rights to purchase any such Capital Stock, including in connection with any merger or consolidation (other than any such securities owned by the Company or a Restricted Subsidiary);

(c)  make any principal payment on, or purchase, defease, repurchase, redeem or otherwise acquire or retire for value, prior to any scheduled maturity, scheduled repayment, scheduled sinking fund payment or other Stated Maturity, any Subordinated Indebtedness (other than (i) any such Subordinated Indebtedness owned by the Company or a Restricted Subsidiary) or (ii) the payment, purchase, defeasance, repurchase, redemption or other acquisition of any such Indebtedness for value in anticipation of satisfying a sinking fund obligation, principal installment or final maturity, in each case, due within one year of the date of such payment, purchase, defeasance, repurchase, redemption or other acquisition; or

(d)  make any Investment (other than any Permitted Investment) in any person,

(such payments or Investments described in the preceding clauses (a), (b), (c) and (d) are collectively referred to as "Restricted Payments"), unless, after giving effect to the proposed Restricted Payment (the amount of any such Restricted Payment, if other than cash, shall be the Fair Market Value of the assets proposed to be transferred by the Company or such Restricted Subsidiary, as the case may be, pursuant to such Restricted Payment):

(A)  no Default shall have occurred and be continuing;

(B)  immediately after giving effect to such Restricted Payment, the Company would be able to Incur $1.00 of additional Indebtedness (other than Permitted Indebtedness); and

(C)  the aggregate amount of all Restricted Payments declared or made from and after the Issue Date (including Restricted Payments permitted by clauses (i), (iv), (vi), (vii) and (x) of the next succeeding paragraph but excluding all other Restricted Payments permitted by the next succeeding paragraph) would not exceed the sum of:

(1)  50% of the aggregate Consolidated Net Income of the Company accrued on a cumulative basis during the period (treated as one accounting period) beginning on the first day of the Company's fiscal quarter commencing after the Issue Date and ending on the last day of the fiscal quarter of the Company for which internal financial statements are available immediately preceding the date of such proposed Restricted Payment (or, if such aggregate cumulative Consolidated Net Income of the Company for such period shall be a deficit, minus 100% of such deficit);

(2)  the aggregate amount of Qualified Proceeds received by the Company as capital contributions to the Company after the Issue Date;

(3)  the aggregate amount of Qualified Proceeds received by the Company from the issuance or sale of Capital Stock (excluding Disqualified Stock) of the Company after the Issue Date;

(4)  the aggregate amount of Qualified Proceeds received by the Company from any person (other than a Disqualified Person) upon the exercise of any options, warrants or rights to purchase shares of Capital Stock (other than Disqualified Stock) of the Company after the Issue Date;

(5)  the aggregate amount of Qualified Proceeds received after the Issue Date by the Company or any Restricted Subsidiary from any person (other than a Disqualified Person), for any Indebtedness or Redeemable Capital Stock of the Company or any Restricted Subsidiary that has been converted or exchanged into or for Capital Stock of the Company (other than Disqualified Stock) or any direct or indirect parent of the Company (to the extent such

122

Indebtedness or Redeemable Capital Stock was originally sold by the Company or such Restricted Subsidiary for cash) plus the aggregate amount of Qualified Proceeds received by the Company or such Restricted Subsidiary (other than from a Disqualified Person) in connection with such conversion or exchange;

(6)  in the case of the disposition, repayment, repurchase, redemption or release of any Investment constituting a Restricted Payment after the Issue Date (including the sale of the Capital Stock of an Unrestricted Subsidiary and the repayment of loans or advances which constituted a Restricted Payment), an amount equal to the Qualified Proceeds so received, less the cost of the disposition, repayment, repurchase, redemption or release of such Investment; and

(7)  so long as the Designation thereof was treated as a Restricted Payment made after the Issue Date, with respect to any Unrestricted Subsidiary that has been redesignated as a Restricted Subsidiary in accordance with "—Limitation on Designations of Unrestricted Subsidiaries" below or has been merged, consolidated or amalgamated with or into, or transfers or conveys its assets to, or is liquidated into, the Company or any Restricted Subsidiary, the Fair Market Value of the Company's interest in such Subsidiary.

For purposes of the preceding clause (C)(4), the value of the Qualified Proceeds received by the Company upon the issuance of Capital Stock upon the exercise of options, warrants or rights will be the amount of Qualified Proceeds received upon the issuance of such options, warrants or rights plus the incremental amount received by the Company upon the exercise thereof.

None of the foregoing provisions will prohibit, so long, in the case of clauses (iv), (vi), (vii), (xiii), (xv), (xxi) and (xxii) below, as there is no Default continuing:

(i)   the payment of any dividend or distribution or the consummation of any irrevocable redemption within 60 days after the date of the declaration of the dividend (or other distribution) or the giving of the redemption notice, as the case may be, if at the date of declaration or notice, such payment would have complied with the provisions of the Indenture;

(ii)  the making of a Restricted Payment in exchange for, or out of the Qualified Proceeds of, a substantially concurrent issue and sale of Capital Stock of the Company (other than Disqualified Stock) or any direct or indirect parent of the Company or from the substantially concurrent contribution of equity capital to the Company; *provided, however*, that such Qualified Proceeds are excluded from clause (C) of the first paragraph of this covenant;

(iii) any redemption, purchase, repurchase, defeasance or other acquisition or retirement of Subordinated Indebtedness by exchange for, or out of the Qualified Proceeds of, a substantially concurrent issue and sale of:

(1)   Capital Stock of the Company (other than Disqualified Stock) or any direct or indirect parent of the Company or from the substantially concurrent contribution of equity capital to the Company; *provided, however,* that any such net cash proceeds are excluded from clause (C) of the first paragraph of this covenant;

(2)   Refinancing Indebtedness; or

(3)   other Indebtedness which is incurred in compliance with the covenant described below under "—Incurrence of Indebtedness" so long as such new Indebtedness is subordinated in right of payment to the Notes on terms that, taken as a whole, are not materially less favorable to the holders of the Notes than those contained in the documentation governing the Indebtedness being redeemed, purchased, repurchased, defeased or acquired or retired;

(iv)  Restricted Payments to pay for the repurchase, redemption or other acquisition or retirement for value of any Capital Stock of the Company, any of its Restricted Subsidiaries, or any of its direct or indirect parent companies, in each case, held by any current or former officer, director, consultant or employee of the Company, any of its Restricted Subsidiaries, or any of its direct or indirect parent companies, and, in each case to the extent applicable, their respective estates, spouses, former spouses or family members or other permitted transferees, in each case, pursuant to any equity subscription agreement, stock option agreement, stockholders' agreement or other agreement, benefit plan or arrangement of any kind, including any Capital Stock rolled over by or issued to management in connection with the Transactions; *provided, however,* that the aggregate Restricted Payments under this clause (v) may not exceed the sum of (A) $20.0 million, plus (B) an amount equal to $5.0 million times the number of calendar years that have commenced since the Issue Date; plus (C) an amount equal to the proceeds from the sale of Capital Stock (other than Disqualified Stock) of the Company (or any direct or indirect parent of the Company to the extent contributed to the Company) to current or former employees, officers, directors or consultants (or any permitted transferees thereof) of the Company and its Restricted Subsidiaries (or any direct or indirect parent company thereof), that occurs after the Issue Date plus (D) an amount equal to the cash proceeds of key man life insurance policies received by the Company and its Restricted Subsidiaries after the Issue Date, less any amounts previously applied to the payment of Restricted Payments pursuant to this clause (v); *provided further, however,* that cancellation of Indebtedness owing to the Company or any of its Restricted Subsidiaries (or any direct or indirect parent company thereof) from current or former employees, officers, directors and consultants (or any permitted transferees thereof) of the Company or any of its Restricted Subsidiaries (or any direct or indirect parent company thereof), in connection with a repurchase of Capital Stock of the Company or any of its Restricted Subsidiaries (or any direct or indirect parent company thereof) from such Persons will not be deemed to constitute a Restricted Payment for purposes of this covenant or any other provisions of the Indenture;

(v)  payments to Holdings in an amount sufficient to permit it to make scheduled payments of interest on the Convertible Debentures that remain outstanding after giving effect to the Transactions;

(vi)  upon the occurrence of a Change of Control and within 60 days after the completion of the offer to repurchase the Notes pursuant to the covenant described under "—Change of Control" above (including the purchase of the Notes tendered), any purchase or redemption of Subordinated Indebtedness or any Capital Stock of the Company or any Restricted Subsidiaries (or any direct or indirect parent company thereof) required pursuant to the terms thereof as a result of such Change of Control at a purchase or redemption price not to exceed 101% of the outstanding principal amount or liquidation amount thereof, plus accrued and unpaid interest or dividends (if any);

(vii)  upon the occurrence of an Asset Sale and within 60 days after the completion of an Asset Sale Offer to repurchase the Notes pursuant to the covenants described under "—Certain Covenants—Disposition of Proceeds of Asset Sales" below (including the purchase of the Notes tendered), as the case may be, any purchase or redemption of Subordinated Indebtedness or any Capital Stock of the Company or any Restricted Subsidiaries (or any direct or indirect parent company thereof) required pursuant to the terms thereof as a result of such Asset Sale at a purchase or redemption price not to exceed 100% of the outstanding principal amount or liquidation amount thereof, plus accrued and unpaid interest or dividends (if any);

(viii)  payments or loans to any direct or indirect parent of the Company in an amount sufficient to enable such direct or indirect parent to pay:

(1)  its legal, accounting, payroll, benefits, incentive compensation, insurance and corporate operating and overhead expenses (including SEC, stock exchange and transfer

agency fees and expenses, franchise and excise taxes and other fees, taxes and expenses required to maintain their corporate existence), and expenses of United Rentals Trust I payable by Holdings pursuant to the terms of the trust agreement governing such trust;

(2)  trade, lease, payroll, benefits, incentive compensation and other obligations in respect of goods to be delivered to, services (including management and consulting services) performed for and properties used by, the Company and the Restricted Subsidiaries or that are otherwise attributable to the ownership or operation of the Company and its Restricted Subsidiaries;

(3)  the purchase price for Investments in other persons; *provided, however*, that promptly following such Investment either:

(x)  such other person either becomes a Restricted Subsidiary or is merged or consolidated with, or transfers or conveys all or substantially all of its assets to, the Company or a Restricted Subsidiary; or

(y)  such Investment would otherwise be permitted under the Indenture if made by the Company and such Investment is contributed or transferred by such direct or indirect parent to the Company or a Restricted Subsidiary;

(4)  reasonable and customary incidental expenses as determined in good faith by the Board of Directors of such direct or indirect parent; and

(5)  all or a portion of the merger consideration and related transaction costs, fees and expenses in connection with the consummation of the URI Merger; and

; *provided, however*, that any payments for the purposes described in clause (1), (2) or (4) will be treated as an appropriate expense of the Company;

(ix)  for so long as the Company is a member of a group filing a consolidated or combined tax return with its direct or indirect parent, payments to such person in respect of an allocable portion of the tax liabilities of such group that is attributable to the Company and the Restricted Subsidiaries and, to the extent of the amount actually received from its Unrestricted Subsidiaries, in amounts required to pay such taxes to the extent attributable to the income of such Unrestricted Subsidiaries (*"Tax Payments"*); *provided, however*, that (1) the aggregate Tax Payments made since the Issue Date shall not exceed the aggregate amount since the Issue Date of the relevant tax (including any penalties and interest) that the Company would owe if the Company were filing a separate tax return (or a separate consolidated or combined return with the Restricted Subsidiaries and its Unrestricted Subsidiaries to the extent described above that are members of the Company's consolidated or combined group), taking into account any carryovers and carrybacks of tax attributes (such as net operating losses) of the Company and such Restricted Subsidiaries from other taxable years and (2) such Tax Payments will be treated as an appropriate expense of the Company; *provided, further, however*, that any Tax Payments received from the Company shall be paid over to the appropriate taxing authority within 30 days after Holdings' receipt of such Tax Payments or refunded to the Company;

(x)  cash payments in lieu of the issuance of fractional shares in connection with the exercise of any warrants, options or other securities convertible into or exchangeable for Capital Stock of the Company, any Restricted Subsidiary or any direct or indirect parent thereof;

(xi)  the deemed repurchase of Capital Stock on the exercise of stock options, warrants or other convertible securities to the extent such Capital Stock represents a portion of the exercise price of those options, warrants or other convertible securities;

(xii)  the payment of any dividend or distribution by a Restricted Subsidiary to the holders of its Capital Stock on a pro rata basis;

(xiii)  the declaration and payment of dividends and distributions to holders of any Redeemable Capital Stock of the Company Incurred in accordance with the covenant described under the caption "—Limitation on Incurrence of Indebtedness" to the extent such dividends are included in the definition of Fixed Charges;

(xiv)  Restricted Payments that are made with Excluded Contributions;

(xv)  the distribution, by dividend or otherwise, of shares of Capital Stock of, or Indebtedness owed to the Company or a Restricted Subsidiary by, Unrestricted Subsidiaries (other than Unrestricted Subsidiaries the primary assets of which are cash, Cash Equivalents and Investment Grade Securities);

(xvi)  the payment of the tender offer consideration and consent fee in connection with the tender offers for the 7¾% Senior Subordinated Notes due 2013 and 7% Senior Subordinated Notes due 2014 of URNA validly tendered and not validly withdrawn and accepted for payment in connection with the tender offers and consent solicitations for such notes as part of the Transactions and any repayment or purchase of any such Senior Subordinated Notes that remain outstanding after the consummation of the Transactions;

(xvii)  the making of any payments to repay or repurchase any Convertible Notes that remain outstanding after the consummation of the Transactions and the merger consideration as set forth in the Acquisition Agreement payable in respect of each share of Holdings common stock issued upon the conversion of the Convertible Notes;

(xviii)  the making of any payments to Holdings to repay or redeem any or all outstanding Convertible Debentures in connection with the optional redemption by Holdings of Convertible Debentures pursuant to Section 11.8 of the indenture governing the Convertible Debentures in an amount not to exceed the sum of (x) the principal amount of the Convertible Debentures Refinanced, (y) to the extent such Refinancing is consummated on or prior to July 31, 2008, a premium equal to 0.65% of the principal amount of the Convertible Debentures Refinanced, and (z) accrued and unpaid interest on the Convertible Debentures Refinanced to the date of the closing of such Refinancing, plus reasonable fees, costs and expenses incurred or otherwise payable by Holdings or the Company relating to such Refinancing;

(xix)  the making of any payments to Holdings, or by Holdings or United Rentals Trust I, upon conversion of the Convertible Debentures to the persons having the right to receive Common Stock issued in connection with such conversion (or the merger consideration payable to holders of Common Stock in connection with the URI Merger in exchange for, or in lieu of the issuance of, such shares), in accordance with the terms and conditions of the indenture governing the Convertible Debentures as in effect on the Issue Date;

(xx)  any Restricted Payment made in connection with the Transactions including fees paid to Sponsors or other Affiliates of the Company and any payment to reimburse the Sponsors or their Affiliates for actual out-of-pocket expenses in connection with the Transactions or for the provision of services to the Company and its Subsidiaries;

(xxi)  the declaration and payment of dividends on the Company's common stock (or the payment of dividends to any direct of indirect parent entity to fund a payment of dividends on such entity's common stock), following consummation of the first public offering of the Company's common stock or the common stock of any of its direct or indirect parent companies after the Issue Date, of up to 6% per annum of the net cast proceeds received by or contributed to the Company in or from any such public offering, other than public offerings with respect to the Company's common stock registered on Form S-4 or Form S-8 and other than any public sale constituting an Excluded Contribution; and

(xxii) other Restricted Payments in an aggregate amount not to exceed $100.0 million at any time outstanding.

*Limitation on Sale/Leaseback Transactions.*    The Company will not, and will not permit any Restricted Subsidiary to, enter into any Sale/Leaseback Transaction with respect to any property unless:

(1)  the Company or such Restricted Subsidiary would be entitled to:

(A)  Incur Indebtedness in an amount equal to the Attributable Debt with respect to such Sale/Leaseback Transaction pursuant to the covenant described under "—Limitation on Indebtedness"; and

(B)  create a Lien on such property securing such Attributable Debt without equally and ratably securing the applicable Notes pursuant to the covenant described under "—Certain Covenants—Limitation on Liens";

(2)  the net proceeds received by the Company or any Restricted Subsidiary in connection with such Sale/Leaseback Transaction are at least equal to the fair value (as determined by the Board of Directors) of such property; and

(3)  the Company applies the proceeds of such transaction in compliance with the covenants described under "—Certain Covenants—Disposition of Proceeds of Asset Sales".

*Limitation on Transactions with Affiliates.*    The Company will not, and will not permit any of its Restricted Subsidiaries to, directly or indirectly, enter into any transaction or Indenture of related transactions (including the sale, transfer, disposition, purchase, exchange or lease of assets, property or services) with, or for the benefit of, any of its Affiliates (other than Restricted Subsidiaries), except:

(a)  on terms that are not materially less favorable to the Company or such Restricted Subsidiary, as the case may be, than those which could have been obtained in a comparable transaction at such time from persons who are not Affiliates of the Company; and

(b)  with respect to a transaction or Indenture of related transactions involving aggregate consideration greater than $20.0 million (other than transactions with Affiliates in connection with joint bidding, joint marketing or other similar arrangements for the provision of services in the ordinary course of services in the Permitted Business), such transaction or transactions shall have been approved by a majority of the members of the Board of Directors of the Company (and, if any, a majority of the Disinterested Members of the Board of Directors of the Company with respect to such transaction).

Notwithstanding the foregoing, the restrictions set forth in this covenant shall not apply to:

(i)    transactions with or among the Company and the Restricted Subsidiaries;

(ii)   customary directors' fees, indemnification and similar arrangements, consulting fees and consulting agreements, employee salaries, bonuses or employment agreements, severance agreements, expense reimbursement arrangements, compensation or employee benefit arrangements, stock option or ownership and incentive arrangements with any future, current or former officer, director, employee or consultant of the Company, any Restricted Subsidiary or any direct or indirect parent of the Company described in the Offering Circular or otherwise entered into in the ordinary course of business;

(iii)  any Restricted Payment permitted to be made in compliance with "—Limitation on Restricted Payments" above;

(iv)  loans, guarantees of loans, advances and other extensions of credit (or cancellations of Indebtedness in respect thereof) to or on behalf of future, current and former officers, directors, employees and consultants of the Company or any Restricted Subsidiary or a direct or indirect parent of the Company made (A) in the ordinary course of business, (B) for the purpose of

127

permitting such persons to purchase Capital Stock of the Company or any direct or indirect parent of the Company or (C) in connection with any travel, entertainment, moving and other relocation expenses;

(v)   any agreement, arrangement or commitment as in effect on the Issue Date and any renewals, amendments, extensions or replacements of any such agreement (so long as such renewals or extensions are not, taken as a whole, materially less favorable to the Company or the Restricted Subsidiaries as determined by the Board of Directors in its reasonable good faith judgment) and the transactions evidenced thereby;

(vi)  (a) transactions with customers, clients, suppliers, joint venture partners, joint ventures (other than to the extent covered by clause (b) below), including their members or partners, or purchasers or sellers of goods or services (including Unrestricted Subsidiaries), in each case in the ordinary course of business, including pursuant to joint venture agreements, and otherwise in compliance with the terms of the Indenture which are, in the aggregate (taking into account all the costs and benefits associated with such transactions), fair to the Company or the applicable Restricted Subsidiary or materially no less favorable to the Company or the applicable Restricted Subsidiary than those that would have been obtained in a comparable transaction by the Company or that Restricted Subsidiary with an unrelated person or entity, in the good faith determination of the Company's board of directors or its senior management, or are on terms at least as favorable as might reasonably have been obtained at such time from an unaffiliated party; (b) transactions with a joint venture engaged in a Permitted Business; *provided* that all the outstanding ownership interests of such joint venture are owned only by the Company, its Restricted Subsidiaries and persons that are not Affiliates of the Company, and (c) transactions with a Person (other than an Unrestricted Subsidiary of the Company) that is an Affiliate of the Company solely because the Company owns, directly or through a Restricted Subsidiary, Capital Stock in, or controls, such Person;

(vii) any issuance of Capital Stock or other securities of the Company or any Restricted Subsidiary to Affiliates of the Company and the granting or performance of registration rights in respect of any such Capital Stock;

(viii) payments by the Company or any Restricted Subsidiary to any Sponsor for (a) any financial advisory, financing, underwriting or placement services, or in respect of any investment banking activities, including in connection with acquisitions and divestitures, which payments are (x) described in the Offering Circular or (y) approved by the majority of the Board of Directors of the Company in good faith, and (b) reimbursement of out-of-pocket expenses incurred on behalf of the Company or any of its Restricted Subsidiaries by the Sponsors from time to time;

(ix) the execution of the Transactions, and the payment of all fees and expenses related thereto, in each case, as contemplated by the Offering Circular, including payment of fees and reimbursement of expenses to the Sponsor;

(x)   purchases of Notes and other Indebtedness if purchased on the same terms as offered to Persons that are not Affiliates of the Company;

(xi)  transactions in which the Company or any of its Restricted Subsidiaries, as the case may be, delivers to the Trustee a letter from an Independent Financial Advisor stating that meets the requirement of clause (a) of the preceding paragraph;

(xii) transactions between the Company or any of its Restricted Subsidiaries and any Person, a director of which is also a director of the Company or any direct or indirect parent of the Company; *provided, however*, that such director abstains from voting as a director of the Company or such direct or indirect parent, as the case may be, on any matter involving such other Person; and

(xiii)  pledges of Equity Interests of Unrestricted Subsidiaries.

*Limitation on Dividends and other Payment Restrictions Affecting Restricted Subsidiaries.*   The Company will not, and will not permit any Restricted Subsidiary to, directly or indirectly, create or otherwise cause or suffer to exist or become effective any consensual encumbrance or restriction on the ability of any Restricted Subsidiary to:

(a)  pay dividends, in cash or otherwise, or make any other distributions to the Company or any of its Restricted Subsidiaries on its Capital Stock or any other interest or participation in, or measured by, its profits;

(b)  pay any Indebtedness owed to the Company or any other Restricted Subsidiary;

(c)  make loans or advances to the Company or any other Restricted Subsidiary; or

(d)  transfer any of its properties or assets to the Company or any other Restricted Subsidiary;

except for such encumbrances or restrictions existing under or by reason of:

(i)  applicable law or any applicable rule, regulation or order;

(ii)  customary non-assignment provisions of (and other customary transfer restrictions contained in) any contract, lease, license or other agreement;

(iii)  customary restrictions on transfers of property subject to a Lien permitted under the Indenture;

(iv)  any agreement or other instrument of a person acquired by (or assets of which are acquired by) the Company or any Restricted Subsidiary in existence at the time of such acquisition or at the time it merges with or into the Company or any of its Restricted Subsidiaries or assumed in connection with the acquisition of assets from such Person (but not created in contemplation thereof), which encumbrance or restriction is not applicable to any person, or the properties or assets of any person, other than the person, or the property or assets, so acquired (and assets and property affixed or appurtenant thereto, additions, improvements and accessions thereto, proceeds thereof, and property related thereto);

(v)  an agreement entered into for the sale or disposition of Capital Stock or assets of a Restricted Subsidiary or an agreement entered into for the sale of specified assets (in either case, so long as such encumbrance or restriction, by its terms, terminates on the earlier of the termination of such agreement or the consummation of such agreement);

(vi)  any agreement in effect on the Issue Date, including pursuant to the Credit Agreement and the other documents executed in connection therewith;

(vii) the Indenture, the Notes and the guarantees thereunder (and any Exchange Notes and guarantees thereof), the Security Documents and the Intercreditor Agreement;

(viii) joint venture agreements, limited liability company operating agreements, partnership agreements, asset sale agreements, sale-leaseback agreements, options, stock sale agreements, lease agreements, licenses and other similar agreements that prohibit actions of the type described in clauses (a), (c) and (d);

(ix)  any agreement entered into with respect to a Special Purpose Vehicle in connection with a Securitization Transaction, containing Standard Securitization Undertakings or other customary restrictions required by the institutional sponsor or arranger of such Securitization Transaction in similar types of documents, or otherwise deemed necessary by the Company in good faith;

(x)  restrictions relating to Foreign Subsidiaries contained in Indebtedness Incurred pursuant to clause (k) of the definition of "Permitted Indebtedness" and any other Indebtedness (including Redeemable Capital Stock) permitted to be incurred or issued, as applicable, subsequent to the Issue Date pursuant to the provisions of the covenant described under "—Limitation on Incurrence of Indebtedness"; provided that any encumbrance or restriction contained in such Indebtedness does not, in the good faith judgment of the Board of Directors of the Company, adversely affect the ability of the Company and the Guarantors, taken as a whole, from making scheduled payments of cash interest on the Notes when due;

(xi)  restrictions on cash or other deposits or net worth imposed by customers, suppliers or landlords under contracts entered into in the ordinary course of business;

(xii)  provisions in agreements or instruments that prohibit the payment of dividends or the making of other distributions with respect to any Capital Stock of a Person on other than a pro rata basis;

(xiii) encumbrances or restrictions arising or agreed to in the ordinary course of business, not relating to any Indebtedness, and that do not, individually or in the aggregate, detract from the value of property or assets of the Company or any of its Restricted Subsidiaries in any manner material to the Company or any of its Restricted Subsidiaries; and

(xiv) any agreement that amends, modifies, restates, increases, supplements, refunds, extends, Refinances, renews or replaces any agreement described in the foregoing clauses, *provided, however*, that the terms and conditions of any such agreement are not materially more restrictive, taken as a whole, with respect to such dividend and payment restrictions than those under or pursuant to the agreement amended, extended, Refinanced, renewed or replaced, as determined in the good faith judgment of the Board of Directors of the Company.

For purposes of determining compliance with this covenant, (i) the priority of any Redeemable Capital Stock in receiving dividends or liquidating distributions prior to dividends or liquidating distributions being paid on common stock shall not be deemed a restriction on the ability to make distributions on Capital Stock and (ii) the subordination of loans or advances made to the Company or a Restricted Subsidiary of the Company to other Indebtedness Incurred by the Company or any such Restricted Subsidiary shall not be deemed a restriction on the ability to make loans or advances.

*Limitation on Designations of Unrestricted Subsidiaries.*   The Company may designate any Restricted Subsidiary as an "Unrestricted Subsidiary" under the Indenture (a "*Designation*") only if:

(i)   no Default shall have occurred and be continuing at the time of or after giving effect to such Designation; and

(ii)  the Company would be permitted to make an Investment (including a Permitted Investment described in clause (xiii) of the definition of "Permitted Investment") at the time of Designation in an amount (the *"Designation Amount"*) equal to the Fair Market Value of the Company's interest in such Subsidiary on such date calculated in accordance with GAAP.

In the event of any such Designation, the Company shall be deemed to have made an Investment constituting a Restricted Payment pursuant to the covenant "—Limitation on Restricted Payments", or a Permitted Investment described in clause (xiii) of the definition of "Permitted Investment", as the case may be, for all purposes of the Indenture in the Designation Amount.

The Company shall not, and shall not cause or permit any Restricted Subsidiary to, at any time:

(x)  provide credit support for or subject any of its property or assets (other than the Capital Stock of any Unrestricted Subsidiary) to the satisfaction of, any Indebtedness of any Unrestricted Subsidiary (including any undertaking, agreement or instrument evidencing such Indebtedness);

(y)  be directly or indirectly liable for any Indebtedness of any Unrestricted Subsidiary; or

130

Exhibit B-6

(z) be directly or indirectly liable for any Indebtedness which provides that the holder thereof may (upon notice, lapse of time or both) declare a default thereon or cause the payment thereof to be accelerated or payable prior to its final scheduled maturity upon the occurrence of a default with respect to any Indebtedness of any Unrestricted Subsidiary (including any right to take enforcement action against such Unrestricted Subsidiary), except any non-recourse guarantee given solely to support the pledge by the Company or any Restricted Subsidiary of the Capital Stock of an Unrestricted Subsidiary.

All Subsidiaries of Unrestricted Subsidiaries shall automatically be deemed to be Unrestricted Subsidiaries.

The Company may revoke any Designation of a Subsidiary as an Unrestricted Subsidiary (a "*Revocation*") if:

(i) no Default shall have occurred and be continuing at the time of and after giving effect to such Revocation; and

(ii) all Liens and Indebtedness of such Unrestricted Subsidiary outstanding immediately following such Revocation would, if Incurred at such time, have been permitted to be Incurred for all purposes of the Indenture.

All Designations and Revocations must be evidenced by Board Resolutions of the Company delivered to the Trustee certifying compliance with the foregoing provisions.

*Additional Subsidiary Guarantees.*   The Company will not permit any of its Wholly Owned Subsidiaries that are Restricted Subsidiaries (and non-Wholly Owned Subsidiaries if such non-Wholly Owned Subsidiaries guarantee (x) other capital markets debt securities of the Company or any Subsidiary Guarantor or (y) any Indebtedness Incurred under clause (b) of the definition of "Permitted Indebtedness"), other than a Subsidiary Guarantor, a Foreign Subsidiary or a Special Purpose Vehicle, to guarantee the payment of any Indebtedness of the Company or any other Subsidiary Guarantor (the "initial guarantee") unless:

(1) such Restricted Subsidiary within 30 days executes and delivers a supplemental indenture to the Indenture providing for a guarantee of the Notes by such Restricted Subsidiary on the same terms as the initial guarantees by the Subsidiary Guarantors;

(2) if such Indebtedness is by its express terms subordinated in right of payment to the Notes, such initial guarantee by such Restricted Subsidiary with respect to such Indebtedness shall be subordinated in right of payment to the guarantee of the Notes substantially to the same extent as such Indebtedness is subordinated to the Notes; and

(3) so long as the notes remain outstanding, such Restricted Subsidiary waives, and will not in any manner whatsoever claim or take the benefit or advantage of, any rights of reimbursement, indemnity or subrogation or any other rights against the Company or any other Restricted Subsidiary as a result of any payment by such Restricted Subsidiary under its initial guarantee.

Notwithstanding the foregoing, this covenant shall not be applicable to (i) any guarantee of any Restricted Subsidiary that existed at the time such Person became a Restricted Subsidiary and was not Incurred in connection with, or in contemplation of, such Person becoming a Restricted Subsidiary and (ii) any guarantee of any Special Purpose Vehicle.

*Reporting Requirements.*   For so long as the Notes are outstanding, whether or not the Company is subject to Section 13(a) or 15(d) of the Exchange Act, or any successor provision thereto, the Company shall file with the SEC (if permitted by SEC practice and applicable law and regulations) substantially the same annual reports, quarterly reports and current reports which the Company would have been required to file with the SEC pursuant to such Section 13(a) or 15(d) or any successor provision thereto if the Company were so subject, such documents to be filed with the SEC on or prior to the respective dates by which the Company would have been required so to file such documents if the Company were so subject (together with extensions granted by the SEC) for a filer that is a

131

"non-accelerated filer" plus five Business Days (the "*Required Filing Dates*"); *provided*, *however*, that the Required Filing Dates for the Company's 2007 Annual Report on Form 10-K and First Quarter Periodic Report on Form 10-Q will be May 19, 2008 and May 31, 2008, respectively. If, notwithstanding the preceding sentence, filing such documents by the Company with the SEC is not permitted by SEC practice or applicable law or regulations, the Company shall transmit (or cause to be transmitted) by mail to all holders of Notes, as their names and addresses appear in the note register, or shall post on its website, copies of such documents (without exhibits), within 15 days after the Required Filing Date. In addition, for so long as any Notes remain outstanding, if at any time the Company is not required to file the above reports with the SEC, the Company will furnish to the holders of Notes and to securities analysts and prospective investors, upon their request, the information required to be delivered pursuant to Rule 144A(d)(4) under the Securities Act, and, to any beneficial holder of Notes, if not obtainable from the SEC, information of the type that would be filed with the SEC pursuant to the foregoing provisions upon the request of any such holder.

Notwithstanding the foregoing, the Company will be deemed to have furnished such reports referred to above to the Trustee and the holders if the Company has filed such reports with the SEC via the EDGAR filing system and such reports are publicly available. In addition, such requirements shall be deemed satisfied prior to the commencement of the Exchange Offer contemplated by the Registration Rights Agreement relating to the Notes or the effectiveness of the Shelf Registration Statement to the extent the information required to be included in such reports is included (1) in the Exchange Offer Registration Statement or Shelf Registration Statement or (2) on its website in each case, subject to exceptions consistent with the presentation of financial information in the Offering Circular.

In the event that (1) the rules and regulations of the SEC permit the Company and any direct or indirect parent entity of the Company to report at such entity's level on a consolidated basis, and (2) such direct or indirect parent entity is not engaged in any business in any material respect other than incidental to its ownership, direct or indirect, of the Capital Stock of the Company, the information and reports required by this covenant may be those of such parent entity on a consolidated basis; provided that such information and reports distinguish in all material respects between the Company and its Subsidiaries and such direct or indirect parent entity and its other subsidiaries, if any.

At any time that any of the Company's Subsidiaries are Unrestricted Subsidiaries, then any "Management's Discussion and Analysis of Financial Condition and Results of Operations" or other comparable section shall provide, to the extent permitted by the rules and regulations of the SEC, an analysis and discussion of the material differences with respect to the financial condition and results of operations of the Company and its Restricted Subsidiaries as compared to the Company and its Subsidiaries (including such Unrestricted Subsidiaries).

*Disposition of Proceeds of Asset Sales.*   The Company will not, and will not permit any Restricted Subsidiary to, make any Asset Sale unless:

(a)  the Company or such Restricted Subsidiary, as the case may be, receives consideration (including by way of relief from, or by any other person assuming responsibility for, any liabilities, contingent or otherwise) at the time of such Asset Sale at least equal to the Fair Market Value of the assets sold or otherwise disposed of; and

(b)  at least 75% of such consideration consists of cash or Cash Equivalents or Replacement Assets or a combination thereof; *provided*, *however*, that for purposes of this clause (b) only the amount of (i) any liabilities (as shown on the most recent balance sheet of the Company or such Restricted Subsidiary or in the footnotes thereto) of the Company or such Restricted Subsidiary that are assumed by the transferee of such assets; (ii) any securities, notes or other obligations or assets received by the Company or such Restricted Subsidiary from such transferee that are converted (including by way of a financing transaction) within 120 days into cash or Cash Equivalents (to the extent of the cash or Cash Equivalents received); and (iii) any Designated Non-cash Consideration received by the Company or any Restricted Subsidiary thereof in such

Asset Sale having a Fair Market Value, taken together with all other Designated Non-cash Consideration received pursuant to this clause (iii) that is at that time outstanding, not to exceed the greater of $100.0 million and 2% of Tangible Assets at the time of receipt of such Designated Non-cash Consideration, with the Fair Market Value of each item of Designated Non-cash Consideration being measured at the time received without giving effect to subsequent changes in value, shall be deemed to be cash for the purposes of this provision; *provided further*, *however*, that the 75% limitation referred to in clause (b) will not apply to any Asset Sale in which the cash or Cash Equivalent portion of the consideration received therefrom, determined in accordance with the foregoing provision, is equal to or greater than what the after-tax proceeds would have been had such Asset Sale complied with the aforementioned 75% limitation.

To the extent that the Net Cash Proceeds of any Asset Sale are not required to be applied to repay, and permanently reduce the commitments under, Applicable Indebtedness of the Company or any Restricted Subsidiary (in each case other than Indebtedness owed to the Company or a Subsidiary of the Company), or are not so applied, the Company or such Restricted Subsidiary, as the case may be, may apply the Net Cash Proceeds from such Asset Sale, within 450 days of such Asset Sale (i) to an investment in Replacement Assets; or (ii) to make a Change of Control Offer to the extent a Change of Control has occurred as a result of such Asset Sale. In the case of clause (i) above, a binding commitment to purchase Replacement Assets shall be treated as a permitted application of the Net Cash Proceeds from the date of such commitment; *provided*, *however* that (x) such purchase is consummated within 545 days after receipt by the Company or any Restricted Subsidiary of the Net Cash Proceeds of any Asset Sale and (y) if such purchase is not consummated within the period set forth in subclause (x), the Net Cash Proceeds not so applied will be deemed to be Excess Proceeds (as defined below).

Pending the final application of any Net Cash Proceeds, the Company or such Restricted Subsidiary may temporarily reduce revolving credit borrowings or otherwise invest the Net Cash Proceeds in any manner that is not prohibited by the Indenture.

If the assets that were the subject of an Asset Sale constituted Collateral, then any Replacement Assets acquired by the Company or any Restricted Subsidiary shall be pledged at the time of their acquisition to the agent under the Intercreditor Agreement as Collateral for the benefit of the holders of the Notes, subject to Permitted Liens and other permitted exceptions and the terms of the Intercreditor Agreement. Any Net Cash Proceeds from any Asset Sale that are not applied as provided above within the timeframes provided above shall constitute "Excess Proceeds" subject to disposition as provided below.

When the aggregate amount of Excess Proceeds exceeds $35.0 million, the Company shall make an offer to purchase (an "*Asset Sale Offer*"), from all holders of the Notes, an aggregate principal amount of the Notes equal to such Excess Proceeds, at a price in cash equal to 100% of the outstanding principal amount thereof plus accrued and unpaid interest, if any, to the purchase date (the "*Asset Sale Offer Price*"). To the extent that the aggregate principal amount of the Notes validly and properly tendered and not withdrawn pursuant to an Asset Sale Offer is less than the Excess Proceeds, the Company may use such deficiency for any purpose not prohibited by the Indenture. The Notes shall be purchased by the Company, at the option of the holder thereof, in principal amounts of $2,000 and any greater multiple of $1,000 thereof, on a date that is not earlier than 30 days and not later than 60 days from the date the notice is given to holders, or such later date as may be necessary for the Company to comply with the requirements under the Exchange Act. If the aggregate principal amount of Notes validly tendered and not withdrawn by holders thereof exceeds the Excess Proceeds, Notes to be purchased will be selected on a pro rata basis.

Notwithstanding the foregoing, if the Company is required to commence an Asset Sale Offer at any time when Applicable Senior Indebtedness is outstanding and the terms of such Applicable Senior Indebtedness provide that a similar offer must be made with respect to such Applicable Senior Indebtedness, then the Asset Sale Offer for the Notes shall be made concurrently with such other

offers and Applicable Senior Indebtedness of each issue will be accepted on a pro rata basis in proportion to the aggregate principal amount of Applicable Senior Indebtedness which the holders thereof elect to have purchased. Any Asset Sale Offer will be made only to the extent permitted under, and subject to prior compliance with, the terms of agreements governing Applicable Senior Indebtedness. Upon completion of such Asset Sale Offer, the amount of Excess Proceeds shall be reduced by the aggregate amount of such Asset Sale Offer.

The Company may satisfy the foregoing obligations with respect to any Net Proceeds from an Asset Sale by making an Asset Sale Offer with respect to such Net Proceeds prior to the expiration of the relevant 450 or 545 day period or with respect to Excess Proceeds of $35.0 million or less.

The provisions under the Indenture relative to the Company's obligation to make an offer to repurchase the Notes as a result of an Asset Sale may be waived or modified with the written consent of the holders of a majority in principal amount of the Notes.

The Company will comply with Rule 14e-1 under the Exchange Act and any other securities laws and regulations thereunder, to the extent such laws and regulations are applicable, in the event that an Asset Sale occurs and the Company is required to make an Asset Sale Offer and purchase Notes as described above. To the extent that the provisions of any securities laws or regulations conflict with the Asset Sale provisions of the Indenture, the Company will comply with the applicable securities laws and regulations and will not be deemed to have breached its obligations under the Asset Sale provisions of the Indenture by virtue of such compliance.

*Limitation on Liens.* The Company will not, and will not permit any Restricted Subsidiary to Incur or suffer to exist any Lien (the "*Initial Lien*") of any kind against or upon any of its property or assets, or any proceeds therefrom, (a) securing any Indebtedness, unless the Notes are equally and ratably secured (except that Liens securing Subordinated Indebtedness shall be expressly subordinate to Liens securing the Notes to the same extent such Subordinated Indebtedness is subordinate to the Notes) and (b) securing any First Priority Lien Obligations of the Company or any Guarantor without effectively providing that the Notes or the guarantee thereof by such Guarantor, as the case may be, shall be granted a second priority security interest (subject to Permitted Liens) upon the assets or property constituting the collateral for such First Priority Lien Obligation; *provided*, *however*, that (i) if granting such security interest requires the consent of a third party (other than a person holding a First Priority Lien Obligation), the Company or such Restricted Subsidiary will use commercially reasonable efforts to obtain such consent with respect to the security interest for the benefit of the Trustee on behalf of the holders; *provided further*, *however*, that if such third party does not consent to the granting of such security interest after the use of commercially reasonable efforts, the Company or such Restricted Subsidiary will not be required to provide such security interest and (ii) clause (a) of the preceding sentence shall not require the Company or any Restricted Subsidiary to secure the Notes if the relevant Initial Lien consists of a Permitted Lien. Any Lien created for the benefit of the holders of the Notes pursuant to the preceding sentence shall provide by its terms that such Lien shall be automatically and unconditionally released and discharged upon the release and discharge of the Initial Lien, except as otherwise provided in the Intercreditor Agreement.

The Company will not, and will not permit any Subsidiary to, Incur any Second Priority Secured Indebtedness unless, after giving effect to such Incurrence, the Consolidated Total Second Lien Debt Ratio would be no greater than 4.2 to 1.0; *provided*, *however*, that additional Second Priority Secured Indebtedness may be Incurred to Refinance any other Second Priority Secured Indebtedness so long as the aggregate principal amount of such additional Second Priority Secured Indebtedness is equal to or less than the aggregate principal amount outstanding (plus all accrued interest on such Indebtedness and all fees and expenses, including any premium (including tender premiums) and defeasance costs and other amounts to accomplish such refinancing) of the Second Priority Secured Indebtedness being Refinanced.

*Impairment of Security Interest.*    Subject to the rights of the holders of Permitted Liens and to the provisions governing the release of Collateral described under "—Release of Collateral," the Company will not, and will not permit any of its Restricted Subsidiaries to, take or knowingly or negligently omit to take, any action which action or omission would or could reasonably be expected to have the result of materially impairing the security interest with respect to the Collateral for the benefit of the Trustee and the holders of the Notes, unless such action or failure to take action is otherwise permitted or contemplated by the Indenture or the Security Documents.

*After-Acquired Property.*    Upon the acquisition by the Company or any Guarantor of any First Priority After-Acquired Property, the Company or such Guarantor shall execute and deliver or cause to be delivered such mortgages, deeds of trust, security instruments, financing statements and certificates and opinions of counsel as shall be reasonably necessary to vest in the Trustee a perfected security interest, subject only to Permitted Liens, in such First Priority After-Acquired Property and to have such First Priority After-Acquired Property (but subject to certain limitations, if applicable), added to the Collateral, and thereupon all provisions of the Indenture relating to the Collateral shall be deemed to relate to such First Priority After-Acquired Property to the same extent and with the same force and effect; *provided*, *however*, that if granting such second priority security interest in such First Priority After-Acquired requires the consent of a third party, the Company will use commercially reasonable efforts to obtain such consent with respect to the second priority interest for the benefit of the Trustee on behalf of the holders of the Notes; *provided further*, *however*, that if such third party does not consent to the granting of such second priority security interest after the use of such commercially reasonable efforts, the Company or such Guarantor, as the case may be, will not be required to provide such security interest.

**Consolidation, Merger, Sale of Assets, etc.**

Each Indenture will provide that (x) the Company will not, in any transaction or Indenture of transactions, merge or consolidate with or into (other than in connection with the URNA Merger), or sell, assign, convey, transfer, lease or otherwise dispose of all or substantially all of its properties and assets as an entirety to, any person or persons, and (y) the Company will not permit any Restricted Subsidiary to enter into any such transaction or Indenture of transactions if such transaction or Indenture of transactions, in the aggregate, would result in a sale, assignment, conveyance, transfer, lease or other disposition of all or substantially all of the properties and assets of the Company or the Company and its Restricted Subsidiaries, taken as a whole, to any other person or persons, unless at the time and after giving effect thereto:

(a)   either:

(i)   if the transaction or transactions is a merger or consolidation, the Company (or in the case of clause (y), the applicable Restricted Subsidiary) shall be the surviving person of such merger or consolidation; or

(ii)   the person formed by such consolidation or into which the Company (or in the case of clause (y), the applicable Restricted Subsidiary) is merged or to which the properties and assets of the Company (or, in the case of clause (y) the applicable Restricted Subsidiary), substantially as an entirety, are transferred (any such surviving person or transferee person being the "*Surviving Entity*") shall be a corporation organized and existing under the laws of the United States of America, any state or territory thereof or the District of Columbia and shall expressly assume by a supplemental indenture executed and delivered to the Trustee, in form satisfactory to such Trustee, all the obligations of the Company (or in the case of clause (y), the applicable Restricted Subsidiary) under the Notes, the Indenture and the Registration Rights Agreement, and in each case, the Indenture shall remain in full force and effect;

(b)   except in the case of any merger of the Company with any Wholly Owned Subsidiary of the Company (and no other persons), immediately after giving effect to such transaction or

Indenture of transactions on a *pro forma* basis (including any Indebtedness Incurred or anticipated to be Incurred in connection with or in respect of such transaction or Indenture of transactions), no Default or Event of Default shall have occurred and be continuing; and

(c)  except in the case of any merger of the Company with any Wholly Owned Subsidiary of the Company (and no other persons), the Company or the Surviving Entity, as the case may be, after giving effect to such transaction or Indenture of transactions on a *pro forma* basis (including any Indebtedness Incurred or anticipated to be Incurred in connection with or in respect of such transaction or series of transactions), could Incur $1.00 of additional Indebtedness (other than Permitted Indebtedness) or the Consolidated Fixed Charge Coverage Ratio of the Company immediately following such transaction would be equal to or greater than the Consolidated Fixed Charge Coverage Ratio of the Company immediately prior to such transaction.

In connection with any consolidation, merger, transfer, lease, assignment or other disposition contemplated hereby, the Company shall deliver, or cause to be delivered, to the Trustee, in form and substance reasonably satisfactory to such Trustee, an officer's certificate and an opinion of counsel, each stating that such consolidation, merger, transfer, lease, assignment or other disposition and the supplemental indenture in respect thereof comply with the requirements under the Indenture.

Notwithstanding the immediately preceding clauses (b) and (c), (1) any Restricted Subsidiary may consolidate with or merge into or transfer all or part of its properties and assets to the Company, and (2) the Company may merge with an Affiliate of the Company solely for the purpose of reincorporating the Company in a State of the United States so long as the amount of Indebtedness of the Company and its Restricted Subsidiaries is not increased thereby, except to the extent otherwise permitted hereby.

Upon any consolidation or merger, or any sale, assignment, conveyance, transfer, lease or disposition of all or substantially all of the properties and assets of the Company and its Restricted Subsidiaries, taken as a whole, in accordance with the immediately preceding paragraphs, the successor person formed by such consolidation or into which the Company (or in the case of clause (y), the applicable Restricted Subsidiary) is merged or the successor person to which such sale, assignment, conveyance, transfer, lease or disposition is made shall succeed to, and be substituted for, and may exercise every right and power of the Company under the Notes, the Indenture and/or the Registration Rights Agreement, as the case may be, with the same effect as if such successor had been named as the Company in such Notes, such Indenture and/or in the Registration Rights Agreement, as the case may be and, except in the case of a lease, the Company (or in the case of clause (y), the applicable Restricted Subsidiary) shall be released and discharged from its obligations thereunder.

The Indenture provides that for all purposes of the Indenture and the Notes (including the provision of this covenant and the covenants described in "—Certain Covenants—Limitation on Indebtedness," "—Limitation on Restricted Payments" and "—Certain Covenants—Limitation on Liens"), Subsidiaries of any surviving person shall, upon such transaction or series of related transactions, become Restricted Subsidiaries unless and until designated Unrestricted Subsidiaries pursuant to and in accordance with "—Certain Covenants—Limitation on Designations of Unrestricted Subsidiaries" and all Indebtedness, and all Liens on property or assets, of the Company and the Restricted Subsidiaries in existence immediately after such transaction or series of related transactions (and that was not an obligation of the Company or any of its Restricted Subsidiaries immediately prior to the consummation of such transaction or series of related transactions) will be deemed to have been Incurred upon such transaction or series of related transactions.

**Events of Default**

The following will be "*Events of Default*" under each Indenture:

(i)  default in the payment of the principal of or premium, if any, when due and payable, on any of the Notes (at Stated Maturity, upon optional redemption, required purchase or otherwise); or

136

(ii)  default in the payment of an installment of interest on any of the Notes, when due and payable, for 30 days; or

(iii)  default in the performance, or breach, of any covenant or agreement of the Company or the Guarantors under such Indenture (other than a default in the performance or breach of a covenant or agreement which is specifically dealt with in clauses (i), (ii) or (iv)) and such default or breach shall continue for a period of 60 days after written notice has been given, by certified mail:

    (x)  to the Company by the Trustee; or

    (y)  to the Company and the Trustee by the holders of at least 25% in aggregate principal amount of the outstanding Notes; or

(iv)  (a) there shall be a default in the performance or breach of the provisions of "—Consolidation, Merger, Sale of Assets, etc.";

    (b)  the Company shall have failed to make or consummate an Asset Sale Offer in accordance with the provisions of such Indenture described under "—Certain Covenants—Disposition of Proceeds of Asset Sales"; or

    (c)  the Company shall have failed to make or consummate a Change of Control Offer in accordance with the provisions of such Indenture described under "—Change of Control"

and, in each case, such default or breach shall continue for a period of 30 days after written notice has been given, by certified mail:

        (x)  to the Company by the Trustee; or

        (y)  to the Company and the Trustee by the holders of at least 25% in aggregate principal amount of the outstanding Notes; or

(v)  default or defaults under one or more agreements, instruments, mortgages, bonds, debentures or other evidences of Indebtedness (other than Indebtedness owing to the Company or a Restricted Subsidiary) under which the Company or any Significant Subsidiary then has outstanding Indebtedness in excess of $50.0 million, individually or in the aggregate, and either:

    (a)  such Indebtedness is already due and payable in full at its final maturity, after giving effect to any applicable grace periods; or

    (b)  such default or defaults have resulted in the acceleration of the maturity of such Indebtedness; or

(vi)  one or more final judgments of any court of competent jurisdiction for the payment of money in excess of $50.0 million (net of any amounts covered by insurance or pursuant to which the Company is indemnified to the extent that the third party under such agreement does not deny its obligations thereunder), either individually or in the aggregate, shall be entered against the Company or any Significant Subsidiary of the Company or any of their respective properties and shall not be paid, discharged or stayed and there shall have been a period of 60 days after the date on which any period for appeal has expired and during which a stay of enforcement of such judgment, order or decree, shall not be in effect and in the event such judgment is covered by insurance or third party indemnification, an enforcement proceeding has been commenced by any creditor upon such judgment or decree which is not promptly stayed; or

(vii)  the entry of a decree or order by a court having jurisdiction in the premises:

    (A)  for relief in respect of the Company or any Significant Subsidiary in an involuntary case or proceeding under the Federal Bankruptcy Code or any other federal, state or foreign bankruptcy, insolvency, reorganization or similar law;

    (B)  adjudging the Company or any Significant Subsidiary bankrupt or insolvent, or seeking reorganization, arrangement, adjustment or composition of or in respect of the Company or any Significant Subsidiary under the Federal Bankruptcy Code or any other similar federal, state or foreign law, or appointing a custodian, receiver, liquidator, assignee,

trustee, sequestrator (or other similar official) of the Company or any Significant Subsidiary or of any substantial part of any of their properties, or ordering the winding up or liquidation of any of their affairs, and the continuance of any such decree or order unstayed and in effect for a period of 60 consecutive days;

(viii) the institution by the Company or any Significant Subsidiary of a voluntary case or proceeding under the Federal Bankruptcy Code or any other similar federal, state or foreign law or any other case or proceedings to be adjudicated a bankrupt or insolvent, or the consent by the Company or any Significant Subsidiary to the entry of a decree or order for relief in respect of the Company or any Significant Subsidiary in any involuntary case or proceeding under the Federal Bankruptcy Code or any other similar federal, state or foreign law or to the institution of bankruptcy or insolvency proceedings against the Company or any Significant Subsidiary, or the filing by the Company or any Significant Subsidiary of a petition or answer or consent seeking reorganization or relief under the Federal Bankruptcy Code or any other similar federal, state or foreign law, or the consent by it to the filing of any such petition or to the appointment of or taking possession by a custodian, receiver, liquidator, assignee, trustee or sequestrator (or other similar official) of any of the Company or any Significant Subsidiary or of any substantial part of its property, or the making by it of an assignment for the benefit of creditors, or the admission by it in writing of its inability to pay its debts generally as they become due; or

(ix) except as permitted by the Indenture, any of the guarantees by any Restricted Subsidiary of the Notes ceases to be in full force and effect or any of such guarantees is declared to be null and void and unenforceable in any material respect or any of such guarantees is found to be invalid in any material respect or any responsible officer of any of the Guarantors denies its liability under its guarantee in writing (other than, in each case, by reason of release of a Guarantor in accordance with the terms of such Indenture) and such Default continues for 10 days after the Company has actual knowledge thereof; or

(x) unless all of the Collateral has been released from the second priority Liens in accordance with the provisions of the Security Documents, the Company shall assert or any Guarantor shall assert, in any pleading in any court of competent jurisdiction, that any such security interest is invalid or unenforceable (other than in accordance with its terms) and, in the case of any Subsidiary Guarantor, the Company fails to cause such Subsidiary to rescind such assertions within 30 days after the Company has actual knowledge of such assertion; or

(xi) the failure by the Company or any Restricted Subsidiary for 60 days after written notice to comply has been given to the Company from the Trustee or the holders of at least 25% in aggregate principal amount of the Notes, with its other agreements related to the Collateral contained in the Indenture or the Security Documents except for a failure that would not be materially adverse to the holders of the Notes and would not materially adversely affect the value of the second priority security interests in the Collateral taken as a whole.

If an Event of Default (other than those covered by clause (vii) or (viii) above with respect to the Company) shall occur and be continuing, the Trustee, by notice to the Company, or the holders of at least 25% in aggregate principal amount of the Notes, then outstanding, by notice to such Trustee and the Company, may declare the principal of, premium, if any, and accrued and unpaid interest, if any, on all of the related Notes due and payable immediately. If an Event of Default specified in clause (vii) or (viii) above with respect to the Company occurs and is continuing, then the principal of, premium, if any, and accrued and unpaid interest, if any, on all the related Notes shall ipso facto become and be immediately due and payable without any declaration or other act on the part of the Trustee or any holder of any Notes.

In the event of any Event of Default specified in clause (v) above, such Event of Default and all consequences thereof (excluding any resulting payment default, other than as a result of acceleration of the Notes) shall be annulled, waived and rescinded, automatically and without any action by any Trustee or the holders of the Notes, if within 20 days after such Event of Default arose: (1) the Indebtedness or guarantee that is the basis for such Event of Default has been discharged; or (2) the holders of such Indebtedness have rescinded or waived the acceleration, notice or action (as the case may be) giving rise to such Event of Default; or (3) the default that is the basis for such Event of Default has been cured.

After a declaration of acceleration under the Indenture, the holders of a majority in aggregate principal amount of the outstanding related Notes, by written notice to the Company and the Trustee, may rescind such declaration if:

(a)  the Company has paid or deposited with such Trustee a sum sufficient to pay

(i)   all sums paid or advanced by such Trustee under the Indenture and the reasonable compensation, expenses, disbursements and advances of such Trustee, its agents and counsel;

(ii)  all overdue interest on all such Notes;

(iii) the principal of and premium, if any, on any such Notes which have become due otherwise than by such declaration of acceleration and interest thereon at the rate borne by such Notes; and

(iv)  to the extent that payment of such interest is lawful, interest upon overdue interest and overdue principal at the rate borne by such Notes which has become due otherwise than by such declaration of acceleration;

(b)  the rescission would not conflict with a judgment or decree of a court of competent jurisdiction; and

(c)  all Events of Default, other than the non-payment of principal of, premium, if any, and interest on such Notes that has become due solely by such declaration of acceleration, have been cured or waived.

The holders of not less than a majority in aggregate principal amount of the outstanding Notes may on behalf of the holders of all such Notes waive any past defaults under the Indenture, except a default in the payment of the principal of, premium, if any, or interest on any such Note, or in respect of a covenant or provision which under the Indenture cannot be modified or amended without the consent of the holder of each such affected Note outstanding.

No holder of any of the Notes has any right to institute any proceeding with respect to the Indenture or any remedy thereunder, unless the holders of at least 25% in aggregate principal amount of such outstanding Notes have made written request, and offered reasonable indemnity, to the Trustee to institute such proceeding as Trustee under such Notes and the Indenture, such Trustee has failed to institute such proceeding within 60 days after receipt of such notice and indemnity and such Trustee, within such 60 day period, has not received directions inconsistent with such written request by holders of a majority in aggregate principal amount of such outstanding Notes. Such limitations do not apply, however, to a suit instituted by a holder of a Note for the enforcement of the payment of the principal of, premium, if any, or interest on such Note on or after the respective due dates expressed in such Note.

During the existence of an Event of Default, the Trustee is required to exercise such rights and powers vested in it under the Indenture and use the same degree of care and skill in its exercise thereof as a prudent person would exercise under the circumstances in the conduct of such person's own affairs. Subject to the provisions of the Indenture relating to the duties of the Trustee, whether or

not an Event of Default shall occur and be continuing, such Trustee under such Indenture is not under any obligation to exercise any of its rights or powers under such Indenture at the request or direction of any of the holders unless such holders shall have offered to such Trustee security or indemnity satisfactory to it. Subject to certain provisions concerning the rights of the Trustee, the holders of a majority in aggregate principal amount of the outstanding Notes have the right to direct the time, method and place of conducting any proceeding for any remedy available to such Trustee, or exercising any trust or power conferred on such Trustee under the Indenture.

If a Default or an Event of Default occurs and is continuing and is known to a Trustee, such Trustee shall mail to each holder of the related Notes notice of the Default or Event of Default within 90 days after obtaining knowledge thereof. Except in the case of a Default or an Event of Default in payment of principal of, premium, if any, or interest on any such Notes, the Trustee may withhold the notice to the holders of such Notes if its board of directors, the executive committee or a committee of its directors or trust officers in good faith determines that withholding the notice is in the interest of the noteholders.

The Company is required to furnish to the Trustee an annual statement as to the performance by the Company of its obligations under the Indenture and as to any default in such performance. The Company is also required to notify the Trustee within thirty Business Days of becoming aware of any Event of Default under the Indenture.

**No Liability For Certain Persons**

No past, present or future director, officer, employee, partner, manager, agent, member, incorporator or stockholder of the Company or any Subsidiary Guarantor, or any of their direct or indirect parent companies, as such, will have any liability for any obligations of the Company or any Guarantor under the Notes, the guarantees thereof or the Indenture or for any claim based on or in respect of, or by reason of such obligations or their creation. Each holder by accepting a Note waives and releases all such liability. The foregoing waiver and release are an integral part of the consideration for the issuance of the Notes. Such waiver may not be effective to waive liabilities under the federal securities laws.

**Defeasance or Covenant Defeasance of Indenture**

The Company may, at its option and at any time, terminate the obligations of the Company with respect to the outstanding the Notes (*"defeasance"*) to the extent set forth below. Such defeasance means that the Company shall be deemed to have paid and discharged the entire Indebtedness represented by the outstanding the Notes and the related Guarantees and cured all Events of Default, except for:

(i)   the rights of holders of such outstanding Notes to receive payment in respect of the principal of, premium, if any, and interest on such Notes when such payments are due solely out of the trust created pursuant to the Indenture;

(ii)   the Company's obligations to issue temporary Notes, register the transfer or exchange of any Notes, replace mutilated, destroyed, lost or stolen Notes and maintain an office or agency for payments in respect of the Notes;

(iii)  the rights, powers, trusts, duties and immunities of the Trustee; and

(iv)  the defeasance provisions of the Indenture.

In addition, the Company may, at its option and at any time, elect to terminate the obligations of the Company and the Guarantors with respect to certain covenants and certain events of default applicable to the Notes that are set forth in the Indenture, some of which are described under "—Change of

Control", "—Certain Covenants", "—Consolidation Merger, Sale of Assets, etc." and "—Events of Default" above, and any subsequent failure to comply with such obligations shall not constitute a Default with respect to such Notes (*"covenant defeasance"*). If the Company exercises its defeasance option or its covenant defeasance option, each Guarantor will be released from all of its obligations with respect to its Guarantee and all Liens granted under the Security Documents shall be released.

In order to exercise either defeasance or covenant defeasance:

(i)   the Company must irrevocably deposit with the Trustee, in trust, for the benefit of the holders of the Notes, cash in United States dollars, U.S. Government Obligations (as defined in the Indenture), or a combination thereof, in such amounts as will be sufficient, in the opinion of a nationally recognized firm of independent public accountants, to pay the principal of, premium, if any, and interest on such outstanding Notes to redemption or maturity, as specified by the Company (except lost, stolen or destroyed Notes which have been replaced or paid);

(ii)   (A) in the case of defeasance, the Company shall have delivered to the Trustee an opinion of counsel that refers to and is based upon a ruling of the Internal Revenue Service or a change in applicable US federal income tax laws to the effect that subject to customary assumptions and exclusions, the holders of such outstanding Notes will not recognize income, gain or loss for US federal income tax purposes, as applicable, as a result of such defeasance and will be subject to federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such defeasance had not occurred; and (B) in the case of covenant defeasance, the Company shall have delivered to the Trustee an opinion of counsel to the effect that subject to customary assumptions and exclusions, the holders of such outstanding Notes will not recognize income, gain or loss for US federal income tax purposes, as applicable, as a result of such covenant defeasance and will be subject to federal income tax on the same amounts, in the same manner and at the same times as would have been the case if such covenant defeasance had not occurred;

(iii)  no Default shall have occurred and be continuing on the date of such deposit (other than a default caused by the Incurrence of Indebtedness to make such deposit and simultaneous deposit relating to other Indebtedness and, in each case, the granting of Liens in connection therewith);

(iv)  such defeasance or covenant defeasance shall not result in a breach or violation of, or constitute a default under, any material agreement or instrument to which the Company is a party or by which it is bound (other than a default caused by the Incurrence of Indebtedness to make such deposit and simultaneous deposit relating to other Indebtedness and, in each case, the granting of Liens in connection therewith);

(v)   the Company shall have delivered to the Trustee an opinion of counsel to the effect that, as of the date of such opinion, subject to customary assumptions and exclusions, after the 91st day following the deposit, the trust funds will not be subject to the effect of any applicable bankruptcy, insolvency, reorganization or similar laws affecting creditors' rights generally;

(vi)  the Company shall have delivered to the Trustee an officer's certificate stating that the deposit was not made by the Company with the intent of preferring the holders of the Notes over the other creditors of the Company with the intent of hindering, delaying or defrauding creditors of the Company or others;

(vii)  no event or condition shall exist that would prevent the Company from making payments of the principal of, premium, if any, and interest on such Notes on the date of such deposit or at any time ending on the 91st day after the date of such deposit; and

(viii) the Company shall have delivered to the Trustee an officer's certificate and an opinion of counsel subject to customary assumptions and exclusions, each stating that all conditions

precedent under the Indenture to either defeasance or covenant defeasance, as the case may be, have been complied with.

**Satisfaction and Discharge**

The Indenture will be discharged and will cease to be of further effect (except as to surviving rights or registration of transfer or exchange of the Notes, as expressly provided for in such Indenture) as to all outstanding Notes issued under the Indenture when:

(i)  either:

(a)  all such Notes theretofore authenticated and delivered under such Indenture (except lost, stolen or destroyed Notes which have been replaced or repaid and Notes for whose payment money has theretofore been deposited in trust or segregated and held in trust by the Company and thereafter repaid to the Company or discharged from such trust) have been delivered to the Trustee for cancellation; or

(b)  all such Notes not theretofore delivered to the Trustee for cancellation (except lost, stolen or destroyed Notes which have been replaced or paid) have become due and payable by reason of the making of a notice of redemption or otherwise or will become due and payable within one year or are to be called for redemption within one year under arrangements reasonably acceptable to such Trustee for the giving of notice of redemption by the Trustee in the name, and at the expense, of the Company, and the Company has irrevocably deposited or caused to be deposited with such Trustee funds in U.S. dollars, U.S. dollar-denominated Government Securities, or a combination thereof, in such amounts as will be sufficient to pay and discharge the entire Indebtedness on such Notes not theretofore delivered to such Trustee for cancellation, for principal of, premium, if any, and interest on such Notes to the date of deposit (in the case of Notes that have become due and payable) or to the maturity or redemption date, as the case may be, together with irrevocable instructions from the Company directing such Trustee to apply such funds to the payment thereof at maturity or redemption, as the case may be;

(ii)  the Company has paid all other sums payable under the Indenture by the Company; and

(iii)  the Company has delivered to the Trustee an officer's certificate and an opinion of counsel (subject to customary assumptions and exclusions) stating that all conditions precedent under the Indenture relating to the satisfaction and discharge of the Indenture have been complied with.

**Intercreditor Agreements**

The Indenture will provide that, at the request of the Company, in connection with the Incurrence by the Company or its Restricted Subsidiaries of any Indebtedness permitted to be Incurred under the Indenture and secured by any of the Collateral, the Company, the relevant Restricted Subsidiaries and the Trustee shall enter into with the holder of such Indebtedness (or their duly authorized representatives) an intercreditor agreement (an *"Additional Intercreditor Agreement"*) on substantially the same terms as the Intercreditor Agreement (or terms not materially less favorable to the holders of the Notes), including substantially the same terms with respect to the limitation on enforcement and release of guarantees; *provided, however,* that such Additional Intercreditor Agreement will not impose any personal obligations on the Trustee or, in the opinion of the Trustee, adversely affect the rights, duties, liabilities or immunities of the Trustee under the Indenture or the Intercreditor Agreement.

The Indenture will also provide that, at the direction of the Company and without the consent of the holders of the Notes, the Trustee shall from time to time enter into one or more amendments to the Intercreditor Agreement or any Additional Intercreditor Agreement to: (1) cure any ambiguity,

142

omission, mistake, defect or inconsistency of any such agreement, (2) increase the amount or types of Indebtedness covered by any such agreement that may be Incurred by the Company or a Restricted Subsidiary (including, with respect to the Intercreditor Agreement or any Additional Intercreditor Agreement or the addition of provisions relating to new Indebtedness ranking junior in right of payment to the Notes), (3) give effect to the amendment, restatement, supplementing, replacement, restructuring, increase, repayment, refunding, Refinancing or other modification of the Credit Agreement or the designation of any Credit Agreement referred to in clause (ii) of the definition thereof, (4) add parties to the Intercreditor Agreement or an Additional Intercreditor Agreement, including Guarantors, or successors, including successor trustees or other representatives or (5) make any other change to any such agreement that does not adversely affect the Notes in any material respect. The Company shall not otherwise direct the Trustee to enter into any amendment to the Intercreditor Agreement or Additional Intercreditor Agreement without the consent of the holders representing a majority in aggregate principal amount of the Notes then outstanding, except as otherwise permitted below under "Amendments and Waivers," and the Company may only direct the Trustee to enter into any amendment to the extent such amendment does not impose any personal obligations on the Trustee or, in the opinion of the Trustee, adversely affect the rights, duties, liabilities or immunities of the Trustee under the Indenture or the Intercreditor Agreement (or any then existing Additional Intercreditor Agreement).

With respect to all matters governed by the Intercreditor Agreement, holders of the Notes will vote together as a class with all other second priority secured creditors, but will not vote as a class with holders of First Priority Lien Obligations or holders of any Subordinated Indebtedness. The Indenture will also provide that each holder of the Notes, by accepting a Note, shall be deemed to have agreed to and accepted the terms and conditions of the Intercreditor Agreement and any Additional Intercreditor Agreement (whether then entered into or entered into in the future pursuant to the provisions described herein).

**Amendments and Waivers**

From time to time, the Company, when authorized by a resolution of its Board of Directors, and the Trustee may, without the consent of the holders of any outstanding related Notes, amend, waive or supplement the Indenture or such Notes for certain specified purposes, including, among other things, the following:

(1)  to cure any ambiguity, defect or inconsistency;

(2)  to provide for uncertificated notes in addition to or in place of certificated notes;

(3)  to provide for the assumption of the Company's or a Guarantor's obligations to holders of notes and Note guarantees in the case of a merger or consolidation or sale of all or substantially all of the Company's or such Guarantor's assets, as applicable;

(4)  to make any change that would provide any additional rights or benefits to the holders of Notes or that does not adversely affect the legal rights under the Indenture of any such holder;

(5)  to comply with requirements of the SEC in order to effect or maintain the qualification of the Indenture under the Trust Indenture Act;

(6)  to conform the text of the Indenture, the Note guarantees or the Notes to any provision of this Description of the Notes which is intended to be a verbatim or substantially similar description thereof;

(7)  to provide for the issuance of additional Notes in accordance with the limitations set forth in the Indenture as of the date of the indenture;

(8)  to allow any Guarantor to execute a supplemental indenture or a guarantee with respect to the Notes;

(9)  to comply with the rules of any applicable securities depositary;

(10) to provide for a successor trustee in accordance with the terms of the Indenture or to otherwise comply with any requirement of the Indenture; or

(11) to add a co-issuer or co-obligor of the Notes.

Other amendments and modifications of an Indenture or the related Notes may be made by the Company and the Trustee with the consent of the holders of not less than a majority of the aggregate principal amount of the outstanding related Notes; *provided, however*, that no such modification or amendment may, without the consent of the holder of each outstanding Note affected thereby:

(i)  reduce the principal amount of, extend the fixed maturity of or alter the redemption provisions described under the caption "Optional Redemption" of, such Notes;

(ii)  change the currency in which any such Notes or any premium or the interest thereon is payable;

(iii) reduce the percentage in principal amount of such Notes that must consent to an amendment, supplement or waiver or consent to take any action under such Indenture or such Notes;

(iv) impair the right to institute suit for the enforcement of any payment on or with respect to such Notes;

(v)  waive a default in payment with respect to such Notes, except a rescission of acceleration of such Notes by the holders of at least a majority in aggregate principal amount of such Notes and a waiver of the payment default that resulted from such acceleration;

(vi) reduce or change the rate or the time for payment of interest on such Notes;

(vii)  subordinate the Notes or any guarantee of such Notes in right of payment in a manner adverse to the holders of such Notes; or

(viii) make any change in the provisions in the Intercreditor Agreement, any Additional Intercreditor Agreement or the Indenture dealing with the application of proceeds of Collateral that would adversely affect the holders of the Notes; *provided, however,* that an amendment to the definition of Permitted Indebtedness or Permitted Liens, or to any corresponding provision of the Intercreditor Agreement to which holders of a majority in aggregate principal amount of the outstanding related Notes have consented, shall not be considered a change to which this clause applies.

The consent of the holders is not necessary under the Indenture to approve the particular form of any proposed amendment. It is sufficient if such consent approves the substance of the proposed amendment.

**The Trustees**

The Indenture will provide that, except during the continuance of an Event of Default, the Trustee thereunder will perform only such duties as are specifically set forth in the Indenture. If an Event of Default has occurred and is continuing, the Trustee will exercise such rights and powers vested in it under the Indenture and use the same degree of care and skill in its exercise as a prudent person would exercise under the circumstances in the conduct of such person's own affairs.

144

The Indenture and provisions of the Trust Indenture Act incorporated by reference therein contain limitations on the rights of the Trustee thereunder, should it become a creditor of the Company, to obtain payment of claims in certain cases or to realize on certain property received by it in respect of any such claims, as security or otherwise. The Trustee is permitted to engage in other transactions; *provided, however*, that if it acquires any conflicting interest (as defined in such Act) it must eliminate such conflict or resign.

### Governing Law

The Indenture, the Security Documents and the Notes and the Guarantees will be governed by the laws of the State of New York (or, to the extent required, the law of the jurisdiction in which the Collateral is located).

### Book-Entry, Delivery and Form

The Notes are being offered and sold to qualified institutional buyers in reliance on Rule 144A (*"Rule 144A Notes"*). Notes also may be offered and sold in offshore transactions in reliance on Regulation S (*"Regulation S Notes"*). Following the initial distribution of Rule 144A Notes and Regulation S Notes, such Notes may be transferred to certain institutional "accredited investors" in the secondary market (*"IAI Notes"*). Except as set forth below, Notes will be issued in registered, global form. Notes will be issued at the closing of this offering only against payment in immediately available funds.

Rule 144A Notes initially will be represented by one or more global notes in registered form without interest coupons (collectively, the *"Rule 144A Global Notes"*). Regulation S Notes initially will be represented by one or more global notes in registered form without interest coupons (collectively, the *"Regulation S Global Notes"*). IAI Notes initially will be represented by one or more global notes in registered form without interest coupons (collectively, the *"IAI Global Notes"*). Beneficial ownership interests in a Regulation S Global Note will be exchangeable for interests in a Rule 144A Global Note, an IAI Global Note or a definitive note in registered certificated form (a *"Certificated Note"*) only after the expiration of the period through and including the 40th day after the later of the commencement and the closing of this offering (the *"Distribution Compliance Period"*) and then only in compliance with the requirements described under "—Exchange of Global Notes for Certificated Notes." The Rule 144A Global Notes, the IAI Global Notes and the Regulation S Global Notes are collectively referred to herein as the *"Global Notes."* The Global Notes will be deposited upon issuance with the Trustee as custodian for DTC, in New York, New York, and registered in the name of DTC or its nominee, in each case for credit to an account of a direct or indirect participant in DTC as described below. Beneficial interests in the Rule 144A Global Notes may not be exchanged for beneficial interests in the Regulation S Global Notes or the IAI Global Notes at any time except in the limited circumstances described below. See "—Exchanges Among Global Notes."

Except as set forth below, the Global Notes may be transferred, in whole and not in part, only to another nominee of DTC or to a successor of DTC or its nominee. Beneficial interests in the Global Notes may not be exchanged for Notes in certificated form except in the limited circumstances described below. See "—Exchange of Global Notes for Certificated Notes."Except in the limited circumstances described below, owners of beneficial interests in the Global Notes will not be entitled to receive physical delivery of Notes in certificated form.

Rule 144A Notes (including beneficial interests in the Rule 144A Global Notes) will be subject to certain restrictions on transfer and will bear a restrictive legend as described under "Transfer Restrictions." Regulation S Notes and IAI Notes will also be subject to certain restrictions on transfer and will also bear the legend as described under "Transfer Restrictions." In addition, transfers of beneficial interests in the Global Notes will be subject to the applicable rules and procedures of DTC and its direct or indirect participants, which may change from time to time.

145

**Depository Procedures**

The following description of the operations and procedures of DTC is provided solely as a matter of convenience. These operations and procedures are solely within the control of the respective settlement systems and are subject to changes by them. We take no responsibility for these operations and procedures and urge investors to contact the system or their participants directly to discuss these matters.

DTC has advised us that DTC is a limited-purpose trust company created to hold securities for its participating organizations (collectively, the *"Participants"*) and to facilitate the clearance and settlement of transactions in those securities between Participants through electronic book-entry changes in accounts of its Participants. The Participants include securities brokers and dealers (including the initial purchasers), banks, trust companies, clearing corporations and certain other organizations. Access to DTC's system is also available to other entities such as banks, brokers, dealers and trust companies that clear through or maintain a custodial relationship with a Participant, either directly or indirectly (collectively, the *"Indirect Participants"*). Persons who are not Participants may beneficially own securities held by or on behalf of DTC only through the Participants or the Indirect Participants. The ownership interests in, and transfers of ownership interests in, each security held by or on behalf of DTC are recorded on the records of the Participants and Indirect Participants.

DTC has also advised us that, pursuant to procedures established by it:

(1)  upon deposit of the Global Notes, DTC will credit the accounts of Participants designated by the Initial Purchasers with portions of the principal amount of the Global Notes; and

(2)  ownership of these interests in the Global Notes will be shown on, and the transfer of ownership of these interests will be effected only through, records maintained by DTC (with respect to the Participants) or by the Participants and the Indirect Participants (with respect to other owners of beneficial interests in the Global Notes).

Investors in the Global Notes who are Participants in DTC's system may hold their interests therein directly through DTC. Investors in the Global Notes who are not Participants may hold their interests therein indirectly through organizations which are Participants in such system. All interests in a Global Note may be subject to the procedures and requirements of DTC. The laws of some states require that certain persons take physical delivery in definitive form of securities that they own. Consequently, the ability to transfer beneficial interests in a Global Note to such persons will be limited to that extent. Because DTC can act only on behalf of Participants, which in turn act on behalf of Indirect Participants, the ability of a person having beneficial interests in a Global Note to pledge such interests to persons that do not participate in the DTC system, or otherwise take actions in respect of such interests, may be affected by the lack of a physical certificate evidencing such interests.

**Except as described below, owners of an interest in the Global Notes will not have Notes registered in their names, will not receive physical delivery of Notes in certificated form and will not be considered the registered owners or holders thereof under the Indenture for any purpose.**

Payments in respect of the principal of, and interest and premium, if any, on a Global Note registered in the name of DTC or its nominee will be payable to DTC in its capacity as the registered holder under the Indenture. Under the terms of the Indenture, the Company and the Trustee will treat the persons in whose names the Notes, including the Global Notes, are registered as the owners of the Notes for the purpose of receiving payments and for all other purposes. Consequently, neither the Company, the Trustee nor any agent of the Company or the Trustee has or will have any responsibility or liability for:

(1)  any aspect of DTC's records or any Participant's or Indirect Participant's records relating to or payments made on account of beneficial ownership interest in the Global Notes or for maintaining,

supervising or reviewing any of DTC's records or any Participant's or Indirect Participant's records relating to the beneficial ownership interests in the Global Notes; or

(2)  any other matter relating to the actions and practices of DTC or any of its Participants or Indirect Participants.

DTC has advised us that its current practice, upon receipt of any payment in respect of securities such as the Notes (including principal and interest), is to credit the accounts of the relevant Participants with the payment on the payment date unless DTC has reason to believe it will not receive payment on such payment date. Each relevant Participant is credited with an amount proportionate to its beneficial ownership of an interest in the principal amount of the relevant security as shown on the records of DTC. Payments by the Participants and the Indirect Participants to the beneficial owners of Notes will be governed by standing instructions and customary practices and will be the responsibility of the Participants or the Indirect Participants and will not be the responsibility of DTC, the Trustee or the Company. Neither the Company nor the Trustee will be liable for any delay by DTC or any of its Participants in identifying the beneficial owners of the Notes, and the Company and the Trustee may conclusively rely on and will be protected in relying on instructions from DTC or its nominee for all purposes.

Subject to the transfer restrictions set forth under "Transfer restrictions," transfers between Participants in DTC will be effected in accordance with DTC's procedures, and will be settled in same-day funds.

DTC has advised the Company that it will take any action permitted to be taken by a holder of Notes only at the direction of one or more Participants to whose account DTC has credited the interests in the Global Notes and only in respect of such portion of the aggregate principal amount of the Notes as to which such Participant or Participants has or have given such direction. However, if there is an Event of Default under the Notes, DTC reserves the right to exchange the Global Notes for legended Notes in certificated form, and to distribute such Notes to its Participants.

Neither the Company nor the Trustee nor any of their respective agents will have any responsibility for the performance by DTC or its participants or indirect participants of their respective obligations under the rules and procedures governing their operations.

**Exchange of Global Notes for Certificated Notes**

Subject to certain conditions, a Global Note is exchangeable for Certificated Notes in definitive form of like tenor in denominations of $2,000 and any greater multiple of $1,000 thereof if:

(1)  DTC notifies us that it is unwilling or unable to continue as depository for the Global Notes or DTC ceases to be a clearing agency registered under the Exchange Act and, in either case, we are unable to locate a qualified successor within 90 days;

(2)  we in our discretion at any time determine not to have all the Notes represented by the Global Notes; or

(3)  a default entitling the holders of the Notes to accelerate the maturity thereof has occurred and is continuing.

Any Global Note that is exchangeable as above is exchangeable for Certificated Notes issuable in authorized denominations and registered in such names as DTC shall direct. In addition, such certificates will bear the legend referred to under "Transfer Restrictions" (unless we determine otherwise in accordance with applicable law), subject, with respect to such certificated Notes, to the provisions of such legend.

**Exchange of Certificated Notes for Global Notes**

Certificated Notes may not be exchanged for beneficial interests in any Global Note unless the transferor first delivers to the Trustee a written certificate (in the form provided in the Indenture) to the effect that such transfer will comply with the appropriate transfer restrictions applicable to such Notes. See "Transfer Restrictions."

**Exchanges Among Global Notes**

Beneficial interests in the Regulation S Global Note may be exchanged for beneficial interests in the Rule 144A Global Note or the IAI Global Note only after the expiration of the Distribution Compliance Period.

Beneficial interests in a Rule 144A Global Note or an IAI Global Note may be transferred to a person who takes delivery in the form of an interest in the Regulation S Global Note, whether before or after the expiration of the Distribution Compliance Period, only if the transferor first delivers to the Trustee a written certificate (in the form provided in the Indenture) to the effect that such transfer is being made in accordance with Rule 903 or 904 of Regulation S or Rule 144.

Beneficial interests in the Rule 144A Global Note may be exchanged for a beneficial interest in the IAI Global Note only upon certification in a form reasonably satisfactory to the Trustee that, among other things, (i) the beneficial interest in such Rule 144A Global Note is being transferred to an "accredited investor" under the Securities Act that is an institutional "accredited investor" acquiring the securities for its own account or for the account of an institutional "accredited investor" and (ii) such transfer is being made in accordance with all applicable securities laws of the States of the United States and other jurisdictions. Beneficial interest in the IAI Global Note may be exchanged for a beneficial interest in the Rule 144A Global Note only upon certification in a form reasonably satisfactory to the Trustee that, among other things, such interest is being transferred in a transaction in accordance with Rule 144A.

Transfers involving exchanges of beneficial interests between the Regulation S Global Notes, the IAI Global Notes and the Rule 144A Global Notes will be effected in DTC by means of an instruction originated by the Trustee through the DTC Deposit/Withdraw at Custodian system. Accordingly, in connection with any such transfer, appropriate adjustments will be made to reflect the changes in the principal amounts of the Regulation S Global Note, the IAI Global Note and the Rule 144A Global Note, as applicable. Any beneficial interest in one of the Global Notes that is transferred to a person who takes delivery in the form of an interest in another Global Note will, upon transfer, cease to be an interest in such Global Note and will become an interest in the other Global Note and, accordingly, will thereafter be subject to all transfer restrictions and other procedures applicable to beneficial interest in such other Global Note for so long as it remains such an interest.

**Same Day Settlement and Payment**

The Company will make payments in respect of the Notes represented by the Global Notes (including principal, premium, if any, and interest) by wire transfer of immediately available funds to the accounts specified by the Global Note holder. The Company will make all payments of principal, interest and premium, if any, with respect to Certificated Notes by wire transfer of immediately available funds to the accounts specified by the holders of the certificated Notes or, if no such account is specified, by mailing a check to each such holder's registered address. The Notes represented by the Global Notes are expected to be eligible to trade in the PORTAL market and to trade in DTC's Same-Day Funds Settlement System, and any permitted secondary market trading activity in such Notes will, therefore, be required by DTC to be settled in immediately available funds. The Company expects that secondary trading in any Certificated Notes will also be settled in immediately available funds.

148

**Certain Definitions**

*"Acquired Indebtedness"* means Indebtedness of a person:

    (a)  assumed in connection with an Asset Acquisition from such person; or

    (b)  existing at the time such person becomes a Subsidiary of any other person and not Incurred in connection with, or in contemplation of, such Asset Acquisition or such person becoming a Subsidiary.

*"Acquisition Agreements"* means the Agreement and Plan of Merger dated as of July 22, 2007, among RAM Holdings, Inc., RAM Acquisition Corp. and Holdings and any other documents entered into in connection therewith, in each case as amended, supplemented or modified from time to time prior to the Issue Date.

*"Affiliate"* means, with respect to any specified person:

    (i)  any other person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified person;

    (ii)  any officer or director that possesses the power to direct or cause the direction of the management or policies of:

        (A)  any such specified person; or

        (B)  any person described in clause (i) above.

*"Applicable Indebtedness"* means:

    (a)  in respect of any asset that is subject of an Asset Sale at a time when such asset is included in the Collateral, Senior Indebtedness of the Company or Indebtedness of a Restricted Subsidiary or any other monetary obligation that, in each case, is secured at such time by such asset under a Lien that takes priority over the Lien in respect of the Notes under the Security Documents;

    (b)  in respect of any asset that is the subject of an Asset Sale at a time when such asset is not included in the Collateral but is owned, directly or indirectly, by a Restricted Subsidiary that is not a Subsidiary Guarantor but the Capital Stock of which is included in the Collateral, (A) any Indebtedness or other obligation referred to in clause (a) above secured by such Capital Stock or (B) any Indebtedness of such Restricted Subsidiary, its Subsidiaries or any other Restricted Subsidiary that is not a Guarantor; and

    (c)  in respect of any other asset, Senior Indebtedness of the Company or Indebtedness of a Restricted Subsidiary.

*"Applicable Premium"* means, on any applicable redemption date, the greater of (i) 1.00% of the principal amount of the Notes and (ii) the excess of: (A) the present value at such redemption date of (1) the redemption price at          , 2011 (such redemption price being set forth under the caption "—Optional Redemption" exclusive of any accrued interest) plus (2) all required remaining scheduled interest payments due on such Note through          , 2011 (but excluding accrued but unpaid interest to the date of redemption), computed using a discount rate equal to the applicable Treasury Rate as of such redemption date plus 50 basis points, over (B) the principal amount of such Note on such redemption date.

*"Applicable Senior Indebtedness"* means:

    (a)  in respect of any asset that is the subject of an Asset Sale at a time when such asset is included in the Collateral, Senior Indebtedness that is secured at such time by such asset (unless such security is junior in any respect to the security for the benefit of the Notes); or

(b)  in respect of any other asset, Senior Indebtedness of the Company or any Subsidiary Guarantor.

*"Asset Acquisition"* means:

(a)  an Investment by the Company or any Restricted Subsidiary in any other person pursuant to which such person shall become a Restricted Subsidiary, or shall be merged with or into the Company or any Restricted Subsidiary; or

(b)  the acquisition by the Company or any Restricted Subsidiary of the assets of any person (other than a Restricted Subsidiary) which constitute all or substantially all of the assets of such person, any division or line of business of such person or any other properties or assets of such person other than in the ordinary course of business.

*"Asset Sale"* means any sale, issuance, conveyance, transfer, lease or other disposition (other than in connection with the URNA Merger) (each, a *"disposition"*) by the Company or any Restricted Subsidiary to any person other than the Company or a Restricted Subsidiary, of:

(a)  any Capital Stock of any Restricted Subsidiary;

(b)  any other properties or assets of the Company or any Restricted Subsidiary, other than, in the case of clauses (a) and (b) above,

(i)  dispositions of (x) cash, Cash Equivalents or Investment Grade Securities or (y) property or equipment that is no longer used or that is obsolete, damaged, used or otherwise unsuitable or no longer required in the business of the Company or a Restricted Subsidiary;

(ii)  dispositions of assets (including issuances and sales of Capital Stock of Subsidiaries) in one or a series of related transactions for an aggregate consideration of less than $10.0 million for any such transaction or series of related transactions;

(iii)  for purposes of the covenant described under "—Certain Covenants—Disposition of Proceeds of Asset Sales" only, (w) a disposition that constitutes a Restricted Payment permitted by the covenant described under "—Certain Covenants—Limitation on Restricted Payments" or a Permitted Investment, (x) a disposition of all or substantially all the assets of the Company in accordance with the covenant described under "Consolidation, Merger, Sale of Assets, Etc.," (y) disposition of properties or assets in connection with a Securitization Transaction) and (z) any disposition that constitutes a Change of Control under the Indenture;

(iv)  the licensing of intellectual property or other general intangibles to third persons;

(v)  the sale, assignment, lease, sub-lease, rental, license, sub-license, consignment, conveyance or other disposition of equipment, inventory or other assets in the ordinary course of business (including leases or subleases with respect to real or personal property temporarily not in use or pending disposition, or not interfering in any material respect with the business of the Company or any of its Restricted Subsidiaries or entered into in the ordinary course of business) or the sale or discounting of accounts receivable or notes receivable in the ordinary course of business or in connection with the compromise, settlement or collection thereof or the conversion of accounts receivable to notes receivable;

(vi)  the issuance of Capital Stock by a Restricted Subsidiary of the Company in which the Company's percentage interest (direct or indirect) in the Capital Stock of such Restricted Subsidiary, after giving effect to the issuance, is at least equal to its percentage interest prior thereto;

(vii)  the good faith surrender or waiver of contract rights or the good faith settlement, release or surrender of claims of any kind;

150

(viii) to the extent allowable under Section 1031 of the Internal Revenue Code of 1986, any exchange of like property for use in a Permitted Business;

(ix) the granting of Liens not prohibited by the Indenture, including the sale or other disposal of property or assets pursuant to the exercise of any remedies pursuant to the Credit Agreement or the other security documents relating to any Indebtedness permitted under the Indenture;

(x) the issuance or sale of Capital Stock in or Indebtedness or other securities of any Unrestricted Subsidiary; and

(xi) the issuance of directors' qualifying Capital Stock or Capital Stock required by applicable law to be held by a person other than the Company or a Restricted Subsidiary.

*"Average Life to Stated Maturity"* means, with respect to any Indebtedness, as at any date of determination, the quotient obtained by dividing:

(i) the sum of the products of:

(a) the number of years (calculated to the nearest one twelfth) from such date to the date or dates of each successive scheduled principal payment (including any sinking fund requirements) of such Indebtedness; and

(b) the amount of each such principal payment; by

(ii) the sum of all such principal payments.

*"Attributable Debt"* in respect of a Sale/Leaseback Transaction means, as at the time of determination, the present value (discounted at the interest rate borne by the notes, compounded annually) of the total obligations of the lessee for rental payments during the remaining term of the lease included in such Sale/Leaseback Transaction (including any period for which such lease has been extended); *provided*, *however*, that if such Sale/Leaseback Transaction results in a Capitalized Lease Obligation, the amount of Indebtedness represented thereby will be determined in accordance with the definition of "Capitalized Lease Obligation."

*"Bank Indebtedness"* means any and all amounts payable under or in respect of the Credit Agreement and the other related senior credit documents, as amended, restated, supplemented, waived, replaced, restructured, repaid, refunded, Refinanced or otherwise modified from time to time (including after termination of the Credit Agreement), including principal, premium (if any), interest (including interest accruing on or after the filing of any petition in bankruptcy or for reorganization relating to the Company or any Restricted Subsidiary whether or not a claim for post-filing interest is allowed in such proceedings), fees, charges, expenses, reimbursement obligations, guarantees and all other amounts payable thereunder or in respect thereof.

*"Board of Directors"* means the board of directors of a company or its equivalent, including managers of a limited liability company, general partners of a partnership or trustees of a business trust, or any duly authorized committee thereof.

*"Borrowing Base"* means 78% of the book value of rental equipment, net of the Company and its Restricted Subsidiaries, (determined based on the consolidated balance sheet of the Company for the most recently ended fiscal month of the Company for which internal consolidated financial statements of the Company are available, and, in the case of any determination relating to any Incurrence of Indebtedness, on a *pro forma* basis including (x) any property or assets of a type described above acquired since the end of such fiscal month and (y) any property or assets of a type described above being acquired in connection therewith); *provided*, *however*, that there shall be excluded from such book value the book value of any rental equipment subject to a lien securing Indebtedness other than First Priority Lien Obligations.

*"Business Day"* means a day other than a Saturday, Sunday or other day on which banking institutions are authorized or required by law to close in New York City.

*"Capital Stock"* means, with respect to any person, any and all shares, interests, participations, rights in or other equivalents (however designated) of such person's capital stock or equity participations, and any rights (other than debt securities convertible into capital stock), warrants or options exchangeable for or convertible into such capital stock and, including with respect to partnerships, limited liability companies or business trusts, ownership interests (whether general or limited) and any other interest or participation that confers on a person the right to receive a share of the profits and losses of, or distributions of assets of, such partnerships, limited liability companies or business trusts.

*"Capitalized Lease Obligation"* means any obligation under a lease of (or other agreement conveying the right to use) any property (whether real, personal or mixed) that is required to be classified and accounted for as a capital lease obligation under GAAP, and, for the purpose of the Indenture, the amount of such obligation at any date shall be the capitalized amount thereof at such date, determined in accordance with GAAP.

*"Cash Equivalents"* means, at any time:

(a)  any evidence of Indebtedness, maturing not more than 12 months after such time, issued, guaranteed or insured by the United States Government or any agency or instrumentality thereof;

(b)  commercial paper, maturing not more than 12 months from the date of issuance, or corporate demand notes, in each case rated at least A-1 by Standard & Poor's Ratings Group or P-1 by Moody's Investors Service, Inc.;

(c)  any certificate of deposit (or time deposits represented by such certificates of deposit) maturing not more than one year after such time, or bankers acceptances, Eurodollar bank deposits or overnight bank deposits that are issued, sold by or held with (i) a bank or trust company organized under the laws of the United States or any state thereof and has at the time of acquisition thereof a combined capital and surplus of not less than $500.0 million or (ii) a bank or trust company organized under the laws of any foreign country having, at the time of acquisition thereof, capital and surplus in excess of $500.0 million (or the U.S. dollar equivalent thereof as of the date of determination);

(d)  any repurchase agreement entered into with any commercial banking institution of the stature referred to in clause (c);

(e)  investments in short term asset management accounts and money market and similar securities which are rated under one of the two highest ratings then obtainable from Standard & Poor's Ratings Group or by Moody's Investors Service, Inc. and which are invested primarily in the type of investments of the types described in clauses (a) through (d) above;

(f)  (i) United States dollars, (ii) Euro, or any national currency of any participating member state of the EMU; or (iii) in the case of any Foreign Subsidiary that is a Restricted Subsidiary, such local currencies held by them from time to time in the ordinary course of business;

(g)  readily marketable direct obligations issued by any state, commonwealth or territory of the United States or any political subdivision or taxing authority thereof having an Investment Grade Rating from either Moody's or S&P with maturities of 12 months or less from the date of acquisition (for purposes of this clause (h), variable rate bonds tied to short-term interest rates that are reset through an auction process that occurs no less frequently than once every 45 days shall be deemed to satisfy the foregoing maturity deadline, notwithstanding such bonds having a longer nominal maturity);

(h)  Investments with maturities of 12 months or less from the date of acquisition in money market funds rated AAA- (or the equivalent thereof) or better by S&P or Aaa3 (or the equivalent thereof) or better by Moody's; and

(i)  In the case of Foreign Subsidiaries, Investments having correlative attributes to the foregoing) held by the Company or any of its Restricted Subsidiaries, from time to time in the ordinary course of business.

*"Change of Control"* means the occurrence of any of the following events:

(a)  the sale, lease or transfer, in one or a series of related transactions, of all or substantially all of the assets of the Company and its Subsidiaries, taken as a whole, to any Person other than a Permitted Holder;

(b)  the Company becomes aware (by way of a report or any other filing pursuant to Section 13(d) of the Exchange Act, proxy, vote, written notice or otherwise) that any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Exchange Act), excluding Permitted Holders, is or becomes the "beneficial owner" (as defined in Rules 13d-3 and 13d-5 under the Exchange Act, except that a person shall be deemed to have "beneficial ownership" of all securities that such person has the right to acquire, whether such right is exercisable immediately or only after the passage of time), directly or indirectly, of more than 50% of the total Voting Stock of the Company or Holdings; *provided, however,* that a "Change of Control" shall not be deemed to have occurred under this subclause (a) unless the Permitted Holders do not have the right or ability by voting power, contract or otherwise to elect or designate for election a majority of the Board of Directors of the Company or Holdings;

(c)  individuals who on the Issue Date constituted the Board of Directors of the Company or Holdings (together with any new directors whose election by such Board of Directors or whose nomination for election by the stockholders of the Company or Holdings was approved by a vote of the majority of the directors then still in office who were either directors on the Issue Date or whose election or nomination for election was previously so approved) cease for any reason to constitute a majority of the Board of Directors of the Company or Holdings then in office; or

(d)  the Company is liquidated or dissolved or adopts a plan of liquidation.

*provided, however,* that a "Change of Control" shall not include the URI Merger or the URNA Merger.

*"Collateral"* means all property subject or purported to be subject, from time to time, to a Lien under any Security Document for the benefit of the Notes.

*"Company"* means, prior to the URNA Merger, RAM Transition Corp, a Delaware corporation, and thereafter, United Rentals (North America), Inc., a Delaware corporation, and its successors and assignors.

*"Consolidated Cash Flow Available for Fixed Charges"* means, with respect to any person for any period:

(i)  the sum of, without duplication, the amounts for such period, taken as a single accounting period, of:

(a)  Consolidated Net Income;

(b)  Consolidated Non-cash Charges to the extent deducted in computing Consolidated Net Income;

(c)  Consolidated Interest Expense, to the extent deducted in computing Consolidated Net Income (plus any items specifically excluded by the definition of the term "Consolidated Interest Expense");

(d)  Consolidated Income Tax Expense, to the extent deducted in computing Consolidated Net Income;

(e)  payments made pursuant to clause (ix) under the caption "—Transactions with Affiliates" or (xxv) under the caption "—Limitation on Restricted Payments"; in each case, to the extent deducted (and not added back) in computing such Consolidated Net Income; minus

(ii)  non-cash gains increasing such Consolidated Net Income for such period, excluding any such items to the extent they represent (a) the reversal in such period of an accrual of, or reserve for, potential cash expenses in a prior period, (b) cash payments made during such period on account of reserves, restructuring charges and other non-cash charges and non-cash losses added to Consolidated Net Income in a prior period, (c) the accrual of revenue or income consistent with past practice and (d) the recognition of deferred revenue.

*"Consolidated Fixed Charge Coverage Ratio"* means, with respect to any person, the ratio of the aggregate amount of Consolidated Cash Flow Available for Fixed Charges of such person for the four full fiscal quarters, treated as one period, for which financial information in respect thereof is available immediately preceding the date of the transaction (the *"Transaction Date"*) giving rise to the need to calculate the Consolidated Fixed Charge Coverage Ratio (such four full fiscal quarter period being referred to herein as the *"Four Quarter Period"*) to the aggregate amount of Consolidated Fixed Charges of such person for the Four Quarter Period.

(a)  In calculating the "Consolidated Fixed Charge Coverage Ratio":

(i)  in the event that the specified person or any of its Restricted Subsidiaries Incurs, repays, repurchases, redeems, defeases, retires, extinguishes or otherwise discharges any Indebtedness (other than working capital borrowings, unless such Indebtedness has been permanently repaid) subsequent to the commencement of the Four Quarter period for which the Consolidated Fixed Charge Coverage Ratio is being calculated and on or prior to the Transaction Date, then the Consolidated Fixed Charge Coverage Ratio will be calculated giving *pro forma* effect to such incurrence, issuance, assumption, guarantee, repayment, repurchase, redemption, defeasance, retirement, extinguishment or other discharge of Indebtedness, and the use of the proceeds therefrom, as if the same had occurred at the beginning of the Four Quarter Period;

(ii)  interest on outstanding Indebtedness determined on a fluctuating basis as of the Transaction Date and which will continue to be so determined thereafter shall be deemed to have accrued at a fixed rate per annum equal to the rate of interest on such Indebtedness in effect on the Transaction Date (after giving effect to the operation of any Hedging Obligations applicable to such Indebtedness); and

(iii)  interest on any Indebtedness under a revolving credit facility shall be computed based upon the average daily balance of such Indebtedness during such period.

(b)  If such person or any of its Restricted Subsidiaries directly or indirectly guarantees Indebtedness of a third person clause (a) shall give effect to the Incurrence of such guaranteed Indebtedness as if such person or such Subsidiary had directly Incurred or otherwise assumed such guaranteed Indebtedness.

(c)  In addition, for purposes of calculating Consolidated Fixed Charge Coverage Ratio:

(i)  any Subject Transaction that occurs during the Four Quarter Period or subsequent to such Four Quarter Period and on or prior to the Transaction Date (including any transaction giving rise to the need to make such calculation) will be given pro forma effect, including Pro forma Cost Savings (and the change in Consolidated Fixed Charges and Consolidated Cash Flow Available for Fixed Charges resulting therefrom), whether or not such Pro forma Cost Savings complies with Regulation S-X, as if such Subject Transaction had occurred on the first day of the Four Quarter Period. If since the beginning of such Four Quarter Period, any Person (that subsequently became

154

a Restricted Subsidiary or was merged with or into the Company or any Restricted Subsidiary since the beginning of such Four Quarter Period) shall have made any Subject Transaction, then the Consolidated Fixed Charge Coverage Ratio shall be calculated giving *pro forma* effect thereto for such Four Quarter Period as if such Subject Transaction had occurred at the beginning of such Four Quarter Period. For purposes of this definition, whenever pro forma effect is to be given to any Subject Transaction, the pro forma calculations shall be made in good faith by a responsible financial or accounting officer of the Company;

(ii)  any person that is a Restricted Subsidiary on the Transaction Date will be deemed to have been a Restricted Subsidiary at all times during such Four Quarter Period; and

(iii) any person that is not a Restricted Subsidiary on the Transaction Date will be deemed not to have been a Restricted Subsidiary at any time during such Four Quarter Period.

*"Consolidated Fixed Charges"* means, with respect to any person for any period, the sum of, without duplication, the amounts for such period of:

(i)  Consolidated Interest Expense; and

(ii)  the aggregate amount of dividends and other similar distributions paid or accrued (excluding items eliminated in consolidation) during such period in respect of Redeemable Capital Stock of such person and its Restricted Subsidiaries on a consolidated basis.

*"Consolidated Income Tax Expense"* means, with respect to any person for any period, the provision for federal, state, local and foreign income taxes and all other taxes based on income or profit or capital, including state and local franchise taxes (such as the Pennsylvania capital tax and the Texas margin tax) (or the non-U.S. equivalent thereof) of such person and its Restricted Subsidiaries for such period as determined on a consolidated basis in accordance with GAAP (including tax expenses of Foreign Subsidiaries and foreign withholding taxes paid or accrued for such period), whether paid directly or as a Tax Payment made in accordance with the covenant described under "—Limitation on Restricted Payments".

*"Consolidated Interest Expense"* means, with respect to any person for any period, without duplication, the sum of:

(i)  the interest expense, net of such person and its Restricted Subsidiaries for such period as determined on a consolidated basis in accordance with GAAP, to the extent such expense was deducted and not added back in determining Consolidated Net Income, including:

(a)  any amortization of original issue discount;

(b)  the net cost under Hedging Obligations (including any amortization of discounts);

(c)  the interest portion of any deferred payment obligation;

(d)  all commissions, discounts and other fees and charges owed with respect to letters of credit, bankers' acceptance financing or similar facilities;

(e)  all capitalized interest; and

(f)  all accrued interest;

in each case, net of the effects of all payments made or received pursuant to Hedging Agreements; and

(ii)  the interest component of Capitalized Lease Obligations paid, accrued and/or scheduled to be paid or accrued by such person and its Restricted Subsidiaries during such period and deemed to accrue at an interest rate reasonably determined by such person to be the rate of interest implicit in such Capitalized Lease Obligation in accordance with GAAP.

155

Notwithstanding anything to the contrary contained herein, for purposes of calculating the Consolidated Fixed Charge Coverage Ratio only, Consolidated Interest Expense shall exclude each of the following:

(i)   the accretion of any original issue discount or any non-cash interest expense resulting from the discounting of any Indebtedness resulting from fair value adjustments resulting from purchase accounting;

(ii)   any financing fees, tender premiums, call premiums and other non-recurring expenses, whether or not capitalized, in connection with the Transactions and Indebtedness that is retired on the Issue Date (including write-offs thereof);

(iii)  penalties and interest relating to taxes;

(iv)   any expensing of bridge, commitment and other financing fees; and

(v)   amortization of deferred financing fees and any loss on early extinguishment of Indebtedness, and any interest expense attributable to the movement in the mark to market valuation of Hedging Obligations or other derivative instruments.

*"Consolidated Net Income"* means, with respect to any person, for any period, the consolidated net income (or loss) of such person and its Restricted Subsidiaries for such period as determined in accordance with GAAP, by excluding, without duplication:

(i)   any extraordinary, non-recurring or unusual gain (or loss), expense or charge, (including relating to the Transactions;

(ii)   solely for purposes of calculating Consolidated Cash Flow Available for Fixed Charges, the portion of net income of such person and its Restricted Subsidiaries allocable to minority interests in unconsolidated persons or to Investments in Unrestricted Subsidiaries to the extent that dividends, distributions or other payments paid in cash (or converted to cash) have not actually been received by such person or one of its Restricted Subsidiaries;

(iii)  gains or losses in respect of (a) any Asset Sales (without giving effect to the $10.0 million threshold provided in the definition thereof) or other asset or securities disposition or abandonment (other than in the ordinary course of business), including the amount of any loss on sale of assets to a Special Purpose Vehicle in connection with a Securitization Transaction and reserves relating thereto (net of fees and expenses relating to the transaction giving rise thereto); and (b) the extinguishment of any (i) Indebtedness or (ii) other derivative instruments of such person or one of its Restricted Subsidiaries in each case, on an after-tax basis;

(iv)   any net income or loss from discontinued operations and any net after-tax gain or loss on disposal of discontinued operations;

(v)   any net unrealized gain or loss (after any offset) resulting in such period from (A) Hedging Obligations or other derivative instruments and the application of Statement of Financial Accounting Standards No. 133, and (B) currency translation gains or losses including those related to currency remeasurements of Indebtedness and the mark to market of Indebtedness denominated in foreign currencies resulting from FAS 52;

(vi)   solely for the purposes of calculating Consolidated Net Income to determine the amount of Restricted Payments permitted under the covenant described under the caption "Certain Covenants—Restricted Payments", the net income of any Restricted Subsidiary of such person (other than a Guarantor or a Special Purpose Vehicle) to the extent that the declaration of dividends or similar distributions by that Restricted Subsidiary of that income is not at the time permitted, directly or indirectly, by operation of the terms of its charter or any agreement, instrument, judgment, decree, order, statute, rule or governmental regulations applicable to that Restricted Subsidiary or its stockholders (a) except to the extent that such net income is actually

156

paid to the Company or a Restricted Subsidiary of the Company by loans, advances, intercompany transfers, principal repayments or otherwise, and (b) unless such restriction with respect to the payment of dividends or similar distributions has been legally waived;

(vii) any gain or loss realized as a result of the cumulative effect of a change in accounting principles and changes as a result of the adoption or modification of accounting policies during such period;

(viii) effects of adjustments (including the effects of such adjustments pushed down to the Company and its Restricted Subsidiaries) pursuant to GAAP resulting from the application of purchase accounting in relation to the Transaction or any Asset Acquisition net of taxes;

(ix) any impairment charge or asset write-off or write-down, including impairment charges or asset write-offs or write downs related to intangible assets, long-lived assets, investments in debt and equity securities or as a result of a change in law or regulation, in each case, pursuant to GAAP (including the amortization of the consideration for any non-competition agreements entered into in connection with the Transactions), and any non-cash impairment charges resulting from the application of Statement of Financial Accounting Standards Nos. 142 and 144 and the amortization of intangibles arising pursuant to No. 141;

(x) any non-cash charges relating to employee benefit or other management compensation plans (including post-employment benefit plans) of any direct or indirect parent of the Company (to the extent such charges relate to plans of any direct or indirect parent of the Company for the benefit of members of the Board of Directors of the Company (in their capacity as such) or employees of the Company and its Restricted Subsidiaries), the Company or any of its Restricted Subsidiaries or any non-cash charges arising from any grant, issuance or repricing of stock appreciation or similar rights, stock, stock options, restricted stock or other equity based awards of any direct or indirect parent of the Company (to the extent such charges relate to plans of any direct or indirect parent of the Company for the benefit of members of the Board of Directors of the Company (in their capacity as such) or employees of the Company and its Restricted Subsidiaries), the Company or any of its Restricted Subsidiaries (excluding in each case any charge to the extent that it represents an accrual of or reserve for cash expenses in any future period or amortization of a prepaid cash expense incurred in a prior period); and

(xi) accruals and reserves that are established within twelve months after the Issue Date that are so required to be established as a result of the Transaction in accordance with GAAP.

In addition, to the extent not already included in the Consolidated Net Income of such person and its Restricted Subsidiaries, notwithstanding anything to the contrary in the foregoing, Consolidated Net Income shall include (a) the amount of proceeds received from business interruption insurance and reimbursements of any expenses and charges that are covered by indemnification or other reimbursement provisions in connection with any Investment or any sale, conveyance, transfer or other disposition of assets permitted under the Indenture, and (b) solely for the purpose of calculating Restricted Payments, the difference, if positive, of the Consolidated Income Tax Expense of the Company calculated in accordance with GAAP and the actual Consolidated Income Tax Expense paid in cash by the Company during such period.

Notwithstanding the foregoing, for the purpose of the covenant described under "Certain Covenants—Limitation on Restricted Payments" only (other than clause (C)(6) of the first paragraph thereof), there shall be excluded from Consolidated Net Income any income arising from any disposition, repayment, repurchase, redemption or release of Investments, in each case to the extent such actions have increased the amount of Restricted Payments permitted under such covenant pursuant to clause (C)(6) thereof.

"*Consolidated Non-cash Charges*" means, with respect to any person for any period, the aggregate depreciation, amortization (including amortization of intangibles and deferred financing costs or fees, and all expenditures in respect of licensed or purchased software or internally developed software and software enhancements that are, or are required to be reflected as, capitalized costs) and other non-cash expense, of such person and its Restricted Subsidiaries reducing Consolidated Net Income of such person and its Restricted Subsidiaries for such period, determined on a consolidated basis in accordance with GAAP (excluding any such charges constituting an extraordinary item or loss).

"*Consolidated Total First Lien Debt Ratio*" means, as of any date of determination, the ratio of (a) Consolidated Total Indebtedness of the Company and its Restricted Subsidiaries on the date of determination that constitutes First Priority Lien Obligations to (b) the aggregate amount of Consolidated Cash Flow Available for Fixed Charges for the then most recent four fiscal quarters for which internal financial statements of the Company and its Restricted Subsidiaries are available in each case with such *pro forma* adjustments to Consolidated Total Indebtedness and Consolidated Cash Flow Available for Fixed Charges as are consistent with the *pro forma* adjustment provisions set forth in the definition of "Consolidated Fixed Charge Coverage Ratio"; *provided, however*, that solely for purposes of the calculation of the Consolidated Total First Lien Debt Ratio, in connection with the incurrence of any Lien securing Indebtedness Incurred under a revolving credit facility or delayed draw term loan facility, the Company or its Restricted Subsidiaries may elect pursuant to an officer's certificate delivered to the Trustee to treat all or any portion of the commitment under such facility as being Indebtedness Incurred at such time and any subsequent Incurrence of such Indebtedness under such facility shall not be deemed, for purposes of this calculation, to be an Incurrence at such subsequent time.

"*Consolidated Total Indebtedness*" means, as of any date of determination, an amount equal to the aggregate amount of all outstanding Indebtedness of the Company and its Restricted Subsidiaries (excluding any undrawn letters of credit issued in the ordinary course of business).

"*Consolidated Total Second Lien Debt Ratio*" means, as of any date of determination, the ratio of (a) Consolidated Total Indebtedness of the Company and its Restricted Subsidiaries on the date of determination that is secured by a Lien on all or any part of the Collateral (unless such Lien is expressly junior to the Lien securing the Notes on terms substantially similar to the relative rights of the holders of First Priority Lien Obligations and the holders of the Notes contained in the Intercreditor Agreement) to (b) the aggregate amount of Consolidated Cash Flow Available for Fixed Charges for the then most recent four fiscal quarters for which internal financial statements of the Company and its Restricted Subsidiaries are available, in each case with such *pro forma* adjustments to Consolidated Total Indebtedness and Consolidated Cash Flow Available for Fixed Charges as are consistent with the *pro forma* adjustment provisions set forth in the definition of "Consolidated Fixed Charge Coverage Ratio," *provided, however,* that solely for purposes of the calculation of the Consolidated Total Second Lien Debt Ratio, in connection with the Incurrence of any Lien securing Indebtedness Incurred under a credit facility, the Company or its Restricted Subsidiaries may elect pursuant to an officer's certificate delivered to the Trustee to treat all or any portion of the commitment under such facility as being Indebtedness Incurred at such time and any subsequent Incurrence of such Indebtedness under such facility shall not be deemed, for purposes of this calculation, to be an Incurrence at such subsequent time.

"*Contribution Indebtedness*" means Indebtedness of the Company or any Restricted Subsidiaries in an aggregate principal amount not greater than the aggregate amount of Qualified Proceeds received by the Company as capital contributions or the issuance or sale of Capital Stock (excluding Disqualified Stock described in clauses (i), (ii), (iii) or (v) of the definition thereof) contributed of the Company after the Issue Date; *provided*, *however*, that:

(a)  such cash contributions have not been used to make a Restricted Payment; and

Exhibit B-7

(b) if the aggregate principal amount of such Contribution Indebtedness is greater than the aggregate amount of Qualified Proceeds contributed to the capital of the Company or such Restricted Subsidiaries, as the case may be, the amount in excess shall be Indebtedness with a Stated Maturity later than the Stated Maturity of the Notes; and

(c) such Contribution Indebtedness (i) is Incurred within 180 days after receipt by the Company of such Qualified Proceeds and (ii) is so designated as Contribution Indebtedness pursuant to an officer's certificate delivered to the Trustee.

"*control*" when used with respect to any specified person means the power to direct the management and policies of such person, directly or indirectly, whether through ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"*Convertible Debentures*" means the 6½% Convertible Subordinated Debentures due August 1, 2028 issued by Holdings to United Rentals Trust I and outstanding on the Issue Date.

"*Convertible Notes*" means the Company's 1⅞% Convertible Senior Subordinated Notes due October 15, 2023 and outstanding on the Issue Date.

"*Credit Agreement*" means (i) the credit agreement entered into on the Issue Date, as amended, restated, supplemented, waived, replaced (whether or not upon termination, and whether with the original lenders or otherwise), restructured, increased, Refinanced or otherwise modified from time to time in whole or in part, including any agreement or indenture extending the maturity thereof, Refinancing or otherwise restructuring all or any portion of the Indebtedness under such agreement or agreements or indenture or indentures or any successor or replacement agreement or agreements or indenture or indentures or increasing the amount loaned or issued thereunder or altering the maturity thereof, among the Company, United Rentals of Canada, Inc., Holdings, RAM Acquisition Corp., the guarantors thereto, the financial institutions thereto, Bank of America, N.A., as U.S. Agent and Canadian Agent and the other agents party thereto, and (ii) whether or not the credit agreement referred to in clause (i) remains outstanding, if designated by the Company to be included in the definition of "Credit Agreement," one or more (A) debt facilities or commercial paper facilities, providing for revolving credit loans, term loans, receivables financing (including through the sale of receivables to lenders or to special purpose entities formed to borrow from lenders against such receivables) or letters of credit, (B) debt securities, indentures or other forms of debt financing (including convertible or exchangeable debt instruments or bank guarantees or bankers' acceptances) or (C) instruments or agreements evidencing any other Indebtedness, in each case, with the same or different borrowers or issuers and, in each case, as amended, supplemented, modified, restructured, Refinanced or restated in whole or in part from time to time.

"*Default*" means any event that is, or after notice or passage of time or both would be, an Event of Default.

"*Designated Non-cash Consideration*" means the Fair Market Value of non-cash consideration received by the Company or any of its Restricted Subsidiaries in connection with an Asset Sale that is so designated as Designated Non-cash Consideration pursuant to an officer's certificate, setting forth the basis of such valuation delivered to the Trustee less the amount of cash or Cash Equivalents received in connection with a subsequent sale of or collection on such Designated Non-cash Consideration.

"*Disinterested Member of the Board of Directors of the Company*" means, with respect to any transaction or series of transactions, a member of the Board of Directors of the Company other than a member who has any material direct or indirect financial interest in or with respect to such transaction or series of transactions or is an Affiliate, or an officer, director or an employee of any person (other

than the Company or Holdings or any Subsidiary thereof) who has any direct or indirect financial interest in or with respect to such transaction or series of transactions.

"*Disqualified Person*" means (i) any Subsidiary of the Company or (ii) any management equity plan, stock option plan, employee stock ownership plan or any other management or employee benefit plan or trust established by the Company or any of its Subsidiaries for the benefit of their employees.

"*Disqualified Stock*" means

    (i)   any Redeemable Capital Stock;

    (ii)   any Capital Stock issued or sold to a Disqualified Person;

    (iii)  any Capital Stock the proceeds of which constitute an Excluded Contribution; and

    (iv)  any Capital Stock which serves as the basis for the Incurrence of Contribution Indebtedness; and

    (v)  any Capital Stock financed with loans, guarantees or other extensions of credit provided by the Company or any Subsidiary of the Company.

"*Equipment Securitization Transaction*" means any sale, assignment, pledge or other transfer (a) by the Company or any Subsidiary of the Company of rental fleet equipment, (b) by any ES Special Purpose Vehicle of leases or rental agreements between the Company and/or any Subsidiary of the Company, as lessee, on the one hand, and such ES Special Purpose Vehicle, as lessor, on the other hand, relating to such rental fleet equipment and receivables arising under such leases and rental agreements and (c) by the Company or any Subsidiary of the Company of any interest in any of the foregoing, together in each case with (i) any and all proceeds thereof (including all collections relating thereto, all payments and other rights under insurance policies or warranties relating thereto, all disposition proceeds received upon a sale thereof, and all rights under manufacturers' repurchase programs or guaranteed depreciation programs relating thereto), (ii) any collection or deposit account relating thereto and (iii) any collateral, guarantees, credit enhancement or other property or claims supporting or securing payment on, or otherwise relating to, any such leases, rental agreements or receivables.

"*Equity Offering*" means any public or private sale of Capital Stock (other than Disqualified Stock) of the Company or, so long as the net proceeds therefrom are contributed to the Company, any of its direct or indirect parent companies, other than:

    (1)  public offerings of Capital Stock registered on Form S-4 or Form S-8;

    (2)  issuances of Capital Stock to any Disqualified Person; and

    (3)  issuance of Capital Stock the proceeds of which constitute an Excluded Contribution.

"*ES Special Purpose Vehicle*" means a trust, bankruptcy remote entity or other special purpose entity which is a Subsidiary of the Company or Holdings (or, if not a Subsidiary of the Company or Holdings, the common equity of which is wholly owned, directly or indirectly, by the Company or Holdings) and which is formed for the purpose of, and engages in no material business other than, acting as a lessor, issuer or depositor in an Equipment Securitization Transaction (and, in connection therewith, owning and financing the rental fleet equipment, leases, rental agreements, receivables, rights to payment and other interests, rights and assets described in the definition of Equipment Securitization Transaction, and pledging or transferring any of the foregoing or interests therein).

"*Event of Default*" has the meaning set forth under "—Events of Default" herein.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended.

"*Excluded Contribution*" means net cash proceeds, marketable securities or Qualified Proceeds received by the Company after the Issue Date and after giving effect to the Transactions from:

    (a)  contributions to its common equity capital; or

    (b)  the sale of Capital Stock (other than Disqualified Stock) of the Company;

in each case designated as Excluded Contributions pursuant to an officer's certificate delivered to the Trustee at the time of such contribution or sale.

"*Fair Market Value*" means, with respect to any asset or property, the price which would be paid in an arm's length free market transaction, for cash, between a willing seller and a willing and able buyer, neither of which is under undue pressure or compulsion to complete the transaction. Fair Market Value shall be determined by the Board of Directors of the Company in good faith.

"*First Priority After-Acquired Property*" means any property (other than the Collateral as of the Issue Date) of the Company and any Guarantor that secures any First Priority Lien Obligations.

"*First Priority Lien Obligations*" means (i) all Secured Bank Indebtedness, (ii) all other Obligations (not constituting Indebtedness) of the Company and its Restricted Subsidiaries under the agreements governing Secured Bank Indebtedness, and (iii) all other Obligations of the Company or any of its Restricted Subsidiaries in respect of Hedging Obligations or Obligations in respect of such cash management services, in each case owing to a person that is a holder of Indebtedness described in clause (i) or Obligations described in clause (ii) or an Affiliate of such holder at the time of entry into such Hedging Obligations or Obligations in respect of cash management services, and (iv) additional First Priority Lien Obligations permitted pursuant to clause (b)(ii) of the definition of Permitted Liens and so designated pursuant to an officer's certificate delivered to the Trustee.

"*Foreign Subsidiary*" means any Restricted Subsidiary not created or organized in the United States or any state or territory thereof or the District of Columbia.

"*GAAP*" means generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as may be approved by a significant segment of the accounting profession of the United States of America, which are in effect from time to time.

"*guarantee*" means, as applied to any Indebtedness:

    (i)  a guarantee (other than by endorsement of negotiable instruments for collection in the ordinary course of business), direct or indirect, in any manner, of any part or all of such Indebtedness; and

    (ii)  an agreement, direct or indirect, contingent or otherwise, the practical effect of which is to assure in any way the payment or performance (or payment of damages in the event of nonperformance) of all or any part of such Indebtedness.

The term "*guarantee*" used as a verb has a corresponding meaning.

"*Guarantor*" means Holdings and each Subsidiary Guarantor.

"*Guaranty Agreement*" means a supplemental indenture, in a form reasonably satisfactory to the Trustee, pursuant to which a Subsidiary Guarantor guarantees the Company's obligations with respect to the related Notes on the terms provided for in the Indenture governing such Notes.

"*Hedging Agreement*" means any interest rate swap agreement, interest rate cap agreement, interest rate collar agreement, commodity swap agreement, commodity cap agreement, commodity collar agreement, foreign exchange contract, currency swap agreement or similar agreement or arrangement

providing for the transfer or mitigation of interest rate or currency risks or changes in commodity prices either generally or under specific contingencies.

"*Hedging Obligations*" means the obligations of any person pursuant to any Hedging Agreement.

"*Holdings*" means United Rentals, Inc., a Delaware corporation.

"*Incur*" means issue, assume, guarantee, incur or otherwise become liable for; *provided, however*, that any Indebtedness of a Person existing at the time such Person becomes a Restricted Subsidiary (whether by merger, consolidation, acquisition or otherwise) shall be deemed to be Incurred by such Person at the time it becomes a Restricted Subsidiary. The term "Incurrence" when used as a noun shall have a correlative meaning.

"*Indebtedness*" means, with respect to any person, without duplication:

(a) all liabilities of such person for borrowed money or for the deferred and unpaid purchase price of property or services, excluding any trade payables (or commercial letters of credit to a trade creditor) and other accrued liabilities or expenses or other expenses Incurred in the ordinary course of business (including obligations owing to customers and suppliers);

(b) all obligations of such person evidenced by bonds, notes, debentures, bankers' acceptances, letters of credit or other similar instruments (other than letters of credit issued in respect of trade payables entered into in the ordinary course);

(c) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such person (even if the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), but excluding trade payables arising in the ordinary course of business;

(d) all Capitalized Lease Obligations of such person and all Attributable Debt in respect of Sale/Leaseback Transactions entered into by such person;

(e) all Indebtedness referred to in the preceding clauses of other persons, the payment of which is secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien upon property (including accounts and contract rights) owned by such person, even though such person has not assumed or become liable for the payment of such Indebtedness (the amount of such obligation being deemed to be the lesser of the Fair Market Value of such property or asset or the amount of the obligation so secured);

(f) all guarantees of Indebtedness referred to in this definition by such person;

(g) all Redeemable Capital Stock of such person valued at the greater of its voluntary or involuntary maximum fixed repurchase price plus accrued dividends;

(h) all obligations under or in respect of Hedging Obligations of such person; and

(i) any amendment, supplement, modification, deferral or Refinancing of any liability of the types referred to in clauses (a) through (h) above;

*provided, however*, that Indebtedness shall not include:

(i) any holdback or escrow of the purchase price of property, services, businesses, securities or assets or to satisfy warranties, indemnifications or other unperformed obligations;

(ii) any contingent payment obligations Incurred in (A) connection with the acquisition of assets or businesses, which are contingent on a final closing balance sheet or the performance of the assets or businesses so acquired, or (B) the ordinary course of business;

(iii) the incurrence by the Company or any of its Restricted Subsidiaries of contingent liabilities arising out of endorsements of checks and other negotiable instruments for deposit or collection in the ordinary course of business;

(iv) deferred or prepaid revenues;

(v) obligations in connection with a Securitization Transaction; or

(vi) obligations under the Acquisition Agreement.

For purposes hereof, the "maximum fixed repurchase price" of any Redeemable Capital Stock which does not have a fixed repurchase price shall be calculated in accordance with the terms of such Redeemable Capital Stock as if such Redeemable Capital Stock were purchased on any date on which Indebtedness shall be required to be determined pursuant to the Indenture, and if such price is based upon, or measured by, the fair market value of such Redeemable Capital Stock, such fair market value shall be approved in good faith by the board of directors of the issuer of such Redeemable Capital Stock.

Notwithstanding anything in the Indenture to the contrary, Indebtedness shall not include, and shall be calculated without giving effect to, the effects of Statement of Financial Accounting Standards No. 133 and related interpretations to the extent such effects would otherwise increase or decrease an amount of Indebtedness for any purpose under the Indenture as a result of accounting for any embedded derivatives created by the terms of such Indebtedness; and any such amounts that would have constituted Indebtedness under the Indenture but for the application of this sentence shall not be deemed an Incurrence of Indebtedness under the Indenture.

"*Independent Financial Advisor*" means an accounting, appraisal, investment banking firm or consultant of nationally recognized standing that is, in the good faith judgment of the Company, qualified to perform the task for which it has been engaged.

"*Intercreditor Agent*" has the meaning given to such term in the Intercreditor Agreement.

"*Intercreditor Agreement*" means the Intercreditor Agreement dated as of the Issue Date, between the Collateral Agent and the collateral agent for the holders of Secured Bank Indebtedness, on behalf of itself and such holders, and acknowledged by the Company and the Guarantors, as it may be amended, restated or replaced from time to time in accordance with the terms thereof.

"*Investment*" means, with respect to any person, any direct or indirect loan or other extension of credit (including a guarantee) or capital contribution to (by means of any transfer of cash or other property to others, or any purchase or acquisition by such person of any Capital Stock, bonds, notes, debentures or other securities or evidences of Indebtedness issued by, any other person. Except as otherwise provided in the Indenture, the amount of an Investment will be determined at the time the Investment is made and without giving effect to subsequent changes in value.

"*Investment Grade Rating*" means a rating equal to or higher than Baa3 (or the equivalent) by Moody's and BBB- (or the equivalent) by S&P, or an equivalent rating by any other rating agency.

"*Investment Grade Securities*" means:

(a) securities issued or directly and fully guaranteed or insured by the United States government or any agency or instrumentality thereof (other than Cash Equivalents);

(b) debt securities or debt instruments with an Investment Grade Rating, but excluding any debt securities or instruments constituting loans or advances among the Company and its Subsidiaries;

(c)  investments in any fund that invests exclusively in investments of the type described in clauses (1) and (2) which fund may also hold immaterial amounts of cash pending investment or distribution; and

(d)  corresponding instruments in countries other than the United States customarily utilized for high quality investments and in each case with maturities not exceeding one year from the date of acquisition.

"*Issue Date*" means          , 2007.

"*Lien*" means any mortgage, charge, pledge, lien (statutory or other), security interest, hypothecation, assignment for security, or preference or priority or other encumbrance upon or with respect to any property of any kind. A person shall be deemed to own subject to a Lien any property which such person has acquired or holds subject to the interest of a vendor or lessor under any conditional sale agreement, capital lease or other title retention agreement; provided that in no event shall an operating lease be deemed to constitute a Lien.

"*Management Group*" means the group consisting of the directors, executive officers and other management personnel of the Company or any direct or indirect parent of the Company, as the case may be, on the Issue Date together with (i) any new directors whose election by such boards of directors or managers or whose nomination for election by the shareholders of the Company or any direct or indirect parent of the Company, as applicable, was approved by a vote of a majority of the directors of the Company or any direct or indirect parent of the Company, as applicable, then still in office who were either directors on the Issue Date or whose election or nomination was previously so approved and (ii) executive officers and other management personnel of the Company or any direct or indirect parent of the Company, as applicable, hired at a time when the directors on the Issue Date together with the directors so approved constituted a majority of the directors of the Company or any direct or indirect parent of the Company as applicable.

"*Maturity Date*" means          , 2014.

"*Net Cash Proceeds*" means, with respect to any Asset Sale, the proceeds thereof in the form of cash or Cash Equivalents including any cash received in respect of or upon the sale or other disposition of any Designated Non-cash Consideration received in any Asset Sale and any cash payments in respect of deferred payment when received in the form of cash or Cash Equivalents (except to the extent that such obligations are financed or sold with recourse to the Company or any Restricted Subsidiary of the Company net of:

(i)  all fees, costs and expenses (including brokerage and sales commissions, fees and expenses of legal counsel, accountants and investment bankers, recording fees, transfer fees, appraisers' and insurance adjusters' fees and severance and relocation costs) related to such Asset Sale or disposition of such Designated Non-cash Consideration;

(ii)  provisions for all taxes paid or payable as a result of such Asset Sale;

(iii)  amounts required to be paid to any person (other than the Company or any Restricted Subsidiary of the Company) owning a beneficial interest in the assets subject to the Asset Sale;

(iv)  payments made to retire Indebtedness where payment of such Indebtedness is (A) secured by the assets or properties the subject of such Asset Sale or (B) otherwise required to be paid by the terms of the agreement governing such Indebtedness;

(v)  appropriate amounts to be provided by the Company or any Restricted Subsidiary of the Company, as the case may be, as a reserve required in accordance with GAAP against any liabilities associated with such Asset Sale and retained by the Company or any Restricted Subsidiary of the Company, as the case may be, after such Asset Sale, including severance costs, pension and other post-employment benefit liabilities, liabilities related to environmental matters

and liabilities under any indemnification obligations associated with such Asset Sale, all as reflected in an officer's certificate delivered to the Trustee;

(vi)  any reserves for adjustment in respect of the sale price of such asset, and

(vii)  any cash escrows in connection with purchase price adjustments, reserves or indemnities (until released).

"*Obligations*" means any principal (including reimbursement obligations with respect to letters of credit whether or not drawn), interest (including all interest accrued thereon after the commencement of any insolvency or liquidation proceeding at the rate, including any applicable post-default rate, specified in the documents governing any such Indebtedness, even if such interest is not enforceable, allowable or allowed as a claim in such proceeding), premium (if any), penalties, fees, indemnifications, reimbursements, expenses, damages and other amounts, obligations and liabilities payable under the documentation governing any Indebtedness.

"*Offering Circular*" means the Offering Circular dated          , 2007, with respect to the offering of the Notes.

"*Permitted Business*" means (1) any business engaged in by the Company or any of its Restricted Subsidiaries on the Issue Date after giving effect to the Transactions, and (2) any business or other activities that are reasonably similar, ancillary, complementary or related to, or a reasonable extension, development or expansion of, the businesses in which the Company and its Restricted Subsidiaries are engaged on the Issue Date after giving effect to the Transactions.

"*Permitted Holder*" means, at any time, each of (i) Holdings, (ii) the Sponsor and (iii) the Management Group. Any person or group whose acquisition of beneficial ownership constitutes a Change of Control in respect of which a Change of Control Offer is made (or is not required to be made) in accordance with the requirements of the Indenture will thereafter, together with its Affiliates, constitute an additional Permitted Holder.

"*Permitted Indebtedness*" means, without duplication:

(a)  Indebtedness of the Company and the Guarantors related to (i) the Notes (other than any Additional Notes), including the guarantees thereof by the Guarantors, and all Exchange Notes and related guarantees issued in exchange therefor pursuant to the Registration Rights Agreement and (ii) the Unsecured Bridge Facility including the guarantees thereof by the Guarantors and any term loans or exchange notes issued pursuant thereto; *provided, however,* the aggregate principal amount outstanding under the Unsecured Bridge Facility does not exceed $1.65 billion;

(b)  Indebtedness Incurred by the Company and Restricted Subsidiaries pursuant to the Credit Agreement and any Refinancing Indebtedness in respect thereof; *provided, however,* that, immediately after giving effect to any such Incurrence, the aggregate principal amount of all Indebtedness Incurred under this clause (b) and then outstanding does not exceed the greater of (A) $2.6 billion and (B) the amount of the Borrowing Base as of the date of such Incurrence, plus, in the case of any Refinancing of such Indebtedness, all accrued interest thereon, and the aggregate amount of fees, underwriting discounts, premiums and other costs and expenses Incurred in connection with such Refinancing, less, in either case, any amounts (not to exceed $500 million in the aggregate) permanently repaid or commitments permanently reduced in accordance with the covenants described under "—Disposition of Proceeds of Asset Sales";

(c)  Indebtedness of the Company or any Restricted Subsidiary outstanding on the Issue Date (other than the Indebtedness described in clauses (a) and (b) above);

(d)  Indebtedness of the Company or any Restricted Subsidiary of the Company Incurred in respect of performance, bid, completion and surety bonds, appeal bonds, bankers' acceptances,

letters of credit, completion guarantees and similar obligations, in each case issued in the ordinary course of business (including to support obligations in respect of workers' compensation claims, health, disability or other benefits to employees or former employees or their families, insurance financing arrangements, self-insurance obligations, take or pay obligations contained in supply agreements, or in connection with the maintenance of, or pursuant to the requirements of, environmental or other permits or licenses from governmental authorities);

(e)  Hedging Obligations that are not incurred for speculative purposes and either: (1) for the purpose of fixing or hedging interest rate risk with respect to any Indebtedness that is permitted by the terms of the Indenture to be outstanding; (2) for the purpose of fixing or hedging currency exchange rate risk with respect to any currency exchanges; or (3) for the purpose of fixing or hedging commodity price risk with respect to any commodity purchases or sales;

(f)  Indebtedness of a Restricted Subsidiary owed to and held by the Company or another Restricted Subsidiary, except that:

(i)  any transfer of such Indebtedness by the Company or a Restricted Subsidiary (other than to the Company or another Restricted Subsidiary); and

(ii)  the sale, transfer or other disposition by the Company or any Restricted Subsidiary of the Company of Capital Stock of a Restricted Subsidiary (other than to the Company or a Restricted Subsidiary) which is owed Indebtedness of another Restricted Subsidiary shall, in each case, be an Incurrence of Indebtedness by such Restricted Subsidiary subject to the other provisions of the Indenture;

(g)  Indebtedness of the Company owed to and held by a Restricted Subsidiary which is unsecured and subordinated in right of payment to the payment and performance of the obligations of the Company under the Indenture and the Notes, except that:

(i)  any transfer of such Indebtedness by the Company or a Restricted Subsidiary (other than to another Restricted Subsidiary); and

(ii)  the sale, transfer or other disposition by the Company or any Restricted Subsidiary of the Company (other than to the Company or a Restricted Subsidiary) of Capital Stock of a Restricted Subsidiary which is owed Indebtedness of the Company shall, in each case, be an Incurrence of Indebtedness by the Company, subject to the other provisions of the Indenture;

(h)  Indebtedness arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business; *provided, however*, that such Indebtedness is extinguished within five Business Days of notice to the Company thereof;

(i)  Indebtedness of the Company or any Restricted Subsidiary under mortgage financings, equipment purchase or lines of credit or for Capitalized Lease Obligations or Incurred to finance (whether prior to or after) the purchase, lease, construction or improvement of property (real or personal) or equipment, whether through the direct purchase of assets or the Capital Stock of any Person owning such assets in an aggregate principal amount outstanding at any time, together with any Refinancing Indebtedness in respect thereof, not to exceed the greater of (i) $350 million and (ii) $7\frac{1}{2}\%$ of Tangible Assets at the time of such Incurrence;

(j)  Refinancing Indebtedness in respect of Coverage Indebtedness or in respect of Indebtedness Incurred pursuant to clauses (a), (c) or (o) of this definition or this clause (j);

(k)  Indebtedness of a Foreign Subsidiary Incurred to finance the working capital of such Foreign Subsidiary;

(l)  Indebtedness arising from agreements of the Company or any Restricted Subsidiary providing for indemnification, adjustment or holdback of purchase price, earnout or similar

166

obligations, in each case, Incurred in connection with the acquisition or disposition of any business, assets or a Subsidiary, other than guarantees of Indebtedness Incurred by any person acquiring all or any portion of such business, assets or Subsidiary for the purpose of financing such acquisition;

(m) Indebtedness of a Special Purpose Vehicle that is not recourse to the Company or any of its Restricted Subsidiaries (other than with respect to Standard Securitization Undertakings) in connection with a Securitization Transaction; *provided, however*, that in the event such Special Purpose Vehicle ceases to qualify as a Special Purpose Vehicle or such Indebtedness ceases to be non-recourse to the Company or any of its Restricted Subsidiaries, such Indebtedness will be deemed, in each case, to be Incurred at such time; *provided further*, *however*, that Indebtedness Incurred under this paragraph (m) with respect to Equipment Securitization Transactions shall not exceed 15% of Tangible Assets after giving effect to such Equipment Securitization Transaction;

(n) guarantees by the Company or a Restricted Subsidiary of Indebtedness that was permitted to be Incurred by the Company or any Restricted Subsidiary under the Indenture;

(o) Indebtedness of a Restricted Subsidiary Incurred and outstanding on or prior to the date on which such Restricted Subsidiary became a Restricted Subsidiary or was acquired, directly or indirectly, by the Company (other than Indebtedness Incurred in connection with, or to provide all or any portion of the funds or credit support utilized to consummate, the transaction or series of related transactions pursuant to which such Subsidiary became a Restricted Subsidiary or was acquired by the Company); *provided, however*, that on the date such Subsidiary became a Restricted Subsidiary or was, directly or indirectly, acquired by the Company and after giving *pro forma* effect thereto, either (x) the Company would have been entitled to Incur at least $1.00 of additional Coverage Indebtedness or (y) the Consolidated Fixed Charge Coverage Ratio would be equal to or greater than the Consolidated Fixed Charge Coverage Ratio calculated immediately prior to the time such Subsidiary became a Restricted Subsidiary or was acquired, directly or indirectly, by the Company;

(p) Indebtedness to the extent supported by a letter of credit that constitutes Indebtedness of the Company or any Restricted Subsidiary Incurred in compliance with the covenant described under "—Certain Covenants—Limitation on Indebtedness";

(q) Indebtedness consisting of loans, guarantees of loans or other extensions of credit to or on behalf of future, current or former officers, directors and employees and consultants of the Company, any Restricted Subsidiaries or any direct or indirect parent, their respective estates, spouses or former spouses, in each case to finance the purchase of Capital Stock of the Company or any direct or indirect parent company permitted under the caption "—Certain Covenants—Limitation on Restricted Payments";

(r) Indebtedness of the Company or any Restricted Subsidiary under mortgage financings, Capitalized Lease Obligations or Sale/Leaseback Transactions with respect to real property in an aggregate principal amount outstanding at any time, together with Refinancing Indebtedness in respect thereof, not to exceed $175.0 million; and

(s) Contribution Indebtedness;

(t) Indebtedness of the Company or any Restricted Subsidiary in respect of Cash Management Obligations (as defined in the Credit Agreement) to the extent constituting Indebtedness;

(u) Indebtedness of the Company or any Restricted Subsidiary, in addition to that described in clauses (a) through (u) of this definition, in an aggregate principal amount outstanding at any time not to exceed the greater of (i) $250.0 million and (ii) 5% of Tangible Assets at the time of such Incurrence.

167

*"Permitted Investments"* means any of the following:

(i)    Investments in the Company or in a Restricted Subsidiary;

(ii)    Investments in another person, if as a result of such Investment:

(A)    such other person becomes a Restricted Subsidiary; or

(B)    such other person, in one transaction or a series of related transactions, is merged, consolidated or amalgamated with or into, or transfers or conveys all or substantially all of its assets, to, or is liquidated into, the Company or a Restricted Subsidiary;

and in each case, any Investment held by such person; *provided, however*, that such Investment was not acquired by such person in contemplation of such person becoming a Restricted Subsidiary or in contemplation of such merger, consolidation, amalgamation, transfer, conveyance or liquidation;

(iii)  Investments acquired by the Company or any of its Restricted Subsidiaries (A) in settlement of claims against any other person by reason of a composition or readjustment of debt, bankruptcy, workout, recapitalization or a reorganization of any debtor of the Company or such Restricted Subsidiary or the good faith settlement of delinquent obligations of a Person or of a litigation arbitration or other dispute, or (B) as a result of a foreclosure by the Company or any of its Restricted Subsidiaries with respect to any secured Investment or other transfer of title with respect to any secured Investment in default;

(iv)  Investments in Hedging Agreements that are not incurred for speculative purposes and either: (1) for the purpose of fixing or hedging interest rate risk with respect to any Indebtedness that is permitted by the terms of the Indenture to be outstanding; (2) for the purpose of fixing or hedging currency exchange rate risk with respect to any currency exchanges; or (3) for the purpose of fixing or hedging commodity price risk with respect to any commodity purchases or sales;

(v)    Investments in any Notes;

(vi)  Investments in Cash Equivalents and Investment Grade Securities;

(vii)  Investments acquired by the Company or any Restricted Subsidiary in connection with (a) an Asset Sale permitted under "—Certain Covenants—Disposition of Proceeds of Asset Sales" or (b) a sale or other disposition of assets not constituting an Asset Sale;

(viii) loans, guarantees of loans, advances, and other extensions of credit to or on behalf of future, current and former officers, directors, employees, and consultants of the Company, any of its Restricted Subsidiaries, or any of its direct or indirect parent companies made (i) in the ordinary course of business, or (ii) for the purpose of permitting such Persons to purchase Capital Stock of the Company or any of its direct or indirect parent companies or in connection with any relocation costs or for other purposes, in an amount not to exceed $15.0 million at any one time outstanding;

(ix)  guarantees (including guarantees of the related Notes) of Indebtedness permitted to be Incurred under the "—Limitation on Indebtedness" covenant;

(x)    Investments consisting of the licensing or contribution of intellectual property pursuant to joint marketing arrangements with other Persons;

(xi)  any Investment in a Special Purpose Vehicle or any Investment by a Special Purpose Vehicle in any other Person in connection with a Securitization Transaction, including Investments of funds held in accounts permitted or required by the arrangements governing the Securitization Transaction or any related Indebtedness;

(xii) extensions of credit to customers or advances, deposits or payments to or with suppliers, lessors or utilities or for workers' compensation or other statutory obligation; and

(xiii) other Investments in any Person made since the Issue Date having an aggregate Fair Market Value (measured on the date each such Investment was made), when taken together with all other Investments made pursuant to this clause (xiii), not to exceed the greater of $100.0 million and 2.0% of Tangible Assets at the time of such Investment; *provided*, *however*, that the Fair Market Value of any such Investments will be reduced (but not below zero) by any dividends, distributions, interest payments, return of capital, repayment or other amount received by the Company or any Restricted Subsidiary in respect of such Investment.

*"Permitted Liens"* means the following types of Liens:

(a)  any Lien existing as of the Issue Date (other than Liens securing Indebtedness under the Credit Agreement or with respect to the Notes and related guarantees);

(b)  (i) Liens securing Indebtedness Incurred pursuant to clause (b) of the definition of "Permitted Indebtedness" and (ii) Liens securing Coverage Indebtedness that will constitute First Priority Lien Obligations in an amount not to exceed $500.0 million; *provided, however* that, in the case of any Coverage Indebtedness, at the time of Incurrence and after giving *pro forma* effect thereto (and assuming that all committed amounts under any existing revolving credit agreement that would, if drawn, constitute First Priority Lien Obligations are drawn), the Consolidated Total First Lien Debt Ratio would be no greater than 2.2 to 1.0;

(c)  any Lien securing Acquired Indebtedness created prior to (and not created in connection with, or in contemplation of) the Incurrence of such Indebtedness by the Company or any Restricted Subsidiary, if such Lien does not attach to any property or assets of the Company or any Restricted Subsidiary other than the property or assets subject to the Lien prior to such Incurrence (other than assets or property affixed or appurtenant thereto, additions, improvements and accessions thereto, proceeds thereof and property related thereto);

(d)  Liens in favor of the Company or a Restricted Subsidiary;

(e)  Liens on and pledges of the assets or Capital Stock of any Unrestricted Subsidiary;

(f)  Liens for taxes, assessments or governmental charges or claims either:

(i)  not delinquent; or

(ii)  thereafter payable without penalty or contested in good faith by appropriate proceedings and as to which the Company or its Restricted Subsidiaries shall have set aside on its books such reserves as may be required pursuant to GAAP;

(g)  statutory Liens of landlords and Liens of carriers, warehousemen, mechanics, suppliers, materialmen, repairmen, or in favor of customs or revenue authorities or freight forwarders or handlers to secure payment of custom duties, and other Liens imposed by law Incurred in the ordinary course of business for sums not yet delinquent or being contested in good faith, if such reserve or other appropriate provision, if any, as shall be required by GAAP shall have been made in respect thereof;

(h)  Liens Incurred or pledges or deposits made in the ordinary course of business (i) in connection with workers' compensation, unemployment insurance and other types of social security and employee health and disability benefits, or casualty or liability insurance or self insurance and similar obligations including any Lien securing letters of credit issued in connection therewith, or (ii) to secure the performance of tenders, completion guarantees, statutory obligations, payment of contested taxes or import duties, surety and appeal bonds, bids, leases, government contracts, supply, purchase or other contracts, performance and return-of-money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money), including any Lien securing letters of credit in connection therewith;

(i)   judgment and attachment Liens not giving rise to an Event of Default and notices of lis pendens and associated rights related to litigation being contested in good faith by appropriate proceedings and for which adequate reserves have been made in conformity with GAAP;

(j)   survey exceptions (or any state of facts an accurate survey would disclose), public and private roads, prescriptive easements and adverse possession claims, minor encumbrances, easements or reservations of, or rights of others for or pursuant to any leases, licenses, rights-of-way, or other similar agreements or arrangements, development, air or water rights, sewer, electric lines, telegraph and telephone lines and other utility lines, pipelines, service liens, railroad lines, improvements and structures located on, over or under any property, drains, drainage ditches, culverts, electric power or gas generating or co-generation, storage and transmission facilities and other similar purposes, or zoning or other restrictions as to the use of real property or minor defects in title which were not incurred to secure the payment of Indebtedness and that do not in the aggregate materially adversely affect the value of said properties or materially impair their use in the operation of the business of the Company and its Restricted Subsidiaries;

(k)   any interest or title of a lessor, licensor or sublicensor under any operating lease, license or sublicense, as applicable (including precautionary financing statements filed in connection therewith) and leases, subleases and licenses granted to others that do not interfere in any material respect with the business of such Person under any Capitalized Lease Obligation;

(l)   (a) Liens securing Indebtedness Incurred to finance the construction, purchase or lease of, or repairs, improvements or additions to, property, plant or equipment of the Company or any Restricted Subsidiary; *provided, however*, that the Lien may not extend to any other property owned by the Company or any Restricted Subsidiary at the time the Lien is Incurred (other than assets and property affixed or appurtenant thereto, additions, improvements and accessions thereto, proceeds thereof and property related thereto), and the Indebtedness (other than any interest thereon) secured by the Lien may not be Incurred more than 270 days after the later of the acquisition, completion of construction, repair, improvement, addition or commencement of full operation of the property subject to the Lien; and (b) Liens securing Indebtedness Incurred pursuant to clause (r) of the definition of "Permitted Indebtedness" on the real property subject to such financing; *provided, however,* that such Liens shall not extend to any other property owned by the Company or any Restricted Subsidiary (other than assets and property affixed or appurtenant thereto, additions, improvements and accessions thereto and proceeds thereof);

(m)   Liens securing reimbursement obligations with respect to commercial letters of credit and bankers' acceptances which encumber documents and other property relating to such letters of credit and bankers' acceptances and products and proceeds thereof;

(n)   Liens securing any Refinancing or successive Refinancings in whole or in part of any Indebtedness secured by any Permitted Lien described in clause (c) and (l) of this definition and any extension, renewal or replacement, in whole or in part, of any such Permitted Lien; *provided, however*, that, in each case, (a) the new Lien shall be limited to all or part of the same property and assets that secured or, under the written agreements pursuant to which the Indebtedness being refinanced arose, could secure the original Lien (plus improvements and accessions to, such property or proceeds or distributions thereof), and (b) the Indebtedness secured by such Lien at such time is not increased to any amount greater than the sum of (i) the outstanding principal amount or, if greater, committed amount of the Indebtedness described under clause (j) at the time the original Lien became a Permitted Lien under the Indenture, and (ii) an amount necessary to pay any fees and expenses, including premiums, related to such Refinancing Indebtedness;

(o)  Liens encumbering deposits made to secure obligations arising from statutory, regulatory, contractual, or warranty requirements of the Company or any of its Restricted Subsidiaries, including rights of offset and set-off;

(p)  Liens securing Hedging Obligations otherwise permitted under the Indenture;

(q)  customary Liens on assets of a Special Purpose Vehicle arising in connection with a Securitization Transaction, including to secure Indebtedness incurred in connection therewith;

(r)  Liens arising out of conditional sale, title retention, consignment or similar arrangements for the purchase of goods entered into in the ordinary course of business;

(s)  Liens in favor of collecting or payor banks having a right of setoff, revocation, refund or chargeback with respect to money or instruments on deposit with or in possession of such banks, whether under Section 4-210 of the Uniform Commercial Code or otherwise, and Liens incurred to secure cash management services in the ordinary course of business, including Liens relating to pooled deposit or sweep accounts of the Company or any of its Restricted Subsidiaries to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Company and its Restricted Subsidiaries;

(t)  Liens created in favor of the Trustee for the Notes (and the related guarantees) and all other monetary obligations as provided in the Indenture; and

(u)  Liens encumbering reasonable customary initial deposits and margin deposits and similar Liens attaching to commodity trading accounts or other brokerage accounts incurred in the ordinary course of business and not for speculative purposes;

(v)  Liens that are contractual rights of set-off relating to purchase order and other agreements entered into by the Company or any of its Restricted Subsidiaries in the ordinary course of business;

(w)  Liens securing Indebtedness of Foreign Subsidiaries permitted to be Incurred under the Indenture, to the extent such Liens relate only to assets and properties of Foreign Subsidiaries; and

(x)  Liens Incurred by the Company or any Restricted Subsidiary with respect to obligations that do not exceed $50.0 million at any time outstanding.

Any provider of additional extensions of credit shall be entitled to rely on the determination of an officer of the Company that Liens incurred satisfy clause (b)(ii) above if such determination is set forth in an officer's certificate delivered to such provider; *provided, however*, that such determination will not affect whether such Lien actually was incurred as permitted by clause (b)(ii).

*"person"* means any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

*"Preferred Stock,"* as applied to any person, means Capital Stock of any class or classes (however designated) which is preferred as to the payment of dividends or distributions, or as to the distribution of assets upon any voluntary or involuntary liquidation or dissolution of such person, over shares of Capital Stock of any other class of such person.

*"Pro forma Cost Savings"* means, with respect to any period, the reduction in net costs and related adjustments that either (i) were directly attributable to a Subject Transaction that occurred during the Four Quarter Period or after the end of the Four Quarter Period and on or prior to the Transaction Date and calculated on a basis that is consistent with Regulation S-X under the Securities Act as in effect and applied as of the Issue Date, or (ii) were actually implemented in connection with such Subject Transaction prior to the Transaction Date and are supportable and quantifiable by the

171

underlying accounting records. Any such pro forma calculation may include adjustments appropriate, in the reasonable good faith determination of the Company to reflect (1) operating expense reductions and other operating improvements or synergies reasonably expected to result from the applicable Subject Transaction (including, to the extent applicable, from the Transactions) and (2) all adjustments of the nature used in connection with the calculation "Adjusted EBITDA" as set forth in footnote (3) to the "Summary Historical and Pro Forma Financial Data" under "Summary" in the Offering Circular to the extent such adjustments, without duplication, continue to be applicable to such Four Quarter Period.

*"Qualified Proceeds"* means any of the following or any combination of the following:

    (a)  cash, Cash Equivalents and Investment Grade Securities;

    (b)  the Fair Market Value of assets that are used or useful in a Permitted Business; and

    (c)  the Fair Market Value of the Capital Stock of any Person engaged primarily in a Permitted Business.

The Fair Market Value of any assets or Capital Stock that are required to be valued by this definition will be determined in good faith by the Board of Directors of the Company.

*"Receivables Securitization Transaction"* means any sale, assignment or other transfer by the Company or any Subsidiary of the Company of accounts receivable, rental receivables or other payment obligations owing to the Company or such Subsidiary of the Company or any interest in any of the foregoing, together in each case with any collections and other proceeds thereof, any collection or deposit account related thereto, and any collateral, guarantees or other property or claims supporting or securing payment by the obligor thereon of, or otherwise related to, or subject to rental agreements, giving rise to, any such receivables.

*"Redeemable Capital Stock"* means any Capital Stock that, either by its terms, by the terms of any security into which it is convertible or exchangeable or by contract or otherwise, is or upon the happening of an event or passage of time would be, required to be redeemed prior to the Maturity Date of the Notes or is redeemable at the option of the holder thereof at any time prior to the Maturity Date of the Notes, or is convertible into or exchangeable for debt securities at any time prior to the Maturity Date of the Notes; *provided*, *however*, that Capital Stock will not constitute Redeemable Capital Stock solely because the holders thereof have the right to require the Company to repurchase or redeem such Capital Stock upon the occurrence of a "change of control" or an "asset sale"; *provided, further, however,* that (a) if such Capital Stock is issued to any employee or to any plan for the benefit of employees of the Company or its Subsidiaries or by any such plan to such employees, such Capital Stock shall not constitute Redeemable Capital Stock solely because it may be required to be repurchased by the Company in order to satisfy applicable statutory or regulatory obligations or as a result of such employee's termination, death or disability, (b) any class of Capital Stock of such Person that by its terms authorizes such Person to satisfy its obligations thereunder by delivery of Capital Stock that is not Redeemable Stock shall not be deemed to be Redeemable Capital Stock. The amount of Redeemable Capital Stock deemed to be outstanding at any time for purposes of the Indenture will be the maximum amount that the Company and its Restricted Subsidiaries may become obligated to pay upon maturity of, or pursuant to any mandatory redemption provisions of, such Redeemable Capital Stock, exclusive of accrued dividends.

*"Refinance"* means, in respect of any Indebtedness, to refinance, extend, renew, refund, repay, prepay, purchase, redeem, defease or retire, or to issue other Indebtedness in exchange or replacement for, such Indebtedness. "Refinanced" and "Refinancing" shall have correlative meanings.

*"Refinancing Indebtedness"* means Indebtedness that Refinances any Indebtedness of the Company or any Restricted Subsidiary existing on the Issue Date or Incurred in compliance with the Indenture, including Indebtedness that Refinances Refinancing Indebtedness; *provided, however,* that:

(1) such Refinancing Indebtedness has a final maturity date no earlier than the final maturity date of the Indebtedness being Refinanced;

(2) such Refinancing Indebtedness has an Average Life to Stated Maturity at the time such Refinancing Indebtedness is Incurred that is equal to or greater than the Average Life to Stated Maturity of the Indebtedness being Refinanced;

(3) such Refinancing Indebtedness has an aggregate principal amount (or if Incurred with original issue discount, an aggregate issue price) that is equal to or less than the aggregate principal amount (or if Incurred with original issue discount, the aggregate accreted value) then outstanding (plus all accrued interest on such Indebtedness and all fees and expenses, including any premium (including tender premiums) and defeasance costs and other amounts necessary to accomplish such refinancing) under the Indebtedness being Refinanced; and

(4) if the Indebtedness being Refinanced is subordinated in right of payment to the applicable Notes, such Refinancing Indebtedness is subordinated in right of payment to the applicable Notes at least to the same extent as the Indebtedness being Refinanced;

*provided further, however,* that (i) Refinancing Indebtedness shall not include (A) Indebtedness of a Subsidiary that is not a Guarantor that Refinances Indebtedness of the Company or (B) Indebtedness of the Company or a Restricted Subsidiary that Refinances Indebtedness of an Unrestricted Subsidiary, and (ii) subclauses (1) and (2) will not apply to any Refinancing of any of the Notes the Unsecured Bridge Facility or any Indebtedness constituting First Priority Lien Obligations.

*"Related Business Assets"* means assets (other than Cash Equivalents) used or useful in a Permitted Business; *provided*, *however*, that any assets received by the Company or a Restricted Subsidiary in exchange for assets transferred by the Company or a Restricted Subsidiary shall not be deemed to be Related Business Assets if they consist of securities of a Person, unless upon receipt of the securities of such Person, such Person would become a Restricted Subsidiary.

*"Replacement Assets"* means properties and assets (including real property) that replace the properties and assets that were the subject of an Asset Sale or properties and assets that are used or useful in a Permitted Business (including (i) the acquisition of Capital Stock of a person, the principal portion of whose assets consist of such property or assets and (ii) the making of capital expenditures).

*"Restricted Subsidiary"* means any Subsidiary of the Company that is not an Unrestricted Subsidiary or a Special Purpose Vehicle.

*"RS Special Purpose Vehicle"* means a trust, bankruptcy remote entity or other special purpose entity which is a Subsidiary of the Company or Holdings (or, if not a Subsidiary of the Company or Holdings, the common equity of which is wholly owned, directly or indirectly, by the Company or Holdings) and which is formed for the purpose of, and engages in no material business other than, acting as an issuer or a depositor in a Receivables Securitization Transaction (and, in connection therewith, owning and financing accounts receivable, rental receivables, other rights to payment, rental agreements and related assets, all proceeds thereof and all rights contractual or other collateral and other assets relating thereto, pledging or transferring any of the foregoing or interests therein and any business or activities incidental to or related to such business).

*"Sale/Leaseback Transaction"* means an arrangement relating to property owned by the Company or a Restricted Subsidiary on the Issue Date or thereafter acquired by the Company or a Restricted Subsidiary whereby the Company or a Restricted Subsidiary transfers such property to a person and the Company or a Restricted Subsidiary leases it from such person.

*"SEC"* means the Securities and Exchange Commission.

*"Secured Bank Indebtedness"* means any Bank Indebtedness that is secured by a Permitted Lien Incurred pursuant to clause (b) of the definition of Permitted Lien.

*"Second Priority Secured Indebtedness"* means any Indebtedness that is secured by a Lien (other than a Specified Lien) on any of the Collateral.

*"Securities Act"* means the Securities Act of 1933, as amended.

*"Securitization Transaction"* means an Equipment Securitization Transaction or a Receivables Securitization Transaction.

*"Security Documents"* means the Intercreditor Agreement, each Additional Intercreditor Agreement (if any), and the security agreements, pledge agreements, collateral assignments and related agreements, as amended, supplemented, restated, renewed, refunded, replaced, restructured, repaid, Refinanced or otherwise modified from time to time, creating, granting and/or perfecting security interests in the Collateral as contemplated by the Indenture or any of the foregoing.

*"Senior Indebtedness"* means with respect to any person:

(1) Indebtedness of such person, whether outstanding on the Issue Date or thereafter created or Incurred; and

(2) accrued and unpaid interest (including post-default rate interest and interest accruing on or after the filing of any petition in bankruptcy or for reorganization relating to such person whether or not post-filing interest is allowed in such proceeding) in respect of
(A) Indebtedness of such person for money borrowed and (B) Indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such person is responsible or liable,

unless, in the case of clauses (1) and (2), in the instrument creating or evidencing the same or pursuant to which the same is outstanding, it is expressly provided that such obligations are subordinate in right of payment to the Notes or the guarantee of such Notes by such person, as the case may be.

Without limiting the generality of the foregoing, "Senior Indebtedness" shall include the principal (including reimbursement obligations with respect to letters of credit, whether or not drawn) of, premium, if any, and interest on all obligations of every nature of any person from time to time owed to the lenders under the Credit Agreement, including principal of and interest on, any loans and letter of credit disbursements outstanding, and all fees, indemnities, reimbursements, expenses and other liabilities payable, under the Credit Agreement.

Notwithstanding the foregoing, "Senior Indebtedness" shall not include:

(a) any Indebtedness of such person (and any accrued and unpaid interest in respect thereof) that is expressly subordinate or junior in any respect to any other Indebtedness or obligations of such person;

(b) Indebtedness which, when Incurred and without respect to any election under Section 1111(b) of Title 11, United States Code, is without recourse to such person;

(c) any Capital Stock;

(d) any accounts payable or other liability to trade creditors arising in the ordinary course of business (including guarantees thereof or instruments evidencing such liabilities);

(e) Indebtedness of or amounts owed by such person for compensation to employees or for services rendered to such person;

(f) any liability for federal, state, local or other taxes owed or owing by such person;

(g)  Indebtedness of such person to a Subsidiary or any other Affiliate or any of such Affiliate's Subsidiaries; and

(h)  that portion of any Indebtedness which is Incurred in violation of the Indenture.

*"Significant Subsidiary"* of any person means a Restricted Subsidiary of such person which would be a "significant subsidiary" of such person as determined in accordance with the definition in Rule 1-02(w) of Article 1 of Regulation S-X promulgated by the SEC and as in effect on the Issue Date.

*"Special Purpose Vehicle"* means an ES Special Purpose Vehicle or an RS Special Purpose Vehicle.

*"Specified Lien"* means any Permitted Lien other than the Permitted Liens pursuant to clause (a), (b), (l), (n) (to the extent such Lien secures a Refinancing of Indebtedness secured by Permitted Liens described in clause (l)), (w) and (x) of the definition of "Permitted Lien".

*"Sponsor"* means (i) Cerberus Capital Management, L.P., any of its Affiliates and any affiliated investment funds or managed accounts which are managed or advised by Cerberus Capital Management, LP or one of its Affiliates (collectively, the "Cerberus Sponsors"), (ii) any person that forms a group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act, or any successor provision) with any Cerberus Sponsors; *provided, however,* that any Cerberus Sponsor controls the Company and Holdings, and (iii) any entity controlled directly or indirectly by any one or more of the foregoing.

*"Standard Securitization Undertakings"* means all representations, warranties, covenants, indemnities, performance guarantees and servicing obligations entered into by the Company or any of its Restricted Subsidiaries that are reasonably customary in a Securitization Transaction, including servicing obligations, repurchase obligations and the provision of cash or Cash Equivalents to pay fees and expenses reasonably related thereto or any Refinancing thereof, in each case which are reasonably customary in securitization transactions. For the avoidance of doubt, undertakings substantially in the form of those contained in the Company's receivables facilities in existence immediately prior to the Issue Date shall be deemed to be "Standard Securitization Undertakings" for purposes of the Indenture.

*"Stated Maturity"* means, when used with respect to any Note, the date specified in such Note as the fixed date on which the principal of such Note is due and payable, and when used with respect to any other Indebtedness, means the date specified in the instrument governing such Indebtedness as the fixed date on which the principal of such Indebtedness is due and payable, and will not include any contingent obligations to repay, redeem or repurchase any such interest or principal prior to the date originally scheduled for the payment thereof.

*"Subject Transaction"* means any of the Transactions, any future acquisition, investment, disposition, issuance, incurrence or repayment of Indebtedness, offering, issuance or disposition of Capital Stock, recapitalization, merger, consolidation, disposed or discontinued operation, including through mergers or consolidations, or any Person or any of its Subsidiaries acquired by the Company or any of its Restricted Subsidiaries, and including any related financing transactions and including increases in ownership of Subsidiaries (including any transaction giving rise to the need to make such calculation).

*"Subordinated Indebtedness"* means, with respect to a person, Indebtedness of such person (whether outstanding on the Issue Date or thereafter Incurred) which is subordinate or junior in right of payment to the Notes or a guarantee of such Notes by such person, as the case may be, pursuant to a written agreement to that effect.

*"Subsidiary"* means, with respect to any person:

(i)  a corporation a majority of whose Voting Stock is at the time, directly or indirectly, owned or controlled by such person, by one or more Subsidiaries of such person or by such person

175

and one or more Subsidiaries thereof (after giving effect to any voting agreement or stockholders agreement that effectively transfers voting power); and

(ii) any other person (other than a corporation), including a partnership, limited liability company, business trust or joint venture, in which such person, one or more Subsidiaries thereof or such person and one or more Subsidiaries thereof, directly or indirectly, at the date of determination thereof, (x) has at least majority ownership interest entitled to vote in the election of directors, managers or trustees thereof (or other person performing similar functions), or (y) is a controlling general partner or otherwise controls such entity.

For purposes of this definition, any directors' qualifying shares or investments by foreign nationals mandated by applicable law shall be disregarded in determining the ownership of a Subsidiary.

*"Subsidiary Guarantors"* means (i) each of the Company's Restricted Subsidiaries that is not a Foreign Subsidiary, an Unrestricted Subsidiary or a Special Purpose Vehicle, and that has not been released from its guarantee of the Notes pursuant to the terms of the Indenture; and (ii) any other Subsidiary of the Company that executes a subsidiary guarantee in accordance with the Indenture, and, in each of (i) and (ii), their respective successors and assigns.

"*Tangible Assets*" means all assets of the Company and its Restricted Subsidiaries, excluding all Intangible Assets and assets subject to a Securitization Transaction. For purposes of the foregoing, "Intangible Assets" means goodwill, patents, trade names, trade marks, copyrights, franchises, experimental expense, organization expenses and any other assets properly classified as intangible assets in accordance with GAAP.

*"Transactions"* has the meaning ascribed thereto in the Offering Circular.

*"Treasury Rate"* means, as of the applicable redemption date, the yield to maturity as of such redemption date of United States Treasury securities with a constant maturity (as compiled and published in the most recent Federal Reserve Statistical Release H.15(519) that has become publicly available at least two Business Days prior to such redemption date (or, if such Statistical Release is no longer published, any publicly available source of similar market data)) most nearly equal to the period from such redemption date to          , 2011; *provided, however,* that if the period from such redemption date to          , 2011 is less than one year, the weekly average yield on actually traded United States Treasury securities adjusted to a constant maturity of one year will be used.

*"Unrestricted Subsidiary"* means each Subsidiary of the Company designated as such pursuant to and in compliance with the covenant described under "—Certain Covenants—Limitation on Designations of Unrestricted Subsidiaries" and each Subsidiary of such Unrestricted Subsidiary.

*"Unsecured Bridge Facility"* means the Bridge Loan Agreement entered into on the Issue Date among the Company, Holdings, the Subsidiary Guarantors and          , as amended, restated, supplemented or otherwise modified from time to time.

*"Voting Stock"* means any class or classes of Capital Stock pursuant to which the holders thereof have the general voting power under ordinary circumstances to elect at least a majority of the board of directors, managers or trustees of any person (irrespective of whether or not, at the time, stock of any other class or classes shall have, or might have, voting power by reason of the happening of any contingency).

"*Wholly Owned Subsidiary*" of any Person means a Restricted Subsidiary of such Person, 100.0% of the outstanding Equity Interests of which (other than directors' qualifying shares) shall at the time be owned by such Person or by one or more Wholly Owned Subsidiaries of such Person.

### CERTAIN UNITED STATES FEDERAL INCOME TAX CONSIDERATIONS

**TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, HOLDERS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES IN THIS OFFERING CIRCULAR IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY HOLDERS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON HOLDERS UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS INCLUDED HEREIN BY THE ISSUER IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN THE MEANING OF CIRCULAR 230) BY THE ISSUER OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

The following is a general discussion of certain material U.S. federal income tax consequences of the acquisition, ownership and disposition of the notes. This discussion is a summary for general information purposes only and does not consider all aspects of U.S. federal income taxation that may be relevant to a particular investor in light of his or her personal circumstances. This discussion is generally limited to the tax consequences to initial holders of the notes that are beneficial owners of the notes, that hold the notes as capital assets (within the meaning of Section 1221 of the Internal Revenue Code of 1986, as amended (the "Code")) (i.e., generally, property held for investment), and that purchase the notes at their "issue price." For this purpose, the "issue price" of a note is the first price at which a substantial part of the notes is sold to the public for money (excluding sales to bond houses, brokers, or similar persons or organizations acting in the capacity of underwriters, placement agents or wholesalers).

This discussion is based upon the U.S. federal tax laws, regulations, rulings and judicial decisions now in effect, which are subject to change, possibly retroactively, or differing interpretations. We have not requested a ruling from the Internal Revenue Service ("IRS") on the tax consequences of owning the notes. As a result, the IRS could disagree with portions of this discussion. This discussion generally does not describe the treatment of partnerships, pass-through entities and investors in pass-through entities that hold the notes. In addition, certain other holders (including banks, thrifts, insurance companies, regulated investment companies, other financial institutions and broker-dealers, traders in securities that elect to use a mark-to-market method of accounting for their securities holdings, tax exempt organizations, persons who hold the notes as part of a "straddle," "hedge," or "conversion transaction" or other integrated transaction, persons that have a "functional currency" other than the U.S. dollar or certain expatriates or former long-term residents of the United States) may be subject to special rules not discussed below. This discussion does not address the U.S. alternative minimum tax law or any aspect of state, local or foreign law or the estate or gift tax consequences of the acquisition, ownership and disposition of the notes (except with respect to estate tax consequences to the extent described below under "Non-U.S. Holders").

**Prospective investors are urged to consult their tax advisors regarding the U.S. federal income tax consequences of acquiring, holding and disposing of the notes, as well as any tax consequences that may arise under the laws of any foreign, state, local or other taxing jurisdiction.**

### U.S. Holders

The following discussion is limited to the U.S. federal income tax consequences to a "U.S. Holder" of a note. For purposes of this discussion, a "U.S. Holder" means a beneficial owner of a note that is (i) an individual who is (or is treated as) a citizen or a resident of the United States (including an alien resident who is a lawful permanent resident of the United States or meets the "substantial presence" test under Section 7701(b) of the Code); (ii) a corporation (or an entity taxable as a corporation for U.S. federal income tax purposes) created or organized in the United States or under the laws of the

United States, any state thereof or the District of Columbia; (iii) an estate whose income is includible in gross income for U.S. federal income tax purposes regardless of its source; or (iv) a trust, if (1) a U.S. court is able to exercise primary supervision over the administration of the trust and one or more U.S. persons have the authority to control all substantial decisions of the trust or (2) such trust was in existence on August 1, 1996 and has a valid election in effect under applicable Treasury Regulations to be treated as a U.S. person.

### *Stated Interest*

Stated interest on a note will be taxable to a U.S. Holder as ordinary income at the time it either accrues or is received in accordance with such U.S. Holder's method of accounting for U.S. federal income tax purposes. If we fail to comply with certain provisions requiring registration of the notes, the interest rate may increase. Assuming that the contingency that we will pay such additional interest is remote or incidental (within the meaning of the applicable Treasury Regulations), the possibility of such payments should not affect the amount or timing of interest income recognized by a U.S. Holder and any actual payments of additional interest should be taxable to U.S. Holders at the time it accrues or is received in accordance with each such U.S. Holder's method of accounting for U.S. federal income tax purposes.

**If, however, the likelihood of such contingency occurring were deemed greater than remote or incidental, the notes could be subject to special rules that apply to contingent debt instruments. These rules generally require a U.S. Holder to accrue interest income at a rate higher than the stated interest rate on the note and to treat as ordinary income (rather than capital gain) a portion of the gain recognized on a sale, exchange or retirement of the note before the resolution of such contingency.**

### *Redemption*

In the event of a Change of Control, the U.S. Holders of the notes will have the right to require us to purchase their notes. Applicable Treasury Regulations provide that the right of U.S. Holders of the notes to require redemption of the notes upon the occurrence of a Change of Control will not affect the yield to maturity of the notes if the likelihood of the occurrence, as of the date the notes are issued, is remote or incidental. We intend to take the position that the likelihood of a repurchase as a result of a Change of Control is remote or incidental under applicable Treasury Regulations and, thus, do not intend to treat this possibility as affecting the yield to maturity of the notes.

We may redeem the notes at any time on or after a certain date, and, in certain circumstances, may redeem or repurchase all or a portion of the notes at any time prior to the maturity date. Under applicable Treasury Regulations, we will be deemed to exercise any option to redeem the notes if the exercise of such option would lower the yield of the debt instrument. We believe, and intend to take the position for purposes of determining yield and maturity, that we will not be treated as having exercised any option to redeem the notes under these rules.

### *Sale, Exchange, Redemption or Repayment of the Notes*

Unless a nonrecognition provision applies, upon the disposition of a note by sale, exchange (other than pursuant to the Exchange Offer discussed below), redemption or repurchase (for example, in the event of a Change in Control) or other taxable disposition, a U.S. Holder generally will recognize gain or loss equal to the difference between (i) the amount realized on the disposition (other than amounts attributable to accrued but unpaid interest, which is treated as interest as described above, and, to the extent, not yet taken into income, which generally will be taxable as ordinary income) and (ii) the U.S. Holder's adjusted tax basis in the note. A U.S. Holder's adjusted tax basis in the note generally will equal the cost of the note (net of accrued interest).

Because the note is held as a capital asset, such gain or loss will generally be capital gain or loss and will be long-term capital gain if the note was held for longer than one year. Currently, non-corporate taxpayers generally are subject to a maximum regular federal income tax rate of 15% on net long-term capital gain. The deductibility of capital losses is subject to certain limitations. U.S. Holders should consult their tax advisors regarding the potential applicability of these limitations to them.

### *Exchange Offer in Connection with Registration of the Notes*

The exchange of the privately placed notes for publicly registered notes pursuant to the Exchange Offer should not constitute a material modification of the terms of the notes and, therefore, it should not constitute a taxable event for U.S. federal income tax purposes. In that event, the exchange would have no U.S. federal income tax consequences to a U.S. Holder, so that the U.S. Holder's holding period and adjusted tax basis for a note would not be affected, and the U.S. Holder would continue to take into account income in respect of a note in the same manner as before the exchange.

### *Discharge*

Were we to obtain a discharge of the indenture within one year before the notes become due and payable with respect to all of the notes then outstanding, as described above under "Description of the Notes—Satisfaction and Discharge," such discharge would generally be deemed to constitute a taxable exchange of the notes outstanding for other property, namely, the funds deposited with the Trustee. In such case, a U.S. Holder would be required to recognize capital gain or loss in connection with such deemed exchange in a manner comparable to that discussed above under "—Sale, Exchange, Redemption or Repayment of the Notes." In addition, after such deemed exchange, a U.S. Holder might also be required to recognize income (likely interest and/or original issue discount) from the property deemed to have been received in such exchange over the remaining life of the transaction in a manner or amount that is different than had the discharge not occurred. U.S. Holders should consult their tax advisors as to the specific consequences arising from a discharge in their particular situations.

### *Information Reporting and Backup Withholding*

We must report annually both to the IRS and to each U.S. Holder any interest and proceeds on redemption or repayment that are paid to such U.S. Holder. A U.S. Holder may be subject to information reporting and backup withholding tax (currently at a rate of 28%) with respect to interest and proceeds from the sale, exchange, redemption or repayment of the notes unless the U.S. Holder (i) is a corporation or comes within certain other exempt categories of recipients and, when required, demonstrates that status, or (ii) provides a correct taxpayer identification number, certifies as to no loss of exemption from backup withholding and otherwise complies with the applicable requirements of the backup withholding rules. U.S. Holders should consult their tax advisors as to their qualification for exemption from backup withholding and the procedure for obtaining such exemption.

Backup withholding is not an additional tax. Any amount paid as backup withholding will be refunded or credited against the U.S. Holder's federal income tax liability, provided that the requisite information is timely provided to the IRS.

### Non-U.S. Holders

The following discussion is limited to the U.S. federal income and U.S. federal estate tax consequences to a beneficial owner of a note that is an individual, corporation, estate or trust that is neither a U.S. Holder nor a person subject to rules applicable to former citizens and long-term residents of the United States (a "Non-U.S. Holder"). In addition, this discussion does not address the U.S. federal income tax consequences to Non-U.S. Holders subject to special treatment under the

Code, such as "controlled foreign corporations," "passive foreign investment companies" and foreign corporations that accumulate earnings to avoid U.S. federal income tax.

For purposes of the discussion below, interest and gain on the sale, exchange, redemption or repayment of the notes will be considered to be "U.S. trade or business income" if such income or gain is (i) effectively connected with the conduct of a U.S. trade or business and (ii) in the case of a treaty resident, attributable to a U.S. permanent establishment (or, in the case of an individual, a fixed base) in the United States.

### Interest

Generally, interest paid by us, including any additional interest for failure to timely register the notes, and any accrued but unpaid interest at the time of disposition (as described below) of a note, to a Non-U.S. Holder will not be subject to U.S. federal income or withholding tax if such interest is not U.S. trade or business income and qualifies as "portfolio interest." Generally, interest on the notes will qualify as portfolio interest if the Non-U.S. Holder (i) does not actually or constructively own 10% or more of the total combined voting power of all classes of our stock entitled to vote, (ii) is not a controlled foreign corporation with respect to which we are a "related person" within the meaning of the Code, (iii) is not a bank that is receiving the interest on a loan made in the ordinary course of its trade or business and (iv) certifies, under penalties of perjury on an IRS Form W-8BEN (or such successor form as the IRS designates), prior to the payments that such holder is not a U.S. person and provides such holder's name and address.

The gross amount of payments of interest that do not qualify for the portfolio interest exception and that are not U.S. trade or business income will be subject to U.S. withholding tax at a rate of 30%, unless a treaty applies to reduce or eliminate withholding. U.S. trade or business income will be taxed at regular, graduated U.S. federal income tax rates rather than the 30% gross rate. In the case of a Non-U.S. Holder that is a corporation, such U.S. trade or business income also may be subject to the branch profits tax. To claim exemption from withholding or to claim the benefits of a treaty, a Non-U.S. Holder must provide a properly executed IRS Form W-8BEN (claiming treaty benefits) or IRS Form W-8ECI (claiming exemption from withholding because income is U.S. trade or business income) (or such successor forms as the IRS designates), as applicable, prior to the payment of interest. These forms must be periodically updated. A Non-U.S. Holder who is claiming the benefits of a treaty may be required in certain instances to obtain and to provide a U.S. taxpayer identification number or to provide certain documentary evidence issued by foreign governmental authorities to prove residence in the foreign country. Also, under applicable Treasury Regulations, special procedures are provided for payments through qualified intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

### Gain on Disposition

Subject to the discussion below concerning backup withholding, a Non-U.S. Holder generally will not be subject to U.S. federal income tax on gain recognized on a sale, exchange, redemption, repayment or discharge of a note unless (i) the gain is U.S. trade or business income (in which case the branch profits tax also may apply to a corporate Non-U.S. Holder) or (ii) the Non-U.S. Holder is an individual who is present in the United States for 183 or more days in the taxable year of the disposition and certain other requirements are met.

### Discharge

As described above under "—Consequences to U.S. Holders—Discharge," a Non-U.S. Holder also may be required to recognize income with respect to the property or rights to the property deemed to have been received in such taxable exchange over the remaining life of the transaction in a manner or

amount that is different than had the discharge not occurred, and such income may be subject to U.S. income and/or withholding taxes. Non-U.S. Holders should consult their tax advisors as to the specific consequences arising from a discharge in their particular situations.

### *Federal Estate Taxes*

Notes held (or treated as held) by an individual who is a Non-U.S. Holder at the time of his or her death will not be subject to U.S. federal estate tax, provided that the interest on such notes would be exempt as portfolio interest when received by the Non-U.S. Holder at the time of his or her death without regard to whether the Non-U.S. Holder has completed an IRS Form W-8BEN and further provided that income on the notes was not U.S. trade or business income.

### *Information Reporting and Backup Withholding*

We must report annually to the IRS and to each Non-U.S. Holder any interest that is paid to the Non-U.S. Holder. Copies of these information returns may also be made available under the provisions of a specific treaty or other agreement to the tax authorities of the country in which the Non-U.S. Holder resides.

Treasury Regulations provide that the backup withholding tax (currently at a rate of 28%) and certain information reporting will not apply to such payments of interest with respect to which either the requisite certification, as described above, has been received or an exemption has otherwise been established; provided that neither we nor our payment agent has actual knowledge, or reason to know, that the holder is a U.S. person or that the conditions of any other exemption are not in fact satisfied. The payment of the gross proceeds from the sale, exchange, redemption or repayment of the notes to or through the U.S. office of any broker, U.S. or foreign, will be subject to information reporting and possible backup withholding unless the owner certifies as to its non-U.S. status under penalty of perjury or otherwise establishes an exemption, provided that the broker does not have actual knowledge, or reason to know, that the holder is a U.S. person or that the conditions of any other exemption are not, in fact, satisfied. The payment of the gross proceeds from the sale, exchange, redemption or repayment of the notes to or through a non-U.S. office of a non-U.S. broker will not be subject to information reporting or backup withholding unless the non-U.S. broker has certain types of relationships with the United States (a "U.S. Related Person").

In the case of the gross payment of proceeds from the sale, exchange, redemption or repayment of the notes to or through a non-U.S. office of a broker that is either a U.S. person or a U.S. Related Person, applicable Treasury Regulations require information reporting (but not backup withholding) on the payment unless the broker has documentary evidence in its files that the owner is a Non-U.S. Holder and the broker has no knowledge, or reason to know, to the contrary.

Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules from a payment to a Non-U.S. Holder will be refunded or credited against the Non-U.S. Holder's U.S. federal income tax liability, provided that the requisite information is timely furnished to the IRS.

## PLAN OF DISTRIBUTION

Under the terms and subject to the conditions contained in a purchase agreement dated
            , 2007, RAM Transition Corp. has agreed to sell to the initial purchasers, and the initial purchasers have severally agreed to purchase, the following principal amounts of the notes.

| Initial Purchasers | Principal Amount |
|---|---|
| Credit Suisse Securities (USA) LLC . . . . . . . . . . . . . . . . . . . . . . . . | $ |
| Morgan Stanley & Co. Incorporated . . . . . . . . . . . . . . . . . . . . . . . . | |
| Banc of America Securities LLC . . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| Lehman Brothers Inc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | |
| Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $2,550,000,000 |

The purchase agreement provides that the initial purchasers are obligated to purchase all of the notes if any are purchased. The purchase agreement also provides that if an initial purchaser defaults, the purchase commitments of non-defaulting initial purchasers may be increased or the offering may be terminated.

The initial purchasers propose to offer the notes in the United States, Canada, Europe, Asia and elsewhere initially at the offering price on the cover page of this offering circular and may also offer the notes to selling group members at the offering price less a selling concession. After the initial offering, the offering price may be changed.

The notes have not been registered under the Securities Act and may not be offered or sold within the United States or to, or for the account or benefit of, U.S. persons except to qualified institutional buyers in reliance on Rule 144A under the Securities Act and to persons in offshore transactions in reliance on Regulation S under the Securities Act. Each of the initial purchasers has agreed that, except as permitted by the purchase agreement, it will not offer, sell or deliver the notes as part of its distribution at any time within the United States or to, or for the account or benefit of, U.S. persons. Terms used in this paragraph have the meanings given to them by Regulation S under the Securities Act. Resales of the notes are restricted as described under "Transfer Restrictions."

The notes are offered for sale in those jurisdictions in the United States, Canada, Europe, Asia and elsewhere where it is lawful to make such offers.

Each initial purchaser has represented and agreed that it has not offered, sold or delivered and will not offer, sell or deliver any of the notes directly or indirectly, or distribute this offering circular or any other offering material relating to the notes, in or from any jurisdiction except under circumstances that will result in compliance with the applicable laws and regulations thereof and that will not impose any obligations on us except as set forth in the underwriting agreement.

**European Economic Area**

In relation to each Member State of the European Economic Area which has implemented the Prospectus Directive (each, a "Relevant Member State"), each initial purchaser has represented and agreed that with effect from and including the date on which the Prospectus Directive is implemented in that Relevant Member State (the "Relevant Implementation Date") it has not made and will not make an offer of notes to the public in that Relevant Member State prior to the publication of a prospectus in relation to the notes which has been approved by the competent authority in that Relevant Member State or, where appropriate, approved in another Relevant Member State and notified to the competent authority in that Relevant Member State, all in accordance with the Prospectus Directive, except that it may, with effect from and including the Relevant Implementation Date, make an offer of Securities to the public in that Relevant Member State at any time,

(a)  to legal entities which are authorized or regulated to operate in the financial markets or, if not so authorized or regulated, whose corporate purpose is solely to invest in securities;

(b)  to any legal entity which has two or more of (1) an average of at least 250 employees during the last financial year; (2) a total balance sheet of more than €43,000,000 and (3) an annual net turnover of more than €50,000,000, as shown in its last annual or consolidated accounts;

(c)  to fewer than 100 natural or legal persons (other than qualified investors as defined in the Prospectus Directive) subject to obtaining the prior consent of the manager for any such offer; or

(d)  in any other circumstances which do not require the publication by the Issuer of a prospectus pursuant to Article 3 of the Prospectus Directive.

For the purposes of this provision, the expression an "offer of notes to the public" in relation to any notes in any Relevant Member State means the communication in any form and by any means of sufficient information on the terms of the offer and the notes to be offered so as to enable an investor to decide to purchase or subscribe for the notes, as the same may be varied in that Member State by any measure implementing the Prospectus Directive in that Member State and the expression "Prospectus Directive" means Directive 2003/71/EC and includes any relevant implementing measure in each Relevant Member State.

**United Kingdom**

Each of the underwriters severally represents, warrants and agrees as follows:

(a)  it has only communicated or caused to be communicated and will only communicate or cause to be communicated an invitation or inducement to engage in investment activity (within the meaning of section 21 of FSMA) to persons who have professional experience in matters relating to investments falling with Article 19(5) of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005 or in circumstances in which section 21 of FSMA does not apply to us; and

(b)  it has complied with, and will comply with all applicable provisions of FSMA with respect to anything done by it in relation to the notes in, from or otherwise involving the United Kingdom.

**Japan**

The initial purchasers will not offer or sell any of our notes directly or indirectly in Japan or to, or for the benefit of any Japanese person or to others, for re-offering or re-sale directly or indirectly in Japan or to any Japanese person, except in each case pursuant to an exemption from the registration requirements of, and otherwise in compliance with, the Securities and Exchange Law of Japan and any other applicable laws and regulations of Japan. For purposes of this paragraph, "Japanese person" means any person resident in Japan, including any corporation or other entity organized under the laws of Japan.

**Hong Kong**

The initial purchasers and each of their affiliates have not (i) offered or sold, and will not offer or sell, in Hong Kong, by means of any document, our notes other than (a) to "professional investors" as defined in the Securities and Futures Ordinance (Cap. 571) of Hong Kong and any rules made under that Ordinance or (b) in other circumstances which do not result in the document being a "prospectus" as defined in the Companies Ordinance (Cap. 32 of Hong Kong or which do not constitute an offer to the public within the meaning of that Ordinance or (ii) issued or had in its possession for the purposes

of issue, and will not issue or have in its possession for the purposes of issue, whether in Hong Kong or elsewhere any advertisement, invitation or document relating to our notes which is directed at, or the contents of which are likely to be accessed or read by, the public in Hong Kong (except if permitted to do so under the securities laws of Hong Kong) other than with respect to our securities which are or are intended to be disposed of only to persons outside Hong Kong or only to "professional investors" as defined in the Securities and Futures Ordinance and any rules made under that Ordinance. The contents of this document have not been reviewed by any regulatory authority in Hong Kong. You are advised to exercise caution in relation to the offer. If you are in any doubt about any of the contents of this document, you should obtain independent professional advice.

**Singapore**

This offering circular or any other offering material relating to our notes has not been and will not be registered as a prospectus with the Monetary Authority of Singapore, and the notes will be offered in Singapore pursuant to exemptions under Section 274 and Section 275 of the Securities and Futures Act, Chapter 289 of Singapore (the "Securities and Futures Act"). Accordingly our notes may not be offered or sold, or be the subject of an invitation for subscription or purchase, nor may this offering circular or any other offering material relating to our notes be circulated or distributed, whether directly or indirectly, to the public or any member of the public in Singapore other than (a) to an institutional investor or other person specified in Section 274 of the Securities and Futures Act, (b) to a sophisticated investor, and in accordance with the conditions specified in Section 275 of the Securities and Futures Act or (c) otherwise pursuant to, and in accordance with the conditions of, any other applicable provision of the Securities and Futures Act.

**Germany**

Each person who is in possession of this offering circular is aware of the fact that no German sales prospectus (Verkaufsprospekt) within the meaning of the Securities Sales Prospectus Act (Wertpapier-Verkaufsprospektgesetz, the "Act") of the Federal Republic of Germany has been or will be published with respect to our notes. In particular, each initial purchaser has represented that it has not engaged and has agreed that it will not engage in a public offering in (offentliches Angebot) within the meaning of the Act with respect to any of our notes otherwise than in accordance with the Act and all other applicable legal and regulatory requirements.

**France**

The notes are being issued and sold outside the Republic of France and, in connection with their initial distribution, each initial purchaser has not offered or sold and will not offer or sell, directly or indirectly, any notes to the public in the Republic of France, and each initial purchaser has not distributed and will not distribute or cause to be distributed to the public in the Republic of France this offering circular or any other offering material relating to the notes, and that such offers, sales and distributions have been and will be made in the Republic of France only to qualified investors (investisseurs qualifiés) in accordance with Article L.411-2 of the Monetary and Financial Code and decrét no. 98-880 dated 1st October, 1998.

**Netherlands**

Our notes may not be offered, sold, transferred or delivered in or from the Netherlands as part of their initial distribution or at any time thereafter, directly or indirectly, other than to individuals or legal entities situated in The Netherlands who or which trade or invest in securities in the conduct of a business or profession (which includes banks, securities intermediaries (including dealers and brokers), insurance companies, pension funds, collective investment institution, central governments, large international and supranational organizations, other institutional investors and other parties, including

184

treasury departments of commercial enterprises, which as an ancillary activity regularly invest in securities hereinafter, "Professional Investors"), provided that in the offer, prospectus and in any other documents or advertisements in which a forthcoming offering of our notes is publicly announced (whether electronically or otherwise) in The Netherlands it is stated that such offer is and will be exclusively made to such Professional Investors. Individual or legal entities who are not Professional Investors may not participate in the offering of our notes, and this offering circular or any other offering material relating to our notes may not be considered an offer or the prospect of an offer to sell or exchange our notes.

We have agreed that we will not offer, sell, contract to sell, pledge or otherwise dispose of, directly or indirectly, or file with the SEC a registration statement under the Securities Act relating to, any United States dollar-denominated debt securities issued or guaranteed by us and having a maturity of more than one year from the date of issue, or publicly disclose our intention to make any offer, sale, pledge, disposition or filing, without the prior written consent of Credit Suisse Securities (USA) LLC for a period of 180 days after the date of this offering circular.

We have agreed to indemnify the initial purchasers against liabilities or to contribute to payments which they may be required to make in that respect.

The notes are a new issue of securities for which there currently is no market. The notes are expected to be made eligible for trading in PORTAL. The initial purchasers have advised us that they intend to make a market in the notes as permitted by applicable law. They are not obligated, however, to make a market in the notes and any market-making may be discontinued at any time at their sole discretion. Accordingly, no assurance can be given as to the development or liquidity of any market for the notes.

We expect that delivery of the notes will be made against payment therefor on or about the closing date specified on the cover page of this offering circular, which will be the          business day following the date hereof (this settlement cycle being referred to as "T+      "). Under Rule 15c6-1 of the SEC promulgated under the Exchange Act, trades in the secondary market generally are required to settle in three business days, unless the parties to any such trade expressly agree otherwise. Accordingly, purchasers who wish to trade notes on the date hereof or the next          succeeding business days will be required, by virtue of the fact that the notes initially will settle in T+     , to specify an alternate settlement cycle at the time of any such trade to prevent a failed settlement. Purchasers of notes who wish to trade notes on the date hereof or the next          business day should consult their own advisor.

The initial purchasers may engage in over-allotment, stabilizing transactions, covering transactions and penalty bids in accordance with Regulation M under the Exchange Act.

- Over-allotment involves sales in excess of the offering size, which creates a short position for the initial purchasers.

- Stabilizing transactions permit bids to purchase the underlying security so long as the stabilizing bids do not exceed a specified maximum.

- Covering transactions involve purchases of the notes in the open market after the distribution has been completed in order to cover short positions.

- Penalty bids permit the initial purchasers to reclaim a selling concession from a broker/dealer when the notes originally sold by such broker/dealer are purchased in a stabilizing or covering transaction to cover short positions.

These stabilizing transactions, covering transactions and penalty bids may cause the price of the notes to be higher than it would otherwise be in the absence of these transactions. These transactions, if commenced, may be discontinued at any time.

In the ordinary course of business, certain of the initial purchasers and their affiliates have provided and may in the future provide financial advisory, investment banking and commercial banking services for us and our subsidiaries for customary fees and expenses. Credit Suisse Securities (USA) LLC, Morgan Stanley & Co. Incorporated, Banc of America Securities LLC, and Lehman Brothers Inc. are also acting as dealer managers and solicitation agents with respect to the tender offer for our existing notes and we have paid fees for such services. In addition, Credit Suisse Securities (USA) LLC is a sell-side advisor to us in connection with the Transactions and will receive a customary fee for such services, and Morgan Stanley & Co. Incorporated is a buy-side advisor to the Sponsor in connection with the Transactions and will receive a customary fee for such services. Affiliates of all or some of the initial purchasers are lenders under our existing credit facility and will be lenders under our new senior secured credit facilities, and each has received, or will receive, customary fees relating thereto. The decision of the initial purchasers to distribute the notes was made independent of their affiliates that are, or may become, lenders under our credit facilities, which had no involvement in determining whether or when to distribute the notes under this offering or the terms of this offering. In the ordinary course, certain of the initial purchasers and their affiliates have acquired and currently own notes that we have issued from time to time. Certain of the initial purchasers and their affiliates will receive a portion of the aggregate proceeds of this offering by tendering the existing notes. The decision of the initial purchasers to distribute the notes was not influenced by the proceeds that they or their affiliates may receive as a result of the use of proceeds as described under "Use of Proceeds."

Exhibit B-8

## NOTICE TO CANADIAN RESIDENTS

**Resale Restrictions**

The distribution of the notes in Canada is being made only on a private placement basis exempt from the requirement that we prepare and file a prospectus with the securities regulatory authorities in each province where trades of notes are made. Any resale of the notes in Canada must be made under applicable securities laws which will vary depending on the relevant jurisdiction, and which may require resales to be made under available statutory exemptions or under a discretionary exemption granted by the applicable Canadian securities regulatory authority. Purchasers are advised to seek legal advice prior to any resale of the notes.

**Representations of Purchasers**

By purchasing notes in Canada and accepting a purchase confirmation a purchaser is representing to us and the dealer from whom the purchase confirmation is received that:

- the purchaser is entitled under applicable provincial securities laws to purchase the notes without the benefit of a prospectus qualified under those securities laws,

- where required by law, that the purchaser is purchasing as principal and not as agent,

- the purchaser has reviewed the text above under Resale Restrictions, and

- the purchaser acknowledges and consents to the provision of specified information concerning its purchase of the notes to the regulatory authority that by law is entitled to collect the information.

Further details concerning the legal authority for this information is available on request.

**Rights of Action—Ontario Purchasers Only**

Under Ontario securities legislation, certain purchasers who purchase a security offered by this offering circular during the period of distribution will have a statutory right of action for damages, or while still the owner of the notes, for rescission against us in the event that this offering circular contains a misrepresentation without regard to whether the purchaser relied on the misrepresentation. The right of action for damages is exercisable not later than the earlier of 180 days from the date the purchaser first had knowledge of the facts giving rise to the cause of action and three years from the date on which payment is made for the notes. The right of action for rescission is exercisable not later than 180 days from the date on which payment is made for the notes. If a purchaser elects to exercise the right of action for rescission, the purchaser will have no right of action for damages against us. In no case will the amount recoverable in any action exceed the price at which the notes were offered to the purchaser and if the purchaser is shown to have purchased the securities with knowledge of the misrepresentation, we will have no liability. In the case of an action for damages, we will not be liable for all or any portion of the damages that are proven to not represent the depreciation in value of the notes as a result of the misrepresentation relied upon. These rights are in addition to, and without derogation from, any other rights or remedies available at law to an Ontario purchaser. The foregoing is a summary of the rights available to an Ontario purchaser. Ontario purchasers should refer to the complete text of the relevant statutory provisions.

**Enforcement of Legal Rights**

All of our directors and officers as well as the experts named herein may be located outside of Canada and, as a result, it may not be possible for Canadian purchasers to effect service of process within Canada upon us or those persons. All or a substantial portion of our assets and the assets of those persons may be located outside of Canada and, as a result, it may not be possible to satisfy a

judgment against us or those persons in Canada or to enforce a judgment obtained in Canadian courts against us or those persons outside of Canada.

**Taxation and Eligibility for Investment**

Canadian purchasers of notes should consult their own legal and tax advisors with respect to the tax consequences of an investment in the notes in their particular circumstances and about the eligibility of the notes for investment by the purchaser under relevant Canadian legislation.

### TRANSFER RESTRICTIONS

The notes have not been registered under the Securities Act and may not be offered or sold within the United States or to, or for the account or benefit of, U.S. persons (as defined in Regulation S under the Securities Act) except to (a) qualified institutional buyers in reliance on the exemption from the registration requirements of the Securities Act provided by Rule 144A and (b) persons in offshore transactions in reliance on Regulation S.

Each purchaser of notes will be deemed to have represented and agreed as follows (terms used in this paragraph that are defined in Rule 144A or Regulation S under the Securities Act are used herein as defined therein):

(1) The purchaser (A) (i) is a qualified institutional buyer, (ii) is aware that the sale to it is being made in reliance on Rule 144A and (iii) is acquiring the notes for its own account or for the account of a qualified institutional buyer or (B) is not a U.S. person and is purchasing the notes in an offshore transaction pursuant to Regulation S.

(2) The purchaser understands that the notes are being offered in a transaction not involving any public offering in the United States within the meaning of the Securities Act, that the notes have not been and, except as described in this offering circular, will not be registered under the Securities Act and that (A) if in the future it decides to offer, resell, pledge or otherwise transfer any of the notes, such notes may be offered, resold, pledged or otherwise transferred only (i) in the United States to a person whom the seller reasonably believes is a qualified institutional buyer in a transaction meeting the requirements of Rule 144A, (ii) outside the United States in a transaction complying with the provisions of Rule 904 under the Securities Act, (iii) pursuant to an exemption from registration under the Securities Act provided by Rule 144 (if available), or (iv) pursuant to an effective registration statement under the Securities Act, in each of cases (i) through (iv) in accordance with any applicable securities laws of any State of the United States, and that (B) the purchaser will, and each subsequent holder is required to, notify any subsequent purchaser of the notes from it of the resale restrictions referred to in (A) above.

(3) The purchaser understands that the notes will, until the expiration of the applicable holding period with respect to the notes set forth in Rule 144(k) of the Securities Act, unless otherwise agreed by us and the holder thereof, bear a legend substantially to the following effect:

THIS NOTE (OR ITS PREDECESSOR) WAS ORIGINALLY ISSUED IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER THE UNITED STATES SECURITIES ACT OF 1933 (THE "SECURITIES ACT"), AND THIS NOTE MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED IN THE ABSENCE OF SUCH REGISTRATION OR AN APPLICABLE EXEMPTION THEREFROM. EACH PURCHASER OF THIS NOTE IS HEREBY NOTIFIED THAT THE SELLER OF THIS NOTE MAY BE RELYING ON THE EXEMPTION FROM THE PROVISIONS OF SECTION 5 OF THE SECURITIES ACT PROVIDED BY RULE 144A THEREUNDER.

THE HOLDER OF THIS NOTE AGREES FOR THE BENEFIT OF THE COMPANY THAT (A) THIS NOTE MAY BE OFFERED, RESOLD, PLEDGED OR OTHERWISE TRANSFERRED, ONLY (I) IN THE UNITED STATES TO A PERSON WHOM THE SELLER REASONABLY BELIEVES IS A QUALIFIED INSTITUTIONAL BUYER (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT) IN A TRANSACTION MEETING THE REQUIREMENTS OF RULE 144A, (II) OUTSIDE THE UNITED STATES IN AN OFFSHORE TRANSACTION IN ACCORDANCE WITH RULE 904 UNDER THE SECURITIES ACT, (III) PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER

THE SECURITIES ACT PROVIDED BY RULE 144 THEREUNDER (IF AVAILABLE) OR (IV) PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE SECURITIES ACT, IN EACH OF CASES (I) THROUGH (IV) IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF ANY STATE OF THE UNITED STATES, AND (B) THE HOLDER WILL, AND EACH SUBSEQUENT HOLDER IS REQUIRED TO, NOTIFY ANY PURCHASER OF THIS NOTE FROM IT OF THE RESALE RESTRICTIONS REFERRED TO IN (A) ABOVE.

Each purchaser of notes offered in reliance on Regulation S will be deemed to have represented and agreed that it is not a U.S. person and is purchasing such notes in an offshore transaction (as such terms are defined in Regulation S) pursuant to Regulation S and understands that such notes will, unless otherwise agreed by us and the holder thereof, bear a legend substantially to the following effect (the "Regulation S Legend"):

THIS NOTE (OR ITS PREDECESSOR) WAS ORIGINALLY ISSUED IN A TRANSACTION ORIGINALLY EXEMPT FROM REGISTRATION UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND MAY NOT BE TRANSFERRED IN THE UNITED STATES OR TO, OR FOR THE ACCOUNT OR BENEFIT OF, ANY U.S. PERSON EXCEPT PURSUANT TO AN AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND ALL APPLICABLE STATE SECURITIES LAWS. TERMS USED ABOVE HAVE THE MEANINGS GIVEN TO THEM IN REGULATION S UNDER THE SECURITIES ACT.

Restricted Notes may be exchanged for notes not bearing the Restricted Note Legend but bearing the Regulation S Legend upon certification by the transferor in the form set forth in the applicable Indenture that the transfer of any such Restricted Note has been made in accordance with Rule 904 under the Securities Act. We understand that under current market practices settlement of the transfer of any such notes may be effected through the facilities of DTC, but that prior to the 40th day after the latest of the commencement of this offering and the last original issue date of the notes, any such transfer may only occur through the facilities of Euroclear and/or Clearstream, Luxembourg.

Each purchaser of the notes will be deemed to have represented and agreed as follows:

(1) Either: (A) the purchaser is not a Plan (which term includes (i) employee benefit plans that are subject to the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), (ii) plans, individual retirement accounts and other arrangements that are subject to Section 4975 of the Internal Revenue Code of 1986, as amended (the "Code"), or to provisions under applicable Federal, state, local, non-U.S. or other laws or regulations that are similar to such provisions of ERISA or the Code ("Similar Laws") and (iii) entities the underlying assets of which are considered to include "plan assets" of such plans, accounts and arrangements) and it is not purchasing the notes on behalf of, or with the "plan assets" of, any Plan; or (B) the purchaser's purchase, holding and subsequent disposition of the notes either (i) are and will not be a prohibited transaction under ERISA or the Code and are and will be otherwise permissible under all applicable Similar Laws or (ii) are and will remain entitled to exemptive relief from the prohibited transaction provisions of ERISA and the Code in accordance with one or more available statutory, class or individual prohibited transaction exemptions, all the conditions of which are satisfied, and are and will be otherwise permissible under all applicable Similar Laws; and

(2) The purchaser will not transfer the notes to any person or entity, unless such person or entity could itself truthfully make the foregoing representations and covenants.

## LEGAL MATTERS

The validity of the notes and the guarantees will be passed upon for us by Lowenstein Sandler PC. The initial purchasers have been represented by Cravath, Swaine & Moore LLP.

## INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

The consolidated financial statements of United Rentals, Inc. as of December 31, 2005 and 2006 and for each of the three years in the period ended December 31, 2006, included in this offering circular have been audited by Ernst & Young LLP, an independent registered public accounting firm, as stated in their report appearing herein.

## WHERE YOU CAN FIND MORE INFORMATION

We file reports, proxy statements, and other information with the SEC. Such reports, proxy statements, and other information can be read and copied at the SEC's Public Reference Room at 450 Fifth Street, N.W., Washington, D.C. 20549. Please call the SEC at 1-800-SEC-0330 for further information on the Public Reference Room. The SEC maintains an internet site at *http://www.sec.gov* that contains reports, proxy and information statements and other information regarding issuers that file electronically with the SEC, including our company. We make available on our Internet website free of charge our annual report on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and amendments to such reports as soon as practicable after we electronically file such reports with the SEC. Our website address is *http://www.ur.com*. **The contents of our website are not incorporated by reference herein. None of our reports, proxy statements or other information filed with or furnished to, or that we may file with or furnish to, the SEC is incorporated by reference herein.**

We will provide you without charge a copy of the notes, the indenture governing the notes and the related registration rights agreement. You may request these documents by contacting us at United Rentals (North America), Inc., Five Greenwich Office Park, Greenwich, Connecticut 06830, Attention: Treasurer.

(This page has been left blank intentionally.)

## INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

Page

Audited Consolidated Financial Statements

Report of Independent Registered Public Accounting Firm on Financial Statements . . . . . . . .    F-2

United Rentals, Inc. Consolidated Balance Sheets as at December 31, 2006 and 2005 . . . . . . .    F-3

United Rentals, Inc. Consolidated Statements of Operations for the years ended
  December 31, 2006, 2005 and 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    F-4

United Rentals, Inc. Consolidated Statements of Stockholders' Equity for the year ended
  December 31, 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    F-5

United Rentals, Inc. Consolidated Statements of Stockholders' Equity for the year ended
  December 31, 2005 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    F-6

United Rentals, Inc. Consolidated Statements of Stockholders' Equity for the year ended
  December 31, 2006 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    F-7

United Rentals, Inc. Consolidated Statements of Cash Flows for the years ended
  December 31, 2006, 2005 and 2004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    F-8

Notes to Consolidated Financial Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    F-9

Schedule II—Valuation and Qualifying Accounts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    F-49

Unaudited Condensed Consolidated Financial Statements

United Rentals, Inc. Condensed Consolidated Balance Sheets as of September 30, 2007,
  September 30, 2006 and December 31, 2006 (unaudited) . . . . . . . . . . . . . . . . . . . . . . . . . . . .    F-50

United Rentals, Inc. Condensed Consolidated Statements of Income for the Nine Months
  Ended September 30, 2007 and 2006 (unaudited) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    F-51

United Rentals, Inc. Condensed Consolidated Statement of Stockholders' Equity for the Nine
  Months Ended September 30, 2007 (unaudited) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    F-52

United Rentals, Inc. Condensed Consolidated Statements of Cash Flows for the Nine Months
  Ended September 30, 2007 and 2006 (unaudited) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    F-53

Notes to Unaudited Condensed Consolidated Financial Statements . . . . . . . . . . . . . . . . . . . . .    F-54

**Report of Independent Registered Public Accounting Firm on Financial Statements**

The Board of Directors and Stockholders of
United Rentals, Inc.

We have audited the accompanying consolidated balance sheets of United Rentals, Inc. and subsidiaries (the Company) as of December 31, 2006 and 2005, and the related consolidated statements of operations, stockholders' equity, and cash flows for each of the three years in the period ended December 31, 2006. Our audits also included the financial statement schedule on page F-49. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the consolidated financial position of United Rentals, Inc. and subsidiaries at December 31, 2006 and 2005, and the consolidated results of their operations and their cash flows for each of the three years in the period ended December 31, 2006, in conformity with U.S. generally accepted accounting principles. Also, in our opinion, the related financial statement schedule, when considered in relation to the basic financial statements taken as a whole, presents fairly in all material respects the information set forth therein.

As discussed in Note 2 to the consolidated financial statements, effective January 1, 2006, the Company adopted Statement of Financial Accounting Standards No. 123R, "Share-Based Payments" using the modified-prospective transition method.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the effectiveness of United Rentals, Inc.'s internal control over financial reporting as of December 31, 2006, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission and our report dated February 26, 2007 expressed an unqualified opinion thereon.

/s/ ERNST & YOUNG LLP

New York, New York
February 26, 2007

## UNITED RENTALS, INC.

## CONSOLIDATED BALANCE SHEETS

### (In millions, except share data)

| | December 31, | |
|---|---|---|
| | 2006 | 2005 |
| | (In millions, except share data) | |
| **ASSETS** | | |
| Cash and cash equivalents | $ 119 | $ 316 |
| Accounts receivable, net of allowance for doubtful accounts of $34 at December 31, 2006 and $41 at December 31, 2005 | 502 | 511 |
| Inventory | 139 | 155 |
| Assets of discontinued operation | 107 | 154 |
| Prepaid expenses and other assets | 56 | 72 |
| Deferred taxes | 82 | 196 |
| Total current assets | 1,005 | 1,404 |
| Rental equipment, net | 2,561 | 2,319 |
| Property and equipment, net | 359 | 306 |
| Goodwill and other intangible assets, net | 1,376 | 1,361 |
| Other long-term assets | 65 | 80 |
| **Total assets** | $5,366 | $5,470 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| Current maturities of long-term debt | $ 37 | $ 27 |
| Accounts payable | 218 | 223 |
| Accrued expenses and other liabilities | 322 | 268 |
| Liabilities related to discontinued operation | 22 | 23 |
| Total current liabilities | 599 | 541 |
| Long-term debt | 2,519 | 2,903 |
| Subordinated convertible debentures | 146 | 222 |
| Deferred taxes | 463 | 458 |
| Other long-term liabilities | 101 | 117 |
| **Total liabilities** | 3,828 | 4,241 |
| Preferred stock—$0.01 par value, 5,000,000 shares authorized: | | |
| Series C perpetual convertible preferred stock—$1,000 per share liquidation preference, 300,000 shares issued and outstanding at December 31, 2006 and 2005 | — | — |
| Series D perpetual convertible preferred stock—$1,000 per share liquidation preference, 150,000 shares issued and outstanding at December 31, 2006 and 2005 | — | — |
| Common stock—$0.01 par value, 500,000,000 shares authorized, 81,178,663 and 77,302,915 shares issued and outstanding, respectively, at December 31, 2006 and 2005 | 1 | 1 |
| Additional paid-in capital | 1,421 | 1,345 |
| Deferred compensation | — | (12) |
| Retained earnings (accumulated deficit) | 69 | (155) |
| Accumulated other comprehensive income | 47 | 50 |
| **Total stockholders' equity** | 1,538 | 1,229 |
| | $5,366 | $5,470 |

See accompanying notes.

F-3

## UNITED RENTALS, INC.

## CONSOLIDATED STATEMENTS OF OPERATIONS

### (In millions, except per share amounts)

| | Year Ended December 31, | | |
| --- | ---: | ---: | ---: |
| | 2006 | 2005 | 2004 |
| Revenues: | | | |
| Equipment rentals | $2,530 | $2,338 | $2,058 |
| Sales of rental equipment | 335 | 304 | 272 |
| New equipment sales | 232 | 205 | 177 |
| Contractor supplies sales | 385 | 301 | 202 |
| Service and other revenues | 158 | 140 | 126 |
| **Total revenues** | **3,640** | **3,288** | **2,835** |
| Cost of revenues: | | | |
| Cost of equipment rentals, excluding depreciation | 1,137 | 1,094 | 977 |
| Depreciation of rental equipment | 408 | 386 | 370 |
| Cost of rental equipment sales | 237 | 223 | 196 |
| Cost of new equipment sales | 191 | 168 | 146 |
| Cost of contractor supplies sales | 302 | 231 | 148 |
| Cost of service and other revenue | 76 | 71 | 65 |
| **Total cost of revenues** | **2,351** | **2,173** | **1,902** |
| **Gross profit** | **1,289** | **1,115** | **933** |
| Selling, general and administrative expenses | 613 | 553 | 449 |
| Restructuring charge | — | — | (4) |
| Non-rental depreciation and amortization | 50 | 38 | 41 |
| Operating income | 626 | 524 | 447 |
| Interest expense, net | 208 | 181 | 327 |
| Interest expense—subordinated convertible debentures | 13 | 14 | 14 |
| Other (income) expense, net | — | (2) | 6 |
| Income from continuing operations before provision for income taxes | 405 | 331 | 100 |
| Provision for income taxes | 156 | 129 | 28 |
| Income from continuing operations | 249 | 202 | 72 |
| Loss from discontinued operations, net of taxes | (25) | (15) | (156) |
| Net income (loss) | $ 224 | $ 187 | $ (84) |
| Basic earnings (loss) available to common stockholders: | | | |
| Income from continuing operations | $ 2.58 | $ 2.13 | $ 0.77 |
| Loss from discontinued operations | (0.26) | (0.16) | (1.65) |
| Net income (loss) | $ 2.32 | $ 1.97 | $(0.88) |
| Diluted earnings (loss) available to common stockholders: | | | |
| Income from continuing operations | $ 2.28 | $ 1.93 | $ 0.71 |
| Loss from discontinued operations | (0.22) | (0.13) | (1.50) |
| Net income (loss) | $ 2.06 | $ 1.80 | $(0.79) |

See accompanying notes.

F-4

**UNITED RENTALS, INC.**

**CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY**

**(In millions)**

F-5

| | Series C Perpetual Convertible Preferred Stock | Series D Perpetual Convertible Preferred Stock | Common Stock Number of Shares | Common Stock Amount | Additional Paid-in Capital | Deferred Compensation | (Accumulated Deficit) Retained Earnings | Comprehensive Income (Loss) | Accumulated Other Comprehensive (Loss) Income |
|---|---|---|---|---|---|---|---|---|---|
| January 1, 2004 . . . . . . . . . . . . . . . . . . . . . . . | $ — | $ — | 77 | $ 1 | $1,330 | $ (26) | $ (258) | | $ 22 |
| Comprehensive income (loss): | | | | | | | | | |
| Net loss . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | | | | (84) | $ (84) | |
| Other comprehensive income (loss): | | | | | | | | | |
| Foreign currency translation adjustments . . . . . . | | | | | | | | 17 | 17 |
| Derivatives qualifying as hedges, net of taxes of $1 . . . . . . . . . . . . . . . . . . . | | | | | | | | (2) | (2) |
| Comprehensive loss . . . . . . . . . . . . . . . . . . . . | | | | | | | | $ (69) | |
| Issuance of common stock under deferred compensation plans, net of forfeitures . . . . . . | | | 1 | — | 13 | (13) | | | |
| Exercise of common stock options and warrants . | | | | | 7 | | | | |
| Amortization of stock compensation . . . . . . . . . | | | | | 2 | 20 | | | |
| Tax benefit related to vesting of restricted stock . | | | | | 1 | | | | |
| Shares repurchased and retired . . . . . . . . . . . . | | | | | (4) | | | | |
| Balance December 31, 2004 . . . . . . . . . . . . . . | $ — | $ — | 78 | $ 1 | $1,349 | $ (19) | $ (342) | | $ 37 |

See accompanying notes.

**UNITED RENTALS, INC.**

**CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY (Continued)**

**(In millions)**

F-6

| | Series C Perpetual Convertible Preferred Stock | Series D Perpetual Convertible Preferred Stock | Common Stock Number of Shares | Common Stock Amount | Additional Paid-in Capital | Deferred Compensation | (Accumulated Deficit) Retained Earnings | Comprehensive Income (Loss) | Accumulated Other Comprehensive Income |
|---|---|---|---|---|---|---|---|---|---|
| Balance December 31, 2004 . . . . . . . . . . . . . . | $ — | $ — | 78 | $ 1 | $1,349 | $ (19) | $ (342) | | $ 37 |
| Comprehensive income (loss): | | | | | | | | | |
| Net income . . . . . . . . . . . . . . . . . . | | | | | | | 187 | $ 187 | |
| Other comprehensive income (loss): | | | | | | | | | |
| Foreign currency translation adjustments . . . . . . | | | | | | | | 10 | 10 |
| Derivatives qualifying as hedges, net of taxes of $2 . . . . . . . . . . . . . . . . . . . | | | | | | | | 3 | 3 |
| Comprehensive income . . . . . . . . . . . . . . . . . | | | | | | | | $ 200 | |
| Issuance of common stock under deferred compensation plans, net of forfeitures . . . . . . | | | | | 2 | (2) | | | |
| Exercise of common stock options and warrants . | | | | | 1 | | | | |
| Amortization of stock compensation . . . . . . . . . | | | | | 1 | 9 | | | |
| Tax benefit relating to vesting of restricted stock and options . . . . . . . . . . . . . . . . . . . . . . | | | | | 1 | | | | |
| Founders shares repurchased and retired . . . . . . | | | (1) | | (2) | | | | |
| Shares repurchased and retired . . . . . . . . . . . | | | — | — | (6) | | | | |
| Forfeiture of stock compensation . . . . . . . . . . . | | | | | (1) | | | | |
| Balance December 31, 2005 . . . . . . . . . . . . . . | $ — | $ — | 77 | $ 1 | $1,345 | $ (12) | $ (155) | | $ 50 |

See accompanying notes.

**UNITED RENTALS, INC.**

**CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY (Continued)**

**(In millions)**

F-7

| | Series C Perpetual Convertible Preferred Stock | Series D Perpetual Convertible Preferred Stock | Common Stock Number of Shares | Common Stock Amount | Additional Paid-in Capital | Deferred Compensation | (Accumulated Deficit) Retained Earnings | Comprehensive Income | Accumulated Other Comprehensive Income |
|---|---|---|---|---|---|---|---|---|---|
| Balance December 31, 2005 . . . . . . . . . . . . . . | $ — | $ — | 77 | $  1 | $1,345 | $  (12) | $ (155) | | $  50 |
| Comprehensive income (loss): | | | | | | | | | |
| Net income . . . . . . . . . . . . . . . . . . . . . . . | | | | | | | 224 | $  224 | |
| Other comprehensive income (loss): | | | | | | | | | |
| Foreign currency translation adjustments . . . . . . | | | | | | | | (2) | (2) |
| Derivatives qualifying as hedges, net of taxes of $1 . . . . . . . . . . . . . . . . . . . | | | | | | | | (1) | (1) |
| Comprehensive income . . . . . . . . . . . . . . . . . | | | | | | | | $  221 | |
| Reclassification of unearned stock compensation in connection with adoption of FAS 123 (R) . . | | | | | (12) | 12 | | | |
| Exercise of common stock options and warrants . | | | 4 | | 78 | | | | |
| Amortization of stock compensation . . . . . . . . . | | | | | 16 | | | | |
| Shares repurchased and retired . . . . . . . . . . . . | | | | | (6) | | | | |
| Balance December 31, 2006 . . . . . . . . . . . . . . | $ — | $ — | 81 | $  1 | $1,421 | $ — | $  69 | | $  47 |

See accompanying notes.

# UNITED RENTALS, INC.

## CONSOLIDATED STATEMENTS OF CASH FLOWS

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | 2006 | 2005 | 2004 |
|  | (In millions) | | |
| **Cash Flows From Operating Activities:** | | | |
| Net income (loss) | $ 224 | $ 187 | $  (84) |
| Adjustments to reconcile net income (loss) to net cash provided by operating activities: | | | |
| Depreciation and amortization | 487 | 454 | 445 |
| Gain on sales of rental equipment | (100) | (82) | (78) |
| Gain on sales of non-rental equipment | (6) | (3) | (2) |
| Amortization of deferred compensation | 16 | 8 | 22 |
| Restructuring and asset impairment charge | — | — | (1) |
| Goodwill impairment | — | — | 139 |
| Loss on sale of discontinued operations | 37 | — | — |
| Repurchase premiums for debt refinancing | — | — | 151 |
| Write-off of deferred financing fees and unamortized premiums on interest rate caps | 9 | — | — |
| Non-cash adjustments to equipment | 10 | 27 | 30 |
| Increase (decrease) in deferred taxes | 119 | 112 | (8) |
| Changes in operating assets and liabilities: | | | |
| Decrease (increase) in accounts receivable | 6 | (78) | 10 |
| Decrease (increase) in inventory | 21 | (54) | (19) |
| Decrease (increase) in prepaid expenses and other assets | 10 | (5) | 34 |
| Decrease (increase) in accounts payable | 14 | (6) | 62 |
| Decrease in accrued expenses and other liabilities | 11 | 69 | 24 |
| Net cash provided by operating activities | 858 | 629 | 725 |
| **Cash Flows From Investing Activities:** | | | |
| Purchases of rental equipment | (879) | (757) | (600) |
| Purchases of non-rental equipment | (86) | (66) | (49) |
| Proceeds from sales of rental equipment | 338 | 307 | 275 |
| Proceeds from sales of non-rental equipment | 18 | 12 | 9 |
| Purchases of other companies | (39) | (40) | (102) |
| Proceeds from sale-leaseback transactions | — | — | 23 |
| Proceeds from sales of rental locations | — | 3 | — |
| Net cash used in investing activities | (648) | (541) | (444) |
| **Cash Flows From Financing Activities:** | | | |
| Proceeds from debt, including borrowings under accounts receivable securitization facility | 265 | — | 2,211 |
| Payments on debt | (669) | (39) | (2,225) |
| Purchase of interest rate caps | — | — | (14) |
| Payments of financing costs | — | (35) | (37) |
| Proceeds from the exercise of common stock options | 78 | 2 | 6 |
| Shares repurchased and retired | (4) | (8) | (5) |
| Proceeds received in conjunction with partial termination of interest rate caps | 3 | — | — |
| Subordinated convertible debentures repurchased and retired, including premium paid of $1 | (77) | — | — |
| Net cash used in financing activities | (404) | (80) | (64) |
| Effect of foreign exchange rates | (3) | 5 | 7 |
| Net (decrease) increase in cash and cash equivalents | (197) | 13 | 224 |
| Cash and cash equivalents at beginning of year | 316 | 303 | 79 |
| Cash and cash equivalents at end of year | $ 119 | $ 316 | $  303 |
| **Supplemental disclosure of cash flow information:** | | | |
| Cash paid for interest | $ 218 | $ 197 | $  175 |
| Cash paid for taxes, net of refunds | 17 | 8 | (10) |
| **Supplemental schedule of non-cash investing and financing activities** | | | |
| The Company acquired the net assets and assumed certain liabilities of other companies as follows: | | | |
| Assets, net of cash acquired | $  39 | $  43 | $  119 |
| Less: liabilities assumed | — | (3) | (17) |
| Net cash paid | $  39 | $  40 | $  102 |

See accompanying notes.

**UNITED RENTALS, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**(Dollars in millions, except per share data and unless otherwise indicated)**

### 1.  Organization, Basis of Presentation and Consolidation

United Rentals, Inc. ("Holdings," "United Rentals" or the "Company") is principally a holding company and conducts its operations primarily through its wholly owned subsidiary, United Rentals (North America), Inc. ("URNA"), and subsidiaries of URNA. Holdings' primary asset is its sole ownership of all issued and outstanding shares of common stock of URNA. URNA's various credit agreements and debt instruments place restrictions on its ability to transfer funds to its shareholder.

We rent equipment to a diverse customer base that includes construction and industrial companies, manufacturers, utilities, municipalities, homeowners and others in the United States, Canada and Mexico. In addition to renting equipment, we sell new and used rental equipment, as well as related contractor supplies, parts and service.

The accompanying consolidated financial statements include our accounts and those of our controlled subsidiary companies. All significant intercompany accounts and transactions have been eliminated. We consolidate variable interest entities if we are deemed the primary beneficiary of the entity. Certain reclassifications of prior year amounts, including the reclassification of the amortization of deferred financing costs from non-rental depreciation and amortization to interest expense, net, the reclassification of certain customer rebates from selling, general and administration expenses to contra revenue, the reclassification of the depreciation expense for certain vehicles from non-rental depreciation and amortization to depreciation of rental equipment and the presentation of our 2005 consolidated balance sheet on a classified basis, have been made to conform to the current year presentation.

In December 2006, we entered into a definitive agreement to sell our traffic control business. As the held for sale and discontinued operations criteria were met, the operations of traffic control are reflected as discontinued operations for all periods presented.

### 2.  Summary of Significant Accounting Policies

#### Cash Equivalents

We consider all highly liquid instruments with maturities of three months or less when purchased to be cash equivalents. Included in the cash balance at December 31, 2005 is $75 that we agreed to maintain in an investment account for a traffic control subsidiary to conduct traffic control business with the state of Florida. In March 2006, we signed an agreement with the state of Florida whereby we are no longer required to maintain these funds in any type of account.

#### Allowance for Doubtful Accounts

We maintain an allowance for doubtful accounts. This allowance reflects our estimate of the amount of our receivables that we will be unable to collect.

#### Inventory

Inventory consists of new equipment, merchandise and contractor supplies, tools, parts, fuel and related supply items. Inventory is stated at the lower of cost or market. Cost is determined, depending on the type of inventory, on either a specific identification, weighted average or first-in, first-out method.

F-9

**UNITED RENTALS, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**(Dollars in millions, except per share data and unless otherwise indicated)**

**2.   Summary of Significant Accounting Policies (Continued)**

**Rental Equipment**

Rental equipment, which includes service and delivery vehicles, is recorded at cost and depreciated over the estimated useful lives of the equipment using the straight-line method. The range of estimated useful lives for rental equipment is two to ten years. Rental equipment is depreciated to a salvage value of zero to ten percent of cost. Ordinary repair and maintenance costs are charged to operations as incurred. Repair and maintenance costs are included in cost of revenues on our consolidated statements of operations. Repair and maintenance expense for our rental equipment was $233, $210 and $198, for the years ended December 31, 2006, 2005 and 2004, respectively.

**Property and Equipment**

Property and equipment are recorded at cost and depreciated over their estimated useful lives using the straight-line method. The range of estimated useful lives for property and equipment is two to thirty-nine years. Ordinary repair and maintenance costs are charged to operations as incurred. Leasehold improvements are amortized using the straight-line method over their estimated useful lives or the remaining life of the lease, whichever is shorter.

**Goodwill**

Goodwill represents the excess of cost over the fair value of identifiable net assets of businesses acquired. As discussed in note 8, goodwill is tested for impairment on at least an annual basis. Prior to January 1, 2004, we tested for goodwill impairment on a branch-by-branch basis. Accordingly, a goodwill write-off was required even if only one or a limited number of our branches had an impairment as of the testing date and even if there was no impairment for all our branches on an aggregate basis. Commencing January 1, 2004, we began testing for goodwill impairment at a regional, rather than a branch, level. We began testing for impairment at this level because Statement of Financial Accounting Standards ("SFAS") No. 142, "Goodwill and Other Intangible Assets" requires that goodwill impairment testing be performed at the reporting unit level. In 2004, following a reorganization of our reporting structure, our regions became our reporting units.

**Other Intangible Assets**

Other intangible assets consist of non-compete agreements and customer-related intangibles (specifically customer relationships). The non-compete agreements are being amortized on a straight-line basis over periods ranging from 2 to 10 years. The customer relationships are being amortized on a straight-line basis over periods ranging from 5 to 12 years.

**Long-Lived Assets**

Long-lived assets are recorded at the lower of amortized cost or fair value. As part of an ongoing review of the valuation of long-lived assets, we assess the carrying value of such assets if facts and circumstances suggest they may be impaired. If this review indicates the carrying value of these assets may not be recoverable, as determined by an undiscounted cash flow analysis over the remaining useful life, the carrying value would be reduced to its estimated fair value.

## UNITED RENTALS, INC.

## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

**(Dollars in millions, except per share data and unless otherwise indicated)**

**2.  Summary of Significant Accounting Policies (Continued)**

**Derivative Financial Instruments**

Under SFAS No. 133, "Accounting for Derivative Instruments and Hedging Activities," all derivatives are required to be recorded as assets or liabilities and measured at fair value. Gains or losses resulting from changes in the values of derivatives are recognized immediately or deferred, depending on the use of the derivative and whether or not it qualifies as a hedge. We periodically use derivative financial instruments in the management of our interest rate and foreign currency exposures. Derivative financial instruments are not used for trading or speculative purposes.

**Translation of Foreign Currency**

Assets and liabilities of our subsidiaries operating outside the United States which have a functional currency other than U.S. dollars are translated into U.S. dollars using exchange rates at the end of the year. Revenues and expenses are translated at average exchange rates effective during the year. Foreign currency translation gains and losses are included as a component of accumulated other comprehensive income (loss) within shareholders' equity.

**Fair Value of Financial Instruments**

The carrying amounts reported in our consolidated balance sheets for accounts receivable, accounts payable, and accrued expenses and other liabilities approximate fair value due to the immediate to short-term maturity of these financial instruments. The fair values of the revolving credit facility and term loan are determined using current interest rates for similar instruments as of December 31, 2006 and 2005 and approximate the carrying value of these financial instruments due to the fact that the underlying instruments include provisions to adjust interest rates to approximate fair market value. The estimated fair value of our other financial instruments at December 31, 2006 and 2005 have been calculated based upon available market information and are as follows:

|  | 2006 | | 2005 | |
|---|---|---|---|---|
|  | Carrying Amount | Fair Value | Carrying Amount | Fair Value |
| Subordinated convertible debentures ........ | $ 146 | $ 142 | $ 222 | $ 192 |
| Senior and senior subordinated notes ........ | 2,044 | 2,070 | 2,044 | 1,997 |
| Other debt ............................ | 20 | 15 | 12 | 9 |

**Revenue Recognition**

Our rental contract periods are daily, weekly or monthly and we recognize equipment rental revenue on a straight-line basis. As part of this straight-line methodology, when the equipment is returned, we recognize as incremental revenue the excess, if any, between the amount the customer is contractually required to pay over the cumulative amount of revenue recognized to date. Revenues from the sale of rental equipment and new equipment are recognized at the time of delivery to, or pick-up by, the customer and when collectibility is reasonably assured. Sales of contractor supplies are also recognized at the time of delivery to, or pick-up by, the customer.

F-11

**UNITED RENTALS, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**(Dollars in millions, except per share data and unless otherwise indicated)**

**2.  Summary of Significant Accounting Policies (Continued)**

**Advertising Expense**

We promote our business through local and national advertising in various media, including trade publications, yellow pages, the Internet, radio, direct mail and sports sponsorships. Advertising costs are generally expensed as incurred.

**Insurance**

We are insured for general liability, workers' compensation, and automobile liability, subject to deductibles, or self-insured retentions, per occurrence of $2 for general liability, $1 for workers' compensation and $2 for automobile liability as of December 31, 2006. Losses within these deductible amounts are accrued based upon the aggregate liability for reported claims incurred, as well as an estimated liability for claims incurred but not yet reported. These liabilities are not discounted. The company is also self insured for group medical claims but purchases "stop loss" insurance to protect itself from any one loss exceeding $330,000 (actual dollars).

**Income Taxes**

We use the liability method of accounting for income taxes. Under this method, deferred tax assets and liabilities are determined based on the differences between financial statement and tax bases of assets and liabilities and are measured using the enacted tax rates and laws that are expected to be in effect when the differences are expected to reverse. Recognition of deferred tax assets is limited to amounts considered by management to be more likely than not realized in future periods.

**Use of Estimates**

The preparation of financial statements in conformity with U.S. generally accepted accounting principles requires management to make estimates and assumptions that affect the amounts reported in the financial statements and accompanying notes. Significant estimates include goodwill impairment charges, allowance for doubtful accounts, useful lives for depreciation and amortization, deferred income taxes, reserves for claims, loss contingencies and fair values of financial instruments. Actual results could materially differ from those estimates.

**Concentrations of Credit Risk**

Financial instruments that potentially subject us to significant concentrations of credit risk include cash and cash equivalents and accounts receivable. We maintain cash and cash equivalents with high quality financial institutions. Concentration of credit risk with respect to accounts receivable is limited because a large number of geographically diverse customers make up our customer base. Our largest customer accounted for less than 1 percent of total revenues in each of 2006 and 2005 and no single customer represented greater than 1 percent of total accounts receivable at December 31, 2006 and 2005. We control credit risk through credit approvals, credit limits and other monitoring procedures.

**Stock-Based Compensation**

Effective January 1, 2006, we adopted SFAS No. 123(R), "Share-Based Payment" ("FAS 123(R)"), which establishes accounting for stock-based awards exchanged for employee services. FAS 123(R)

**UNITED RENTALS, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**(Dollars in millions, except per share data and unless otherwise indicated)**

### 2.  Summary of Significant Accounting Policies (Continued)

provides that stock-based compensation costs be measured at the grant date based on the fair value of the award and recognized as an expense over the requisite service period. Determining the fair-value of share-based awards requires judgment, including estimating stock price volatility, forfeiture rates and expected option life. We adopted FAS 123(R) using the modified-prospective transition method, and therefore we did not restate the results of prior periods. The adoption of FAS 123(R) did not have a material impact on our financial statements. FAS 123(R) requires that cash flows from tax benefits resulting from tax deductions in excess of the compensation cost recognized for stock-based awards ("excess tax benefits") be classified as financing cash flows prospectively from January 1, 2006. Prior to the adoption of FAS 123(R), such excess tax benefits were presented as operating cash flows.

Restricted stock awards are issued at the fair value of the stock on the grant date. Prior to the adoption of FAS 123(R), unearned compensation for grants of restricted stock equivalent to the fair value of the shares at the date of grant was recorded as a separate component of stockholders' equity and subsequently amortized to compensation expense over the awards' vesting period. In accordance with FAS 123(R), stockholders' equity is credited commensurate with the recognition of compensation expense. All unamortized unearned compensation at January 1, 2006 was reclassified to additional paid-in capital.

Prior to January 1, 2006, in accordance with Accounting Principles Board ("APB") Opinion No. 25, "Accounting for Stock Issued to Employees," we did not recognize compensation expense relating to employee stock options because the exercise price was equal to or greater than the fair market value (as defined under the relevant award plan) of our stock at the date of grant. If we had elected to recognize compensation expense using a fair value approach, our pro forma income and earnings per share for the years ended December 31, 2005 and 2004 would have been as follows:

|  | December 31 | |
|---|---|---|
|  | 2005 | 2004 |
| Net income (loss), as reported . . . . . . . . . . . . . . . . . . . . . . . . | $ 187 | $  (84) |
| *Plus:* Stock-based compensation expense included in reported net income (loss), net of tax . . . . . . . . . . . . . . . . . . . . . . . . | 5 | 13 |
| *Less:* Stock-based compensation expense determined using the fair value method, net of tax . . . . . . . . . . . . . . . . . . . . . . . . | (6) | (17) |
| Pro forma net income (loss) . . . . . . . . . . . . . . . . . . . . . . . . . . | $ 186 | $  (88) |
| Net income (loss) available to common stockholders per share-basic: |  |  |
| As reported . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $1.97 | $(0.88) |
| Pro forma . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $1.96 | $(0.93) |
| Net income (loss) available to common stockholders per share-diluted: |  |  |
| As reported . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $1.80 | $(0.79) |
| Pro forma . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | $1.79 | $(0.83) |

The weighted average fair value of options granted was $8.18 and $7.33 during 2005 and 2004, respectively. The fair value was estimated on the date of grant using the Black-Scholes option pricing

**UNITED RENTALS, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**(Dollars in millions, except per share data and unless otherwise indicated)**

**2.  Summary of Significant Accounting Policies (Continued)**

model which uses subjective assumptions which can materially affect fair value estimates and, therefore, does not necessarily provide a single measure of fair value of options. We used a risk-free interest rate average of 3.9 in 2005 and 2.9 in 2005 and 2004, respectively, a volatility factor for the market price of our common stock of 60 percent and 62 percent in 2005 and 2004, respectively, and a weighted-average expected life of options of approximately three years in 2005 and 2004. For purposes of these pro forma disclosures, the estimated fair value of options is amortized over the options' vesting period.

**New Accounting Pronouncements**

In June 2006, the Financial Accounting Standards Board ("FASB") issued Interpretation No. 48, "Accounting for Uncertainty in Income Taxes" (an interpretation of FAS 109, "Accounting for Income Taxes"), which is effective for fiscal years beginning after December 15, 2006. This interpretation was issued to clarify the accounting for uncertainty in income taxes recognized in the financial statements by prescribing a recognition threshold and measurement attribute for the financial statement recognition and measurement of a tax position taken or expected to be taken in a tax return. We do not expect there will be any material impact on the income tax benefits we have recognized in our financial statements as a result of this interpretation.

In September 2006, the FASB issued SFAS No. 157 "Fair Value Measurements," which is effective for fiscal years beginning after November 15, 2007 and interim periods within those fiscal years. This statement provides a single definition of fair value, together with a framework for measuring it, and requires new additional disclosure about the use of fair value to measure assets and liabilities. This statement also emphasizes that fair value is a market-based measurement, not an entity-specific measurement, and sets out a fair value hierarchy with the highest priority being quoted prices in active markets. While this statement does not add any new fair value measurements, it may change current practice. We are currently evaluating the potential impact of this statement.

**3.  Discontinued Operations**

In December 2006, we entered into a definitive agreement to sell our traffic control business to HTS Acquisition, Inc. ("HTS"), an entity newly-formed by affiliates of private equity investors Wynnchurch Capital Partners and Oak Hill Special Opportunities Fund, L.P. In connection with this transaction, we recorded an after-tax loss on sale in 2006 of $24. Traffic control was previously presented as a separate reporting segment. The transaction closed in February 2007 and we received net proceeds of $68.

In accordance with SFAS No. 144, "Accounting for the Impairment or Disposal of Long-Lived Assets," the results of operations of our traffic control business have been reported within discontinued operations in the consolidated statements of operations, and prior period consolidated statements of operations have been recast. The assets and liabilities associated with the traffic control business have also been classified separately in our consolidated balance sheets. The segment results in note 4 and the condensed consolidating statements in note 19 also reflect the reclassification of traffic control to discontinued operations. The 2006 consolidated statement of cash flows does not separately report the cash flows of the discontinued operations. Interest expense of $4 has been allocated to the traffic control operations for each of the three years in the period ended December 31, 2006. The interest expense allocation to discontinued operations is based on the expected proceeds from the sale as well

F-14

**UNITED RENTALS, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**(Dollars in millions, except per share data and unless otherwise indicated)**

**3. Discontinued Operations (Continued)**

as our average cost of debt. General corporate overhead costs previously allocated to traffic control when it was presented as a reportable segment have been reclassified and reflected in continuing operations.

Summarized results of operations for traffic control are as follows:

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | **2006** | **2005** | **2004(1)** |
| **Revenues** | $280 | $270 | $ 255 |
| Income (loss) from operation before income taxes | $ 1 | $(21) | $(188) |
| Loss on sale | (37) | — | — |
| Income tax benefit | 11 | 6 | 32 |
| **Loss from discontinued operation, net of taxes** | $(25) | $(15) | $(156) |

(1)  2004 results include a $139 pre-tax goodwill impairment charge.

The following is a summary of the assets and liabilities of traffic control as of December 31:

|  | **2006** | **2005** |
|---|---|---|
| **Assets** | | |
| Accounts receivable, net | $65 | $ 61 |
| Rental equipment, net | 11 | 32 |
| Property and equipment, net | 14 | 40 |
| Other assets | 17 | 21 |
| **Total assets of discontinued operation** | 107 | 154 |
| **Liabilities** | | |
| Accounts payable | 7 | 10 |
| Accrued expenses and other liabilities | 15 | 13 |
| **Total liabilities related to discontinued operation** | 22 | 23 |
| **Net assets of discontinued operation** | $85 | $131 |

In conjunction with the sale, we retained financial responsibility for deductibles and self-insured retentions associated with casualty insurance programs (workers' compensation, automobile liability and general liability) covering the traffic control business with respect to claims arising from loss occurrences prior to closing. These liabilities are not being assumed by the purchaser. We are not liable for these types of liabilities associated with the traffic control business which arise subsequent to the sale. The aggregate amount of these retained liabilities as of December 31, 2006 was $30 and is included in accrued expenses and other liabilities and other long-term liabilities in the consolidated balance sheet.

**UNITED RENTALS, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**(Dollars in millions, except per share data and unless otherwise indicated)**

**4. Segment Information**

Our reportable segments are general rentals and trench safety, pump and power. The general rentals segment includes the rental of construction, aerial, industrial and homeowner equipment and related services and activities. The general rentals segment's customers include construction and industrial companies, manufacturers, utilities, municipalities and homeowners. The general rentals segment operates throughout the United States and Canada and has one location in Mexico. The trench safety, pump and power segment includes the rental of specialty construction products and related services. The trench safety, pump and power segment's customers include construction companies involved in infrastructure projects, municipalities and industrial companies. This segment operates in the United States and has one location in Canada.

These segments align our external segment reporting with how management evaluates and allocates resources. We evaluate segment performance based on segment operating results.

The accounting policies of our segments are the same as those described in the summary of significant accounting policies in note 2. Certain corporate costs, including those related to selling, finance, legal, risk management, human resources, corporate management and information technology systems, are deemed to be of an operating nature and are allocated to our segments based on the actual amount of costs incurred in the prior year for SG&A and equipment rental revenue generating activities. As discussed in note 3 to our consolidated financial statements, traffic control, which was previously presented as a reporting segment, is now presented within discontinued operations. In conjunction with this presentation, general corporate overhead costs previously allocated to traffic control based on our management reporting have been reclassified to continuing operations and reflected within the operating results of general rentals and trench safety, pump and power, our remaining reportable segments. Prior period segment results have been recast to reflect this presentation. Additionally, in 2006, we determined the amount of self-insurance costs attributable to our traffic control operations exceeded the amount of such costs allocated to these operations and, as a result, have reflected more of these costs within discontinued operations than were previously allocated to traffic control when it was a reportable segment. Prior period segment results have been recast to reflect this presentation. The current methodology for allocating self-insurance costs, which includes our estimated exposures for general liability, workers' compensation and automobile liability, reflects the risk profiles of our segments and is based on actuarially performed analyses. As a result of these changes, approximately $16, $15 and $15 of corporate overhead costs for 2006, 2005 and 2004, respectively, that otherwise would have been allocated to traffic control have been reflected in our reportable segment operating income and approximately $9, $11 and $4 of self-insurance costs for 2006, 2005 and 2004, respectively, that would have been allocated to our reportable segments under our prior allocation methodology have been presented within discontinued operations.

**UNITED RENTALS, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**(Dollars in millions, except per share data and unless otherwise indicated)**

### 4.   Segment Information (Continued)

The following table sets forth financial information by segment. Information related to our consolidated balance sheets is presented as of December 31, 2006 and 2005.

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | **2006** | **2005** | **2004** |
| Total reportable segment revenues |  |  |  |
| General rentals | $3,423 | $3,108 | $2,705 |
| Trench safety, pump and power | 217 | 180 | 130 |
| Total revenues | $3,640 | $3,288 | $2,835 |
| Total reportable segment depreciation and amortization expense |  |  |  |
| General rentals | $ 435 | $ 404 | $ 395 |
| Trench safety, pump and power | 23 | 20 | 16 |
| Total depreciation and amortization expense | $ 458 | $ 424 | $ 411 |
| Reportable segment operating income |  |  |  |
| General rentals | $ 568 | $ 477 | $ 417 |
| Trench safety, pump and power | 58 | 47 | 30 |
| Segment operating income | $ 626 | $ 524 | $ 447 |
| Total capital expenditures |  |  |  |
| General rentals | $ 900 | $ 763 | $ 590 |
| Trench safety, pump and power | 51 | 38 | 35 |
| Assets of discontinued operation | 14 | 22 | 24 |
| Total capital expenditures | $ 965 | $ 823 | $ 649 |
| Total assets |  |  |  |
| General rentals | $5,112 | $5,200 |  |
| Trench safety, pump and power | 147 | 116 |  |
| Assets of discontinued operation | 107 | 154 |  |
| Total assets | $5,366 | $5,470 |  |

**UNITED RENTALS, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**(Dollars in millions, except per share data and unless otherwise indicated)**

**4. Segment Information (Continued)**

We operate in the United States, Canada and Mexico. Geographic area information for the years ended December 31, 2006, 2005 and 2004 is as follows, except for balance sheet information which is presented as of December 31, 2006 and 2005 only:

| | Year ended December 31, | | |
|---|---|---|---|
| | 2006 | 2005 | 2004 |
| Reportable segment revenues from external customers | | | |
| Domestic | $3,260 | $2,960 | $2,585 |
| Foreign (primarily Canada) | 380 | 328 | 250 |
| Total revenues from external customers | $3,640 | $3,288 | $2,835 |
| Rental equipment, net | | | |
| Domestic | $2,318 | $2,099 | |
| Foreign | 243 | 220 | |
| Total consolidated rental equipment, net | $2,561 | $2,319 | |
| Property and equipment, net | | | |
| Domestic | $ 329 | $ 285 | |
| Foreign | 30 | 21 | |
| Total consolidated property and equipment, net | $ 359 | $ 306 | |
| Goodwill and other intangible assets, net | | | |
| Domestic | $1,242 | $1,214 | |
| Foreign | 134 | 147 | |
| Total consolidated goodwill and other intangible assets, net | $1,376 | $1,361 | |

**5. Rental Equipment**

Rental equipment consists of the following:

| | December 31, | |
|---|---|---|
| | 2006 | 2005 |
| Rental equipment | $ 3,760 | $ 3,410 |
| Less accumulated depreciation | (1,199) | (1,091) |
| Rental equipment, net | $ 2,561 | $ 2,319 |

**UNITED RENTALS, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**(Dollars in millions, except per share data and unless otherwise indicated)**

## 6. Property and Equipment

Property and equipment consist of the following:

|  | December 31, | |
|---|---|---|
|  | 2006 | 2005 |
| Land | $ 91 | $ 62 |
| Buildings | 152 | 128 |
| Non-rental vehicles | 71 | 83 |
| Machinery and equipment | 42 | 35 |
| Furniture and fixtures | 101 | 91 |
| Leasehold improvements | 100 | 88 |
|  | 557 | 487 |
| Less accumulated depreciation and amortization | (198) | (181) |
| Property and equipment, net | $ 359 | $ 306 |

## 7. Acquisitions

We completed two, two and three acquisitions during the years ended December 31, 2006, 2005 and 2004, respectively. The results of operations of the businesses acquired in these acquisitions have been included in our results of operations from their respective acquisition dates.

In March 2006, we acquired the equipment and assets of Handy Rent-All Center, which had annual revenues of approximately $16. The aggregate purchase price for this acquisition was approximately $23. In June 2006, we acquired the equipment and assets of D. Larry Carter, Inc., which had annual revenues of approximately $10. The aggregate purchase price for this acquisition was approximately $18.

In December 2005, we acquired Sandvick Equipment & Supply Company, a trench safety company, with annual revenues of approximately $21. In June 2005, we acquired HSS RentX branch locations in Colorado. Total 2004 revenues of the acquired branches were approximately $9. The aggregate purchase price for these acquisitions was approximately $42, less liabilities assumed of approximately $10.

In October 2004, we acquired Atlantic Rentals Ltd., which had revenues in 2003 of approximately $32. In February 2004, we acquired 843504 Alberta Ltd. (formerly known as Skyreach Equipment, Ltd.), which had annual revenues in 2003 of approximately $35. The aggregate purchase price for these 2004 acquisitions was approximately $91, less liabilities assumed of $22.

The purchase prices for all acquisitions have been allocated to the assets acquired and liabilities assumed based on their respective fair values at their respective acquisition dates. Purchase price allocations are subject to change when additional information concerning asset and liability valuations is completed. The preliminary purchase price allocations that are subject to change primarily consist of intangible assets as well as rental and non-rental equipment valuations. These allocations are finalized within twelve months of the acquisition date and are not expected to result in significant differences between the preliminary and final allocations.

**UNITED RENTALS, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**(Dollars in millions, except per share data and unless otherwise indicated)**

**7. Acquisitions (Continued)**

Pro forma combined results of operations giving effect to these acquisitions would not vary materially from historical results.

**8. Goodwill and Other Intangible Assets**

The following table presents the changes in the carrying amount of goodwill for each of the three years in the period ended December 31, 2006:

|  | General rentals | Trench safety, pump and power | Total |
|---|---|---|---|
| Balance at January 1, 2004 | $1,202 | $ 70 | $1,272 |
| Goodwill related to acquisitions | 35 | — | 35 |
| Foreign currency translation and other adjustments | (14) | — | (14) |
| Balance at December 31, 2004 | 1,223 | 70 | 1,293 |
| Goodwill related to acquisitions | 4 | 27 | 31 |
| Foreign currency translation and other adjustments | 4 | — | 4 |
| Balance at December 31, 2005 | 1,231 | 97 | 1,328 |
| Goodwill related to acquisitions | 21 | (12) | 9 |
| Foreign currency translation and other adjustments | 1 | — | 1 |
| Balance at December 31, 2006 | $1,253 | $ 85 | $1,338 |

We are required to review our goodwill for impairment annually as of a scheduled review date. However, if events or circumstances suggest that goodwill could be impaired, we may be required to conduct an earlier review. The scheduled review date is October 1 of each year.

Other intangible assets primarily consist of customer relationships and non-compete agreements. Intangible assets were comprised of the following at December 31, 2006 and 2005:

|  | Average Remaining Amortization Period | | As of December 31, 2006 | | |
|---|---|---|---|---|---|
|  | 2006 | 2005 | Gross Carrying Amount | Accumulated Amortization | Net Amount |
| Non-compete agreements | 26 months | 18 months | $21 | $19 | $ 2 |
| Customer relationships | 7 years | 9 years | $49 | $13 | $36 |

|  | As of December 31, 2005 | | |
|---|---|---|---|
|  | Gross Carrying Amount | Accumulated Amortization | Net Amount |
| Non-compete agreements | $21 | $18 | $ 3 |
| Customer relationships | $40 | $10 | $30 |

Amortization expense for other intangible assets was $4, $5 and $4 for the years ended December 31, 2006, 2005 and 2004, respectively.

**UNITED RENTALS, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**(Dollars in millions, except per share data and unless otherwise indicated)**

**8. Goodwill and Other Intangible Assets (Continued)**

As of December 31, 2006, estimated amortization expense for other intangible assets for each of the next five years and thereafter is as follows:

| | |
|---|---:|
| 2007 | $ 5 |
| 2008 | 5 |
| 2009 | 5 |
| 2010 | 4 |
| 2011 | 4 |
| Thereafter | 15 |
| | $38 |

**9. Accrued Expenses and Other Liabilities and Other Long-Term Liabilities**

Accrued expenses and other liabilities consist of the following:

| | December 31, | |
|---|---:|---:|
| | 2006 | 2005 |
| Self-insurance accruals | $ 50 | $ 47 |
| Accrued compensation | 88 | 50 |
| Financial derivative instruments | 12 | — |
| Property and income taxes payable | 27 | 17 |
| Interest payable | 47 | 45 |
| Deferred revenue | 16 | 12 |
| Accrued benefit costs | 14 | 12 |
| Deferred Rent | 9 | 8 |
| Professional fees | 7 | 11 |
| Restructuring reserves | 3 | 5 |
| Other(1) | 49 | 61 |
| Accrued expenses and other liabilities | $322 | $268 |

(1) Other includes multiple items, none of which is individually significant.

Other long-term liabilities consist of the following:

| | December 31, | |
|---|---:|---:|
| | 2006 | 2005 |
| Self-insurance accruals | $ 49 | $ 41 |
| Financial derivative instruments | 44 | 54 |
| Other | 8 | 22 |
| | $101 | $117 |

**UNITED RENTALS, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**(Dollars in millions, except per share data unless otherwise indicated)**

### 10. Debt

Debt consists of the following:

|  | December 31, | |
|---|---|---|
|  | 2006 | 2005 |
| Revolving Credit Facility, interest payable at a weighted average rate of 6.2 and 5.3 percent at December 31, 2006 and 2005, respectively | $ 137 | $ 137 |
| Term Loan, interest payable at 7.4 and 6.6 percent at December 31, 2006 and 2005, respectively | 330 | 737 |
| 7¾ percent Senior Subordinated Notes, interest payable semi-annually | 525 | 525 |
| 7 percent Senior Subordinated Notes, interest payable semi-annually | 375 | 375 |
| 6½ percent Senior Notes, interest payable semi-annually | 1,000 | 1,000 |
| 1⅞ percent Convertible Senior Subordinated Notes, interest payable semi-annually | 144 | 144 |
| Accounts receivable securitization facility | 25 | — |
| Other debt, including capital leases | 20 | 12 |
| Total debt | 2,556 | 2,930 |
| Less current portion | (37) | (27) |
| Long-term debt | $2,519 | $2,903 |

*Senior Secured Credit Facility.*   URNA's senior secured credit facility, as amended and restated, includes a (i) $650 revolving credit facility, (ii) $150 institutional letter of credit facility and (iii) $750 term loan. The revolving credit facility, institutional letter of credit facility and term loan are governed by the same credit agreement. URNA's obligations under the credit facility are guaranteed by Holdings and, subject to limited exceptions, URNA's domestic subsidiaries and are secured by liens on substantially all of the assets of URNA, Holdings and URNA's domestic subsidiaries. Set forth below is certain additional information concerning the amended and restated facility.

*Revolving Credit Facility.*   The revolving credit facility enables URNA to borrow up to $650 on a revolving basis and enables certain of the Company's Canadian subsidiaries to borrow up to $150 (provided that the aggregate borrowings of URI and the Canadian subsidiaries may not exceed $650). A portion of the revolving credit facility, up to $250, is available for issuance of letters of credit. The revolving credit facility is scheduled to mature and terminate in February 2009. As of December 31, 2006, the outstanding borrowings under this facility were $137 and utilized letters of credit were $21. All outstanding borrowings under the revolving credit facility at December 31, 2006 were Canadian subsidiary borrowings.

U.S. dollar borrowings under the revolving credit facility accrue interest, at the borrower's option, at either (a) the ABR rate (which is equal to the greater of (i) the Federal Funds Rate plus 0.5 percent and (ii) JPMorgan Chase Bank's prime rate) plus a margin of 1.25 percent, or (b) an adjusted LIBOR rate plus a maximum margin of 2.25 percent.

Exhibit B-9

**UNITED RENTALS, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**(Dollars in millions, except per share data unless otherwise indicated)**

**10. Debt (Continued)**

Canadian dollar borrowings under the revolving credit facility accrue interest, at the borrower's option, at either (a) the Canadian prime rate (which is equal to the greater of (i) the CDOR rate plus 1 percent and (ii) JPMorgan Chase Bank, Toronto Branch's prime rate) plus a margin of 1.25 percent, or (b) the B/A rate (which is equal to JPMorgan Chase Bank, Toronto Branch's B/A rate) plus a maximum margin of 2.25 percent. The rate applicable to Canadian borrowings outstanding under the revolving credit facility was 6.2 at December 31, 2006.

URNA is also required to pay the lenders a commitment fee equal to 0.5 percent per annum, payable quarterly, in respect of undrawn commitments under the revolving credit facility.

*Institutional Letter of Credit Facility ("ILCF").*   The ILCF provides for up to $150 in letters of credit. The ILCF is in addition to the letter of credit capacity under the revolving credit facility. The total combined letter of credit capacity under the revolving credit facility and the ILCF is $400. Subject to certain conditions, all or part of the ILCF may be converted into term loans. The ILCF is scheduled to terminate in February 2011. As of December 31, 2006, the outstanding letters of credit under the ILCF were approximately $150.

URNA is required to pay a fee which accrues at the rate of 0.1 percent per annum on the amount of the ILCF. In addition, URI is required to pay participation and other fees in respect of letters of credit. For letters of credit obtained under both the ILCF and the revolving credit facility, these fees accrue at the rate of 2.40 percent and 1.90 percent per annum, respectively.

*Term Loan.*   The term loan was obtained in two draws. An initial draw of $550 was made upon the closing of the credit facility in February 2004 and an additional draw of $200 was made in April 2004.

The term loan must be repaid in installments as follows: (i) during the period from and including June 30, 2004 to and including March 31, 2010, URNA must repay on each March 31, June 30, September 30 and December 31 of each year an amount equal to one-fourth of 1 percent of the original aggregate principal amount of the term loan reduced pro-rata by the $400 prepayment referred to below and (ii) URNA must repay on each of June 30, 2010, September 30, 2010, December 31, 2010, and at maturity on February 14, 2011 an amount equal to 23.5 percent of the original aggregate principal amount of the term loan reduced pro-rata by the $400 prepayment referred to below. In 2006, we prepaid $400 of our outstanding term loan. Contemporaneous with this term loan prepayment, we terminated a portion of our interest rate caps that were hedging our interest rate exposures on our term loan. Amounts repaid in respect of the term loan may not be reborrowed.

Borrowings under the term loan accrue interest, at URNA's option, at either (a) the ABR rate plus a maximum margin of 1.25 percent, or (b) an adjusted LIBOR rate plus a maximum margin of 2.25 percent. The rate was 7.4 percent at December 31, 2006.

*Covenants.*   Under the agreement governing the senior secured credit facility, we are required to, among other things, satisfy certain financial tests relating to: (a) interest coverage ratio, (b) the ratio of funded debt to cash flow, (c) the ratio of senior secured debt to tangible assets and (d) the ratio of senior secured debt to cash flow. We are also subject to various other covenants under the agreement governing the credit facility. These covenants require us to timely file audited annual and quarterly financial statements and limit or restrict, among other things, our ability to incur indebtedness, make

F-23

**UNITED RENTALS, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**(Dollars in millions, except per share data unless otherwise indicated)**

**10.   Debt (Continued)**

prepayments of certain indebtedness, pay dividends, make investments, create liens, and engage in mergers, acquisitions and dispositions. If we are unable to satisfy any of these covenants, the lenders could elect to terminate the credit facility and require us to repay the outstanding borrowings under the credit facility. If at any time an event of default under the senior secured credit facility exists, the interest rate applicable to each revolving and term loan will be based on the highest margins provided for.

*7¾ percent Senior Subordinated Notes.*   In November 2003, URNA issued $525 million aggregate principal amount of 7¾ percent Senior Subordinated Notes (the "7¾ percent Notes") which are due November 15, 2013. The net proceeds from the sale of the 7¾ percent Notes were $523 million (after deducting the initial purchasers' discount and offering expenses). The 7¾ percent Notes are unsecured and are guaranteed by Holdings and, subject to limited exceptions, URNA's domestic subsidiaries. The 7¾ percent Notes may be redeemed on or after November 15, 2008, at specified redemption prices that range from 103.875 percent in 2008 to 100.0 percent in 2011 and thereafter. The indenture governing the 7¾ percent Notes contains certain restrictive covenants, including, among others, limitations on (i) additional indebtedness, (ii) restricted payments, (iii) liens, (iv) dividends and other payments, (v) preferred stock of certain subsidiaries, (vi) transactions with affiliates, (vii) the disposition of proceeds of asset sales and (viii) our ability to consolidate, merge or sell all or substantially all of our assets, as well as a requirement to timely file periodic reports with the SEC.

*7 percent Senior Subordinated Notes.*   In January 2004, URI issued $375 aggregate principal amount of 7 percent Senior Subordinated Notes (the "7 percent Notes") which are due February 15, 2014. The net proceeds from the sale of the 7 percent Notes were approximately $369, after deducting offering expenses. The 7 percent Notes are unsecured and are guaranteed by Holdings and, subject to limited exceptions, URNA's domestic subsidiaries. The 7 percent Notes mature on February 15, 2014 and may be redeemed by URNA on or after February 15, 2009, at specified redemption prices that range from 103.5 percent in 2009 to 100.0 percent in 2012 and thereafter. The indenture governing the 7 percent Notes contains certain restrictive covenants, including, among others, limitations on (i) additional indebtedness, (ii) restricted payments, (iii) liens, (iv) dividends and other payments, (v) preferred stock of certain subsidiaries, (vi) transactions with affiliates, (vii) the disposition of proceeds of asset sales and (viii) our ability to consolidate, merge or sell all or substantially all of our assets, as well as a requirement to timely file periodic reports with the SEC.

*6½ percent Senior Notes.*   In February 2004, URNA issued $1 billion aggregate principal amount of 6½ percent Senior Notes (the "6½ percent Notes") which are due February 15, 2012. The net proceeds from the sale of the 6½ percent Notes were approximately $985, after deducting offering expenses. The 6½ percent Notes are unsecured and are guaranteed by Holdings and, subject to limited exceptions, URNA's domestic subsidiaries. The 6½ percent Notes mature on February 15, 2012 and may be redeemed by URNA on or after February 15, 2008, at specified redemption prices that range from 103.25 percent in 2008 to 100.0 percent in 2010 and thereafter. The indenture governing the 6½ percent Notes contains certain restrictive covenants, including limitations, among others, on (i) additional indebtedness, (ii) restricted payments, (iii) liens, (iv) dividends and other payments, (v) preferred stock of certain subsidiaries, (vi) transactions with affiliates, (vii) the disposition of proceeds of asset sales, (viii) our ability to consolidate, merge or sell all or substantially all of our

**UNITED RENTALS, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**(Dollars in millions, except per share data unless otherwise indicated)**

**10.  Debt (Continued)**

assets and (ix) sale-leaseback transactions, as well as a requirement to timely file periodic reports with the SEC.

*1⅞ percent Convertible Senior Subordinated Notes.*    In October and December 2003, URNA issued approximately $144 million aggregate principal amount of 1⅞ percent Convertible Senior Subordinated Notes (the "1⅞ percent Convertible Notes") which are due October 15, 2023. The net proceeds from the sale of the 1⅞ percent Convertible Notes were approximately $140 million (after deducting the initial purchasers' discount and offering expenses). The 1⅞ percent Convertible Notes are unsecured and are guaranteed by Holdings. Holders of the 1⅞ percent Convertible Notes may convert them into shares of common stock prior to their maturity at a current conversion price of approximately $22.25 per share (subject to further adjustment in certain circumstances), if (i) the price of our common stock reaches a specific threshold, (ii) the 1⅞ percent Convertible Notes are called for redemption, (iii) specified corporate transactions occur or (iv) the trading price of the 1⅞ percent Convertible Notes falls below certain thresholds. The 1⅞ percent Convertible Notes mature on October 15, 2023 and may be redeemed on or after October 20, 2010, at 100.0 percent of the principal amount. Holders of the 1⅞ percent Convertible Notes may require URNA to repurchase all or a portion of the 1⅞ percent Convertible Notes in cash on each of October 15, 2010, October 15, 2013 and October 15, 2018 at 100 percent of the principal amount of the 1⅞ percent Convertible Notes to be repurchased.

*Accounts Receivable Securitization Facility.*    In October 2006, we amended our existing accounts receivable securitization facility. The amended facility provides for generally lower borrowing costs and the facility size has been increased from $200 to $300. Additionally, the maturity was extended from May 2009 to October 2011. Borrowings under the amended facility will continue to be reflected as debt on our consolidated balance sheets. Key terms of this facility include:

- borrowings may be made only to the extent that the face amount of the receivables in the collateral pool exceeds the outstanding loans by a specified amount;

- the facility is structured so that the receivables in the collateral pool are the lenders' only source of repayment;

- after expiration or early termination of the facility, no new amounts will be advanced under the facility and collections on the receivables securing the facility will be used to repay the outstanding borrowings; and

- the facility contains standard termination events including, without limitation, a termination event if (i) the long-term senior secured rating of URI falls below either B+ from Standard & Poor's Rating Services ("S&P") or B2 from Moody's Investors Service ("Moody's") or (ii) our New Credit Facility is terminated. At December 31, 2006, the Company's long-term senior secured debt was rated BB- by S&P and Ba1 by Moody's.

Outstanding borrowings under the facility generally accrue interest at the commercial paper rate plus a specified spread not to exceed 1.0 percent. We are also required to pay a commitment fee based on our Funded Debt to Cash Flow ratio. This commitment fee was 22.5 basis points (0.225 percent) at December 31, 2006.

F-25

**UNITED RENTALS, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**(Dollars in millions, except per share data unless otherwise indicated)**

**10.   Debt (Continued)**

*Loan Covenants and Compliance*

As of December 31, 2006, we were in compliance with the covenants and other provisions of our senior secured credit facility, the senior notes, the QUIPS and our accounts receivable securitization facility. Any failure to be in compliance with any material provision or covenant of these agreements could have a material adverse effect on our liquidity and operations.

We consider our most restrictive covenant to be the Minimum Interest Coverage ratio, which is the ratio of our consolidated net income to our interest expense, as defined in our senior secured credit facility. The minimum amount permitted under this covenant is 1.65 to 1.0 and our actual Minimum Interest Coverage ratio for the year ended December 31, 2006 was 2.40 to 1.0.

*Interest Rate Swap and Cap Agreements.*   As of December 31, 2006, we had swap agreements with an aggregate notional amount of $1.2 billion. The effect of these agreements was to convert $1.2 billion of our fixed rate notes to floating rate instruments. The fixed rate notes being converted consisted of: (i) $445 of our 6½ percent Notes through 2012, (ii) $375 of our 7¾ percent senior subordinated notes through 2013 and (iii) $375 of our 7 percent Notes through 2013. These swap agreements which convert our fixed rate notes to floating rate instruments are designated as fair value hedges. Changes in the fair values of our fair value hedges, as well as the offsetting fair value changes in the hedged items, are recorded on the statements of operations. There was no ineffectiveness related to our fair value hedges. As of December 31, 2006, we had an unrealized loss of $56, based upon the fair value of our fair value hedges. Certain of these swaps contain mutual put provisions which allow either party to terminate the swap for the market value of the swap as of certain specified dates between 2007 and 2009. In February 2007, swaps with a notional of $250 were modified and, as a result, these swaps will be de-designated as fair value hedges.

As of December 31, 2006, we had interest rate cap agreements that effectively limit the interest rate on $329 of our term loan. The cap agreements, which are designated as cash flow hedges, terminate in June 2007. Changes in the fair values of our cash flow hedges are recorded in other comprehensive income and reclassified into earnings in the same periods during which the hedged transactions affect earnings. There was no ineffectiveness related to our cash flow hedges. As of December 31, 2006, we had an unrealized gain of $1 based upon the fair value of our cash flow hedges.

*Maturities.*   Maturities of the Company's debt for each of the next five years and thereafter at December 31, 2006 are as follows:

| | |
|---|---:|
| 2007 | $    37 |
| 2008 | 22 |
| 2009 | 154 |
| 2010 | 250 |
| 2011 | 85 |
| Thereafter | 2,008 |
| Total | $2,556 |

**UNITED RENTALS, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**(Dollars in millions, except per share data unless otherwise indicated)**

**11.  Subordinated Convertible Debentures**

The subordinated convertible debentures included in our consolidated balance sheets reflect the obligation to our subsidiary that has issued preferred securities. This subsidiary is not consolidated in our financial statements because we are not the primary beneficiary of the trust.

In August 1998, a subsidiary trust (the "Trust") of Holdings issued and sold $300 of QUIPS in a private offering. The Trust used the proceeds from the offering to purchase 6½ percent convertible subordinated debentures due 2028 (the "Debentures") which resulted in Holdings receiving all of the net proceeds of the offering. The QUIPS are non-voting securities, carry a liquidation value of $50 (fifty dollars) per security and are convertible into the Company's common stock. The initial convertible rate was 1.146 shares of common stock per preferred security (equivalent to an initial conversion price of $43.63 per share).

In August and October 2006, we announced redemptions of an aggregate of $76 of QUIPS. The redemption price was 101.3%. In conjunction with the redemptions, we retired $76 of our Debentures. The redemptions were funded with the proceeds of stock option exercises received during 2006. As of December 31, 2006 and 2005, the aggregate amount of Debentures outstanding was $146 and $222, respectively.

Holders of the QUIPS are entitled to preferential cumulative cash distributions from the Trust at an annual rate of 6½ percent of the liquidation value, accruing from the original issue date and payable quarterly in arrears beginning February 1, 1999. The distribution rate and dates correspond to the interest rate and payment dates on the Debentures. Holdings may defer quarterly interest payments on the Debentures for up to twenty consecutive quarters, but not beyond the maturity date of the Debentures. If Holdings' quarterly interest payments on the Debentures are deferred, so are the corresponding cash distribution payments on the QUIPS. During any period in which Holdings is deferring its quarterly interest payments, Holdings will be prohibited from paying dividends on any of its capital stock or making principal, interest or other payments on debt securities that rank pari passu with or junior to the Debentures.

Holdings has executed a guarantee with regard to payment of the QUIPS to the extent that the Trust has insufficient funds to make the required payments.

**UNITED RENTALS, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**(Dollars in millions, except per share data unless otherwise indicated)**

## 12.  Income Taxes

The components of the provision for income taxes from continuing operations for each of the three years in the period ended December 31, 2006 are as follows:

|  | Year ended December 31, | | |
|---|---|---|---|
|  | **2006** | **2005** | **2004** |
| Current |  |  |  |
| Federal | $ 10 | $  6 | $ — |
| Foreign | 10 | 3 | 2 |
| State and local | 6 | 3 | 2 |
|  | 26 | 12 | 4 |
| Deferred |  |  |  |
| Federal | $117 | $ 93 | $ 28 |
| Foreign | 3 | 8 | 2 |
| State and local | 10 | 16 | (6) |
|  | 130 | 117 | 24 |
| Total | $156 | $129 | $ 28 |

A reconciliation of the provision for income taxes and the amount computed by applying the statutory federal income tax rate of 35 percent to income from continuing operations before provision (benefit) for income taxes is as follows:

|  | Year ended December 31, | | |
|---|---|---|---|
|  | **2006** | **2005** | **2004** |
| Computed tax at statutory tax rate | $142 | $113 | $35 |
| State income taxes, net of federal tax benefit | 10 | 12 | (3) |
| Non-deductible expenses and other | 5 | 2 | (2) |
| Foreign taxes | (1) | 2 | (2) |
|  | $156 | $129 | $28 |

**UNITED RENTALS, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**(Dollars in millions, except per share data unless otherwise indicated)**

**12.  Income Taxes (Continued)**

The components of deferred income tax assets (liabilities) are as follows:

| | December 31, 2006 | | | December 31, 2005 | | |
|---|---|---|---|---|---|---|
| | Current | Non Current | Total | Current | Non Current | Total |
| Reserves and allowances . . . . . . . . . . . | $ 70 | $ 35 | $ 105 | $ 74 | $ 32 | $ 106 |
| Net operating loss and credit carryforwards . . . . . . . . . . . . . . . . . . | 24 | 50 | 74 | 134 | 71 | 205 |
| Total Deferred Tax Assets . . . . . . . . . . . | 94 | 85 | 179 | 208 | 103 | 311 |
| Property and equipment . . . . . . . . . . . . | — | (510) | (510) | — | (563) | (563) |
| Valuation Allowance . . . . . . . . . . . . . . . | (12) | (8) | (20) | (12) | (6) | (18) |
| Intangibles . . . . . . . . . . . . . . . . . . . . . . | — | (30) | (30) | — | 8 | 8 |
| Total Deferred Tax Liability . . . . . . . . . . | (12) | (548) | (560) | (12) | (561) | (573) |
| Total deferred income tax asset (liability) | $ 82 | $(463) | $(381) | $196 | $(458) | $(262) |

For financial reporting purposes, income from continuing operations before income taxes for our foreign subsidiaries was $42, $34 and $20 for the years ended December 31, 2006, 2005 and 2004, respectively. At December 31, 2006, unremitted earnings of foreign subsidiaries were approximately $65. Since it is our intention to indefinitely reinvest these earnings, no United States taxes have been provided for these amounts. Determination of the amount of unrecognized deferred tax liability on these unremitted taxes is not practicable.

We have net operating loss carryforwards ("NOL's") of $41 for federal income tax purposes that expire from 2012 through 2024. We have not recorded a valuation allowance against this deferred tax asset because it is deemed more likely than not that such benefit will be realized in the future. We have NOL's of $970 for state income tax purposes that expire from 2007 through 2026. We have recorded a valuation allowance against this deferred asset of $19 and $18 as of December 31, 2006 and 2005, respectively. For comparative purposes, the components of deferred tax assets and liabilities at December 31, 2005 have been revised to reflect an increase in state net operating loss carryforwards offset by a corresponding increase in the valuation allowance. We have foreign tax credit carryforwards that expire from 2009 through 2016. We have recorded a valuation allowance against this deferred asset of $1 as of December 31, 2006.

**13.  Commitments and Contingencies**

**SEC Non-Public Fact Finding Inquiry and Special Committee Review**

On August 25, 2004, the Company received a letter from the SEC in which the SEC referred to an inquiry of the Company. The letter transmitted a subpoena requesting certain of the Company's documents. The letter and the subpoena referred to an SEC investigation entitled *In the Matter of United Rentals, Inc*. The notice from the SEC stated that the inquiry did not mean that the SEC had concluded that the Company or anyone else had broken the law or that the SEC had a negative opinion of any person, entity or security. The inquiry appeared to relate to a broad range of the Company's accounting practices and was not confined to a specific period.

**UNITED RENTALS, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**(Dollars in millions, except per share data unless otherwise indicated)**

**13.   Commitments and Contingencies (Continued)**

The Company has since received additional document subpoenas from the SEC. As previously announced, in March 2005, the Company's board of directors formed the Special Committee to review matters related to the SEC inquiry. The Special Committee retained independent counsel. The board of directors received and acted upon findings of the Special Committee in January 2006. The actions that we took with respect to the Special Committee's findings and actions that we took with respect to certain other accounting matters, including the restatement of previously issued consolidated financial statements for 2003 and 2002, are discussed in our 2005 Form 10-K.

The Company has provided documents in response to the SEC subpoenas to the SEC or to the Special Committee, which has, in turn, provided documents to the SEC. The Company is cooperating fully with the SEC in complying with the subpoenas. The Company is also responding to the SEC's informal requests for information. The Company has also received requests for information informally and by subpoena from the U.S. Attorney's office for the District of Connecticut. The Company is also cooperating fully with the U.S. Attorney's office requests. We cannot predict the outcome of these inquiries, whether any proceeding relating to them will be brought or when these matters might be resolved.

**Shareholder Class Action Lawsuits and Derivative Litigation**

In August 2004 the Company received notice from the SEC that it was conducting a non-public, fact-finding inquiry of the Company. Following the Company's public announcement of the SEC inquiry, three purported class action lawsuits were filed against the Company in the United States District Court for the District of Connecticut. The plaintiff in each of the lawsuits initially sought to sue on behalf of a purported class comprised of purchasers of the Company's securities from October 23, 2003 to August 30, 2004. The lawsuits initially named as the defendants the Company, its chairman, its vice chairman and chief executive officer, its former president and chief financial officer, and its former corporate controller. These initial complaints alleged, among other things, that certain of the Company's SEC filings and other public statements contained false and misleading statements which resulted in damages to the plaintiffs and the members of the purported class when they purchased the Company's securities. On the basis of those allegations, plaintiffs in each action asserted claims (a) against all defendants under Section 10(b) of the Securities Exchange Act of 1934, as amended (the "Exchange Act") and Rule 10b-5 promulgated thereunder, and (b) against one or more of the individual defendants under Section 20(a) of the Exchange Act. The complaints sought unspecified compensatory damages, costs and expenses. On February 1, 2005, the Court entered an order consolidating the three actions. On November 8, 2005, the Court appointed City of Pontiac Policeman's and Fireman's Retirement System as lead plaintiff for the purported class. The consolidated action is now entitled *In re United Rentals, Inc. Securities Litigation*.

On June 5, 2006, pursuant to a schedule agreed to by the parties and approved by the Court, lead plaintiff filed a consolidated amended complaint, which (a) adds allegations relating to, among other things, the conclusions of the Special Committee and to other matters disclosed in the 2005 Form 10-K, (b) amends the purported class period to include purchasers of the Company's securities from February 28, 2001 to August 30, 2004 and (c) names as an additional defendant the Company's first chief financial officer. In September 2006, the Company and certain of the individual defendants moved to dismiss the consolidated amended complaint in this action. Briefing with respect to these motions is

**UNITED RENTALS, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**(Dollars in millions, except per share data unless otherwise indicated)**

**13.  Commitments and Contingencies (Continued)**

now complete. The Company intends to continue to defend against this action vigorously. At this stage of the litigation, it is not possible to estimate the amount of loss or range of possible loss that might result from an adverse judgment or a settlement of this matter.

In January 2005 an alleged shareholder filed an action in Connecticut State Superior Court, Judicial District of Norwalk/Stamford at Stamford, purportedly suing derivatively on the Company's behalf. The action, entitled *Gregory Riegel v. John N. Milne*, et al., names as defendants certain of the Company's current and/or former directors and/or officers, and names the Company as a nominal defendant. The complaint asserts, among other things, that the defendants breached their fiduciary duties to the Company by causing or allowing the Company to disseminate misleading and inaccurate information to shareholders and the market and by failing to establish and maintain adequate accounting controls, thus exposing the Company to damages. The complaint seeks unspecified compensatory damages, costs and expenses against the defendants. The parties to the Riegel action have agreed that the proceedings in this action will be stayed pending the resolution of the motions to dismiss in the purported shareholder class actions.

In November 2004 the Company received a letter from counsel for an alleged shareholder, raising allegations similar to the ones set forth in the derivative complaint described above and demanding that the Company take action in response to those allegations against certain of the Company's current and/or former directors and/or officers. Following receipt of the letter, the Company's board of directors formed a special committee to consider the letter. In August 2005, this alleged shareholder commenced an action in Connecticut State Superior Court, Judicial District of Norwalk/Stamford at Stamford, purporting to sue derivatively on the Company's behalf. The action, entitled *Nathan Brundridge v. Leon D. Black, et al*., initially named as defendants certain of the Company's current and/or former directors and/or officers, and named the Company as a nominal defendant. The initial complaint in this action asserted, among other things, that all of the defendants breached their fiduciary obligations to the Company by causing or allowing the Company to disseminate misleading and inaccurate information to shareholders and the market, and by failing to establish and maintain adequate accounting controls, thus exposing the Company to damages. The initial complaint in this action also asserted a claim for unjust enrichment against the Company's chairman and its vice chairman and chief executive officer. The initial complaint sought unspecified compensatory damages, equitable relief, costs and expenses against all of the defendants. The initial complaint also sought an order, in connection with plaintiff's unjust enrichment claim, directing the defendants against whom that claim was asserted to disgorge certain compensation they received from the Company with respect to fiscal years 2001, 2002 and 2003.

On June 5, 2006, pursuant to a schedule agreed to by the parties and approved by the Court, plaintiff in the Brundridge action filed an amended complaint, which (a) adds allegations relating to, among other things, the conclusions of the Special Committee and to other matters disclosed in the 2005 Form 10-K, and (b) names as an additional defendant the Company's former president and chief financial officer and asserts the same claims against him as it previously asserted and continues to assert against the Company's chairman and its vice chairman and chief executive officer. In September 2006, the Company and certain of the individual defendants moved to dismiss the amended complaint in this action. In December 2006, plaintiff in this action filed its opposition to these motions to dismiss. Subsequently, the parties agreed that the proceedings in this action will be stayed pending

**UNITED RENTALS, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**(Dollars in millions, except per share data unless otherwise indicated)**

**13.  Commitments and Contingencies (Continued)**

resolution of the motions to dismiss in the purported shareholder class actions. The parties' agreement provides that any party may terminate the stay at any time on 30 days' written notice to the Court and all other parties, and defendants will have an opportunity to submit reply papers in further support of their motions to dismiss this action after the termination of the stay.

In August 2005 another alleged shareholder filed an action in the United States District Court for the District of Connecticut, purporting to sue derivatively on the Company's behalf. The action, entitled Natalie Gordon v. Wayland R. Hicks, et al., names as defendants certain of the Company's current and/or former directors and/or officers, and names the Company as a nominal defendant. The initial complaint in this action asserted claims against each of the defendants for breach of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment. Each of these claims is premised on, among other things, the theory that the individual defendants caused or permitted the Company to disseminate misleading and inaccurate information to shareholders and to the market, and failed to establish and maintain adequate accounting controls, thus exposing the Company to damages. The initial complaint also asserted (a) a claim that a former director breached fiduciary obligations by selling shares of the Company's common stock while in possession of material, non-public information, and (b) a claim against the Company's chairman, its vice chairman and chief executive officer, and its former president and chief financial officer for recovery of certain incentive-based compensation under section 304 of the Sarbanes-Oxley Act. The initial complaint sought unspecified compensatory damages, equitable relief, restitution, costs and expenses against all of the defendants. The initial complaint also sought an order declaring that the defendants against whom the section 304 claim was directed are liable under the Sarbanes-Oxley Act and directing them to reimburse the Company for all bonuses or other incentive-based or equity-based compensation they received for the fiscal years 1999 through 2004.

On June 5, 2006, pursuant to a schedule agreed to by the parties and approved by the Court, plaintiff in the Gordon action filed an amended complaint, which (a) adds allegations relating to, among other things, the conclusions of the Special Committee and to other matters disclosed in the 2005 Form 10-K, and (b) names as additional defendants certain other of the Company's current and/or former directors and/or officers. The amended complaint also asserts an additional claim against certain of the Company's current and/or former directors for violation of Section 14(a) of the Exchange Act. In September 2006, the Company and certain of the individual defendants moved to dismiss the amended complaint in this action. Briefing with respect to these motions is now complete.

We are also subject to a number of claims and proceedings that generally arise in the ordinary conduct of our business. These matters include, but are not limited to, general liability claims (including personal injury, product liability, and property and auto claims), indemnification and guarantee obligations, employee injuries and employment-related claims, self-insurance obligations, tax examinations and contract and real estate matters. Based on advice of counsel and available information, including current status or stage of proceeding, and taking into account accruals for matters where we have established them, we currently believe that any liabilities ultimately resulting from these claims and proceedings will not, individually or in the aggregate, have a material adverse effect on our consolidated financial position, results of operations or cash flows.

**UNITED RENTALS, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**(Dollars in millions, except per share data unless otherwise indicated)**

**13.  Commitments and Contingencies (Continued)**

**Indemnification**

The Company indemnifies its officers and directors pursuant to indemnification agreements and may in addition indemnify these individuals as permitted by Delaware law. Accordingly, in connection with the purported class action lawsuit, three purported shareholder derivative lawsuits, the SEC inquiry, the U.S. Attorney's Office inquiry and related review of the Special Committee described above, the Company has advanced counsel fees and other reasonable fees and expenses, actually and necessarily incurred by the present and former directors and officers who are involved, in an aggregate amount of approximately $4.0. Each of the individuals is required to execute an undertaking to repay such expenses if he or she is finally found not to be entitled to indemnification.

**Operating Leases**

We lease rental equipment, real estate and certain office equipment under operating leases. Certain real estate leases require us to pay maintenance, insurance, taxes and certain other expenses in addition to the stated rental payments. Future minimum lease payments, by year and in the aggregate, for non-cancelable operating leases with initial or remaining terms of one year or more are as follows at December 31, 2006:

|  | Real Estate Leases | Rental Equipment Leases | Non-rental Equipment Leases |
|---|---|---|---|
| 2007 | $ 79 | $29 | $32 |
| 2008 | 69 | 21 | 21 |
| 2009 | 58 | 9 | 12 |
| 2010 | 47 | — | 8 |
| 2011 | 39 | — | 5 |
| Thereafter | 140 | — | 1 |
|  | $432 | $59 | $79 |

As part of certain of our equipment operating leases, we guarantee that the value of the equipment at the end of the lease term will not be less than a specified projected residual value. We do not know at this time whether and to what extent the actual residual values may be less than the guaranteed residual values and, accordingly, cannot quantify the amount that we may be required to pay under these guarantees. If the actual residual value for all equipment subject to such guarantees were to be zero, then our maximum potential liability under these guarantees would be approximately $8. This potential liability was not reflected on our balance sheet as of December 31, 2006, or any prior date.

Rent expense under all non-cancelable real estate, rental equipment and other equipment operating leases totaled $161, $167 and $150 for the years ended December 31, 2006, 2005 and 2004, respectively. Our real estate leases provide for varying terms, including leases subject to customary escalation clauses, and include 32 leases that are on a month-to-month basis and 34 leases that provide for a remaining term of less than one year and do not provide a renewal option.

**UNITED RENTALS, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**(Dollars in millions, except per share data and unless otherwise indicated)**

**13. Commitments and Contingencies (Continued)**

**Restricted Stock Awards**

We have granted to employees other than executive officers and directors approximately 179,000 shares of restricted stock that have not yet vested. The shares vest in 2007 or 2008 or earlier upon a change in control of the Company, death, disability, retirement or certain terminations of employment, and are subject to forfeiture prior to vesting on certain other terminations of employment, the violation of non-compete provisions and certain other events. If a holder of restricted stock sells his stock and receives sales proceeds that are less than a specified guaranteed amount set forth in the grant instrument, we have agreed to pay the holder the shortfall between the amount received and such specified amount; however, the foregoing only applies to sales that are made within five trading days of the vesting date. The specified guaranteed amount is (i) $17.20 per share with respect to approximately 136,000 shares scheduled to vest in 2007 and (ii) $19.86 per share with respect to approximately 43,000 shares scheduled to vest in 2008.

**Employee Benefit Plans**

We currently sponsor three defined contribution 401(k) retirement plans which are subject to the provisions of ERISA. We also sponsor a deferred profit sharing plan for the benefit of the full-time employees of our Canadian subsidiaries. Under these plans, we match a percentage of the participants' contributions up to a specified amount. Company contributions to the plans were $8, $6 and $5 in 2006, 2005 and 2004, respectively.

**Environmental Matters**

The Company and its operations are subject to various laws and related regulations governing environmental matters. Under such laws, an owner or lessee of real estate may be liable for the costs of removal or remediation of certain hazardous or toxic substances located on or in, or emanating from, such property, as well as investigation of property damage. We incur ongoing expenses associated with the removal of underground storage tanks and the performance of appropriate remediation at certain of our locations.

**14. Preferred Stock**

As of December 31, 2006 and 2005, we have two classes of preferred stock outstanding. In total, we are authorized to issue 5 million shares of preferred stock, $0.01 par value, of which an aggregate of 450,000 have been issued.

*Series C Preferred and Series D Preferred.* There are 300,000 shares of our Series C Preferred outstanding and 150,000 shares of our Series D Preferred outstanding. The Series D Preferred includes 105,252 shares designated as Class D-l and 44,748 shares designated as Class D-2. The rights of the two classes of Series D Preferred are substantially the same, except that only the Class D-l has the voting rights described below.

Principal terms of the Series C Preferred and Series D Preferred include the following (subject to the special provisions described below that will apply in the event of certain Non-Approved Change of Control transactions): (i) each share is entitled to a liquidation preference of $1,000 per share; (ii) at

F-34

**UNITED RENTALS, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**(Dollars in millions, except per share data and unless otherwise indicated)**

**14.   Preferred Stock (Continued)**

the holder's option, each share of Series C Preferred is convertible into 40 shares of common stock subject to adjustment (representing a conversion price of $25 per share based on the liquidation preference) and each share of Series D Preferred is convertible into 33⅓ shares of common stock subject to adjustment (representing a conversion price of $30 per share based on the liquidation preference); (iii) the holders of the Series C Preferred and Series D Preferred (on an as converted basis) and the holders of the common stock vote together as a single class on all matters (except that the Series C Preferred may vote as a separate class as described in the next clause); (iv) the holders of the Series C Preferred, voting separately as a single class, may elect two directors (subject to reduction to one, if the shares of Series C Preferred owned by specified holders cease to represent, on an as converted basis, at least eight million shares of common stock, and reduction to zero, if such shares of Series C Preferred cease to represent at least four million shares of common stock), (v) there are no stated dividends on the Series C Preferred or Series D Preferred, but the Series C Preferred and Series D Preferred, on an as converted basis, will participate in any dividends declared on the common stock, (vi) upon the occurrence of specified change of control transactions, other than a Non-Approved Change of Control (as defined below), we must offer to redeem the Series C Preferred and Series D Preferred at a price per share equal to the liquidation preference plus an amount equal to 6.25 percent of the liquidation preference compounded annually from January 1999 in the case of the Series C Preferred, and September 1999 in the case of the Series D Preferred, to the redemption date, (vii) if we issue for cash common stock (or a series of preferred stock convertible into common stock) and the price for the common stock is below the conversion price of the Series C Preferred, then we must offer to repurchase a specified portion of the outstanding Series C Preferred at the price per share set forth in the preceding clause, and (viii) if we issue for cash common stock (or a series of preferred stock convertible into common stock) for a price for the common stock below the conversion price of the Series D Preferred, then we must offer to repurchase a specified portion of the outstanding Series D Preferred at the price per share specified in the second preceding clause.

*Special Rights of Series C Preferred and Series D Preferred Upon Non-Approved Change of Control.* In general, a Non-Approved Change of Control transaction is a change of control transaction that the Board of Directors (the "Board") has disapproved and which the Board has not facilitated by such actions as weakening or eliminating the Company's Stockholder Rights Plan. If a Non-Approved Change of Control occurs, and the Board does not offer the holders of the Series C Preferred and Series D Preferred essentially the same redemption rights that apply to an Approved Change of Control transaction: (i) the holders of the Series C Preferred would elect a majority of the Board for a specified period, (ii) the holders of the Series C Preferred and Series D Preferred would be entitled to an additional 6.25 percent return on the liquidation preference, compounded annually from January 1999 for the Series C Preferred and from September 1999 for the Series D Preferred, (iii) after the holders of the common stock receive an amount equivalent to the liquidation preference, the holders of the Series C Preferred and Series D Preferred would share with the holders of the common stock, on an as converted basis, in any remaining amounts available for distribution, and (iv) the Series C Preferred and Series D Preferred would accrue dividends at a maximum annual rate, compounded annually, equal to 18 percent of the liquidation preference.

**UNITED RENTALS, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**(Dollars in millions, except per share data and unless otherwise indicated)**

**15.  Capital Stock**

We have 500 million authorized shares of common stock, $0.01 par value. At December 31, 2006 and 2005, there were (i) 5.7 and 5.8 million shares of common stock reserved for the exercise of warrants, respectively, (ii) 6.4 and 10.5 million shares of common stock reserved for issuance pursuant to options granted under our stock option plans, respectively, (iii) 3.3 and 5.1 million shares of common stock reserved for the issuance of outstanding preferred securities of a subsidiary trust, (iv) 17 million shares of common stock reserved for the issuance of Series C and Series D preferred stock and (v) 6.5 million shares of common stock reserved for the conversion of convertible debt, respectively.

*Stock Option Plans:*  Prior to the amendment and restatement of our 2001 Senior Stock Plan, we maintained six plans which generally provide for the awarding of options, some or all of which may be "incentive stock options" within the meaning of the Internal Revenue Code, common stock and other equity-linked awards to our officers, directors, employees and others who render services to the Company: the United Rentals, Inc. 1997 Stock Option Plan, the 1997 Performance Award Plan of U.S. Rentals, Inc., the United Rentals, Inc. 1998 Stock Option Plan, the United Rentals, Inc. 1998 Supplemental Stock Option Plan, the United Rentals, Inc. 2001 Stock Plan and the United Rentals, Inc. 2001 Senior Stock Plan. In June 2006, our shareholders approved an amendment to the 2001 Senior Stock Plan pursuant to which 2.2 million shares then remaining available for grant under the other five plans were transferred and made available for grant under the 2001 Senior Stock Plan. This transfer, which did not change the aggregate number of shares authorized for issuance under our plans, was made in part because the 2001 Senior Stock Plan was one of only two plans that permitted the granting of restricted stock, as well as to streamline the grant process going forward by having all new awards issued under the same plan. As part of the amendment and restatement, the 2001 Senior Stock Plan was renamed the 2001 Comprehensive Stock Plan. As of December 31, 2006, 2.9 million shares were available for grant of stock and options.

Awards that were granted under our equity plans prior to the approval of our 2001 Comprehensive Stock Plan continue to be governed by the terms of the plan under which they were granted.

**UNITED RENTALS, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**(Dollars in millions, except per share data and unless otherwise indicated)**

### 15.   Capital Stock (Continued)

A summary of the transactions within the Company's stock option plans follows (shares in thousands):

| | Shares | Weighted Average Exercise Price |
|---|---|---|
| Outstanding at January 1, 2004 . . . . . . . . . . . . . . . . . . . . | 12,263 | $20.05 |
| Granted . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 812 | 16.86 |
| Exercised . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (379) | 14.12 |
| Canceled . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (1,405) | 19.14 |
| Outstanding as of December 31, 2004 . . . . . . . . . . . . . . . | 11,291 | 19.79 |
| Granted . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 157 | 18.99 |
| Exercised . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (63) | 13.14 |
| Canceled . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (919) | 18.46 |
| Outstanding at December 31, 2005 . . . . . . . . . . . . . . . . . | 10,466 | 19.93 |
| Granted . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 304 | 29.22 |
| Exercised . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (3,914) | 19.69 |
| Canceled . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (505) | 24.45 |
| Outstanding at December 31, 2006 . . . . . . . . . . . . . . . . . | 6,351 | $20.18 |
| Exercisable at December 31, 2004 . . . . . . . . . . . . . . . . . . | 10,931 | $19.98 |
| Exercisable at December 31, 2005 . . . . . . . . . . . . . . . . . . | 10,273 | $19.97 |
| Exercisable at December 31, 2006 . . . . . . . . . . . . . . . . . . | 6,174 | $20.11 |

As of December 31, 2006 (options in thousands):

| | Options Outstanding | | | Options Exercisable | |
|---|---|---|---|---|---|
| Range of Exercise Prices | Amount Outstanding | Weighted Average Remaining Contractual Life | Weighted Average Exercise Price | Amount Exercisable | Weighted Average Exercise Price |
| $5.00–$10.00  . . . . . . . . | 46 | 5.0 | $ 9.80 | 46 | $ 9.80 |
| 10.01–15.00  . . . . . . . . | 2,059 | 2.1 | 12.57 | 2,057 | 12.57 |
| 15.01–20.00  . . . . . . . . | 661 | 6.2 | 17.42 | 586 | 17.28 |
| 20.01–25.00  . . . . . . . . | 2,461 | 5.2 | 21.99 | 2,411 | 22.00 |
| 25.01–30.00  . . . . . . . . | 441 | 2.8 | 26.81 | 401 | 26.54 |
| 30.01–35.00  . . . . . . . . | 407 | 2.0 | 31.76 | 397 | 31.75 |
| 35.01–40.00  . . . . . . . . | 87 | 1.5 | 36.04 | 87 | 36.04 |
| 40.01–45.00  . . . . . . . . | 184 | 1.7 | 43.93 | 184 | 43.93 |
| 45.01–50.00  . . . . . . . . | 5 | 1.5 | 45.56 | 5 | 45.56 |
| | 6,351 | 3.7 | $20.18 | 6,174 | $20.11 |

*Warrants.*   As of December 31, 2006 and 2005, there were outstanding warrants to purchase an aggregate of 5.7 and 5.8 million shares of common stock, respectively. The weighted-average exercise

**UNITED RENTALS, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**(Dollars in millions, except per share data and unless otherwise indicated)**

**15.  Capital Stock (Continued)**

price of the warrants was $12.04 and $12.03 per share as of December 31, 2006 and 2005, respectively. The warrants may be exercised through 2011.

*Stockholders' Rights Plan.*    We adopted a Stockholders' Rights Plan on September 28, 2001. This plan, as well as other provisions of our charter and bylaws, may have the effect of deferring hostile takeovers or delaying or preventing changes in control or management of the Company, including transactions in which our shareholders might otherwise receive a premium for their shares over the then current market prices. The rights expire on September 27, 2011.

**16.  Related Party**

We have from time to time purchased equipment and parts from and sold equipment to Terex Corporation ("Terex") and expect to do so in 2007. One of our former directors (until June 2005) is chairman and chief executive officer of Terex. We purchased approximately $146, $157 and $124, of equipment and parts from Terex during 2006, 2005 and 2004, respectively. We also sold approximately $0, $7 and $12, of equipment to Terex during 2006, 2005 and 2004, respectively. As of December 31, 2006 and 2005, amounts due to Terex were $11 and $10 and amounts due from Terex were $0 and $0, respectively.

**UNITED RENTALS, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**(Dollars in millions, except per share data and unless otherwise indicated)**

**17.   Quarterly Financial Information (Unaudited)**

| | First Quarter | Second Quarter | Third Quarter | Fourth Quarter(1) | Full Year |
|---|---|---|---|---|---|
| For the year ended December 31, 2006: | | | | | |
| Total revenues . . . . . . . . . . . . . . . . | $ 799 | $ 919 | $ 983 | $ 939 | $3,640 |
| Gross profit . . . . . . . . . . . . . . . . . . | 250 | 321 | 371 | 347 | 1,289 |
| Income from continuing operations . . | 25 | 59 | 88 | 77 | 249 |
| Per share—basic . . . . . . . . . . . . . | 0.26 | 0.62 | 0.90 | 0.79 | 2.58 |
| Per share—diluted  . . . . . . . . . . . . | 0.23 | 0.54 | 0.79 | 0.71 | 2.28 |
| Net income . . . . . . . . . . . . . . . . . . | 20 | 56 | 95 | 53 | 224 |
| For the year ended December 31, 2005: | | | | | |
| Total revenues . . . . . . . . . . . . . . . . | $ 688 | $ 814 | $ 896 | $ 890 | $3,288 |
| Gross profit . . . . . . . . . . . . . . . . . . | 199 | 268 | 333 | 315 | 1,115 |
| Income from continuing operations . . | 21 | 51 | 75 | 55 | 202 |
| Per share—basic . . . . . . . . . . . . . | 0.21 | 0.54 | 0.79 | 0.59 | 2.13 |
| Per share—diluted  . . . . . . . . . . . . | 0.20 | 0.49 | 0.70 | 0.53 | 1.93 |
| Net income . . . . . . . . . . . . . . . . . . | 12 | 50 | 76 | 49 | 187 |

(1)   During the fourth quarter of 2006, we recorded an after-tax loss of $24, reflected within discontinued operations, related to the sale of our traffic control business as well as a charge of $9 reflecting recent loss experience related to our estimated provision for self-insurance reserves. Additionally, during the fourth quarter of 2006, we completed our annual physical inventory inspections and determined that our reserve for inventory obsolescence and shrinkage was overstated. As a result of this change in estimate, we reduced our provision for inventory obsolescence and shrinkage by $10. In addition, during the fourth quarter of 2006, we recorded a charge of $7 related to our estimated exposure for sales-tax matters.

**18.   Earnings Per Share**

Basic earnings per share is computed by dividing net income (loss) by the weighted-average number of common shares outstanding and, if dilutive, the Series C and Series D preferred shares as if converted to common shares since such shares are participating securities. Diluted earnings per share includes the impact of other diluted securities. The diluted share base for years where the numerator represents a loss excludes incremental weighted shares for the below-captioned "Effect of dilutive

**UNITED RENTALS, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**(Dollars in millions, except per share data and unless otherwise indicated)**

**18.  Earnings Per Share (Continued)**

securities" due to their antidilutive effect. The following table sets forth the computation of basic and diluted earnings per share (shares in thousands):

|  | Year Ended December 31, | | |
|  | 2006 | 2005 | 2004 |
|---|---|---|---|
| Numerator: | | | |
| Income from continuing operations . . . . . . . . . . . . | $   249 | $   202 | $    72 |
| Loss from discontinued operations, net of income taxes  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | (25) | (15) | (156) |
| Net income (loss) . . . . . . . . . . . . . . . . . . . . . . . . | 224 | 187 | (84) |
| Convertible debt interest . . . . . . . . . . . . . . . . . . . . | 2 | 2 | 2 |
| Subordinated convertible debt interest . . . . . . . . . . | 8 | 9 | — |
| Net income (loss) available to common stockholders: . . . . . . . . . . . . . . . . . . . . . . . . . . . | $   234 | $   198 | $   (82) |
| Denominator: | | | |
| Weighted-average common shares . . . . . . . . . . . . . | 79,609 | 77,814 | 77,611 |
| Series C preferred . . . . . . . . . . . . . . . . . . . . . . . . | 12,000 | 12,000 | 12,000 |
| Series D preferred . . . . . . . . . . . . . . . . . . . . . . . . | 5,000 | 5,000 | 5,000 |
| Denominator for basic earnings per share— weighted-average . . . . . . . . . . . . . . . . . . . . . . . | 96,609 | 94,814 | 94,611 |
| Effect of dilutive securities: | | | |
| Employee stock options and warrants  . . . . . . . . . . | 5,851 | 4,136 | 3,921 |
| Convertible shares  . . . . . . . . . . . . . . . . . . . . . . . . | 6,461 | 5,842 | 5,599 |
| Subordinated convertible debentures . . . . . . . . . . . | 4,685 | 5,078 | — |
| Restricted stock units and phantom shares . . . . . . . | 187 | 166 | 74 |
| Denominator for dilutive earnings per share— adjusted weighted-average shares . . . . . . . . . . . | 113,793 | 110,036 | 104,205 |
| Basic earnings (loss) available to common stockholders: | | | |
| Income from continuing operations  . . . . . . . . . . | $   2.58 | $   2.13 | $   0.77 |
| Loss from discontinued operations . . . . . . . . . . . | (0.26) | (0.16) | (1.65) |
| Net income (loss)  . . . . . . . . . . . . . . . . . . . . . . . | $   2.32 | $   1.97 | $   (0.88) |
| Diluted earnings (loss) available to common stockholders: | | | |
| Income from continuing operations  . . . . . . . . . . | $   2.28 | $   1.93 | $   0.71 |
| Loss from discontinued operations . . . . . . . . . . . | (0.22) | (0.13) | (1.50) |
| Net income (loss)  . . . . . . . . . . . . . . . . . . . . . . . | $   2.06 | $   1.80 | $   (0.79) |

**UNITED RENTALS, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**(Dollars in millions, except per share data and unless otherwise indicated)**

**19.  Condensed Consolidating Financial Information of Guarantor Subsidiaries**

URNA is 100 percent owned by Holdings (the "Parent") and has outstanding (i) certain indebtedness that is guaranteed by the Parent and (ii) certain indebtedness that is guaranteed by both Parent and substantially all of URNA's United States subsidiaries (the "guarantor subsidiaries"). However, this indebtedness is not guaranteed by URNA's foreign subsidiaries (the "non-guarantor subsidiaries") and certain of its United States subsidiaries. The guarantor subsidiaries are all 100 percent-owned and the guarantees are made on a joint and several basis and are full and unconditional (subject to subordination provisions and subject to a standard limitation which provides that the maximum amount guaranteed by each guarantor will not exceed the maximum amount that can be guaranteed without making the guarantee void under fraudulent conveyance laws). Separate consolidated financial statements of the guarantor subsidiaries have not been presented because management believes that such information would not be material to investors. However, condensed consolidating financial information as of December 31, 2006 and 2005, and for each of the three years

**UNITED RENTALS, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**(Dollars in millions, except per share data and unless otherwise indicated)**

19. **Condensed Consolidating Financial Information of Guarantor Subsidiaries (Continued)**

in the period ended December 31, 2006, are presented. The condensed consolidating financial information of the Company and its subsidiaries are as follows:

**CONDENSED CONSOLIDATING BALANCE SHEETS**

**December 31, 2006**

|  | Parent | URNA | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Other and Eliminations | Total |
|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | |
| Cash and cash equivalents . . . . . . . . . . . . . | $  — | $   40 | $    3 | $   76 | $   — | $   119 |
| Accounts receivable, net . . . . . . . . . . . . . . | — | 9 | 7 | 486 | — | 502 |
| Intercompany receivable (payable) . . . . . . . | — | 373 | 144 | (517) | — | — |
| Inventory. . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 66 | 57 | 16 | — | 139 |
| Assets of discontinued operation . . . . . . . . . | — | — | 107 | — | — | 107 |
| Prepaid expenses and other assets . . . . . . . . | 8 | 8 | 37 | 3 | — | 56 |
| Deferred taxes . . . . . . . . . . . . . . . . . . . . . . . | — | 82 | — | — | — | 82 |
| Total current assets . . . . . . . . . . . . . . . . . | 8 | 578 | 355 | 64 | — | 1,005 |
| Rental equipment, net . . . . . . . . . . . . . . . . . | — | 1,427 | 891 | 243 | — | 2,561 |
| Property and equipment, net . . . . . . . . . . . . | 38 | 97 | 194 | 30 | — | 359 |
| Investments in subsidiaries . . . . . . . . . . . . . | 1,638 | 2,352 | — | — | (3,990) | — |
| Goodwill and other intangible assets, net . . . | — | 177 | 1,065 | 134 | — | 1,376 |
| Other long-term assets . . . . . . . . . . . . . . . . | — | 52 | 13 | — | — | 65 |
| Total assets . . . . . . . . . . . . . . . . . . . . . . . . | $1,684 | $4,683 | $2,518 | $ 471 | $(3,990) | $5,366 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | | | |
| Current maturities of long-term debt . . . . . . | $  — | $   37 | $   — | $   — | $   — | $   37 |
| Accounts payable . . . . . . . . . . . . . . . . . . . . | — | 72 | 118 | 28 | — | 218 |
| Accrued expenses and other liabilities . . . . . | — | 176 | 198 | 22 | (74) | 322 |
| Liabilities related to discontinued operation . | — | — | 22 | — | — | 22 |
| Total current liabilities . . . . . . . . . . . . . . . | — | 285 | 338 | 50 | (74) | 599 |
| Long-term debt . . . . . . . . . . . . . . . . . . . . . . | — | 2,350 | 7 | 162 | — | 2519 |
| Subordinated convertible debentures . . . . . . | 146 | — | — | — | — | 146 |
| Deferred taxes . . . . . . . . . . . . . . . . . . . . . . . | — | 440 | (9) | 32 | — | 463 |
| Other long-term liabilities . . . . . . . . . . . . . . | — | 44 | 57 | — | — | 101 |
| Total liabilities . . . . . . . . . . . . . . . . . . . . . . | 146 | 3,119 | 393 | 244 | (74) | 3,828 |
| Total stockholders' equity . . . . . . . . . . . . . . | 1,538 | 1,564 | 2,125 | 227 | (3,916) | 1,538 |
| Total liabilities and equity . . . . . . . . . . . . . . | $1,684 | $4,683 | $2,518 | $ 471 | $(3,990) | $5,366 |

**UNITED RENTALS, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**(Dollars in millions, except per share data and unless otherwise indicated)**

**19. Condensed Consolidating Financial Information of Guarantor Subsidiaries (Continued)**

**December 31, 2005**

| | Parent | URNA | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Other and Eliminations | Total |
|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | |
| Cash and cash equivalents . . . . . . . . . . . . . | $ — | $ 200 | $ 105 | $ 11 | $ — | $ 316 |
| Accounts receivable, net . . . . . . . . . . . . . . | — | 11 | 16 | 484 | — | 511 |
| Intercompany receivable (payable) . . . . . . . | — | 471 | 39 | (510) | — | — |
| Inventory . . . . . . . . . . . . . . . . . . . . . . . . . | — | 73 | 64 | 18 | — | 155 |
| Assets of discontinued operation . . . . . . . . . | — | — | 154 | — | — | 154 |
| Prepaid expenses and other assets . . . . . . . . | 11 | 8 | 54 | (1) | — | 72 |
| Deferred taxes . . . . . . . . . . . . . . . . . . . . . . | — | 196 | — | — | — | 196 |
| Total current assets . . . . . . . . . . . . . . . . | 11 | 959 | 432 | 2 | — | 1,404 |
| Rental equipment, net . . . . . . . . . . . . . . . . | — | 1,303 | 796 | 220 | — | 2,319 |
| Property and equipment, net . . . . . . . . . . . . | 38 | 88 | 161 | 19 | — | 306 |
| Investments in subsidiaries . . . . . . . . . . . . . | 1,402 | 2,186 | — | — | (3,588) | — |
| Goodwill and other intangible assets, net . . . | — | 163 | 1,052 | 146 | — | 1,361 |
| Other long-term assets . . . . . . . . . . . . . . . . | — | 61 | 17 | 2 | — | 80 |
| Total assets . . . . . . . . . . . . . . . . . . . . . . . . | $1,451 | $4,760 | $2,458 | $ 389 | $(3,588) | $5,470 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | | | |
| Current maturities of long-term debt . . . . . . | $ — | $ 27 | $ — | $ — | $ — | $ 27 |
| Accounts payable . . . . . . . . . . . . . . . . . . . . | — | 67 | 134 | 22 | — | 223 |
| Accrued expenses and other liabilities . . . . . | — | 74 | 242 | 10 | (58) | 268 |
| Liabilities related to discontinued operation . | — | — | 23 | — | — | 23 |
| Total current liabilities . . . . . . . . . . . . . . | — | 168 | 399 | 32 | (58) | 541 |
| Long-term debt . . . . . . . . . . . . . . . . . . . . . | — | 2,766 | — | 137 | — | 2,903 |
| Subordinated convertible debentures . . . . . . | 222 | — | — | — | — | 222 |
| Deferred taxes . . . . . . . . . . . . . . . . . . . . . . | — | 428 | (7) | 37 | — | 458 |
| Other long-term liabilities . . . . . . . . . . . . . . | — | 54 | 63 | — | — | 117 |
| Total liabilities . . . . . . . . . . . . . . . . . . . . . . | 222 | 3,416 | 455 | 206 | (58) | 4,241 |
| Total stockholders' equity . . . . . . . . . . . . . . | 1,229 | 1,344 | 2,003 | 183 | (3,530) | 1,229 |
| Total liabilities and equity . . . . . . . . . . . . . . | $1,451 | $4,760 | $2,458 | $ 389 | $(3,588) | $5,470 |

See accompanying notes.

F-43

**UNITED RENTALS, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**(Dollars in millions, except per share data and unless otherwise indicated)**

19.  **Condensed Consolidating Financial Information of Guarantor Subsidiaries (Continued)**

**CONDENSED CONSOLIDATING STATEMENTS OF OPERATIONS**

**For the Year Ended December 31, 2006**

| | Parent | URNA | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Other and Eliminations | Total |
|---|---|---|---|---|---|---|
| Revenues: | | | | | | |
| Equipment rentals | $ — | $1,229 | $1,051 | $250 | $ — | $2,530 |
| Sales of rental equipment | — | 164 | 136 | 35 | — | 335 |
| New equipment sales | — | 111 | 89 | 32 | — | 232 |
| Contractor supplies sales | — | 154 | 186 | 45 | — | 385 |
| Service and other revenues | — | 85 | 55 | 18 | — | 158 |
| **Total revenues** | **—** | **1,743** | **1,517** | **380** | **—** | **3,640** |
| Cost of revenues: | | | | | | |
| Cost of equipment rentals, excluding depreciation | — | 548 | 467 | 122 | — | 1,137 |
| Depreciation of rental equipment | — | 207 | 157 | 44 | — | 408 |
| Cost of rental equipment sales | — | 121 | 92 | 24 | — | 237 |
| Cost of new equipment sales | — | 90 | 74 | 27 | — | 191 |
| Cost of contractor supplies sales | — | 122 | 142 | 38 | — | 302 |
| Cost of service and other revenue | — | 41 | 26 | 9 | — | 76 |
| **Total cost of revenues** | **—** | **1,129** | **958** | **264** | **—** | **2,351** |
| Gross Profit | — | 614 | 559 | 116 | — | 1,289 |
| Selling, general and administrative expenses | — | 253 | 280 | 80 | — | 613 |
| Non-rental depreciation and amortization | 9 | 21 | 16 | 4 | — | 50 |
| Operating Income (Loss) | (9) | 340 | 263 | 32 | — | 626 |
| Interest expense, net | 4 | 197 | (4) | 11 | — | 208 |
| Interest expense-subordinated convertible debentures | 13 | — | — | — | — | 13 |
| Other (income) expense, net | 1 | 31 | 28 | (60) | — | — |
| Income (loss) from continuing operations before provision for income taxes | (27) | 112 | 239 | 81 | — | 405 |
| Provision (benefit) from income taxes | (11) | 44 | 91 | 32 | — | 156 |
| Income (loss) from continuing operations | (16) | 68 | 148 | 49 | — | 249 |
| Loss from discontinued operations, net of taxes | — | — | (25) | — | — | (25) |
| Income (loss) before equity in net earnings of subsidiaries | (16) | 68 | 123 | 49 | — | 224 |
| Equity in net earnings of subsidiaries | 240 | 172 | — | — | (412) | — |
| Net income (loss) | $224 | $ 240 | $ 123 | $ 49 | $(412) | $ 224 |

UNITED RENTALS, INC.

NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)

(Dollars in millions, except per share data and unless otherwise indicated)

19.   Condensed Consolidating Financial Information of Guarantor Subsidiaries (Continued)

CONDENSED CONSOLIDATING STATEMENTS OF OPERATIONS

For the Year Ended December 31, 2005

| | Parent | URNA | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Other and Eliminations | Total |
|---|---|---|---|---|---|---|
| Revenues: | | | | | | |
| Equipment rentals | $ — | $1,158 | $ 962 | $218 | $ — | $2,338 |
| Sales of rental equipment | — | 142 | 126 | 36 | — | 304 |
| New equipment sales | — | 106 | 76 | 23 | — | 205 |
| Contractor supplies sales | — | 123 | 143 | 35 | — | 301 |
| Service and other revenues | — | 78 | 46 | 16 | — | 140 |
| Total revenues | — | 1,607 | 1,353 | 328 | — | 3,288 |
| Cost of revenues: | | | | | | |
| Cost of equipment rentals, excluding depreciation | — | 523 | 466 | 105 | — | 1,094 |
| Depreciation of rental equipment | — | 200 | 144 | 42 | — | 386 |
| Cost of rental equipment sales | — | 105 | 91 | 27 | — | 223 |
| Cost of new equipment sales | — | 84 | 65 | 19 | — | 168 |
| Cost of contractor supplies sales | — | 102 | 102 | 27 | — | 231 |
| Cost of service and other revenue | — | 37 | 25 | 9 | — | 71 |
| Total cost of revenues | — | 1,051 | 893 | 229 | — | 2,173 |
| Gross Profit | — | 556 | 460 | 99 | — | 1,115 |
| Selling, general and administrative expenses | — | 239 | 247 | 67 | — | 553 |
| Non-rental depreciation and amortization | 7 | 14 | 15 | 2 | — | 38 |
| Operating Income (Loss) | (7) | 303 | 198 | 30 | — | 524 |
| Interest expense, net | — | 173 | (2) | 10 | — | 181 |
| Interest expense-subordinated convertible debentures | 14 | — | — | — | — | 14 |
| Other (income) expense, net | — | 14 | 10 | (26) | — | (2) |
| Income (loss) from continuing operations before provision for income taxes | (21) | 116 | 190 | 46 | — | 331 |
| Provision (benefit) from income taxes | (8) | 45 | 76 | 16 | — | 129 |
| Income (loss) from continuing operations | (13) | 71 | 114 | 30 | — | 202 |
| Loss from discontinued operations, net of taxes | — | — | (15) | — | — | (15) |
| Income (loss) before equity in net earnings of subsidiaries | (13) | 71 | 99 | 30 | — | 187 |
| Equity in net earnings of subsidiaries | 200 | 129 | — | — | (329) | — |
| Net income (loss) | $187 | $ 200 | $ 99 | $ 30 | $(329) | $ 187 |

**UNITED RENTALS, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**(Dollars in millions, except per share data and unless otherwise indicated)**

19.  **Condensed Consolidating Financial Information of Guarantor Subsidiaries (Continued)**

**CONDENSED CONSOLIDATING STATEMENTS OF OPERATIONS**

**For the Year Ended December 31, 2004**

| | Parent | URNA | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Other and Eliminations | Total |
|---|---|---|---|---|---|---|
| Revenues: | | | | | | |
| Equipment rentals | $ — | $1,037 | $ 853 | $168 | $ — | $2,058 |
| Sales of rental equipment | — | 117 | 127 | 28 | — | 272 |
| New equipment sales | — | 97 | 62 | 18 | — | 177 |
| Contractor supplies sales | — | 85 | 94 | 23 | — | 202 |
| Service and other revenues | — | 73 | 41 | 12 | — | 126 |
| **Total revenues** | **—** | **1,409** | **1,177** | **249** | **—** | **2,835** |
| Cost of revenues: | | | | | | |
| Cost of equipment rentals, excluding depreciation | — | 459 | 437 | 81 | — | 977 |
| Depreciation of rental equipment | — | 190 | 144 | 36 | — | 370 |
| Cost of rental equipment sales | — | 84 | 93 | 19 | — | 196 |
| Cost of new equipment sales | — | 77 | 54 | 15 | — | 146 |
| Cost of contractor supplies sales | — | 63 | 68 | 17 | — | 148 |
| Cost of service and other revenue | — | 35 | 24 | 6 | — | 65 |
| **Total cost of revenues** | **—** | **908** | **820** | **174** | **—** | **1,902** |
| Gross Profit | — | 501 | 357 | 75 | — | 933 |
| Selling, general and administrative expenses | — | 189 | 206 | 54 | — | 449 |
| Restructuring | — | 1 | (4) | (1) | — | (4) |
| Non-rental depreciation and amortization | 7 | 15 | 16 | 3 | — | 41 |
| Operating Income (Loss) | (7) | 296 | 139 | 19 | — | 447 |
| Interest expense, net | — | 323 | (3) | 7 | — | 327 |
| Interest expense-subordinated convertible debentures | 14 | — | — | — | — | 14 |
| Other (income) expense, net | — | 9 | 13 | (16) | — | 6 |
| Income (loss) from continuing operations before provision for income taxes | (21) | (36) | 129 | 28 | — | 100 |
| Provision (benefit) from income taxes | (8) | (19) | 44 | 11 | — | 28 |
| Income (loss) from continuing operations | (13) | (17) | 85 | 17 | — | 72 |
| Loss from discontinued operations, net of taxes | — | — | (156) | — | — | (156) |
| Income (loss) before equity in net earnings of subsidiaries | (13) | (17) | (71) | 17 | — | (84) |
| Equity in net earnings of subsidiaries | (71) | (54) | — | — | 125 | — |
| Net income (loss) | $(84) | $ (71) | $ (71) | $ 17 | $125 | $ (84) |

**UNITED RENTALS, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**(Dollars in millions, except per share data and unless otherwise indicated)**

19.   **Condensed Consolidating Financial Information of Guarantor Subsidiaries (Continued)**

**CONDENSED CONSOLIDATING CASH FLOW INFORMATION**

**For the Year Ended December 31, 2006**

| | Parent | URNA | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Other and Eliminations | Total |
|---|---|---|---|---|---|---|
| Net cash provided by (used in) operating activities | $ (3) | $ 605 | $ 142 | $114 | $ — | $ 858 |
| Net cash used in investing activities | (88) | (323) | (244) | (71) | 78 | (648) |
| Net cash provided by (used in) financing activities | 91 | (442) | — | 25 | (78) | (404) |
| Effect of foreign exchange rate changes on cash and cash equivalents | — | — | — | (3) | — | (3) |
| Increase (decrease) in cash and cash equivalents | — | (160) | (102) | 65 | — | (197) |
| Cash and cash equivalents at beginning of period | — | 200 | 105 | 11 | — | 316 |
| Cash and cash equivalents at end of period | $ — | $ 40 | $ 3 | $ 76 | $ — | $ 119 |

**For the Year Ended December 31, 2005**

| | Parent | URNA | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Other and Eliminations | Total |
|---|---|---|---|---|---|---|
| Net cash provided by (used in) operating activities | $ 6 | $ 328 | $ 270 | $ 25 | $ — | $ 629 |
| Net cash used in investing activities | (19) | (284) | (199) | (41) | 2 | (541) |
| Net cash provided by (used in) financing activities | 13 | (91) | — | — | (2) | (80) |
| Effect of foreign exchange rate changes on cash and cash equivalents | — | — | — | 5 | — | 5 |
| Increase (decrease) in cash and cash equivalents | — | (47) | 71 | (11) | — | 13 |
| Cash and cash equivalents at beginning of period | — | 247 | 34 | 22 | — | 303 |
| Cash and cash equivalents at end of period | $ — | $ 200 | $ 105 | $ 11 | $ — | $ 316 |

**UNITED RENTALS, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**(Dollars in millions, except per share data and unless otherwise indicated)**

19. **Condensed Consolidating Financial Information of Guarantor Subsidiaries (Continued)**

**For the Year Ended December 31, 2004**

|  | Parent | URNA | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Other and Eliminations | Total |
|---|---|---|---|---|---|---|
| Net cash provided by (used in) operating activities | $ (8) | $ 627 | $ 98 | $ 8 | $ — | $ 725 |
| Net cash used in investing activities | (13) | (268) | (96) | (73) | 6 | (444) |
| Net cash provided by (used in) financing activities | 21 | (154) | — | 75 | (6) | (64) |
| Effect of foreign exchange rate changes on cash and cash equivalents | — | — | — | 7 | — | 7 |
| Increase (decrease) in cash and cash equivalents | — | 205 | 2 | 17 | — | 224 |
| Cash and cash equivalents at beginning of period | — | 42 | 32 | 5 | — | 79 |
| Cash and cash equivalents at end of period | $ — | $ 247 | $ 34 | $ 22 | $ — | $ 303 |

## SCHEDULE II—VALUATION AND QUALIFYING ACCOUNTS

## UNITED RENTALS, INC.

**(Dollars in millions, except per share data and unless otherwise indicated)**

| Description | Balance at Beginning of Period | Additions Charged to Costs and Expenses | Other | Deductions | Balance at End of Period |
|---|---|---|---|---|---|
| **Year ended December 31, 2006:** | | | | | |
| Allowance for doubtful accounts . . . . . . . . . . . . | $41 | $ 11 | $— | $ 18(a) | $34 |
| Reserve for obsolescence and shrinkage . . . . . . . | 11 | 15 | — | 20(b) | 6 |
| Self-insurance reserve . . . . . . . . . . . . . . . . . . . . | 88 | 123 | — | 112(c) | 99 |
| **Year ended December 31, 2005:** | | | | | |
| Allowance for doubtful accounts . . . . . . . . . . . . | $45 | $ 18 | $ 1 | $ 23(a) | $41 |
| Reserve for obsolescence and shrinkage . . . . . . . | 10 | 22 | — | 21(b) | 11 |
| Self-insurance reserve . . . . . . . . . . . . . . . . . . . . | 81 | 115 | — | 108(c) | 88 |
| **Year ended December 31, 2004:** | | | | | |
| Allowance for doubtful accounts . . . . . . . . . . . . | $40 | $ 30 | $ 2 | $ 27(a) | $45 |
| Reserve for obsolescence and shrinkage . . . . . . . | 7 | 22 | — | 19(b) | 10 |
| Self-insurance reserve . . . . . . . . . . . . . . . . . . . . | 92 | 90 | — | 101(c) | 81 |

    The above information reflects the continuing operations of the Company for the periods presented. Additionally, because the Company has retained certain self-insurance liabilities associated with the traffic control business, those amounts have been included as well.

(a)  Represents write-offs of accounts, net of recoveries.

(b)  Represents write-offs.

(c)  Represents payments.

**UNITED RENTALS, INC.**

**CONDENSED CONSOLIDATED BALANCE SHEETS (UNAUDITED)**

**(Dollars in millions, except per share data)**

| | September 30, 2007 | September 30, 2006 | December 31, 2006 |
|---|---|---|---|
| **ASSETS** | | | |
| Cash and cash equivalents | $ 112 | $ 140 | $ 119 |
| Accounts receivable, net of allowance for doubtful accounts of $24, $36 and $34 at September 30, 2007, September 30, 2006 and December 31, 2006, respectively | 582 | 541 | 502 |
| Inventory | 123 | 153 | 139 |
| Assets of discontinued operation | — | 160 | 107 |
| Prepaid expenses and other assets | 51 | 53 | 56 |
| Deferred taxes | 51 | 73 | 82 |
| Total current assets | 919 | 1,120 | 1,005 |
| Rental equipment, net | 2,918 | 2,659 | 2,561 |
| Property and equipment, net | 415 | 343 | 359 |
| Goodwill and other intangible assets, net | 1,407 | 1,370 | 1,376 |
| Other long-term assets | 58 | 69 | 65 |
| **Total assets** | $5,717 | $5,561 | $5,366 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | |
| Current maturities of long-term debt | $ 78 | $ 285 | $ 37 |
| Accounts payable | 248 | 263 | 218 |
| Accrued expenses and other liabilities | 273 | 292 | 322 |
| Liabilities related to discontinued operation | — | 31 | 22 |
| Total current liabilities | 599 | 871 | 599 |
| Long-term debt | 2,535 | 2,513 | 2,519 |
| Subordinated convertible debentures | 146 | 159 | 146 |
| Deferred taxes | 472 | 413 | 463 |
| Other long-term liabilities | 100 | 104 | 101 |
| **Total liabilities** | 3,852 | 4,060 | 3,828 |
| Preferred stock—$0.01 par value, 5,000,000 shares authorized: | | | |
| Series C perpetual convertible preferred stock—$1,000 per share liquidation preference, 300,000 shares issued and outstanding at September 30, 2007, September 30, 2006 and December 31, 2006 | — | — | — |
| Series D perpetual convertible preferred stock—$1,000 per share liquidation preference, 150,000 shares issued and outstanding at September 30, 2007, September 30, 2006 and December 31, 2006 | — | — | — |
| Common stock—$0.01 par value, 500,000,000 shares authorized, 85,801,507, 80,570,247 and 81,178,663 shares issued and outstanding at September 30, 2007, September 30, 2006 and December 31, 2006, respectively | 1 | 1 | 1 |
| Additional paid-in capital | 1,479 | 1,424 | 1,421 |
| Retained earnings | 278 | 16 | 69 |
| Accumulated other comprehensive income | 107 | 60 | 47 |
| **Total stockholders' equity** | 1,865 | 1,501 | 1,538 |
| | $5,717 | $5,561 | $5,366 |

See accompanying notes.

F-50

Exhibit B-10

## UNITED RENTALS, INC.

### CONDENSED CONSOLIDATED STATEMENTS OF INCOME (UNAUDITED)

**(Dollars in millions, except per share amounts)**

| | Nine Months Ended September 30, | |
|---|---|---|
| | 2007 | 2006 |
| Revenues: | | |
| Equipment rentals | $1,947 | $1,874 |
| Sales of rental equipment | 243 | 248 |
| New equipment sales | 177 | 172 |
| Contractor supplies sales | 301 | 288 |
| Service and other revenues | 133 | 119 |
| **Total revenues** | **2,801** | **2,701** |
| Cost of revenues: | | |
| Cost of equipment rentals, excluding depreciation | 885 | 850 |
| Depreciation of rental equipment | 321 | 304 |
| Cost of rental equipment sales | 174 | 172 |
| Cost of new equipment sales | 147 | 141 |
| Cost of contractor supplies sales | 245 | 234 |
| Cost of service and other revenue | 60 | 58 |
| **Total cost of revenues** | **1,832** | **1,759** |
| **Gross profit** | **969** | **942** |
| Selling, general and administrative expenses | 447 | 453 |
| Non-rental depreciation and amortization | 38 | 37 |
| Operating income | 484 | 452 |
| Interest expense, net | 146 | 157 |
| Interest expense—subordinated convertible debentures | 7 | 11 |
| Other income, net | (7) | — |
| Income from continuing operations before provision for income taxes | 338 | 284 |
| Provision for income taxes | 128 | 112 |
| Income from continuing operations | 210 | 172 |
| Income (loss) from discontinued operation, net of taxes | (1) | (1) |
| Net income | $ 209 | $ 171 |
| Basic earnings available to common stockholders: | | |
| Income from continuing operations | $ 2.10 | $ 1.78 |
| Income (loss) from discontinued operation | — | (0.01) |
| Net income | $ 2.10 | $ 1.77 |
| Diluted earnings available to common stockholders: | | |
| Income from continuing operations | $ 1.87 | $ 1.57 |
| Income (loss) from discontinued operation | — | (0.01) |
| Net income | $ 1.87 | $ 1.56 |

See accompanying notes.

**UNITED RENTALS, INC.**

**CONDENSED CONSOLIDATED STATEMENT OF STOCKHOLDERS' EQUITY (UNAUDITED)**

**(in millions)**

| | Series C Perpetual Convertible Preferred Stock | Series D Perpetual Convertible Preferred Stock | Common Stock | | Additional Paid-in Capital | Retained Earnings | Comprehensive Income | Accumulated Other Comprehensive Income |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | Number of Shares | Amount | | | | |
| Balance, December 31, 2006 . . . . . . . . . . | $— | $— | 81 | $ 1 | $1,421 | $ 69 | | $ 47 |
| Comprehensive income: | | | | | | | | |
| Net income . . . . . . . . | | | | | | 209 | $209 | |
| Other comprehensive income: | | | | | | | | |
| Foreign currency translation adjustments . . . . . . | | | | | | | 60 | 60 |
| Comprehensive income | | | | | | | $269 | |
| Exercise of common stock options . . . . . | | | 5 | — | 22 | | | |
| Amortization of stock compensation . . . . . | | | | | 15 | | | |
| Excess tax benefits from share-based payment arrangements, including release of deferred tax valuation allowance of $6 . . . . . . . . . . . | | | | | 28 | | | |
| Shares repurchased and retired . . . . . . . | | | | | (4) | | | |
| Forfeiture of stock compensation . . . . . | | | | | (3) | | | |
| Balance, September 30, 2007 . . . . . . . . . . | $— | $— | 86 | $ 1 | $1,479 | $278 | | $107 |

See accompanying notes.

**UNITED RENTALS, INC.**

**CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS (UNAUDITED)**

**(Dollars in millions)**

|  | Nine Months Ended September 30, | |
|---|---|---|
|  | 2007 | 2006 |
| **Cash Flows From Operating Activities:** | | |
| Income from continuing operations | $ 210 | $ 172 |
| Adjustments to reconcile income from continuing operations to net cash provided by operating activities: | | |
| Depreciation and amortization | 359 | 341 |
| Amortization of deferred financing costs | 7 | 8 |
| Gain on sales of rental equipment | (69) | (76) |
| Gain on sales of non-rental equipment | (5) | (2) |
| Non-cash adjustments to equipment | (1) | 8 |
| Write-off of deferred financing costs | — | 8 |
| Amortization of deferred compensation | 12 | 11 |
| Increase in deferred taxes | 41 | 92 |
| Changes in operating assets and liabilities: | | |
| Increase in accounts receivable | (79) | (29) |
| Decrease in inventory | 16 | 4 |
| Decrease in prepaid expenses and other assets | 1 | 6 |
| Increase in accounts payable | 30 | 40 |
| (Decrease) increase in accrued expenses and other liabilities | (38) | 6 |
| Net cash provided by operating activities—continuing operations | 484 | 589 |
| Net cash provided by operating activities—discontinued operation | 9 | 17 |
| Net cash provided by operating activities | 493 | 606 |
| **Cash Flows From Investing Activities:** | | |
| Purchases of rental equipment | (785) | (787) |
| Purchases of non-rental equipment | (81) | (50) |
| Proceeds from sales of rental equipment | 243 | 248 |
| Proceeds from sales of non-rental equipment | 20 | 13 |
| Purchases of other companies | (23) | (39) |
| Net cash used in investing activities—continuing operations | (626) | (615) |
| Net cash provided by (used in) investing activities—discontinued operation | 67 | (11) |
| Net cash used in investing activities | (559) | (626) |
| **Cash Flows From Financing Activities:** | | |
| Proceeds from debt | 421 | 265 |
| Payments on debt | (420) | (423) |
| Proceeds from the exercise of common stock options | 22 | 64 |
| Proceeds received in conjunction with partial termination of interest rate caps | — | 3 |
| Subordinated convertible debentures repurchased and retired, including premium of $1 | — | (64) |
| Shares repurchased and retired | (4) | (1) |
| Excess tax benefits from share-based payment arrangements | 28 | — |
| Net cash provided by financing activities | 47 | (156) |
| Effect of foreign exchange rates | 12 | — |
| Net decrease in cash and cash equivalents | (7) | (176) |
| Cash and cash equivalents at beginning of period | 119 | 316 |
| Cash and cash equivalents at end of period | $ 112 | $ 140 |

See accompanying notes.

**UNITED RENTALS, INC.**

**NOTES TO UNAUDITED CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**

**(Dollars in millions, except per share data unless otherwise indicated)**

**1. Organization and Basis of Presentation**

**General**

United Rentals, Inc. ("Holdings," "United Rentals" or the "Company") is principally a holding company and conducts its operations primarily through its wholly owned subsidiary, United Rentals (North America), Inc. ("URNA"), and subsidiaries of URNA. Holdings' primary asset is its sole ownership of all issued and outstanding shares of common stock of URNA. URNA's various credit agreements and debt instruments place restrictions on its ability to transfer funds to its shareholder.

We rent equipment to a diverse customer base that includes construction and industrial companies, manufacturers, utilities, municipalities, homeowners and others in the United States, Canada and Mexico. In addition to renting equipment, we sell new and used rental equipment, as well as related contractor supplies, parts and service.

In April 2007, we announced that our board of directors had authorized the commencement of a process to explore a broad range of strategic alternatives to maximize shareholder value, including a possible sale of the Company, and had retained financial advisors in this process. On July 23, 2007, we announced that we had signed a definitive merger agreement to be acquired by affiliates of Cerberus Capital Management, L.P. ("Cerberus"), in a transaction valued at approximately $6.6 billion, inclusive of approximately $2.6 billion in outstanding debt obligations, but exclusive of transaction costs. Completion of the transaction is subject to customary closing conditions, including approval of the transaction by our stockholders, but not to a financing condition. On October 19, 2007, at a special meeting of our stockholders, the merger agreement was approved. We currently expect the transaction to close on or about November 16, 2007, but cannot guarantee this timing or result. For more detailed information, see our Current Reports on Form 8-K, filed with the SEC on July 24, 2007, October 19, 2007 and October 30, 2007. See also note 5 below for a description of two lawsuits filed following our announcement of the transaction.

We have prepared the accompanying unaudited condensed consolidated interim financial statements in accordance with the accounting policies described in our Annual Report on Form 10-K for the year ended December 31, 2006 (the "2006 Form 10-K") and the interim reporting requirements of Form 10-Q. Accordingly, certain information and note disclosures normally included in financial statements prepared in accordance with U.S. generally accepted accounting principles ("GAAP") have been condensed or omitted. These condensed consolidated financial statements should be read in conjunction with the 2006 Form 10-K. Certain reclassifications have been made to prior year financial information to conform to the current year presentation.

In our opinion, all adjustments, consisting only of normal recurring adjustments, which are necessary for a fair statement of financial position, operating results and cash flows for the interim periods presented have been made. Interim results of operations are not necessarily indicative of the results of the full year.

**Discontinued Operation**

In December 2006, we entered into a definitive agreement to sell our traffic control business to HTS Acquisition, Inc., an entity newly-formed by affiliates of private equity investors Wynnchurch Capital Partners and Oak Hill Special Opportunities Fund, L.P. The transaction closed in February 2007 and we received net proceeds of $66.

**UNITED RENTALS, INC.**

**NOTES TO UNAUDITED CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**(Dollars in millions, except per share data unless otherwise indicated)**

**1. Organization and Basis of Presentation (Continued)**

In accordance with SFAS No. 144, "Accounting for the Impairment or Disposal of Long-Lived Assets," the results of operations of our traffic control business have been reported as a discontinued operation in the condensed consolidated statements of income. The assets and liabilities associated with the traffic control business have also been classified separately in our condensed consolidated balance sheets. Additionally, our condensed consolidated statements of cash flows separately report the cash flows of the discontinued operation within the operating and investing sections. Revenues related to our discontinued operation were approximately $20 and $209 for the nine months ended September 30, 2007 and 2006, respectively. During the nine months ended September 30, 2007 and 2006, we reported losses from our discontinued operation of $3 ($1 after tax) and $1 ($1 after tax), respectively.

**Accounting Change**

We adopted the provisions of Financial Accounting Standards Board Interpretation No. 48, "Accounting for Uncertainty in Income Taxes" ("FIN 48"), an interpretation of FASB Statement No. 109, on January 1, 2007. We did not record any unrecognized income tax benefits as a result of the implementation of FIN 48. At the adoption date of January 1, 2007, we had $6 of unrecognized tax benefits. For the nine months ended September 30, 2007, there was an increase in our FIN 48 accrual of $1.9.

Consistent with the classification in prior years, the Company classifies interest and penalties related to uncertain income tax positions in interest expense and selling, general, and administrative expenses, respectively, in its condensed consolidated statements of income. At the date of adoption, approximately $1 of interest expense and $0 of penalties are included in accrued expenses and other liabilities on our condensed consolidated balance sheet. For the nine months ended September 30, 2007, less than $1 of interest expense related to income tax was reflected in our condensed consolidated statements of income.

We file income tax returns in the U.S. and in several foreign jurisdictions. With few exceptions, we have completed our domestic income tax examinations, or the statute of limitations has expired in the respective jurisdictions, for years before 2005. The IRS commenced an audit of the 2005 taxable year during the second quarter of 2007 which is expected to be completed during the fourth quarter. At that time, the Company expects that the FIN 48 accrual will be reduced by $1.9. In addition, our Canadian operating subsidiary is currently under examination for tax years 2003 through 2005. Included in the balance of unrecognized tax benefits at January 1, 2007 are certain tax positions for which it is reasonably possible that the total amounts of the unrecognized tax benefits could significantly change during the next twelve months. However, based on the status of the ongoing audit examinations and alternative settlement options available to the Company for certain of these tax positions, which could include legal proceedings, it is not possible to estimate the amount or timing of any such change to the previously recorded uncertain tax positions. Other than as discussed above, there have been no significant changes to the status of these audit examinations and settlement proceedings during the nine month periods ended September 30, 2007.

**New Accounting Pronouncements**

In February 2007, the Financial Accounting Standards Board issued SFAS No. 159, "The Fair Value Option for Financial Assets and Financial Liabilities—Including an Amendment of SFAS 115",

**UNITED RENTALS, INC.**

**NOTES TO UNAUDITED CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**(Dollars in millions, except per share data unless otherwise indicated)**

**1. Organization and Basis of Presentation (Continued)**

which allows for the option to measure financial instruments and certain other items at fair value. Unrealized gains and losses on items for which the fair value option has been elected are reported in earnings. This statement is effective for financial statements issued for fiscal years beginning after November 15, 2007. We do not believe the adoption of this statement will have a material effect on our financial condition or results of operations.

In September 2006, the FASB issued SFAS No. 157 "Fair Value Measurements," which is effective for fiscal years beginning after November 15, 2007 and interim periods within those fiscal years. This statement provides a single definition of fair value, together with a framework for measuring it, and requires new additional disclosure about the use of fair value to measure assets and liabilities. This statement also emphasizes that fair value is a market-based measurement, not an entity-specific measurement, and sets out a fair value hierarchy with the highest priority being quoted prices in active markets. While this statement does not add any new fair value measurements, it may change current practice. We are currently evaluating the potential impact of this statement.

In June 2006, the FASB ratified the consensus reached on EITF Issue No. 06-03, "How Sales Taxes Collected from Customers and Remitted to Governmental Authorities Should Be Presented in the Income Statement (that is, Gross Versus Net Presentation)" ("EITF 06-03"). The EITF reached a consensus that the presentation of taxes on either a gross or net basis is an accounting policy decision that requires disclosure. EITF 06-03 is effective for our fiscal year beginning January 1, 2007. Sales tax amounts collected from customers have been recorded on a net basis. The adoption of EITF 06-03 did not have any effect on our financial position or results of operations.

**2. Segment Information**

Our reportable segments are general rentals and trench safety, pump and power. The general rentals segment includes the rental of construction, aerial, industrial and homeowner equipment and related services and activities. The general rentals segment's customers include construction and industrial companies, manufacturers, utilities, municipalities and homeowners. The general rentals segment operates throughout the United States and Canada and has one location in Mexico. The trench safety, pump and power segment includes the rental of specialty construction products and related services. The trench safety, pump and power segment's customers include construction companies involved in infrastructure projects, municipalities and industrial companies. This segment operates in the United States and has one location in Canada. These segments align our external segment reporting with how management evaluates and allocates resources. We evaluate segment performance based on segment operating results.

**UNITED RENTALS, INC.**

**NOTES TO UNAUDITED CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**(Dollars in millions, except per share data unless otherwise indicated)**

## 2. Segment Information (Continued)

Operating segment revenues and profitability for the nine months ended September 30, 2007 and 2006 were as follows:

| | Nine months Ended September 30, | |
|---|---|---|
| | 2007 | 2006 |
| Total reportable segment revenues | | |
| General rentals | $2,632 | $2,535 |
| Trench safety, pump and power | 169 | 166 |
| Total revenues | $2,801 | $2,701 |
| Total reportable segment depreciation and amortization expense | | |
| General rentals | $ 342 | $ 324 |
| Trench safety, pump and power | 17 | 17 |
| Total depreciation and amortization expense | $ 359 | $ 341 |
| Reportable segment operating income | | |
| General rentals | $ 440 | $ 409 |
| Trench safety, pump and power | 44 | 43 |
| Segment operating income | $ 484 | $ 452 |
| Total reportable segment capital expenditures | | |
| General rentals | $ 836 | $ 797 |
| Trench safety, pump and power | 30 | 40 |
| Total capital expenditures | $ 866 | $ 837 |

| | September 30, 2007 | September 30, 2006 | December 31, 2006 |
|---|---|---|---|
| Total assets | | | |
| General rentals | $5,553 | $5,244 | $5,112 |
| Trench safety, pump and power | 164 | 157 | 147 |
| Assets of discontinued operation | — | 160 | 107 |
| Total assets | $5,717 | $5,561 | $5,366 |

## 3. Acquisitions

In February 2007, we acquired High Reach Equipment Services, LLC ("High Reach"). High Reach had one aerial equipment branch in Georgia and 2006 revenues of approximately $11. The aggregate purchase price for this acquisition was approximately $23. Pro forma combined results of operations giving effect to this acquisition would not vary materially from historical results.

## 4. Goodwill and Other Intangible Assets

The carrying amount of our goodwill was $1,359, $1,340 and $1,338 at September 30, 2007, September 30, 2006 and December 31, 2006, respectively. We are required to review our goodwill for

**UNITED RENTALS, INC.**

**NOTES TO UNAUDITED CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**(Dollars in millions, except per share data unless otherwise indicated)**

## 4. Goodwill and Other Intangible Assets (Continued)

impairment annually as of a scheduled review date. However, if events or circumstances suggest that goodwill could be impaired, we may be required to conduct an earlier review. The scheduled review date is October 1 of each year.

Other intangible assets consist of customer relationships and non-compete agreements and are amortized over periods ranging from 3 to 12 years. Amortization expense for other intangible assets was $5 and $3 for the nine months ended September 30, 2007 and 2006, respectively. The cost of other intangible assets and the related accumulated amortization as of September 30, 2007 was as follows:

|  | September 30, 2007 |
|---|---|
| Gross carrying amount | $ 83 |
| Accumulated amortization | (35) |
| Net amount | $ 48 |

## 5. Legal and Regulatory Matters

### SEC Non-Public Fact Finding Inquiry and Special Committee Review

In August 2004, we received a letter from the SEC in which the SEC referred to an inquiry of the Company. The letter transmitted a subpoena requesting certain of our documents. The letter and the subpoena referred to an SEC investigation entitled *In the Matter of United Rentals, Inc.* The notice from the SEC stated that the inquiry did not mean that the SEC had concluded that the Company or anyone else had broken the law or that the SEC had a negative opinion of any person, entity or security. The inquiry appeared to relate to a broad range of our accounting practices and was not confined to a specific period.

In March 2005, our board of directors formed the Special Committee to review matters related to the SEC inquiry. The Special Committee retained independent counsel. The board of directors received and acted upon findings of the Special Committee in January 2006. The actions that we took with respect to the Special Committee's findings and actions that we took with respect to certain other accounting matters, including the restatement of previously issued consolidated financial statements for 2003 and 2002, are discussed in our Annual Report on Form 10-K for the year ended December 31, 2005 (the "2005 Form 10-K"). We have provided documents in response to SEC subpoenas and informal requests as well as to the Special Committee, which has, in turn, provided documents to the SEC.

In July 2007, we received a letter from the staff of the SEC stating that the staff intends to recommend that the Commission authorize the staff to file an injunctive action against the Company for alleged violations of provisions relating to the maintenance of books and records, internal accounting controls, periodic filing requirements, as well as antifraud provisions as set forth in Section 17(a) of the Securities Act of 1933, Sections 10(b), 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Securities Exchange Act of 1934, and Rules 10b-5, 12b-20, 13a-1, 13a-11, 13a-13 and 13b2-1 thereunder. The letter states that the relief the staff may recommend includes permanent injunctions and civil penalties. Under SEC procedures, we have the opportunity to respond to the SEC staff before the staff makes a formal recommendation as to whether any action should be brought by the SEC. The staff's

**UNITED RENTALS, INC.**

**NOTES TO UNAUDITED CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**(Dollars in millions, except per share data unless otherwise indicated)**

**5. Legal and Regulatory Matters (Continued)**

letter also states that the staff intends to request authorization to engage in settlement discussions with the Company. We intend to continue cooperating fully with the SEC in this matter.

The U.S. Attorney's office has also requested information from the Company informally and by subpoena about matters related to the SEC inquiry. We are also cooperating fully with this office.

We cannot predict the outcome of these inquiries or when these matters might be resolved.

**Shareholder Class Action Lawsuits and Derivative Litigation**

Following our public announcement of the SEC inquiry, three purported class action lawsuits were filed against the Company in the United States District Court for the District of Connecticut. The plaintiff in each of the lawsuits initially sought to sue on behalf of a purported class comprised of purchasers of our securities from October 23, 2003 to August 30, 2004. The lawsuits initially named as the defendants the Company, our chairman, our vice chairman and then chief executive officer, our former president and chief financial officer, and our former corporate controller. These initial complaints alleged, among other things, that certain of our SEC filings and other public statements contained false and misleading statements which resulted in damages to the plaintiffs and the members of the purported class when they purchased our securities. On the basis of those allegations, plaintiffs in each action asserted claims (a) against all defendants under Section 10(b) of the Securities Exchange Act of 1934, as amended (the "Exchange Act") and Rule 10b-5 promulgated thereunder, and (b) against one or more of the individual defendants under Section 20(a) of the Exchange Act. The complaints sought unspecified compensatory damages, costs and expenses. On February 1, 2005, the Court entered an order consolidating the three actions. On November 8, 2005, the Court appointed City of Pontiac Policeman's and Fireman's Retirement System as lead plaintiff for the purported class. The consolidated action is now entitled *In re United Rentals, Inc. Securities Litigation*.

On June 5, 2006, pursuant to a schedule agreed to by the parties and approved by the Court, lead plaintiff filed a consolidated amended complaint, which (a) added allegations relating to, among other things, the conclusions of the Special Committee and other matters disclosed in the 2005 Form 10-K, (b) amended the purported class period to include purchasers of our securities from February 28, 2001 to August 30, 2004 and (c) named as an additional defendant our first chief financial officer. In September 2006, we and certain of the individual defendants moved to dismiss the consolidated amended complaint in this action. Briefing with respect to these motions is now complete. We intend to continue to defend against this action vigorously. At this stage of the litigation, it is not possible to estimate the amount of loss or range of possible loss that might result from an adverse judgment or a settlement of this matter.

In January 2005 an alleged shareholder filed an action in Connecticut State Superior Court, Judicial District of Norwalk/Stamford at Stamford, purportedly suing derivatively on the Company's behalf. The action, entitled *Gregory Riegel v. John N. Milne*, *et al.*, named as defendants certain of our current and/or former directors and/or officers, and named the Company as a nominal defendant. The complaint asserted, among other things, that the defendants breached their fiduciary duties to the Company by causing or allowing the Company to disseminate misleading and inaccurate information to shareholders and the market and by failing to establish and maintain adequate accounting controls, thus exposing the Company to damages. The complaint seeks unspecified compensatory damages, costs and expenses against the defendants. The parties to the Riegel action have agreed that the proceedings

**UNITED RENTALS, INC.**

**NOTES TO UNAUDITED CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**(Dollars in millions, except per share data unless otherwise indicated)**

**5. Legal and Regulatory Matters (Continued)**

in this action will be stayed pending the resolution of the motions to dismiss in the purported shareholder class actions.

In November 2004 we received a letter from counsel for an alleged shareholder, raising allegations similar to the ones set forth in the derivative complaint described above and demanding that the Company take action in response to those allegations against certain of our current and/or former directors and/or officers. Following receipt of the letter, our board of directors formed a special committee to consider the letter. In August 2005, this alleged shareholder commenced an action in Connecticut State Superior Court, Judicial District of Norwalk/Stamford at Stamford, purporting to sue derivatively on the Company's behalf. The action, entitled *Nathan Brundridge v. Leon D. Black, et al*., initially named as defendants certain of our current and/or former directors and/or officers, and named the Company as a nominal defendant. The initial complaint in this action asserted, among other things, that all of the defendants breached fiduciary obligations to the Company by causing or allowing the Company to disseminate misleading and inaccurate information to shareholders and the market, and by failing to establish and maintain adequate accounting controls, thus exposing the Company to damages. The initial complaint in this action also asserted a claim for unjust enrichment against our chairman and our vice chairman and then chief executive officer. The initial complaint sought unspecified compensatory damages, equitable relief, costs and expenses against all of the defendants. The initial complaint also sought an order, in connection with plaintiff's unjust enrichment claim, directing the defendants against whom that claim was asserted to disgorge certain compensation they received from us with respect to fiscal years 2001, 2002 and 2003.

On June 5, 2006, pursuant to a schedule agreed to by the parties and approved by the Court, plaintiff in the Brundridge action filed an amended complaint, which (a) added allegations relating to, among other things, the conclusions of the Special Committee and other matters disclosed in the 2005 Form 10-K, and (b) named as an additional defendant our former president and chief financial officer and asserted the same claims against him as it previously asserted and continued to assert against our chairman and our vice chairman and then chief executive officer. In September 2006, we and certain of the individual defendants moved to dismiss the amended complaint in this action. In December 2006, plaintiff in this action filed its opposition to these motions to dismiss. Subsequently, the parties agreed that the proceedings in this action will be stayed pending resolution of the motions to dismiss in the purported shareholder class actions. The parties' agreement provides that any party may terminate the stay at any time on 30 days' written notice to the Court and all other parties, and defendants will have an opportunity to submit reply papers in further support of their motions to dismiss this action after the termination of the stay.

In August 2005 another alleged shareholder filed an action in the United States District Court for the District of Connecticut, purporting to sue derivatively on the Company's behalf. The action, entitled *Natalie Gordon v. Wayland R. Hicks, et al*., named as defendants certain of our current and/or former directors and/or officers, and named the Company as a nominal defendant. The initial complaint in this action asserted claims against each of the defendants for breach of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment. Each of these claims is premised on, among other things, the theory that the individual defendants caused or permitted the Company to disseminate misleading and inaccurate information to shareholders and to the market, and failed to establish and maintain adequate accounting controls, thus exposing the Company to damages. The initial complaint also asserted (a) a claim that a former director breached fiduciary obligations by

**UNITED RENTALS, INC.**

**NOTES TO UNAUDITED CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**(Dollars in millions, except per share data unless otherwise indicated)**

**5. Legal and Regulatory Matters (Continued)**

selling shares of our common stock while in possession of material, non-public information, and (b) a claim against our chairman, our vice chairman and then chief executive officer, and our former president and chief financial officer for recovery of certain incentive-based compensation under section 304 of the Sarbanes-Oxley Act. The initial complaint sought unspecified compensatory damages, equitable relief, restitution, costs and expenses against all of the defendants. The initial complaint also sought an order declaring that the defendants against whom the section 304 claim was directed are liable under the Sarbanes-Oxley Act and directing them to reimburse us for all bonuses or other incentive-based or equity-based compensation they received for the fiscal years 1999 through 2004.

On June 5, 2006, pursuant to a schedule agreed to by the parties and approved by the Court, plaintiff in the Gordon action filed an amended complaint, which (a) added allegations relating to, among other things, the conclusions of the Special Committee and other matters disclosed in the 2005 Form 10-K, and (b) named as additional defendants certain other of our current and/or former directors and/or officers. The amended complaint also asserted an additional claim against certain of our current and/or former directors for violation of Section 14(a) of the Exchange Act. In September 2006, we and certain of the individual defendants moved to dismiss the amended complaint in this action. Briefing with respect to these motions is now complete.

Following our July 23, 2007 announcement of the merger agreement with affiliates of Cerberus, two lawsuits against the proposed acquisition were filed. First, a putative class action complaint, entitled *Donald Lefari v. United Rentals, Inc. et al.,* was filed in the Superior Court of the Judicial District of Stamford-Norwalk on July 23, 2007 (the "Lefari action"). This lawsuit purports to be brought on behalf of all common stockholders of the Company and names the Company and all of our directors and Cerberus as defendants. The operative complaint alleges, among other things, that our board of directors violated its fiduciary duties to the Company's stockholders by entering into the merger agreement and that our proxy statement failed to disclose material information. Plaintiff Lefari sought to enjoin the proposed transaction on those bases. On September 19, 2007, the parties to the Lefari action entered into a memorandum of understanding to settle the action and a settlement agreement is expected to be negotiated by the parties. On September 28, 2007, the second lawsuit, *Nathan Brundridge vs. Wayland R. Hicks et al.,* was also filed in the Superior Court of the State of Connecticut, Judicial District of Stamford-Norwalk (the "Brundridge II action"). This lawsuit names our current directors as defendants. The complaint alleges, among other things, that our board of directors failed to disclose all the material facts that the Company's stockholders require in order to cast an informed vote for or against the proposal to adopt the merger agreement. If the court approves the anticipated settlement agreement in the Lefari action, that lawsuit will be dismissed with prejudice, and thereby release claims asserted by the plaintiff in the Brundridge II action.

We are also subject to a number of claims and proceedings that generally arise in the ordinary conduct of our business. These matters include, but are not limited to, general liability claims (including personal injury, product liability, and property and auto claims), indemnification and guarantee obligations, employee injuries and employment-related claims, self-insurance obligations and contract and real estate matters. Based on advice of counsel and available information, including current status or stage of proceeding, and taking into account accruals for matters where we have established them, we currently believe that any liabilities ultimately resulting from these ordinary course claims and proceedings will not, individually or in the aggregate, have a material adverse effect on our consolidated financial position, results of operations or cash flows.

**UNITED RENTALS, INC.**

**NOTES TO UNAUDITED CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**(Dollars in millions, except per share data unless otherwise indicated)**

**6. Earnings Per Share**

Basic earnings per share is computed by dividing net income by the weighted-average number of common shares outstanding and, if dilutive, the Series C and Series D preferred shares as if converted to common shares since such shares are participating securities. Diluted earnings per share includes the impact of other diluted securities. The following table sets forth the computation of basic and diluted earnings per share (shares in thousands):

| | Nine months Ended September 30, | |
|---|---|---|
| | 2007 | 2006 |
| Numerator: | | |
| Income from continuing operations | $   210 | $   172 |
| Income (loss) from discontinued operation, net of taxes | (1) | (1) |
| Net income | 209 | 171 |
| Convertible debt interest | 1 | 1 |
| Subordinated convertible debt interest | 4 | 6 |
| Net income available to common stockholders | $   214 | $   178 |
| Denominator: | | |
| Weighted-average common shares | 82,537 | 79,124 |
| Series C preferred | 12,000 | 12,000 |
| Series D preferred | 5,000 | 5,000 |
| Denominator for basic earnings per share—weighted-average | 99,537 | 96,124 |
| Effect of dilutive securities: | | |
| Employee stock options and warrants | 4,775 | 6,257 |
| Convertible shares | 6,461 | 6,461 |
| Subordinated convertible debentures | 3,342 | 5,078 |
| Restricted stock units and other | 491 | 158 |
| Denominator for dilutive earnings per share—adjusted weighted-average shares | 114,606 | 114,078 |
| Basic earnings available to common stockholders: | | |
| Income from continuing operations | $   2.10 | $   1.78 |
| Income (loss) from discontinued operation | — | (0.01) |
| Net income | $   2.10 | $   1.77 |
| Diluted earnings available to common stockholders: | | |
| Income from continuing operations | $   1.87 | $   1.57 |
| Income (loss) from discontinued operation | — | (0.01) |
| Net income | $   1.87 | $   1.56 |

**UNITED RENTALS, INC.**

**NOTES TO UNAUDITED CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**(Dollars in millions, except per share data unless otherwise indicated)**

### 7. Condensed Consolidating Financial Information of Guarantor Subsidiaries

URNA is 100 percent owned by Holdings (the "Parent") and has outstanding (i) certain indebtedness that is guaranteed by the Parent and (ii) certain indebtedness that is guaranteed by both Parent and substantially all of URNA's United States subsidiaries (the "guarantor subsidiaries"). However, this indebtedness is not guaranteed by URNA's foreign subsidiaries and certain of its United States subsidiaries (the "non-guarantor subsidiaries"). The guarantor subsidiaries are all 100 percent-owned and the guarantees are made on a joint and several basis and are full and unconditional (subject to subordination provisions and subject to a standard limitation which provides that the maximum amount guaranteed by each guarantor will not exceed the maximum amount that can be guaranteed without making the guarantee void under fraudulent conveyance laws). Separate consolidated financial statements of the guarantor subsidiaries have not been presented because management believes that such information would not be material to investors; however, condensed consolidating financial information is presented. The condensed consolidating financial information of the Company and its subsidiaries is as follows:

**CONDENSED CONSOLIDATING BALANCE SHEET**
**September 30, 2007**

| | Parent | URNA | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Other and Eliminations | Total |
|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | |
| Cash and cash equivalents | $ — | $ 18 | $ 8 | $ 86 | $ — | $ 112 |
| Accounts receivable, net | — | 26 | (18) | 574 | — | 582 |
| Intercompany receivable (payable) | — | 467 | 126 | (593) | — | — |
| Inventory | — | 56 | 51 | 16 | — | 123 |
| Prepaid expenses and other assets | — | 12 | 34 | 5 | — | 51 |
| Deferred taxes | — | 51 | — | — | — | 51 |
| **Total current assets** | **—** | **630** | **201** | **88** | **—** | **919** |
| Rental equipment, net | — | 1,492 | 1,092 | 334 | — | 2,918 |
| Property and equipment, net | 42 | 196 | 148 | 29 | — | 415 |
| Investments in subsidiaries | 1,962 | 2,541 | — | — | (4,503) | — |
| Goodwill and other intangible assets, net | — | 185 | 1,067 | 155 | — | 1,407 |
| Other non-current assets | 7 | 43 | 8 | — | — | 58 |
| **Total assets** | **$2,011** | **$5,087** | **$2,516** | **$ 606** | **$(4,503)** | **$5,717** |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | | | |
| Current maturities of long-term debt | $ — | $ 78 | $ — | $ — | $ — | $ 78 |
| Accounts payable | — | 80 | 139 | 29 | — | 248 |
| Accrued expenses and other liabilities | — | 248 | 103 | 8 | (86) | 273 |
| **Total current liabilities** | **—** | **406** | **242** | **37** | **(86)** | **599** |
| Long-term debt | — | 2,318 | 12 | 205 | — | 2,535 |
| Subordinated convertible debentures | 146 | — | — | — | — | 146 |
| Deferred taxes | — | 445 | (9) | 36 | — | 472 |
| Other liabilities | — | 42 | 58 | — | — | 100 |
| **Total liabilities** | **146** | **3,211** | **303** | **278** | **(86)** | **3,852** |
| **Total stockholders' equity** | **1,865** | **1,876** | **2,213** | **328** | **(4,417)** | **1,865** |
| **Total liabilities and equity** | **$2,011** | **$5,087** | **$2,516** | **$ 606** | **$(4,503)** | **$5,717** |

**UNITED RENTALS, INC.**

**NOTES TO UNAUDITED CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**(Dollars in millions)**

**7. Condensed Consolidating Financial Information of Guarantor Subsidiaries (Continued)**

**CONDENSED CONSOLIDATING BALANCE SHEET**

**September 30, 2006**

| | Parent | URNA | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Other and Eliminations | Total |
|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | |
| Cash and cash equivalents . . . . . . . . . . . . . . . | $ — | $ 20 | $ 69 | $ 51 | $ — | $ 140 |
| Accounts receivable, net . . . . . . . . . . . . . . . . . | — | 17 | (25) | 549 | — | 541 |
| Intercompany receivable (payable) . . . . . . . . . | — | 396 | 5 | (401) | — | — |
| Inventory . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 69 | 64 | 20 | — | 153 |
| Assets of discontinued operation . . . . . . . . . . . | — | — | 160 | — | — | 160 |
| Prepaid expenses and other assets . . . . . . . . . . | — | 8 | 45 | — | — | 53 |
| Deferred taxes . . . . . . . . . . . . . . . . . . . . . . . | — | 73 | — | — | — | 73 |
| **Total current assets** . . . . . . . . . . . . . . . . . . . . | **—** | **583** | **318** | **219** | **—** | **1,120** |
| Rental equipment, net . . . . . . . . . . . . . . . . . . . | — | 1,477 | 929 | 253 | — | 2,659 |
| Property and equipment, net . . . . . . . . . . . . . | 40 | 85 | 189 | 29 | — | 343 |
| Investments in subsidiaries . . . . . . . . . . . . . . | 1,612 | 2,325 | — | — | (3,937) | — |
| Goodwill and other intangible assets, net . . . . | — | 167 | 1,063 | 140 | — | 1,370 |
| Other non-current assets . . . . . . . . . . . . . . . . | 8 | 51 | 9 | 1 | — | 69 |
| **Total assets** . . . . . . . . . . . . . . . . . . . . . . . . | **$1,660** | **$4,688** | **$2,508** | **$ 642** | **$(3,937)** | **$5,561** |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | | | |
| Current maturities of long-term debt . . . . . . . | $ — | $ 285 | $ — | $ — | $ — | $ 285 |
| Accounts payable . . . . . . . . . . . . . . . . . . . . . | — | 68 | 162 | 33 | — | 263 |
| Accrued expenses and other liabilities . . . . . . . | — | 181 | 185 | 12 | (86) | 292 |
| Liabilities related to discontinued operation . . | — | — | 31 | — | — | 31 |
| **Total current liabilities** . . . . . . . . . . . . . . . . | **—** | **534** | **378** | **45** | **(86)** | **871** |
| Long-term debt . . . . . . . . . . . . . . . . . . . . . . | — | 2,163 | 7 | 343 | — | 2,513 |
| Subordinated convertible debentures . . . . . . . . | 159 | — | — | — | — | 159 |
| Deferred taxes . . . . . . . . . . . . . . . . . . . . . . . | — | 406 | (32) | 39 | — | 413 |
| Other liabilities . . . . . . . . . . . . . . . . . . . . . . | — | 59 | 45 | — | — | 104 |
| **Total liabilities** | **159** | **3,162** | **398** | **427** | **(86)** | **4,060** |
| **Total stockholders' equity** . . . . . . . . . . . . . . | **1,501** | **1,526** | **2,110** | **215** | **(3,851)** | **1,501** |
| **Total liabilities and equity** . . . . . . . . . . . . . | **$1,660** | **$4,688** | **$2,508** | **$ 642** | **$(3,937)** | **$5,561** |

UNITED RENTALS, INC.

NOTES TO UNAUDITED CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (Continued)

(Dollars in millions)

7. Condensed Consolidating Financial Information of Guarantor Subsidiaries (Continued)

CONDENSED CONSOLIDATING BALANCE SHEET

December 31, 2006

| | Parent | URNA | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Other and Eliminations | Total |
|---|---|---|---|---|---|---|
| ASSETS | | | | | | |
| Cash and cash equivalents . . . . . . . . . . . . . . . | $ — | $ 40 | $ 3 | $ 76 | $ — | $ 119 |
| Accounts receivable, net . . . . . . . . . . . . . . . . | — | 9 | 7 | 486 | — | 502 |
| Intercompany receivable (payable) . . . . . . . . . | — | 373 | 144 | (517) | — | — |
| Inventory . . . . . . . . . . . . . . . . . . . . . . . . . . . | — | 66 | 57 | 16 | — | 139 |
| Assets of discontinued operation . . . . . . . . . . . | — | — | 107 | — | — | 107 |
| Prepaid expenses and other assets . . . . . . . . . . | 8 | 8 | 37 | 3 | — | 56 |
| Deferred taxes . . . . . . . . . . . . . . . . . . . . . . . . | — | 82 | — | — | — | 82 |
| Total current assets . . . . . . . . . . . . . . . . . . . . | 8 | 578 | 355 | 64 | — | 1,005 |
| Rental equipment, net . . . . . . . . . . . . . . . . . . . | — | 1,427 | 891 | 243 | — | 2,561 |
| Property and equipment, net . . . . . . . . . . . . . | 38 | 97 | 194 | 30 | — | 359 |
| Investments in subsidiaries . . . . . . . . . . . . . . . | 1,638 | 2,352 | — | — | (3,990) | — |
| Goodwill and other intangible assets, net . . . . | — | 177 | 1,065 | 134 | — | 1,376 |
| Other non-current assets . . . . . . . . . . . . . . . . | — | 52 | 13 | — | — | 65 |
| Total assets . . . . . . . . . . . . . . . . . . . . . . . . . | $1,684 | $4,683 | $2,518 | $ 471 | $(3,990) | $5,366 |
| LIABILITIES AND STOCKHOLDERS' EQUITY | | | | | | |
| Current maturities of long-term debt . . . . . . . | $ — | $ 37 | $ — | $ — | $ — | $ 37 |
| Accounts payable . . . . . . . . . . . . . . . . . . . . . . | — | 72 | 118 | 28 | — | 218 |
| Accrued expenses and other liabilities . . . . . . . | — | 176 | 198 | 22 | (74) | 322 |
| Liabilities related to discontinued operation . . | — | — | 22 | — | — | 22 |
| Total current liabilities . . . . . . . . . . . . . . . . | — | 285 | 338 | 50 | (74) | 599 |
| Long-term debt . . . . . . . . . . . . . . . . . . . . . . . | — | 2,350 | 7 | 162 | — | 2,519 |
| Subordinated convertible debentures . . . . . . . . | 146 | — | — | — | — | 146 |
| Deferred taxes . . . . . . . . . . . . . . . . . . . . . . . . | — | 440 | (9) | 32 | — | 463 |
| Other liabilities . . . . . . . . . . . . . . . . . . . . . . . | — | 44 | 57 | — | — | 101 |
| Total liabilities . . . . . . . . . . . . . . . . . . . . . . | 146 | 3,119 | 393 | 244 | (74) | 3,828 |
| Total stockholders' equity . . . . . . . . . . . . . . . | 1,538 | 1,564 | 2,125 | 227 | (3,916) | 1,538 |
| Total liabilities and equity . . . . . . . . . . . . . . | $1,684 | $4,683 | $2,518 | $ 471 | $(3,990) | $5,366 |

F-65

**UNITED RENTALS, INC.**

**NOTES TO UNAUDITED CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**(Dollars in millions, except per share data unless otherwise indicated)**

**7. Condensed Consolidating Financial Information of Guarantor Subsidiaries (Continued)**

### CONDENSED CONSOLIDATING STATEMENT OF INCOME

#### For the Nine Months Ended September 30, 2007

| | Parent | URNA | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Other and Eliminations | Total |
|---|---|---|---|---|---|---|
| Revenues: | | | | | | |
| Equipment rentals .................... | $ — | $ 954 | $ 779 | $214 | $ — | $1,947 |
| Sales of rental equipment .............. | — | 126 | 89 | 28 | — | 243 |
| New equipment sales .................. | — | 86 | 63 | 28 | — | 177 |
| Contractor supplies sales .............. | — | 124 | 139 | 38 | — | 301 |
| Service and other revenues ............. | — | 68 | 50 | 15 | — | 133 |
| **Total revenues** ...................... | — | 1,358 | 1,120 | 323 | — | 2,801 |
| Cost of revenues: | | | | | | |
| Cost of equipment rentals, excluding depreciation ...................... | — | 423 | 361 | 101 | — | 885 |
| Depreciation of rental equipment ........ | — | 162 | 123 | 36 | — | 321 |
| Cost of rental equipment sales .......... | — | 94 | 61 | 19 | — | 174 |
| Cost of new equipment sales ........... | — | 69 | 55 | 23 | — | 147 |
| Cost of contractor supplies sales ........ | — | 107 | 105 | 33 | — | 245 |
| Cost of service and other revenues ....... | — | 32 | 20 | 8 | — | 60 |
| **Total cost of revenues** ................. | — | 887 | 725 | 220 | — | 1,832 |
| **Gross Profit** ......................... | — | 471 | 395 | 103 | — | 969 |
| Selling, general and administrative expenses . | — | 180 | 207 | 60 | — | 447 |
| Non-rental depreciation and amortization ... | 7 | 15 | 13 | 3 | — | 38 |
| **Operating Income** ..................... | (7) | 276 | 175 | 40 | — | 484 |
| Interest expense, net ................... | — | 138 | — | 8 | | 146 |
| Interest expense-subordinated convertible debentures ....................... | 7 | — | — | — | — | 7 |
| Other expense (income), net ............. | — | 24 | 17 | (48) | — | (7) |
| Income from continuing operations before provision for income taxes ........... | (14) | 114 | 158 | 80 | — | 338 |
| Provision for income taxes ............. | (5) | 43 | 59 | 31 | — | 128 |
| Income from continuing operations ....... | (9) | 71 | 99 | 49 | — | 210 |
| Loss from discontinued operations, net of tax | — | 2 | (3) | — | | (1) |
| Income (loss) before equity in net earnings of subsidiaries ...................... | (9) | 73 | 96 | 49 | — | 209 |
| Equity net earnings of subsidiaries ........ | 218 | 145 | — | — | (363) | — |
| Net income (loss) .................... | $209 | $ 218 | $ 96 | $ 49 | $(363) | $ 209 |

**UNITED RENTALS, INC.**

**NOTES TO UNAUDITED CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**(Dollars in millions, except per share data unless otherwise indicated)**

**7. Condensed Consolidating Financial Information of Guarantor Subsidiaries (Continued)**

**CONDENSED CONSOLIDATING STATEMENT OF INCOME**

**For the Nine Months Ended September 30, 2006**

| | Parent | URNA | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Other and Eliminations | Total |
|---|---|---|---|---|---|---|
| Revenues: | | | | | | |
| Equipment rentals | $ — | $  920 | $  775 | $179 | $  — | $1,874 |
| Sales of rental equipment | — | 123 | 99 | 26 | — | 248 |
| New equipment sales | — | 82 | 66 | 24 | — | 172 |
| Contractor supplies sales | — | 116 | 139 | 33 | — | 288 |
| Service and other revenues | — | 65 | 41 | 13 | — | 119 |
| **Total revenues** | **—** | **1,306** | **1,120** | **275** | **—** | **2,701** |
| Cost of revenues: | | | | | | |
| Cost of equipment rentals, excluding depreciation | — | 417 | 341 | 92 | — | 850 |
| Depreciation of rental equipment | — | 154 | 117 | 33 | — | 304 |
| Cost of rental equipment sales | — | 89 | 66 | 17 | — | 172 |
| Cost of new equipment sales | — | 66 | 55 | 20 | — | 141 |
| Cost of contractor supplies sales | — | 99 | 108 | 27 | — | 234 |
| Cost of service and other revenues | — | 31 | 20 | 7 | — | 58 |
| **Total cost of revenues** | **—** | **856** | **707** | **196** | **—** | **1,759** |
| **Gross Profit** | **—** | **450** | **413** | **79** | **—** | **942** |
| Selling, general and administrative expenses | — | 185 | 215 | 53 | — | 453 |
| Non-rental depreciation and amortization | 7 | 16 | 11 | 3 | — | 37 |
| **Operating Income** | **(7)** | **249** | **187** | **23** | **—** | **452** |
| Interest expense, net | 3 | 150 | (3) | 7 | | 157 |
| Interest expense—subordinated convertible debentures | 11 | — | — | — | — | 11 |
| Other expense (income), net | 1 | 11 | 10 | (22) | — | — |
| Income from continuing operations before provision for income taxes | (22) | 88 | 180 | 38 | — | 284 |
| Provision for income taxes | (9) | 35 | 71 | 15 | — | 112 |
| Income from continuing operations | (13) | 53 | 109 | 23 | — | 172 |
| Loss from discontinued operations, net of tax | — | — | (1) | — | | (1) |
| Income (loss) before equity in net earnings of subsidiaries | (13) | 53 | 108 | 23 | — | 171 |
| Equity in net earnings of subsidiaries | 184 | 131 | | | (315) | — |
| Net income (loss) | $171 | $  184 | $  108 | $ 23 | $(315) | $  171 |

**UNITED RENTALS, INC.**

**NOTES TO UNAUDITED CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**(Dollars in millions, except per share data unless otherwise indicated)**

**7. Condensed Consolidating Financial Information of Guarantor Subsidiaries (Continued)**

**CONDENSED CONSOLIDATING CASH FLOW INFORMATION**

**For the Nine Months Ended September 30, 2007**

| | Parent | URNA | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Other and Eliminations | Total |
|---|---|---|---|---|---|---|
| Net cash provided by operating activities—continuing operations . . . . . | $ 4 | $ 191 | $ 231 | $ 58 | $— | $ 484 |
| Net cash provided by operating activities—discontinued operation . . . . | — | — | 9 | — | — | 9 |
| Net cash provided by operating activities . | 4 | 191 | 240 | 58 | — | 493 |
| Net cash used in investing activities—continuing operations . . . . . . . . . . . . . | (11) | (306) | (236) | (73) | — | (626) |
| Net cash provided by investing activities—discontinued operation . . . . | — | 66 | 1 | — | — | 67 |
| Net cash used in investing activities . . . . | (11) | (240) | (235) | (73) | — | (559) |
| Net cash provided by financing activities . | 7 | 27 | — | 13 | — | 47 |
| Effect of foreign exchange rate . . . . . . . . | — | — | — | 12 | — | 12 |
| Net increase (decrease) in cash and cash equivalents. . . . . . . . . . . . . . . . . . . . . | — | (22) | 5 | 10 | — | (7) |
| Cash and cash equivalents at beginning of period . . . . . . . . . . . . . . . . . . . . . | — | 40 | 3 | 76 | — | 119 |
| Cash and cash equivalents at end of period . . . . . . . . . . . . . . . . . . . . . | $ — | $ 18 | $ 8 | $ 86 | $— | $ 112 |

F-68

**UNITED RENTALS, INC.**

**NOTES TO UNAUDITED CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**(Dollars in millions, except per share data unless otherwise indicated)**

**7. Condensed Consolidating Financial Information of Guarantor Subsidiaries (Continued)**

**CONDENSED CONSOLIDATING CASH FLOW INFORMATION**

**For the Nine Months Ended September 30, 2006**

| | Parent | URNA | Guarantor Subsidiaries | Non-Guarantor Subsidiaries | Other and Eliminations | Total |
|---|---|---|---|---|---|---|
| Net cash provided by (used in) operating activities—continuing operations | $ (1) | $ 515 | $ 193 | $(118) | $— | $ 589 |
| Net cash provided by operating activities—discontinued operation | — | — | 17 | — | — | 17 |
| Net cash provided by (used in) operating activities | (1) | 515 | 210 | (118) | — | 606 |
| Net cash used in investing activities—continuing operations | (10) | (309) | (235) | (61) | — | (615) |
| Net cash used in investing activities—discontinued operation | — | — | (11) | — | — | (11) |
| Net cash provided by (used in) investing activities | (10) | (309) | (246) | (61) | — | (626) |
| Net cash provided by (used in) financing activities | 11 | (386) | — | 219 | — | (156) |
| Effect of foreign exchange rate | — | — | — | — | — | — |
| Net increase (decrease) in cash and cash equivalents | — | (180) | (36) | 40 | — | (176) |
| Cash and cash equivalents at beginning of period | — | 200 | 105 | 11 | — | 316 |
| Cash and cash equivalents at end of period | $ — | $ 20 | $ 69 | $ 51 | $— | $ 140 |

**8. Subsequent Event**

On October 16, 2007, we announced that URNA has commenced cash tender offers and consent solicitations for all of its outstanding 6½ percent Senior Notes due 2012 (the "6½ percent Notes"), 7¾ percent Senior Subordinated Notes due 2013 (the "7¾ percent Notes") and 7 percent Senior Subordinated Notes due 2014 (the "7 percent Notes" and together with the 6½ percent Notes and the 7¾ percent Notes, the "Notes"). The Notes are comprised of (i) $1.0 billion principal amount of 6½ percent Notes, (ii) $525 principal amount of 7¾ percent Notes and (iii) $375 principal amount of 7 percent Notes. The tender offers and consent solicitations are being conducted in connection with, and are conditioned upon among other things the consummation of, the anticipated acquisition of the Company by affiliates of Cerberus. The full terms and conditions of the tender offers and consent solicitations are set forth in URNA's Offer to Purchase and Consent Solicitation Statement and related consent and Letter of Transmittal, each dated October 16, 2007. The tender offers will expire at 12:00 midnight, New York City time, on November 13, 2007. The consent solicitations will expire at 5:00 p.m., New York City time, on October 29, 2007. As of that time, URNA had received sufficient consents with respect to all of the Notes (more than 98% of the principal amount in each case) to effect all proposed amendments to the indentures governing the Notes. For more information, please see our Current Report on Form 8-K, filed with the SEC on October 30, 2007.

(This page has been left blank intentionally.)

(This page has been left blank intentionally.)

(This page has been left blank intentionally.)



Exhibit C



Share documents, videos, applications
and more in PDF Portfolios.

Adobe



## FINANCE & ECONOMICS

Private equity

# A boom in bust-ups

Sep 27th 2007 | NEW YORK
From The Economist print edition



Illustration by David Simonds

**As more deals turn ugly, buy-out firms rethink their approach to investing and their relations with backers**

SCOURING today's soggy leveraged-buy-out landscape, it seems faintly ridiculous that as recently as June bankers were waiting with bated breath for the first $100 billion deal. In a matter of weeks the private-equity boom has been strangled, its oxygen—cheap

debt—cut off by the credit crisis. Shares in Blackstone, which led the boom, languish some 20% below the price at which they were sold to the public in June. The volume of buy-outs has shrunk (see chart).

Shareholders of recent targets, suddenly fearful that offers will not materialise, have been rushing to approve transactions—just as buyers and their bankers get cold feet. Tempers are frayed at PHH, an American mortgage lender, after JPMorgan Chase and Lehman Brothers balked at financing its sale to Blackstone and General Electric. This pales next to the acrimony at Harman International, an American audio-equipment maker, where the erstwhile buyers, Kohlberg Kravis Roberts (KKR) and Goldman Sachs, insist they no longer have to honour the $8 billion deal.



Other takeovers may be heading the same way. The group buying SLM, owner of Sallie Mae, a student lender, has said it plans to withdraw its offer. The buy-out of Tribune, a newspaper group, looks wobbly too. Reflecting fears that others will follow Harman, "arb spreads"—the premium of the offer price over the actual price—for the two-dozen largest buy-out targets rose to over 7% this week.

The spat over Harman is a clear sign that some of the more egregious bubble-era buy-outs will end up in court or, worse, collapse. There is little hope of the deal's terms being renegotiated—as happened recently with Home Depot's supply unit—which suits the banks just fine. With the diminished appetite for leveraged loans, they face having to hold the debt themselves or sell it at a loss if the takeover is completed. Investors have just bought $5 billion-worth of loans to First Data, a transaction-processing firm, at a discount and with tougher terms.

For the buyers, aborting is not easy. The obvious route, short of paying a large break-up fee, is to invoke the "material adverse change" clause, which lets the buyer walk away if the target's financial health has declined sharply relative to that of its industry. But courts rarely allow this: no American deal of any size has been scuttled in this way for more than four years.

The bigger risk, however, is that buy-out funds end up with piles of capital that they cannot deploy, irritating investors who must pay management fees regardless of whether their money is put to work. When markets turn, deal droughts can last many months. In the downturn of 2000-02, for instance, Bain Capital went for over a year without completing a deal.

Investors in private-equity funds will certainly need to be patient. As dealmaking slows and exits become trickier, the firms will have to focus on improving the companies already in their portfolios. Carlyle's boss, David Rubenstein, told a recent private-equity conference that the average holding period is likely to rise to four to six years, far above today's levels. On the plus side, this may help to assuage public criticism of private equity's penchant for "quick flips".

Targets are likely to be smaller as well as fewer in coming months. The head of a Wall Street investment bank says it is hard to imagine deals much bigger than $10 billion well into next year. That may tempt the big private-equity groups into the middle market,

which they haughtily ignored when mega-deals were easy. There has been less of a let-up in sub-$1 billion dealmaking, notes Newcomb Stillwell of Ropes & Gray, a law firm.

Meanwhile, there is likely to be emphasis on "growth equity"—investments in firms at an earlier stage of the development cycle than the classic turnaround case. Firms like Blackstone and Cerberus can also point to strong restructuring practices and a keen eye for distressed assets. Some of the best opportunities are to be had when debt markets seize up. Witness the fortunes made by vulture investors in the months after the collapse of Enron. With rating agencies predicting a rise in corporate defaults, some repair work may be needed on firms already in private-equity hands. Much of the debt is floating-rate and linked to interbank rates that remain elevated (see article).

Private equity is also in more places around the world than it was in the last downturn. Then, the American firms had little foreign presence outside London. Now they are represented—and starting to do deals—in India, China and other promising emerging markets.

There is no sign that institutional investors are losing their ardour for the industry. A survey of pension-fund managers by Citigroup, published this week, found that 85% of them plan to raise their allocation to "alternative" assets over the next three years, despite the market turmoil. Private equity is expected to overtake property and hedge funds as the most popular investment in that category. Investors may, however, start to ask harder questions about their cut of the profits, especially in light of a recent report by two academics at the University of Pennsylvania. This found that the typical buy-out fund takes almost twice as much from its investors in management fees as it makes in gains in the value of its holdings.

Add this to the squabbles over recent deals and it is clear that private equity's kings face a less regal future. So why were they sounding so upbeat at last week's conference? Perhaps their change in fortune has yet to sink in. Perhaps for the time being they can make a handsome living from all those management fees—though that cannot go on forever: eventually, they will have to earn some returns. Either way, as the Wall Street boss remarks: "They had a wonderful ride, so please don't feel sorry for them." Perish the thought.

Copyright © 2008 The Economist Newspaper and The Economist Group. All rights reserved.

Exhibit D

PHH deal may collapse over debt finance shortfall | Reuters.com

**REUTERS**    sponsored by EPSON 
EXCEED YOUR VISION

Print | Close this window

# PHH deal may collapse over debt finance shortfall

Mon Sep 17, 2007 1:33pm EDT

By Mark McSherry

NEW YORK (Reuters) - Mortgage and vehicle fleet company PHH Corp (PHH.N: Quote, Profile, Research, Stock Buzz), which agreed to be acquired by General Electric Co (GE.N: Quote, Profile, Research, Stock Buzz) and Blackstone Group LP (BX.N: Quote, Profile, Research, Stock Buzz), said on Monday its takeover could collapse because Blackstone faces a shortfall of up to $750 million in debt financing.

PHH shares were down 16.8 percent to $23.71 on the New York Stock Exchange in afternoon trading. The deal struck in March to acquire PHH was done at $31.50 per share in cash, or about $1.8 billion.

If the PHH deal fell apart, it would be the latest casualty of the turmoil currently roiling credit markets.

PHH said Blackstone told GE in a letter that it received revised interpretations on debt availability for the deal from J.P. Morgan Chase & Co (JPM.N: Quote, Profile, Research, Stock Buzz) and Lehman Brothers Holdings Inc (LEH.N: Quote, Profile, Research, Stock Buzz) that could result in a shortfall of up to $750 million.

Blackstone will continue its efforts to obtain debt financing but is not optimistic, PHH said. Blackstone has also said there can be no assurances that conditions to closing the deal will be satisfied, PHH added.

Under the terms of the March transaction, GE would retain PHH's vehicle fleet company PHH Arval and then sell PHH Mortgage to Blackstone immediately after closing.

CREDIT TURMOIL

Mount Laurel, New Jersey-based PHH said it expects GE to fulfill its obligations under the merger deal.

However, in a statement, GE spokesman Stephen White said: "GE continues to hope that Blackstone will succeed in arranging its financing so the merger can be completed. But if Blackstone is unable to complete its purchase, GE will not be obligated to complete the merger."

The turmoil in credit markets has held up financing packages for numerous

U.S. takeover deals.

On Friday, Finish Line Inc (FINL.O: Quote, Profile, Research, Stock Buzz) said Swiss bank UBS (UBSN.VX: Quote, Profile, Research, Stock Buzz) warned it may terminate its agreement to finance Finish Line's $1.5 billion purchase of shoe and hat retailer Genesco Inc (GCO.N: Quote, Profile, Research, Stock Buzz).

Also last week, Morgan Stanley (MS.N: Quote, Profile, Research, Stock Buzz) threatened to pull its debt financing from the leveraged buyout of Reddy Ice (FRZ.N: Quote, Profile, Research, Stock Buzz), according to a regulatory filing, amid a fight with the buyer over deal terms.

The maker of packaged ice agreed to be bought by hedge fund GSO Capital Partners in July for $1.1 billion, with Morgan Stanley providing around $700 million of debt financing.

(Reporting by Mark McSherry)

© Thomson Reuters 2008. All rights reserved. Users may download and print extracts of content from this website for their own personal and non-commercial use only. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is expressly prohibited without the prior written consent of Thomson Reuters. Thomson Reuters and its logo are registered trademarks or trademarks of the Thomson Reuters group of companies around the world.

Thomson Reuters journalists are subject to an Editorial Handbook which requires fair presentation and disclosure of relevant interests.



# BANKING TIMES

Daily Banking Industry News

**Banking Sectors:**    *October 29, 2007*

- Savings & Investments
- Borrowing & Lending
- Pensions & Retirement
- Jobs & Employment
- Business Banking
- Investment Banking

 RSS/XML

**By company:**

- Abbey
- Bank of Scotland
- Barclays
- Co-operative Bank
- Halifax
- HSBC
- Lloyds TSB
- Nationwide
- NatWest
- Royal Bank of Scotland
- Yorkshire Bank

**By organisation:**

- FSA
- BBA

**Also see:**

- Insurance Daily

# Blackstone Could Back Out Of PHH Deal

*by Stewart Douglas*

**Story link**: Blackstone Could Back Out Of PHH Deal

The reputable equity outfit Blackstone Group could be close to calling time on its agreement to purchase US lender PHH in spite of its longstanding reputation for never backing down from an acquisition according to reported in US media today.

The prospective bid by the equity group and the investment division of General Electric would see them acquire the business of lender PHH in a joint move that is thought to be worth just under $2 billion.

Mortgage lender PHH has suffered a significant downturn in the value of its mortgage business as a result of heightened risk from within the sub-prime sector.  Whilst it is of course not directly involved in the sub-prime market, and holds no sub-prime mortgages on its books, it has had to withstand the fallout from the mortgage sector in terms of the value of its loan assets.

As a result the company proposed there may be a deficit in value as compared to finance provided by banking consortia from the US and further afield to the tune of $750 million, having a significant and material impact on any potential deal.

Should Blackstone pull out, it will be liable to the tune of $50 million in cancellation penalties written in to the contract, on the assumption that it cannot directly attribute any causal link between the loss in value to PPH, which analysts have already stated as being unlikely.

Additionally there is a possibility that the value of the PHH mortgage portfolio could increase depending on the fluctuations in the market over the near future, which could ultimately help recoup the deficit reported by the lender in the run up to the deal.

It remains to be seen whether as a term material to the contract Blackstone would have sufficient legal standing to strike down the deal without incurring the relevant penalties, or whether it will attempt to ride the storm with the mortgage book valuation.

Mortgage - Countrywide®
Govt-insured mortgages up to $729K in select areas.
Lower rate options
www.Countrywide.com

Short Sale Foreclosures
Step-by-Step Guide Getting Banks To Discount Mortgages
up to 40%!
www.ShortSaleMagic.com

Current Mortgage Rates
Mortgage Rates Hit 46 Month Lows! See Rates - No Credit
Check Needed.
www.CompareInterestRates.com

6.00% Year Fixed Rate
Dedicated Service 7 Days A Week Direct Mortgage
Lender. Apply Now!
www.BestRateLoans.com

˅ ˅                                          Ads by Google

fu

**Add to Bookmarks:**

Netscape    Del.icio.us    Digg    Furl

StumbleUpon    Yahoo MyWeb    Google    Spurl

---

**Related stories to: Blackstone Could Back Out Of PHH Deal**

Blackstone In Alliance Legal Action Threat  ...

Blackstone PHH Takeover Stalls  ...

Citi in $12bn loan sale to private equity  ...

UBS Look To Back Out Of $1.5 Billion Financing Agreement  ...

Blackstone invites Northern Rock bidders as withdrawals reach £14bn  ...

**No Comments »**

No comments yet.

**Leave a comment**

| | Name (required) |

| | Mail (will not be published) (required) |

| | Website |



COMPANIES
**FINANCIAL SERVICES**

Close

# Blackstone's PHH deal loses appeal



By Henny Sender in New York
Published: October 28 2007 22:00 | Last updated: October 28 2007 22:00

The likelihood of the Blackstone Group abandoning an agreement to purchase a North American mortgage lender is growing, despite the private equity firm's reputation for never walking away from a deal, according to people familiar with the matter.

The original plan was for Blackstone and a unit of General Electric to pay $1.8bn for the mortgage and fleet lease business of PHH, with Blackstone taking the mortgage business and GE the vehicle leasing business.

PHH is not in the subprime mortgage business, but the value of its mortgages have deteriorated since September, when PHH announced there could be a $750m shortfall in the debt financing from banks led by JPMorgan and Lehman Brothers.

If Blackstone chooses to walk away from the deal and is unable to blame the banks, it would be liable to pay $50m.

Financing for future private equity buyouts of financial firms has almost evaporated, requiring buyers to put up far more equity than in the past.

Last week, Kohlberg Kravis Roberts and the private equity arm of Goldman Sachs terminated their planned $8bn buyout of Harman International Industries. They settled instead for an investment of $400m in the struggling audio equipment maker as part of a deal to preclude litigation over the breakup.

The financing terms for the Blackstone deal are different from the terms in most deals because the lending commitment is dependent on the valuation of the assets in the PHH portfolio. The banks claim that some of the underlying mortgage assets did not meet the standards to qualify under the original agreement.

For Blackstone to fill the gap, it would either have to find alternative funds or double its $750m equity contribution, something Tony James, Blackstone's president, has said he would not do. The economics of the PHH deal for Blackstone have deteriorated and if Blackstone was to put up more of its own money, its returns would be even lower.

"This is a Blackstone problem, not a bank finance problem," said one banker involved in the deal. "We are standing by our commitment. Blackstone has to fill the gap."

A spokesman for Blackstone declined to comment.

It is possible that Blackstone could bet that the value of the PHH mortgages may recover. Mr James has said that Blackstone is prepared to hold its investments for longer than the previous average of 18 months.

Copyright The Financial Times Limited 2008

"FT" and "Financial Times" are trademarks of the Financial Times. Privacy policy | Terms
© Copyright The Financial Times Ltd 2008.

**The New York Times**

PRINTER-FRIENDLY FORMAT
SPONSORED BY


October 23, 2007

# Canceling Harman Deal, Suitors Buy Bonds Instead

**By MICHAEL J. de la MERCED**

The private equity firm Kohlberg Kravis Roberts and the investment bank Goldman Sachs agreed yesterday to end their $8 billion buyout of Harman International Industries, which makes speakers, and instead buy $400 million in bonds of the company.

The settlement ends a dispute over the deal that threatened to wind up in court, as several other proposed buyouts recently have.

Under the new agreement, the buyout deal struck in April will be dissolved, with no litigation or payment of the $225 million termination fee. Instead, Kohlberg Kravis and Goldman Sachs will buy bonds that can be exchanged for Harman shares at $104, below the $120-a-share price of the original offer.

Harman said it would use the proceeds to buy back stock. Brian F. Carroll, a member of Kohlberg Kravis, will also join Harman's board.

Shares in Harman closed down 53 cents, to $85.87, yesterday.

"Although we do not agree with the reasons for cancellation of the original merger agreement, we view this $400 million investment as a vote of confidence in our business and its prospects for continued growth," Sidney Harman, the executive chairman of Harman, said in a statement.

The deal brings an amicable end to the dispute, one that avoids a potentially long and expensive court battle. Other buyout targets, like Sallie Mae and Genesco, have already sued their prospective buyers, who have argued that the targets have suffered financially.

Others have chosen to negotiate. Home Depot agreed in August to sell its professional supply unit to three buyout firms for $8.5 billion, having cut the price from $10.3 billion.

Last month, Kohlberg Kravis and Goldman Sachs said they intended to walk away from the Harman deal, saying that the company's financial health had suffered from what is known as a

Canceling Harman Deal, Suitors Buy Bonds Instead - New York Times                                    Page 2 of 2

material adverse change. If a court had agreed, the change would have allowed the two firms to end the deal without paying the $225 million breakup fee.

Harman disagreed, initially without saying why. Later, it said it would lower its earnings forecast for 2008. Harman revised its projected earnings for the first quarter, which ended Sept. 30, to 50 cents a share, or less than half of the $1.02 predicted by analysts surveyed by Bloomberg News.

The company attributed that announcement to increased research and development costs, though it said its profit margins would improve as the year went on.

Harman is scheduled to release its earnings report Thursday.

Copyright 2007 The New York Times Company

The magazine for people going places...



 PRI

Powered by

# KKR, Goldman Sachs pull out of $8B buyout of Harman International

- Story Highlights
- Two firms back out of $8 billion buyout of audio equipment maker Harman
- Kohlberg Kravis Roberts, Goldman Sachs cite "material adverse change"
- Harman disagreed with the assertions; not clear what action, if any, it would take

**WASHINGTON (AP)** -- Two private equity firms on Friday backed out of their $8 billion buyout of upscale audio equipment maker Harman International Industries, marking the latest such deal to run into trouble amid tightening global credit conditions.

Kohlberg Kravis Roberts & Co. and Goldman Sachs Group's private equity unit told Harman they are under no obligation to complete the merger because "a material adverse change in Harman's business has occurred," Harman said in a statement.

Harman, whose audio equipment brands include Infinity, JBL and Harman Kardon, said it disagreed with those assertions, but did not make clear what action, if any, it would take.

Investors punished the stock all day long as word dripped out that KKR and GS Capital Partners were attempting to nullify the deal. By the end of the day, Harman shares had plummeted by more than 20 percent.

A person familiar with the negotiations who asked not to be named because he was not authorized to speak publicly told The Associated Press that the private equity firms sought to squash the deal over questions about Harman's financial health, not because of any financing difficulties in a tight credit market. The person said the effort to back out is sincere, and not a negotiating tactic.

Representatives for KKR and GS Capital Partners did not immediately return phone calls.

Shares of Harman dropped $23.49, or 20.93 percent, to $88.76. In the past year, the company's stock has traded between $79.98 and $125.13, which it hit after the deal was announced in April. KKR and GS Capital Partners agreed to pay $120 per share in cash for Harman and the company's board approved the deal, which was scheduled to close at the end of the year.

The once-booming private equity industry has stumbled during the past few months as tightening credit conditions have caused investors to balk at funding the deals. Buyout firms -- which snap up companies and then take them private -- had grown used to easy credit, and have recently had a difficult time persuading banks to underwrite their takeovers.

KKR on Friday had success in attracting investors to a $5 billion loan used for its acquisition of First Data Corp. Initial reluctance by Wall Street caused the buyout shop to lower the amount of its borrowing, and come out with an initial $5 billion instead of an original plan to raise $14 billion.

Cerberus Capital Management in July had to inject more equity into its takeover of Chrysler Group from Germany's Daimler. More recently, Home Depot lowered the sale price on its wholesale supply unit by 17 percent to complete its sale to private equity firms.

Problems with the Harman deal comes a day after SLM, commonly known as Sallie Mae, issued a statement saying it expects the investors seeking to buy it for $25 billion to honor their commitments. The Sallie Mae deal includes a $900 million breakup fee compared with a $225 million termination fee in the Harman transaction.

About two hours before Harman announced late Friday afternoon that the buyout was off, NYSE Euronext issued a release saying the exchange had asked the company if there were any events to explain unusual trading of its stock. Harman said at the time that its policy was not to comment on unusual market activity or rumors.

Shortly before 4 p.m. EDT, however, the company issued a terse press release, explaining what had happened.

The credit crisis caused four of Wall Street's top investment banks to report this week that it wrote-off some $4 billion of loans during the third quarter. In some cases, the banks weren't able to find funding for the loans -- or they plunged in value as investors retreated.

There has also been a number of reports that major investment and retail banks have approached private-equity firms about calling deals off. The banks have offered to pay the breakup fee to keep the large loans off their books.

Copyright 2007 The Associated Press. All rights reserved.This material may not be published, broadcast, rewritten, or redistributed.

## Links referenced within this article

Associated Press
http://edition.cnn.com/interactive_legal.html#AP

## Find this article at:

http://edition.cnn.com/2007/BUSINESS/09/23/harmon.buyout.ap/index.html

☑  Uncheck the box to remove the list of links referenced in the article.

? 2008 Cable News Network.

# REUTERS

sponsored by 

Print | Close this window

## UPDATE 4-Private equity firms back out of Harman deal

Fri Sep 21, 2007 6:49pm EDT

(Updates with Harman statement, stock halt)

By Michael Flaherty

NEW YORK, Sept 21 (Reuters) - Harman International Industries Inc (HAR.N: Quote, Profile, Research, Stock Buzz) said its private equity buyers are pulling out of their $8 billion buyout deal, a severe blow to the company whose shares fell more than 25 percent on Friday.

The audio equipment maker said that Kohlberg Kravis Roberts & Co LP and Goldman Sachs Group Inc's (GS.N: Quote, Profile, Research, Stock Buzz) private equity arm believe a "material adverse change" occurred in Harman's business and that it breached the merger agreement.

Harman said in a one paragraph release that it disagrees such a change occurred and that it did not violate the buyout contract.

KKR and Goldman's decision not only impacts Harman, but could have broader repercussions for the firms and the leveraged buyout sector, as it comes at a sensitive time for the industry. The credit crunch has threatened to scuttle several leveraged buyout deals, forcing banks stuck with loans to renegotiate deals and straining relations among Wall Street, private equity buyers and the companies involved.

The crunch has caused investors, bankers and lawyers to scour merger agreements in search of ways for buyers to get out of deals, or sellers to keep them in tact.

"The world has changed," said Dan Fuss, vice chairman at Loomis Sayles in Boston, who helps oversee $77 billion in fixed-income assets. "In this current market, I don't know that the economics made sense anymore and so that caused it to fall apart. I strongly suspect a number of others are not going to make it."

But the Harman bail-out looks centered on the financial conditions of the company itself, not the lending agreement, and marks the first time in a two-year private equity acquisition frenzy that buyers walked out of a major deal.

Merger arbitrage traders and an analyst said among the hurdles Harman faced was rising inventories and declining cash flows and sales in the last few quarters. Traders also said questions surfaced recently about Harman's

relationship with Daimler-Chrysler, a customer for its audio products.

Harman announced the buyout in April, in a deal that allowed shareholders to keep equity. The deal includes a break up fee of $225 million.

That KKR and Goldman are backing out of not just a deal, but an agreement that was supposed to bring in shareholders, does not help private equity's already roughed-up image, even if the firms prove they are within their rights according to the contract.

KKR, the firm credited with creating the LBO industry, filed to go public recently, attributing its success to the firm's "culture and values."

BACKING OUT

Harman shares dropped 24 percent to $85 on Friday after the Wall Street Journal and Reuters reported trouble with the deal.

Harman shares fell to $83 following its release after the market closed. Under the terms of the deal, Harman stockholders would have received $120 per share. The firms have not said what triggered the "material adverse change" claim.

One analyst said Harman's inventories in February were up 40 percent, while second-half sales expectations were for an 11 percent rise.

"When you've got inventories going through the roof, cash flows are going to get hit," said Alisa Guyer Galperin, an analyst covering Harman at independent research firm RiskMetrics Group.

The merger proxy does have language in it on pertaining the deal being threatened in the event of certain "material adverse" effects on Harman.

"The company either has to slow production, reduce prices, or have inventories remain at elevated levels, and that deteriorates your cash flow model," Galperin said, adding that personal navigation devices for cars were among the items sitting in the inventory.

Traders said on Friday that a great deal of attention was being paid to a filing showing that sales to DaimlerChrysler accounted for 25 percent of Harman's total consolidated net sales for the fiscal year ended June 30, 2007. Cerberus Capital recently bought Chrysler from Daimler.

While Harman says in the filing that loss of sales to the customer would have a "material adverse effect" on sales, there is no public indication that the relationship is in jeopardy.

Harman founder Sidney Harman owned about 5 percent of the company's stock at the time of the deal and committed to exchange half of his holdings for stub equity.

The Harman deal allowed Harman shareholders to own as much as 27 percent of the company after the buyout.

"There is no doubt it adds a deal of complexity, heightens the embarrassment, and makes the pain a little greater" should the deal fall apart, said Colin Blaydon, director of the Center for Private Equity and Entrepreneurship at Dartmouth University's Tuck School of Business.

(Additional reporting by Jennifer Ablan, Richard Leong and Mark McSherry)

© Thomson Reuters 2008. All rights reserved. Users may download and print extracts of content from this website for their own personal and non-commercial use only. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is expressly prohibited without the prior written consent of Thomson Reuters. Thomson Reuters and its logo are registered trademarks or trademarks of the Thomson Reuters group of companies around the world.

Thomson Reuters journalists are subject to an Editorial Handbook which requires fair presentation and disclosure of relevant interests.



Print This Article

<< Return to The Finish Line, Genesco deal goes awry

# The Finish Line, Genesco deal goes awry

Chantal Todé
September 25 2007

The Finish Line Inc. accused Genesco Inc. yesterday of breaching the merger agreement between the two multichannel merchants, saying Genesco has failed to supply certain financial information.

In June, Indianapolis-based The Finish Line agreed to acquire Genesco, Nashville, for $54.50 per share or approximately $1.5 billion. However, UBS AG, which had agreed to finance most of The Finish Line's offer, reportedly stopped working on the closing documents for the agreement as a result of concerns about Genesco's financial performance.

For the second quarter ended Aug. 4, Genesco reported a loss before discontinued operations of $2.9 million compared to earnings before discontinued operations of $5.9 million for the same period in the previous year. Second quarter sales increased 8 percent for a total of $328 million while same-store sales declined 7 percent.

Last week, Genesco filed a suit in Chancery Court in Nashville seeking a court order requiring the shoe and apparel retailer to consummate its deal to acquire Genesco. In today's statement, The Finish Line insists it has met all of its obligations.

Also last week, Genesco sent a letter to The Finish Line stating that it believes UBS is looking for a way out of the commitment "not because of Genesco's results, but because the upheaval in the credit markets makes this deal less profitable for them."

Genesco sells footwear, headwear and accessories in more than 2,000 retail stores in the United States and Canada. Its brands include Journeys, Journeys Kidz, Johnston & Murphy, Lids and Hat World. It also operates several e-commerce Web sites and mails catalogs for its Journeys and Journeys Kidz brands.

Earlier this year, Genesco rejected two unsolicited buyout offers from Foot Locker Inc. to acquire all of

the company's outstanding stock for $46 and $51 per share, respectively.

**The Hertz 3-Day Weekend**
Get your **first day free!**

RESERVE A CAR ▶

# TheStreet.com

Try Jim Cramer's *Action Alerts PLUS*
▶ CLICK HERE NOW

Retail                                                    ▶ Return to Article

# Finish Line May Step Back from Genesco Deal

## TSC Staff

08/30/07 - 12:08 PM EDT

**Finish Line** FINL said Thursday that it is mulling its options with regards to its $1.5 billion purchase of **Genesco**GCO after the footwear seller posted weak second-quarter results.

Shares of Finish Line jumped 13% on the news, while Genesco shares tumbled 13%.

Genesco, owner of brands such as Journeys and Johnston & Murphy, earlier Thursday reported a second-quarter loss of $4.2 million, or 19 cents a share, compared with a year-earlier profit of $5.9 million, or 24 cents a share. The results included charges of 13 cents a share, but still were much worse than analysts' forecast for a profit of 31 cents a share.

Sales rose 8% to $328 million, but fell short of Wall Street's estimate of $350 million.

Finish Line said in a statement Thursday that it was "disappointed" with Genesco's second-quarter results.

"Consistent with its responsibilities to The Finish Line's shareholders, the company is evaluating its options in accordance with the terms of the merger agreement," Finish Line said. "The company does not intend to make further comments at this time."

Finish Line agreed in June to buy Genesco for $54.50 a share, or roughly $1.5 billion. That deal came after fellow shoe retailer **Foot Locker** GCO made several offers for Genesco that were spurned.

Shares of Finish Line recently were up 70 cents to $6.25. Genesco shares were down $6.60 to $43.50.

---

**Visit TheStreet for more great features**

**THESTREET PREMIUM SERVICES**

From the action-oriented investing ideas of *Action Alerts PLUS* by Jim Cramer to the expert technical trading strategies of Helene Meisler's *Top Stocks*, TheStreet.com offers a range of premium services to help boost your portfolio's performance. View now.

**EXPERT ADVISORS ALERTS DELIVERED TO YOUR INBOX**

*Action Alerts PLUS*: Cramer's personal portfolio, emails before he acts.
*RealMoney*: 45+ experts share their top investing ideas and analysis.
*Stocks Under $10*: Alerts identify undervalued stocks with profit potential.

# REUTERS

sponsored by 

Print | Close this window

## Sallie Mae buyers offer to scrap $25 bln buyout

Mon Oct 15, 2007 2:16pm EDT

By Mark McSherry

NEW YORK (Reuters) - The consortium that agreed to buy student lender Sallie Mae (SLM.N: Quote, Profile, Research, Stock Buzz) for $25 billion said on Monday it has offered to terminate the transaction.

The buyer group led by private equity firm J.C. Flowers & Co said it has asked a court to declare that it is not obligated to proceed with the deal.

The consortium released a letter sent to Vice Chancellor Leo E. Strine, Jr. of Delaware Chancery Court offering to terminate the $60-a-share leveraged buyout of Sallie Mae, formally known as SLM Corp.

Sallie Mae shares were down $2.47 or about 5 percent to $45.98 in Monday afternoon trading on the New York Stock Exchange.

The group said its move was in response to a letter that Sallie Mae sent to the court on Friday asking for an expedited trial.

The consortium said it offered to terminate the merger agreement in response to Sallie Mae's assertion on Friday that the agreement is impeding the student lender's ability to run its business.

"The letter explains that by entering into an agreement to terminate the merger agreement, Sallie Mae would be free from the restrictions that it is complaining about," the consortium said in a statement.

Sallie Mae has filed a lawsuit seeking a breakup fee of $900 million from the consortium of private equity firms J.C. Flowers and Friedman Fleischer and Lowe and major banks JPMorgan Chase & Co (JPM.N: Quote, Profile, Research, Stock Buzz) and Bank of America Corp (BAC.N: Quote, Profile, Research, Stock Buzz).

COUNTERCLAIMS

The buyer group said it also filed its counterclaims with the Delaware Chancery Court.

The consortium argues Sallie Mae has suffered a "material adverse change" to its business due to a serious credit market squeeze and legislation that slashes subsidies to student lenders, but Sallie Mae disagrees.

"The buyer's filings are simply another effort to confuse events," said a spokesman for Sallie Mae on Monday. "Consistent with our recent statements and court filings, there has been no material adverse effect.

"The buyer group's misstatements attempt to mask a simple fact -- that the buyer's group is obligated to honor the contract they signed, and pay $60 per share. If they fail to do so, they will be liable for the termination fee."

The student lender's lawsuit seeks a declaration that the buyer group has reneged on the original merger agreement; that no material adverse change has occurred; and that Sallie Mae may terminate the takeover and collect the $900 million.

The original buyout has a $900 million breakup fee. But if the consortium could prove Sallie Mae suffered a material adverse change, it would not have to pay the fee.

The consortium agreed in April to pay $60 a share for Sallie Mae, but later proposed to cut its price to $50 a share plus extra payments depending on how the company performed, citing the credit market squeeze and the legislation.

Sallie Mae has said that the buyers should stick to the original agreement and that the revised $50-a-share proposal has since expired.

(Reporting by Mark McSherry, editing by Jeffrey Benkoe/Tim Dobbyn/Gerald E. McCormick)

© Thomson Reuters 2008. All rights reserved. Users may download and print extracts of content from this website for their own personal and non-commercial use only. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is expressly prohibited without the prior written consent of Thomson Reuters. Thomson Reuters and its logo are registered trademarks or trademarks of the Thomson Reuters group of companies around the world

Thomson Reuters journalists are subject to an Editorial Handbook which requires fair presentation and disclosure of relevant interests.

**The New York Times**

PRINTER-FRIENDLY FORMAT
SPONSORED BY



July 12, 2007

# Sallie Mae's Suitors Say the Deal Is at Risk

### By ERIC DASH

A consortium planning to buy the student loan giant Sallie Mae said yesterday that Congressional legislation aimed at reducing subsidies to lenders might cause the $25 billion deal to falter, a move that some analysts suggested was a negotiating tactic to lower the price.

In public filings, the bidders informed the SLM Corporation, the owner of Sallie Mae, that the proposed legislation "could result in a failure of the conditions to the closing of the merger to be satisfied." Sallie Mae's board, in turn, said that it "strongly disagreed."

Despite the comments, there was no indication yesterday that either side was ready to walk away, which would force the payment of a $900 million breakup fee, according to people briefed on the situation.

A Sallie Mae spokesman declined to comment beyond the filings as did a spokeswoman for the buyout group.

But news that the buyout group was balking sent Sallie Mae's shares down more than 14 percent. The stock recovered slightly to close down 9.7 percent, at $52.15.

Even as Sallie Mae agreed in April to sell itself to two private equity firms — J. C. Flowers and Friedman Fleischer & Lowe — and two investment banks — JPMorgan Chase and Bank of America — the specter of the legislation has haunted the deal.

But revelations yesterday — shortly before the House voted to cut subsidies to student lenders — suggested that the buyout group was trying to pay a lower price.

At issue is the interpretation of an escape clause in the sales agreement, which indicated that the deal could be scuttled if any change in the student-lending laws was substantially harmful to either side.

The buyout group contends that the proposed new laws meet that condition; Sallie Mae contends that they do not.

Sallie Mae's Suitors Say the Deal Is at Risk - New York Times                    Page 2 of 2

In February, before the Sallie Mae bid was announced, the Bush administration proposed to cut subsidies to student lenders by $16 billion over five years. Yesterday, the House passed a measure to reduce subsidies by $18.8 billion over the same period, according to a Congressional Budget Office analysis. A Senate proposal calls for $19.5 billion in cuts. The president has threatened a veto.

Analysts said that even if the buyout group did not withdraw its offer, it could cause Sallie Mae's board to compromise.

The buyers are "trying to get a discount," said Richard Hofmann, an analyst at CreditSights, a research firm in New York.

"The legislative risks were well telegraphed at the time the offer was announced," Mr. Hofmann said.

"While they are blaming legislation, we think it is really driven more by the conditions in credit markets as they start to do the financing for this deal," he added. "That pushback is going to cause them to pay higher interest costs, which lowers their returns on their investment."

Since the deal was announced, Wall Street analysts have questioned whether the company could withstand the heavy debt load that private equity typically adds on. Over the last few weeks, credit conditions have soured and made it harder for buyers to borrow at favorable terms.

There could be other explanations. The split between the Sallie Mae's buyers and its board surfaced in regulatory filings released yesterday; the parties may be trying to guard against potential lawsuits.

There may also be a political motive. News was released shortly before the House voted, and some analysts suggested the buyout group was sending a message to Congress.

Copyright 2007 The New York Times Company

Privacy Policy | Search | Corrections | RSS | First Look | Help | Contact Us | Work for Us | Site Map

**The New York Times**

PRINTER FRIENDLY FORMAT
SPONSORED BY    GO TH

October 16, 2007

# Sallie Mae Deal More Shaky

**By MICHAEL J. de la MERCED**

A $25 billion deal to acquire Sallie Mae, the student loan lender, grew more precarious yesterday when the buyers proposed dissolving the merger agreement.

The buyers were responding to a request on Friday by Sallie Mae's parent company, the SLM Corporation, for an expedited trial on a lawsuit related to the acquisition. Their response raises the odds that any decision to resolve issues will have to come from a judge.

On Friday, Sallie Mae asked the Delaware Court of Chancery to accelerate its lawsuit, arguing that the buyers — J. C. Flowers & Company and Friedman Fleischer & Lowe, as well as Bank of America and JPMorgan Chase — were interfering with operations in an effort to force the company to accept a lower price.

According to the agreement, reached in April, the buyers have a say over some aspects of the lender's business, including pursuing certain kinds of financing and instituting some changes to executive compensation.

In yesterday's court filing, the buyers asked Vice Chancellor Leo E. Strine Jr. to dismiss Sallie Mae's lawsuit and allow them to walk away without penalty. They disputed the charge that they were impeding Sallie Mae's operations and argued that an expedited trial would hurt their case.

"We do not believe that an expedited trial of the sort that Sallie Mae appears to be contemplating — which would, as a practical matter, truncate our ability to get full discovery — is necessary," the group's letter says.

In a separate letter to Mr. Strine, the buyers proposed ending the agreement while preserving their legal claims. That would allow Sallie Mae to operate as it wanted while allowing the two parties to resolve their dispute in court at a later date.

Copyright 2007 The New York Times Company

Sallie Mae Deal More Shaky - New York Times

Privacy Policy  |  Search  |  Corrections  |  RSS  |  First Look  |  Help  |  Contact Us  |  Work for Us  |  Site Map

Exhibit E



HOME PAGE | MY TIMES | TODAY'S PAPER | VIDEO | MOST POPULAR | TIMES TOPICS

**The New York Times**
Thursday, July 31, 2008

# Business

WORLD   U.S.   N.Y./REGION   BUSINESS   TECHNOLOGY   SCIENCE   HEALTH   SPORTS   OPINION   ARTS

**Search Business**                    **Financial Tools**              More in **Business »**

[News, Stocks, Funds, Companies]  Go   Select a Financial Tool ▾   World       Markets    Economy
                                                                      **Business**

# DealBook      Edited by Andrew Ross Sorkin          SEARCH D

| DEALBOOK HOME | MERGERS & ACQUISITIONS | INVESTMENT BANKING | I.P.O. / OFFERINGS | PRIVATE EQUITY | HEDGE FUNDS | VEN CAP |

JOBS

## Home Depot: A Script for Deal Renegotiations?

August 27, 2007, 2:48 pm

Link to This          **TOPICS**        Private Equity
E-mail This           **INDUSTRIES**



Will the drama at HD Supply spawn any sequels?

That's the question in market watchers' minds after **Home Depot** agreed
Sunday to make several concessions in the sale of its wholesale supply unit,
including lowering the price by $1.8 billion and keeping a sizable stake in the unit. As the
credit markets remain all but frozen, anxious banks and private equity firms may try to
repeat the feat with other buyouts, like those for **First Data** or **TXU**.

Or maybe not. Though one participant in the Home Depot battle told The New York
Times, "You'll see this movie again soon," there are reasons to think this may have been a
singular scenario.

What's clear is that the buyers — **Bain Capital**, the **Carlyle Group** and **Clayton
Dubilier & Rice** — and their banks squeezed major concessions from Home Depot.
Beyond lowering the price to $8.5 billion from $10.3 billion and agreeing to hold onto a
12.5 percent stake, the struggling retailer also assented to providing $1 billion in debt
financing.

The last point drew a huge sigh of relief from **J.P. Morgan Chase**, **Merrill Lynch** and
**Lehman Brothers**, who had threatened to walk away from financing the deal.

**LATEST**

MERGERS
Star-Le
Buyout
Sale

Can Br
Hot?

Bristol-
Billion
INVESTM

Scenes

102 of 522 DOCUMENTS

Copyright 2007 Factiva ®, from Dow Jones
All Rights Reserved

# Dow Jones Factiva

Copyright (c) 2007, Dow Jones & Company, Inc.

# Dow Jones Newswires

Dow Jones Chinese Financial Wire

November 9, 2007 Friday 2:23 PM GMT

**LENGTH:** 564 words

**HEADLINE:** DJ Clear Channel Confirms Providence Weighing Options Over Deal

**BODY:**

DOW JONES NEWSWIRES

Clear Channel Communications Inc. (CCU) confirmed Friday that Providence Equity Partners Inc. is considering withdrawing from a $1.2 billion deal to acquire 56 of its television stations.

'A representative of Providence informed the company that the buyer is considering its options under the agreement including not closing the acquisition on the terms and conditions in the agreement,' Clear Channel said in a filing with the Securities and Exchange Commission.

The company said that the deal has not been terminated and that it has not been accused of violating or failing to fulfill any of its terms.

Clear Channel also said the sale of the stations to Providence does not affect the planned buyout of Clear Channel by Thomas H. Lee Partners LP and Bain Capital Partners LLC.

But a failure to close the Providence deal, announced in April, could pose costly delays to the buyout. If Providence decides to walk away, investors will be watching to see if the stance of Bain, Thomas H. Lee or their funding banks change. A series of busted leveraged-buyout transactions has inspired nervousness in the investment community.

Providence has reservations about the transaction because of its view of the long-term prospects of Clear Channel's local TV stations, according to one person familiar with the transaction. Providence may try to renegotiate the purchase price. If the deal fails, it would have to pay a $45 million break-up fee.

Clear Channel said the TV group was poised for a record-breaking 2008. 'If for some reason the deal does not close we would look forward to keeping these terrific assets in the Clear Channel family,' a spokeswoman told Friday's editions of The Wall Street Journal.

Clear Channel's buyout offer, first made in November 2006, went through months of negotiations, as shareholders balked at the price offered. Shareholders approved the deal in September after Bain and Thomas H. Lee raised the offer price twice. The sharp turn in the credit markets means the final price, $39.20 a share, would be difficult to replicate. The deal has yet to close and requires regulatory approval.

DJ Clear Channel Confirms Providence Weighing Options Over Deal Dow Jones Chinese Financial Wire November 9, 2007 Friday 2:23 PM GMT

Providence's move is unlikely to kill the buyout, said one person close to the situation. A group of banks have agreed to fund the overall Clear Channel purchase price, meaning that a scuttled TV-station deal shouldn't have an impact, this person said. Thomas H. Lee and Bain may have to pay a break-up fee of as much as $600 million if they abandon the deal.

In reporting earnings Thursday, Clear Channel said the transaction may not close until the first quarter of 2008, as the company awaits governmental approvals. That could add significantly to the cost of the deal. If the Providence deal fails and Thomas H. Lee and Bain end up acquiring the TV stations in the buyout, there could be further delays on the regulatory front.

The buyout agreement calls for a sweetener to shareholders if the deal fails to close by Dec. 31.

Some shareholders wonder if the deal will get done at all. In late October, the stock was trading shy of $38. This week, the stock has fallen. It closed Thursday down $1.06, or 3%, to $34.85.

-Kathy Shwiff, Dow Jones Newswires; 201-938-5975; Kathy.Shwiff@dowjones.com

(Matthew Karnitschnig, Sarah McBride and Dana Cimilluca of the Wall Street Journal contributed to this report.)

-0-

**NOTES:**
PUBLISHER: Dow Jones & Company, Inc.

**LOAD-DATE:** November 10, 2007

107FF8

********** Print Completed **********

Time of Request: Wednesday, August 06, 2008  18:32:49 EST

Print Number:    1821:107221945
Number of Lines: 58
Number of Pages: 2

Send To:  HORA, ROBERT
          MILBANK TWEED HADLEY & MCCLOY
          1 CHASE MANHATTAN PLZ
          NEW YORK, NY 10005-1401

97 of 522 DOCUMENTS

Copyright 2007 The Florida Times-Union
Florida Times-Union (Jacksonville)

November 10, 2007 Saturday

**SECTION:** Pg. D-1

**LENGTH:** 510 words

**HEADLINE:** Sale of Clear Channel TV stations uncertain;
The buyer is having second thoughts and wants to "consider its options."

**BYLINE:** MARK BASCH

**BODY:**

Clear Channel Communications Inc. said Friday that a $1.2 billion buyout of its television group, which includes Jacksonville stations WAWS TV-30 and WTEV TV-47, may fall through.

Providence Equity Partners Inc. agreed in April to buy Clear Channel's 56 television stations in 24 markets. But in a filing with the Securities and Exchange Commission on Friday, Clear Channel said Providence, a private investment firm, is now "considering its options." Those options include "not closing the acquisition on the terms and conditions in the agreement."

Separately from the sale of the television stations, San Antonio-based Clear Channel has agreed to a buyout of the entire company by a private investment group. That buyout is not contingent on the deal to sell the television stations.

Analysts said they don't expect problems with the television sale to affect the corporate buyout.

"We do feel it is largely a non-event for the buyout as we do not believe there are covenants in the deal requiring Clear Channel to finalize the TV station sale," said a research note Friday by Stifel, Nicolaus & Co. analyst Kit Spring.

Although Clear Channel disclosed the possible problems with the television sale Friday, the possibility of the deal falling through was first reported Thursday afternoon by the Wall Street Journal's Web site. Citing an unnamed source, the Journal story said Providence is concerned about the long-term prospects for the television stations and may try to lower the purchase price.

Providence has already formed a company called Newport Television to run the stations. Newport will be based in Kansas City, Mo.

Fox network affiliate WAWS and CBS affiliate WTEV have also taken steps to prepare for new owners. Both stations are housed in a Clear Channel-owned building on Jacksonville's Southside, which also houses seven Jacksonville radio stations owned by Clear Channel. The television stations plan to keep their studios in the same location, leasing space from Clear Channel.

The corporate buyout of Clear Channel is also hitting snags. The company said Thursday it hopes to complete the buyout by year's end, but it is still awaiting regulatory approval. So the closing may be delayed until early 2008.

Sale of Clear Channel TV stations uncertain; The buyer is having second thoughts and wants to "consider its options."
Florida Times-Union (Jacksonville) November 10, 2007 Saturday

The news this week apparently has made investors nervous. The private equity group led by Thomas H. Lee Partners L.P. and Bain Capital Partners LLC agreed to pay $39.20 a share to buy Clear Channel. But Clear Channel's stock fell $1.06 to $34.85 Thursday. The stock did rise 92 cents to $35.77 on Friday.

Clear Channel owned about 1,150 U.S. radio stations a year ago when it first agreed to the buyout, but it has put up about 500 stations for sale as it goes through the buyout process. The company has said it is looking to sell Jacksonville station WJBT (92.7 FM), because Clear Channel currently exceeds the limit for stations it is allowed to own in the Jacksonville market. It has had a waiver from the FCC that allowed it to exceed the limit, but that can't be transferred to the new owners.

mark.basch@jacksonville.com, (904) 359-4308

**LOAD-DATE:** November 14, 2007

Case 1:08-cv-05516-MGC    Document 10-15    Filed 08/07/2008    Page 8 of 11

But Home Depot's case has some idiosyncrasies that aligned to make the renegotiations possible.

For one, the deal involved the sale of an asset, rather than the entire company. As a result, the parent company was able to retain an equity stake and provide debt financing, two keys to averting the deal's collapse.

Also, unlike companies like First Data, which processes credit cards, or **Alltel**, the rural cellphone service provider, Home Depot was desperate for cash. It was counting on the sale to help finance a 250-million share buyback to lift its flagging stock. In announcing earlier this month that it may reprice the deal, Home Depot said that it was cutting the price it was offering in its buyback, and some feared that the repurchase might be withdrawn completely if the deal fell apart.

Furthermore, it took more than the debt markets' implosion to drag Home Depot back to the table. There was the simultaneous blow of the collapsing housing market, which has sapped profits from HD Supply and Home Depot more generally. Remember that it was the private equity firms who came back to the negotiating table first, declaring that HD Supply's worsening financial condition was reason enough to walk away.

Legally speaking, it remains unclear whether the buyers actually could walk away without paying a $309 million breakup fee. The so-called material adverse change clause in the Home Depot agreement specifically rules out "changes affecting any or all of the wholesale distribution industries for construction" and "general financial or capital market conditions, including interest rates or currency exchange rates." (Read the whole M.A.C. clause in this previous DealBook item.)

But Home Depot could not afford to call the private equity firms' bluff, and agreed to lower the price to $9 billion.

Then the banks rushed in, demanding their own concessions. Though Home Depot's legal counsel, Martin Lipton of **Wachtell Lipton Rosen & Katz**, said that the first renegotiated deal did not alter the agreements with the banks, the heads of J.P. Morgan, Merrill and Lehman indicated otherwise. Though the banks themselves could not declare that a material adverse change had occurred, by dint of the new deal, they seem to have argued that Home Depot and the private equity firms essentially admitted as much. That left an opening to press forward with their own demands.

It's hard to think of many other deals in which private equity firms or banks could even threaten to invoke a material adverse change clause; only the buyouts of the **Chrysler**

Case 1:08-cv-05516-MGC    Document 10-15    Filed 08/07/2008    Page 9 of 11

**Group** and **Sallie Mae** come to mind.

But even then, crucial differences remain. Though Chrysler is also the sale of a unit in a troubled industry, the negotiations between **DaimlerChrysler**, **Cerberus Capital Management** and the J.P. Morgan-led consortium of banks were far friendlier, as all parties admitted that the sale of the American car maker could not go through without significant help. Hence, when the banks were unable to resell more than $12 billion in buyout-related debt in the markets, Cerberus and Daimler agreed to hold a collective $2 billion of that on their books.

Meanwhile, while the buyers of Sallie Mae — the buyout firms **J.C. Flowers & Company** and **Friedman Fleischer & Lowe**, as well as **J.P. Morgan** and **Bank of America** — have all but declared a material adverse change in the student lender, citing several bills circulating in Congress, the company has fiercely contested those claims.

Stock in Sallie Mae's parent, the SLM Corporation, has fallen as much as 11 percent since the squabble was made public. But few think the buyers want to break off the deal. And some observers, like the M&A Law Prof blog, have argued that Sallie Mae's M.A.C. clause is close to airtight, setting a high bar for the buyers to make their point.

Like virtually any buyer, private equity firms would prefer to pay less for their purchases. But absent the combination of very specific conditions, it's not clear that they can doctor other deals to match Home Depot's script.

*—Michael J. de la Merced*

## Add your comments...

Name      *Required*

E-mail      *Required (will not be published)*

Comment

Ads by

**Stock**
Don't B
Investi
www.G

**Want**
> 80%
Dave's
www.D

**Inves**
For pri
million
www.a



# Bloomberg.com



## Home Depot Says Sale Price of HD Supply May Be Cut (Update8)

By Mary Jane Credeur and Jason Kelly

Aug. 9 (Bloomberg) -- Home Depot Inc. may have to accept a lower price for the contractor-supply unit it agreed to sell to buyout firms for $10.3 billion, forcing it to scale back a stock repurchase plan.

Home Depot shares fell 5.3 percent today in New York Stock Exchange composite trading, the most in more than four years.

The world's largest home-improvement retailer is in talks with Bain Capital LLC, Carlyle Group and Clayton Dubilier & Rice about restructuring the sale of HD Supply, which provides tools and lumber to builders and accounts for 13 percent of the retailer's revenue. Financing for the purchase may be at issue as investors hit by losses on subprime mortgages shun riskier debt.

``What looked like a great deal two months ago might not look so good now,'' said John Olert, co-head of North America corporate finance at Fitch Ratings in New York. Buyers ``want to make sure everything's in order before they commit.''

Home Depot is facing the same credit crunch that caused debt investors to reject bond and loan packages for buyouts of companies including Alliance Boots Plc and Chrysler LLC. Banks and private-equity firms are seeking to renegotiate terms of the loans and bonds to make them more palatable.

Talks with the buyout firms may result ``in material changes to the terms and financing of the transaction, including a reduction in the $10.325 billion purchase price,'' Home Depot said in a statement today.

Tender Offer Cut

Shares of Home Depot dropped $2.01 to $35.79 at 4:01 p.m. They have fallen 11 percent this year.

Home Depot cut the price it's willing to pay for its stock in a tender offer to $37 to $42 a share, from $39 to $44 previously. Investors who had already agreed to sell their shares at the higher range won't get that price. They can withdraw and tender the shares again if they choose, the company said.

About 3.05 million shares had been tendered as of yesterday, Home Depot said. The buyback offer was extended to Aug. 31.

``If the buyout firms get too aggressive and the deal comes off the table, all of a sudden they won't have the $10 billion to buy these shares,'' said Peter Jankovskis, who helps manage $1.3 billion, including Home Depot shares, at Oakbrook Investments LLC in Lisle, Illinois.

If the sale of HD Supply falls through, the buyout firms must pay Home Depot a breakup fee of $309.8 million, according to a U.S. regulatory filing on June 20.

Carlyle spokesman Chris Ullman declined to comment. Bain spokeswoman Charlyn Lusk declined to comment, as did Clayton Dubilier's Tom Franco and Home Depot spokeswoman Paula Drake.

## Reversal of Strategy

HD Supply accounted for $12.1 billion of Atlanta-based Home Depot's $91 billion in sales last year. Chief Executive Officer Frank Blake's plan to shed the unit was a reversal of predecessor Robert Nardelli's goal of expanding the division.

``The unit being purchased is very sensitive to the housing sector itself,'' Jankovskis said. ``We were pleasantly surprised that Home Depot was able to negotiate as good a price in the first place.''

Rising mortgage rates and stricter rules for borrowers with poor credit histories have contributed to the worst U.S. housing slump in 16 years. That prompted Home Depot in July to cut its forecast for annual profit. It reports second-quarter results Aug. 14.

## Nardelli and Chrysler

Nardelli, who left Home Depot in January, was named CEO of Chrysler on Aug. 6 as new owner Cerberus Capital Management LP takes control of the third-largest U.S. automaker.

Several other top Home Depot executives have departed in recent months, including Jim Stoddart, who was in charge of generating new business; customer service head Jose Lopez; top lawyer Frank Fernandez; and human resources chief Dennis Donovan.

Buyers of bond and loan packages, burned by defaults in the sub-prime mortgage market, are demanding greater yields for the high-risk debt used to fund leveraged buyouts. As much as $400 billion worth of debt may be waiting to be syndicated to fund such purchases, according to Baring Asset Management.

The perceived risk of owning Home Depot's bonds rose today, according to credit-default swap traders. Five-year contracts rose 7.5 basis points to 50 basis points, according to London- based CMA Datavision. An increase suggests deterioration in the perception of credit quality. The price means it costs $50,000 a year to protect $10 million in bonds.

Home Depot's 5.4 percent notes due in 2016 rose 0.1 cent to 93.5 cents on the dollar at 4:41 p.m. in New York, according to Trace, the NASD's bond-pricing service. The yield fell to 6.4 percent.

To contact the reporter on this story: Mary Jane Credeur in Atlanta at mcredeur@bloomberg.net; Jason Kelly in New York at jkelly14@bloomberg.net.

*Last Updated: August 9, 2007 17:20 EDT*



©2008 BLOOMBERG L.P. ALL RIGHTS RESERVED. Terms of Service | Privacy Policy | Trademarks

Exhibit F

RAM HOLDINGS, INC.

August 31, 2007

<u>CONFIDENTIAL</u>

United Rentals, Inc.
Five Greenwich Office Park
Greenwich, Connecticut 06831
Attention: Roger E. Schwed, General Counsel

Dear Mr. Schwed:

As you know, on August 29, 2007, we communicated to UBS Investment Bank our desire to have a conversation with United Rentals, Inc. ("<u>URI</u>") about the terms of the Agreement and Plan of Merger, dated as of July 22, 2007, among URI, Ram Holdings, Inc. and Ram Acquisition Corp. (the "<u>Merger Agreement</u>"). We are troubled by URI's refusal to discuss the Merger Agreement with us.

Our request for a discussion was prompted by our concerns about recent unanticipated developments in the credit and financial markets. We fully understand the terms and conditions of the Merger Agreement, Guarantee and Stockholders Agreements (each as defined in the Merger Agreement) and related agreements. We believe it is in all of the parties' best interests to discuss the impact of these unanticipated market developments sooner rather than later. We would have expected that URI's Board of Directors would prefer to address these concerns now through a constructive dialogue.

We are also troubled by URI's actions surrounding the filing of the Proxy Statement (as defined in the Merger Agreement). We raised a number of comments on the last draft we received, but URI chose to file the Proxy Statement without addressing our substantive comments or even discussing them with our counsel.

In light of the foregoing concerns, we are renewing our request to discuss the terms of the Merger Agreement. We will look forward to your response.

Very truly yours,

RAM HOLDINGS, INC.

By: _____
          Steven F. Mayer
          President

cc:    Gary Horowitz (Simpson Thacher & Bartlett, LLP)
       Cary Kochman (UBS Investment Bank)
       Peter H. Ehrenberg and Robert G. Minion (Lowenstein Sandler PC)

Exhibit G

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

```
UNITED RENTALS, INC.,              :
                                   :
              Plaintiff,           :
                                   :
         v                         : Civil Action
                                   : No. 3360-CC
RAM HOLDINGS, INC. and RAM         :
ACQUISITION CORP.,                 :
                                   :
              Defendants.          :
```

- - -

Chancery Court
Court of Chancery Courthouse
34 The Circle
Georgetown, Delaware
Tuesday, December 18, 2007
9:58 a.m.

- - -

BEFORE:  HON. WILLIAM B. CHANDLER III, Chancellor.

- - -

TRIAL TRANSCRIPT - VOLUME I

- - -

------------------------------------------------------------

CHANCERY COURT REPORTERS
New Castle County Courthouse
500 North King Street - Suite 11400
Wilmington, Delaware 19801-3759
(302) 255-0524

E. McNeal - Direct

| Page 98 |
|---|
| 1 the background of the merger. Again, it was the last |
| 2 piece of the proxy before we were filing. There was |
| 3 always the thought amongst the parties, to my |
| 4 understanding, that we were going to file at the end |
| 5 of the month. So he had said that some of his team |
| 6 were on vacation, had not had a chance to look through |
| 7 it, and that they would get comments to us shortly. |
| 8    With regard to Brad, he asked me what |
| 9 my understanding was of why Brad was resigning, and |
| 10 there was a few questions back and forth. I gave him |
| 11 my understanding. Then, at the end of the call, the |
| 12 final comment from Bart was, "Okay. Well, we're going |
| 13 to have to see what we're going to do about this." |
| 14    Q.    Okay. Was there any discussion about |
| 15 the state of the credit markets during this call? |
| 16    A.    No. |
| 17    Q.    Okay. All right. Your next contact |
| 18 with them? What do you remember? |
| 19    A.    On the 29th we had an e-mail from |
| 20 Steve Mayer and Mike Green asking if they could have a |
| 21 call with myself and Cary Kochman. |
| 22    Q.    This is August 29th? |
| 23    A.    That's correct. |
| 24    Q.    Did you head up the call? |

| Page 99 |
|---|
| 1    A.    We did. |
| 2    Q.    Tell us what happened during that |
| 3 call. |
| 4    A.    It was an evening call. It was led by |
| 5 Steve Mayer. He said they had been looking at this |
| 6 transaction and, with the changing in the credit |
| 7 markets, that it was making them rethink some things, |
| 8 and they believed they had a 100 million-dollar |
| 9 walkaway as part of this transaction, and that they |
| 10 were asking us to allow them to have a conversation |
| 11 with us, or other representatives of United Rentals, |
| 12 about changing the terms of the transaction. |
| 13    Q.    Was there discussion about the |
| 14 alternative price? |
| 15    A.    No. |
| 16    Q.    Okay. What did the UBS |
| 17 representatives say to them? |
| 18    A.    We said, "You know, we don't believe |
| 19 you have a walkaway. There was specific performance |
| 20 in the contract. We suggest that you read through |
| 21 it." And we asked specifically about they were in |
| 22 this conversation repudiating a merger contract that |
| 23 they had signed, and their response was no, they were |
| 24 not repudiating, that they just wanted to have a |

| Page 100 |
|---|
| 1 conversation. And that they may not even decide to |
| 2 change anything at the end of this conversation, but |
| 3 it was a conversation that they wanted to have. |
| 4    Q.    Was the word "repudiate" a specific |
| 5 word that was used during that conversation? |
| 6    A.    Yes. |
| 7    Q.    All right. How did the call end? |
| 8    A.    It ended with them saying, again, they |
| 9 believed they had this walkaway. They didn't want to |
| 10 pay it. They didn't think we wanted to pay it, and |
| 11 they asked us to take their request for a meeting back |
| 12 to the board. |
| 13    Q.    Okay. What happened next between UBS |
| 14 and the Cerberus representatives? What was the next |
| 15 event? |
| 16    A.    So the next event was we received -- |
| 17 the United Rentals team received a letter from them, I |
| 18 believe, on August 30th, stating that they were |
| 19 unhappy, that we hadn't taken some of their changes in |
| 20 the proxy, and that we hadn't agreed to a meeting with |
| 21 them. |
| 22    Q.    Okay. And then you had agreed to a |
| 23 meeting with them? |
| 24    A.    That we had not agreed to a meeting. |

| Page 101 |
|---|
| 1    Q.    What was the next conversation that |
| 2 you had with Cerberus representative? |
| 3    A.    The next conversation that we had was |
| 4 around September 18th or so. We got a call from Steve |
| 5 Mayer, and it was myself and Cary Kochman that |
| 6 returned the call. They were asking for permission |
| 7 and release under the confidentiality agreements that |
| 8 parties had signed to reach out and speak with outside |
| 9 equity partners for folks who had come in and help as |
| 10 part of the equity check commitment. |
| 11    Q.    Okay. Let's move forward a little bit |
| 12 and move it up to November 12th. Okay? |
| 13    Do you remember having conversations |
| 14 with them on November 12th? |
| 15    A.    I didn't specifically, but I had a |
| 16 conversation with Rick Leaman from UBS who had come |
| 17 from a meeting with them. |
| 18    Q.    What did you understand that meeting |
| 19 was about? |
| 20    MR. SHAPIRO: Your Honor -- |
| 21    MR. SEITZ: I'll withdraw the |
| 22 question. |
| 23 BY MR. SEITZ: |
| 24    Q.    So Mr. Leaman had a meeting. |

Exhibit H

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

UNITED RENTALS, INC.,                         :
                                              :
                Plaintiff,                    :
                                              :
        v                                     : Civil Action
                                              : No. 3360-CC
RAM HOLDINGS, INC. and RAM                     :
ACQUISITION CORP.,                            :
                                              :
                Defendants.                   :

                        - - -

                        Chancery Court
                        Court of Chancery Courthouse
                        34 The Circle
                        Georgetown, Delaware
                        Tuesday, December 18, 2007
                        9:58 a.m.

                        - - -

BEFORE:   HON. WILLIAM B. CHANDLER III, Chancellor.

                        - - -


                TRIAL TRANSCRIPT - VOLUME I


                        - - -




----------------------------------------------------------
                CHANCERY COURT REPORTERS
               New Castle County Courthouse
           500 North King Street - Suite 11400
             Wilmington, Delaware 19801-3759
                    (302) 255-0524

S. Feinberg - Cross

1    THE COURT: My view, Mr. Hirschfeld
2  and Mr. Bernstein, is that bad faith would only be
3  relevant if we were talking about shifting attorneys'
4  fees at the end of this matter. For me there's only
5  one question up and front. What did the contract say
6  and what does the contract mean. So issues of bad
7  faith, and so on, just don't seem to be terribly
8  relevant to me. But if that helps you, I'm pleased to
9  let you go forward with that testimony, if you want;
10  but it's not going to be very helpful to me.
11    MR. HIRSCHFELD: No. It does help me.
12  And I -- I will shorten the examination as a result of
13  that, Your Honor.
14  BY MR. HIRSCHFELD:
15    Q.    I'd like to ask you, Mr. Feinberg,
16  to -- to focus on the meeting that you had on
17  November 12th that was discussed briefly during your
18  examination.
19    Do you recall what you said to the UBS
20  representatives in attendance at that meeting on the
21  subject of the banks and their willingness to fund or
22  their comments regarding their willingness to fund
23  their debt commitment?
24    A.    Yeah. I -- I believe I said that, you

1  know, that I -- I thought the banks would fund, but
2  there were a number of conditions that needed to get
3  met. There was certainly some risk in it, and that --
4  you know, that they had -- that the markets were
5  tough, that the banks were certainly going to take
6  a -- take -- have some -- a hit on -- on their -- on
7  their loan; and when that happens, there's never
8  certainty. But, you know, again, I didn't -- I -- I
9  did believe that they would fund, but there was
10  certainly some doubt to it.
11    Q.    Did you tell the UBS representatives
12  anything about the substance of the communications
13  that you'd been having with the banks over the
14  previous week?
15    A.    Yeah. The banks -- we told them the
16  banks were giving us a hard time and they weren't
17  happy with -- with -- with funding it, and there was a
18  number of issues and conditions that -- that were
19  there, and that basically, you know, they were -- I
20  guess -- they were -- they were nervous in this -- in
21  this tough financial environment.
22    Q.    Did you tell them that the banks had
23  asked you for concessions?
24    A.    I don't recall if I specifically told

1  them that, the banks then; but I think that, you know,
2  it's pretty typical in these kind of situations for
3  the banks to ask for concessions when -- when things
4  are starting to go wrong.
5    Q.    Is Cerberus Capital Management a
6  fiduciary entity? Does it owe fiduciary duties?
7    A.    Yes.
8    Q.    And it owes those fiduciary duties to
9  the investors whose funds it manages; correct?
10    A.    Correct.
11    Q.    In making the decision to fund the
12  equity commitment letter, does Cerberus Capital
13  Management have a fiduciary duty to its investors?
14    A.    Yes.
15    Q.    Would the -- the investment committee
16  have to consider its fiduciary duties in determining
17  whether or not to fund the equity commitment letter?
18    A.    Yes.
19    Q.    Do you have any understanding more
20  recently than the understanding you had in -- on
21  November 12th at the meeting with the UBS
22  representatives, do you have any more recent
23  understanding about the willingness of the banks to
24  give you the money today if you asked for it at RAM

1  Holdings?
2    MR. BERNSTEIN: Objection, Your Honor.
3  This calls for hearsay. What we're trying to get into
4  is an answer here about what the bank representatives
5  may or may not have said in recent weeks in December.
6  The RAM side submitted the deposition to this Court of
7  Mr. Sanders from Morgan Stanley who testified that the
8  banks are prepared to meet their legal obligations.
9  That is proper evidence. To have this witness testify
10  about hearsay about what the banks said to him in
11  December violates Rule 803.3 under the Delaware rules
12  of evidence which has been interpreted that you don't
13  admit statements about another party's intent where
14  they're in a suspicious circumstance, and obviously
15  banter back and forth about negotiations, about the
16  banks reducing their obligations does not have the
17  indicia of reliability to satisfy that test.
18    MR. HIRSCHFELD: Your Honor --
19    MR. BERNSTEIN: If the RAM side wanted
20  to put in testimony from the bankers that as of today,
21  December 17th, they're not -- December 18th, sorry,
22  Your Honor. Losing track of days. (Continuing)
23  -- they're not willing to fund, they should put a bank
24  representative on the stand and explain why

Exhibit I

**RAM HOLDINGS, INC.**

November 14, 2007

United Rentals, Inc.
Five Greenwich Office Park
Greenwich, Connecticut 06831
Attention: Roger E. Schwed, General Counsel

Re:    Agreement and Plan of Merger among RAM Holdings, Inc. ("Parent"), RAM
Acquisition Corp. ("Merger Sub") and United Rentals, Inc. ("URI") dated as of
July 22, 2007 (the "Agreement")

Dear Mr. Schwed:

We are writing in connection with the above-captioned Agreement. As
you know, as part of the negotiations of the Agreement and the ancillary documentation,
the parties agreed that our maximum liability in the event that we elected not to
consummate the transaction would be payment of the Parent Termination Fee (as defined
in the Agreement) in the amount of $100 million.  This aspect of the transaction is
memorialized in, among other places, Section 8.2(e) of the Agreement, the final sentence
of which reads as follows:

> "In no event, whether or not this Agreement has been
> terminated pursuant to any provision hereof, shall Parent,
> Merger Sub, Guarantor or the Parent Related Entities,
> either individually or in the aggregate, be subject to any
> liability in excess of the Parent Termination Fee [$100
> Million] for any or all losses or damages relating to or
> arising out of this Agreement or the transactions
> contemplated by this Agreement, including breaches by
> Parent or Merger Sub of any representations, warranties,
> covenants or agreements contained in this Agreement, and
> in no event shall the Company seek equitable relief or seek
> to recover any money damages in excess of such amount
> from Parent, Merger Sub, Guarantor or any Parent Related
> Party or any of their respective Representatives."

In light of the foregoing, and after giving the matter careful consideration,
this is to advise that Parent and Merger Sub are not prepared to proceed with the
acquisition of URI on the terms contemplated by the Agreement.

CONFIDENTIAL

United Rentals, Inc.
November 14, 2007
Page 2

Given this position and the rights and obligations of the parties under the Agreement and the ancillary documentation, we see two paths forward. If URI is interested in exploring a transaction between our companies on revised terms, we would be happy to engage in a constructive dialogue with you and representatives of your choosing at your earliest convenience. We could be available to meet in person or telephonically with URI and its representatives for this purpose immediately. In order to pursue this path, we would need to reach resolution on revised terms within a matter of days.

If, however, you are not interested in pursuing such discussions, we are prepared to make arrangements, subject to appropriate documentation, for the payment of the $100 million Parent Termination Fee.

We look forward to your response.

Very truly yours,

RAM HOLDINGS, INC.

By: _____
　　　　Steven F. Mayer
　　　　President

cc:　Gary Horowitz, Esq. and Eric Swedenburg, Esq. (Simpson Thacher & Bartlett LLP)
　　　Cary Kochman and Emily McNeal (UBS Investment Bank)
　　　Peter H. Ehrenberg, Esq. and Robert G. Minion, Esq. (Lowenstein Sandler PC)
　　　Michael L. Hirschfeld, Esq. and Scott A. Edelman, Esq. (Milbank, Tweed, Hadley & McCloy, LLP)

CONFIDENTIAL

Exhibit J

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

UNITED RENTALS, INC.,                          :
                                               :
          Plaintiff,                           :
                                               :
          v                                    : Civil Action
                                               : No. 3360-CC
RAM HOLDINGS, INC. and RAM                     :
ACQUISITION CORP.,                             :
                                               :
          Defendants.                          :

                        - - -

                    Chancery Court
                    Court of Chancery Courthouse
                    34 The Circle
                    Georgetown, Delaware
                    Tuesday, December 18, 2007
                    9:58 a.m.

                        - - -

BEFORE:  HON. WILLIAM B. CHANDLER III, Chancellor.

                        - - -


          TRIAL TRANSCRIPT - VOLUME I


                        - - -




------------------------------------------------------
                CHANCERY COURT REPORTERS
              New Castle County Courthouse
           500 North King Street - Suite 11400
              Wilmington, Delaware 19801-3759
                    (302) 255-0524

C. Kochman - Direct

Page 302

1  felt from our side had gone away and we'd given them
2  full diligence on, had now escalated to them in their
3  mind into a big problem. And they wanted to insert
4  some form of mechanism which would be a holdback in
5  the context of the acquisition, and they were talking
6  about numbers in excess of $120 million.
7      Q.    Did you respond to that?
8      A.    Again, I think in my own mind that was
9  a major step back. You know, a nearly
10 7 billion-dollar transaction, the concept of putting
11 in a 100, 150 million-dollar holdback on an SEC matter
12 seemed to me to, frankly, be a red herring. I
13 wondered whether they even wanted to go forward at all
14 on the transaction.
15     Q.    Did you talk to Mr. Mayer again on the
16 21st?
17     A.    Yes, I did.
18     Q.    On July 21st, did you speak with
19 Mr. Mayer?
20     A.    I did.
21     Q.    And could you tell us about that
22 conversation?
23     A.    By then the SEC issue was off the
24 table and the tone was very different. This was

Page 303

1  Steven Mayer pushing for the transaction to get done.
2  He told me that he was at the 34.50, and that was
3  best, final, last. We're done on price. That's it.
4  And he wanted to sign that deal on Sunday.
5      Q.    How about was there any talk about an
6  option during this call?
7      A.    Well, once I realized that there was a
8  limit, we're done on the price issues, the only other
9  open issue for me to raise was the dollar amount of
10 the termination fee, and I immediately said to him,
11 "Let's talk about the termination fee." You know --
12 and I think I was asking for either 110 or
13 $120 million at that point in time.
14     Q.    Okay. And what did he say?
15     A.    He said, you know, "Gee, that's a lot
16 of money. You know, I view this as an option. And my
17 LPs would be very unhappy if I, you know, burnt that
18 100 million plus dollars." And I was taken aback by
19 that.
20     Q.    And what did you say to him?
21     A.    I said, "You know, that's crazy.
22 That's a nonstarter. This is not an option. That's
23 something I would never take back to the board." And
24 I laid into him fairly good and said that this is a

Page 304

1  board that has concerns about your ability to
2  consummate transactions. They see what's going on
3  with Chrysler. They don't view you in the same
4  breaths as KKR or Blackstone. And, you know, it's a
5  complete nonstarter.
6      Q.    Did he respond to that?
7      A.    He backed away. He said, "Time out.
8  You know, I'm 100 percent committed to this
9  transaction. I'm going to take you -- I'm going to
10 tell you right now that the debt financing and the
11 commitment letters we have in hand are designed
12 exactly for difficult markets. We'll get this deal
13 done. I'm going to take you under the tent."
14     Q.    Is that the same thing as going over
15 the wall?
16     A.    I think under the tent or -- I'm going
17 to take you under the tent on Chrysler. What he said
18 is, "I'm going to make you an insider on that," which
19 is to say we will get that deal done next week. That
20 was at a point in time where we're saying the Chrysler
21 deal would not get done.
22        And he said, "Look, let me message you
23 back to that board. You tell that board that we will
24 get this deal done. We're 100 percent committed."

Page 305

1      Q.    Okay. Let's move to the next point.
2  Sorry to truncate this. But I'm trying to move this
3  along.
4          August 29th. Did you have a phone
5  call on August 29th with Cerberus representatives?
6      A.    Yes.
7      Q.    And who was on that call?
8      A.    It was requested by Cerberus and it
9  was set up by e-mail, and it was Steven Mayer and Mike
10 Green and Emily McNeal joined me.
11     Q.    And what was said during that call?
12     A.    They called up and said, "We want to
13 talk to you about the transaction. We want to have an
14 opportunity to sit down and talk about the terms of
15 the transaction." And, you know, I kept drawing them
16 out. "What are you talking about?"
17     Q.    And what did they say?
18     A.    They said, "We want to talk to you
19 about price."
20     Q.    What was the discussion concerning
21 price during this conversation?
22     A.    I asked what they were thinking and
23 they would not give a number.
24     Q.    Was there any talk about state of the

C. Kochman - Direct

Page 306

1  credit markets during this call?
2      A.     Yes. It was referenced that these
3  were difficult credit markets. And I came back on
4  that and said, "You know, these commitments that you
5  have in hand, you told me that these are designed for
6  adverse credit markets."
7      Q.     What about the issue of an option?
8  Was that discussed during this call?
9      A.     The word "option" was not used. He
10  said to me that they felt that they had the ability to
11  pay $100 million and get out of the transaction
12  essentially.
13      Q.     And did you respond to that?
14      A.     I did.
15      Q.     What did you say?
16      A.     I said, you know, my understanding is
17  you've got good faith obligations. We talked about
18  those undertakings, those obligations. I mean, I was
19  in the room with them in New York when the standard --
20  we had some head-nodding around the standard. I said,
21  "It's also my understanding that you have specific
22  performance in this contract."
23      Q.     Where did you come to that
24  understanding that there was specific performance?

Page 307

1      A.     Well, it's long-standing. The
2  chairman, CEO, Brad Jacobs, from day one said he
3  wanted a water-tight contract. When we put out the
4  bid instructions draft with the agreement, you know,
5  it spoke to an absence of conditionality. I had
6  always known that it was in the contract.
7      Q.     But you didn't review the merger
8  agreement; right?
9      A.     No. I'm not a practicing attorney.
10      Q.     Okay. But my question was a little
11  more pointed. You didn't actually review the merger
12  agreement and weren't involved in the drafting of
13  it; right?
14      A.     Correct.
15      Q.     What was your involvement in this
16  transaction following this call on August 9th? Before
17  we leave it, was there any discussion about whether
18  Cerberus was repudiating the contract?
19      A.     You know, I said, "I don't understand
20  what's going on here. You know, my view is that
21  you've got these obligations."
22      His commentary back was, "Look, it's
23  open to interpretation. We think we can pay
24  $100 million and get out of this."

Page 308

1      I said, "Okay, what I'm hearing is,
2  you're telling me you're intending to repudiate the
3  contract."
4      Q.     And what did they say?
5      A.     They said, "You're a horrible
6  listener. That's not what I said. I said I'm
7  thinking about having -- I want to have a conversation
8  about the contract. And I'm thinking that it's
9  possible for me to pay $100 million get out of this
10  contract." Something along those lines.
11      MR. SEITZ: May I have a second, Your
12  Honor?
13      Nothing further.
14      CROSS-EXAMINATION
15  BY MR. SHAPIRO:
16      Q.     Good evening, Mr. Kochman. I see you
17  again?
18      A.     Mr. Shapiro.
19      Q.     Mr. Kochman and I share rooms in the
20  garden of the hotel. We're out in the cold.
21      I'd like to start and make sure I
22  heard your testimony right about the meeting on the
23  evening of July 12th. That's the meeting where you
24  suggested a possibility of a go-shop provision. Is

Page 309

1  that correct?
2      A.     Correct.
3      Q.     And Mr -- you looked over at Mr. Mayer
4  and you could see in his face that he was thinking
5  about what you suggested?
6      A.     No. We articulated what he was
7  thinking.
8      Q.     You thought you testified you could
9  see from looking at his face that you knew what he was
10  thinking. Didn't you testify to that on direct?
11      A.     Don't think I did. I think I
12  testified there was some head-nodding, and he said to
13  us, "This may be an option which would be helpful to
14  your board and I could see why you would want that."
15  Okay.
16      Q.     Did Mr. Mayer nod his head? Was he
17  one of the head-nodders?
18      A.     There was some openness and agreement
19  around the concept which was non -- verbally and
20  nonverbally communicated.
21      Q.     Did Mr. Mayer nonverbally communicate
22  his agreement or his openness?
23      A.     Yes.
24      Q.     Did you know that Mr. Mayer wasn't at