UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

AMIDA CAPITAL MANAGEMENT II, LLC,

               Plaintiff,

          -against-

CERBERUS CAPITAL MANAGEMENT, L.P.,

              Defendant.

Case No. 1:08-CV-05516-MGC

---

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT CERBERUS CAPITAL MANAGEMENT, L.P.'S MOTION TO DISMISS

MILBANK, TWEED, HADLEY & McCLOY LLP
Michael L. Hirschfeld
Robert C. Hora
One Chase Manhattan Plaza
New York, New York  10005
Tel: (212) 530-5000
Fax: (212) 530-5219
E-mail: mhirschfeld@milbank.com
       rhora@milbank.com

*Attorneys for Defendant Cerberus Capital Management, L.P.*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ....................................................................................................... iii

PRELIMINARY STATEMENT ................................................................................................. 1

SUMMARY OF ALLEGATIONS ............................................................................................. 5

I.      THE PARTIES...................................................................................................................... 5

II.     THE PROPOSED ACQUISITION OF URI....................................................................... 6

III.    AMIDA'S RISK ARBITRAGE STRATEGY DRIVES ITS PURCHASES OF
        URI COMMON STOCK .................................................................................................... 6

IV.     THE ACQUISITION FINANCING .................................................................................. 7

V.      CAUTIONARY STATEMENTS CONTAINED IN THE PRELIMINARY
        CONFIDENTIAL OFFERING CIRCULAR DISTRIBUTED TO AMIDA AND
        OTHER ATTENDEES AT THE NOTES PRESENTATION .......................................... 8

VI.     DONAWAY'S ALLEGED OPTIMISTIC STATEMENTS CONCERNING THE
        PROPOSED ACQUISITION .......................................................................................... 10

VII.    THE PURPORTED "FAILURE" TO DESCRIBE EVENTS THAT OCCURRED
        IN AUGUST 2007 ............................................................................................................ 12

VIII.   PLAINTIFF PURCHASES ADDITIONAL URI STOCK ........................................... 14

IX.     RAM HOLDINGS DETERMINES NOT TO COMPLETE THE PROPOSED
        MERGER ........................................................................................................................... 14

X.      THE CURRENT LITIGATION ...................................................................................... 15

ARGUMENT................................................................................................................................. 15

I.      MOTION TO DISMISS STANDARD............................................................................ 15

II.     THE COMPLAINT FAILS TO STATE A CLAIM UNDER SECTION 10(b) ............ 17

        A.      Amida's Alleged Reliance on the Notes Presentation as a Purported Basis
                for Purchasing URI Common Stock Was Not Reasonable.................................. 17

        B.      Donaway's Purported Statements at the Notes Presentation Do Not
                Support a Claim Under Section 10(b).................................................................. 19

1. The Complaint Does Not Specify a Statement Assuring that the Acquisition Will Close ................................................................................ 19

2. Donaway's Alleged Statements Were, at Most, Non-Actionable Expressions of Optimism ........................................................................ 20

3. Amida Has Not Sufficiently Alleged Facts Showing that Donaway's Alleged Expression of Optimism Was False When Made ............................................................................................................ 22

C. CCM Had No Duty to Disclose the August 2007 Communications Between RAM Holdings and URI as Part of the Notes Presentation ................. 24

III. PLAINTIFF HAS FAILED TO ALLEGE SCIENTER ................................................... 26

IV. AMIDA'S CLAIMS FOR COMMON LAW FRAUD AND FRAUDULENT INDUCEMENT MUST BE DISMISSED ........................................................................ 29

V. THE COMPLAINT FAILS TO STATE A CLAIM FOR PROMISSORY ESTOPPEL ............................................................................................................................ 30

CONCLUSION .......................................................................................................................... 31

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Abrahamson v. Fleschner*,
 568 F.2d 862 (2d Cir. 1977) .......................................................................... 17

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
 493 F.3d 87 (2d Cir. 2007) ............................................................................ 26

*Basic Inc. v. Levinson*,
 485 U.S. 224 (1988) ....................................................................................... 17

*Bell Atl. Corp. v. Twombly*,
 127 S. Ct. 1955 (2007) ................................................................................... 16

*De Jesus v. Sears, Roebuck & Co.*,
 87 F.3d 65 (2d Cir. 1996) ................................................................................ 8

*Denny v. Barber*,
 576 F.2d 465 (2d Cir.1978) ........................................................................... 24

*Elliot Assocs., L.P. v. Covance, Inc.*,
 No. 00-Civ.-4115 (SAS), 2000 WL 1752848 (S.D.N.Y. Nov. 28, 2000) ..................... 20, 21

*Emergent Capital Inv. Mgmt. v. Stonepath Group, Inc.*,
 343 F.3d 189 (2d Cir. 2003) .......................................................................... 18

*Endovasc Ltd. v. J.P. Turner & Co.*,
 No. 02-Civ.-7313 (LAP), 2004 WL 634171 (S.D.N.Y. Mar. 31, 2004) ..................... 29, 30

*Faulkner v. Verizon Commc'ns, Inc.*,
 156 F. Supp. 2d 384 (S.D.N.Y. 2001) ........................................................... 20, 24

*Faulkner v. Verizon Commc'ns, Inc.*,
 189 F. Supp. 2d 161 (S.D.N.Y. 2002) ........................................................... 21, 22

*Fischman v. Raytheon Mfg. Co.*,
 188 F.2d 782 (2d Cir. 1951) .......................................................................... 19

*Ganino v. Citizens Utils. Co.*,
 228 F.3d 154 (2d Cir. 2000) .......................................................................... 15

*Harsco Corp. v. Segui*,
 91 F.3d 337 (2d Cir. 1996) ............................................................................ 17

*In re Ames Dep't Stores Inc. Stock Litig.*,
 991 F.2d 953 (2d Cir 1993) ........................................................................... 19

*In re Apple Computer, Inc.*,
 No. 03-16614, 127 Fed. Appx. 296 (9th Cir. Apr. 4, 2005) .............................. 27

*In re Bio-Tech Gen. Corp. Sec. Litig.*,
   380 F. Supp. 2d 574 (D.N.J. Aug. 10, 2005) ...................................................... 28

*In re Bristol-Myers Squibb Secs. Litig.*,
   312 F. Supp. 2d 549 (S.D.N.Y. 2004)..........................................................16, 24

*In re Cairns & Assocs., Inc.*,
   372 B.R. 637 (S.D.N.Y. Bankr. 2007)................................................................ 31

*In re Dynex Capital, Inc. Sec. Litig.*,
   No. 05-Civ.-1897 (HB), 2006 WL 314524 (S.D.N.Y. Feb. 10, 2006) ................ 27

*In re Enron Corp. Secs., Derivative & "ERISA" Litig.*,
   No. MDL-1446, Civ. A. H-01-3624, Civ. A H-04-0088, 2005 WL 3704688
   (S.D. Tex. Dec. 5, 2005) .................................................................................... 26

*In re Federated Dep't Stores, Inc. Sec. Litig.*,
   No. 00-Civ.-6362 (RCC), 2004 WL 444559 (S.D.N.Y. Mar. 11, 2004) ............. 28

*In re Health Mgmt. Sys., Inc. Sec. Litig.*,
   No. 97 Civ. 1865 (HB), 1998 WL 283286 (S.D.N.Y. June 1, 1998)................... 28

*In re Livent, Inc. Noteholders Sec. Litig.*,
   151 F. Supp. 2d 371 (S.D.N.Y. 2001)................................................................ 15

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
   513 F.3d 702 (7th Cir. 2008) ............................................................................. 27

*Mfrs. Life Ins. Co. v. Donaldson, Lufkin & Jenrette Secs. Corp.*,
   No. 99-1944 (NRB), 2000 WL 709006 (S.D.N.Y. June 1, 2000) .................. 29, 30

*Morse v. Weingarten*,
   777 F. Supp. 312 (S.D.N.Y. 1991)................................................................ 29, 30

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000)............................................................................... 16

*Podany v. Robertson Stephens, Inc.*,
   318 F. Supp. 2d 146 (S.D.N.Y. 2004)................................................................ 31

*Ryan v. J. Walter Thompson Co.*,
   453 F.2d 444 (2d Cir. 1971)............................................................................... 25

*Shields v. Citytrust Bancorp, Inc.*,
   25 F.3d 1124 (2d Cir. 1994)....................................................................16, 24, 28

*Southland Secs. Corp. v. INSpire Ins. Solutions Inc.*,
   365 F.3d 353 (5th Cir. 2004) ............................................................................. 27

*Sovereign Metal Corp. v. Ciraco*,
   No. 91 Civ. 751 (LLS), 1992 WL 6161 (S.D.N.Y. Jan. 3, 1992) ....................... 17

