UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X
AMIDA CAPITAL MANAGEMENT II, LLC,

                Plaintiff,          <u>OPINION</u>

     -against-                08 Civ. 5516 (MGC)

CERBERUS CAPITAL MANAGEMENT, L.P., RAM
HOLDINGS, INC., RAM ACQUISITION CORP.,
RAM HOLDINGS COMPANY, LLC, CERBERUS
PARTNERS L.P., CERBERUS ASSOCIATES,
L.L.C., STEVEN F. MAYER*, AND STEPHEN A.
FEINBERG*,

                Defendants.
----------------------------------X

APPEARANCES:

        COUGHLIN STOIA GELLER RUDMAN & ROBBINS LLP
        58 South Service Road, Suite 200
        Melville, NY 11747

        Attorneys for Plaintiff

        By: Samuel H Rudman, Esq.
            David A. Rosenfeld, Esq.
            Stuart A. Davidson, Esq.
            Stephen R. Astley, Esq.

        MILBANK, TWEED, HADLEY & MCCLOY, LLP
        1 Chase Manhattan Plaza
        New York, NY 10005

        Attorneys for Defendants

        By: Michael L Hirschfeld, Esq.
            Robert C. Hora, Esq.
            Jennie Woltz, Esq.

---

*  Steven F. Mayer was incorrectly named as "Steven T. Mayer," and Stephen A.
Feinberg was incorrectly named as "Stephen M. Feinberg."  I have amended the
caption accordingly, and the Clerk of the Court is directed to amend the
docket sheet.

**Cedarbaum, J.**

Amida Capital Management II, LLC ("Amida") sues under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and under New York law, for fraud in connection with Amida's purchase of stock of United Rentals, Inc. during Cerberus's aborted buy-out of United Rentals in 2007.

I dismissed the original Complaint at oral argument on October 30, 2008, and granted Amida leave to replead. Defendants now move to dismiss the Amended Complaint. For the following reasons, the motion to dismiss is granted.

<strong>BACKGROUND</strong>

**I. The Parties**

The following facts are drawn from the Amended Complaint, the exhibits attached to that complaint, and documents incorporated into the complaint by reference.

Amida is a New York-based investment firm. Cerberus Capital Management L.P. is a large private equity firm headquartered in New York. Cerberus Partners, L.P. is the general partner of Cerberus Capital Management L.P. Cerberus Associates, L.L.C. is a Delaware limited liability company that is the general partner of Cerberus Partners L.P.

Cerberus[1] created Ram Holdings, Inc., a Delaware corporation, as an acquisition vehicle for United Rentals, Inc.  The sole shareholder of RAM Holdings, Inc. is RAM Holdings Company, LLC, whose sole member is Cerberus Associates, LLC.  RAM Acquisition Corp. is a wholly-owned subsidiary of RAM Holdings, Inc.

United Rentals, Inc., ("URI") is a large equipment rental company with a principal place of business in Greenwich, Connecticut.

Amida sues Cerberus Capital Management, Cerberus Partners, RAM Holdings, Inc., RAM Acquisition Corp., and Steven Mayer under Section 10(b) of the Securities Exchange Act and Rule 10b-5 issued thereunder.  Amida sues Cerberus Capital Management, Cerberus Associates, RAM Holdings Company, LLC, Ram Holdings, Inc., Cerberus Partners, Steven Mayer and Stephen Feinberg as "control persons" under Section 20(a) of the Securities Exchange Act.  Amida also sues all defendants for New York common law fraud, fraudulent inducement, and promissory estoppel.

**II.    The Cerberus / United Rentals Transaction**

   **A. April – July 2007: negotiations and signing of the Merger Agreement**

In April 2007, URI announced that its board was contemplating a sale of the company, and retained UBS Investment

---

[1] For the purposes of this motion, I will adopt the parties' practice and refer to Cerberus Capital Management, L.P., Cerberus Partners, L.P., Cerberus Associates, L.L.C., Ram Holdings, Inc., Ram Holdings Company, LLC, and Ram Acquisition Corp. collectively as "Cerberus" unless it is necessary to identify a specific entity.

Bank and Credit Suisse as advisers.  In May 2007, Cerberus and five other potential purchasers indicated interest in an all-cash purchase of URI's outstanding shares.  Cerberus initially indicated that it would offer a price of $35-$37 per share, but reduced its offer to $33 per share in early July.  Price negotiations continued until July 21, 2007, when Cerberus made a final offer of $34.50 per share.  While the deal price was being negotiated in June and July 2007, Cerberus and URI exchanged drafts of the Merger Agreement.  On July 22, 2007, URI's Board of Directors approved the Merger Agreement at the price of $34.50 per share, and decided to recommend the merger to URI's shareholders.  URI and RAM Holdings, Inc. entered into the Merger Agreement on July 22, 2007.

On July 23, 2007, URI issued a press release that announced the Merger and summarized certain provisions of the Merger Agreement.  URI filed this press release with the Securities and Exchange Commission ("SEC") on form 8-K on July 24, 2007, and attached the entire Merger Agreement as an exhibit to that form.

RAM Holdings, Inc. filed a Schedule 13D (a "13D") with the SEC on August 1, 2007.  In that 13D, RAM Holdings declared its intent to acquire control of URI for $34.50 per share of common stock.  The Merger Agreement and other governing agreements were filed as exhibits to the 13D and incorporated into that document by reference.