*Starkman v. Warner Commc'ns, Inc.*,
   671 F. Supp. 297 (S.D.N.Y. 1987)................................................................ 29, 30

*Stein v. Gelfand*,
   476 F. Supp. 2d 427 (S.D.N.Y. 2007)....................................................................30, 31

*Stoneridge Inv. Partners v. Scientific-Atlanta, Inc.*,
   128 S. Ct. 761 (2008) ...........................................................................................17

*Sultan v. Read*,
   No. 03-Civ.-7462 (PKL), 2005 WL 486732 (S.D.N.Y. Mar. 1, 2005)................29

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
   531 F.3d 190 (2d Cir. 2008) .................................................................................27

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   127 S. Ct. 2499 (2007) .........................................................................................17

*United Rentals, Inc. v. RAM Holdings, Inc.*,
   937 A.2d 810 (Del. Ch. 2007) ..............................................................................15

*Waxman v. Envipco Pick Up & Processing Servs., Inc.*,
   No. 02-Civ.-10132 (GEL), 2003 WL 22439796 (S.D.N.Y. Oct. 28, 2003) ........30

## STATUTES

15 U.S.C. § 78j(b) ..............................................................................................passim

15 U.S.C. § 78u-4(b)(1) .....................................................................................16

15 U.S.C. § 78u-4(b)(2) .....................................................................................16, 26

15 U.S.C. § 78u-4(b)(3)(A) ...............................................................................17

## RULES

17 C.F.R. § 230.144A .........................................................................................1, 7

17 C.F.R. § 240.14a-101 .....................................................................................25

Fed. R. Civ. P. 12(b)(6) ......................................................................................1

Fed. R. Civ. P. 9(b) ............................................................................................1, 16, 21, 29

## OTHER AUTHORITIES

Guy P. Lander, Resales of Restricted Securities Under SEC Rules 144 and 144A
   §A-47
   (46-3d. Corporate Practice Series 2001) ..............................................................1

Defendant Cerberus Capital Management, L.P. ("CCM") respectfully submits this memorandum of law in support of its motion, pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), to dismiss the Complaint.

## PRELIMINARY STATEMENT

This action arises from the proposed acquisition of United Rentals, Inc. ("URI") by RAM Holdings, Inc. ("RAM Holdings"), an affiliate of defendant CCM. At the invitation of one of RAM Holdings' lenders, plaintiff, Amida Capital Management II, LLC ("Plaintiff" or "Amida"), attended a confidential sales presentation (the "Notes Presentation") for qualified institutional buyers[1] regarding proposed high-yield debt securities ("Post-Merger Notes" or "Notes") to be issued by URI following completion of the planned acquisition. The attendees, including Amida, were specifically cautioned that the information they were receiving was being communicated to them solely for the purpose of allowing them to evaluate a purchase of the proposed Post-Merger Notes, and for no other purpose. Amida asserts that information imparted during the Notes Presentation, plus the mere fact that the Notes Presentation occurred, led it to conclude that RAM Holdings would shortly complete its acquisition of URI on the terms previously announced.

---

[1] "Qualified institutional buyers" are institutions registered under the Securities Exchange Act of 1934 (the "'34 Act") that, because of their investment activity and sophistication, are deemed not to require the same level of disclosure as ordinary investors. *See* Guy P. Lander, Resales of Restricted Securities Under SEC Rules 144 and 144A § A-47 (46-3d. Corporate Practice Series 2001) ("Rule 144A is based on the concept that certain institutions can fend for themselves …."). Securities and Exchange Commission ("SEC") Rule 144A provides that if securities are sold to qualified institutional buyers in a private transaction without publicity or general solicitation of buyers, the sales will be exempt from the registration requirements of the Securities Act of 1933. 17 C.F.R. § 230.144A. To qualify, an institution like Plaintiff must own and invest in at least $100 million of securities not affiliated with that institution. *Id.* Amida's public filings indicate that its securities holdings in unaffiliated entities are valued at nearly $500 million.

Buoyed by this conclusion, Amida took an aggressive risk arbitrage position in URI common stock, increasing its already substantial holdings and positioning itself – if the acquisition closed – to capture the small differential between the market price of URI shares and the previously announced merger price. Nine days after the Notes Presentation, however, responding to acutely worsening conditions in the credit markets and to the growing risk of recession, RAM Holdings informed URI, and URI informed the market, that RAM Holdings would not proceed with the acquisition, but would either enter into negotiations with URI to see if agreement could be reached on revised merger terms or pay URI a contractually stipulated $100 million termination fee. The market price of URI stock fell sharply on this news. Amida has responded by accusing CCM of some ill-defined "fraud" during the Notes Presentation, asserting that this "fraud" caused it to retain its existing URI holdings and buy more URI stock.

This is a stunningly overreaching "claim." Fully aware that it was receiving a confidential presentation about proposed post-merger debt securities, and informed in writing that it should neither rely upon nor use the presentation for any purpose other than to evaluate a possible purchase of those debt securities, Amida ignored these warnings and immediately bought more than 400,000 shares of URI stock, admittedly using the confidential information it was told it should not use, and which was not available to the market as a whole, as the basis for the purchase. Amida is hardly the type of investor the federal securities laws were intended to protect.

Not surprisingly, Amida has failed to allege a claim for relief under Section 10(b). **_First,_** whatever Amida thinks it may have heard during the Notes Presentation, it was not reasonable for Amida to have relied upon it as the alleged basis to purchase URI stock. Amida was told that the information was being communicated on a confidential basis solely to allow

evaluation of the proposed Post-Merger Notes, and could not be used for any other purpose. Indeed, consistent with industry practice, the Offering Circular Amida received, *see* Compl. ¶ 28, specified that by accepting delivery of the Offering Circular, Amida was agreeing that it would not use the information contained therein for any purpose other than to evaluate a possible purchase of the Post-Merger Notes.[2]  Accordingly, Amida cannot satisfy the reasonable reliance element of a Section 10(b) claim.

        *Second,* the Complaint nowhere alleges a statement by CCM at the Notes Presentation regarding the expected completion of the acquisition of URI.  To be sure, the Notes Presentation assumed that the acquisition would be completed, because otherwise the Notes would not be issued.  But when detailing the specific remarks allegedly made during the Notes Presentation, *see* Compl. ¶¶ 6, 30-33, the Complaint recites only statements concerning the growth rate of the equipment rental industry as a whole, and cost-saving operating changes that RAM Holdings intended to pursue to improve URI's business prospects following the acquisition – all of which statements were made to indicate to the attendees the strength of the post-acquisition company that would issue the Post-Merger Notes.  Amida asserts that it drew from this discussion "further comfort" that the acquisition would close, *see id.* ¶ 6, but Amida's mistaken inference is not an actionable misstatement by CCM.[3]

        *Third,* even if the alleged statements during the Notes Presentation properly could be understood as an expression of CCM's optimism regarding completion of the acquisition, such an expression of optimism is not actionable unless the plaintiff alleges facts – not

---

[2]  As is discussed more fully below, Amida also agreed, *inter alia*, that it would not disclose the information communicated at the sales presentation to anyone.  *See infra* at 9.  The import of this restriction could not have been lost on a sophisticated investor like Amida.

[3]  Amida had apparently concluded, well **before** the Notes Presentation, that the URI merger would close as announced, acquiring by November 4, 2007 a net long position in URI common stock worth almost $3 million.  *See* Compl. ¶ 25.

conclusory statements – clearly showing that the indication of optimism either rose to the level of a guarantee or was, in fact, false. Amida does not allege that CCM "guaranteed" that the acquisition would close, and so tries to satisfy the second prong of the requirement by alleging that the expression of optimism was false because CCM had purportedly told URI two months earlier that it would not complete the acquisition on the agreed terms.

Specifically, Amida alleges that CCM informed URI in August 2007 that it would not proceed with the acquisition unless the terms were renegotiated. *See* Compl. ¶¶ 8, 38-39. But the correspondence attached to the Complaint and the trial testimony Amida cites for this proposition, *see id.* ¶¶ 39-41, do not support Amida's contention. To the contrary, they show that CCM (and RAM Holdings) made no demand to renegotiate any of the deal terms, much less threatened or informed URI that RAM Holdings would not complete the acquisition on the agreed terms. Amida's conclusory assertion is refuted by the very materials offered to support it.

*Fourth,* Amida's suggestion that fraud is established by the proximity of the sales presentation to RAM Holdings' subsequent notification that it would not complete the acquisition on the announced terms is nothing more than an impermissible attempt to plead fraud by hindsight. Amida points to nothing on or before November 5, 2007 showing that the purported expression of optimism on November 5 was false. The subsequent change in RAM Holdings' position is fully explained by the increasing market uncertainty, with almost daily disclosures of substantial losses in the real estate and banking sectors, and predictions of worse losses to come.