### B. August and September 2007 - Cerberus seeks a "discussion" of the terms of the Merger.

July 2007 marked the beginning of what was then called the "credit crunch," the first phase of the financial crisis that culminated in the fall of 2008.  On August 29, 2007, representatives of Cerberus requested a telephone call with UBS to discuss the terms of the transaction, particularly the purchase price, given the difference between that day's closing price of $32.33 and the merger price of $34.50.  URI did not respond to Cerberus's invitation, and Cerberus followed up with a letter on August 31, 2007.  That letter asked URI's Board of Directors to join Cerberus in a "constructive dialogue" concerning the "unanticipated developments in the credit and financial markets."  (Am. Compl. Ex. B.)

### C. September 2007 – URI rebuffs Cerberus's requests for a "discussion."

URI responded by letter on September 6, 2007.  In that letter, URI rejected Cerberus's invitation to discuss changes to the Merger Agreement, characterizing Cerberus's request as "without cause or contractual support."  The letter notes that RAM Holdings, Inc. had obtained committed debt financing, thus protecting it from the turmoil in the credit markets, and that changed conditions "generally affecting the economy or the financial, debt, credit, or securities markets in the Untied States" were expressly carved out of the Material Adverse

Circumstances clause of the Merger Agreement.   (Am. Compl. Ex.
C.)   There were no further attempts by Cerberus to renegotiate
the terms of the Merger Agreement until about November 12, 2007.

According to Amida, URI's refusal to renegotiate the merger
terms "created a stalemate situation that signaled the end of any
possibility of a merger between URI and Cerberus."   (Am. Compl. ¶
49.)

URI filed its Definitive Proxy Statement on September 19,
2007, and scheduled the Special Meeting at which its shareholders
would vote on the merger for October 19.   About 99.8% of the
votes entered at the October 19, 2007 Special Meeting were in
favor of the merger.

During September and October, Amida bought a "net total" of
$2.95 million in URI common stock.   (Am. Compl. ¶ 52.)

### D. The November 5, 2007 Roadshow

On November 5, 2007, Cerberus held a roadshow at a W Hotel
in New York City to solicit interest among Qualified
Institutional Buyers[2] in Notes that would be issued after the
Merger closed.   Amida attended the roadshow, received a copy of
the preliminary Offering Circular, and heard a presentation by
Carlton Donaway, a Cerberus employee.   Amida believed that the
occurrence of the roadshow meant that the merger was likely to

---

[2] Rule 144A under the Securities Act of 1933 permits the sale of certain
unregistered securities to a Qualified Institutional Buyer, which is an entity
of an enumerated type that "owns and invests on a discretionary basis at least
$100 million in securities. . . ."   17 C.F.R. § 230.144A

close because "few mergers have failed to close following a roadshow."  (Am. Compl. ¶ 57.)  Between November 5 and 14, Amida bought about $14.4 million of URI common stock.

### E. The Merger Collapses

On November 12, 2007, Cerberus met with UBS to discuss Cerberus's commitment to a renegotiated transaction.  On November 14, 2007, URI announced that Ram Holdings, Inc. had informed URI that it was not prepared to proceed with the purchase of URI on the terms set forth in the Merger Agreement.  Upon that news, URI's stock fell from the November 13 closing price of $34.01 per share to $23.50 per share on November 14, 2007.  On November 15, RAM Holdings, Inc. amended its 13D.

On November 19, 2007, URI sued RAM Holdings, Inc. and RAM Acquisition Corp. in Delaware Chancery Court for specific performance of the Merger Agreement.  After a trial in December 2007, that court decided that specific performance was unavailable under the Merger Agreement, and URI's recourse was limited to the $100 million limited guarantee provided in the Merger Agreement.  United Rentals, Inc. v. RAM Holdings, Inc., 937 A.2d 810 (Del. Ch. 2007).  URI then demanded the $100 million, which Cerberus paid.

Shareholders of URI filed a putative class action against URI, Cerberus, Steven Mayer, and Stephen Feinberg in the District of Connecticut.  See DeCicco et al. v. United Rentals, Inc. et

al., 602 F. Supp. 2d 325 (D. Conn. 2009).  In DeCicco, the plaintiffs alleged that URI had misled them by failing to disclose the unavailability of specific performance and the risk that Cerberus could elect to terminate the agreement by paying the $100 million fee.  They also alleged that the attempted renegotiation of late August and early September ought to have been publicly disclosed, and that RAM Holdings, Inc. ought to have amended its 13D.  Judge Hall dismissed the complaint on March 10, 2009 (Id.) and dismissed the Amended Consolidated Complaint with prejudice on August 24, 2009.  First New York Sec. L.L.C., et al. v. United Rentals, Inc., et al., No. 07 Civ. 1708 (JCH), 2009 U.S. Dist. LEXIS 78605 (D. Conn. August 24, 2009).

### F. Amida's Allegations

Amida alleges that Cerberus made three classes of false or materially misleading statements.  First, Amida seeks to hold Cerberus liable for alleged misstatements and omissions in URI's press releases and SEC filings during the merger period.  Second, Amida alleges that RAM Holdings, Inc.'s 13D was false or misleading when issued or ought to have been amended to prevent it from becoming false or misleading upon later events.  Third, Amida contends that Donaway's statements at the roadshow were materially false or misleading.