*Fifth*, Amida has failed to plead scienter. To plead scienter against a corporate defendant, a plaintiff must allege facts that create a strong inference that the corporate officer responsible for the challenged statements acted with the requisite state of mind. The Complaint,

however, contains no facts demonstrating that the CCM representative who attended the Notes Presentation and allegedly made the offending statements had any knowledge that RAM Holdings purportedly had already decided not to complete the proposed merger, or had any motive to make false statements regarding the expected completion of the merger.

Amida's pendent state law claims for common law fraud, fraudulent inducement and promissory estoppel are similarly defective and must be dismissed.  Like Amida's federal claim, each of these pendent claims relies upon a purported "promise to close" that Amida does not sufficiently allege, and that CCM never made.  Each of the common law claims involves the same misuse of confidential information, and the same palpably unreasonable reliance by Amida, as does the federal claim.

<u>**SUMMARY OF ALLEGATIONS**</u>

**I.    THE PARTIES**

Founded in 1992, CCM is a private investment firm with its principal place of business in New York, New York.  Compl. ¶¶ 16, 18.  The firm, which manages investments on behalf of affiliated funds and accounts, is active in private equity, lending, and real estate, and specializes in providing financial resources and operational expertise to help undervalued or underperforming companies realize their potential.  *Id.* ¶ 17.  CCM formed RAM Holdings to serve as the vehicle to effectuate the acquisition of URI.

Plaintiff Amida is a highly sophisticated investment firm, also headquartered in New York.  *Id.* ¶ 15.  According to its most recent Form-13F filed with the Securities and Exchange Commission, it holds positions in at least 345 different securities, valued in the aggregate at nearly $500 million.  Amida Form 13-F, attached as Ex. A to the Declaration of Robert C. Hora dated August 7, 2008 ("Hora Decl.").

## II.     THE PROPOSED ACQUISITION OF URI

On July 22, 2007, RAM Holdings and RAM Acquisition Corp. ("RAM Acquisition" and, together with RAM Holdings, the "RAM Entities") entered into a merger agreement (the "Merger Agreement") with URI, an equipment rental company headquartered in Connecticut, pursuant to which RAM Holdings agreed to pay $34.50 per share for all of URI's outstanding common stock and merge its subsidiary, RAM Acquisition, with URI.  Compl. ¶ 20. The total value of the transaction, including assumption of URI indebtedness, was approximately $6.6 billion.  *Id.*  The merger was announced on July 23, 2007, and approved by URI shareholders at a meeting on October 19, 2007.  *Id.* ¶¶ 3, 24.  After announcing the results of the shareholder vote, URI indicated that it expected the transaction to close in mid-November 2007, following the satisfaction of various conditions to closing.  *Id.* ¶ 24.

## III.    AMIDA'S RISK ARBITRAGE STRATEGY DRIVES
## ITS PURCHASES OF URI COMMON STOCK

Amida alleges that it began purchasing URI common stock "on a hedged basis" in September and October 2007, employing a trading strategy known as "risk arbitrage" – essentially, making bets on whether a proposed merger will be completed at a specified price. *Id.* ¶ 4.  As its name implies, the strategy is a risky one.  A risk arbitrageur purchases stock of a target company after a merger or tender offer is announced, hoping to derive trading profits from small price movements in the target's stock during the pendency of the transaction and, if the transaction closes, to capture the typically small spread between the post-announcement market price of the issuer's securities and the announced price of the deal.  The arbitrageur, however, runs the risk (among others) that if the transaction is not completed, the arbitrageur will find itself holding stock that is worth less than the arbitrageur paid for it.  Amida alleges that it

already purchased "a net total of $2.95 million" in URI common stock prior to the Notes Presentation as part of this "risk arbitrage" strategy. *Id.* ¶ 25.

## IV.    THE ACQUISITION FINANCING

The Merger Agreement contemplated that RAM Holdings would finance the acquisition of URI through a $1.4 billion equity contribution to be made at closing by investment funds or accounts designated by CCM (the "Equity Commitment"); up to $4 billion in leveraged financing to be provided at closing by Morgan Stanley, Credit Suisse, Bank of America, and Lehman Brothers (the "Banks"); and an offering by the surviving corporation of approximately $2.55 billion in high-yield Post-Merger Notes. *See id.* ¶¶ 26, 28. The offering of the Post-Merger Notes was expressly conditioned on the successful consummation of the proposed acquisition. *See* Offering Circular, Hora Decl. Ex. B at 6.

The prospective Notes offering was structured as a private offering to "qualified institutional buyers" ("QIBs")[4] under SEC Rule 144A, 17 C.F.R. § 230.144A. *Id.* at i. The Banks, who are not named as defendants in this action, committed to act essentially as underwriters of the offering, agreeing to buy the entire issue at a slight discount and hoping to resell as much as possible to QIBs at non-discounted prices. To solicit investment in the Notes, and also to gauge the strength of investor interest in the offering, the Banks held the Notes Presentation (referred to in the Complaint as the "Roadshow") for QIBs at the W Hotel in New York City on November 5, 2007. Compl. ¶ 26. Plaintiff alleges that it attended the Notes Presentation at the invitation of Credit Suisse. *Id.* Plaintiff alleges that Carlton Donaway ("Donaway"), described as a CCM "Senior Advisor – Operations," attended and spoke on behalf of CCM. *Id.* ¶ 29.

---

[4] *See* n.1, *supra*.

As a sophisticated Wall Street investor, Plaintiff knew that the purpose of the Notes Presentation was to market the Post-Merger Notes*, not* the outstanding URI common stock. Written materials distributed at the Notes Presentation explicitly stated that URI stock *would no longer exist*, and there would be no URI public stockholders, at the time the Notes were issued, because those Notes would be issued, if at all, only *after* the completion of the proposed merger. Offering Circular, Hora Decl. Ex. B at 6, 55.

Although the Complaint "questions" whether the Notes Presentation was, in fact, intended to promote investor interest in the Notes, referring pejoratively to the "ostensible" purpose for the Notes Presentation, *see* Compl. ¶¶ 5, 26, Amida does not allege any facts showing that the proposed Notes offering was not genuine, but instead was some sort of ruse concocted by the Banks (which were hosting the presentation and had invited Amida to attend) and CCM to induce arbitrageurs to purchase URI stock. Similarly, Amida does not allege any facts showing that the focus of the Notes Presentation was not the Notes, but rather potential ownership of URI stock. To the contrary, Amida alleges that the sponsors of the Notes Presentation explained the "benefits" of "URI *debt ownership*" to the attendees. *Id.* ¶ 43 (emphasis added).

## V. CAUTIONARY STATEMENTS CONTAINED IN THE PRELIMINARY CONFIDENTIAL OFFERING CIRCULAR DISTRIBUTED TO AMIDA AND OTHER ATTENDEES AT THE NOTES PRESENTATION

Amida acknowledges that it and other attendees at the Notes Presentation received a preliminary confidential offering circular (the "Offering Circular"), dated November 1, 2007. Compl. ¶ 28.[5] Although this 191-page Offering Circular, which painstakingly lays out the terms, characteristics and risks of the Post-Merger Notes, was clearly

---

[5] The Court may properly consider the Offering Circular in connection with this motion: When ruling on a motion to dismiss, a court may consider documents that have been annexed as exhibits to the complaint or incorporated by reference therein. *De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 69 (2d Cir. 1996).

the heart of the Notes Presentation, Amida chose not to attach this critical document to its pleading. Instead, Amida tries to sweep it under the rug with a broad, non-specific allegation that it "emphasized the benefits of the Merger and the associated debt offering." *Id.*

Although perhaps implicit from Amida's cursory description, it bears mentioning that the Offering Circular, by its terms, does not purport to be a solicitation of anything other than an investment in the Post-Merger Notes. The Offering Circular in fact contains no substantive discussion of URI common stock or other URI equity securities, except to indicate that such equity securities would be extinguished upon consummation of the merger. Offering Circular, Hora Decl. Ex. B at 6.

Significantly – although not mentioned by Amida – the Offering Circular repeatedly admonished attendees of the Notes Presentation that the information it contained was confidential, and it expressly cautioned against and prohibited use of that information for any purpose other than evaluating whether to invest in the Post-Merger Notes:

- "We are furnishing this offering circular on a ***confidential basis*** … ***solely to allow a prospective investor to consider purchasing the notes***," *id.* at i (emphasis added);

- "This offering circular is being provided on a ***confidential basis*** … to 'qualified institutional buyers' … for informational use ***solely in connection with their consideration of the purchase of the notes***," *id.* (emphasis added);

- "This offering circular is a ***confidential document*** that we are providing only to prospective purchasers of the notes ***solely for the purpose of making a decision whether to invest in the notes***," *id.* at ii (emphasis added);

- "***By receiving [the] offering circular, you will be deemed to have agreed not to … use this offering circular for any purpose other than evaluating whether to invest in the notes*** ….," *id.* (emphasis added).