### DISCUSSION

### I.   Standard on a Motion to Dismiss

On a motion to dismiss under Fed. R. Civ. P. 12(b)(6), I accept the factual allegations of the complaint as true, and draw all reasonable inferences in favor of the plaintiff.  ECA and Local 134 IBEW Joint Pension Trust v. JP Morgan Chase Co., 553 F.3d 187, 196 (2d Cir. 2009).  In addition to the allegations of the complaint, I may consider documents that are attached to or incorporated into the complaint by reference, or documents publicly filed with the SEC, upon which the plaintiff  relied in bringing this suit.  ATSI Commc'ns v. Shaar Fund, 493 F.3d 87, 98 (2d Cir. 2007).

To survive a motion to dismiss, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, --- U.S. ---, 129 S.Ct. 1937, 1949 (2009) (quoting Bell Atlantic v. Twombly, 550 U.S. 544, 570 (2007)).

## II. Analysis

### A. Section 10(b)

To state a claim under Section 10(b) of the Securities Exchange Act of 1934 (codified at 15 U.S.C. 78j(b)) and Rule 10b-5, 17 C.F.R. § 240.10b-5, a plaintiff must allege: (1) a misstatement or omission of material fact; (2) made by the defendant with scienter; (3) in connection with the purchase or sale of securities; (4) upon which the plaintiff relied; and (5) that plaintiff's reliance was the proximate cause of its injury.

<u>Lattanzio v. Deloitte & Touche LLP</u>, 476 F.3d 147, 153 (2d. Cir 2007); <u>see also</u> <u>JP Morgan Chase</u>, 553 F.3d at 197.

A securities fraud claim must also meet the heightened pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Fed. R. Civ. P. 9(b).  The PSLRA requires that the complaint specify "each statement alleged to have been misleading," and, if the allegation is on information and belief, "state with particularity" the facts upon which the belief is formed.  15 U.S.C. § 78u-4(b)(1)(B).  In addition, the complaint must "state with particularity facts giving rise to a strong inference" of scienter for each alleged misrepresentation. 15 U.S.C. § 78u-4(b)(2).  This means that the allegations of the complaint must raise an inference of scienter for each actionable statement that is "at least as compelling as any opposing inference one could draw from the facts alleged."  <u>Tellabs Inc. v. Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 325 (2007); <u>see also</u> <u>ATSI Commc'ns</u>, 493 F.3d at 99 (<u>quoting</u> <u>Tellabs</u>).

As outlined above, Amida alleges that the § 10(b) defendants are liable for three classes of false or misleading statements: statements made by URI in SEC filings, the 13D filing of RAM Holdings, Inc., and statements made at the roadshow.

### 1. URI Statements

The first class of allegedly false or misleading statements that underlie Amida's § 10(b) claim are contained in fifteen SEC

filings and press releases that URI issued between July 22, 2007 and November 7, 2007.  Section 6.9 of the Merger Agreement required both Cerberus and URI to obtain the other's input or consent before issuing public statements about the merger.  The parties dispute whether § 6.9 required URI to obtain Cerberus's consent prior to filing or only required URI to use "commercially reasonable efforts" to give Cerberus time to comment.  Either interpretation compels the same analysis under § 10(b).[3]

Amida's theory of liability is somewhat ambivalent.  First, it contends that Cerberus's contractual right to "approve or participate in the preparation" of URI's filings imposed upon Cerberus a duty to ensure the accuracy of those filings, and therefore liability for "failing to correct URI's disclosures."  Amida's second theory is that purchasers of URI stock had read Section 6.9 of the Merger Agreement, and so understood URI's statements to come with an implicit guarantee by Cerberus that those statements were accurate.  Both of these theories of

---

[3] Section 6.9 of the Merger Agreement reads as follows: "Each of the Company [URI], Parent [RAM Holdings, Inc.] and Merger Sub [RAM Acquisition Corp.] agrees that no public release or announcement concerning the transactions contemplated hereby shall be issued by any party without the prior written consent of the Company and Parent (which consent shall not be unreasonably withheld or delayed), except as such release or announcement may be required by law or the rules or regulations of any applicable United States securities exchange or regulatory or governmental body to which the relevant party is subject, wherever situated, in which case the party required to make the release or announcement shall use its commercially reasonable efforts to provide the other party reasonable time to comment on such release or announcement in advance of such issuance, it being understood that the final form and content of any such release or announcement, to the extent so required, shall be at the final discretion of the disclosing party."

liability are foreclosed by decisions of the Supreme Court and
the Second Circuit.