Thus, investors attending the Notes Presentation, including Amida, were expressly warned not to rely on the information disseminated with respect to the proposed Post-Merger Notes to make an investment in any other securities – including URI stock.  Amida's actions in purchasing and holding URI common stock, and its claims herein, are in direct defiance of these clear warnings.

## VI.    DONAWAY'S ALLEGED OPTIMISTIC STATEMENTS CONCERNING THE PROPOSED ACQUISITION

Ignoring the explicit warnings contained in the Offering Circular, Amida attempts to premise its claims regarding its purchases of URI stock upon the notion that Donaway gave assurances during the Notes Presentation that the merger would close as scheduled at the price previously announced.  But when Amida recites the actual statements purportedly made by Donaway, they include no such statement assuring a closing.  In fact, the specific statements attributed to Donaway by Amida make no mention of an anticipated closing at all.

Recounting Donaway's purported statements "[m]ore specifically," Amida alleges that "Cerberus emphasized that the poor condition of the credit and financial markets did not affect Cerberus' optimistic view" of URI's future business outlook and "stressed at the Roadshow that with an industry growing at an 11% compound annual growth rate or CAGR, Cerberus found its investment in URI to be attractive, notwithstanding the current credit environment."  *Id.* ¶ 30.  Amida further alleges that Donaway spoke of "significant control" purportedly being exercised by CCM over the "management and operations of URI" and listed specific improvements at URI adopted or contemplated as a consequence of CCM's input.  *Id.* ¶ 31.

According to the Complaint, Donaway "stated that new management at URI, under the direction of Cerberus" had "already taken steps to enhance cost savings at URI, transforming URI from a 'growth story' to a 'cost story,' … with the benefit of approximately

$200 million in immediate cost savings." *Id.* Donaway allegedly told the attendees that "new management at URI" had "already sold three corporate jets," *id.* ¶ 31; "would strive to outsource more functions," *id.* ¶ 32; and "planned on terminating 1,000 employees, … resulting in a $55 million cost savings for URI," *id.* ¶ 33. Significantly, Amida does not allege that Donaway's remarks regarding URI's future business outlook or the CAGR of the equipment rental industry as a whole were inaccurate. Nor does it allege that the specific cost improvements at URI listed by Donaway were not, in fact, being made.

It is thus apparent that the cause of Amida's displeasure is *not* any promise of completion by Donaway (who, according to the allegations of the Complaint, made no such promise). Rather, it is Amida's conclusion, reached after the Notes Presentation, that it was worth gambling more than it already had that the proposed acquisition would close on the terms previously announced. As the Complaint alleges, the statements purportedly made by Donaway gave Amida "further comfort that the merger would close as planned." *Id.* ¶ 6. But "further comfort" is an inference drawn by Amida, not a promise made by Donaway or CCM. Amida is complaining about its own thought process in reaching its conclusion concerning the likelihood that the merger would close, and it now sues CCM for "failing" to ensure that Amida's subjective assessment was "correct" – *i.e.,* was accurately predictive of future events. Such a claim is unprecedented.

Amida also alleges (preposterously) that the mere fact that the Notes Presentation occurred also caused it to conclude that the merger was likely to be completed. Compl. ¶ 57. But the occurrence of a debt offering roadshow does not guarantee that a merger will close; indeed, as a sophisticated investor, Amida was fully aware that one of the purposes of such a roadshow is to determine the level of potential investor interest and, consequently, the terms that

the borrower will have to offer in order to obtain financing.  As the term "risk arbitrage"

suggests, there is always a risk that ongoing events, such as turmoil in the credit and financial

markets or the failure of a closing condition, can act to derail a proposed merger – for example,

by making prohibitively expensive, or even unavailable, the financing needed to complete the

transaction.

On November 5, 2007, this risk was not merely theoretical; it was palpable and

immediate.  In the fall of 2007, there was unprecedented turmoil in the credit markets arising out

of the subprime mortgage crisis, and this turmoil caused the markets to question the viability of

virtually every deal struck during the spring and summer of 2007.[6]  Among the deals being

questioned (or already in litigation) by the time of the Notes Presentation were the acquisition of

PHH Corp. by Blackstone and General Electric, the takeover of Harmon International by

Kohlberg Kravis Roberts and Goldman Sachs, Finish Line, Inc.'s buyout of Genesco, Inc., the

buyout of SLM Corp. by J.C. Flowers, and the sale of Clear Channel Communications, Inc. to a

consortium of private equity buyers.[7]

## VII.  THE PURPORTED "FAILURE" TO DESCRIBE EVENTS THAT OCCURRED IN AUGUST 2007

In addition to its complaints about Donaway's allegedly "comforting" statements,

Amida alleges that CCM "omitted" to disclose to attendees at the Notes Presentation that it

supposedly "told URI in August 2007 that it would not complete the merger with URI unless

URI agreed to renegotiate the previously executed Merger Agreement."  Compl. ¶ 8.  (The

Complaint at times appears inconsistent in this regard, sometimes alleging more aggressively

---

[6]  *See, e.g.*, *A Boom in Bust-ups*, The Economist, Sept. 27, 2007, Hora Decl. Ex. C at 1 (noting that previously agreed buyouts were being "strangled" as their "oxygen" – cheap debt – was being "cut off by the credit crisis").

[7]  *See* Hora Decl. Ex. D.  In at least one pre-November buyout, the sale of Home Depot, Inc.'s contractor-supply unit to a group of private equity buyers, the seller agreed to reduce the sale price to $8.5 billion from $10.3 billion as a result of the burgeoning credit crisis.  *See* Hora Decl. Ex. E.

that CCM had decided that it would "walk away" from the proposed merger as of August 2007. *See id.* ¶ 9.)

Amida's allegations, however, grossly distort the objective record. Relying on correspondence between RAM Holdings and URI and upon unspecified testimony before the Delaware Court of Chancery in December 2007 in URI's failed suit to compel the RAM Entities to complete the merger, Amida alleges that in August 2007, "Cerberus demanded that URI renegotiate the price of the Merger." *Id.* ¶ 38. The actual text of the August 31, 2007 letter from RAM Holdings to URI referenced in and attached as Exhibit A to the Complaint,[8] however, simply asks for a "conversation" with URI about the terms of the Merger Agreement. 8/31/08 Ltr. from S. Mayer to R. Schwed, Hora Decl. Ex. F at 1. Nothing in the letter demands a renegotiation of price or any other term, nor does the letter repudiate the Merger Agreement. *Id.* at 1.

Amida also misrepresents the Delaware trial testimony. Compl. ¶¶ 37, 40. The Complaint's assertion that RAM Holdings "demanded" a renegotiation of the merger is directly contradicted by the trial testimony of URI's investment bankers. URI's bankers testified that RAM Holdings ***never*** threatened to repudiate the transaction, and confirmed that RAM Holdings did not propose any change to price or any other term of the Merger Agreement. Del. Tr. [McNeal], Hora Decl. Ex. G at 99:13-100:3; Del. Tr. [Kochman], Hora Decl. Ex. J at 305:20-23, 308:5-8. Indeed, URI's bankers testified that they specifically inquired whether RAM Holdings had a revised price it wanted URI to consider and were told in response that RAM Holdings had no price proposal and was not necessarily sure at that juncture whether any changes needed to be

---

[8] Amida persists in referring inaccurately to acts undertaken by RAM Holdings as acts undertaken by CCM. The August 31, 2007 letter attached as Exhibit A to the Complaint was sent by RAM Holdings, not, as Amida alleges, by CCM. While this purposeful confusion of the identities of CCM and RAM Holdings is not relevant to the disposition of this motion, CCM has endeavored in its description of events in this memorandum of law to identify accurately the entity that took a specified action.

made at all.[9]  Del. Tr. [McNeal], Hora Decl. Ex. G at 99:13-15; 99:21-100:1-3; Del. Tr.

[Kochman], Hora Decl. Ex. J at 305:20-23.

## VIII.   PLAINTIFF PURCHASES ADDITIONAL URI STOCK

Despite the fact that Amida knew the purpose of the Notes Presentation was to

solicit investment in the Post-Merger Notes, and despite the explicit warnings that it should not

rely upon or use the information conveyed to it at the Notes Presentation for any purpose other

than to consider a possible investment in Post-Merger Notes, Amida alleges that it was "induced

to retain and purchase" URI common stock as a result of the Notes Presentation.  Compl. ¶ 35.

Amida alleges that it held onto the approximately $2.95 million of URI common stock that it had

acquired prior to the Notes Presentation and "purchased an additional $14.4 million of URI

common stock" on various dates from November 5-14, 2007, in the belief that URI, under the

supposed "control of Cerberus," was an "attractive investment" and "consistent with a merger

arbitrage strategy."  *Id.* ¶ 35.