The starting point for analysis is <u>Central Bank of Denver v.
First Interstate Bank of Denver</u>, 511 U.S. 164 (1994), in which
the Supreme Court held that § 10(b) does not permit a private
action for aiding and abetting, and thus imposes liability only
on a person or entity that employs a manipulative device or makes
a material misstatement or omission.  <u>Id.</u>, at 191.  Because
<u>Central Bank</u> unequivocally eliminated liability for aiding and
abetting in a private action under § 10(b), Amida attempts to
argue that Cerberus is liable as a "primary violator" for having
participated in the drafting of URI's statements.[4]  The
established rule in this Circuit is that a person is only a
primary violator in a misstatement case under § 10(b) "if a
misstatement is attributed to it at the time of [the statement's]
dissemination."  <u>Lattanzio</u>, 476 F.3d at 155 (<u>citing</u> <u>Wright v.
Ernst & Young LLP</u>, 152 F.3d 169, 175 (2d Cir. 1998)).  Imposing
liability for "participation" or "approval" of a statement made
by another party would contradict <u>Central Bank</u> by recreating
liability for aiding and abetting by another name.[5]  As the

---

[4] The "substantial participation" test Amida advances was adopted by the Ninth
Circuit in <u>In re Software Toolworks, Inc. Sec. Litig.</u>, 50 F.3d 615, 628 n.3
(9th Cir. 1994), which held an accountant liable for playing a "significant
role in drafting and editing" a letter sent to the SEC.  The Second Circuit
examined and expressly declined to adopt the holding of <u>Software Toolworks</u> in
<u>Wright v. Ernst & Young LLP</u>, 152 F.3d 169, 176 (2d Cir. 1998)).
[5] Indeed, one might "participate" in the drafting of a statement or consent to
its issuance without even "knowingly assisting" the fraud as is required in
SEC actions for aiding and abetting.  <u>See</u> Securities Exchange Act § 20(e), 15

Second Circuit commented in <u>Shapiro v. Cantor</u>, 123 F.3d 717, 720 (2d Cir. 1997), "if <u>Central Bank</u> is to have any real meaning, a defendant must actually make a false or misleading statement in order to be held liable under Section 10(b). Anything short of such conduct is merely aiding and abetting . . . no matter how substantial that aid may be. . . ."

Amida's second argument is that purchasers of URI securities understood Cerberus's contractual right to review URI's statements as Cerberus's adoption of those statements. This theory is identical to the one rejected by the Second Circuit in <u>Lattanzio</u>. There, the plaintiffs sought to hold Deloitte liable for false 10-Qs that Warnaco issued. Although the 10-Qs were not accompanied by an audit opinion, an SEC regulation required Deloitte to review Warnaco's quarterly statements. 17 C.F.R. § 210.10-01(d). The <u>Lattanzio</u> plaintiffs argued that because the law required Deloitte to review the statements, the market understood Warnaco's statements to contain an "implied assertion of accuracy" by Deloitte. <u>Lattanzio</u>, 476 F.3d at 155. The Court of Appeals rejected this argument, and held that liability could not be imposed on a defendant unless that defendant made an "articulated statement" adopting the issuer's statements; "public

---

U.S.C. § 78t(e) (authorizing SEC to prosecute those who "knowingly provide substantial assistance" to another's fraud; <u>SEC v. Collins & Aikman Corp.</u>, 524 F. Supp. 2d 477, 491 (S.D.N.Y. 2007) (SEC must show that a § 20(e) defendant knew about the primary violation and yet provided substantial assistance.)

understanding that an accountant is at work behind the scenes does not create an exception . . . unless the public's understanding [of attribution] is based on the accountant's articulated statement, the source for that understanding . . . does not matter." Id.  See also Thomas H. Lee Equity Fund V L.P. v. Mayer Brown Rowe & Maw LLP, 612 F. Supp. 2d 267, 279 (S.D.N.Y. 2009); In Re Refco, Inc. Sec. Litig., 609 F. Supp. 2d 304 (S.D.N.Y. 2009).  Bcause Cerberus never made any "articulated statement" adopting URI's statements or warranting their accuracy, under Lattanzio Amida cannot impute those statements to Cerberus.

Amida contends that the holdings of Wright and Lattanzio are undermined by the Supreme Court's 2008 decision in Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148, 128 S. Ct. 761 (2008), which Amida reads as permitting it to recover from Cerberus for URI's alleged misstatements as long as Amida relied on Cerberus's participation as an implicit guarantee by Cerberus of the accuracy of URI's statements.  Defendants argue that, insofar as Stoneridge is relevant to this case, its holding highlights that Amida cannot have relied on any statement by Cerberus when reading URI's releases.

The Stoneridge Court began from the premise that a defendant can only be held liable as a primary violator for a deceptive statement that it made and upon which the plaintiffs relied.

Because the Court viewed "participat[ion] in a scheme to violate 10(b)" as a form of aiding and abetting liability precluded by Central Bank, the Court proceeded to consider whether the defendant's deceptive acts satisfied each element for liability under § 10(b).  Stoneridge, 552 U.S. at ---, 128 S. Ct. at 771. The Court ultimately held that Scientific-Atlanta's acts were "too remote to satisfy the requirement of reliance" because they were only communicated to the plaintiffs, shareholders of Charter Communications, through Charter's independently-prepared financial statements.  Id., 552 U.S. at ---, 128 S. Ct. at 770.

The holding of Stoneridge begins from the same premise as Wright and Lattanzio, and the Second Circuit has continued to rely on those cases after Stoneridge.  Morrison v. National Australian Bank Limited, 547 F.3d 167, 176 (2d Cir. 2008) (relying on Wright for the proposition that a primary 10b-5 violation requires a false or misleading statement and later citing Stoneridge.)

Amida has not alleged that any of URI's statements were attributed to Cerberus, but only that the Merger Agreement either imposed upon Cerberus a duty to correct URI's statements or permits Amida to impute URI's statements to Cerberus.  These arguments were rejected in Central Bank, Wright, and Lattanzio. Amida cannot state a claim against Cerberus for the alleged defects in URI's public releases and filings.