## IX.   RAM HOLDINGS DETERMINES NOT TO
## COMPLETE THE PROPOSED MERGER

As November 2007 progressed, conditions in the financial and credit markets

continued to worsen, and consumer confidence and other published indicators nosedived.  As

CCM's Chief Executive Officer, Stephen Feinberg, testified at the Delaware trial, given the

"tough financial environment," lenders who had committed to finance the merger were "giving

[CCM and RAM Holdings] a hard time" about funding the transaction.  Del. Tr. [Feinberg],

Hora Decl. Ex. H at 59:11-21.  Under those circumstances, CCM determined that it could no

---

[9]  As in its August 31 letter, RAM Holdings simply asked for the opportunity to have a conversation with URI about the merger terms.  *See* Del. Tr. [McNeal], Hora Decl. Ex. G at 99:21-100:3 ("And we asked specifically about [whether] they were in this conversation repudiating a merger contract that they had signed, and their response was no, they were not repudiating, that they ***just wanted to have a conversation***.  And that they ***may not even decide to change anything at the end of this conversation***, but it was a conversation they wanted to have.") (emphasis added).

longer supply the Equity Commitment, and RAM Holdings determined that it could no longer proceed with the proposed merger on the terms previously announced.

By letter dated November 14, 2007, RAM Holdings notified URI that "after giving the matter careful consideration, … [it was] not prepared to proceed with the acquisition of [URI] on the terms contemplated by the merger agreement."  11/14/07 Ltr. from S. Mayer to R. Schwed, Hora Decl. Ex. I at 1; *see also* Compl. ¶ 43.  On November 19, 2007, URI commenced an action against the RAM Entities in the Delaware Court of Chancery, seeking specific performance of the Merger Agreement.  After a bench trial on December 18-19, 2007, the Court of Chancery ruled in favor of the RAM Entities, finding that URI had no right to compel them to close the merger.  *See United Rentals, Inc. v. RAM Holdings, Inc.*, 937 A.2d 810 (Del. Ch. 2007).

## X.    THE CURRENT LITIGATION

On March 19, 2008, Amida, by its counsel herein, wrote to CCM demanding payment of losses allegedly incurred on its trading in URI stock.  By letter dated March 26, 2008, CCM, through counsel, rejected Amida's demand.  Plaintiff filed its Complaint herein on June 18, 2008.

## ARGUMENT

## I.    MOTION TO DISMISS STANDARD

In deciding a motion to dismiss, a court must accept all well-pleaded allegations in the complaint as true.  *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000).  The Court, however, "need not credit conclusory statements unsupported by assertions of facts or legal conclusions and characterizations presented as factual allegations."  *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 404 (S.D.N.Y. 2001).  Likewise, the Court need not credit factual assertions or characterizations that are refuted by the objective record.  *In re*

*Bristol-Myers Squibb Secs. Litig.*, 312 F. Supp. 2d 549, 555 (S.D.N.Y. 2004). Importantly, the

law no longer requires a moving defendant to show that the plaintiff can prove "no set of facts"

entitling it to relief. *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1959-60 (2007). In *Twombly*,

the Supreme Court "retired" the "no set of facts" standard in favor of a more rigorous review that

requires plaintiffs to allege facts that render their claim not merely "conceivable," but truly

"plausible." *Id.* at 1960.

   A plaintiff alleging fraud claims must also satisfy Rule 9(b) of the Federal Rules

of Civil Procedure, and, if the claim is one for securities fraud under Section 10(b) of the '34

Act,[10] the PSLRA's heightened pleading standards. *See Novak v. Kasaks*, 216 F.3d 300, 312 (2d

Cir. 2000). Rule 9(b) requires a plaintiff to plead facts that "(1) specify the statements that the

plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the

statements were made, and (4) explain why the statements were fraudulent." *Shields v. Citytrust*

*Bancorp, Inc.*, 25 F.3d 1124, 1127-28 (2d Cir. 1994) (internal quotations and citations omitted).

The PSLRA similarly requires that a plaintiff "specify each statement alleged to have been

misleading [and] the reason or reasons why the statement is misleading," and that allegations

made on information and belief "state with particularity all facts" on which the belief is based.

15 U.S.C. § 78u-4(b)(1).

   The PSLRA also requires that a plaintiff "state with particularity facts giving rise

to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-

4(b)(2). The inference alleged must be "more than merely 'reasonable' or 'permissible' – it must

be cogent and compelling." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2510

---

[10] 15 U.S.C. § 78j(b).

(2007). The PSLRA commands that a complaint that fails to meet these requirements "shall" be dismissed at the pleading stage. 15 U.S.C. § 78u-4(b)(3)(A).

## II.     THE COMPLAINT FAILS TO STATE A CLAIM UNDER SECTION 10(b)

### A.     Amida's Alleged Reliance on the Notes Presentation as a Purported Basis for Purchasing URI Common Stock Was Not Reasonable

As a matter of law, Amida could not have reasonably relied on statements made at the Notes Presentation as an alleged basis for purchasing URI common stock.[11] Amida was informed in writing that the information it was receiving at the Notes Presentation was being communicated "solely" to allow it to evaluate a potential investment in the Post-Merger Notes and could not be used nor relied upon for any other purpose. Amida's decision to ignore that warning, and (purportedly) to premise its further purchases of URI stock on inferences drawn from the Notes Presentation, cannot form the basis of a claim for "fraud" against CCM.

A plaintiff's mere allegation that it relied on a defendant's representations in purchasing or selling a security is not enough to state a claim under Section 10(b). *Harsco Corp. v. Segui*, 91 F.3d 337, 342 (2d Cir. 1996). The complaint must demonstrate that the plaintiff's reliance on the allegedly fraudulent representations was objectively reasonable. *Id.* This requirement is an "essential" element of a Section 10(b) claim and "ensures that … the 'requisite causal connection between a defendant's [alleged] misrepresentation and a plaintiff's [purported] injury' exists as a predicate for liability." *Stoneridge Inv. Partners v. Scientific-Atlanta, Inc.*, 128 S. Ct. 761, 769 (2008) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 243 (1988)). Sophisticated

---

[11] Amida cannot assert a claim under Section 10(b) for loss allegedly resulting from continuing to hold securities. *See Abrahamson v. Fleschner*, 568 F.2d 862, 868 (2d Cir. 1977) (holding that "the requirement of fraud in connection with the purchase or sale of a security is not satisfied by an allegation that plaintiffs were induced fraudulently not to sell their securities."); *Sovereign Metal Corp. v. Ciraco*, No. 91 Civ. 751 (LLS), 1992 WL 6161, at *2-3 (S.D.N.Y. Jan. 3, 1992) ("[F]raudulent inducement not to sell is not a 10b-5 violation."). Accordingly, the Section 10(b) claim, as distinguished from the common law claims, seeks only recovery of losses allegedly incurred on purchases made after the Notes Presentation.

investors like Amida are held to a particularly stringent standard in demonstrating reasonable reliance. *Emergent Capital Inv. Mgmt. v. Stonepath Group, Inc.*, 343 F.3d 189, 195 (2d Cir. 2003).

   The security that Amida alleges it purchased following the Notes Presentation – URI common stock – was ***not*** the investment being offered or solicited at the Notes Presentation. As the Complaint acknowledges, Amida was invited to the Notes Presentation to evaluate a potential investment in Post-Merger Notes to be issued by URI. Compl. ¶¶ 5, 26, 43. The content of the Notes Presentation was properly tailored to disclose to attendees information believed to be relevant to their consideration of a purchase of the Notes. The presentation *assumed* that RAM Holdings' proposed acquisition of URI would close, and focused, as would be expected, upon the business prospects of the post-merger company that would be the issuer of the Notes. It was the potential performance of that prospective company, not the performance of the then-current URI, that was significant to a prospective investor in the Notes.

   Importantly, the statements made with respect to the Post-Merger Notes were not intended and did not purport to provide disclosure to be used for the attendees' consideration of an investment in any other security. There was no attempt to communicate information – much less *complete* information – that an investor would need in order to evaluate a purchase of URI preferred stock, URI's existing bonds, or URI's common stock. Instead, the attendees, including Amida, were expressly cautioned that the information disseminated at the Notes Presentation was confidential and that they should use and rely upon that information ***only*** to consider a purchase of the Post-Merger Notes, and for ***no other purpose***. *See supra* at 9-10.

   Despite these clear and unambiguous warnings, Amida alleges that it "relied" upon the confidential, nonpublic information it received at the Notes Presentation concerning the

Post-Merger Notes as the basis for purchasing more than $14.4 million of URI common stock.