### 2. Cerberus's Schedule 13D

Amida also bases its § 10(b) claim upon the 13D of RAM Holdings, Inc., filed on August 1, 2007 and amended on November 14, 2007.  Amida alleges that the 13D was materially false and misleading when it was issued, and that Cerberus's failure to amend the 13D in light of subsequent events rendered it materially misleading.

#### a. The August 1, 2007 Schedule 13D as filed

Under Item 4 of its 13D, RAM Holdings, Inc. stated that "pursuant to the Merger Agreement, among other things, (i) the Merger Sub will merge with and into the Company [URI]."  Amida alleges that this statement and the entire Schedule 13D were misleading because RAM Holdings, Inc. failed to disclose that (1) Cerberus had "misgivings regarding the merger and the offer price," (2) Cerberus "did not intend to pay $34.50 per share," and (3) Cerberus "[was] very reluctant to complete the Merger under the terms of the Merger Agreement."  (Am. Compl. ¶ 72.)

Failing to disclose material information is actionable only when the defendant is under a duty to disclose those facts. Castellano v. Young & Rubicam, 257 F.3d 171, 179 (2d Cir. 2001) (citing In re Time Warner Inc. Sec. Litig., 9. F.3d 259, 267 (2d Cir. 1993)); see also Basic, Inc. v. Levinson, 485 U.S. 224, 239 n. 17 (1988).  Here, the parties agree that Cerberus's duty to disclose was principally imposed by § 13(d) of the Securities

Exchange Act, which requires certain disclosures to be filed on a Schedule 13D by a person that acquires an interest in more than 5% of certain classes of securities. 15 U.S.C. § 78m(d); 17 C.F.R. § 240.13d-101. Item 4 of Schedule 13D requires the filer to disclose the purpose of acquisition of the issuer's securities and any plans regarding the issuer; Item 6 requires the disclosure of any contracts or agreements between the filer and the issuer.

The 13D contains neither a prediction about the likelihood of the merger ultimately being completed nor any representation about Cerberus's views on the merger. In addition, Amida has not attempted to specify what "misgivings" Cerberus is supposed to have had, which makes it difficult to understand how omitting those unidentified misgivings rendered the 13D false or misleading. Ultimately, Amida has not put forward an interpretation of any language in the 13D that is rendered materially misleading by the nondisclosure of Cerberus's alleged "misgivings" or "reluctance."

Amida also alleges that Cerberus did not intend to pay $34.50 per share for URI as of August 1, 2007, the date the 13D was filed. Because Schedule 13D requires the disclosure of plans relating to the issuer, I assume for the purposes of this motion that it would be materially misleading for RAM Holdings to state

a plan to merge with URI "pursuant to the Merger Agreement" if it had no such plan.

At the outset, Amida has not alleged any facts that give rise to a reasonable inference that on August 1, 2007, Cerberus did not intend to carry out the Merger Agreement.  Amida points to the course of negotiations between Cerberus and URI, and relies heavily on the fact that Cerberus was "negotiated up" from $33 per share to $34.50 a share, and made its final offer with the admonition that "a penny more kills the deal."  I have grave doubts about whether it is reasonable to infer even "reluctance" to complete a merger, let alone intent not to complete the merger as agreed, from the fact that two sophisticated businesses strenuously negotiated the price for a multi-billion-dollar transaction.  See Bell Atlantic Co. v. Twombly, 550 U.S. 544, 557 (2007) (dismissing a complaint because the factual allegations, taken as true, did not give rise to a plausible inference of a conspiracy); see also Ashcroft v. Iqbal, --- U.S. ---, 129 S.Ct. 1937, 1949-50 (2009).

In addition, the PSLRA requires that the inference that Cerberus knowingly or recklessly misrepresented its intent to merge must be "cogent and compelling, and thus strong in light of other explanations."  Tellabs, 551 U.S. at 324.  Such a cogent inference can be shown by facts establishing either "(1) motive and opportunity to commit fraud, or (2) strong circumstantial

evidence of conscious misbehavior or recklessness." JP Morgan Chase, 553 F.3d at 198 (citing Ganino v. Citizens Utility Company, 228 F.3d 154, 168-69 (2d Cir. 2000)); Novak v. Kasaks, 216 F.3d 300, 307 (2d Cir. 2000). Amida has not provided any motive (and disclaimed any attempt to plead motive at oral argument on April 28, 2008). Thus, it must plead scienter though "strong circumstantial evidence" of scienter, although that evidence must be "correspondingly greater" when there is no motive shown. JP Morgan Chase, at 199 (quoting Kalnit v. Eichler, 264 F.3d 131, 142 (2d Cir. 2001)).

A number of competing inferences can be drawn from the pre-August 1, 2007 facts. Amida urges that the course of negotiations demonstrates that Cerberus only reluctantly agreed to the merger and shortly decided to either have the price lowered or abandon the deal altogether. Another inference from the negotiations was that Cerberus sought to pay as little as possible for URI and ultimately offered $34.50 because it wished to buy URI at that price. The inference that Cerberus knowingly or recklessly misrepresented its plan to merge with URI as of August 1, 2007 is not as strong as the inference that on August 1, 2007, Cerberus did plan to merge RAM with URI for $34.50 a share. Amida has therefore failed to plead a § 10(b) violation in the 13D of RAM Holdings when it was filed.