Amida does not even pretend to justify its actions in this regard, let alone establish that it acted

reasonably in ignoring the limitations, both implicit and express, on the reliability and utility of

the information it received.[12]

### B.    Donaway's Purported Statements at the Notes Presentation Do Not Support a Claim Under Section 10(b)

#### 1.    The Complaint Does Not Specify a Statement Assuring that the Acquisition Will Close

Even if Amida could properly allege that its purported reliance on the Notes

Presentation was reasonable (and it plainly cannot, given the substance of the warnings it

received), Amida's attempt to manufacture a fraud claim against CCM would still fail:  nowhere

does the Complaint allege a statement by Donaway promising the completion of the merger on

the previously disclosed terms.  The Complaint instead relies entirely on Donaway's alleged

remarks that CCM found its proposed investment in URI to be "attractive" despite a bad

economy and that, at CCM's instance, new management at URI had "taken steps to enhance cost

savings at URI."  *See* supra at 10-11.  But there is absolutely nothing in the substance of these

alleged statements that constitutes a promise or commitment that the merger would close.

---

[12]  *In re Ames Department Stores Inc. Stock Litigation*, 991 F.2d 953 (2d Cir 1993), is not to the contrary. There, the Court of Appeals noted that a series of publicly disseminated disclosures by the defendants, all of which allegedly painted a knowingly false picture of rosy performance, some of which were made in general company filings including an annual report, quarterly reports and press releases, and some of which were made in prospectuses for two specific debt offerings, could form the basis for a stockholder class claim under Section 10(b).  Addressing the issue as arising under the "in connection with" requirement of Section 10(b), the court, referencing a line of precedent beginning with *Fischman v. Raytheon Mfg. Co.*, 188 F.2d 782 (2d Cir. 1951), held that "statements ***directed to the general public*** which affect the public's interest in the corporation's stock are made in connection with sales or purchases of that stock."  *Ames*, 991 F.2d at 966 (emphasis added).  Here, by contrast, unlike the publicly disseminated statements in *Ames*, the Offering Circular and the statements at the Notes Presentation most certainly were ***not*** directed to the general public, and they are not alleged to have been publicly disseminated.  Indeed, the Offering Circular expressly prohibits transmittal to anyone other than the original QIB recipient.  Accordingly, the predicate for satisfying the "in connection with" requirement is not met.

Discussion at the Notes Presentation was focused on how the merged URI would operate after the acquisition, but that was simply a result of the obvious fact that the Post-Merger Notes would not be issued unless and until the merger closed.  Indeed, Amida and other attendees of the Notes Presentation were specifically informed in writing that the offering of the Post-Merger Notes was contingent on the successful consummation of the merger and that the sponsors of the offering were entitled to withdraw the offering at any time before closing.  Offering Circular, Hora Decl. Ex. B at ii, 6.  Although Amida asserts that it drew the inference that the merger was likely to close from the Notes Presentation and from the purported fact that "few (if any) mergers have failed to close following a roadshow for reasons other than [invocation of a material adverse effects clause]," Compl. ¶ 6, Amida's inference is not a "statement" by CCM.

### 2. Donaway's Alleged Statements Were, at Most, Non-Actionable Expressions of Optimism

Even if Donaway's alleged statements about the equipment rental industry and the RAM Entities' cost-saving plans could be viewed as expressions of optimism that the transaction would be consummated, such expressions of optimism are not actionable under the securities laws unless the complaint alleges specific facts demonstrating either that the expression was phrased as a guarantee or that it was known to be false when made.  Absent at least one of these allegations, courts in this District have routinely rejected attempts by merger arbitrageurs and other investors to assert Section 10(b) claims based on indications of optimism regarding completion of a proposed merger.  *See, e.g.*, *Elliot Assocs., L.P. v. Covance, Inc.*, No. 00-Civ.-4115 (SAS), 2000 WL 1752848, at *9 (S.D.N.Y. Nov. 28, 2000) (holding that alleged statements regarding the expected completion of a merger were nonactionable indications of optimism); *Faulkner v. Verizon Commc'ns, Inc.*, 156 F. Supp. 2d 384, 397-400 (S.D.N.Y. 2001) ("*Faulkner I*") (holding that statements that proposed merger was "on track" to close were nonactionable);

*Faulkner v. Verizon Commc'ns, Inc.*, 189 F. Supp. 2d 161, 165 (S.D.N.Y. 2002) ("*Faulkner II*")
(same).

In *Elliot Associates*, 2000 WL 1752848 at *1, two arbitrageurs brought a
securities fraud action against Covance, Inc. ("Covance") following the failure of its planned
merger with Paraxel, Inc. ("Paraxel"). The plaintiffs alleged that they were "misled" into taking
long positions in Paraxel common stock by various statements purportedly made by Covance
representatives. According to plaintiffs, Covance officials told them several times in June 1999
in calls and at investor conferences that the proposed merger was "on track to close" and that the
"strategic rationale for the combination" was "compelling." *Id.* at *2-3. The merger, however,
was terminated by mutual consent on June 25, 1999. *Id.* at *3. The court dismissed plaintiffs'
fraud claims, holding that none of the alleged statements could possibly be understood as a
guarantee that the merger would close, especially "given the usual level of uncertainty as to
whether any proposed merger would actually be completed," and that plaintiffs had alleged no
facts, as required by Rule 9(b) and the PSLRA, demonstrating that any of the optimistic
statements were known to be false when made. *Id.* at *8-9.

Similarly, in *Faulkner II*, 189 F. Supp. 2d at 162, the plaintiffs, investors in
publicly traded notes issued by Northpoint Communications Corp. ("Northpoint"), filed Section
10(b) claims against Verizon Communications, Inc. ("Verizon") after Verizon unilaterally
terminated its merger agreement with Northpoint. Plaintiffs alleged that they were defrauded
into purchasing the notes by several optimistic statements made or authorized by Verizon
regarding the status of the anticipated merger. *Id.* at 163-66. Among other things, Verizon filed
a Form 10-Q on November 14, 2000 in which it stated that it "expect[ed] the Merger to close in
2001" and purportedly authorized a press release issued by Northpoint on November 20, 2000

announcing that the merger continued to be "on track." *Id.* at 165.  On November 29, 2000, nine days after the issuance of the press release, Verizon terminated the merger agreement, arguing that revisions to Northpoint's third quarter earnings (which were disclosed to the public for the first time in the Northpoint release on November 20, but allegedly known to Verizon prior to November 14) constituted a "material adverse effect." *Id.* at 166.

The court dismissed plaintiffs' claims, finding that the challenged statements regarding the status of the proposed merger could not be reasonably understood by plaintiffs as anything other than an indication of optimism that the merger would ultimately be consummated and that plaintiffs had provided "no factual basis to support the claim that prior to November 14, 2000, Verizon had changed its mind and decided to terminate the merger." *Id.* at 167, 173.  The court reached this determination notwithstanding evidence that, within days of signing the merger agreement, Verizon's chief negotiator authored internal memoranda that raised, as an alternative to completing the merger, the possibility of letting Northpoint go bankrupt and then buying the company more cheaply in bankruptcy.  *Id.* at 164.  The court found that the memoranda, on their face and as a matter of law, were merely "inquiries" and not probative of any decision to terminate.  *Id.* at 171.

The situation here is no different.  None of Donaway's alleged statements can be construed as a guarantee, especially given the heightened risks at work in November 2007, *see supra* at 12 and nn. 6-7.  And the Complaint alleges no facts demonstrating that Donaway's purported optimism was insincere.

### 3.    Amida Has Not Sufficiently Alleged Facts Showing that Donaway's Alleged Expression of Optimism Was False When Made

In an effort to show that Donaway's purported indications of optimism at the Notes Presentation were false when made, Amida first asserts that CCM told URI in August

2007 that it would not close the merger unless URI agreed to lower the previously agreed deal price. This allegation is untenable, because it is squarely contradicted by the documents and testimony invoked in the Complaint to substantiate it.

RAM Holdings' August 31, 2007 letter to URI, which Amida falsely trumpets as demanding a renegotiation, makes no such demand. It does not contain any language proposing revisions to the Merger Agreement, nor does it state that CCM will "back out" of the merger if URI does not agree to renegotiated terms. To the contrary, the letter simply recites "a desire to have a conversation" and "discussion" with URI about the Merger Agreement, and asks URI to reconsider its unwillingness to do so. Hora Decl. Ex. F at 1. The letter in fact goes out of its way to indicate that it is ***not*** a repudiation of the Merger Agreement.

Amida's description of the trial testimony surrounding RAM Holdings' telephone call with URI's investment bankers on August 29, 2007 is similarly inaccurate. Far from evidencing a demand to renegotiate, the testimony shows that RAM Holdings' representatives told URI's bankers that they wanted to have "a conversation" with URI about the terms of the proposed merger. Del. Tr. [McNeal], Hora Decl. Ex. G at 99:24-100:1. In response to questions from URI's bankers about the RAM Entities' commitment to the deal, RAM Holdings' representatives expressly stated that they were not repudiating the Merger Agreement and that, they conceived it was quite likely that, following a conversation with URI, the RAM Entities might not seek any changes at all to the transaction terms. *Id.* at 99:21-100:3.