### b. Alleged failure to update the 13D

Amida also alleges that Cerberus violated § 10(b) by failing to amend its Schedule 13D after the late August and early September communications between Cerberus and URI. The parties agree that liability under § 10(b) may be imposed for failure to amend a Schedule 13D as required by § 13(d) and the rules thereunder. <u>Azurite Corp. Ltd. v. Amster & Co.</u>, 52 F.3d 15, 18 (2d Cir. 1995); <u>see, e.g.</u>, 17 C.F.R. § 240.13d-101.  When § 10(b) liability depends on failure to amend a Schedule 13D, the relevant inquiry is not whether the alleged omission is material standing alone under the rule of <u>TSC Indus., Inc. v. Northway, Inc.</u>, 426 U.S. 438 (1976), but rather whether the statute and rules governing Schedule 13D would require filing of an amended Schedule 13D.  <u>Azurite</u>, 52 F.3d at 18.

In <u>Azurite</u>, the Second Circuit held that a 13D filer must disclose any "definite" or "fixed" plans regarding an issuer, but need not disclose "tentative" or "inchoate" plans, or make predictions about future behavior.  <u>Id.</u>  Therefore, exploration of a proxy fight was not enough to require amendment to the prior 13D that indicated no "control purpose."  <u>Id.</u>, at 19.  An amendment was required only when the filer formed a definite plan to undertake a proxy contest.  <u>Id.</u>

Amida relies on two cases that predate <u>Azurite</u>, <u>Kamerman v. Steinberg</u>, 123 F.R.D. 66 (S.D.N.Y. 1988), and <u>In Re Gulf</u>

Oil/Cities Service Tender Offer Litig., 725 F.Supp. 712 (S.D.N.Y. 1989).  In Kamerman, Steinberg filed a 13D announcing a tender offer for Disney on Friday, June 8, 1984.  Over the subsequent weekend, he abandoned the tender offer and reached an agreement with Disney by which Disney would repurchase his shares.  Id., 123 F.R.D. at 70.  Steinberg did not publicly announce the abandonment of the tender offer until after the market had closed on Monday, June 11, and did not amend his Schedule 13D until June 13.  Id.  Judge Motley concluded that abandoning the tender offer and accepting a share repurchase was such a "sharp break" from his prior position that it rendered his previous statements materially misleading, particularly because he did not disclose the change until after the repurchase was consummated.  Id., at 72.

Gulf Oil relied on Kamerman's "sharp break" standard and held that Gulf Oil's statements extolling its planned merger with Cities Service became materially misleading when Gulf Oil's board concluded that instead of pursuing the merger, it would instead explore options to terminate or subvert the merger.  Gulf Oil, 725 F. Supp. at 747-48.

Amida has not alleged any facts that suggest that Cerberus adopted a plan not to merge RAM and URI, nor has it provided any facts that suggest that Cerberus's position on the merger at any point before November 14, 2007 was such a "sharp break" from its

previous position that its 13D was rendered materially misleading under the logic of Kamerman and Gulf Oil.  The late August and early September communications were a single, rebuffed attempt to "have a discussion" about the terms of the merger.  Although Amida alleges that the merger was "dead," it has neither alleged that Cerberus and URI stopped working towards the merger nor pleaded any facts that would support such an allegation.  The brief attempt to start "a discussion" about the terms of the Merger Agreement does not by itself plausibly suggest that Cerberus abandoned its previous plan to merge RAM with URI and instead formed a plan not to merge with URI at any point prior to November 14, 2007.  Therefore, Amida has not alleged that Cerberus incurred a duty to amend its 13D as set out in Azurite.

The developments in this case are in marked contrast to the complete about-face presented in Kamerman and Gulf Oil.  Because Amida has failed to allege facts that show that Cerberus incurred a duty to amend its 13D, Amida does not state a § 10(b) claim based on Cerberus's alleged failure to amend.

### 3. The Roadshow

The third class of alleged misrepresentations upon which Amida's § 10(b) claim is based were made at a November 5, 2007 roadshow in New York City.  That roadshow was intended to solicit interest in a private placement of post-Merger notes of Cerberus-owned URI.  Only Qualified Institutional Buyers were invited to

attend, and each attendee was provided with a preliminary
Offering Circular.  Due to the limited scope of the private
placement, the preliminary Offering Circular warned that it was a
"confidential document that we are providing only to prospective
purchasers of the notes solely for the purpose of making a
decision whether to invest in the notes."

At the roadshow, Cerberus employee Carlton Donaway gave a
presentation that Amida alleges "gave further comfort that the
Merger would close as planned."[6]   The particular misstatements
that Donaway is alleged to have made are the following:

> 1) "The poor condition of the credit and financial markets
>    did not affect Cerberus's optimistic view of the
>    Merger"; (Am. Compl. ¶ 97.)
>
> 2) "With an industry growing at 11% compound annual growth
>    rate, or 'CAGR' Cerberus found its investment in URI to
>    be attractive, notwithstanding the current credit
>    environment;"  Id.
>
> 3) "Cerberus had already asserted significant control over
>    the management and operations of URI and Cerberus was
>    actively involved in the day-to-day management and
>    operations of URI;" Id.
>
> 4) "New management at URI, under the direction of new
>    owner, Cerberus, had already taken steps to enhance
>    cost savings at URI, transforming Cerberus-controlled
>    URI from a 'growth story' to a 'cost story,' and that
>    Cerberus-controlled URI was now focused on improving