The assertion that RAM Holdings "demanded" a renegotiation and told URI that it would walk away from the proposed merger unless a renegotiation occurred is simply not supported by anything cited in the Complaint, and is, in fact, contradicted by those sources. The Court should therefore disregard Amida's false characterizations of the August 2007

communications. *See In re Bristol-Myers Squibb Secs. Litig.*, 312 F. Supp. 2d at 555 ("The court need not accept as true an allegation that is contradicted by documents on which the complaint relies.").

      Amida's second suggestion, that fraud may be established by the mere proximity of the Notes Presentation to RAM Holdings' notice to URI that it would not proceed with the merger, Compl. ¶ 43, is similarly insufficient as a matter of law. "The mere disclosure of adverse information shortly after a positive statement does not support a finding that the prior statement was false at the time it was made." *Faulkner I*, 156 F. Supp. 2d at 400 (rejecting plaintiff's assertion that defendant's decision to terminate merger agreement nine days after it announced that it expected the transaction to close raised an inference of fraud). Amida has offered nothing but conclusory allegations to support its assertion that CCM's alleged indications of optimism on November 5 were false when made. RAM Holdings' decision to withdraw from the proposed merger on November 14 was fully explained by continuously worsening conditions in the credit and financial markets, and the heightened risk of recession, all of which was widely reported. Amida's impermissible attempt to plead fraud by hindsight should be rejected. *See Shields*, 25 F.3d at 1129 (rejecting legitimacy of alleging fraud by hindsight); *Denny v. Barber*, 576 F.2d 465, 470 (2d Cir. 1978) (Friendly, J.) (same).

### C.    CCM Had No Duty to Disclose the August 2007 Communications Between RAM Holdings and URI as Part of the Notes Presentation

      In addition to attempting (without success) to allege actionable misstatements by CCM, Amida attempts to allege – equally without success – that Donaway made an actionable "omission" by failing to disclose RAM Holdings' August 2007 communications with URI to attendees at the Notes Presentation. Compl. ¶¶ 8, 52. But in addition to the gross inaccuracy of Amida's characterization of these communications, detailed above, Amida also has failed to

plead any facts demonstrating why it would have been necessary or appropriate for the details of these communications to have been disclosed to prospective purchasers *of Post-Merger Notes*. In fact, these communications were irrelevant to potential investors in the Post-Merger Notes, whose decisions to invest or not to invest in the Notes would not have been influenced by knowledge of the communications.

As a matter of law and logic, there is no duty to disclose information that is irrelevant to a prospective investor's investment decision. *Ryan v. J. Walter Thompson Co.*, 453 F.2d 444, 447 (2d Cir. 1971) (defendant had no duty under Section 10(b) to disclose facts that were irrelevant to repurchase of plaintiff's stock). Amida alleges no particularized facts that demonstrate why a detailed disclosure of RAM Holdings' August 2007 communications with URI would have been relevant to prospective purchasers of debt securities to be issued *after* the merger, whose investment decision would take effect only if the merger closed.

In fact, such information would have been entirely irrelevant to potential purchasers of the Notes. If the RAM Entities elected to walk away from the merger, the Notes would not be issued, and the potential purchasers of those securities would make no investment. If the merger closed as announced, the purported "fact" that there had been communications in August 2007 about the possibility of different merger terms would likewise be irrelevant to an investor who purchased the Post-Merger Notes. And if the RAM Entities and URI amended the terms of the Merger Agreement, potential investors in the Notes offering – which would not occur until after the merger – would have had ample time to decide for themselves, on the basis of facts, rather than speculation, whether investment in the Post-Merger Notes was attractive in light of the revised merger terms.[13]

---

[13]  SEC proxy rules would, of course, require public disclosure of any revised merger terms. *See* 17 C.F.R. § 240.14a-101.

It is thus fundamentally wrong to complain, as Amida does, that information purportedly relevant or material to its purchase of URI common stock was not contained in the Notes Presentation.  It did not have to be, because it was irrelevant to prospective purchasers of the Post-Merger Notes.  Materiality and justifiable reliance are measured with reference to an investment decision by a particular audience which intends to purchase a particular security.  *See In re Enron Corp. Secs., Derivative & "ERISA" Litig.*, No. MDL-1446, Civ. A. H-01-3624, Civ. A H-04-0088, 2005 WL 3704688, at *10 n.50 (S.D. Tex. Dec. 5, 2005) (rejecting claims of justifiable reliance by plaintiffs who were not "the investor audience expressly targeted by" allegedly misleading offering memoranda).  In the circumstances of the contemplated private offering presented here, the speaker has an obligation under the federal securities laws to the targeted investors, with respect to the specified securities, but not to investors in other securities not being addressed.

## III.    PLAINTIFF HAS FAILED TO ALLEGE SCIENTER

Amida's Section 10(b) claim is also deficient because Amida does not plead any facts showing that Donaway, the individual alleged to have made the purported misstatements and omissions, acted with an intent to defraud those attending the Notes Presentation.  Absent particularized factual allegations showing that Donaway acted with scienter, and that his scienter is properly attributed to CCM, Plaintiff cannot plead or prove scienter with respect to CCM.

To plead scienter under the PSLRA, a plaintiff must, with respect to each alleged act or omission, allege facts that give rise to a cogent and compelling inference that the defendant either (*i*) had motive and opportunity to commit fraud or (*ii*) engaged in "conscious misbehavior or recklessness."  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007); *see also* 15 U.S.C. § 78u-4(b)(2).  In its recent decision in *Teamsters Local 445 Freight Division Pension Fund v. Dynex Capital Inc.*, the Second Circuit held that when seeking

to state a claim for securities fraud against a corporation or similar entity, a plaintiff **cannot** plead scienter on the part of a corporation "without pleading scienter against any particular employees of the corporation."  531 F.3d 190, 194 (2d Cir. 2008) (citing *In re Dynex Capital, Inc. Sec. Litig.*, No. 05-Civ.-1897 (HB), 2006 WL 314524, at *9-10 (S.D.N.Y. Feb. 10, 2006)).

　　　　Rather, the plaintiff must plead facts demonstrating a strong inference of scienter on the part of an *individual* "who was responsible for the [allegedly false or misleading] statements."  *Id.* at 197.  The individual need not be named as a defendant, but "[w]hen the defendant is a corporate entity … the pleaded facts must create a strong inference that someone whose intent could be imputed to a corporation acted with the requisite scienter."  *Id.* at 195. While this requirement may not preclude a plaintiff from pleading scienter based on the conduct of persons not joined as defendants (and perhaps not identifiable by name at the time of pleading), *id.*, citing *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 708 (7th Cir. 2008), the plaintiff is required to plead specific facts raising a strong inference that an identifiable person whose intent could be imputed to the corporation acted with the requisite scienter.  *Teamsters Local 445,* 531 F.3d 190 at 195, 197.[14]

　　　　Here, the Complaint clearly identifies Donaway as the "agent" allegedly acting for CCM responsible for the alleged misstatements and omissions.  Although the Complaint asserts in a conclusory fashion that Donaway's alleged statements regarding the proposed URI merger were "categorically and knowingly false" because CCM ultimately walked away from the merger, Compl. ¶ 36, the Complaint does not plead any facts demonstrating that Donaway knew about or was in any way involved in the RAM Entities' decision to withdraw from the

---

[14]  *Accord In re Apple Computer, Inc.*, No. 03-16614, 127 Fed. Appx. 296, 303 (9th Cir. Apr. 4, 2005) (holding that "[a] corporation is deemed to have the requisite scienter for fraud only if the individual corporate officer making the statement has the requisite level of scienter at the time that he or she makes the statement"); *Southland Secs. Corp. v. INSpire Ins. Solutions Inc.*, 365 F.3d 353, 366 (5th Cir. 2004) (same).

merger or CCM's decision not to proceed with the Equity Commitment.  Likewise, the Complaint does not allege facts showing that Donaway was aware on November 5, 2007, when the Notes Presentation was held, that the RAM Entities purportedly had already determined (months earlier) that they would not complete the proposed merger.  Nor does the Complaint plead any facts demonstrating that Donaway had knowledge of or involvement in RAM Holdings' purported attempt to "renegotiate" the merger in August 2007.  Instead, the Complaint relies exclusively on Donaway's alleged position as "Senior Advisor – Operations for Cerberus" to impute such knowledge to him.