---

[6] Paragraph 55 of the Amended Complaint alleges that Donaway "said the Merger
would close as planned."  However, this statement is not in quotation marks
and is not included in the "False and Misleading Statements" section of the
Amended Complaint.  Amida also does not point to this statement as an
actionable misstatement in its Memorandum in Opposition.  Because Amida does
not identify this as a direct quotation, I take it that Amida offers it as a
paraphrase of the specifically-identified statements in Paragraph 97 of the
Amended Complaint.

its core business, with the benefit of approximately
$200 million in immediate cost savings;" <u>Id.</u>

5) "New management at Cerberus-controlled URI had already
   sold URI's three corporate jets;" <u>Id.</u>

6) "New management at Cerberus-controlled URI would strive
   to outsource more functions;" <u>Id.</u>

7) "Cerberus had already completed an evaluation of the
   workforce of URI and new management at Cerberus-
   controlled URI planned on terminating 1,100 employees,
   resulting in a $55 million cost savings for URI.  This
   included terminating 700 employees by November 16,
   2007, and the remainder of them by March 2008."  <u>Id.</u>

It is clear how Donaway's statements could be materially
misleading if Cerberus had abandoned its plan to merge with URI
at the time of the roadshow.  It is less obvious how Donaway's
statements about Cerberus's plans for URI after the merger, or
statements about steps already taken to make URI more profitable
(sale of URI's corporate jets, e.g.) would be rendered false or
misleading by Donaway's failure to disclose "misgivings,"
"reluctance," or a desire to "rethink" the merger.

In essence, Amida's Amended Complaint equivocates between
the theory that Donaway's statements were false because Cerberus
had already abandoned the merger and the theory that those
statements would lead a URI shareholder to believe that the
merger was likely to occur, a materially misleading impression in
light of the "increased risk" of non-consummation.

24

Ultimately, neither theory can be successful because the facts of Amida's Amended Complaint do not give rise to a strong inference of scienter.  As explained above, the plaintiff must show "strong circumstantial evidence" of "conscious misbehavior or recklessness" when there are no allegations of motive.  <u>JP Morgan Chase</u>, 553 F.3d at 198.  Among the ways that a plaintiff may show such "strong circumstantial evidence" are showing that the defendant "engaged in deliberately illegal behavior" or "knew facts or had access to information suggesting that their public statements were not accurate."  <u>Id.</u>, at 199 (<u>citing</u> <u>Novak</u>, 216 F.3d at 311).

The parties disagree sharply about what may be inferred from the fact that the roadshow was intended to market notes that would only issue should the merger close, and what that may imply about the materiality of the alleged omissions.

The circumstances of the roadshow are important when considering whether the facts alleged in the complaint are strong circumstantial evidence of scienter.  Given the goal of his presentation, Donaway expressly addressed why post-Merger URI would be a good investment, not whether the Merger would occur.  Amida has not argued that the nondisclosure of facts regarding an "increased risk" would tend to mislead an audience solely concerned with the value of post-Merger URI debt.  I assume for purposes of this motion that the "increased risk" may have been

material to potential purchasers of URI common stock.  Thus,
Amida in sum argues that Donaway knew or should have known that
potential purchasers of URI shares were among his audience,
anticipated that his statements about Cerberus's plans for post-
Merger URI would lead them to believe that the merger was likely,
and therefore understood that he might deceive those URI
purchasers unless he disclosed the facts suggesting an increased
risk that the merger would not close.

   Section 10(b) does not create a cause of action for
negligence.  As the Supreme Court stated in Ernst & Ernst v.
Hochfelder, 425 U.S. 185 (1976), § 10(b) only prohibits conduct
undertaken with "intent to deceive, manipulate, or defraud."  Id.
at 189.  The Second Circuit has interpreted Ernst & Ernst to
permit a § 10(b) action based on reckless conduct that is "highly
unreasonable" and "an extreme departure from the standards of
ordinary care."  Novak, 216 F.3d at 308; see also JP Morgan
Chase, 553 F.3d at 203.  It is therefore not enough for Amida to
allege that Donaway's presentation might have misled a potential
URI purchaser about Cerberus's opinion of the Merger by
implication; Donaway must have either acted knowingly or been
"highly unreasonable" in disregarding that potential to mislead
to incur § 10(b) liability.  Amida has not alleged any facts from
which it can be inferred that Donaway knew or was reckless in not
knowing that potential purchasers of URI common stock attended

the roadshow, or, knowing that, it was an "extreme departure from the standard of ordinary care" not to disclose information which would have prevented a URI stock purchaser attending the Notes Roadshow from erroneously concluding that Cerberus believed that there was a low risk that the merger would not close.

Amida thus falls back on the position adopted in the initial Complaint, that Cerberus had already determined that it would not merge by the time of the roadshow but chose to conduct the roadshow anyway and to have Donaway misrepresent Cerberus's position.  This theory fails because Amida has not pleaded facts that make that culpable inference cogent.