That, however, is not enough to plead a strong inference of scienter:  "[C]ourts have routinely rejected … attempts to plead scienter based on allegations" that defendants' management positions or other positions within the corporate hierarchy provided them with "access to information" that allegedly rendered their statements fraudulent.  *In re Health Mgmt. Sys., Inc. Sec. Litig.*, No. 97 Civ. 1865 (HB), 1998 WL 283286, at *6 (S.D.N.Y. June 1, 1998).[15]

The Complaint also fails to allege any facts to show that Donaway had a motive to misrepresent information concerning the proposed merger to attendees of the Notes Presentation.  To plead that a defendant had a "motive" to commit securities fraud, a plaintiff must allege facts demonstrating that the defendant would personally reap "concrete benefits" through "one or more of the [alleged] false statements and wrongful nondisclosures."  *Shields v. Citytrust Bancorp., Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994).  The Complaint does not do so. Although the Complaint makes the conclusory assertion that "Cerberus" was motivated to inflate

---

[15] *See also In re Federated Dep't Stores, Inc. Sec. Litig.*, No. 00-Civ.-6362 (RCC), 2004 WL 444559, at *6 (S.D.N.Y. Mar. 11, 2004) (dismissing complaint where plaintiffs sought "to impute knowledge to [individuals] without any specific allegations that [individuals] themselves actually received the information that [p]laintiffs argue establishes scienter"); *In re Bio-Tech Gen. Corp. Sec. Litig.*, 380 F. Supp. 2d 574, 596 (D.N.J. Aug. 10, 2005) (dismissing complaint where plaintiff "conspicuously neglect[ed] the critical step of connecting" sales reports that allegedly contained information contradicting defendants' public statements "with the named [i]ndividual [d]efendants in this case.").

URI's stock price and cause purchases by arbitrageurs in order to increase its leverage to induce URI to accept a lower deal price, Compl. ¶ 65, the Complaint contains no particularized facts showing that **Donaway** was aware of or participated in any decisions concerning whether to proceed with the proposed merger or in any purported efforts to renegotiate or restructure the transaction with URI.

Nor does the Complaint allege any facts demonstrating that Donaway would reap a personal benefit as a result of any of the purported "misrepresentations" at the Notes Presentation. Indeed, the Complaint offers nothing to show that Donaway had any reason to induce attendees of the Notes Presentation to purchase URI stock.

## IV.    AMIDA'S CLAIMS FOR COMMON LAW FRAUD AND FRAUDULENT INDUCEMENT MUST BE DISMISSED

Amida's second and third counts attempt to plead claims for fraud and fraud in the inducement under New York state law. The elements of these common law claims are "essentially the same as those which must be pleaded to establish a claim under § 10(b) and Rule 10b-5." *Endovasc Ltd. v. J.P. Turner & Co.*, No. 02-Civ.-7313 (LAP), 2004 WL 634171, at *14 (S.D.N.Y. Mar. 31, 2004), *vacated in part on other grounds by* 169 Fed. Appx. 655 (2d Cir. 2006); *see also Starkman v. Warner Commc'ns, Inc.*, 671 F. Supp. 297, 308 (S.D.N.Y. 1987).[16] Because these claims sound in fraud, they are also subject to the heightened pleading requirements of Rule 9(b). *See Mfrs. Life Ins. Co. v. Donaldson, Lufkin & Jenrette Secs. Corp.*,

---

[16]  To state a claim for common law fraud under New York law, a plaintiff must allege "1) the defendant's misrepresentation or omission of material fact, 2) the defendant's intent to deceive plaintiff, 3) justifiable reliance upon the misrepresentation by the defrauded party, and 4) that the plaintiff's injury was caused by the defendant's misrepresentation." *Morse v. Weingarten*, 777 F. Supp. 312, 319 (S.D.N.Y. 1991). To state a claim for fraudulent inducement under New York law, a plaintiff must plead facts showing "(1) that [the defendant] made a misrepresentation (2) as to material fact (3) which was false (4) and known to be false by the defendant (5) that was made for the purpose of inducing [the plaintiff] to rely on it (6) that [the plaintiff] rightfully did so rely (7) in ignorance of its falsity (8) to his injury." *Sultan v. Read*, No. 03-Civ.-7462 (PKL), 2005 WL 486732, at *3 (S.D.N.Y. Mar. 1, 2005).

No. 99-1944 (NRB), 2000 WL 709006, at *5 n.8 (S.D.N.Y. June 1, 2000) (applying Rule 9(b) to common law fraud claim); *Waxman v. Envipco Pick Up & Processing Servs., Inc.*, No. 02-Civ.-10132 (GEL), 2003 WL 22439796, at *12 (S.D.N.Y. Oct. 28, 2003) (applying Rule 9(b) to claim for fraud in the inducement).

Amida's common law fraud and fraud in the inducement claims incorporate the same substantive allegations as Amida's claim under Section 10(b). These claims are therefore deficient for precisely the same reasons that Amida's Section 10(b) claim is fatally flawed. *See Starkman*, 671 F. Supp. at 308 (dismissing common law fraud claim for the same reasons discussed in dismissing Section 10(b) claims); *Morse*, 777 F. Supp. at 319 (dismissing common law fraud claim based on "the identical analysis" used to dismiss Section 10(b) claim); *Endovasc Ltd.*, 2004 WL 634171, at *14 (S.D.N.Y. Mar. 31, 2004) (dismissing plaintiff's common law fraud claim "for the same reasons discussed in dismissing [plaintiff's] misrepresentation and market manipulation claims"); *Mfrs. Life Ins. Co.*, 2000 WL 709006, at *5 (finding plaintiff's common law fraud "deficient for precisely the same reasons that its federal [Section] 10(b) claim fail[ed]"); *Waxman*, 2003 WL 22439796, at *12 ("[F]or substantially the reasons that … [the] securities fraud claims [fail], any allegation of fraud in the inducement would fail to state a claim.").

## V.    THE COMPLAINT FAILS TO STATE A CLAIM FOR PROMISSORY ESTOPPEL

Amida's attempt to recover from CCM on a theory of promissory estoppel is completely without basis. To state a claim for promissory estoppel under New York law, a plaintiff must plead, at a minimum, "a clear and unambiguous promise" and "reasonable and foreseeable reliance" by the party to whom the purported promise is made. *Stein v. Gelfand*, 476 F. Supp. 2d 427, 436 (S.D.N.Y. 2007). As discussed above, none of CCM's alleged indications

of optimism at the Notes Presentation even remotely constitute a "promise" or commitment that the proposed merger would close, let alone a clear and unambiguous one.

        Nor could Amida reasonably rely on statements directed to potential purchasers of post-acquisition debt securities of a post-merger URI in purchasing currently outstanding URI common stock: Amida was expressly advised not to use any information communicated at the Notes Presentation for any purpose other than to evaluate a potential investment in the post-merger debt. Amida's claim for promissory estoppel is therefore plainly overreaching and must be dismissed. *See In re Cairns & Assocs., Inc.*, 372 B.R. 637, 659 (S.D.N.Y. Bankr. 2007) (dismissing promissory estoppel claim for failure to allege clear and unambiguous promise); *Stein*, 476 F. Supp. 2d at 435 (dismissing promissory estoppel claim for failure to allege reasonable reliance).

## <u>CONCLUSION</u>

        The federal securities laws are not intended as a tool to provide investors with insurance every time their investments strategies, in hindsight, turn out to have been mistaken. *Podany v. Robertson Stephens, Inc.*, 318 F. Supp. 2d 146 (S.D.N.Y. 2004). This is particularly so where, as here, the investor, by its own admission, chose to engage in an investment strategy that was inherently fraught with risk, and did so in defiance of express warnings that the information upon which it purports to have relied should not be used for such purpose. For the

reasons stated above, CCM respectfully requests that the claims asserted in the Complaint be dismissed with prejudice.

Respectfully submitted,

MILBANK, TWEED, HADLEY & McCLOY LLP

By: __/s/ Michael L. Hirschfeld__
Michael L. Hirschfeld
Robert C. Hora
One Chase Manhattan Plaza
New York, New York  10005
Tel: (212) 530-5000
Fax: (212) 530-5219
E-mail: mhirschfeld@milbank.com
            rhora@milbank.com

*Attorneys for Defendant Cerberus Capital Management, L.P.*

## CERTIFICATE OF SERVICE

I, Michael L. Hirschfeld, an attorney duly admitted to practice before the United States District Court for the Southern District of New York, certify that on August 7, 2008, a copy of the foregoing Memorandum of Law in Support of Defendant Cerberus Capital Management, L.P.'s Motion to Dismiss was filed electronically. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF system.

>     /s/ Michael L. Hirschfeld
> Michael L. Hirschfeld
> MILBANK, TWEED, HADLEY & McCLOY LLP
> 1 Chase Manhattan Plaza
> New York, NY  10005-1413
> Phone:  (212) 530-5000
> Fax:  (212) 530-5219
> E-mail:  mhirschfeld@milbank.com