Amida's inference that Cerberus had abandoned the merger by November 5 rests principally on the rebuffed attempt to renegotiate in late August and early September, and the fact that Cerberus indicated its intent not to close the deal as agreed on November 14, only nine days after the roadshow.  Amida also points to the testimony of Cerberus founder and CEO Stephen Feinberg in the Delaware Chancery trial.  There, he testified that Cerberus was not ready to close the deal "in November," and so "tol[d] both the company and the banks that were not prepared to go forward at $34.50."  Amida interprets this to mean that Cerberus had already decided not to go ahead at $34.50 as of the date of the roadshow, although there are no facts pleaded that

27

suggest Cerberus indicated that to URI and its banks any earlier
than November 12, 2007.

The factual allegations of the Amended Complaint give rise
to competing non-culpable inferences.  First, the fact that
Cerberus held a roadshow at all would be at least curious if
Cerberus had concluded that the transaction would not take place.
While Amida argues the roadshow was a "deceptive nonverbal act,"
it has abandoned any attempt to suggest a motive for Cerberus to
hold a roadshow knowing that it would never issue the notes that
were the subject of that roadshow.  While a § 10(b) plaintiff is
not required to plead a motive, Amida's inability to suggest any
logical reason for Cerberus to hold a roadshow for notes that
would never be issued weakens the inference that Amida urges.
Next, Amida relies on the late August and early September
communications to show that Cerberus had abandoned the merger by
November.  Amida has alleged no other facts that would suggest
that Cerberus and URI had not been working towards the merger in
the intervening months.  Finally, the inference from the temporal
proximity of the roadshow to the November 14 announcement is not
"strong circumstantial evidence" that Cerberus had knowingly
misrepresented the state of affairs on November 5.

In sum, the inference that Cerberus was working towards the
merger as of November 5 is stronger than the culpable inference
that it had abandoned the merger and knowingly or recklessly

misrepresented to the contrary at the roadshow.  Ultimately, Amida has not explained either why Cerberus would hold a false roadshow, or alleged facts that are "strong circumstantial evidence" that Cerberus had already decided not to merge with URI when it held the roadshow.  Therefore, Amida's § 10(b) claim based on the roadshow fails because the facts of Amida's complaint do not give rise to an inference of scienter that is "at least as compelling as any opposing inference one could draw from the facts alleged."   Tellabs, 551 U.S. at 308.

Thus Amida's § 10(b) allegations do not meet the pleading standard for each element of a § 10(b) claim with respect to any class of alleged misstatements.

### A. Section 20(a)

Because Amida's complaint does not state a claim under § 10(b), its § 20(a) claim must be dismissed for lack of a primary violation.  See JP Morgan Chase, 553 F.3d at 207 (citing SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1472 (2d Cir. 1996)).

### B. New York Common Law Claims

#### 1. Common Law Fraud and Fraudulent Inducement

Under New York law, to state a claim for fraud a plaintiff must demonstrate: (1) a misrepresentation or omission of material fact; (2) which the defendant knew to be false; (3) which the

defendant made with the intention of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5) which caused injury to the plaintiff. <u>Lama Holding Co. v. Smith Barney, Inc.</u>, 88 N.Y.2d 413, 421 (1996).  The elements of a claim for fraudulent inducement are similar: the defendant must have made a misrepresentation of a material fact, that was known to be false and intended to be relied on when made, and that the plaintiff justifiably relied on that misrepresentation to its injury. <u>Braddock v. Braddock</u>, 60 A.D.3d 84, 86 (1st Dept. 2009).  State law claims of fraud and fraudulent inducement must be based on facts giving rise to a "strong inference" of fraudulent intent. <u>See, e.g.</u>, <u>Lerner v. Fleet Bank</u>, 4598 F.3d 273, 290 (2d Cir. 2006) (to state a claim for fraud under New York law, a complaint must plead facts giving rise to a "strong inference of fraudulent intent.")

### 2. Promissory Estoppel

The elements of a claim for promissory estoppel under New York law are: (1) a clear and unambiguous promise; (2) upon which the plaintiff reasonably and foreseeably relied; (3) to the plaintiff's detriment.  <u>Cyberchron Corp. v. Calldata Sys. Dev.</u>, 47 F.3d 39, 44 (2d Cir. 1995) (citing <u>Ripple's of Clearview Inc. v. LeHavre Assoc.</u>, 88 A.D.2d 120, 122 452 N.Y.S. 2d 447 (2d Dept. 1982)).  Amida's complaint does not allege that Cerberus made any

promise to Amida that the URI deal would close, much less a "clear and unambiguous" one.

## CONCLUSION

For the foregoing reasons, defendants' motion to dismiss the Amended Complaint is granted. Leave to replead is not granted because further amendment would be futile.  Rutolo v. City of New York, 514 F.3d 184, 191 (2d Cir. 2008) (citing Foman v. Davis, 371 U.S. 178, 182 (1962)).  The Amended Complaint has not cured the defects of the initial complaint.  Amida has not demonstrated how it might "transform the facts pleaded into a sufficient allegation" of fraud under § 10(b) of the Securities Exchange Act or New York common law.  See Lewis ex rel. American Express Co. v. Robinson (In re American Express Co. Sec. Litig.), 39 F.3d 395, 402 (2d Cir. 1994).  The Clerk of the Court is instructed to close the case.

SO ORDERED.

Date:    New York, New York
         November 10, 2009


                              S/_____
                                 MIRIAM GOLDMAN CEDARBAUM
                                 United States District Judge